**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| GRIDDY ENERGY LLC,[1] ) | Case No. 21-30923 (MI) |
| ) | |
| Debtor. ) | |
| ) | |

**DECLARATION OF MICHAEL FALLQUIST IN SUPPORT OF THE**
**DEBTOR'S CHAPTER 11 PETITIONS AND FIRST DAY RELIEF**

I, Michael Fallquist, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information and belief:

1.      I am the Chief Executive Officer of Griddy Energy LLC (the "Debtor" or "Griddy") and I have served in my current role since December 4, 2020.  Prior to my appointment in my current role, I was the Chief Executive Officer of Crius Energy LLC until the business was acquired in July 2019.  I hold a Bachelor of Arts degree in economics from Colgate University and a Master of Business Administration degree from Cornell University.

2.      Commencing on the date hereof (the "Petition Date"), the Debtor filed in this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  I am knowledgeable about and familiar with the Debtor's business and financial affairs.  I submit this declaration (this "Declaration") in support of the Debtor's voluntary petition for relief and motions and applications filed concurrently herewith (the "First Day Declaration").   I am authorized to submit this Declaration on behalf of the Debtor.

---

[1]  The Debtor in this chapter 11 case, along with the last four digits of its federal tax identification number, is Griddy Energy LLC (1396). The mailing address for the Debtor is PO Box 1288, Greens Farms, CT 06838.

3.      Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, my opinion based upon experience, knowledge and information concerning the Debtor's operations and financial condition, or my discussions with the Debtor's advisors.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4.      This Declaration has been organized into four sections.  The first provides an overview of the Debtor and its business.  The second summarizes the Debtor's organizational and capital structure.  The third describes the events leading to the filing of this chapter 11 case and the objectives of this case.  The fourth section summarizes the relief requested in, and the legal and factual bases supporting, the "first day" motions and applications the Debtor has filed with this Court (the "First Day Motions").

### INTRODUCTION

5.      Griddy is a retail electric provider ("REP") in Texas, which provided its customers the ability to purchase wholesale electricity with no mark-up.  Griddy currently has no customers as a result of Electric Reliability Council of Texas's ("ERCOT") forced mass transition of Griddy's customers on February 26, 2021.

6.      Prior to February 2021, Griddy's customers paid an average rate of $0.098 per kilowatt hour ("kWh"),[2] representing aggregate savings of more than $17 million dollars since 2017 as compared with the Energy Information Agency ("EIA") Texas average.  Griddy's business model provided customers with transparency regarding real-time electricity prices, forecasted

---

[2]  The average rate includes wholesale electricity costs, TDSP charges, ancillary services, the Griddy membership fee and other fees and credits.  This rate excludes taxes.

electricity prices and their energy usage and billings, which allowed its customers to control how much they spent on electricity.

7.     At all times when Griddy served customers, the Public Utility Commission of Texas's ("PUCT") guidelines permitted Griddy's wholesale electricity pass-through product. Consistent with this, in January 2017, the PUCT granted Griddy's REP license.  As part of the REP license approval process, Griddy, through its former management team, had extensive discussions with PUCT staff about the wholesale electricity pass-through product and the disclosures required.  Furthermore, in the 12 months leading up to the mid-February 2021 weather event, Griddy received only five customer complaints (known as "Informal Complaints") from the PUCT – each of which was resolved in favor of Griddy with the PUCT finding "No Violation."

8.     During the winter storm in Texas in February 2021, Griddy and its customers suffered as a result of (a) inaccurate information from ERCOT about the preparedness of the electricity grid for the 2020-2021 winter season, (b) the decision by the PUCT to order electricity prices be set to $9,000 per megawatt hour ("MWh"), and (c) ERCOT's decision to hold electricity prices at $9,000 per MWh for 32 hours after firm load shed had stopped.  Prior to the PUCT order, the real-time electricity price had reached $9,000 per MWh *for a total of only 3 hours since 2015*. In contrast, after the PUCT order, the electricity price was set to $9,000 per MWh for 87.5 hours between February 15, 2021 and February 19, 2021.

9.     While Griddy's customers were subject to the extreme electricity prices resulting from the PUCT order, Griddy earned only $9.99 per month per customer, as it passes-through the wholesale cost of electricity with no mark-up.  In other words, Griddy earned *only* the same fixed fee of $9.99 per month per customer regardless of whether the wholesale cost of electricity was high or low.

10.     During these unforeseen market conditions, Griddy prioritized the interests of its customers and took actions to try and protect those customers.  On February 12, 2021, Griddy emailed customers information about switching electricity providers.  On February 13, 2021, Griddy urged its customers via email, text and robocalls to switch electricity providers.  As a result of Griddy's proactive outreach efforts, nearly 10,000 customers (representing more than one-third (1/3) of Griddy's customer base) switched to another provider before February 15, 2021.  In addition, on February 16, 2021, immediately following the PUCT order, Griddy contacted ERCOT to seek relief for its customers by switching them to another provider in a mass transition event. ERCOT did not accommodate Griddy's request.

