1                 IN THE UNITED STATES BANKRUPTCY COURT

2                 FOR THE SOUTHERN DISTRICT OF TEXAS

3                          HOUSTON DIVISION

4    IN RE:                      §      CASE NO. 21-30923-11
                                 §      HOUSTON, TEXAS
5    GRIDDY ENERGY, LLC,         §      TUESDAY,
                                 §      MARCH 16, 2021
6          DEBTOR.               §      11:00 A.M. TO 12:38 P.M.

7

8                    FIRST DAY HEARINGS (VIA ZOOM)

9              BEFORE THE HONORABLE MARVIN ISGUR
               UNITED STATES BANKRUPTCY JUDGE

10

11

12      APPEARANCES:                      SEE NEXT PAGE

13

14

15      (Recorded via CourtSpeak; No log notes)

16

17

18

19

20              TRANSCRIPTION SERVICE BY:

21         JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                935 Eldridge Road, #144
22              Sugar Land, TX 77478
                   281-277-5325
23              www.judicialtranscribers.com

24

25    Proceedings recorded by electronic sound recording;
         transcript produced by transcription service.


                   JUDICIAL TRANSCRIBERS OF TEXAS, LLC

```
 1                    APPEARANCES (VIA ZOOM):

 2

 3  FOR THE DEBTOR:              BAKER BOTTS, LLP
                                 Robin Spigel, Esq.
 4                               Jacob Herz, Esq.
                                 Chris Newcomb, Esq.
 5                               30 Rockefeller Plaza
                                 New York, NY  10112
 6                               212-408-2545

 7                               BAKER BOTTS, LLP
                                 David Eastlake, Esq.
 8                               910 Louisiana Street
                                 Houston, TX  77002
 9                               713-229-1397

10

11  FOR ERCOT:                   MUNSCH HARDT KOPF & HARR, PC
                                 Kevin Lippman, Esq.
12                               500 N. Akard St., Suite 3800
                                 Dallas, TX  75201
13                               214-855-7500

14

15  FOR PUTATIVE CLASS:          POTTS LAW FIRM
                                 Derek Potts, Esq.
16                               3737 Buffalo Speedway, #1900
                                 Houston, TX  77098
17                               888-902-6245

18

19  FOR THE STATE OF TEXAS:      TX ATTORNEY GENERAL'S OFFICE
                                 Rachel Obaldo, Esq.
20                               300 West 15th St., 8th Fl.
                                 PO Box 12648
21                               Austin, TX  78711
                                 512-463-2173

22

23

24  (Please also see Electronic Appearances.)

25
```

1                              INDEX

2

3   WITNESS:          Direct    Cross    Redirect    Recross

4   ROOP BHULLAR
      By Mr. Eastlake    29         .          .          .

5

6

7   EXHIBITS:                           Offered    Received

8   DEBTORS:
    Ex. 21                                 9          9
9   Ex. 26                                 8          8
    Ex. 27-1                               9          9
10  Ex. 27-3                               8          8

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    JUDICIAL TRANSCRIBERS OF TEXAS, LLC

1          HOUSTON, TEXAS; TUESDAY, MARCH 16, 2021; 11:00 A.M.

2          THE COURT:  All right, good morning.  We are here

3   on first day hearings in the Griddy Energy case.  It's

4   21-30923.  We have done electronic appearances.

5          If I could get counsel for the Debtor to go ahead

6   and press five star one time on your line, we will begin

7   with an opening statement by Debtor's counsel.

8       (No audible response.)

9          THE COURT:  Again, if counsel will press five star

10  one time on your line.

11         All right, who do we have from 212-408-2500?

12         MS. SPIGEL:  Good morning, Your Honor, Robin

13  Spigel with Baker Botts.  Your Honor, I'm here as counsel to

14  the Debtors.  I'm having a little trouble getting on

15  GoToMeet.com right this second so I apologize for the delay.

16         THE COURT:  No, take your time.  We'll get you

17  there.

18         And we also have someone --

19         MS. SPIGEL:  Okay.

20         THE COURT:  -- from 713-229-5617.

21         MR. EASTLAKE:  Yes, Your Honor, good morning,

22  David Eastlake of Baker Botts, proposed counsel for the

23  Debtor.  I was raising my hand in the event Ms. Spigel was

24  having a technical issue.  But it sounds like we have her

25  now.  She will (indiscernible) --

1          THE COURT:  Mr. Eastlake, we'll wait for

2   Ms. Spigel.  I can barely hear you.  The phone connection is

3   really bad.

4          MR. EASTLAKE:  Okay, Your Honor, we'll work on

5   that.  Thank you.

6      (Pause in the proceeding.)

7          MS. SPIGEL:  Apologies, Your Honor.  My apologies,

8   Your Honor, we're almost there.

9          THE COURT:  Ms. Spigel, take your time.  The only

10  thing COVID has really taught me is to be patient with

11  technology, so.

12         MS. SPIGEL:  Okay.  I apologize.  Very stressful.

13         Okay.  I'm ready.  And the -- you see the blue

14  box?

15         MR. EASTLAKE:  Blue box.

16         THE COURT:  Ms. Spigel, I'm not seeing you yet.

17         MS. SPIGEL:  Okay.

18         THE COURT:  If you intended to have your camera

19  on, I don't see it.

20         MS. SPIGEL:  Okay.  One second.  I think -- no --

21      (Ms. Spigel/Mr. Eastlake confer.)

22         MS. SPIGEL:  I'm sorry.  One second, Your Honor.

23  I apologize.

24         Okay.  I think I am here.

25         THE COURT:  Ms. Spigel, now I can see you.  Thank

1  you.

2              MS. SPIGEL:  Okay.

3              THE COURT:  All right.  How did you want to

4  proceed today, Ms. Spigel?

5              MS. SPIGEL:  Thank you, Judge Isgur.  Is the

6  camera okay?  I realize it's very far away.  Is that okay

7  for Your Honor?

8              Can we move that a little closer?

9              THE COURT:  I mean, I can barely see you so it's

10 probably a good idea if they'll move the camera about six

11 feet closer.  Let's keep going closer.

12             MS. SPIGEL:  Can you go --

13             THE COURT:  Why don't we just get right up where

14 we can see her?

15             Ms. Spigel, good morning.  Why don't you go ahead

16 and proceed?

17             MS. SPIGEL:  Apologies, Your Honor.  Thank you

18 very much.  Again, for the Record, Robin Spigel, Baker

19 Botts, counsel for Griddy Energy.  On the line also with me

20 are certain of my colleagues.

21             I'm not familiar with your procedure.  Should I go

22 through each person from the firm who's on the line or

23 should the fact that they registered their appearance, is

24 that sufficient?

25             THE COURT:  The electronic appearances are what

1  we're going to rely on so that we can move right into the

2  hearing.

3          MS. SPIGEL:  Okay.  Thank you, Your Honor.  And

4  thank you for taking the time today to see us first -- on

5  this first day hearing of the case.  We appreciate Your

6  Honor's time.  I know there was a lot of paper filed

7  yesterday over a long period of time so we definitely

8  appreciate your time.

9          Just as an initial matter, I wanted to let you

10  know that two declarants from the company are on the line.

11  With me here is Mr. Michael Fallquist, who is the Chief

12  Executive Officer of the company.  Also on the line is

13  Mr. Roop Bhullar, who is the Chief Financial Officer of the

14  company.

15          I'd like to just get some administrative matters

16  out of the way.

17          THE COURT:  All right.

18          MS. SPIGEL:  Okay.  A copy of the first day

19  pleadings was sent to the U.S. Trustee's Office at the end

20  of last week.  And we've spoken to the U.S. Trustee's Office

21  and received some comments from the U.S. Trustee's Office

22  and incorporated those comments into what was filed.  There

23  were a few outstanding items by the time we filed our

24  motions and orders, and so when we go through the motions,

25  we'll point out, you know, where the resolutions are with

1   the U.S. Trustee.  I believe that we're resolved on all

2   matters one way or another.

3           Also, notice of this morning's hearing was sent by

4   expedited means to the top -- well, it's the top 30

5   creditors, but we only really have 19 creditors listed on

6   that top 30, so that went to all of them, including the

7   Electric Reliability Council of Texas, or ERCOT, the

8   Debtor's secured creditors, the Office of the Attorney

9   General of the State of Texas, the Public Utilities

10  Commission of Texas, the United States Attorney's Office for

11  the Southern District of Texas, the Texas Comptrollers of

12  Public Accounts, the IRS, and then anyone who filed a notice

13  of appearance by the time that we served it.  I'd ask that

14  the certificate of service filed by Stretto at Docket No. 26

15  and is attached to exhibit list as Docket No. 27-3, that

16  that be admitted into evidence.

17          THE COURT:  Is there any objection to the

18  admission of 26 and 27-3?  If anyone has an objection,

19  please press five star.

20      (No audible response)

21           THE COURT:  All right, those are admitted.

22      (Debtor's Exhibits Nos. 26 and 27-3 were received in

23  evidence)

24          MS. SPIGEL:  Thank you, Your Honor.

25          It also -- unless Your Honor has an objection or

1  if anyone else has an objection, I'd like to offer into

2  evidence the first day Declaration of Mr. Fallquist, the

3  CEO, which was filed with this Court on March 15th at Docket

4  No. 21, and attached to exhibit list as Docket No. 27-1,

5  since many of the first day motions rely on his Declaration.

6  He is here with me and available for cross-examination.

7          THE COURT:  So I've had the chance to read both of

8  the two Declarations.  Let me see if anyone objects to their

9  admission first, and then we're going to see if anyone has

10 any examination for the two witnesses.

11         So, first, if anyone has any objection to the

12 admission -- let me see, I've got Mr. Lippman here.

13 Mr. Lippman, go ahead, please.

14         MR. LIPPMAN:  Yes, Your Honor.  This is Kevin

15 Lippman here on behalf of ERCOT.

16         I was just noticing that my electronic appearance

17 apparently didn't get recorded.  But the only comment I have

18 on the first day Declaration is that we don't oppose any of

19 the relief being sought today, but we request the Court to

20 limit the Declaration to today's hearing because there are

21 comments in the Declaration which ERCOT does not agree with

22 but believe at a subsequent hearing is probably the

23 appropriate time to address them.

24         THE COURT:  All right.  Does anyone else have any

25 objection to the two Declarations?

1        (No audible response)

2        THE COURT:  All right, I'm admitting the two

3 Declarations for all purposes but for today only.  They are

4 not admitted for any subsequent hearing unless they are

5 offered at that time and admitted at that time.  So I'm, in

6 effect, sustaining Mr. Lippman's mini objection, but

7 admitting them for the purpose of today.

