**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **GRIDDY ENERGY LLC** | § | **Case No. 21-30923 (MI)** |
| **Debtor** | § | |

---

**EMERGENCY MOTION FOR AN ORDER DIRECTING THE UNITED STATES
TRUSTEE TO APPOINT A COMMITTEE OF CUSTOMER CLAIMS
INCLUDING TORT CLAIMANT CUSTOMERS**

---

EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON APRIL 1, 2021 AT 2:00 PM (CT) IN COURTROOM 404, 4TH FLOOR, 515 RUSK ST., HOUSTON, TX 77002. IT IS ANTICIPATED THAT ALL PERSONS WILL APPEAR TELEPHONICALLY AND ALSO MAY APPEAR VIA VIDEO AT THIS HEARING.

AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE ISGUR'S CONFERENCE ROOM NUMBER IS 954554.

YOU MAY VIEW VIDEO VIA GOTOMEETING. TO USE GOTOMEETING, THE COURT RECOMMENDS THAT YOU DOWNLOAD THE FREE GOTOMEETING APPLICATION. TO CONNECT, YOU SHOULD ENTER THE MEETING CODE "JUDGEISGUR" IN THE GOTOMEETING APP OR CLICK THE LINK ON JUDGE ISGUR'S HOME PAGE ON THE SOUTHERN DISTRICT OF TEXAS WEBSITE. ONCE CONNECTED, CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.

HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF THE HEARING. TO MAKE YOUR ELECTRONIC APPEARANCE, GO TO THE SOUTHERN DISTRICT OF TEXAS WEBSITE AND SELECT "BANKRUPTCY COURT" FROM THE TOP MENU. SELECT "JUDGES' PROCEDURES," THEN "VIEW HOME PAGE" FOR JUDGE ISGUR." UNDER "ELECTRONIC APPEARANCE" SELECT "CLICK HERE TO SUBMIT ELECTRONIC APPEARANCE." SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.

IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.

RELIEF IS REQUESTED NOT LATER THAN APRIL 1, 2021.

TO THE HONORABLE DAVID R. JONES, UNITED STATES BANKRUPTCY JUDGE

NOW COMES Karen Prescott ("Tort Claimant Customer" or "Movant") individually and on behalf of all similarly situated customers of the Debtor suffering property damage or personal injury (the "Tort Claimant Customers") and files this Motion for an Order Directing the United

States Trustee to Appoint a Committee of Tort Claimant Customers of the Debtor, and would show as follows:

# I.
## JURISDICTION AND VENUE
## AND STATUTORY BASIS FOR THIS MOTION

1.      On March 15, 2021, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Petition Date").

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, and this matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

3.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1414.

4.      The statutory bases for the relief requested in this Motion are sections 101, 105, 1102(a)(2) and 1181 of title 11 of the United States Code (the "Bankruptcy Code"), and Federal Rule of Bankruptcy Procedure 9014.[1]

# II.
## BACKGROUND

**A.      Movant's Prompt Request for a Separate Committee of Tort Claimant Customers and Membership on any Unsecured Creditors' Committee**

5.      Movant has filed, or will promptly file, a proof of claim in this case based upon the injuries suffered by Movant.  Movant, through its counsel promptly and immediately notified the United States Trustee ("UST") of this claim, of the proof of claim filing, and of Movant's desire to participate as a member of either a Tort Claimant Customers' Committee or as an unsecured creditors' committee member.

---

[1]      Except as otherwise provided here, (i) all references to sections are references to sections of the Bankruptcy Code, (ii) all references to Rule or FRBP are references to the Federal Rules of Bankruptcy Procedure, (iii) all references to Local Rules are references to local rules of the Bankruptcy Court for the Southern District of Texas, and (iv) all references docket numbers or DN are references to docket numbers in the above-captioned bankruptcy case.

**B.      The Nature of Movant's Claims and the Similarly Situated Claimants**

6.      On or about February 14, 2021, the State of Texas experienced a cold weather event in which more than 4 million Texas households lost electric power.  As a result of the impending cold weather event, Texas Governor Greg Abbott issued a disaster declaration on February 12, 2021, for all 254 counties in the State of Texas.  On the following day, February 13, 2021, Governor Abbott requested a federal emergency declaration, which was approved on February 14, 2021.  By February 15, 2021, the National Weather Service had issued a winter storm warning for the entire State of Texas.

