1            IN THE UNITED STATES BANKRUPTCY COURT

2           FOR THE SOUTHERN DISTRICT OF TEXAS

3                    HOUSTON DIVISION

4  IN RE:                    §     CASE NO. 21-30923-11
                             §     HOUSTON, TEXAS
5  GRIDDY ENERGY, LLC,       §     THURSDAY,
                             §     APRIL 1, 2021
6           DEBTOR.          §     1:57 P.M. TO 2:24 P.M.

7

8     MOTIONS TO APPOINT ADDITIONAL COMMITTEES (VIA ZOOM)

9           BEFORE THE HONORABLE MARVIN ISGUR
              UNITED STATES BANKRUPTCY JUDGE

10

11

12     APPEARANCES:                    (SEE NEXT PAGE)

13

14

15     (Recorded via CourtSpeak; No log notes)

16

17

18

19

20              TRANSCRIPTION SERVICE BY:

21        JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                935 Eldridge Road, #144
22              Sugar Land, TX 77478
                   281-277-5325
23            www.judicialtranscribers.com

24

25  Proceedings recorded by electronic sound recording;
        transcript produced by transcription service.

1                    <u>APPEARANCES (VIA ZOOM)</u>:

2

3   FOR THE DEBTOR:              BAKER BOTTS, LLP
                                 Robin Spigel, Esq.
4                                30 Rockefeller Plaza
                                 New York, New York  10112
5                                212-408-2545

6

7   FOR THE STATE OF TEXAS:      TEXAS ATTORNEY GENERAL'S
                                 OFFICE
8                                Abigail R. Ryan, Esq.
                                 PO Box 12548
9                                Austin, Texas  78711
                                 512-475-4297
10

11  FOR PUBLIC UTILITY
    COMMISSION OF TEXAS:         ATTORNEY GENERAL OF TEXAS
12                               Jason B. Binford, Esq.
                                 300 W 15th Street
13                               Mail MC-008
                                 Austin, Texas  78701
14                               512-475-4936

15

16  FOR THE US TRUSTEE:          US TRUSTEE'S OFFICE
                                 Jana S. Whitworth, Esq.
17                               515 Rusk Street
                                 Suite 3516
18                               Houston, Texas  77002
                                 713-718-4650
19

20  FOR KAREN PRESCOTT:          JORDAN HOLZER & ORTIZ, PC
                                 Shelby A. Jordan, Esq.
21                               500 N Shoreline
                                 Suite 900 N
22                               Corpus Christi, Texas  78401
                                 361-884-5678
23

24
    (Please also see Electronic Appearances.)
25

1          HOUSTON, TEXAS; THURSDAY, APRIL 1, 2021; 1:57 P.M.

2          THE COURT:  All right.  Good afternoon.  We're

3   here in the Griddy Energy case with respect to the oral

4   motions and the written motion to appoint additional

5   Committees.

6          I want to start with a report from the US

7   Trustee.  I understand that from just reading the Docket

8   Sheet that a Committee has been appointed and I want to

9   understand who's on the current Committee and then we'll

10   move to the parties that are the Movants here today.

11          If I can get the US Trustee to press five star

12   one time on your phone please?

13          Ms. Whitworth, good afternoon.

14          MS. WHITWORTH:  Good afternoon, Judge Isgur.

15          Can you hear me?

16          THE COURT:  I can.  Thank you.

17          MS. WHITWORTH:  Your Honor, I am very pleased to

18   report that the US Trustee has fulfilled his duty under

19   Section 1102(a)(1) of the Bankruptcy Code to appoint a

20   Committee of unsecured creditors as reflected in the United

21   States Trustee's Notice of Appointment of Creditors filed at

22   Document 116.

23          Judge, this Committee consists of three members,

24   all of whom are former customers and claimants against the

25   Debtor and the US Trustee takes the position that the

1  Committee adequately represents all unsecured creditors

2  including those claimants against Griddy and we don't feel

3  like an additional Committee is required at this time.

4         I spoke with Ms. Ryan --

5         THE COURT:  So what is Ms. O'Neil's claims

6  against the Estate?

