IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Griddy Energy LLC, | ) | Case No. 21-30923 (MI) |
| | ) | |
| Debtor. | ) | |

**AFFIDAVIT OF PUBLICATION FOR <u>NON-FORMER CUSTOMERS</u>
BAR DATE NOTICE IN THE NEW YORK TIMES**



# PROOF OF PUBLICATION

Apr-05, 20 21

I, Edgar Noblesala, in my capacity as a Principal Clerk of the Publisher of The New York Times, a daily newspaper of general circulation printed and published in the City, County and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on

Apr 5, 2021, NYT & Natl, pg B3

Sworn to me this 5th day of April, 2021

Notary Public

Ellen Herb
Notary Public, State of New York
No. 01HE6163785
Qualified in New York County
Commission Expires April 2, 2023

---

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

In re: GRIDDY ENERGY LLC,[1]   ) Chapter 11
            Debtor.   ) Case No. 21-30923 (MI)

**NOTICE OF DEADLINES FOR NON-FORMER CUSTOMERS OF THE DEBTOR FOR THE FILING OF PROOFS OF CLAIM, INCLUDING REQUESTS FOR PAYMENTS UNDER SECTION 503(b)(9) OF THE BANKRUPTCY CODE**

THE NON-FORMER CUSTOMER CLAIMS BAR DATE IS APRIL 28, 2021 at 5:00 p.m. (CT)
THE GOVERNMENTAL CLAIMS BAR DATE IS SEPTEMBER 13, 2021 at 5:00 p.m. (CT)

PLEASE TAKE NOTICE OF THE FOLLOWING:

*Deadlines for Filing Proofs of Claim for All Entities Other than Former Customers[2] of the Debtor*. On March 30, 2021, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order (the "Order") establishing certain deadlines for the filing of proofs of claim by non-Former Customers of the Debtor, including requests for payment under section 503(b)(9) of the Bankruptcy Code, in the chapter 11 case of Griddy Energy LLC (the "Debtor"), Case No. 21-30923 (MI).

*The Non-Former Customer Bar Dates*. Pursuant to the Order, *all* entities (except former customers of the Debtor, governmental units, and other entities exempt from filing Proof(s) of Claim under the Order), including individuals, partnerships, estates, and trusts who have a claim or potential claim against the Debtor that arose prior to **March 15, 2021**, no matter how remote or contingent such right to payment or equitable remedy may be, *including* requests for payment under section 503(b)(9) of the Bankruptcy Code, MUST FILE A PROOF OF CLAIM as to all entities *other than* Former Customers, on or before **April 28, 2021 at 5:00 p.m. (CT)** (the "Non-Former Customer Claims Bar Date"). Governmental entities who have a claim or potential claim against the Debtor that arose prior to **March 15, 2021**, no matter how remote or contingent such right to payment or equitable remedy may be, MUST FILE A PROOF OF CLAIM on or before **September 13, 2021 at 5:00 p.m. (CT)** (the "Governmental Bar Date"). NO BAR DATE HAS BEEN SET YET FOR FORMER CUSTOMERS OF THE DEBTOR.

EXCEPT FOR FORMER CUSTOMERS AND ANY OTHER PERSON OR ENTITY THAT IS EXEMPT FROM FILING A PROOF OF CLAIM UNDER THE ORDER, ANY PERSON OR ENTITY WHO FAILS TO FILE A PROOF OF CLAIM, INCLUDING ANY REQUEST FOR PAYMENT UNDER SECTION 503(b)(9) OF THE BANKRUPTCY CODE, ON OR BEFORE THE NON-FORMER CUSTOMER CLAIMS BAR DATE OR GOVERNMENTAL BAR DATE, AS APPLICABLE, SHALL NOT BE TREATED AS A CREDITOR WITH RESPECT TO SUCH CLAIM FOR THE PURPOSES OF VOTING AND DISTRIBUTION ON ANY CHAPTER 11 PLAN.