11.     Prior to the February 2021 Texas winter storm event and the PUCT order to set electricity prices to the $9,000 per MWh market cap, *Griddy was solvent*.  In the span of one devastating week – through the failings of ERCOT which resulted in price intervention by the PUCT – Griddy was left in a position where it had no choice but to file this chapter 11 case and try to maximize value for the benefit of its creditors while balancing the desire to give its former customers relief from the uncertainty of being subject to collection actions as a result of the extreme wholesale electricity prices from the winter storm event.

## I.   The Debtor's Business

12.     Griddy was founded in 2016.  It is a REP in Texas and, prior to the end of February 2021, sold electricity to customers.  While Griddy was planning for operations in other states, to date, Griddy has only sold electricity in Texas.  Prior to the events that precipitated this chapter 11 case, Griddy had approximately 29,000 customers in Texas and 30 employees.  Griddy currently has an office in Houston, Texas, and its principal office is in Westport, Connecticut.

13.    On February 26, 2021, well after the winter storm event, ERCOT commenced the forced transitioning of Griddy's customers to a Provider of Last Resort ("POLR").  As a result, as of the date hereof, Griddy has no customers and Griddy has reduced its employee headcount to 16.

14.    The Texas energy market has several key players, which are listed below.

a.    **Energy Reliability Council of Texas**.  The Texas power grid is operated and managed by ERCOT.  ERCOT has certain market rules that have been developed in consultation with market participants.  In order to facilitate a REP's participation in the ERCOT market, each REP is required to be party to a Standard Form Market Participant Agreement with ERCOT pursuant to which the applicable REP and ERCOT agree to abide by certain standard protocols applicable to all REPs.

b.    **Public Utility Commission of Texas**.  The PUCT is a state agency that regulates utilities within the state of Texas, including those participating in the ERCOT market.  The PUCT's oversight responsibility includes, among other things, monitoring activity of ERCOT market players, including ERCOT itself, power generators, transmission and distribution providers, power marketers and REPs.  The PUCT implements and enforces rules under the Public Utility Regulatory Act (PURA) and ERCOT's protocols.

c.    **Power Generation Companies**.  Power generation companies own and operate facilities that generate electricity.  In Texas, such companies utilize coal, nuclear power, natural gas, and renewable power resources to generate electricity.  Through ERCOT, power generating companies sell electricity to REPs who in return work with TDSPs (as defined below) to ensure that electricity reaches customers.

d.    **Transmission and Distribution Service Providers ("TDSP")**.  REPs do not deliver electricity to consumers.  Instead, they contract with TDSPs that cover certain service areas that own and operate the physical power delivery infrastructure (i.e., the lines, wires, meters, etc.).  There are several TDSPs in Texas including: AEP Texas, CenterPoint Energy, Oncor Electric Delivery Company and Texas – New Mexico Power.

e.    **Retail Electric Providers**.  REPs sell electric energy to retail customers in the areas of Texas where the sale of electricity is open to retail competition.  A REP buys wholesale electricity, delivery service and related services, prices electricity for consumers and seeks consumers to buy electricity from them.  REPs are licensed by the PUCT.  Per PUCT regulations, the PUCT regulates the types of products that can be offered by REPs and the disclosures required for customers.

15.    The process of opening the Texas power market to retail choice began in 2002 with Texas Senate Bill 7.  Retail choice gives consumers freedom to shop for electricity providers that

offer a variety of different types of electricity plans, including fixed rate plans, variable rate plans and index rate plans, with the rules for each type of plan set by the PUCT.[3]

16.     Griddy's business model was simple.  For a fixed monthly fee of $9.99, each customer had access to wholesale electricity costs with no mark-up.

17.     Griddy used a prepayment model to charge customers for electricity.  At the time of enrollment, customers added a payment method such as a credit or debit card to their accounts and an initial electricity prepayment of $49 was processed to establish an account balance.  Billed electricity amounts were calculated daily, one day in arrears for each customer using their meter data published on Smart Meter Texas, and automatically deducted from their account balance.  Additional charges, such as ERCOT ancillary services, TDSP charges and transmission and distribution losses were calculated and allocated to the customer.  When a customer's account balance fell below a threshold of $25, and in accordance with PUCT regulations for prepay products, Griddy automatically charged the payment method on file for a specified "Recharge Amount," which was set by the customer (not to be less than $49).  If a customer chose to cease purchasing electricity from Griddy, Griddy refunded any positive prepayment balance that had not been applied to electricity charges.