8        (Debtor's Exhibits Nos. 21 and 27-1 received in

9 evidence)

10        THE COURT:  I didn't think you were going to agree

11 with very many of the ERCOT-related statements, Mr. Lippman,

12 so I'm not very surprised at the objection.

13        Does anyone have any cross-examination for either

14 of the two declarants that they wish to undertake at this

15 point?  Again, if so, please press five star.

16        Once you press five star and I enable your line,

17 by the way, you are enabled for the rest of the hearing, so.

18        (No audible response)

19        THE COURT:  Okay.  The two are admitted and there

20 is no cross-examination.

21                Ms. Segal (sic) -- I'm sorry, it's

22 Spigel, I've been mispronouncing it.  I apologize to you,

23 Ms. Spigel.

24        MS. SPIGEL:  That's okay, thanks, thank you, Your

25 Honor.  And thank you for admitting those Declarations

1    evidence for today's -- the purpose of today's hearing.

2             Your Honor, we are here because of Winter Storm

3    Uri and the extreme electricity pricing that occurred in

4    Texas during this storm.  Given the unique circumstances

5    here where my client was solvent before the storm, and

6    because of what happened during the storm, including that

7    extreme pricing, we thought that it would be good to hear

8    from the CEO of the company just from a very brief, high

9    level so you can understand what the product was that Griddy

10   was offering and how it worked, right?  We believe that it's

11   important background to understand how we got to this place

12   where we are seeking to liquidate Griddy.

13             THE COURT:  All right, we can do that.

14             MS. SPIGEL:  Thank you, Your Honor.

15             MR. FALLQUIST:  Thank you, Robin.  Good morning,

16   Your Honor.  Thank you for your time today.  My name is

17   Michael Fallquist, and I am the Chief Executive Officer of

18   Griddy.

19             THE COURT:  You're -- hold on, wait a second.  So,

20   okay, so we've admitted your Declaration and now we're going

21   to have Mr. Fallquist testify as well?  Is that -- I thought

22   you were going to put somebody else on.  So this --

23             MS. SPIGEL:  Oh, well, --

24             THE COURT:  -- is going to be -- that's fine.  I

25   just wanted --

1        MS. SPIGEL:  Yeah, and --

2        THE COURT:  -- to know what we're doing.

3        MS. SPIGEL:  Right.  And, Your Honor, this is, I

4   guess, technically less testimony, his Declaration is

5   admitted into evidence, but more of we thought that it would

6   be good for you to hear just from him as to what the product

7   was because I think, like I said, it's just important to

8   understand the background.  I will get into a presentation,

9   but we just wanted to get -- let you hear from him

10  personally just the story of what the company does.

11        THE COURT:  So this is in the form of a non-

12  evidentiary opening statement?  I just want to know what our

13  Record is --

14        MS. SPIGEL:  Yeah.

15        THE COURT:  -- going to look like.

16        MS. SPIGEL:  Yes, Your Honor.

17        THE COURT:  Does anyone object to having a -- it

18  will not be admitted for any purpose.  It's done for the

19  purpose of background.  Anyone object?

20     (No audible response)

21        THE COURT:  All right.  I've never done this

22  before but we'll take our shot.

23        Go ahead, please.

24        MS. SPIGEL:  Thank you, Your Honor.

25        THE COURT:  Thank you.

1          MR. FALLQUIST:  Yeah, thank you, Your Honor.

2 Again, my name is Michael Fallquist.

3          I'm the Chief Executive Officer of Griddy Energy.

4 I've served in this role since December, 2020, a period of

5 just over three months.  Griddy Energy is a licensed retail

6 electric provider in Texas.  Prior to Winter Storm Uri,

7 Griddy had approximately 29,000 customers and 30 employees.

8 Griddy was solvent.

9          Griddy's business model was simple.  Our customers

10 paid a fixed monthly membership fee of $9.99.  We charged

11 the same monthly membership fee regardless of whether the

12 price of electricity was high or low.  Our customer value

13 proposition was two-fold.  First, we provided electricity at

14 wholesale prices.  We passed through the cost of electricity

15 to our customers with no markup -- exactly what we paid, the

16 customer paid.

17          Second, we provided our customers with information

18 and alerts about electricity prices and their electricity

19 usage.  Specifically, we provided our customers with real

20 time wholesale electricity prices that changed every five

21 minutes.  Alerts and notifications when prices were above or

22 below threshold, such as a price spike alert or low price

23 notification, future electricity price projections based on

24 ERCOT's day-ahead market prices for the remainder of the

25 current day and the next day, historical electricity usage

1  and cost patterns at a monthly, daily, and hourly level, and

2  historical billing, including the average cost of

3  electricity each day.

4          The information we provided our customers put them

5  in control of how much they paid for electricity with Griddy

6  as they could shift their electricity usage throughout each

7  day in response to high or low electricity prices.  The

8  Griddy business model worked.

9          Prior to February, 2021, Griddy customers saved

10  more than $17 million in aggregate since the business was

11  launched in 2017.  That's compared with the EIA Texas

12  average electricity rate.  The business model worked in a

13  market where the grid was reliable and market forces of

14  supply and demand determined the price of electricity.

15          Unfortunately, during Winter Storm Uri in February

16  2021, the electric grid was not reliable and market forces

17  did not determine the price of electricity, as the price of

18  electricity was set by regulators in response to challenges

19  on the electric grid.  The wholesale price of electricity in

20  Texas is subject to a $9,000 per megawatt hour market cap.

21  Since the market cap was set to $9,000 in 2015, the price of

22  electricity has reached the market cap based on market

23  forces of supply and demand for 12 15-minute intervals for a

24  total of three nonconsecutive hours in six years.  By

25  contrast, in February 2021 regulators set the price of

1   electricity to the market cap of $9,000 per megawatt hour

2   for 87-1/2 consecutive hours.  Because Griddy passes through

3   the wholesale price of electricity to our customers with no

4   markup, our customers paid this price for electricity.  This

5   resulted in electricity charges to our customers that were

6   approximately 300 times more than normal from February 15th

7   to February 19th.

8            Unlike past periods of temporary high prices where

9   Griddy customers used the information we provided them to

10  shift their electricity usage throughout the day to minimize

11  costs, this was not the case is February 2021 because there

12  was no place to go.  For 87-1/2 consecutive hours, our

13  customers paid the market cap price for electricity and can

14  do nothing about it.  We now find ourselves in the situation

15  where we were a solvent and thriving business just one month

16  ago, but today Griddy and its customers are just collateral

17  damage of the actions taken by others surrounding Winter

18  Storm Uri.

19            Thank you, Your Honor.

20            THE COURT:  Thank you.

21            Does anyone else wish to make any sort of an

22  opening statement?

23            MS. SPIGEL:  Thank you, Your Honor.  It's Robin

24  Spigel again.

25            I appreciate Your Honor allowing us to allow the

1   CEO to just make a preliminary statement.  I would like to

2   also -- I'm sorry.  I would also like to proceed, unless

3   Your Honor would like to do it in a different way, because I

4   know the pleadings filed provide full details, but I also

5   propose to provide a high-level summary regarding the events

6   that led the company to filing and the anticipated

7   trajectory of these cases.

8            THE COURT:  Thank you, Ms. Spigel.

9            Go ahead, please.

10            MS. SPIGEL:  Thank you.

11            So as Mr. Fallquist said, the company is a retail

12   electric provider.  So it buys power on the wholesale market

13   and sells it to its customers at that price it purchases,

14   right?  It's passed through, and it has a 9.99 per month,

15   per member membership fee.  So during the storm, for Griddy

16   how it worked is that their -- and this is a very simplified

17   explanation, just to be clear.  But there's power

18   generation, right?  ERCOT purchased from the power

19   generators the electricity; Griddy bought it, the

20   electricity from ERCOT on behalf of its customers; and the

21   electricity actually goes from the power generators through

22   the transmission and distribution utility lines as delivered

23   to the customers.

24            With respect to Griddy generally, if I can just

25   take a step back, the -- in a transaction that closed on

1   December 4th, 2020, the ownership of Griddy was sold to a

2   new ownership group and a new management team was appointed,

3   which included Mr. Fallquist and Mr. Bhullar, each of whom

4   are also indirect minority owners of the company.  And the

5   Debtor is a wholly-owned subsidiary of Griddy Holdings, LLC.

6   There is also other non-debtor affiliates that are part of

7   the corporate family.

8          Griddy had two secured facilities:  One was a

9   credit agreement with Macquarie and a related ISDA

10  agreement.  The borrowing base under its credit facility was

11  in the maximum amount of $15 million, and it allowed Griddy

12  to issue LC's to market participants, regulators, and

13  independent system operators, as was required in the

14  ordinary course of its business.

15         The Debtor is required to reimburse Macquarie to

16  the extent such letters of credit are drawn.  And currently

17  there's one LC in the amount of $300,000 that remains

18  outstanding.  The Debtor also had an ISDA master agreement

19  with Macquarie Energy, pursuant to which it could purchase

20  electricity on standard market terms.  The obligations under

21  both of those facilities are secured by substantially all of

22  the assets of the company, as well as certain assets of its

23  parent and affiliates.

24         As of the petition date, the aggregate amount that

25  was owed to the secured lenders was $1.448 million and

1    change, and that's exclusive of accrued and unpaid interest,

2    fees and expenses, and letter of credit reimbursement

3    obligations.  As of the petition date, the company had

4    approximately 32-1/2 million of unsecured obligations,

5    that's exclusive of any financial litigation claim, with

6    ERCOT being the number one creditor owed a total of in

7    excess of 29 million.

8          Your Honor, as we've said before, right, we're

9    here because of Winter Storm Uri and the electricity pricing

10   that occurred in Texas during the storm.  While Griddy was

11   solvent just month -- just one month ago, the business was

12   obliterated by the extreme pricing that was put in place.

13   And just for reference, with respect to the 9,000 per

14   megawatt real time settlement price cap that was held for

15   87-1/2 hours that Mr. Fallquist referred to and is in his

16   Declaration, that translates to $9 a kilowatt hour that's

17   charged to customers.

18          And I think while electricity prices during the

19   storm would have naturally been higher than what -- in

20   normal, non-extreme weather conditions, the average in

21   normal time that a Griddy customer pays was approximately

22   .098 cents per kilowatt.

23          THE COURT:  Point oh, nine, eight cents, meaning

24   nine cents or meaning nine one-hundredths of a cent?

25          MS. SPIGEL:  Meaning nine one-hundredths of a

1   cent, so a penny.  And that's the average over, you know, a

2   several year period of time, but that is the average price.