7.      The cold weather event caused increased energy demands across the state as Texans tried to keep their homes and businesses warm, with total state energy demand peaking around 69,000 megawatts.  A peak winter demand of 69,000 megawatts is by no means unusual. As recently as the 2018 winter season, the Texas energy grid experienced demand in excess of 65,000 megawatts.

8.      Likewise, the Texas energy grid regularly meets summer demands of 125,000 megawatts—almost twice the peak demand experienced in February 2021.  As energy demand rose in February 2021, the supply of energy fell as outdated power generators failed, depriving the Texas power grid of 45,000 megawatts of energy.

9.      Along with Debtor Griddy Energy and others, ERCOT provides 90 percent of Texas's electricity and serves 26 million customers.  ERCOT and Debtor Griddy Energy and others could have increased electric production capacity in Texas in the days and weeks leading up to the February 2021 cold weather event, but consciously chose not to do so.  Debtor Griddy Energy and others could have increased electric production capacity in Texas in the days and weeks leading up to the February 2021 cold weather event, but consciously chose not to do so.  Similarly, Debtor

and others could have weatherized and updated their generation, transmission, and distribution facilities in order to prevent cold-weather failures like those experienced in February 2021, but consciously chose not to do so.

10.     In response to Debtor's and/or its contract counter-parties failure to anticipate increased energy demands in February 2021, as well as the failure of Debtor Griddy Energy and/or its contract counter-parties to weatherize and update their generation, transmission, and distribution facilities, the transmission and distribution utilities that make up the Texas energy grid were ordered to initiate rolling blackouts.  These rolling blackouts left millions in the State of Texas without power for several days.

11.     This cold weather event and its effects on the Texas energy grid were neither unprecedented, nor unexpected, nor unforeseen. In fact, similar cold weather events in 1989 and 2011 led to exactly the same type of rolling blackouts that have affected and continue to affect Texas residents and businesses.  Texas also experienced disruptive cold weather events in 1983, 2003, 2006, 2008, and 2010.

12.     After investigating the Texas power grid in the wake of the cold weather event of 1989, the Public Utilities Commission of Texas made the following recommendations:

•       "All utilities should ensure that they incorporate the lessons learned during December of 1989 into the design of new facilities in order to ensure their reliability in extreme weather conditions.

•       All utilities should implement procedures requiring a timely annual (each Fall) review of unit equipment and procedures to ensure readiness for cold weather operations.

•       All utilities should ensure that procedures are implemented to correct defective freeze protection equipment prior to the onset of cold weather.

•       All utilities should maintain insulation integrity and heat tracing systems in proper working order. Generating unit control systems and equipment essential to cold weather operations should be included in a correctly managed preventive maintenance program.

• Additional training programs for plant personnel on the emergency cold weather procedures, including periodic drills, should be implemented by each responsible utility."

PUCT 1989 Report at 7. This information was never communicated to the Debtor's customers, nor did the Debtor take steps to ensure that contract counter-parties were in compliance with these directives and thus Debtor's Customers were left unprepared for that which the Debtor Griddy Energy knew.

13. The Federal Energy Regulatory Commission and a nonprofit regulatory authority investigated the Texas power grid after rolling blackouts were again required during a cold weather event in 2011. The FERC report concluded:

Despite the recommendations issued by the PUCT in its report on the 1989 event, the majority of the problems generators experienced in 2011 resulted from failures of the very same type of equipment that failed in the earlier event. And in many cases, these failures were experienced by the same generators. . . . In its 1989 report, the PUCT commented that "whether the corrective actions being implemented [by the generators in the wake of the event] are sufficient to prevent future freeze-off related power plant failures, only direct experience with another deep freeze will ascertain." **Texas has now had that second event, and the answer is clearly that the corrective actions were not adequate, or were not maintained**. Generators were not required to institute cold weather preparedness, and efforts in that regard lapsed with the passage of time.

FERC 2011 Report at 178–79 (footnote omitted) (emphasis added). The FERC report further noted:

the massive amount of generator failures that were experienced raises the question whether it would have been helpful to increase reserve levels going into the event. This action would have brought more units online earlier, might have prevented some of the freezing problems the generators experienced, and could have exposed operational problems in time to implement corrections before the units were needed to meet customer demand.