7         MS. WHITWORTH:  She is in the same position as

8  the other customers who were billed at the higher rate and

9  suffered a loss --

10        THE COURT:  She's one of the most prominent

11  restructuring lawyers in the state and just happens to also

12  be a former customer of Griddy?  I just want to be sure

13  that's what's going on.

14        MS. WHITWORTH:  Yes, Your Honor.

15        THE COURT:  All right.  And Mr. Williams?

16        MS. WHITWORTH:  He is also a Griddy customer.

17  He, I believe -- let me pull up my chart, Your Honor.  I

18  believe he was billed over $17,000 for two -- or three

19  different meters that normally ran between $75 and $150 a

20  month.

21        And Ms. Khoury is also one of the customers who

22  was billed at the higher rate than normal.

23        THE COURT:  All right.  Thank you.

24        Now let me hear from the --

25        MS. WHITWORTH:  Your Honor?

1          THE COURT:  I'm sorry.  Go ahead.

2          MS. WHITWORTH:  If I may, Your Honor?

3  Ms. Lisa Khoury, who was elected as the chair of the

4  Unsecured Creditors Committee, would like to address the

5  Court and say a few words on behalf of the Committee, if the

6  Court would permit her the time to do that.

7          THE COURT:  I will.  First, I want to hear from

8  those that made motions and then --

9          MS. WHITWORTH:  Yes, sir.

10         THE COURT:  -- I basically wanted a status report

11  from you on the existing Committee.  As to the merits of

12  appointing a new Committee, I don't know whether some of

13  those motions are going to be moot.  I just don't know what

14  the status is and I want the parties (indiscernible).  So

15  those who made oral motions, we will hear from you.

16         Ms. O'Neil, I see you there and you've raised

17  your hand.  I assume that you're not making an oral motion

18  but just clarifying your role as that of a customer; is that

19  right?

20         MS. O'NEIL:  Yes, Your Honor.  I just wanted to

21  respond to the Court.  For the Record, Holly O'Neil.

22         I am appearing basically in the unfortunate

23  position of being a creditor in this particular instance.

24  We had two properties both on Griddy and unfortunately our

25  -- ran up about $27,000 in costs on those two properties,

1  which were paid -- or charged against us by Griddy directly.

2  So I know it's unusual, but I also wanted to be helpful to

3  the process as well. so.

4          THE COURT:  I saw your name on the list and I

5  said I've got to find out what's going on here before I go

6  on and that clarification answers the question that I had,

7  so thank you.

8          Ms. Ryan, go ahead.

9          MS. RYAN:  (No audible response).

10          THE COURT:  Ms. Ryan?

11          MS. RYAN:  Good afternoon, Judge Isgur.  This is

12  Abigail Ryan representing the State of Texas and I'm with

13  the Office of the Texas Attorney General.

14          I believe since the US Trustee has appointed a

15  Committee of general unsecured creditors, which looks like

16  it will be led by consumers that have been caught up in the

17  winter storm, that my request for a Consumer Committee is

18  moot by the appointment of the General Unsecured Creditors

19  Committee.

20          THE COURT:  Thank you.

21          MS. RYAN:  Thank you, Your Honor.

22          THE COURT:  Mr. Jordan?

23          MR. JORDAN:  (No audible response).

24          THE COURT:  Mr. Jordan?

25          MR. JORDAN:  Judge, thank you.  Very briefly just

1   to let you know our position, then when you're ready to hear

2   our arguments, I'll do that.

3            Our position is that the appointment of the

4   Committee that happened on the eve of this hearing that

5   happened last afternoon -- last afternoon and met for the

6   first time this morning, that that probably is -- I don't

7   know what really motivated the timing, but that probably is

8   a good indicator of progress in that there's a legitimate

9   Committee.  There are no tort claimants on that Committee,

10  and so a legitimate Committee of those people whose contract

11  obligations resulted in being tagged for huge amounts of

12  money that no one would in my mind had foreseen.

13           But the issue about what our motion deals with

14  has nothing to do with this Committee.  This Committee is

15  the -- the lady that wants to talk to you is the class

16  representative of those people who lost money by being

17  overcharged and the other two members -- Ms. O'Neil just

18  mentioned and Mr. Williams, they're also people who are

19  contractually obligated to do something that no one

20  contemplated.  And so the question becomes:  How is that to

21  be handled?