*Filing a Proof of Claim*. Each Proof of Claim must be filed, including supporting documentation, so as to be *actually received* by Stretto as follows: (i) by electronic submission through the interface available at https://cases.stretto.com/Griddy or (ii) if submitted through non-electronic means, by U.S. Mail or other hand delivery system at the following address: (a) **If by First-Class Mail**: Griddy Energy LLC Claims Processing c/o Stretto 410 Exchange, Suite 100 Irvine, CA 92602; and (b) **If by Hand Delivery or Overnight Mail** Griddy Energy LLC Claims Processing c/o Stretto 410 Exchange, Suite 100 Irvine, CA 92602.

PROOFS OF CLAIM SUBMITTED BY FACSIMILE OR ELECTRONIC MAIL WILL NOT BE ACCEPTED.

*Contents of Proofs of Claim*. Each Proof of Claim must: (i) be legible; (ii) include a claim amount denominated in United States dollars using, if applicable, the exchange rate as of 5:00 p.m. (CT) on the Petition Date (and to the extent such claim is converted to United States dollars, state the rate used in such conversion); (iii) conform substantially with the Proof of Claim Form provided by the Debtor or Official Form 410; and (iv) be signed by the claimant or by an authorized agent or legal representative of the claimant on behalf of the claimant, whether such signature is an electronic signature or is ink.

*Electronic Signatures Permitted*. Proofs of claim signed electronically by the claimant or an authorized agent or legal representative of the claimant may be deemed acceptable for purposes of claims administration. Copies of proofs of claim or proofs of claim sent by facsimile or electronic mail will not be accepted.

*Section 503(b)(9) Requests for Payment*. Any proof of claim and/or priority asserting a claim arising under section 503(b)(9) of the Bankruptcy Code must also (i) include the value of the goods delivered to and received by the Debtor in the 20 days prior to the Petition Date; (ii) attach any documentation identifying the particular invoices for which such 503(b)(9) claim is being asserted; and (iii) attach documentation of any reclamation demand made to the Debtor under section 546(c) of the Bankruptcy Code (if applicable).

*Additional Information*. If you have any questions regarding the claims process and/or you wish to obtain a copy of the Non-Former Customer Claims Bar Date notice, a proof of claim form, the Order, or certain other pleadings, orders, and notices, or related documents you may do so by: (a) calling the Debtor's restructuring hotline at (855) 478-2725 (toll free U.S.) or (949) 471-0997 (International); (b) visiting the Debtor's restructuring website at: https://cases.stretto.com/Griddy; and/or (c) GriddyInquiries@stretto.com.

[1] The last four digits of the Debtor's federal tax identification number are 1396. The mailing address for the Debtor is PO Box 1288, Greens Farms, CT 06838.

[2] "Former Customer" means a person who (a) was a retail electricity customer (or the legal representative of such customer) of the Debtor at any point from February 11, 2021 through February 19, 2021 and (b) is the holder of a claim of any kind against the Debtor that arose during or relates to the period from February 11, 2021 through February 19, 2021.

TRAVEL | ENVIRONMENT

# Making a Business Case For Ocean Conservancy

**By TATIANA SCHLOSSBERG**

Marty Odlin, who grew up and lives on the Maine coast, remembers what the ocean used to be like. But now, he said, "It's like a desert and just within my lifetime." In the last few years, he said, he has seen lots of sea grass and many other species virtually disappear from the shoreline.

Mr. Odlin, 39, comes from a fishing family and has a passion for the history of the ocean and the coast, both of which have informed his sense of the ocean's decline, a small part of the catastrophic deletion of marine life over the last several hundred years.

Using his training as an engineer, Mr. Odlin has decided to try to reverse that decline with his company, Running Tide, which is based in Portland. Using a combination of robotics, sensors and machine learning, he is building an aquaculture operation that is selling oysters now and eventually clams. He is also using that system to grow kelp, with the goal of producing enough of this seaweed to pull carbon dioxide from the atmosphere and permanently sequester it by burying it on the ocean floor, and sell carbon offsets.