18.     In Texas, the wholesale price of electricity changes every five minutes and is determined by ERCOT based on real-time supply and demand for electricity.  The wholesale price of electricity is subject to a $9,000 per MWh market cap, and it can be as low as $0 per MWh or even negative.  Prior to and after a customer signed up with Griddy, the range of wholesale electricity prices were disclosed by Griddy to the customer in multiple places.

---

[3]     §25.475 *General Retail Electric Provider Requirements and Information Disclosures to Residential and Small Commercial Customers*.

19. Price spikes have occurred throughout Griddy's operating history, including several days in August 2019 during which real-time electricity prices reached the $9,000 per MWh market cap for twelve 15-minute intervals over a three-day period (for a total of 3 hours). Griddy's customers experienced higher-than-normal bills during the month of August 2019; however, on average, customers who remained on the electricity product for the entire 2019 calendar 12-month period still achieved a lower cost of electricity as compared with the EIA Texas average.

20. Griddy's business model provided customers with information to mitigate the impact of electricity price spikes, including:

    a. allowing the customer to see the real-time price of wholesale electricity, and shift their electricity usage immediately in response to high prices;

    b. providing alerts when prices exceeded thresholds, such as a price spike;

    c. providing future price projections, based on ERCOT's day-ahead market prices, for the remainder of the current day and next day (once published), giving the customer the ability to plan their electricity usage and to adjust to times where the wholesale price may be lower;

    d. providing historical usage and cost patterns at a monthly, daily and hourly level, enabling customers to understand usage patterns and behavior; and

    e. historical billing, including the average cost of energy each day.

21. Griddy's business model had wider implications that could benefit the electricity grid. Other types of electricity rate plans, such as fixed price products, are designed to remove the customer as an active participant in the grid despite the fact that residential and small commercial electricity usage is generally the most weather-sensitive load on the grid. Customers on fixed-price products do not have the incentive to change their energy usage behavior when electricity supply is scarce, and therefore they do not. On the other hand, Griddy's customers demonstrated that they were price responsive and collectively worked to balance the electricity grid. As highlighted below, in response to a price event on August 15, 2020, Griddy's customers

collectively reduced their load by approximately 20% during a peak demand event that occurred as a result of system load rising in response to extreme heat.



22.     Griddy believes that, as illustrated by what happened in August 2020, if there had been a functioning market with more load-responsive customers like Griddy's, those customers could have made a meaningful impact on grid conditions throughout the winter storm event in February 2021.

## II.     Corporate and Capital Structure

23.     The Debtor is a Delaware limited liability company.  It is wholly-owned by Griddy Holdings, LLC.  In a transaction closed on December 4, 2020, the ownership of the Debtor was

sold to a new ownership group and a new management team, including myself as CEO, was appointed.

### A. Macquarie Secured Debt

24.     On December 4, 2020, the Debtor entered into that certain Borrowing Base Facility Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "Macquarie Borrowing Base Agreement") with Macquarie Investments US Inc. ("Macquarie US") and certain non-debtor affiliates of the Debtor, Griddy Holdings LLC ("Holdings"), Griddy Technologies LLC ("Griddy Tech") and Griddy Pro LLC ("Griddy Pro"), as guarantors, pursuant to which Macquarie US extended credit to the Debtor, subject to a borrowing base in an amount up to a maximum of $15,000,000.00.

25.     The Borrowing Base Facility provided the Debtor with the ability to issue letters of credit to market participants, regulators and independent systems operators as required in the course of its business, and the Debtor is required to reimburse Macquarie US to the extent such letters of credit are drawn.  The Debtor has one letter of credit posted to EDF Trading North America LLC as part of transition arrangements following the termination of the prior credit facility on December 4, 2020.

26.     In connection with the Macquarie Borrowing Base Agreement, the Debtor entered into that certain ISDA 2002 Master Agreement (together with each schedule, annex, appendix and exhibit thereto, and confirmation thereunder, as each may be amended, restated, supplemented or otherwise modified from time to time, the "Macquarie ISDA Agreement") by and between the Debtor and Macquarie Energy LLC ("Macquarie Energy" and, together with Macquarie US, "Macquarie"), pursuant to which the Debtor purchased electricity from Macquarie Energy on standard market terms.

27.     The Debtor's obligations under the Macquarie Borrowing Base Agreement and the Macquarie ISDA Agreement are secured by substantially all of the assets of the Debtor and the assets of Holdings, including on a limited recourse basis its equity interests in the Debtor, and certain of its affiliate guarantors, as more fully described in related loan and security documents. Macquarie Energy is the collateral agent for Macquarie.

28.     As of the Petition Date, the aggregate amount outstanding under the Macquarie Agreements is $1,448,937.58, exclusive of accrued and unpaid interest, fees, letter of credit reimbursement obligations and other related amounts, which include the obligation to provide to Macquarie cash or credit support in the form of letters of credit acceptable to Macquarie in its sole discretion in an amount not less than $307,500 as collateralization for 102.5% of the full undrawn amount of the EDF letter of credit, and certain fees and expenses of Macquarie, including reasonable and documented legal fees and expenses.