3           MR. FALLQUIST:  Correction, ten cents is what the

4   all-in rate was.

5           MS. SPIGEL:  Oh, my apologies.  Okay, ten cents.

6   Apologies, Your Honor.

7           The company took steps to try and mitigate the

8   effects of the high pricing and urged its customers to

9   switch to other providers.  That was at the beginning of the

10  storm.  You may have read about it in the newspapers.

11  Griddy sent emails, texts, and robocalls urging customers to

12  switch --

13          THE COURT:  I read about it in the Declarations I

14  think.

15          MS. SPIGEL:  Okay, thank you.

16          Despite its efforts, right, not being good for the

17  bottom line, Griddy was concerned with its customers.  And

18  it remains so.  I mean, in total, through its aggressive

19  outreach about 10,000 of its customers were able to

20  successfully transition to other providers.  But for those

21  that were remaining who didn't or couldn't move to another

22  provider, Griddy tried to get ERCOT to mass transition its

23  customers to another provider of last resort to avoid the

24  further extreme pricing exposure.

25          In fact, Griddy sought emergency relief on the

1   evening of February 16th to mass transition the customers

2   from ERCOT because Griddy knew that it wouldn't be able to

3   meet the collateral demands that were being made by ERCOT.

4   Had ERCOT been able to or had they mass transitioned those

5   customers, we believe that would have protected ERCOT and

6   that would have protected the customers.  But unfortunately

7   those customers were not mass transitioned, right?

8          And so during the storm, customers obviously need

9   electricity.  Griddy purchases the electricity during this

10  storm from ERCOT, and that's the transmission and utility

11  distribution service providers deliver it to the customers,

12  right?  It leaves Griddy in an untenable position because

13  it's buying electricity because customers need the

14  electricity during the storm, and it's buying it on their

15  behalf, but the collection from customers were the only way

16  to pay ERCOT.  And the prices were so high that the

17  collections were insufficient.

18         And so ERCOT's putting -- pushing Griddy to pay,

19  you know, outsized amounts, and ERCOT was pushing Griddy to

20  put up more collateral.  And Griddy did what it could and

21  paid the ERCOT bill that it could.  In fact, it paid

22  millions of dollars to ERCOT during this period.  The

23  amounts it got from its customers it paid to ERCOT.

24         On February 21st, after the storm, the PUCT issued

25  a press release that strongly urged reps to delay billing

1  and collections for residential and small customers, small

2  commercial customers.  So Griddy ceased active collection

3  efforts at that point.  But there was continued demand for

4  payments and continued demand for collateral, and there

5  weren't any or very little incoming funds at that point.

6  And so without being able to meet the demands, ERCOT then

7  forced the mass transition of Griddy's customers, so not

8  during the storm but after.  And that mass transition

9  started on February 26.

10       And so here we are after the storm and two weeks

11  after the mass transition, there's 19 creditors listed on

12  the top creditor list.  ERCOT is listed as being owed

13  approximately 29 million.  The transmission distribution

14  service providers are owed in total around 2.7 million.

15  Griddy's credit card processor is owed over a million

16  dollars from what I believe are customer-disputed charges.

17  In other words, the winter storm was an unprecedent event in

18  Texas, and the high pricing that was held in place destroyed

19  businesses and materially affected people's lives.

20       Yesterday, Your Honor, we filed a suite of first

21  day motions with a proposed Plan of liquidation, a proposed

22  Disclosure Statement, and a motion to approve the Disclosure

23  Statement.  That motion is not on for today, Your Honor.

24  But Griddy comes to the Court to try and implement an

25  orderly and judicious liquidation.  And what do I mean by

1  that?  The proposed Plan provides for at a very high level

2  for the secured lender to give up to other creditors for the

3  benefit of the estate approximately 40 percent of the

4  principal amounts of what it's owed.  It provides for

5  general unsecured creditors to share in available cash.  And

6  the net proceeds from any recoveries on claims against

7  others related to the storm, if there are any, a plan

8  administrator would be appointed to decide whether there are

9  any causes of actions to pursue.

10        And, importantly, and I think the key feature of

11  this plan, is that it provides for a unique provision.  It

12  provides for a customer class.  So the customer class is in

13  exchange for mutual releases between the Debtor and certain

14  other parties on the one hand, the customers -- and it's

15  those customers that -- who will vote in favor of the Plan

16  or abstain from voting -- will be released from all unpaid

17  electricity bills.  Right?

18        There are approximately 24,000 people in the State

19  of Texas that owe Griddy a total of more than $29 million.

20  And if the plan is confirmed and the Court approves those

21  releases, a material number of Texans will be able to have

22  the certainty that collection agencies won't be knocking at

23  their door, that there won't be lawsuits related to unpaid

24  electricity bills, and that their credit scores won't be

25  affected because they couldn't pay their electricity bills.

1       We think the Plan and the customer class is very

2  unique and important.  And Griddy's customers have always

3  been its priority.  The Plan is being proposed to try and

4  solve what we believe is a serious issue and is lingering in

5  the public.

6       Griddy has extremely limited resources at this

7  point.  So in order to effectuate this Plan, Griddy is

8  seeking to put the case on an expedited timeline, but at the

9  same time providing parties in interest due process.  So as

10 I said, we filed the Plan and Disclosure Statement and the

11 motion to approve yesterday.  Later during this hearing we

12 are seeking to set a bar date expeditiously.  We expect to

13 file the Schedules and SOFAs imminently, and that the bar

14 date will be keyed off of that filing.  And we'll be asking

15 the Court to conditionally approve the Disclosure Statement

16 in the next three to four weeks with a confirmation hearing

17 four to five weeks thereafter.

18      All told, we hope Griddy's confirmation to occur

19 in 80 to 85 days.  We believe we don't have the resources to

20 go much beyond that.  But we want to implement this Plan, we

21 think it's important, ad we think getting the first day

22 relief approved today is the first step on this journey.

23      A few other things I just want to mention before I

24 turn the podium to my colleagues.  First, Griddy has put in

25 an independent director in place as a seasoned, former

1   bankruptcy professional.  This person was a consultant to

2   the company in the last few weeks and is up-to-speed both on

3   the company and the proposed Plan.

4          Second, since the storm, Griddy has been talking

5   to the State of Texas Attorney General's Office.  The State

6   of Texas AG's office started a civil investigative demand

7   against Griddy and others after the storm.  The AG's office

8   also commenced a lawsuit against Griddy since the storm.

9   Over the last few days, we have been discussing with the

10  AG's office Griddy's proposed Plan, and the parties have

11  agreed to try and work cooperatively together in good faith.

12         Yesterday, before the filing, the parties entered

13  into a short agreement whereby the civil investigative

14  demands and the lawsuit has been abated while the parties

15  try to work together in good faith.  And while the Attorney

16  General's Office hasn't taken an official position yet with

17  respect to the Plan, Griddy believes that the plan aligns

18  with what the AG's office was ultimately trying to achieve

19  with this lawsuit, to give the people of Texas negatively

20  affected by the storm and the extreme pricing, some relief.

21         I believe Ms. Obaldo from the AG's office is on

22  the line.  I'm not sure whether she wants to add or clarify

23  anything I've said or if Your Honor has any questions with

24  this?

25         THE COURT:  I'm going to let you finish your

1  statement and then we're going to see if anybody else wants

2  to make a statement.

3          MS. SPIGEL:  Thank you, Your Honor.  I'm almost

4  done.

5          THE COURT:  No, I'm not --

6          MS. SPIGEL:  Just lastly, Your Honor, --

7          THE COURT:  -- I wasn't -- I'm not trying to rush

8  you, just telling you what the game plan is.

9          MS. SPIGEL:  Okay.  Thank you, I appreciate that.

10          And just lastly, Your Honor, yesterday Griddy

11  removed a lawsuit from State Court to the Bankruptcy Court.

12  The lawsuit includes Griddy Energy and its parent, Griddy

13  Holdings.  No formal relief has yet been sought, but we have

14  removed it because we believe that the claims against Griddy

15  Holdings are necessarily intertwined with Griddy Energy.  I

16  don't think at this point I need to get into the merits of

17  that lawsuit, but I just wanted to alert you because it

18  shows up on the docket.  That is something that we're going

19  to need to be dealing with in the next couple of weeks.

20          THE COURT:  Ms. Spigel, thank you.

21          Let me see if I've got anyone else that wishes to

22  make an opening statement.  I do have Ms. Ryan I think wants

23  to speak.  Ms. Ryan, good morning.

24          MS. RYAN:  (No audible response).

25          THE COURT:  Ms. Ryan, you may have your own lined

1  muted because I'm not hearing you.  I've got your line

2  unmuted here.

3         MS. RYAN:  (No audible response).

4         THE COURT:  Ms. Ryan, I'm still not able to hear

5  you.  We'll come back to you.

6         I have somebody from 713-963-8881.  Who do we have

7  from that number?

8         MR. POTTS:  Your Honor, this is attorney Derek

9  Potts.

10        THE COURT:  Mr. Potts, I'm going to let you go

11 ahead and then we'll come back and we'll hear from Ms. Ryan.

12        Go ahead, Mr. Potts.

13        MR. POTTS:  Thank you.

14        THE COURT:  You're class action counsel.

15        MR. POTTS:  I'm class action counsel, that's

16 right, Your Honor.  We -- this case was removed two hours

17 before a hearing that was supposed to occur yesterday in

18 Harris County District Court.  It was an emergency TRO

19 hearing that was going to take up a couple issues, one of

20 them to present -- to prevent this allocation of resources.

21        Our claim is not just about pending bills.  Our

22 claim is about disgorgement of monies that were collected.

23 And as you heard from the CEO earlier, between February 15th

24 and February 19th, tens of millions of dollars we believe

25 were collected by Griddy from the consumers of -- from their

1  customers, the consumers of Texas.  This money was collected

2  involuntarily.  It was done through automatic debits and

3  credits these peoples' accounts.

4         And so I just wanted to make the Court aware of

5  that.  If there's discussions of a customer class, we

6  certainly need to be involved in that.  We've not been

7  contacted or told anything about it.  And we believe the

8  class is going to be much more significant than forgiving

9  current bills.  It's going to be about reimbursement and

10 disgorgement of money that was wrongfully collected during

11 those four days.

12        THE COURT:  Mr. Potts, thank you.

13        Does anyone else wish to address the Court in the

14 form of any sort of an opening statement?