FERC 2011 Report at 8. As the FERC report observed, "[m]any of the generators that experienced outages in 1989 failed again in 2011." [FERC 2011 Report at 8]. Now, many of these same power generators, transmitters, and distributors, including those of Debtor Griddy Energy or its contract

counter-parties and others, have failed once again due to their refusal to implement the reasonable economical remedies recommended in 1989 and 2011.  Again, none of this information was ever communicated to the Debtor's customers, nor did the Debtor take steps to ensure that contract counter-parties were in compliance with these directives and thus Debtor's Customers were left unprepared for that which the Debtor Griddy Energy knew.

14.     Just as the reports predicted, most Griddy Energy customers experienced loss of electricity, exposing many of its customers to the freezing elements, and causing many customers to suffer property damage that could not be prevented without electric power.  Griddy Energy knew, or should have known that its services, or that of its contract counter-parties, could result in power outages at the most vulnerable times (during freezing weather) yet failed to take any reasonable actions to prevent the outages or to warn its customers that such an event had been forecast and preventative actions recommended by governmental and regulatory agencies.

**C.     The Debtor's Chapter 11 Case**

15.     The Debtor's Chapter 11 case has been driven by the failure of Debtor Griddy Energy to avoid power outages, causing massive overbilling to its Customers at the same time that it exposed its Customers to the predictable and forecast power outages arising from the freezing weather conditions.

16.     Griddy Energy's business model was simple, but deceptive.  For a fixed monthly fee of $9.99, each customer had access to wholesale electricity pricing with no mark up. Griddy Energy used a prepayment model to charge customers for electricity without notifying its customers of the risks it was taking by purchasing through Griddy Energy at changing rates from generating companies, transmission and distribution service providers that had failed to comply with the governmental recommendations that would have prevented this disaster ending in

property damages and personal injuries.

17.     Thus, Winter Storm Uri brought extreme cold weather to Texas. Load on the power grid climbed to winter records and a host of other factors led to generation outages and forced the Electric Reliability Council of Texas ("ERCOT") to shed electric load, in the form of rolling blackouts, in order to match the available generation on the grid.  At the same time Griddy Energy's average cost of a kilowatt hour of electricity of $0.098 jumped to almost $9,000.00 per kilowatt hour which Griddy Energy attempted to collect from its Customers.

18.     Finally, but as important, as a result, the Debtor has lost all of its customers by reassignment of those customers to other providers who may share as successors liability to compensate the Debtor's customers for their property damages and personal injuries.  However, the Debtor's plan and disclosure statement, unaddressed by any Committee, proposes to offer releases of the exorbitant billings in exchange for a complete release which includes both property damages and personal injuries or wrongful death claims.  Remarkably, without a Committee review and recommendation, or at least a Committee position statement, many Customers may be unaware of the loss of claims and rights by releasing Griddy Energy as the Plan proposes.  Most importantly, the Debtor is attempting to fast-track its Chapter 11.  Debtor filed its Disclosure Statement seeking interim approval, and its Plan of Liquidation in such short time as to make it very difficult, if not impossible, to organize and notify the Debtor's customers by an *ad hoc* group of Customers and their counsel, of their obligations to file claims or sufficient time to allow organization of a committee to assist in enforcing the Customer's rights and claims and the impact of voting on the proposed Plan.  See Notice by the Debtor for July 19, 2021 [Dkt.# 112].  Also to address the Debtor's position in the Plan and announced by the Debtor to the Court that it has no liability because it was only a pass-through retailer.  This position must be analyzed and opinions

and recommendations of a committee will do that (which must include an analysis of the failure of the Debtor at a minimum to warn its customers that the program they were offered included contract counter-parties whose operations did not protect from exactly what was predicted by the governmental agencies and statutes).  Likewise, to the extent that these counter-parties may have liability to the Griddy Energy Customers, or that the re-assigned provider for these Customers may have successor liability for some part, portion or all of these claims, must be determined before offering a trade-off of releases and only a Committee would do so.  The Debtor is motivated solely by demanding payment of these massive, unfair, and maybe illegal billings, in exchange for a release of the Debtor.