22           The issues for them are absolutely distinct from

23  the issues that the tort claimants have in this case and so

24  for that reason, Judge, we truly desire to go forward with

25  our hearing on the motion to appoint a -- now a tort -- a

1   customers' tort claim Committee.  I don't -- I doubt the

2   motivation had any to do with the higher standard that many

3   courts apply to a second Committee because we were really

4   not anticipating being a second Committee.  We were in line,

5   I thought, to be a participant in a Committee of tort

6   claimants and -- but now we are a second Committee.

7           But I don't think that changes the nature -- will

8   not change the nature of my presentation to the Court today,

9   nor should it change the nature of, I don't think, the

10  burden of proof since this has all happened literally within

11  hours of this Court's announced hearing when you announced

12  Monday there'd be a hearing on these issues.  The response

13  came yesterday evenin, so.

14          THE COURT:  All right.

15          MR. JORDAN:  And let me just mention one other

16  thing.  The Debtor has filed an opposition and objection to

17  our motion and that opposition basically said they weren't

18  opposed to a Committee of customers, they were only opposed

19  to any Committee member being a customer and a tort

20  claimant.  And I think the effect is they got their wish in

21  that respect.  This Committee that has now been appointed by

22  the US Trustee doesn't have any representation of a tort

23  claimant on it at all.

24          THE COURT:  Thank you.

25          Let me hear from Ms. Khoury and then we're going

1  to come back and let's talk about how we're going to proceed

2  on your motion.

3          Ms. Khoury, if I can get you to press five star

4  one time on your phone please?

5          All right.  I've got you.

6          MS. KHOURY:  Your Honor --

7          THE COURT:  Ms. Khoury, good afternoon.

8          MS. KHOURY:  Good afternoon.  Can you hear me?

9          THE COURT:  I can.  Thank you.

10          Thank you for agreeing to serve as chair of the

11  Committee, Ms. Khoury.

12          MS. KHOURY:  Yes.  And we are excited to serve

13  and assist the Court.  On behalf of the Committee, I just

14  wanted to let you know we recognize that it's our

15  responsibility to represent all unsecured creditors and that

16  we think that we can do this as one Committee and we want to

17  do this properly as we do realize this is a unique case.

18          THE COURT:  Thank you, Ms. Khoury.

19          Mr. Jordan, if you want to proceed today, I'm

20  going to let you proceed today.  This is scheduled for

21  hearing today.  If you want to wait because things changed

22  late yesterday, I don't think in any way unfairly, I'm going

23  to abate your motion and let you bring it back on for

24  another day.

25          I have real questions about some of the stuff in

1   your pleadings, but, you know, those -- there may be very

2   good answers to the questions that I have.

3          Do you want to proceed today or do you want to

4   proceed on another day where you can better swallow and

5   absorb the appointment of a Committee?

6          MR. JORDAN:  Judge, I actually think today would

7   be fine.  I don't -- I'm anxious to hear issues of concerns

8   that the Court has and -- so that would -- I wouldn't be

9   comfortable waiting for another week wondering what

10  Judge Isgur was concerned about, so -- and from my

11  perspective, I think because the distinctions that I made

12  earlier, I would like to proceed today with just a series of

13  oral arguments to -- that the Court understand our position

14  that there is no representation of any tort claimant on this

15  Committee and that that -- and the tort claimant is so

16  distinct that it really needs to be handled in a fashion of

17  having a Tort Committee, which I know the Court is very

18  familiar with those kind of Committees and have implemented

19  those from time to time, but I --

20         THE COURT:  So you're not going to -- you won't

21  have any actual evidence today, it's going to be argument?

22         MR. JORDAN:  It's just going to be argument.

23  There may be some judicial notice requests, but it's just

24  argument.  In fact, it's --

25         THE COURT:  I really have two questions for you

1  and let me just ask them.

2          MR. JORDAN:  Okay.

3          THE COURT:  First is:  How many tort claimants

4  are you aware of against Griddy itself?