The company also plans to seed oyster reefs and clam beds along the shoreline, and restore kelp forests and sea grass, to help the coastal ecosystem by bringing back biodiversity and improving water quality, among other benefits.

Mr. Odlin's plans are one of a number of efforts in the "blue economy," a term used to describe commercial activity on the oceans, seas and coasts. He and others are trying to prove that ocean conservation, sustainable fishing and carbon sequestration can be good for business, especially as global shipping, aquaculture and the appetite for wild seafood increases around the world.

Mr. Odlin and his team build everything: boats, oyster floats, sensors and more, all with very high sensitivity to their environment. They measure the amount of feed in the water and the growth rate of the various species and send that information into a database that they use to make all sorts of decisions: whether to change the feed, reposition the shellfish floats or make bigger changes about the varieties they're growing. They also use the hard-won knowledge of commercial fishermen — there are about a dozen on staff — which Mr. Odlin said was a huge advantage.

The climate crisis demands technological innovations and "hard hats and steel toes," he said.

Dan Watson, the chief executive and co-founder of SafetyNet Technologies, also has recognized the benefits of working alongside industry and demonstrating profitability.

His company builds high-tech fishing nets for trawling boats: Attached to the nets are LED lights that flash in various patterns and levels of brightness to signal emergency escape hatches (right-size holes) for those species that fishing boats aren't trying to catch, known collectively as bycatch.

Studies have shown that LED lights can significantly reduce the amount of unwanted species that end up in fishing nets.

According to the Food and Agriculture Organization of the United Nations, about 9.1 million tons, or just over 10 percent of all of the fish caught every year, are thrown away, with nearly half coming from trawling nets.

In an era of overfishing and shifting habitats because of climate change that defy international regulations, reducing the amount of fish or other marine animals that are caught by mistake could have important consequences for the health of various populations as well as ocean biodiversity as a whole, Mr. Watson said.

"When I started all of this, I was a student, and I had the attitude of, 'This is going to save the world and everyone should do it,'" Mr. Watson said.

"I had to turn more towards, 'Here is the value proposition, and there is a strong financial argument for catching the right fish,'" he added. "We can show crews, 'Here is what you save on fuel, here is what you save on regulatory fines.'"

Others, too, see the value of working with industry groups. Whale Safe is an initiative from the University of California Santa Barbara to help big ships avoid hitting whales as they travel through ports around Los Angeles. The program came, in part, as a response to shipping companies asking for help, according to Douglas McCauley, a professor of ocean science at U.C.S.B.

Ship strikes, as they are known, are among the leading causes of death for whales, and 2018 and 2019 were the worst years on record for collisions on the West Coast, with 27 total resulting in 22 deaths, according to the National Oceanic and Atmospheric Administration. Scientists estimate that the actual number of whales killed by ships could be much higher — as many as 80 a year off the West Coast, according to one study — because not all of the bodies are discovered.

Dr. McCauley helped bring together ocean technologists working at U.C.S.B. to build a near real-time detection system for whales in the Santa Barbara Channel, combining three inputs: an artificial intelligence algorithm that analyzes whale sounds, classifies them by species, and sends the data for review; a remote sensing system that predictively forecasts whale presence; and plain old citizen science, where trained whale watchers log whales into a mobile app.

"It's not helpful if you're only able to say, 'Southern California is forecast to be cloudy with a chance of blue whales,'" and this model forecasts at a much finer scale, Dr. McCauley said.


JAMES YANG

The system delivers the information to ships in a simplified rubric of low, medium, high and very high, so that they can slow if whales are around, which can significantly reduce the number of ship strikes.