**B.  Other Matters**

29.     The Debtor is subject to two enforcement investigations by PUCT arising from alleged violations of PUCT regulations in 2019.  The Debtor and PUCT have been in discussions regarding resolving such investigations.

30.     In addition, since the winter storm event in mid-February, the Debtor has been named as a defendant in (a) three civil actions filed by former Griddy customers alleging violations of the Texas Deceptive Trade Practices Act and other torts; and (b) a civil action filed by the Attorney General of Texas, also alleging violations of the Texas Deceptive Trade Practices Act. Each of these lawsuits is meritless.

31.     The Debtor also is subject to a Civil Investigative Demand initiated by the Attorney General of Texas precipitated by the mid-February winter storm event.  The Debtor was one of

twelve electric industry market participants to receive a Civil Investigative Demand on February 19, 2021.

### III.   Key Events Leading to Chapter 11

32.   ERCOT's mission can be distilled into two key functions: (a) to "maintain the reliability of the electric grid of Texas" and (b) to "help Market Participants fulfill customers' electric service needs by maintaining a balance between load and generation."[4]  All participants agree to the rules established by ERCOT to perform these functions, and in turn, rely on ERCOT to perform its duty.  One of ERCOT's duties is to provide timely and relevant resource adequacy information to market participants.  Among its publications detailing the state and readiness of the power grid, ERCOT publishes a final Seasonal Assessment of Resource Adequacy ("SARA") seasonally.  The SARA for the winter 2020-2021 season was published by ERCOT on November 5, 2020.  In summary, ERCOT anticipated sufficient generation (82,513 MW) to meet the peak winter demand forecast (57,699 MW).  A section of the report detailed their view on potential risks to this assessment. Under the 'Extreme Peak Load / Extreme Generation Outages During Extreme Peak Load' section, they envisioned a peak demand of 67,208 MW and 13,953 MW of generation outages, which would have left 1,352 MW of excess capacity.

33.   Winter Storm Uri brought extreme cold weather to Texas and set the stage for the system and market failure that ensued.  Grid system electric load climbed to winter records and was forecast to not only exceed ERCOT's "Extreme Peak Load" forecast laid out in the SARA, but also the absolute system peak set back in the summer of 2019.[5]  A host of missteps and poor

---

[4]    See http://www.ercot.com/services/programs.

[5]    Rolling black outs were implemented before this record level could be achieved.

planning that led to generation outages forced ERCOT to shed electric load, in the form of rolling blackouts, in order to match the available generation on the grid.

34.     On February 15, 2021, in response to the electric load shedding required to balance a grid experiencing unprecedented outages, the PUCT adopted an order instructing ERCOT to set the real-time settlement point price at the high offer cap of $9,000 per MWh.  This order went into effect immediately and stayed in effect until February 19, 2021, representing a total duration of 87.5 consecutive hours.

35.     The PUCT order should have been lifted on February 18, 2021 when ERCOT rescinded load shed instructions.  Potomac Economics, the Independent Market Monitor, has now reported in a letter to the PUCT that ERCOT's failure to remove the price cap in accordance with the intent of the PUCT price order was "inappropriate pricing intervention" that resulted in $16 billion in additional costs[6].

36.     Against a backdrop of a failing electric grid which resulted in unprecedented price intervention, Griddy worked diligently to manage the significant challenges presented.  Prior to the onset of the storm, the weather reports had identified February 15, 2021 and February 16, 2021 as potential days of concern.  Based on information available at the time, Griddy developed a communications strategy to provide advance notice to customers by email:  an initial notice would be sent on February 12, 2021 warning of the upcoming event (3 days in advance) and a subsequent reminder would be sent on February 14, 2021 (1 day in advance).  Both notices would provide information to customers about the expected high electricity prices so the customers could plan in advance to shift their electricity usage to minimize the cost of their electricity bill as Griddy's customers had historically done in other high price events.

---

[6]     http://interchange.puc.texas.gov/Documents/51812_61_1114183.PDF

37. The weather on February 11, 2021 was much colder than forecasted, causing higher than expected real-time electricity prices. ERCOT's day-ahead temperature forecast for Houston[7] called for temperatures mostly in the high 50s when actual temperatures were in the low 40s. The colder-than-forecasted weather caused electricity demand to be approximately 20% higher than ERCOT's day-ahead electricity load forecast. The increased electricity demand caused real-time electricity prices for February 11, 2021 to settle well above day-ahead electricity prices ($635/MWh real-time vs $56/MWh day-ahead, peak average, Houston load zone). As a result of the market volatility, Griddy intensified its communication strategy with customers. Griddy began preparing daily communications which provided a recap of the prior day and forward-looking commentary to prepare its customers to best manage their energy use on the upcoming days.