15        MS. OBALDO:  Your Honor, this is Rachel Obaldo.  I

16 believe that my phone number may be tied to Ms. Abigail

17 Ryan's.  I'm with the --

18        THE COURT:  Oops.

19        MS. OBALDO:  -- Office of the Attorney General.

20 That's okay, --

21        THE COURT:  Okay, yes, I --

22        MS. OBALDO:  -- I apologize.

23        THE COURT:  No, that's fine.  It came across as

24 her, but I will add your name to that list.

25        Thank you, Ms. Obaldo.  Go ahead.

1          MS. OBALDO:  Just to touch on what Ms. Spigel

2    referenced, I would like to reiterate that our office has

3    been in discussions and we continue our negotiations and

4    working in good faith.  The hope is to fully resolve both

5    the lawsuit and the CID that's pending.  So we are working

6    and we hope to get those resolved soon.

7          Thank you.

8          THE COURT:  Thank you, Ms. Obaldo.

9          Does anyone else wish to make an opening

10   statement?

11       (No audible response)

12          THE COURT:  All right.  I need the evidentiary

13   record expanded with respect to the cash collateral motion

14   because there are parts of it I don't understand.  And I

15   want to give parties an opportunity to introduce evidence so

16   that I can have a better understanding of what I'm being

17   asked to rule upon.

18          When I look at the Griddy three-week cash budget,

19   this is exhibit -- or, excuse me, it is ECF 18-3, there is a

20   restricted cash in the revenue account.  I don't understand

21   why that is restricted or if it is, in fact, restricted in

22   favor of Macquarie.  I also don't understand why if there's

23   this much cash, and if Macquarie has a lien on all the cash,

24   they need any adequate protection at all.  And if they don't

25   have a lien in the cash, why they're entitled to any

1    adequate protections.

2         It just -- it makes no sense to me when you're

3    proposing to spend a total of a $145,000 out of a cash

4    balance of $5.7 million, why Macquarie deserves anything

5    under the Code?  And I need a full evidentiary record before

6    I grant any relief of that nature, because what this means

7    is I don't understand what's going on.  So it may be I

8    didn't read the Declarations properly or it may just be need

9    more evidence.

10        So I'll let you put on the evidence.  Who's going

11   to be your witness on that, Ms. Spigel?

12        MS. SPIGEL:  Your Honor, Mr. Roop Bhullar, the

13   Chief Financial Officer of the company, will be the witness.

14   My colleague, David Eastlake, is going to be addressing the

15   cash collateral motion and the evidence.

16        THE COURT:  All right.  So if I can get

17   Mr. Bhullar to go ahead and press five star one time on his

18   phone.  Mr. Eastlake's line remains active.  And we'll go

19   there.

20        Mr. Bhullar, good morning, sir.

21        MR. BHULLAR:  (No audible response).

22        THE COURT:  Okay.  Would you say something to

23   where I can make sure your line is working?

24        MR. BHULLAR:  Good morning, Your Honor.

25        THE COURT:  Would you raise your right hand,

1   please, sir?

2        (Witness sworn.)

3            THE COURT:  Thank you.

4            All right, Mr. Eastlake.

5            MR. EASTLAKE:  Thank you, Your Honor.  Before I

6   begin, I just want to make sure the Court can hear me.  We

7   were able to move some things around during the hearing so

8   I'm hoping you can hear me now.

9            THE COURT:  It's better but it still sounds like

10  you're in a cave.

11           MR. EASTLAKE:  Okay, Your Honor, we'll power

12  through it.  Just let me know if you can't hear me at any

13  point.

14           But David Eastlake of Baker Botts, proposed

15  counsel for Griddy Energy.

16                DIRECT EXAMINATION OF ROOP BHULLAR

17  BY MR. EASTLAKE:

18  Q    Mr. Bhullar, would you please state your full name for

19  the Record and spell it?

20  A    My full name is Roop Singh Bhullar, that's spelled

21  R-O-O-P, S-I-N-G-H, B-H-U-L-L-A-R.

22  Q    Thank you, Mr. Bhullar.

23       Would you go ahead and just take a few -- a minute to

24  walk the Court through your educational background?

25  A    Sure.  I have a Bachelor of Management Studies and a

1  Bachelor of Laws from the University of Waikato in New

2  Zealand.  I also have a Master's degree in Business

3  Administration from the Anderson School at UCLA.

4  Q    And, Mr. Bhullar, what is your current role at Griddy?

5  A    I'm the Chief Financial Officer.

6  Q    And how long have you held that position?

7  A    I was appointed to this role on December 4th, 2020.

8  Q    And did you hold any prior position before becoming

9  Chief Financial Officer at Griddy?

10 A    No other positions with Griddy.  But in terms of my

11 professional background, I've spent the last 20 years in

12 various accounting and finance roles, including most

13 recently as the CFO of Prius (phonetic) Energy Trust,

14 publicly listed retail energy provider, where I was

15 responsible for the overall finance, accounting, treasury,

16 and relation functions of the business.  Prior to that, I

17 was in senior financial roles at two other retail energy

18 companies:  Commerce Energy and King Country Energy.  And

19 prior to that, I started my career in public accounting

20 where I worked at Deloitte in various tax and accounting

21 roles.

22 Q    Thank you, Mr. Bhullar.

23      What I'd like to do now is talk about the Debtor's

24 pre-petition debt structure.  Can you generally describe the

25 pre-petition debt as it stands today?

1        THE COURT:  Mr. Eastlake, --

2  A    Sure.

3        THE COURT:  -- why don't we take a minute?

4  Because your record is going to be so bad as hard as it is

5  to hear you.  I think the phone has to be just a lot closer

6  -- your microphone, a lot closer to where you are.  Let's

7  take the time to get it fixed.

8        (Pause in the proceeding.)

9        MR. EASTLAKE:  Okay, Your Honor, is this better?

10        THE COURT:  That is better, thank you.

11        MR. EASTLAKE:  Okay, great.

12  BY MR. EASTLAKE:

13  Q    Mr. Bhullar, I'd like to talk about the Debtor's

14  pre-petition debt structure.  Could you just generally

15  describe the pre-petition secured debt and what that

16  consists of?

17  A    Sure.  On December 4th, 2020, Griddy entered into a

18  borrowing-based facility agreement with Macquarie

19  Investments, US, Inc. and Macquarie Energy, LLC.  And under

20  this agreement Griddy had the ability to procure energy and

21  make various collateral postings to both utilities or

22  regulators in order for us to operate our business.  The --

23  it was a $15 million -- or it is a $15 million facility.

24  And currently there is $1.5 million outstanding, exclusive

25  of a $300,000 letter of credit in favor of a prior credit

1  facility provider, and exclusive also of unpaid interest and

2  fees under our agreement with Macquarie.

3  Q    And, Mr. Bhullar, could you describe the collateral

4  package?

5  A    So under the agreement, Macquarie has first priority

6  security interest in liens of substantially all of Griddy's

7  assets, including guarantees from various other affiliate

8  businesses in the Griddy structure.  And this includes liens

9  of all of Griddy's cash.  Griddy currently has approximately

10  $5.6 million of cash contained within three bank accounts

11  with JPMorgan Chase.  And that is all part of Macquarie's

12  security package.

13  Q    And just so the Record's clear, Mr. Bhullar, these --

14  the bank accounts would include the revenue account,

15  correct?

16  A    That's correct.

17  Q    Mr. Bhullar, turning to the Debtor's requested

18  immediate use of cash collateral, how would the Debtor be

19  harmed if it was unable to continue to use cash during this

20  case?

21  A    The only cash that is available to Griddy is contained

22  in those three bank accounts that are all subject to

23  Macquarie's first priority security interest.  Griddy has no

24  other access to cash which would be essential to

25  effectuating our proposed Chapter 11 winddown plan.

1  Q    And do you believe that the Debtor could obtain any

2  third party financing to conduct its orderly winddown?

3  A    We do not believe that in the current scenario of the

4  winddown, proposed winddown plan of Griddy, that there would

5  be available financing externally available to us.

6  Q    Thank you.

7       And, Mr. Bhullar, were there negotiations leading up to

8  the bankruptcy filing regarding the Debtor's continued use

9  of cash collateral?

10 A    Yes, there were extensive negotiations conducted by

11 Griddy and its counsel with Macquarie and their counsel.

12 Q    And were you involved in these negotiations?

13 A    Yes.

14 Q    And how so?

15 A    In responding to questions coming from counsel who were

16 in direct contact with Macquarie's counsel and taking

17 certain points back to the rest of the Griddy management

18 team and board for approval.

19 Q    And as part of these negotiations, was Macquarie asking

20 for certain adequate protections to consensually agree to

21 allow the Debtor to continue to use its cash collateral?

22 A    Yes, that is my belief.

23 Q    And, Mr. Bhullar, based on the terms and conditions

24 that were ultimately agreed to by the parties for the

25 continued use of cash collateral, do you believe that they

1  are reasonable?

2  A    I do believe they are reasonable.

3           THE COURT:  Why is it reasonable to give them

4  anything if you're going to spend $150,000 out of 5.6

5  million and they're owed 1.8?  Why are you doing anything

6  for them?

7           THE WITNESS:  Your Honor, I -- Griddy does not

8  have access to any other cash in order to pay professionals

9  and pay employees and to wind down the business and

10  effectuate our customer relief plan.

11          THE COURT:  No, they're over-secured three to one.

12  Why do you need to provide them anything?  Why can't you

13  just spend the money?  Why are you giving them anything?

14          THE WITNESS:  Your Honor, can I just take a minute

15  to outline the structure of our bank account and agreements

16  with Macquarie?

17          THE COURT:  You may.  But you've told me you owe

18  them roughly 1.8 or $1.9 million and that they have a lien

19  on roughly $5.7 million worth of cash.  Normally that means

20  they're massively over-secured.  And if what you want to

21  spend is a $150,000, you don't give them any adequate

22  protection, you can spend it with a Court Order.  I want to

23  know why you're giving them things, why you're giving them

24  anything, in order to be able to spend $150,000.

25          THE WITNESS:  My understanding is that we have

1   access to $2.9 million in our operating account, which is

2   only subject to a shifting blocked account control agreement

3   with Macquarie.  And then Macquarie will continue to have

4   full lender control of $2.7 million, which is secured --

5          THE COURT:  Yes.  So why are you -- you're not

6   answering my question.  You're telling me the structure.  I

7   want to know why do you need to give them anything in the

8   way of adequate protection to get a Court Order that

9   authorizes you to spend $150,000?  I mean, what possibly

10  happened in these negotiations that you've described where

11  you all decided to give them something when all you're

12  trying to spend is 150,000 and they're three-to-one over-

13  secured?  This isn't making sense.