19.     Also critical to this issue and this Motion is the UST's position, announced to the Court on Monday, March 28, 2021, that the UST did not believe the Debtor's Customers were creditors, and did not support a committee.  Incredibly, this position was taken even though Movant's lawyers and others had notified the UST of the property damage and personal injury claims of Movants and similarly situated Customers but had no return communication regarding those claims.  These Tort Claimant Customers are creditors, *albeit* unliquidated and potentially disputed, with protected rights, including as to the personal injury Tort Claimant Customers, a right to a jury trial as determined by, and only in, the U.S. District Court.  The UST's position is wrong and warrants an order of this Court as set out in this Motion.

20.     Movants are aware that this Court does not solicit, form, nor select committee members all of which remains in the UST's authority.  However, without such committee, and thus without this Court's order there will be no committee, these Customers will remain scattered, disconnected, and likely greatly prejudiced in their rights and knowledge to exercise those rights.

**III.**
**THE NATURE OF THE CAUSES OF ACTION AND REMEDIES**
**OF THE MOVANT'S AND SIMILARLY SITUATED TORT CLAIMANT CUSTOMERS**

18.     Movant alleges that the Debtor Griddy Energy and others had a duty to Movant and other Customer to exercise, or cause to be exercised by those enabling Griddy Energy, to deliver it services, and to take reasonable care in maintaining and updating its generation, transmission, and distribution facilities in order to prevent cold-weather failures like those experienced in February 2021.  Having knowledge that none of these protections were in place, Griddy Energy not only failed to take, or cause to be taken, reasonable corrective actions to prevent cold-weather failures in its generation, transmission, and distribution facilities, but also failed to warn its Customers that each Customer faced the potential for substantial property damage or personal injury, or death, if these actions were ignored by Griddy Energy and its contract counter-parties.

19.     Debtor Griddy Energy had duties to its Customers to either comply (or demand that it contract counter-parties comply) with the duty under 16 TEX. ADMIN. CODE § 25.52 to "make reasonable provisions to manage emergencies resulting from failure of service."  Debtor Griddy Energy not only failed to "make reasonable provisions to manage emergencies resulting from failure of service" but also failed to warn its Customers that each Customer faced the potential for substantial property damage or personal injury, or death, if these actions were ignored by Griddy Energy and its contract counter-parties, as required by 16 TEX. ADMIN. CODE § 25.52. Debtor Griddy Energy's violations of 16 TEX. ADMIN. CODE § 25.52 constituted negligence *per se*.

20.     Griddy Energy had at a minimum a duty to warn its Customers and those relying on the supply of electricity that conditions existed in Griddy Energy's supply chain that could cause significant power outages coupled with significant charges neither disclosed nor in the contemplation of Griddy Energy Customers when they, and each of them, were induced to do

business with Griddy Energy.

21.     Debtor Griddy Energy's acts and omissions described herein involved an extreme degree of risk of harm to others, including Movant. Despite knowledge of this extreme risk of harm, Debtor Griddy Energy persisted in performing the acts and omissions described herein with a conscious indifference to and reckless disregard to the rights, safety, or welfare of others.  Debtor Griddy Energy's relevant conduct resulting in the injuries of Movant reflected such an entire want of care as to establish that the acts and omissions in question were the result of actual conscious indifference to the rights, welfare, or safety of the persons affected by it, including without limitation Movant.   Debtor Griddy Energy's conduct constituted more than momentary thoughtlessness, inadvertence, or error of judgment.

22.     These claims are significantly distinct from any breach of contract claim of customers, or claim of vendors, suppliers, and the like inasmuch as these claims may look to both the general asserts of the Debtor in connection with confirmation of its plan and treatment of the Tort Claimant Customers' claims, and also the general liability insurance policies of the Debtor, which are property of the estate, and which property and proceeds must be dedicated to the Tort Claimant Customers' claims and not general unsecured or administrative claims.   *See, e.g., Martinez v. OGA Charters, L.L.C. (In re Charters, L.L.C.)*, 901 F.3d 599 (5th Cir. 2018).