5          MR. JORDAN:  Against Griddy as customers?  Gosh,

6  I -- Judge, I can't give you an accurate number.  I can say

7  that it's multiple.  We have four candidates that we sent to

8  the US Trustee's Office earlier this week and before with

9  respect to the Committee and one movant is named, but we

10 have three others or four others that have filled out the

11 information and have asked.

12         But the problem I would have in giving you a

13 number is I think even the law firms that I've been working

14 with don't have accurate numbers yet.  They've got

15 inquiries, they have -- they're going through their due

16 diligence, but it would number in a fairly large number, we

17 believe, but that's about as accurate, Your Honor, as I can

18 get.  If that needs to be more accurate, I can certainly

19 have that answer quantified with what we have so far, but I

20 will say that it's --

21         THE COURT:  Well, of the three, what are the

22 injuries by the three, the alleged injuries for the three?

23         MR. JORDAN:  Actually there's four, I think.

24 Three are property damage claims, that is, broken pipes,

25 flooding, those sort of things.  And then the Movant,

1   Ms. Prescott, is a personal injury claim.  I don't have the

2   details, Judge, of her injuries because the problem we had

3   is that assigning the claims among the various entities that

4   are involved in both bankruptcy and non-bankruptcy has been

5   a real task.  We don't -- for instance, we don't in the

6   Griddy case have access to the customer base.  The address

7   is not disclosed --

8           THE COURT:  But you have clients and the clients

9   know who their power provider was, right?

10          MR. JORDAN:  They do.  And in the event that

11  Patrick Luff (phonetic) is on the phone and can answer the

12  questions specifically, I would defer to him.  He is one of

13  the counsel, Judge, the -- for one of the law firms that's

14  been most active and he has really been handling the

15  database and the information that's been furnished to me, so

16  I would be giving you secondhand information.

17          THE COURT:  Okay.

18          MR. JORDAN:  If Mr. Luff --

19          THE COURT:  What could Griddy in theory have done

20  so that your clients with broken pipes wouldn't have had

21  broken pipes?  What could Griddy itself have done?  As a

22  retail provider only, what could they have done so that your

23  clients wouldn't have had broken pipes?

24          MR. JORDAN:  Judge, I would say -- I'd say it's

25  slightly different.  Here's what they should have done at a

1  minimum:  What they could have done --

2          THE COURT:  No, no.  I want you to answer my

3  question.

4          What could they have done that if they had done

5  it, your clients wouldn't have had broken pipes?

6          MR. JORDAN:  They could have fully disclosed to

7  our clients that the recommendations of the -- the FERC

8  recommendations of the Texas Energy Commission, those that

9  -- the recommendations or the instructions that were set out

10  in our motion, they could have warned their customers,

11  "Look, here's the problems we have" and --

12          THE COURT:  If they had warned their customers,

13  your customers still wouldn't have had electricity.  I want

14  to know what could they have done so that your clients

15  wouldn't have had broken pipes.

16          MR. JORDAN:  Well, I would say it this way:  I

17  think, I understand the science of this, is that certain

18  providers didn't have these issues, certain -- well, for

19  instance, I was right in the middle of Austin and six inches

20  of snow --

21          THE COURT:  That's a distribution issue, not a

22  retail provider.

23          What could a retail provider have done so that

24  your clients would not have had broken pipes?  Because if

25  that's not part of the pleading, I don't have any idea why

1   there's a claim.

2           MR. JORDAN:  And part of the pleading that I

3   filed with the Court says that the duty to have disclosed

4   that their counter -- contract counterparties, that is, the

5   generators or the distributors or the transmission, they

6   have not done what the recommendations since 2011 required

7   and that was to winterize --

8           THE COURT:  What steps of Griddy would have

9   stopped your clients' pipes from breaking?  Disclosure alone

10  doesn't stop a pipe from breaking.

11          MR. JORDAN:  Well, it --

12          THE COURT:  What would have stopped your clients'

13  pipes from breaking?

14          MR. JORDAN:  It could have only -- in my argument

15  thus far, it could only have caused the customer to employ

16  another agency or another provider.

17          THE COURT:  I think that's a basic

18  misunderstanding of how the Texas system works.  I can buy

19  electricity from virtually any retail provider here in

20  Houston and at my home when my power went out, it was

21  because CenterPoint couldn't deliver power to me.  It had

22  nothing to do with who I bought power from.  I bought it

23  from a retail provider.  My retail provider couldn't have

24  made CenterPoint give me power.