When ships reduce their speed they use less fuel, resulting in fewer greenhouse gas emissions and other pollutants; the global shipping industry accounts for nearly 3 percent of global greenhouse gas emissions.

Cargo ships typically burn dirty fuel that releases pollutants like nitrous oxide and sulfur dioxide, which can cause various cancers and childhood asthma for people living in port cities. Air pollution in general also disproportionately affects communities of color.

In only six months, slower speeds in the Santa Barbara and San Francisco areas helped reduce pollution from nitrous oxide by more than 530 tons and greenhouse gas emissions by 17,000 metric tons.

But saving the whales could also have huge climate benefits, Dr. McCauley said.

During their lives and when they die, whales help sequester enormous amounts of carbon dioxide in two ways. When alive, whales supply phytoplankton (which suck up carbon dioxide) with the nutrients they need to grow. When whales die, their bodies sink to the bottom of the ocean and over time become part of the marine sediment layer, where they can sequester the carbon dioxide they have accumulated during their life span, an average of 33 tons for a great whale species, keeping it out of the atmosphere for hundreds or thousands of years.

Any of these projects require a more hands-on approach to saving the ocean and a more deliberate overlap of business and conservation, which have historically been at odds, said Mr. Odlin, the founder of Running Tide.

"We have to take a more active role in solving the problem that we're seeing," he said. "And how do you take a more active role? The moral imperative is that you have to build something at the scale of the problem."

Otherwise, he said, "generations in front of us are not going to forgive us."

"We still have a chance right now, so I'm working as hard as I can."


RUNNING TIDE
Marty Odlin, C.E.O. of Running Tide.

*'There is a strong financial argument for catching the right fish.'*
Dan Watson, chief executive of SafetyNet Technologies.

---

# Absence of Vaccine for Children Complicates Families' Summer Travel Plans

**By DEBRA KAMIN**

Nearly every summer, Ada Ayala, a teacher, and her husband, Oscar Cesar Pleguezuelos, travel with their children to visit Mr. Cesar Pleguezuelos's parents in Spain. But this year, even though they will both soon be fully vaccinated in their home state of Florida, they are changing their plans. The reason? There is still no pediatric Covid-19 vaccine available for their kids.

The travel industry, buoyed by news of vaccine rollouts, is anticipating a summer rush after a year of devastation. But amid the chatter of travel's long-awaited rebound, many families with children — who comprise roughly 30 percent of the global travel market — say they are largely being left out of the conversation.

In a March survey on Bébé Voyage, an online community for traveling families, 90 percent of the respondents said that amid unclear guidelines on Covid-19 testing, they were searching for flexible bookings. The topic also comes up often on Bébé Voyage's Facebook page, particularly among parents in the United States. "It's the Americans in the group that are the most nervous traveling with kids," said the Bébé Voyage chief executive, Marianne Perez de Fransius.

Ms. Ayala, 44, is among those nervous parents. "If it wasn't for the kids, we would definitely be flying this summer," she said. Ms. Ayala already received her shot as a teacher. Her husband, also 44, will soon receive his shots, too, because Florida recently opened vaccinations to those age 40 and up. But their children, Charlise, 6, and Oscar, 2, will have to wait many months to be inoculated.

"My 2-year-old isn't going to wear a mask for 10 hours on a flight, and I don't know if I want to expose him for a 16-hour trip with layovers," Ms. Ayala said. "I'll feel more confident when vaccination reaches more people worldwide, or at least in the destinations we want to go."

Nearly one in three adults in the United States have now received at least one dose of the Covid-19 vaccine. But a full pediatric Covid-19 vaccine currently isn't expected until the end of 2021 at the earliest, and while they wait, parents are struggling to figure out how they, too, can travel safely this summer, and even where their children are welcome as rules on quarantine and testing continue to shift.