38. The winter storm intensified on February 12, 2021, causing a second straight day of higher-than-expected real-time electricity prices. ERCOT's day-ahead forecast again missed low on system electricity demand and too warm on temperatures. Real-time electricity prices settled well above the day-ahead electricity prices again ($493/MWh real-time vs $166/MWh day-ahead, peak average, Houston load zone).

39. In addition to the realized price activity, by February 12, 2021, it became clear that the final winter SARA had severely underestimated the potential for both extreme load and generation outages. As a result of the second straight day of high real-time prices and increases to forward electricity prices, Griddy emailed its customers on Friday afternoon, February 12, 2021, to inform them that high prices could persist for an extended period of time and provided information about switching to a different retail energy provider. Specifically, Griddy wrote that "[i]f the forecast and prices are too extreme for you right now, we understand if you want to switch

---

[7]    The temperatures forecasts were for the Coast weather zone, which closely overlaps with the Houston load zone.

providers.  While we value you as a member, we want what is best for your wallet and family even more."  That day, 843 customers switched to a new provider.

40.     On February 13, 2021, as ERCOT real-time prices remained elevated, Griddy decided to take immediate action to urge customers immediately switch to another REP.  Griddy contacted its customers by email, text message and telephone in an attempt to protect its customers from the high wholesale electricity prices.   As an example, Griddy texted every customer the following:

> URGENT message from Griddy, your electricity provider. Prices are looking to stay at record rates over the next couple of days due to the polar vortex. Your well-being is more important than our bottom-line. Unless you are a Griddy energy-saving expert, we recommend you immediately switch to another provider due to these price surges. You do not have to contact us. Contact another provider to switch you over ASAP. Here are some recommended plans to switch you over to today. https://www.griddy.com/post/how-to-switch. We will be here for you once this crazy storm blows over. Stay warm, stay safe!

That day, 2,915 customers switched to a new provider (last day of service February 12, 2021) and an additional 5,964 switched prior to February 15, 2021 (last day of service February 14, 2021). In total, 9,722 of Griddy's customers were switched prior to the catastrophic market failure on February 15, 2021.

41.     On February 15, 2021, the situation in Texas significantly deteriorated, resulting in ERCOT and the PUCT taking emergency measures.  In an attempt to preserve the reliability of the grid, ERCOT issued an Energy Emergency Alert 3 ("EEA3") resulting in rolling blackouts that left millions of Texans without power.  In the early evening, the PUCT issued an order instructing ERCOT to set electricity prices to the market cap of $9,000 per MWh.  At the federal level, President Biden issued a disaster declaration for the entire state of Texas.

42.     On February 16, 2021, ERCOT remained under EEA3 and the PUCT order setting electricity prices to the $9,000 per MWh market cap remained in effect.

43.     Griddy discussed options to protect its customers from the extreme high electricity prices.  Griddy believed the best option was to initiate a mass transition of its customers to POLR, which would have stopped any further pass-through electricity charges from Griddy and imposed a post-pay billing structure that would have enabled customers to benefit from any relief provided by the Texas legislature prior to making any more payments.

44.     Griddy informed ERCOT that it would be unable to meet collateral demands and sought to initiate an expedited mass transition of its customers to POLR.  ERCOT did not accommodate Griddy's request and referred Griddy to the PUCT.  ERCOT ultimately defaulted Griddy nine days later, on February 26, 2021, for "failure to provide collateral when due pursuant to the ERCOT protocols" – the same reason Griddy previously provided to ERCOT when it sought assistance to protect its customers.

45.     Griddy's secured lender, Macquarie, began to take steps to preserve its remedies, culminating in a letter sent to Griddy dated February 17, 2021, notifying it of numerous alleged defaults under the Macquarie Agreements.  As a result of the alleged defaults, transactions and borrowing under the Macquarie Agreements were suspended.

46.     On February 17, 2021, ERCOT remained under EEA3 and the PUCT order setting electricity prices to the $9,000 per MWh market cap remained in effect.

47.     On ERCOT's recommendation, Griddy contacted the PUCT seeking to initiate an expedited mass transition of its customers to POLR.  Griddy was informed that it was unlikely Griddy would be able to have a call that day to discuss its urgent request given the challenges that PUCT staff were having with power and internet following the winter storm.  At this point, Griddy did not believe an expedited mass transition of its customers to POLR was an available option.

48. Notwithstanding Griddy having previously advised ERCOT of its declining financial position, ERCOT sent a notice to Griddy that it was required to increase the size of collateral in favor of ERCOT by $2,904,754.76 within two (2) business days.

49. On February 18, 2021, ERCOT remained under EEA3 and the PUCT order setting electricity prices to the $9,000 per MWh market cap remained in effect despite ERCOT rescinding all firm load shed instructions at 11:55 p.m. on February 17, 2021.