14         THE WITNESS:  Based on advice, I don't know what

15  other opportunities Griddy would have to use this cash,

16  which is otherwise --

17         THE COURT:  Just get a Court Order that says you

18  can use it, and you don't need to give them any adequate

19  protection.  Why are you giving them adequate protection?

20  Why do they need adequate protection?  How are they impaired

21  by what you're doing?  They remain massively over-secured.

22         MR. EASTLAKE:  And, Your Honor, I'm happy to

23  address that, this is David Eastlake, at some point to

24  answer Your Honor's question.

25         THE COURT:  Sure, go ahead, because I'm not -- I

1   mean, I asked you to put on a witness to tell me why we're

2   providing adequate protection and I didn't understand it.

3   That's why I keep asking.  If you want to put on another

4   witness, that's okay, or you can tell me as a matter of law

5   why you need to do this, but I can't imagine this isn't

6   factually based.  So I'm not understanding the facts on

7   which you have decided that it is reasonable to give them

8   any adequate protection to spend this money.

9          MR. EASTLAKE:  Well, Your Honor, I think from our

10  perspective, we're not really giving them anything and --

11         THE COURT:  Of course you are.  You're stipulating

12  to the validity of all their liens.

13         MR. EASTLAKE:  Correct, Your Honor.  We don't have

14  any basis to believe that there's some issue with that, but

15  there is still --

16         THE COURT:  Why would you give that away on Day

17  One?  I don't know that I'm ever going to have a Committee

18  in this case, for example.  I may, but it's hard forming a

19  Committee out of customers.

20         Why are you giving -- what under the law says it's

21  appropriate to give them anything at all?

22         MR. EASTLAKE:  Your Honor, again, we recognize

23  that Macquarie is oversecured.  The adequate protections in

24  the form of replacement liens and the superpriority

25  administrative claim, we don't think we ever get there.  We

1    don't think there's going to be the diminution, but as part

2    of the --

3            THE COURT:  Then why give it to them?  Then why

4    give it to them?

5            MR. EASTLAKE:  Because, Your Honor, as part of

6    these negotiations, this is what Macquarie wanted for deal

7    terms and --

8            THE COURT:  Okay.

9            MR. EASTLAKE:  -- Ms. Norfleet, she's on the

10   phone, and can offer the perspective from her client.  But

11   if you look at the Order carefully, we really did push back

12   and we tried to keep it very limited in terms of what

13   Macquarie was going to get, its replacement liens, its

14   adequate protection superpriority claim.  Again, those only

15   come into play if there's any diminution of value.  We don't

16   think that'll be the case.

17           It also provides for continued monthly interest

18   payments.  Your Honor, we're talking about $7,000.

19   Moreover, Macquarie is oversecured and would be entitled to

20   post-petition accruing interest, so it's just really a

21   timing thing with a small amount of money and -- at issue.

22           And then finally, Your Honor --

23           THE COURT:  I don't understand.  You're paying all

24   their legal bills and you've negotiated a situation that

25   costs money.  This is making no sense to me.  I want

1   evidence to tell me why I'm going to make -- give them any

2   adequate protection and so far I have none.

3           Ms. Norfleet?

4           MS. NORFLEET:  (No audible response).

5           THE COURT:  Ms. Norfleet?

6           MS. NORFLEET:  Good morning, Your Honor.

7   Kelli Norfleet, on behalf of Macquarie.

8           Mr. Eastlake is correct, our view was that this

9   was a fairly limited relief package.  And again the

10  adequate --

11          THE COURT:  Tell me under the law why you are

12  entitled to any adequate protection for the expenditure of

13  $150,000 when you're three-to-one overprotected.  What under

14  the law gives you that?

15          MS. NORFLEET:  Well, Your Honor, we were looking

16  at the longer term of the case and not necessarily just a

17  three-week period in which they're going to spend about

18  $150,000 and over the course of the case, you know, there

19  are any number of issues that could arise during the course

20  of the case like Mr. Potts alleging that money should be

21  disgorged.

22          THE COURT:  Well, if you're saying that they're

23  not limited to 150,000 and they can spend all the cash, then

24  I understand.  But I thought they were limited to 150,000

25  today and I was giving --

1          MS. NORFLEET:  No.

2          THE COURT:  -- you adequate protection today.

3          MS. NORFLEET:  No, Your Honor.  To be clear that

4  we are not seeking approval of a budget here and Griddy is

5  not limited to the budget that they filed.  From what I

6  understand they're seeking, the Debtor's counsel has already

7  filed that budget.  I think it was required under the local

8  conflict case procedures.

9          THE COURT:  So how much money can they spend if we

10 sign this Order, all of it?

11         MS. NORFLEET:  Their consent is for the use of any

12 cash collateral in the operating and segregated accounts,

13 Your Honor.

14         THE COURT:  So that makes you oversecured by

15 $900,000.

16         Why are you entitled to adequate protection?

17         MS. NORFLEET:  Again, Your Honor, we were trying

18 to look to the longer term in the case and we don't know

19 what disputes are going to arise over -- whether any of

20 Griddy's money may be claimed by other creditors.  And so

21 the adequate protection was intended as a backstop in case

22 those issues do arise.  As I said, we don't expect there to

23 be a diminution value here.

24         THE COURT:  And your client is willing to take a

25 40 percent discount on what it's owed?

1          MS. NORFLEET:  Yes, Your Honor.

2          THE COURT:  What's it getting in exchange for

3    that?

4          MS. NORFLEET:  The agreement that was reached

5    regarding the treatment under the Plan was to facilitate the

6    plan process.  Griddy believes that the plan process is the

7    most efficient way to address all the claims that have been

8    asserted against it and they have negotiated with Macquarie

9    to take a discount to facilitate that plan process.

10         THE COURT:  And does Macquarie get anything in

11   exchange for the discount?

12         MS. NORFLEET:  Macquarie is considered a released

13   party under the Plan, but there's an opt-out mechanism for

14   those releases, as is customary in the Southern District,

15   but I would suppose the real benefit is that all parties get

16   to try to resolve these issues in an efficient manner.

17         THE COURT:  Okay.  I'm denying the motion to use

18   cash collateral that includes the provision of adequate

19   protection.  If the Debtor wants to file an amended motion

20   to use cash collateral or make an oral motion to use cash

21   collateral where they are this far overprotected and what

22   they want to spend is what I'm being asked to approve on the

23   budget, the Debtor may do so, but I am hearing no

24   justification for doing this.

25         This is a case of substantial public concern and

1  I'm not going to guess about what I'm doing.  You're asking

2  me to guess.  I decline.  I have no evidence to support it.

3           Under controlling Supreme Court precedent,

4  adequate protection need not be provided to an oversecured

5  secured creditor unless there is a substantial possibility

6  of a diminution and the value of that collateral.  I've

7  heard zero evidence of that, so I'm denying the motion as

8  pled.

9           Where do you want to go next?

10          MR. EASTLAKE:  Your Honor, this is David Eastlake.

11          I would -- I'll take the Court up on its offer and

12  orally move to permit the Debtors' continued use of cash

13  collateral over the objection of Macquarie should they

14  continue to object to such use.

15          THE COURT:  In what amounts?  In the amount shown

16  in the budget you're trying to spend or some other amount?

17          MR. EASTLAKE:  Well, really again going back to

18  also what Ms. Norfleet was talking about, we -- there really

19  isn't a set amount or a cap.  Certainly for purposes of

20  today and the interim period, you know, that's what we

21  project to spend.  We are working on a 13-week budget.

22  Mr. Bhullar's been working on that and he may be able to --

23  if we take the case a few weeks further out, kind of what

24  we're looking for -- looking at in a 13-week budget

25  scenario.

1          THE COURT:  Are there objections to Mr. Eastlake's

2   oral motion?

3       (No audible response.)

4          THE COURT:  All right.  I'm going to grant the

5   Debtor the authority to -- I'm sorry, go ahead.  Any

6   objection?

7          MS. NORFLEET:  I apologize, Your Honor, Kelli

8   Norfleet, on of Macquarie.

9          Not necessarily an objection, perhaps a limited

10  objection, but our request would be that the authority to

11  use cash collateral only be for cash it needs in the revenue

12  and segregated accounts.

13          THE COURT:  That part's granted.

14          MS. NORFLEET:  Thank you, Your Honor.

15          THE COURT:  All right.  I'm authorizing the Debtor

16  orally on its oral motion to spend cash collateral, but not

17  to spend any money out of the restricted cash in the revenue

18  account without further order of the Court.

19          Where do we go now?

20          MR. EASTLAKE:  Thank you, Your Honor.

21          MS. SPIGEL:  Thank you, Your Honor.  It's

22  Robin Spigel again.

23          At this point, I'd like to turn the virtual podium

24  over to my colleague, Jacob Herz, to present the First Day

25  -- the other First Day pleadings, if it suits Your Honor.

1          THE COURT:  Thank you.

2          Mr. Herz, would you press five star one time on

3    your line please?  Thank you.

4          MR. HERZ:  Thank you, Your Honor.

5          THE COURT:  Mr. Herz, go ahead please.

6          MR. HERZ:  Thank you, Your Honor.  Jacob Herz from

7    Baker Botts, on behalf of -- proposed counsel to the Debtor.

8          If it makes sense, Your Honor, we filed a proposed

9    Agenda, Docket No. 33, and we'll start moving through that

10   quickly, but we'll cut out No. 7 on the Agenda because it

11   was covered on the cash collateral issues.

12          To begin with, Your Honor, we'd like to thank the

13   Court for entering the Order approving Stretto's retention.

14   That was originally the first item on our Agenda.  We just

15   want to let the Court know that we received informal

16   comments from the United States Trustee and that was

17   included in the Order that you approved.

18          THE COURT:  All right.  Thank you.

19          MR. HERZ:  Your Honor, the second item on the

20   Agenda is the tax motion and this is at Docket No. 9.

21   Your Honor, the tax --

22          THE COURT:  Given that there is no money in the

23   budget to pay the taxes with, why are we taking this up on

24   an emergency basis?

25          MR. HERZ:  Your Honor, we're proposing at this

1  point a very modest amount of $34,000.  I'd have to confirm

2  with the client, but I don't think it needs to be paid

3  necessarily immediately, but if you look at the -- that's

4  only on account of the franchise taxes all pre-petition.

5          THE COURT:  So when is it due?  I don't have any

6  theoretical problem with that, but in the initial budget, I

7  saw nothing for taxes, so it made me think maybe we don't

8  have an emergency.  When is that due?

9          Mr. Bhullar?

10         MR. BHULLAR:  Franchise taxes are due on May 15th.

11         THE COURT:  All right.  Are there any taxes that

12  need to be paid between now and May 15th?