## IV.
## ARGUMENTS AND AUTHORITIES

### A.     Personal Injury Claims are Distinct from General Unsecured Claims of this Debtor

22.     The term "personal injury" encompasses "any injury which is an invasion of personal rights, and in this signification it may include such injuries to the person (including)

mental suffering." BLACK'S LAW DICTIONARY 786 (6th ed. 1990).[2]

23.     There are a number of distinctions among the nature of contract claims and tort claims that compel the appointment of a separate Tort Claimant Customers' Committee, including the following:

a.     Distinct from unsecured creditors, Tort Claimant Customers are the beneficiaries of the Debtor's general liability insurance proceeds which are property of this Debtor's estate to be held for the injury victims exclusively—not to be used generally by the Debtor for the Debtor's benefit or for the benefit of the Debtor's unsecured creditors. *See, e.g., Martinez v. OGA Charters, L.L.C. (In re Charters, L.L.C.)*, 901 F.3d 599 (5th Cir. 2018); *Houston v. Edgeworth (In re Edgeworth)*, 993 F.2d 51, 55–56 (5th Cir. 1993). In addition, Tort Claimant Customers are also entitled to look to the general assets of the Debtor pro-rata with all general unsecured creditors for any claims that are not paid or covered by any such insurances, in particular after exhaustion of those policy proceeds.[3]

b.     The liquidation and treatment of tort personal injury claims in a bankruptcy case is controlled by 28 U.S.C. § 157(b)(5), which provides the District Court's exclusive

---

[2]     *In re Webb*, 210 B.R. 266, 271–72 (Bankr. E.D. Va.), *aff'd, King v. Webb (In re Webb)*, 214 B.R. 553 (E.D. Va. 1997); *Boyer v. Balenoff (In re Boyer)*, 93 B.R. 313, 317 (Bankr. N.D.N.Y. 1988). *See also Anthony v. Baker (In re Baker)*, 86 B.R. 234, 236 (D. Colo. 1988) (stating without any discussion that malicious prosecution is a personal injury tort); *Littles v. Lieberman (In re Littles)*, 75 B.R. 240, 242 (Bankr. E.D. Pa. 1987) (citing intentional or negligent infliction of emotional distress as examples of personal injury torts and stating that § 157(b)(5) is "limited to those torts or causes of action which require proof of damage as an element of the underlying cause of action").

[3]     Here, the Tort Claimant Customers have claims against both the exclusive right to insurance proceeds and the general right to look to the Debtor's assets. *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986). Contract duties arise from a specific agreement between the parties; tort obligations are duties imposed by law apart from the promises made in the contract. *Airborne Freight Corp. v. C.R. Lee Enters.*, 847 S.W.2d 289, 293–94 (Tex. App.—El Paso 1992, writ denied); *see DeLanney*, 809 S.W.2d at 494. If a defendant's conduct gives rise to liability only because it breaches the parties' agreement, the plaintiff will have only a breach-of-contract claim. *DeWitt Cty. Elec. Coop. v. Parks*, 1 S.W.3d 96, 105 (Tex. 1999); *Exxon Mobil Corp. v. Kinder Morgan Oper. L.P.*, 192 S.W.3d 120, 126–27 (Tex. App.—Houston [14th Dist.] 2006, no pet.). But under the "independent-injury rule," if the conduct would give rise to liability independent of the contract, the plaintiff may be able to assert both breach-of-contract and tort claims. *Kinder Morgan Oper.*, 192 S.W.3d at 126–27; *see Parks*, 1 S.W.3d at 105.

jurisdiction to determine the amount of any tort claim, but which cannot be accomplished by the bankruptcy court as part of, or even independent of, the plan confirmation process. Although unsecured creditors filing claims do not have a right to a jury trial, personal injury claimants do and their claims may not be determined in amount by the Debtor's Plan without express consent.

      c.    More so than any other creditors in a bankruptcy proceeding, Tort Claimant Customers have been brought into this forum involuntarily. Tort Claimant Customers do "not elect to work for, do business with, or purchase the securities of" a corporate debtor.[4] In fact it was the deception of the Debtor in refusing to disclose the distinct likelihood of harm that created the Customer relationship simply because Tort Claimant Customers do not choose to be injured at all. *See* 8 COLLIER ON BANKRUPTCY ¶ 1171.01 (describing Tort Claimant Customers as "involuntary creditors"). This distinction is important for a number of reasons, including the ability of a trade creditor to protect its interest prior to doing business with a debtor. Not so for Tort Claimant Customers, who made no decision to do business with the debtor, and whose claim must be liquidated, again distinct from a vendor with a contract claim.[5]

      d.    Personal injury and wrongful death claims have a far greater public policy support for fair and equitable treatment than breach of contract claims. Not only are personal injury claims the exclusive province of the District Court, but a Tort claimant also

---

[4]    *See* Margaret I. Lyle, *Note, Mass Tort Claims and the Corporate Tortfeasor: Bankruptcy Reorganization and Legislative Compensation Versus the Common-Law Tort System*, 61 TEX. L. REV. 1297, 1305–06 (1983) (explaining that a tort victim could make himself a secured creditor if, before the debtor filed for bankruptcy, the tort victim got a final judgment against the debtor and levied immediately upon the debtor's assets that were not subject to any prior security interests).