25          I want to know your theory under which your folks

1   wouldn't have been without power.  And going to another

2   retail provider is a theory that on its face is inconsistent

3   with the way that I understand the system to function.

4   Maybe my understanding is wrong and maybe I should give you

5   a chance to let me know this answer to this, but I'm not

6   going to be appointing a Committee on a frivolous claim.

7           MR. JORDAN:  Well, and I wouldn't -- I really

8   wouldn't ask you to do that so I would suggest that I have

9   an opportunity to answer the question in the specifics of

10  the industry how it works.

11          But back to the point that I was trying to make

12  is that if Griddy had said, "Look, what's happening here is

13  that if you don't winterize your own home, here's what's

14  going to happen.  If you don't buy you a generator, here's

15  what's going to happen."  There are ways that Griddy could

16  have cautioned that the buying of cheap electricity or could

17  have cautioned that our counter-contract parties are not

18  winterizing the system and that you will likely lose --

19          THE COURT:  No.  Griddy couldn't make them do

20  that.  And the price that Griddy charged had nothing to do

21  with the reliability, I don't think.  Maybe this is just a

22  fundamental misunderstanding on my part and I do want to

23  understand this.  If Griddy could have --

24          MR. JORDAN:  Well, I --

25          THE COURT:  If there's something Griddy could

1  have done so that your clients would have had power, I

2  understand the claim, but if there's nothing Griddy could

3  have done so that your clients would get power, I don't

4  understand it and it looks frivolous.  If you want some time

5  to answer that question, I will give you the time.

6          MR. JORDAN:  Judge, I do because first of all, I

7  would -- if it turns out to be you're accurate and I'm not,

8  I will not pursue a frivolous motion, so I want the

9  opportunity to respond to you.  And I feel ill-prepared

10  because only because this is not my industry.  This was --

11  my industry is applying these facts that I'm aware of to the

12  Bankruptcy Code and to the issues that are involved.  But I

13  would like some additional time to respond specifically to

14  your question as it applies to the industry that I may be

15  entirely mistaken about.

16          THE COURT:  So let me ask -- I think the most

17  objective one here right now about this will be the Attorney

18  General's Office.  I don't know if that's Ms. Ryan,

19  Mr. Binford.

20          Am I understanding the basics of how the system

21  works?  Because if so, I don't want to be sending Mr. Jordan

22  down a rabbit trail either.

23          Ms. Ryan, Mr. Binford, whoever wants to answer.

24          MS. RYAN:  Good afternoon, Your Honor.  This is

25  Abigail Ryan for the Texas Attorney General's Office.  As I

1  represent the Consumer Protection Division, I think that I

2  will let Mr. Binford answer that question for you.

3          THE COURT:  Thank you.

4          Mr. Binford, is there -- in your view, is there

5  something a retail provider could have done to assure

6  distribution of power to Mr. Jordan's clients' homes?

7          MR. BINFORD:  Your Honor, Jason Binford, on

8  behalf of the Public Utility Commission.

9          I'm not aware of anything, but I hesitate to have

10  my opinion carry a whole lot of weight here.  I'm in a

11  similar situation of Mr. Jordan where I can -- I'd love to

12  debate the intricacies of the Bankruptcy Code with Your

13  Honor, but I certainly do not present myself as an expert in

14  this industry and I can discuss with my client but for

15  whatever it's worth, Jason Binford's opinion is that I don't

16  understand what they could have done.

17          THE COURT:  All right.  I'm going to give you a

18  chance to tell me, Mr. Jordan.

19          Why don't I do this?  If anyone objects, please

20  voice it.  Otherwise, I'm abating the motion.  When you're

21  ready to terminate the abatement, I want you to file a

22  motion to terminate the abatement and include with it an

23  explanation of what Griddy could have done so that your

24  clients would not have lost power.

25          MR. JORDAN:  Judge, I really appreciate that

1  courtesy and I will do that and I will do that as promptly

2  as I can.  I know this abatement is not going to -- doesn't

3  need to be hanging around, so I will get the -- as much of

4  an answer as I can get accurately and with citations as

5  quickly as I possibly can.  And I appreciate

6  (indiscernible).