"This is the elephant in the room right now," said Cate Caruso, an adviser for Virtuoso, a network of luxury travel agencies, who also owns her own travel planning company, True Places Travel. The potential that a child could become infected with Covid-19 while abroad and not be allowed on a return flight, she said, is a major deterrent for parents. "Anywhere you go outside of the U.S. right now, you've got to think about how you're going to get back in," she said. "It's leaving behind a whole bunch of people who are ready to go."

In Ms. Ayala's case, a compromise has been struck: If and when Spain — which is currently closed to American travelers — opens its borders, Mr. Cesar will travel to Spain with their daughter, Charlise, while Ms. Ayala will remain in Florida with Oscar. "She goes to school and is very good with wearing her mask, cleaning her hands and keeping distance," Ms. Ayala said of her daughter. "So I think she can be safe. But it's just not possible with a baby."

But she doesn't plan to stay home all summer. Whether or not her husband and daughter make it to Spain, Ms. Ayala is planning a family road trip at some point this summer, likely within Florida.

After a year of road trips, R.V.s and rental cottages, many Americans are now ready to fly again: Online searches for late-summer flights are up as much as 75 percent, and hotels on both coasts are reporting that they are sold out through October. But families, more than any other travel sector, continue to play it safe.

Rovia, a membership-based global travel agency that works with both travelers and travel agents, reports that beach and camping destinations within driving distance are the most popular choices for families this summer. An exception? Disney World, which is seeing an uptick in reservations for summer from families looking to visit while capacity remains limited (and lines, as a result, remain shorter).


TODD ANDERSON FOR THE NEW YORK TIMES
Oscar Cesar Pleguezuelos and Ada Ayala with their children, who are 2 and 6.

"The rate of couples traveling by air has increased faster, whereas families are still leaning toward travel by car and R.V. rentals," said Jeff Gwynn, Rovia's director of communications.

Montoya and Phil Hudson, who showcase their travels as a Black family on their popular blog, The Spring Break Family, are among them. "Most years we go pretty far — Spain, Italy, France, as far as we can go. This year it was about what's reachable by car," Ms. Hudson said. She and Mr. Hudson, who both work in the health care industry, are vaccinated, but admit they probably won't be willing to fly with their two daughters, Leilah, 11, and Layla, 8, for several more months.

That's because they want to wait for herd immunity to help keep their daughters safe. "The goal is to wait until the majority of the population is vaccinated, or has at least had the opportunity to become vaccinated," Ms. Hudson said.

In addition to preferring driving over flying this summer, travel analysts say families with children will also continue to opt for rental homes over hotel rooms.

In fact, when it comes to the vacation cottage market, parents are booking faster than anyone else. "Families are the number one group expected to travel in 2021," said Vered Schwarz, the president and chief operating officer of Guesty, a short-term property management platform which reports that its summer reservations are already 110 percent higher than 2020, with families comprising more than 30 percent of those booking. "For families with unvaccinated children, private rentals are appealing — they are comfortable and they avoid hotels chock-full of crowded common areas," she said.

The question of how to treat unvaccinated children who may be traveling with their parents is also presenting a legal and ethical minefield for American travel operators.

The European Union is considering a vaccine passport that will allow free travel within the bloc for those who can show proof of inoculation. In Israel, a green pass has been established for those who have been vaccinated, granting holders not just the ability to cross a border but also check into a hotel or eat inside a restaurant, but children are not exempt — so parents with unvaccinated children must dine outside at restaurants and find babysitters before heading to the gym or a show.

But in the United States, such policies are unlikely to take hold, said Chuck Abbott, the general manager of the InterContinental San Diego. "Most hotels would not ask for that information, because it violates the privacy of the guest," he said. "Even putting vaccinated guests on a different floor than other guests would likely present a legal issue."

Compared with summer 2019, families' plans for summer 2021 are more low-key: Travelocity reports that bookings to Mount Rushmore and Nashville are significantly up over two years ago; internationally, family bookings to London, Paris and Rome, destinations that were top family sites in 2019, but have still not reopened to U.S. travel, are way down, while Cancún, which is currently open to American travelers without quarantine requirements, is up nearly 50 percent.