50. ERCOT sent another notice stating that Griddy was required to again increase the size of collateral in favor of ERCOT by $11,235,701.68 within two (2) bank business days.

51. Macquarie sent a Shifting Control Notice to Griddy and its bank, through which it took control of all of Griddy's bank accounts pursuant to the Blocked Account Control Agreement the parties had entered into to secure the obligations under the Macquarie Agreements.

52. On February 19, 2021, ERCOT lifted the EEA3 at 9:00 a.m., reinstating market-based pricing for wholesale electricity. As a result, wholesale electricity prices quickly fell to $20 per MWh and went negative soon thereafter.

53. ERCOT sent Griddy another notice on this day requiring that Griddy increase its collateral in favor of ERCOT by $25,278,346.13 within two (2) bank business days.

54. On February 21, 2021, the PUCT issued a press release related to emergency actions to protect Texas electricity customers which "strongly urged" REPs to delay billing and collections for residential and small commercial customers including invoices with estimated meter reads.[8]

55. On February 22, 2021, ERCOT issued a market notice stating that it was "temporarily deviating from Protocol deadlines and timing related to settlements, collateral

---

[8]    See https://www.puc.texas.gov/agency/resources/pubs/news/2021/PUCTX-REL-COLD21-022121-EOM.pdf.

obligations, and Invoice payments while prices are under review.  Invoices or settlements will not be executed until issues are finalized by State leaders considering solutions to the financial challenges caused by the winter event, which is anticipated to occur this week."[9]  However, without further explanation, ERCOT quickly backtracked from this position in another market notice sent on February 23, 2021 which stated that "ERCOT has ended its temporary deviation from protocol deadlines and timing related to settlements, collateral obligations, and invoice payments.  Invoices and settlement will be executed in accordance with Protocol language."[10]

56.     On February 23, 2021, Griddy paid $11,138,011.87 in cash to Macquarie to satisfy amounts outstanding under the Macquarie Agreements related to the purchase of physical electricity from Macquarie, thereby greatly reducing the amounts owed under the facilities but also reducing Griddy's cash on hand.

57.     On February 26, 2021, ERCOT commenced a mass transition of Griddy's customers to POLR.  On this same day, the PUCT approved Griddy's amended REP certificate, previously filed when new management took control on December 4, 2020.  However, on March 2, 2021, the PUCT filed a petition to revoke Griddy's REP certificate.

58.     As of March 14, 2021, Griddy has outstanding accounts receivables balances from its customers totaling $29.1 million.

59.     Prior to the mid-February winter storm event, Griddy was solvent.  As discussed above, the failures of ERCOT and resulting actions taken by the PUCT during the winter storm event resulted in Griddy's loss of all of its customers and forced Griddy to file this case.  The winter storm event also left Griddy in an untenable position – engage in aggressive collection

---

[9]     See http://www.ercot.com/services/comm/mkt_notices/archives/5235.

[10]    See http://www.ercot.com/services/comm/mkt_notices/archives/5238.

actions against customers for exceedingly high prices for wholesale electricity and ancillary services (which is not its preference) and fight baseless lawsuits – or file for bankruptcy and distribute its remaining cash in an orderly manner.

60.     In the weeks since the winter storm event, Griddy has created a chapter 11 plan whereby (i) Macquarie would compromise a portion of the remaining amount of money owed to it by Griddy for the benefit of Griddy's other creditors, (ii) Griddy would give former customers with unpaid bills releases in exchange for such customers' releases of Griddy and certain other parties, (iii) other general unsecured creditors would share pro rata in remaining available cash, and (iv) upon emergence, a plan administrator would take over ownership of Griddy and, in his or her discretion, pursue causes of action, whether against ERCOT for potential preference claims, fraudulent transfers or other claims related to the winter storm event, or otherwise.  Griddy has filed its proposed chapter 11 plan, disclosure statement and related motions concurrently herewith. Griddy intends to seek confirmation of its proposed chapter 11 plan on as expedited basis as possible.

61.     The objective of the Debtor in this chapter 11 case is to maximize value to its estate for creditors, facilitate the efficient resolution of claims, including pending and future litigation resulting from the events that occurred during the mid-February winter storm event, and enable the Debtor to wind down efficiently for the benefit of its creditors.

62.     In furtherance of this goal, the Debtor will seek to work efficiently and in a time sensitive manner in prosecuting this chapter 11 case by seeking early in the case to:  establish a bar date; review, evaluate, object to and where necessary settle claims; and seek approval of disclosure statement and a chapter 11 plan of liquidation.  The Debtor submits that an orderly

winddown of its operations will maximize value for all of its creditors and fulfill the fundamental dual purposes of chapter 11, to maximize value and treat creditors appropriately.