13         MR. BHULLAR:  We currently believe that we're paid

14  up for all sales and use and gross receipt taxes based on

15  our estimate.  I believe the motion was filed out of an

16  abundance of caution in case there was a change in the

17  numbers or anything like that, Your Honor.

18         THE COURT:  All right.  Mr. Herz, would it work

19  for you if we set final hearings in the case -- when would

20  you like those, what week would be best, the week of the 5th

21  of April, the week of the 12th of April?  Tell me what you

22  need to get done.

23         MR. HERZ:  Well, Your Honor, I would turn over

24  here to Ms. Spigel.

25         MS. SPIGEL:  Your Honor, it's Robin Spigel.  If I

1  may?

2            THE COURT:  Sure.

3            MS. SPIGEL:  I think that we would like final

4  hearings during the week of the 5th, if Your Honor is

5  available, or the week after either way.  And it is fine for

6  us to have the tax motion not on an emergency basis.  I

7  think we filed it, as Mr. Bhullar said, out of an abundance

8  of caution.  There isn't an immediate need to pay the taxes.

9  But either --

10            THE COURT:  How does April the 6th at 1:30 look

11  for your Second Day Hearings?

12            MS. SPIGEL:  Mr. Bhullar, are you available on

13  April 6th?  I just want to -- I'm sorry, this is awkward

14  over video, but I think that that is okay.

15            MR. BHULLAR:  Yes, I'll be available.

16            MS. SPIGEL:  Yes.  Thank you, Your Honor.

17            THE COURT:  Is there any party-in-interest that

18  objects to having Second Day Hearings on April the 6th at

19  1:30?

20        (No audible response.)

21            THE COURT:  All right.  In keeping what's our

22  policy that we only take up matters where there's an

23  emergency on First Day Hearings, we'll continue the taxes

24  motion.  We'll take it up on April the 6th at 1:30.  Let's

25  go to your next matter.

1          MR. HERZ:  Thank you, Your Honor.

2          The next matter is the cash collateral motion and

3    that's filed at Docket No. 12.

4          THE COURT:  Cash collateral or cash management?

5          MR. HERZ:  I'm sorry, I apologize, cash

6    management.

7          THE COURT:  All right.  Go ahead, please.

8          MR. HERZ:  Your Honor, in the cash management

9    motion, the Debtor seeks among other things authority to

10   continue to maintain its current bank accounts.  They're all

11   at JPMorgan Chase, which is an approved depository, and that

12   as was mentioned in relation to cash collateral, includes

13   the segregated account, the revenue account, and also the

14   operating account.

15         In addition in the motion, the Debtor seeks

16   authority to continue to use its current business forms,

17   which are mostly electronic, and also to -- in the

18   circumstance it needs to, continue to engage in some

19   intercompany transactions, which doesn't expect would arise

20   during the case, but it's in there in an abundance of

21   caution.

22         THE COURT:  All right.  Is there any party that

23   has any objection --

24         MR. HERZ:  Your Honor --

25         THE COURT:  I'm sorry, go ahead.

1          MR. HERZ:  I'd just say if Your Honor has --

2    unless Your Honor had any other questions --

3          THE COURT:  Does any party have --

4          MR. HERZ:  -- I'd ask that --

5          THE COURT:  -- any objections to the cash

6    management motion?

7       (No audible response.)

8          THE COURT:  Does any party have any objection to

9    the form of the Order on cash management?  If so, you'll

10   need to press five star one time on your phone.

11      (No audible response.)

12         THE COURT:  All right.  Let me put the Order up on

13   the screen then.

14      (Pause in the proceedings.)

15         MS. SPIGEL:  Your Honor, it's Robin Spigel.

16         I realize that we didn't put Central time on that

17   second line.

18         THE COURT:  All of my times are Central, so you're

19   good.

20         MS. SPIGEL:  Okay, perfect.  Thank you.

21         THE COURT:  And we'll just let all the service

22   occur electronically.  I think this repeats the 4:00 o'clock

23   deadline.

24         Any objection to the few changes that I've made to

25   the proposed form of Order?

1     (No audible response.)

2          MR. HERZ:  No, Your Honor.

3          THE COURT:  All right.  Thank you.

4          Mr. Herz, I'm going to go ahead and send this to

5    Mr. Laws to get docketed for us.

6          Tell me where you want to go next.

7          MR. HERZ:  Thank you, Your Honor.

8          For the next items, I'll turn the podium over to

9    my colleague, Chris Newcomb.

10         THE COURT:  All right.  Mr. Newcomb, let me get

11   your line activated here.

12         Mr. Newcomb, good afternoon.

13         MR. NEWCOMB:  Good afternoon, Your Honor.

14   Chris Newcomb with Baker Botts, on behalf of the Debtor.  If

15   it's acceptable, Your Honor, I'll just continue down the

16   Agenda in order.

17         THE COURT:  All right.

18         MR. NEWCOMB:  The next motion, No. 4, on the

19   Agenda is the motion to pay certain obligations of the

20   Debtor's employees, and continue their benefits programs.

21   The Debtor currently has 16 employees.  These employees are

22   critical to keeping the Debtor running and resolving

23   critical issues during the Debtor's wind-down and, of

24   course, significantly their employees depend on their

25   compensation and benefits programs for their livelihood.

1          The Debtor made its semimonthly payroll yesterday

2   prior to commencing the case so accordingly the Debtor

3   believes that it's paid all its pre-petition amounts with

4   respect to wages and benefits programs, but out of an

5   abundance of caution, wanted to seek authority to pay any

6   remaining pre-petition amounts that may have lingered that

7   have not been paid.  And then the Debtor is also seeking

8   authority to continue to pay its employees and maintain its

9   benefit programs in the ordinary course post-petition.

10         The Debtor believes the retaining its employees

11  and keeping them focused is critical and that given sort of

12  the impending wind-down, there's a real risk of losing

13  employees if it fails to satisfy any of its wage or benefit

14  obligations.

15         We did receive some informal comments from the

16  United States Trustee's Office.  We incorporated those in

17  the Order prior to filing the motion and we understand that

18  they don't object to the relief sought with those changes

19  made.

20         So I'm happy to answer any questions you have, but

21  otherwise we'd ask that the Court enter the Order approving

22  the relief set in the motion.

23         THE COURT:  All right.  Is there any objection to

24  the wages Order, all the employee obligations?

25      (No audible response.)

1          THE COURT:  All right.  I'm granting the motion

2    based on the declarations that have been filed.  It's clear

3    you've got to keep these employees here if you're going to

4    get an effective plan in trying to get where we're going.

5          MR. NEWCOMB:  Thank you, Your Honor.

6          THE COURT:  I've signed the Order.  We'll get that

7    docketed today.

8          Where do you want to go next?

9          MR. NEWCOMB:  Thank you, Your Honor.

10         Next up is No. 5 on the Agenda, which is the bar

11   date motion.  Through this motion, the Debtor respectfully

12   request that the Court set deadlines for creditors to file

13   Proofs of Claims in the case.  Most prominently the Debtor

14   is seeking a bar date -- a general bar date that is 41 days

15   after the date that the Debtor filed its Schedules.  It

16   expects to file its Schedules later this week.  That's a bit

17   of a change from what was filed in the motion originally,

18   which I'll get into in a sec.

19         As Ms. Spigel has outlined, the Debtor has very

20   limited resources to make its way through the case and

21   achieve the benefits of the Plan that are proposed by

22   customers and creditors.  We think setting the bar date now

23   on the first day plays an important role in sort of moving

24   us down that path towards completing the Plan in a way

25   that's sustainable for the Debtor's resources.

1          The Debtors have very few creditors.  As
2    Ms. Spigel noted, we couldn't even fill out a top 30 list.
3    However, we do want to make sure that the Debtor's former
4    customers are given the opportunity to file claims if they
5    feel they have them.  We don't believe that former customers
6    are owed any money, but we do want to allow them to assert
7    claims.

8          So we're proposing to serve approximately 57,000
9    former customers and, as you may have seen in the motion, we
10   propose to do so exclusively by electronic means.  That's
11   the way that the Debtor historically communicated with its
12   customers exclusively and we think it's the most effective
13   way to reach them and also, of course, it would conserve a
14   significant amount of estate resources, as opposed to
15   service by First Class Mail, which would be fairly
16   expensive.

17         As I noted, the US Trustee did express some
18   concerns about the timeline.  They wanted creditors to be
19   able to benefit from hearing what had to be said in the 341
20   Meeting of Creditors and so they asked us to extend the
21   timeline out.  We ultimately agreed to push back the general
22   bar date and timing by seven days.  We'd originally
23   requested it be set 34 days after the Schedules are filed
24   and now we're going to seek to have it entered 41 days
25   after.

1    So we understand with that change that the US

2  Trustee does not object to the bar date motion.  That change

3  is not currently in the Order so we would have to file an

4  amended order to reflect that change.

5    THE COURT:  Let me talk to you a minute about what

6  you mean by "former customer."  A customer that did business

7  with you up until February 10th we'll call it, I got it that

8  you think it's really unlikely that they have claims and

9  notifying them electronically, you know, makes a lot of

10  sense.  For folks after that, I guess they're today still

11  former customers, but very recently former.

12    MR. NEWCOMB:  That's right.

13    THE COURT:  And I'm concerned that they don't get

14  a Proof of Claim that they can complete.  And I'm trying to

15  figure out how you're contemplating handling getting those

16  people Proofs of Claim and written notice.  A lot of the

17  requests to keep everybody in electronic notice sure makes a

18  lot of sense even for those customers other than for the

19  very first mailing and I at least want to explore whether it

20  doesn't make some sense that for the first mailing, anyone

21  that was, in fact, a customer as of February 10th would get

22  a written notice with a written Proof of Claim and

23  thereafter all the notices would be electronic.

24    But I want to hear argument about that because I'm

25  not sure I'm right, but that was the concern that I had as I

1  read it.

2          MR. NEWCOMB:  Sure, Your Honor.  And just to

3  outline, my understanding from discussing it at relevant

4  length with our claims agent is the email notice that would

5  go out to the customers would include -- you know, it would

6  include sort of a link directly to the -- you know, a Proof

7  of Claim form and they would be able to fill that out

8  electronically directly so it would be -- it would sort of

9  ease the process from them having to see the form going on

10  and logging on just to start clicking on a link and be able

11  to do it, so we figured it would be significantly simpler

12  for them.

13          Again you know, there's potentially, you know,

14  within the time frame you talked about, 29,000 customers and

15  you know, that serving them, you know, based on the

16  estimates you've heard from the claims agent, that would

17  probably be approximately $29,000 to do, which is a

18  significant sum for this Debtor.