[5]    Wrongful Death Claimants' Motion for Formation of Creditors' Committee, at 1, *In re Montreal Me. & Atl. Ry., Ltd.*, No. 13-10670 (Bankr. D. Me. Aug. 22, 2013), ECF No. 76.

cannot be forced to stand by and watch as the Debtor's assets are paid to contract and administrative claimants, only because the bankruptcy court does not have jurisdiction to liquidate those claims.  Public policy mandates a fair and equitable treatment among all claimants. Because the bankruptcy code has special provisions protection personal injury claimants, and because insurance coverage is dedicated to the victims of personal injury and property damage claims, Congress has granted bankruptcy courts broad equitable powers in their exercise of jurisdiction under the Bankruptcy Code, 11 U.S.C. § 105(a), yet restricting confirmed Chapter 11 plans to the "fair and equitable" test. 11 U.S.C. § 1129(b)(1).   The U.S. Supreme Court has recognized that there is an "overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction," which this Court has likewise acknowledged. *Bank of Marin v. England*, 385 U.S. 99, 103 (1966); *In re AWECO, Inc.*, 725 F.2d 293, 300 (5th Cir. 1984) ("The terms 'equity' and 'fairness' are not only terms of art in bankruptcy—they are catch words of bankruptcy law in general.  Equitable considerations should be preeminent in the exercise of bankruptcy jurisdiction.").

24.     These Tort Claimant Customers' claims are frequently in the nature of, or filed as, class actions which, similar to a bankruptcy proceeding, are distinct in that in a class action the rights of claimants must be similar in both factual causation as well as legal remedies.  General unsecured creditors are simply dissimilar to any Tort Claimant Customers and, for instance, could not participate in any class action as a class member.  *Compare* FED. R. CIV. P. 23(a) ("fairly and adequately protect the interests of the class"), *with* 11 U.S.C. § 1102(a)(2) (2012) ("assure adequate representation of creditors").

25.     Without an official committee, the largest class of common Customer Tort Claims will have difficulty functioning as a group, taking class positions, or have effective participation in only some form of *ad hoc* participation.  Likewise, having a fund of insurance proceeds from which only the Tort Claimant Customers class may participate compels consideration even though there will be additional costs.  Those costs could be directed to the general liability insurance proceeds to which the Tort Claimant Customers class is exclusively entitled to participate.

**B.     The Bankruptcy Code Authorizes More Than a Single Committee of Unsecured Creditors – Customers Suffering Property Damages or Personal Injuries are Creditors**

25.     The Code currently authorizes courts to form one or more creditors' committees to represent unsecured creditors.  11 U.S.C. § 1102(a)(1)–(2) (2012).

26.     The United States Trustee's office ("UST") has not appointed a committee of creditors and has indicated that it does not intend to appoint a committee of the Debtor Griddy Energy's Customers.  The UST argued precisely the opposite to this Court, indicating its position that Customers are only "rate payers" owing monies to the Debtor, and not creditors.  This position simply overlooks the more than 29,000 customers that may have suffered property damage, personal injury or even death as a result of the negligence and acts, or failures to act, of the Debtor Griddy Energy.

27.     Movant urges this Court to appoint a committee of Customers Suffering Property Damage or Personal Injury Claims.

**V.**
**CERTIFICATE OF CONFERENCE**

27.     Movant's Counsel made numerous attempts to discuss this Motion with the UST office, placing multiple calls with messages and multiple email requests both prior to and after the initial formation of the UCC and the Reconstituted UCC, to discuss the topic of this motion, none

of which have addressed the prior requests, or this Motion.  Movant will continue to reach out to the UST office, but accordingly, this Motion is considered an Opposed Motion.