7          THE COURT:  Ms. Spigel?  Go ahead, Ms. Spigel.

8          MS. SPIGEL:  Your Honor, Robin Spigel, Baker

9  Botts, counsel for the Debtor.

10          Your Honor, Mr. Jordan brought this motion and

11  it's fraught with inaccuracies related to the business.  We

12  object to the ability of him to come back and spend more

13  time and money -- there's a lot of lawyers -- on this

14  particular hearing.  He doesn't know whether his clients

15  have claims, what kind of claims they are and what the

16  relationship is between Griddy business and the claims that

17  he's making.

18          Griddy provided access to electricity.  His

19  clients got electricity because we procured it from ERCOT or

20  others and it was transmitted to his clients.  I don't think

21  there should be another opportunity for Mr. Jordan to come

22  back and reopen his claims.  He hasn't -- there are no

23  claims that have been filed.  The motion is by one movant

24  and five law firms.  We haven't -- we're not aware of any

25  property damage or personal injury related to Griddy.  And

1  we object to it being abated or adjourned.

2         THE COURT:  I'm going to overrule the objection.

3  If he can give me a credible picture, then I'm going to

4  allow him to present it.  I'm not going to deny Texas

5  customers the ability to be here, but they're going to be

6  here on something that at least I understand is potential

7  for a claim.  And right now my view is the claim as stated

8  looks frivolous, but that is based on my general

9  understanding of how the Texas power system is put together

10 and I shouldn't be dismissing something based on my general

11 understanding.  If Mr. Binford's not an expert, then I

12 promise I'm not an expert.  So let me let Mr. Jordan have

13 the opportunity to replead it.

14        You don't know Mr. Jordan, maybe you do know

15 Mr. Jordan.  I don't think he's going to replead it and tell

16 me something that isn't accurate so he'll investigate now

17 and figure out what they could have done.  If there's

18 nothing that they could have done, then he's not going to

19 move to terminate the abatement.  We'll see it then.

20        I'm abating.  We'll wait and see what we get.

21 Thank you.

22        MR. JORDAN:  Thank you, Judge.

23        THE COURT:  I am showing that the oral motion

24 made by the Attorney General is now withdrawn as moot.

25        We have a Committee.  My thanks go to the US

1   Trustee for appointing a Committee so promptly.

2          Ms. Khoury, I appreciate the fact that you

3   recognized that your job is for all unsecured claims and not

4   just for customer claims.  I think that the fact that the

5   three members of the Committee happen to be customers means

6   that we won't lose focus that customers may have claims as

7   well, but your duty isn't just to customers, it's to

8   everybody.

9          I would also encourage you, because of the lack

10  of money in the case and because of the fact that most cases

11  and most claims of this nature are going to result in some

12  contingency fee award, you consider -- the Committee should

13  consider retaining counsel that is funded, at least in part,

14  on a contingency fee basis based on the benefits that are

15  derived to the holders of unsecured claims.  That is not a

16  requirement.  You're allowed to try and hire somebody on an

17  hourly fee basis and maybe some mixture of the two, but I

18  would just encourage you to consider all your alternatives

19  and if you come up with an alternative that makes sense,

20  then I'll approve it.

21          But most people are -- start off by believing

22  that a Committee can't hire contingency fee counsel and I'll

23  just tell you I start off believing a Committee can hire

24  contingency fee counsel and in this case, that may make more

25  sense.  It is up to you and you may choose to hire pure

1  hourly.  Okay.

2          We are in adjournment until 2:30.  Thank you.

3      (Hearing adjourned at 2:24 p.m.)

4                    * * * * *

5          *I certify that the foregoing is a correct*

6  *transcript to the best of my ability due to the condition of*

7  *the electronic sound recording of the ZOOM/telephonic*

8  *proceedings in the above-entitled matter.*

9  */S/ MARY D. HENRY*

10 *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

11 *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

12 *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

13 *JTT TRANSCRIPT #63747*

14 *DATE FILED:  APRIL 6, 2021*

15

16

17

18

19

20

21

22

23

24

25