After a year of virtual schooling and working from home, parents have no desire to quarantine with their kids, said Anthony Berklich, the founder of the travel platform Inspired Citizen. "What these destinations are basically saying is you can come but your children can't," he said.

Instead, families are opting for warm-weather destinations closer to home.

When the Centers for Disease Control and Prevention announced in January that proof of a negative PCR test would be required of all air passengers arriving in the United States, many tropical resorts — including more than a dozen Hyatt properties — began offering not just free on-site testing, but a deeply discounted room in which to quarantine in case that test comes back positive. That move, said Rebecca Alesia, a travel consultant with SmartFlyer, has been a boon for family travel business.

"What happens if the morning you're supposed to come home, you get up and Junior has a surprise positive test?" she said. "A lot of my clients have booked this summer because of this policy."

For parents struggling to decide how and when to return to travel, there is good news on the horizon, said Dr. Shruti Gohil, the medical director of infection prevention at the University of California, Irvine.

"The chances of a good pediatric vaccine coming soon are high," she said, noting that both Pfizer and Moderna are already running pediatric trials on their vaccines. "There is no reason to think that the vaccine will have any untoward effects on children that we haven't already noted in adults."

In the meantime, she said, parents with children need to continue to be cautious. That doesn't mean families shouldn't travel at all, but she recommends choosing to drive rather than fly; to not allow unvaccinated children to play unmasked with children from other households; and to remain vigilant about wearing masks and regularly washing hands while on the road.

"We can't keep saying that you can't go anywhere," she said. "At some point we have to have some kind of nuance around this. But this is a game we are all still playing until the virus is gone."

**30%**
Share of the global travel market made up of children.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

In re: GRIDDY ENERGY LLC,¹ ) Chapter 11
  Debtor. ) Case No. 21-30923 (MI)

**NOTICE OF DEADLINES FOR THE FILING OF PROOFS OF CLAIM, INCLUDING REQUESTS FOR PAYMENTS UNDER SECTION 503(b)(9) OF THE BANKRUPTCY CODE**

**THE NON-FORMER CUSTOMER CLAIMS BAR DATE IS APRIL 28, 2021 at 5:00 p.m. (CT)**

**THE GOVERNMENTAL CLAIMS BAR DATE IS SEPTEMBER 13, 2021 at 5:00 p.m. (CT)**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

*Deadlines for Filing Proofs of Claim for All Entities Other than Former Customers² of the Debtor.* On March 30, 2021, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order (the "Order") establishing certain deadlines for the filing of proofs of claim by non-former Customers of the Debtor, including requests for payment under section 503(b)(9) of the Bankruptcy Code, in the chapter 11 case of Griddy Energy LLC (the "Debtor"), Case No. 21-30923 (MI).

*The Non-Former Customer Bar Dates.* Pursuant to the Order, *all* entities (except former customers of the Debtor, governmental units, and other entities exempt from filing Proof(s) of Claim under the Order), including individuals, partnerships, estates, and trusts who have a claim or potential claim against the Debtor that arose prior to **March 15, 2021**, no matter how remote or contingent such right to payment or equitable remedy may be, *including* requests for payment under section 503(b)(9) of the Bankruptcy Code, MUST FILE A PROOF OF CLAIM **as to all entities other than Former Customers, on or before April 28, 2021 at 5:00 p.m. (CT)** (the "Non-Former Customer Claims Bar Date"). Governmental entities who have a claim or potential claim against the Debtor that arose prior to **March 15, 2021**, no matter how remote or contingent such right to payment or equitable remedy may be, MUST FILE A PROOF OF CLAIM on or **September 13, 2021 at 5:00 p.m. (CT)** (the "Governmental Bar Date"). NO BAR DATE HAS BEEN SET YET FOR FORMER CUSTOMERS OF THE DEBTOR.