## IV.    First Day Motions

63.     The First Day Motions seek relief to allow the Debtor to meet necessary obligations and fulfill its duties as a debtor in possession.  I am familiar with the contents of each First Day Motion and believe that the relief sought in each First Day Declaration is narrowly tailored to continue the Debtor's operations to the extent necessary to permit it to orderly and efficiently wind down in chapter 11, maximize value and the relief sought in the best interest of the Debtor's estate and creditors' interest.  The facts set forth in each First Day Motion are incorporated herein by reference.  Capitalized terms used but not otherwise defined in this section of this Declaration shall have the meanings given to them in the relevant First Day Motions.  Below is an overview of each of the First Day Motions.

### A.    Operations-Related Motions

**i.    Debtor's Emergency Motion for Interim and Final Orders (I) Authorizing the Debtor to (A) Continue Operating Its Cash Management System, (B) Honor Certain Prepetition Obligations, (C) Maintain Existing Bank Accounts and Business Forms, and (D) Continue Certain Intercompany Transactions ("Cash Management Motion").**

64.     Under the Cash Management Motion, the Debtor requests the entry of interim and final orders (a) authorizing, but not directing, the Debtor to continue using its existing cash management practices, bank accounts and business forms; (b) authorizing the continuance of intercompany transactions; and (c) granting related relief.

65.     The Debtor's cash management system (the "Cash Management System") constitutes a customary and essential business practice.  I believe that it would be inefficient and time consuming to establish new cash management practices.  I believe that allowing the existing

cash management practices to remain in place will facilitate a smoother transition into chapter 11 and facilitate a more efficient wind down.

66.     I believe that if the Debtor was required to comply with the guidelines of the U.S. Trustee, the burden of opening new bank accounts, revising its cash management practices and changing its collection accounts would be unduly disruptive in the context of this case, and impose unnecessary burdensome expenses on the estate.

67.     In the ordinary course of its business, the Debtor effectuates certain limited intercompany transactions.   While the Debtor does not expect to effectuate intercompany transactions during the case, it has included such request out of an abundance of caution in the event an intercompany transaction become necessary.

68.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor, its estate and its creditors, and will make the Debtor's transition into chapter 11 smoother, less costly and more orderly.   Accordingly, on behalf of the Debtor, I respectfully submit that the Cash Management Motion should be approved.

**ii.     Debtor's Emergency Motion for an Order (I) Authorizing, But Not Directing, the Debtor to (A) Pay Prepetition Employee Obligations, (B) Continue Certain Employee Benefit Programs; and (II) Authorizing, But Not Directing, Applicable Banks and Financial Institutions to Honor Prepetition Checks for Payment of the Prepetition Employee Obligations ("Wage Motion").**

69.     By the Wage Motion, the Debtor seeks authority to (a) pay and/or otherwise honor or perform, as applicable, prepetition obligations to the Debtor's employees, including accrued and unpaid prepetition wages and salaries and certain other compensation described in such motion; (b)(i) honor and continue in the ordinary course until further notice various benefit plans, programs, practices, policies and procedures, and (ii) make prepetition contributions and pay any prepetition amounts associated with such benefit programs, including paying fees and costs in

20

connection therewith; and (c) pay over to the appropriate party all prepetition withholdings, deductions and payroll-related taxes from the employees.

70.     The Debtor's Employees, all of whom depend on their paychecks and Debtor-sponsored benefits and programs to support their families, are essential to the Debtor's chapter 11 case.  Any disruption from Employee resignations or lack of morale could hinder the Debtor's ability to efficiently wind down and increase administrative costs forcing the Debtor to need to retain independent contractors that are not familiar with the Debtor's operations.  Accordingly, I believe that failing to honor the Debtor's Prepetition Employee Obligations would have adverse consequences for the Debtor's ability to efficiently wind down its operations in chapter 11 and is necessary to maximize the value of the Debtor's estate for all creditors.

71.     I further understand that a portion of the Prepetition Employee Obligations constitutes funds held in trust for payment to third parties.  As a result, I understand that paying such amounts to the applicable payees will not prejudice the Debtor's estate because such amounts do not constitute property of the Debtor's estate.  However, I understand that payment of such amounts will avoid potential fines, lawsuits and potential personal liability for the Debtor's members and officers, all of which will be costly for the Debtor and distract them from the orderly liquidation and winddown of the Debtor.

72.     I believe that the relief requested in the Wage Motion is in the best interests of the Debtor, its estate and its creditors, and is necessary to facilitate a successful outcome to the Debtor's chapter 11 case.  Accordingly, on behalf of the Debtor, I respectfully submit that the Wage Motion should be approved.

iii. **Debtor's Emergency Motion for an Order Authorizing (I) the Debtor to Pay Certain Prepetition Taxes and Related Obligations and (II) Authorizing Financial Institutions to Receive, Process, Honor and Pay All Checks Presented for Payment and to Honor All Funds Transfer Requests Related to Such Obligations ("Tax Motion").**

73.     By the Tax Motion, the Debtor seeks authority to pay its pre-petition and post-petition tax obligations to the applicable taxing authorities.