19          And I think most importantly historically all

20  these customers have dealt exclusively with Griddy

21  electronically.  Griddy has never sent them any bills,

22  they've never sent them really anything so they expect and

23  are accustomed to receiving communications from Griddy via

24  email.  And so I think that is -- and that's sort of the

25  tested way that Griddy has communicated with them much more

1   so than their mailing address.  So we think it's probably

2   the most effective way to reach them and also has the

3   benefit of conserving estate resources.

4           THE COURT:  So if somebody gets a text from --

5   because as I understand it, you sometimes -- some people

6   you're communicating by email and others by text from what I

7   read in the declarations.  If somebody gets a text from

8   Stretto relating to Griddy, are you telling me they can

9   click on that and immediately fill out a Proof of Claim?

10          MR. NEWCOMB:  Yes.  It would take them directly to

11  the place on the Stretto website that allows them to file a

12  Proof of Claim.

13          THE COURT:  And is there anything in the proposed

14  Order or motion that would mock up what that's going to look

15  like?

16          MR. NEWCOMB:  I don't know that we have that

17  currently, but we could probably pull something together or

18  sort of flesh out in more detailed language kind of what

19  that would look like, if that would be helpful.

20          THE COURT:  But let me hear from others that -- as

21  to whether having essentially a one-click Proof of Claim

22  that is sent by email or by text is, in fact, adequate for

23  folks.  I'm still not persuaded.  I didn't realize you were

24  going to do the one-click issue to fill out a Proof of

25  Claim.  That is helpful in terms of where we're going.

1          Can I hear from anyone else that has an issue with

2   that?

3          MR. POTTS:  Judge, it's Derek Potts, class

4   counsel.

5          We have a major issue with that.  But first and

6   foremost, I think it's premature to be setting a claim bar

7   date at this emergency hearing.  We do have a class action.

8   Theoretically everyone is already a member of that class

9   action.  There's a putative class action at this point.  We

10  may have multiple claims.

11         People are going to be confused at this juncture

12  getting a claim form.  And so we need to do discovery.  I'm

13  not sure what your intent is with respect to our particular

14  case whether you're going to carve us out or not, but we

15  need class discovery, we need lists of all the customers so

16  we can tabulate that information.

17         So we would strongly object to this request and

18  we'd request that a bar date not even be set today.

19         THE COURT:  We've already set a bar date.  This

20  just changes it.  So we need to figure out what we're doing.

21  A bar date is set by Local Rule.

22         What are you, Mr. Newcomb, going to tell me about

23  putative class members and their need to file out -- fill

24  out a Proof of Claim?

25         MR. NEWCOMB:  I mean, Your Honor, they'd have the

1  same opportunity to file a Proof of Claim they would in sort

2  of any other case.  I know there's certain standards in this

3  District for whether or not class members can file class

4  Proof of Claims, but I think they'd have the opportunity

5  just the same as anyone else to file a Proof of Claim.

6          And if they need to make a motion to allow

7  themselves to file a Proof of Claim, they'd have the

8  opportunity to do so.  But I don't know that that needs to

9  change, you know, our ability to reach out to customers and

10  get them the opportunity to file a Proof of Claim.  I'm not

11  really sure how that, you know, affects that and why that we

12  should have to slow down the process in order for them to do

13  what they need to do.  They'd be able to file on behalf of

14  other creditors.

15          MS. SPIGEL:  Your Honor, it's Robin Spigel.

16          THE COURT:  Go ahead.  Ms. Spigel?

17          MS. SPIGEL:  I'm sorry to interrupt, but I just

18  would like to correct the Record because it's a purported

19  class.  It is not a class action.  They filed it as a

20  purported class.  It hasn't been certified.  So I just think

21  it's important for the Record to reflect that.

22          THE COURT:  I think he used the word "putative"

23  class.  It's a putative class, right?  They filed one

24  seeking class certification.

25          MS. SPIGEL:  Thank you.

1           THE COURT:  So let's take just this category of

2   customers from February 10th until the date of power.  Tell

3   me administratively why you need to know whether those

4   people have claims that would fall into group or class type

5   of claimants.  Explain to me why you need this kind of bar

6   date.  I've got it for the whole rest of the world why you

7   need it.  Why do you need it for this group?

8           MR. NEWCOMB:  Well I think, Your Honor, just for

9   the ability to prosecute a plan.  I mean, we'll use that

10  information to help solicit the Plan, but to prosecute a

11  plan we're going to need to know sort of the quantity of

12  claims and, you know, to make sure that we can prove that we

13  meet the standards for confirmation.  And again, I think

14  it's important for solicitation to ensure that anyone who

15  asserts that they have a claim in a particular amount that

16  we're able to go out and seek that.  It establishes the

17  amount of their claim as well for purposes of tabulating

18  votes on the Plan.

19          And if someone files a Proof of Claim, they're --

20  under our proposed Disclosure Statement solicitation

21  procedures, their claim will be set at that amount; whereas,

22  alternatively if they fail to file a claim, we would propose

23  to set that amount at $1 for purposes of solicitation, which

24  is obviously not up for today, but, you know, that's among

25  the rationales for why we would want to go ahead and have

1   the customers file claims.

2           THE COURT:  Mr. Newcomb, this is something I've

3   not thought through and I want you and Mr. Potts both to

4   address it if you would.

5           Can we set two bar dates?  Can we set a bar date

6   that says, "To be counted for voting purposes under the

7   Plan, your Proof of Claim must be filed within 41 days, but

8   to have an allowed claim, your Proof of Claim will remain at

9   the existing bar date, which is 90 days from the petition

10  date," or do you need to have the same bar date for both

11  purposes under the law?  And I don't know.  I don't think

12  I've done this before, but I'm trying to address both

13  concerns.

14          MR. POTTS:  Judge, this is Mr. Potts.

15          In terms of them just gathering information about

16  claims, that's completely different than filing a claim as a

17  member of the class and I think answers the question.  So I

18  think it would be fine for them to gather some information

19  in 41 days, but as long as that no way limits a person's

20  ability to participate in the class and file a claim as a

21  class member, we would not have an objection to that.

22          THE COURT:  Well, what about voting on the Plan?

23          MR. POTTS:  I think 41 days is fine for that, as

24  long as it doesn't affect their ability to make a claim

25  under the class action.

1         THE COURT:  Mr. Newcomb, can -- I don't know this
2   and so I don't know that I should rule on it right now, but
3   what's your view on whether we can set two bar dates, one
4   for plan administration purposes, but another one for claim
5   for distribution purposes?
6         MR. NEWCOMB:  I mean, Your Honor, my concern there
7   is just that it would be confusing to the claimant class,
8   you know, seeing that sort of they have to file a claim by
9   one date and then later on file another claim.  I'm
10  concerned that people might file a claim initially and then
11  fail to file one later on if it is required under the Plan.
12        THE COURT:  Well, no, they wouldn't have to file
13  two.  You tell people, "Here's your Proof of Claim form.  If
14  you want to be able to vote on the Plan, your deadline is
15  April 1, otherwise your deadline is May 15th," and I'm
16  making up those dates, but you tell people they only file
17  one.  I don't know if that's legal and I probably need to
18  give you all a chance to work through and think about that.
19        The Rules certainly would allow a 41-day bar date
20  under the Federal Rules of Bankruptcy Procedure.  We already
21  set a 90-day bar date starting at the petition date by Local
22  Rule.  So I think this is something we've got to work
23  through pretty quickly.
24        Does it make some sense to come back at the end of
25  this week and try and work through this question?

1          MS. SPIGEL:  Your Honor, it's Robin Spigel.

2          MR. NEWCOMB:  I think --

3          MS. SPIGEL:  May I speak?

4          THE COURT:  Sure.

5          MS. SPIGEL:  Sorry.  I'm sorry to interrupt

6   Mr. Newcomb in particular, but I'm the most familiar with

7   the Plan, so I just want to just discuss how it works and I

8   know it's not before anyone and it was filed last night

9   so -- but I just want to give people a preview, right?

10          So if you're a customer, you are able to vote in

11  Class 5 of the customer class.  If you vote to reject, then

12  you automatically become an unsecured creditor if you have

13  filed a Proof of Claim with the Court.

14          So you need to -- if you believe you have a claim

15  and you reject the customer class, you still need to assert

16  that Proof of Claim.

17          THE COURT:  So let's talk about voting and let's

18  talk about releases.

19          Are you telling me that if someone doesn't want to

20  do a mutual release, that they have to vote "No" on the

21  Plan?

22          MS. SPIGEL:  As a Class 5 customer, yes.  But they

23  then automatically -- on the ballot, they automatically

24  become a Class 4 general unsecured creditor.  They can opt

25  out of the releases, they can reject the Plan as a Class 4

1  general unsecured creditor.

2          THE COURT:  Okay.

3          MS. SPIGEL:  The customer releases are totally --

4  you know, are optional.

5          THE COURT:  Okay.  So do you know sitting here

6  today what the law is on whether I can have a bar date that

7  is -- that where I leave the current bar date alone at

8  90 days, but we tell people, "If you haven't filed your

9  Proof of Claim by X date, then you may not vote on the

10  Plan."  Is that permissible under the law?  I don't know.

11          MS. SPIGEL:  I don't know, Your Honor.  I would

12  venture to guess that you have to file your Proof of Claim

13  in order to be given an opportunity to vote on the Plan, but

14  I don't know for sure.  We can look into it.

15          THE COURT:  Does it make sense to come back maybe

16  on Friday and -- when people can think through this

17  question, Mr. Potts, and you can brief whether we can do

18  sort of a split bar date of this nature?

19          MR. POTTS:  Yes, Your Honor.  I'd like the

20  opportunity to do some research and confer with everyone.

21          MS. OBALDO:  Your Honor, if I may?  This is

22  Rachel Obaldo with the OAG's Office.  May I be heard?

23          THE COURT:  Of course.

24          MS. OBALDO:  Your Honor, as you know, we represent

25  the State of Texas and we would have an interest in -- we

1   have a public interest in protecting those who may be

2   directly or indirectly affected by this so we would like to

3   be a part of this discussion, as well as brainstorm some

4   ways that we could further provide notice to former

5   customers.

6           THE COURT:  There's no one I would prefer to have

7   involved, so yes.  I think this is an important public issue

8   for the State to worry about.

9           Folks, I haven't read the Plan.  I've read what

10  they tell me about the Plan.  A plan that tells people -- it

11  sounded like on average the average outstanding bill is

12  about $1,000 right now for people, maybe $1100 -- that tells

13  people, "You can be forgiven without any litigation of your

14  $1100 obligation or you can join up over in a class action

15  and you might win, you might lose."