## VI.
## CONCLUSION

28.     In determining whether additional creditors' committees are needed in a case, courts balance the following most important factors addressed above: (1) the nature of the case; (2) the ability of the existing creditors' committee to function; (3) the added cost of forming an additional creditors' committee and the timing of a creditor group's motion requesting the court to form an additional creditors' committee; and (4) the desires of the constituencies.[6]  In fact, tort claims resulting from the negligence of electric utilities in bankruptcy are clearly recognized as important and meaningful committees to treat tort claims and the respective remedies to protect this unique class of creditors.  *See, e.g.*, PG&E Tort Claimants Committee 2019-2021, United States Bankruptcy Court, Northern District of California, No. 19-30088 (DM).

29.     Balancing these factors strongly weighs in favor of forming a committee for Tort Claimant Customers.  The interests and rights in property of the estate, to the exclusion of other unsecured creditors (*i.e.*, the general liability insurance, as well as Director and Officer insurance), the sheer size of the personal injury and property damages claims, as well as the nature of personal injury claims and the unique jurisdiction of the District Court for the purposes of liquidation (and treatment), strongly compels the appointment of a Tort Claimant Customers' Committee.

---

[6]      *See, e.g.*, *In re Dow Corning Corp.*, 194 B.R. 121, 141 (Bankr. E.D. Mich. 1996) (*citing In re Hill Stores Co.*, 137 B.R. 4, 5–6 (Bankr. S.D.N.Y. 1992)); *In re McLean Indus., Inc.*, 70 B.R. 852, 860–61 (Bankr. S.D.N.Y. 1987), *rev'd on other grounds*, 212 B.R. 258 (E.D. Mich. 1997); *Albero v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 68 B.R. 155, 159 (Bankr. S.D.N.Y. 1986); *In re Kalvar Microfilm, Inc.*, 195 B.R. 599, 601 (Bankr. D. Del. 1996); *In re McLean Indus., Inc.*, 70 B.R. 852, 860 (Bankr. S.D.N.Y. 1987).  No one factor is dispositive, and the amount of due consideration given to each depends on the circumstances of the particular chapter 11 case. *See Dana*, 344 B.R. at 38; *Kalvar Microfilm*, 195 B.R. at 601.

WHEREFORE, Movant, individually and on behalf of other similarly situated personal injury, wrongful death and property damages claimants, requests and seeks an order of this Bankruptcy Court for the United States Trustees' appointment of a Tort Claimant Customers' Committee in addition, and not in lieu of, the unsecured creditors' committee previously appointed and reconstituted by the United States Trustee's office, and for such other and further relief to which Movant may be justly entitled, both at law and in equity.

Respectfully submitted,

*/s/ Shelby A. Jordan*
Shelby A. Jordan
Texas Bar No. 11016700
Fed Bar No. 2195
Jordan, Holzer & Ortiz
500 N. Shoreline Dr. Suite 900
Corpus Christi, Texas 78401
Telephone:  (361) 884-5678
Facsimile: (361) 888-5555
sjordan@jhwclaw.com
Bankruptcy Counsel for
Larry Duane Ford

Sander L. Esserman
Texas Bar No. 06671500
Peter C. D'Apice
Texas Bar No. 05377783
**STUTZMAN BROMBERG ESSERMAN & PLIKFA**
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
Email: esserman@sbep-law.com
        dapice@sbep-law.com
Telephone:  (214) 969-4900
Facsimile:  (214) 969-4999

**State Court Counsel for Movants**
Larry F. Taylor, Jr.
Texas Bar No. 24071156
**THE COCHRAN FIRM**
3400 Carlisle St., Ste. 550

Dallas, TX 75204
Email: ltaylor@cochrantexas.com
Telephone: (214) 651-4260
Facsimile: (214) 651-4261

Mikal C. Watts
Texas Bar No. 20981820
**WATTS GUERRA LLP**
Four Dominion Drive
Bldg. 3, Suite 100
San Antonio, TX 78257
Email: mcwatts@wattsguerra.com
Telephone: (210) 447-0500
Facsimile: (210) 447-0501