EXCEPT FOR FORMER CUSTOMERS AND ANY OTHER PERSON OR ENTITY THAT IS EXEMPT FROM FILING A PROOF OF CLAIM UNDER THE ORDER, ANY PERSON OR ENTITY WHO FAILS TO FILE A PROOF OF CLAIM, INCLUDING ANY REQUEST FOR PAYMENT UNDER SECTION 503(b)(9) OF THE BANKRUPTCY CODE, ON OR BEFORE THE NON-FORMER CUSTOMER CLAIMS BAR DATE OR GOVERNMENTAL BAR DATE, AS APPLICABLE, SHALL NOT BE TREATED AS A CREDITOR WITH RESPECT TO SUCH CLAIM FOR THE PURPOSES OF VOTING AND DISTRIBUTION ON ANY CHAPTER 11 PLAN.

*Filing a Proof of Claim.* Each Proof of Claim must be filed, including supporting documentation, so as to be *actually received* by Stretto as follows: (i) by electronic submission through the interface available at https://cases.stretto.com/Griddy or (ii) if submitted through non-electronic means, by U.S. Mail or other hand delivery system at the following address: (a) **If by First-Class Mail:** Griddy Energy LLC Claims Processing c/o Stretto 410 Exchange, Suite 100 Irvine, CA 92602; and (b) **If by Hand Delivery or Overnight Mail** Griddy Energy LLC Claims Processing c/o Stretto 410 Exchange, Suite 100 Irvine, CA 92602.

**PROOFS OF CLAIM SUBMITTED BY FACSIMILE OR ELECTRONIC MAIL WILL NOT BE ACCEPTED.**

*Contents of Proofs of Claim.* Each Proof of Claim must: (i) be legible; (ii) include a claim amount denominated in United States dollars using, if applicable, the exchange rate as of March 15, 2021 on the Petition Date (and to the extent such claim is converted to United States dollars, state the rate used in such conversion); (iii) conform substantially with the Proof of Claim Form provided by the Debtor or Official Form 410; and (iv) be signed by the claimant or by an authorized agent or legal representative of the claimant on behalf of the claimant, whether such signature is an electronic signature or is ink.

*Electronic Signatures Permitted.* Proofs of claim signed electronically by the claimant or an authorized agent or legal representative of the claimant may be deemed acceptable for purposes of claims administration. Copies of proofs of claim or proofs of claim sent by facsimile or electronic mail will not be accepted.

**Section 503(b)(9) Requests for Payment.** Any proof of claim and/or priority asserting a claim arising under section 503(b)(9) of the Bankruptcy Code must also (i) include the value of the goods delivered to and received by the Debtor in the 20 days prior to the Petition Date; (ii) attach any documentation identifying the particular invoices for which such 503(b)(9) claim is being asserted; and (iii) attach documentation of any reclamation demand made to the Debtor under section 546(c) of the Bankruptcy Code (if applicable).

*Additional Information.* If you have any questions regarding the claims process and/or you wish to obtain a copy of the Non-Former Customer Claims Bar Date notice, a proof of claim form, the Order, or certain other pleadings, orders, and notices, or related documents you may do so by: (a) calling the Debtor's restructuring hotline at **(855) 478-2725 (toll free U.S.)** or **(949) 471-0997 (International)**; (b) visiting the Debtor's restructuring website at: https://cases.stretto.com/Griddy; and/or (c) Griddyinquiries@stretto.com.

¹ The last four digits of the Debtor's federal tax identification number are 1396. The mailing address for the Debtor is PO Box 1288, Greens Farms, CT 06838.

² "Former Customer" means a person who (a) was a retail electricity customer (or the legal representative of such customer) of the Debtor at any point from February 11, 2021 through February 19, 2021 and (b) is the holder of a claim of any kind against the Debtor that arose during or relates to the period from February 11, 2021 through February 19, 2021.