74.     The Debtor, in the ordinary course, incurs various tax liabilities (the "Taxes") owing to Taxing Authorities, including sales and use taxes, gross receipts taxes and franchise taxes. Paying the Debtor's Taxes, when due in the ordinary course, will benefit the estate by avoiding the risk of audits, liens, or actions to lift the automatic stay, which would unnecessarily divert the Debtor's attention from its orderly winddown and waste estate resources in addressing any of the foregoing. I understand that certain types of taxes, commonly called trust fund taxes, are collected on a taxing authority's behalf and, under some laws, could expose persons within the Debtor to claims if the Debtor fails to remit such tax. If asserted, such claims would distract these individuals from the Debtor's chapter 11 case. Finally, I believe failure to pay the Taxes when due may expose the Debtor to the risk of penalties, interest or both, which could negatively impact the value of the Debtor's assets available for distribution to its creditors.

75.     I believe the relief requested in the Tax Motion is in the best interests of the Debtor and its creditors and, accordingly, submit on behalf of the Debtor that it should be approved.

**B.** <u>**Administrative Motion**</u>

   **i.**   **Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Debtor to Redact Certain Personally Identifiable Information for Individual Creditors; (II) Approving the Form and Manner of Notifying Creditors of the Commencement of this Chapter 11 Case and Other Information; (III) Authorizing Electronic Notice of Former Customers; and (IV) Granting Related Relief (the "<u>Customer Notice Motion</u>").**

76.      By the Customer Notice Motion, the Debtor seeks (a) authority to redact certain personally identifiable information for individual creditors; (b) approve the form and manner of notice of commencement of this chapter 11 case and the scheduling of the meeting of creditors under section 341 of the Bankruptcy Code; (c) authorizing the Debtor to provide notice to its customers by electronic means; and (d) granting related relief.

77.      I understand that if the Debtor were to provide notice to all of its approximately 57,000 former customers, costs for each service could exceed $57,000 and that the procedures outlined in the Customer Notice Motion will save the estate's resources by providing electronic notice to the Debtor's former customers, which was the Debtor's prime means of communicating with its former customers while it was operating.

78.      Accordingly, on behalf of the Debtor, I respectfully submit that the Customer Notice Motion should be approved.

> **ii.** **Debtor's Emergency Motion for Entry of an Order: (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9); (II) Establishing Amended Schedules Bar Date; (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests; (IV) Approving Notice of Bar Dates; and (V) Granting Related Relief (the "<u>Bar Date Motion</u>").**

79.     By the Bar Date Motion, the Debtor, among other things, seeks to establish 5:00 p.m. (prevailing Central Time) on the date that is 34 calendar days after the date on which the Debtor files its Schedules of Assets and Liabilities.  I understand that in order for the Debtor to swiftly confirm a plan and emerge from chapter 11, it is necessary that the Debtor be able to ascertain the universe of claims asserted against it and begin the reconciliation process.  I understand that this will help shorten the duration of the chapter 11 case and help maximize recovery for the Debtor's creditors.

80.     Accordingly, on behalf of the Debtor, I respectfully submit that the Bar Date Motion should be approved.

**C.**   **<u>Retention-Related Motions</u>**

> **i.** **Debtor's Emergency Application for Entry of an Order (A) Authorizing the Retention and Appointment of Stretto as Claims, Noticing and Solicitation Agent and (B) Granting Related Relief (the "<u>Stretto Retention Application</u>").**

81.     The Debtor seeks to retain Stretto as notice, claims, solicitation and administrative agent.  I believe that by retaining Stretto in the chapter 11 case, the Debtor's estate, and particularly its creditors, will benefit from Stretto's service.  Stretto has developed efficient and cost-effective methods in its area of expertise.  I understand that Stretto is fully equipped to handle the volume of mailing involved and properly sending the required notices to creditors and other interested parties in the chapter 11 case, and therefore, respectfully submit that the Stretto Retention Application should be approved.

**ii.    Other Retention Motions**

82.     The Debtor will file an application seeking to retain Baker Botts L.L.P., as its bankruptcy counsel.  The Debtor will also be filing a motion to retain professionals in the ordinary course of business whose services are not directly related to the chapter 11 case, but whose services are required during this chapter 11 case.

## CONCLUSION

In furtherance of its restructuring effort, the Debtor respectfully requests that orders granting the relief requested in the First Day Motions be entered.


Dated: March 15, 2021

Griddy Energy LLC, as debtor and debtor in possession


    /s/  *Michael Fallquist*
By:     Michael Fallquist
        Chief Executive Officer