16          Those are really important things to be able to

17  tell people and they need to know both sides of that.  They

18  need to know that if they don't do the release, they could

19  very well be held liable for the $1,000 or $1100 and they

20  need to know if they do do the release, they're not going to

21  come back in some class action and get -- and I apologize,

22  Mr. Potts, I haven't read your class action.  They're not

23  going to get, for example, ETPA damages and I don't know if

24  that's in your class action or not --

25          MR. POTTS:  Yes.

1           THE COURT:  -- not suggesting it should or

2    shouldn't be -- because you signed a release.  So you know,

3    what do you want to swap for?  And we need to really be sure

4    we're telling people accurate information and know how to do

5    that.

6           The other problem that I know we have is whether

7    we're going to get additional class action lawsuits or class

8    action parties that want to join an independent class action

9    and I don't know whether we shouldn't be setting a bar date

10   for that, as well, so that this can all be considered.

11          I'm very worried about what notice we're going to

12   give to people.  I do think what the Debtor is proposing is

13   unique and there will be many people that believe it is to

14   their advantage to get rid of the bill and not worry about

15   things and there are going to be many others that are angry

16   and want to pursue a lawsuit, and I don't think I should be

17   putting people into one category or the other.  We need to

18   be sure that they know what their rights are.

19          And I can't imagine that we don't want your office

20   heavily involved in trying to balance those interests,

21   Ms. Obaldo.

22          MS. OBALDO:  Yes, Your Honor.  We intend to very

23   active in those discussions and addressing that concern.

24          THE COURT:  Do you think we can be ready by Friday

25   or am I being too optimistic to think -- or do you all maybe

1   want to do just a status conference on Friday to see where

2   we are on this issue?  It sounds like we won't even have

3   schedules filed yet. so we're not too worried about sending

4   out notices until we can really calculate it, but you all

5   tell me what is going to be helpful.

6          MS. SPIGEL:  Your Honor, we hope to -- yes,

7   Your Honor.

8          THE COURT:  Go ahead, Ms. Spigel.

9          MS. SPIGEL:  We hope to be filing the Schedules

10  before Friday, but -- and I would like to set it for a

11  hearing although perhaps we can contact Your Honor's

12  Chambers if it would -- should just be converted to a status

13  conference.  As I said, we just are worried about the

14  limited resources here.  I hear all the concerns and I think

15  it is important.  We absolutely would like to have the right

16  notice go to the customers and have them decide.  This is

17  not -- we're not try to jam the customers.  And even with

18  the electronic notice, that's the only way they've ever

19  gotten notice from the company, so we are trying to do

20  the -- yeah.

21          THE COURT:  I don't think you're trying to jam

22  people either.  I hope nothing I said implies that.  No, I

23  just want to be sure that we get this done right and that

24  people know what their options in an accurate way are.

25          Why don't we do this?  Unless I get a strongly-

1   worded objection from somebody, I'm going to come in Friday

2   morning at 8:00 and figure out where we're going on this

3   question.  And I'm not discounting the possibility that

4   it'll be obvious by Friday morning at 8:00 what I should do,

5   but in all likelihood I think it's going to be status

6   conference of -- I want to be sure that when we give people

7   this initial notice, they understand the consequences of

8   filing a Proof of Claim, they understand the consequences of

9   what might be the future release, that of course filing the

10  Proof of Claim isn't going subject them to release albeit a

11  vote on the Plan, but telling people early so they can start

12  thinking about things may be very helpful so that they can

13  understand this and maybe not.  Maybe we shouldn't do that

14  before we have a plan that's been conditionally approved,

15  but that's the kind of thing we can worry about on Friday.

16          So unless someone has a conflict, I do have

17  somebody else that wants to participate.

18          From 832-585-9829, who do we have?

19          MS. STRATER:  Yes, Your Honor.  This is Karen B.A.

20  Strater (phonetic).  I represent Sequarty's (phonetic)

21  putative class action, as well as a few other individuals

22  and I just wanted to comment that although the customers

23  have always received notification by email, that if they're

24  no longer receiving the services from Griddy, they may not

25  pay attention to the email, so I think that a status

1  conference on Friday is probably a good idea.  I'm not sure
2  that by Friday we would have a full plan on how to best
3  notify the people because they may not pay attention to an
4  email from Griddy if they are no longer receiving those
5  services and I just wanted to bring that to the Court's
6  attention.  I'm very concerned about how they're going to
7  get notification.
8         THE COURT:  I am, too, but I would tell you that
9  one of the big problems we have with bankruptcy -- in any
10  bankruptcy case is people get a letter and they throw it
11  away.  So figuring out the best way to notify people is
12  really important and it may be that email is superior to a
13  letter and it may be that it's inferior to a letter.
14         Do you have a separate class that you're proposing
15  or are you representing a limited group?
16         MS. STRATER:  Your Honor, it's part of the same
17  class.
18         THE COURT:  As Mr. Potts?
19         MS. STRATER:  Yes, Your Honor.
20         THE COURT:  Okay.  I did not know that.  Thank
21  you.
22         All right.  If no one is objecting then, we're
23  going to continue this motion.
24         Hand in hand with that goes the redaction motion,
25  so we might as well talk about this as well.  It's almost

1  the same problem, which is if we can figure out a good way

2  to tell people what their rights are, then we may protect

3  them by redacting their address and their phone number and

4  their email.  But if we can't figure out a good way to

5  communicate with them, all sides of this, not just the

6  Debtor's side, but also the here's-a-lawsuit-you-may-have

7  side, I don't want to then limit them from receiving

8  information from others that might give them important

9  information.

10           So I think the redaction motion needs to be going

11  hand-in-hand with the notice.  We need to figure what is

12  effective notice and how we're going to do that so let's

13  talk about that on Friday as well.

14           So, Mr. Newcomb, we've interrupted you a lot.

15  We're going to go back to you now and we'll see you though

16  on those motions on Friday morning.

17           Where did you want to go now, Mr. Newcomb?

18           MR. NEWCOMB:  Your Honor, I think if we're going

19  to push the redaction motion. as well, then I think that --

20  I'm just double-checking, but I believe that takes us to the

21  end of the Agenda.  I know --

22           THE COURT:  You can disagree with me, but don't

23  you think they go hand-in-hand in terms of -- redaction

24  makes more sense if people are getting full notice from all

25  sides than it does if it's going to limit their ability to

1  get notices?

2        MR. NEWCOMB:  Yes, Your Honor, I agree.  I just

3  wanted to note that we did serve -- I'm sorry, we did file a

4  creditor matrix last night.  That's a limited creditor

5  matrix that doesn't have the former customers listed on

6  there, but we did list individual -- we did redact

7  individual address information on that creditor matrix, but

8  if that's something that we need to revisit and file an

9  amended one after we discuss the motion, we're happy to do

10 so.  But I just want to say that for the Record.

11       THE COURT:  So, Mr. Newcomb, look as to -- and

12 I'll listen to this argument on Friday as well, but as to

13 protecting your employees' home addresses and stuff, I got

14 it that that might be appropriate.

15       The customers I want to be sure get adequate

16 information and I want to be sure the redaction, that the

17 balance of protecting their privacy is properly weighed

18 against their need for information from appropriate parties.

19       And I really hope that the Texas Attorney

20 General's Office will focus heavily on that question for us

21 as well, Ms. Obaldo.

22       MS. OBALDO:  Yes, Your Honor, we will.

23       THE COURT:  Thank you.

24       MR. POTTS:  Your Honor, one last issue if I may?

25 First to be able to properly give notice, we also need to

1  know about the existence of any insurance coverage that

2  might potentially cover the class action so we would ask

3  that that be -- that any and all policies be disclosed

4  immediately.

5          THE COURT:  I'll let you talk to Debtor's counsel

6  about that.  If we have a discovery issue, you can bring it

7  up at any point.  I'm pretty good about giving people

8  hearings, but I would expect that you would be able to make

9  an informal request to Debtor's counsel and learn what you

10 need to learn.

11         MR. POTTS:  Thank you, Your Honor.

12         THE COURT:  Thank you.

13         Does anyone else have anything that we need to

14 deal with today?

15     (No audible response.)

16         THE COURT:  All right.  This is a difficult case

17 and I know that I started off giving people maybe more

18 difficulty than what they wanted, but I really am worried

19 about getting this handled properly and that worry is not a

20 reflection at all that the Debtors aren't handling it

21 properly.  Debtors are proposing to do something unique and

22 really in an unprecedented situation as far as I know in

23 terms of how to approach things.

24         So my tone or words may have come across wrong and

25 for that I do extend my apologies to people.  I just -- I

1  think it's really important that the Court take charge of

2  the case early when you have this kind of situation.  With

3  the huge number of Texans who were adversely affected, I

4  want to be sure they know what their rights are.  And I

5  really do respect the difficulty that everyone is

6  confronting in trying to deal with things.

7          I read all of the declarations.  I want the

8  Debtors to know that when they were sending notices out to

9  people and saying "You should change providers," that was an

10 impressive thing to do.

11         Mr. Potts, you probably don't want to hear that,

12 but it was an impressive thing for them to do.  As to

13 whether it frees from of other problems, I don't know, but

14 I'm not seeing someone here that set out to do anything

15 wrong.  I may have someone here that did something wrong and

16 it's way too early for me to make that kind of

17 determination.

18         I don't know whether -- if ERCOT's pricing was

19 incorrect, if I understand the declarations, there is no

20 allegation that it was incorrect for the entire period.  I

21 believe it was incorrect for the latter portion of the

22 87 hours and we would still have a problem here.

23         So we have a lot to do, we have a lot to learn and

24 I just want to thank everybody for being here and trying to

25 get the right thing done, which is what I'm hearing everyone

1   trying to do, and I'm trying to be really careful and I hope

2   you hear that, that spirit and not in the spirit of

3   criticism.

4          Thank you all.  I'm going to go ahead and adjourn

5   the court until 1:30 when I have 1:30 hearings, but I will

6   see you guys at 8:00 a.m. Central Time by telephone on

7   Friday morning.  Thank you.

8        (The parties thank the Court.)

9        (Proceeding concluded at 12:38 p.m.)

10                       *  *  *  *  *

11          *I certify that the foregoing is a correct*

12   *transcript to the best of my ability due to the condition of*

13   *the electronic sound recording of the ZOOM/telephonic*

14   *proceedings in the above-entitled matter.*

15   */S/ MARY D. HENRY*

16   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

17   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

18   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

19   *JTT TRANSCRIPT #63624*

20   *DATE FILED:  MARCH 18, 2021*

21

22

23

24

25