Patrick A. Luff
Texas Bar No. 24092728
Matthew R. McCarley
Texas Bar No. 24041426
C. Bryan Fears
Texas Bar No. 24040886
N. Majed Nachawati
Texas Bar No. 24038319
**FEARS NACHAWATI, PLLC**
5473 Blair Road
Dallas, TX 75231
Email:  pluff@fnlawfirm.com
        mccarley@fnlawfirm.com
        fears@fnlawfirm.com
        mn@fnlawfirm.com
Telephone: (214) 890-0711
Facsimile: (214) 890-0712

Jerrold S. Parker
New York Bar No. 1894666
*Pro hac vice application to be filed*
Raymond Silverman
New York Bar No. 3033743
*Pro hac vice application to be filed*

Melanie Muhlstock
New York Bar No. 2858900
*Pro hac vice application to be filed*
Nicholas F. Morello New Jersey Bar No.
322572020
*Pro hac vice application to be filed*

**PARKER WAICHMAN LLP**
6 Harbor Park Drive
Port Washington, NY 11050
Email:  jerry@yourlawyer.com
          rsilverman@yourlawyer.com
          mmuhlstock@yourlawyer.com
          nmorello@yourlawyer.com
Telephone: (516) 723-4629
Facsimile: (516) 723-4729

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that notice of the filing of this document has been served on the below named parties by available knowledge by the Court's CM/ECF system on March 31, 2021.

Karen Hope Beyea-Schroeder on behalf of Creditor Charles Huppert
karen.schroeder@rburnettlaw.com

Karen Hope Beyea-Schroeder on behalf of Creditor Thomas Clark
karen.schroeder@rburnettlaw.com

Jason B. Binford on behalf of Interested Party Public Utility Commission of Texas
Jason.binford@oag.texas.gov

Riley Burnett on behalf of Creditor Charles Huppert
rburnett@rburnettlaw.com

Riley Burnett on behalf of Creditor Thomas Clark
rburnett@rburnettlaw.com

Kevin Chiu on behalf of Debtor Griddy Energy LLC
kevin.chiu@bakerbotts.com

Jeffrey R Cox on behalf of Interested Party Bernice Willman
jcox@slmpc.com

David Robert Eastlake on behalf of Debtor Griddy Energy LLC
david.eastlake@bakerbotts.com

James Ryan Fowler on behalf of Creditor Lisa Sandifer Khoury
rfowler@potts-law.com

James Ryan Fowler on behalf of Plaintiff Lisa Khoury
rfowler@potts-law.com

Tara L Grundemeier on behalf of Creditor Harris County, et al.
houston_bankruptcy@publicans.com

Shelby A Jordan on behalf of Interested Party multiple injured and death case tort claimants
ecf@jhwclaw.com

John Lawrence on behalf of Defendant Griddy Energy LLC
john.lawrence@bakerbotts.com, jessica.aquino@bakerbotts.com

John Lawrence on behalf of Defendant Griddy Holdings LLC
john.lawrence@bakerbotts.com, jessica.aquino@bakerbotts.com

Kevin M Lippman on behalf of Creditor ERCOT
klippman@munsch.com, pmoore@munsch.com

Christopher R. Newcomb on behalf of Debtor Griddy Energy LLC
chris.newcomb@bakerbotts.com, jacob.herz@bakerbotts.com

Kelli S. Norfleet on behalf of Creditor Macquarie Energy LLC
kelli.norfleet@haynesboone.com, kenneth.rusinko@haynesboone.com

Kelli S. Norfleet on behalf of Creditor Macquarie Investments US Inc.
kelli.norfleet@haynesboone.com, kenneth.rusinko@haynesboone.com

Rachel Ruth Obaldo on behalf of Interested Party State of Texas
bk-robaldo@oag.texas.gov, sherri.simpson@oag.texas.gov

Deborah Michelle Perry on behalf of Creditor ERCOT
dperry@munsch.com

Michael Alan Rosenthal on behalf of Interested Party Luminant Energy Company LLC
MBischoping@gibsondunn.com;kmatorana@gibsondunn.com

Abigail R. Ryan on behalf of Interested Party State of Texas
Abigail.Ryan@oag.texas.gov

Robin Spigel on behalf of Debtor Griddy Energy LLC
robin.spigel@bakerbotts.com

US Trustee
USTPRegion07.HU.ECF@USDOJ.GOV

Jana Smith Whitworth on behalf of U.S. Trustee US Trustee
jana.whitworth@usdoj.gov


*/s/ Shelby A. Jordan*
Shelby A. Jordan