**Exhibit B**

**Redline**

> **THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR CONDITIONAL APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN CONDITIONALLY APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| GRIDDY ENERGY LLC,[1] | Case No. 21-30923 (MI) |
| Debtor. | |

## [PROPOSED] DISCLOSURE STATEMENT FOR AMENDED PLAN OF LIQUIDATION FOR GRIDDY ENERGY LLC UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

David Eastlake, Texas Bar No. 24074165

**BAKER BOTTS L.L.P.**
910 Louisiana Street

Houston, Texas 77002
Telephone: (713) 229-1234
Facsimile: (713) 229-1522
Email:  *david.eastlake@bakerbotts.com*

Robin Spigel (admitted *pro hac vice* admission pending)
Chris Newcomb (admitted *pro hac vice* admission pending)
**BAKER BOTTS L.L.P.**
30 Rockefeller Plaza
New York, New York   10112-4498
Telephone:  (212) 408-2500
Facsimile: (212) 408-2501
Email:  *robin.spigel@bakerbotts.com*
           *chris.newcomb@bakerbotts.com*

Dated:   ~~March 15~~April 19, 2021

---

[1]   The last four digits of the Debtor's federal tax identification number are 1396.  The mailing address for the Debtor is PO Box 1288, Greens Farms, CT 06838.

## TABLE OF CONTENTS

Page

I.     INTRODUCTION AND EXECUTIVE SUMMARY ......................................................... **4**

II.    THE PLAN ........................................................................................................ **6̶7**

  A.   **Unclassified Claims** ...................................................................................... **6̶7**

     Unclassified Claims Summary ............................................................................ **6̶7**

     Unclassified Claims Detail ................................................................................. **7̶8**

  B.   **Classified Claims and Interests** ...................................................................... **8̶9**

     Summary of Classification and Treatment ........................................................... **8̶9**

     Classified Claims and Interests Detail ............................................................... **9̶13**

      1.   Class 1 – Prepetition Lender Claims ..................................................... **9̶13**

      2.   Class 2 – Other Secured Claims ............................................................ **1̶0̶14**

      3.   Class 3 – Priority Non-Tax Claims. ....................................................... **1̶0̶14**

      4.   Class 4 – Other General Unsecured Claim. ........................................... **1̶1̶15**

      5.   Class 5 – Customer Claims. .................................................................. **1̶1̶15**

      6.   Class 6 – Intercompany Claims. ........................................................... **1̶2̶17**

      7.   Class 7 – Existing HoldCo Interests. .................................................... **1̶2̶17**

  C.   **Releases and Exculpation** ............................................................................. **1̶3̶18**

  D.   **Plan Administrator** ..................................................................................... **1̶9̶26**

  E.   **Other Significant Plan Provisions.** ................................................................ **2̶1̶28**

     Comprehensive Settlement of Claims and Controversies ..................................... 28

     Texas Storm Causes of Action ........................................................................... 28

     Creditors' Representative .................................................................................. 28

     Cancellation of Agreements, Equity Interests and Security Interests. .................... 29

     Distributions under the Plan .............................................................................. 29

     Assumption and Rejection of Executory Contracts and Unexpired Leases .............. 29

III.   VOTING PROCEDURES AND REQUIREMENTS ................................................. **2̶3̶30**

  A.   **Classes Entitled to Vote on the Plan** .............................................................. **2̶3̶30**

  B.   **Votes Required for Acceptance by a Class** ...................................................... **2̶3̶30**

  C.   **Certain Factors To Be Considered Prior to Voting** ......................................... **2̶3̶31**

  D.   **Classes Not Entitled To Vote on the Plan** ....................................................... **2̶4̶31**

  E.   **Cramdown** ................................................................................................... **2̶4̶31**

  F.   **Allowed Claims** ........................................................................................... **2̶4̶32**

G.  Impairment generally ................................................................. ~~25~~32

H.  Solicitation and Voting Process ................................................ ~~25~~32

The Solicitation Package ................................................................ 33

Voting Deadlines. .......................................................................... 34

Voting Instructions. ....................................................................... 34

I.  The Combined Hearing. ............................................................. ~~28~~36

IV.  DESCRIPTION OF THE DEBTOR AND EVENTS LEADING TO CHAPTER 11 FILING ........................................................................................... ~~29~~36

A.  Overview of the Debtor and Its Business.................................... ~~29~~36

B.  Overview of Capital Structure.................................................... ~~31~~39

Prepetition Secured Facility .......................................................... 39

C.  Prepetition Litigation.................................................................. ~~32~~40

D.  Events Leading to ~~Bankruptcy~~ ...........................................~~33~~this Chapter 11 Case ..... 40

E.  The Debtor's Wind -Down and Liquidation................................ ~~34~~42

V.  THE CHAPTER 11 CASE ................................................................ ~~35~~43

A.  Significant Events During the Chapter 11 Case.......................... ~~35~~43

First Day Matters .......................................................................... 43

Additional Motions Filed/To Be Filed in the Chapter 11 Case ..... 44

VI.  CONFIRMATION PROCEDURES .................................................. ~~36~~46

A.  Combined Disclosure Statement and Confirmation Hearing................. ~~36~~46

B.  Confirmation of the Plan............................................................ ~~37~~46

Best Interests Test/Liquidation Analysis ...................................... 47

Feasibility..................................................................................... 48

No Unfair Discrimination .............................................................. 48

Fair and Equitable Test ................................................................. 49

C.  Alternatives to Confirmation and Consummation of the Plan............... ~~40~~49

VII.  CERTAIN RISK FACTORS TO BE CONSIDERED ....................... ~~40~~50

A.  General......................................................................................... ~~40~~50

B.  Risk Relating to the Plan and Other Bankruptcy Considerations......... ~~40~~50

C.  Additional Factors to Be Considered ........................................... ~~44~~54

VIII. ........CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ................................................................................................... ~~45~~55

A.  Introduction.................................................................................. ~~45~~56

B.  Certain U.S. Federal Income Tax Consequences of the Plan to the Debtor.......... ~~47~~57

iii

1.  U.S. Federal Income Tax Classification of the Debtor ............................................ **47**57

2.  Cancellation of Debt Income ................................................................................... **47**57

**C.  Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims** ............................................................................................................... **48**58

1.  Consequences to U.S. Holders of Allowed Claims (Other Than Allowed Class 5 Claims) ...................................................................................................................... **48**58

2.  Consequences to U.S. Holders of Allowed Class 5 Claims ..................................... **49**60

3.  Information Reporting and Backup Withholding ..................................................... **50**61

**D.  Importance of Obtaining Professional Tax Assistance** ........................................... **51**61

**IX.  RECOMMENDATION AND CONCLUSION** ............................................................ **51**62

## TABLE OF EXHIBITS

**Exhibit A:**    Plan of Liquidation for Griddy Energy LLC Under Chapter 11 of the Bankruptcy Code

**Exhibit B:**    Liquidation Analysis

**IMPORTANT NOTICE**

THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE ~~JOINT LIQUIDATING~~ AMENDED PLAN OF LIQUIDATION FOR GRIDDY ENERGY LLC UNDER CHAPTER 11 OF THE BANKRUPTCY CODE (THE "**PLAN**"). NO REPRESENTATIONS ABOUT THE DEBTOR HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT.

THE DEBTOR URGES YOU TO READ THIS DISCLOSURE STATEMENT CAREFULLY FOR A DISCUSSION OF VOTING INSTRUCTIONS, RECOVERY INFORMATION, CLASSIFICATION OF CLAIMS, THE HISTORY OF THE DEBTOR AND THE CHAPTER 11 CASE, THE DEBTOR'S BUSINESS, THE EVENTS LEADING TO THIS CASE AND, AND A SUMMARY AND ANALYSIS OF THE PLAN.

ALL CAPITALIZED TERMS IN THIS DISCLOSURE STATEMENT NOT OTHERWISE DEFINED HEREIN HAVE THE MEANINGS GIVEN TO THEM IN THE PLAN, A COPY OF WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS <u>EXHIBIT A</u>.

INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT.  THE DEBTOR RESERVES THE RIGHT TO FILE AN AMENDED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER TO SELL, OR THE SOLICITATION OF AN OFFER TO BUY, ANY SECURITIES.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE. THE PLAN AND THIS DISCLOSURE STATEMENT WERE NOT REQUIRED TO BE PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NONBANKRUPTCY LAW. DISSEMINATION OF THIS DISCLOSURE STATEMENT IS CONTROLLED BY BANKRUPTCY RULE 3017. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE PARTIES IN INTEREST IN THIS CASE WITH "ADEQUATE INFORMATION" (AS DEFINED IN SECTION 1125 OF THE BANKRUPTCY CODE) SO THAT THOSE CREDITORS WHO ARE ENTITLED TO VOTE WITH RESPECT TO THE PLAN CAN MAKE AN INFORMED JUDGMENT REGARDING SUCH VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN.  THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN; RATHER, THIS DISCLOSURE

STATEMENT IS INTENDED ONLY TO AID AND SUPPLEMENT SUCH REVIEW. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, THE PLAN SUPPLEMENT (WHICH, UNLESS OTHERWISE SPECIFIED IN THE PLAN, WILL BE FILED NO LATER THAN FIVE (5) BUSINESS DAYS PRIOR TO THE DEADLINE FOR BALLOTS TO BE RECEIVED IN CONNECTION WITH VOTING TO ACCEPT OR REJECT THE PLAN) AND THE EXHIBITS ATTACHED THERETO AND THE AGREEMENTS AND DOCUMENTS DESCRIBED THEREIN. IF THERE IS ANY CONFLICT BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN WILL GOVERN. YOU ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND PLAN SUPPLEMENT AND TO READ CAREFULLY THE ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS, BEFORE DECIDING HOW TO VOTE WITH RESPECT TO THE PLAN.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M. (PREVAILING CENTRAL TIME) ON [_____], 2021, UNLESS EXTENDED BY THE DEBTOR (THE "**VOTING DEADLINE**"). TO BE COUNTED, BALLOTS MUST BE RECEIVED BY THE VOTING AGENT (AS DEFINED HEREIN) ON OR BEFORE THE VOTING DEADLINE.

THE EFFECTIVENESS OF THE PLAN IS SUBJECT TO SEVERAL CONDITIONS PRECEDENT. THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF INTERESTS IN, THE DEBTOR (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

EXCEPT AS OTHERWISE SET FORTH HEREIN, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE BY THE DEBTOR AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF OR CREATE ANY DUTY TO UPDATE SUCH INFORMATION. NO PERSON HAS BEEN AUTHORIZED BY THE DEBTOR IN CONNECTION WITH THE PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS, NOTICES AND SCHEDULES ATTACHED TO OR INCORPORATED BY REFERENCE OR REFERRED TO IN THIS DISCLOSURE STATEMENT AND/OR THE PLAN AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTOR.

IT IS THE DEBTOR'S POSITION THAT THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL

CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PERSON, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTOR OR HOLDERS OF CLAIMS OR INTERESTS.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISOR(S) WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

## I.      INTRODUCTION AND EXECUTIVE SUMMARY

Griddy Energy LLC, as debtor and debtor in possession (the "**Debtor**" or "**Griddy**") in the above-captioned chapter 11 case (the "**Chapter 11 Case**"), submits this Disclosure Statement pursuant to section 1125 of title 11 of the United States Code (the "**Bankruptcy Code**") for use in the solicitation of votes on the *Amended* Plan of Liquidation for Griddy Energy LLC Under Chapter 11 of the Bankruptcy Code (as amended, supplemented or modified from time to time, the "**Plan**").[2]   A copy of the Plan is annexed as **Exhibit A** to this Disclosure Statement. **Capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Plan**.

This Disclosure Statement sets forth certain information regarding the Debtor's proposed liquidation, prepetition operating and financial history, the need to seek chapter 11 protection, and the Debtor's strategy for winding down its operations, liquidating and distributing its remaining assets to its creditors.   FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS, APPENDICES, AND ANY SCHEDULES HERETO AND THERETO IN THEIR ENTIRETY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

Griddy is a retail ~~electricity~~electric provider ("**REP**") in Texas which provided its customers the ability to purchase wholesale electricity with no mark-up.  Prior to the events that precipitated this chapter 11 case, Griddy had approximately 29,000 customers in Texas and approximately 30 employees.  As a result of the forced transitioning of customers to a Provider of Last Resort ("**POLR**") commencing on February 26, 2021 by the ~~Electricity~~Electric Reliability Council of Texas ("**ERCOT**"), Griddy currently has no customers and, as of the Petition Date, ~~has~~had reduced its employee headcount to ~~approximately 15~~16.  The Debtor has filed this case to pursue a chapter 11 plan of liquidation and implement a wind down of its business.

The liquidation and orderly ~~winddown~~wind down provided for in the Plan and described herein will result in the distribution of the Debtor's assets to its creditors and interest holders consistent with the priorities set forth in the Bankruptcy Code.  The Plan provides, among other things~~.~~, that:

- the Debtor's secured lender will, for the benefit of the Debtor's estate: (a) forego receipt of ~~40% of the remaining aggregate principal amount outstanding under the Debtor's prepetition credit agreement (i.e., consensually agree to "give-up" $600,000 of the~~approximately $550,000 of the principal face amount owed to it by the Debtor in favor of other creditors in accordance with the terms of the Plan~~)~~ and (b) receive interest at the non-default contract rate (rather than seeking to collect default interest from the Petition Date to the Effective Date);

- holders of Allowed Class 5 Customer Claims (i.e., former customers of the Debtors~~)~~):

---

[2]  ~~Capitalized terms not otherwise defined herein have the meaning given to them in the Plan.~~

(a) will have the opportunity to receive releases from the Debtor and the other Released Parties[3] for all claims, including, for unpaid amounts owed by such former ~~customer for unpaid amounts owed~~ customers for the electricity and related fees, taxes, expenses and other costs due as a result of the winter storm event that occurred in mid-February 2021 in Texas (commonly referred to as "**Winter Storm Uri**"), in exchange for such former customers giving the Released Parties a release of all claims the ~~customer~~former customers have or may have against the Released Parties. ~~Any former customer that does not wish to exchange releases~~; and ~~that timely and properly files an unsecured nonpriority claim against the Debtor by the Bar Date in accordance with the Bar Date Order will be treated as Other General Unsecured Creditors. Any former customer that does not wish to exchange releases and does not file timely and properly file a proof of claim against the Debtor shall not have any Class 4 Claims (Other General Unsecured Creditors) or Class 5 Claims (Customer Claims) against the Debtor;~~

- ~~Other General Unsecured Creditors will receive the Available Cash of the Debtor; and~~

(b) for those former customers that:

(i) do not opt out of the mutual releases described in (a) immediately above; and

(ii) paid the Debtor for electricity consumed by such Participating Customer (i.e., a former customer that votes to accept the Plan or abstains from voting on the Plan) during the period February 13, 2021 through February 19, 2021 and timely and properly files a proof of claim for such amount as reflected on the Debtor's books and records by the Former Customers Bar Date in accordance with the Former Customers Bar Date Order, such former customer would have an Allowed Claim in Class 5 in such amount, *less* any amounts such Participating Customer successfully disputed and received a full or partial refund from such Participating Customer's credit card company (to the extent not accounted for in the Debtor's books and records).

---

[3] Under the Plan, "Released Parties" means, collectively, and each solely in its capacity as such: (a) the Debtor, (b) the Committee and its members, (c) the Prepetition Secured Lenders and the Collateral Agent, and (d) each of such parties' respective predecessors, successors, assigns, subsidiaries, affiliates, including the Non-Debtor Affiliates, owners, and each of their respective current and former officers, directors, employees, managers, members, principals, shareholders, agents, advisors and professionals (including any attorneys, consultants, financial advisors, investment bankers and other professionals retained by such Persons) or other representatives, each in their capacities as such, together with their successors and assigns; provided, however, that such attorneys and professional advisors shall only include those that provided services related to the Chapter 11 Case and the transactions contemplated by the Plan; provided, further, that no Person shall be a Released Party if it elects to opt out of the releases provided for in Article XII of the Plan in its Ballot.  "Non-Debtor Affiliates" means the Debtor's non-debtor affiliates, including, HoldCo, Griddy Technologies LLC, Griddy Pro LLC, Griddy VI Holdings LLC, Griddy VI Intermediate Holdings LLC, Griddy 6 Holdings LLC and Griddy VI Series A Holdings LLC.

Any former customer that does not wish to exchange releases will be considered a "Non-Participating Customer" and will not be treated as having an Allowed Class 5 Customer Claim.  Rather, such Non-Participating Customer would have a temporarily Allowed Claim in Class 4 (Other General Unsecured Claims) for purposes of voting on the Plan.  For all other purposes, if the Non-Participating Customer timely and properly files an unsecured nonpriority claim against the Debtor by the applicable Bar Date in accordance with the applicable Bar Date Order, the Non-Participating Customer will be treated as a holder of Other General Unsecured Claims.  Other than for purposes of voting on the Plan, any former customer that does not wish to exchange releases and does not timely and properly file a proof of claim against the Debtor shall not have either a Class 4 Claims (Other General Unsecured Claims) or Class 5 Claims (Customer Claims) against the Debtor;

- Holders of Allowed Other General Unsecured Claims will receive on a Pro Rata basis (i) the aggregate amount of Available Cash of the Debtor and (ii) any Net Recovery Proceeds,[4] provided that, with respect to any Causes of Action arising from, relating to or in connection with the winter storm event that occurred in Texas in mid-February 2021, holders of Allowed Other General Unsecured Claims will share any recoveries therefrom (net of all costs and expenses) on a Pro Rata basis with the holders of Allowed Class 5 Participating Customer Claims on account of their Allowed Participating Customer Potential Return Claims;[5] and

- the Debtor will appoint a plan administrator (the "**Plan Administrator**") and, upon the Effective Date, the Liquidating Debtor will enter into a Plan Administrator Agreement with the Plan Administrator and the sole interest in the Liquidating Debtor will vest in the Plan Administrator.  The Plan Administrator will act as a fiduciary and will have full authority to administer the liquidation and wind down of the Debtor under the provisions of the Plan, including to: (i) make Distributions to holders of Claims set forth in the Plan; (ii) object to, dispute, compromise or settle the amount, validity, priority, treatment or Allowance of any Claim; (iii) sell, abandon or dispose of any remaining property of the Debtor; and (iv) pursue any Causes of Action consistent with the provisions of the Plan.

---

[4]  Net Recovery Proceeds means the Cash or other amounts received by the Debtor, if any, from the pursuit of any Cause of Action (formally or informally) not released under the Plan, net of all costs and expenses deducted therefrom, to be distributed (Pro Rata) to holders of Allowed Other General Unsecured Claims, subject to all Claims of a higher priority being paid in full or adequate reserves being set aside in accordance with the Plan.

[5]  Participating Customer Potential Return means, for each applicable Participating Customer, the total amount such Participating Customer paid the Debtor for electricity consumed by such Participating Customer during the period February 13, 2021 through February 19, 2021, including when the Public Utilities Commission of Texas imposed the $9,000 per MWh price for wholesale power, as reflected on the Debtor's books and records, *less* any amounts such Participating Customer successfully disputed and received a full or partial refund from such Participating Customer's credit card company (to the extent not accounted for in the Debtor's books and records).

Each holder of a Claim or Interest entitled to vote on the Plan should read this Disclosure Statement, the Plan, and the instructions accompanying the Ballots, in their entirety before voting on the Plan.  These documents contain, among other things, important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes.   The statements contained in this Disclosure Statement are made only as of the date hereof unless otherwise specified, and there can be no assurance that the statements contained herein will be correct at any time hereafter. All creditors should also carefully read **Section VIII** of this Disclosure Statement – the "*Certain Risk Factors To Be Considered*" – before voting to accept or reject the Plan.

THE DEBTOR BELIEVES THAT IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR AND ALL OF ITS STAKEHOLDERS.  FOR ALL OF THE REASONS DESCRIBED IN THIS DISCLOSURE STATEMENT, THE DEBTOR URGES YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN BY THE VOTING DEADLINE, (*I.E.*, THE DATE BY WHICH YOUR BALLOT MUST BE **ACTUALLY RECEIVED**), WHICH IS [____], **2021** AT 5:00 P.M. (CENTRAL TIME).

## II.    THE PLAN

As noted above, the Plan provides for a liquidation and orderly ~~winddown~~wind down in a manner that would result in, among other things, (i) mutual releases between the Debtor and the other Released Parties, on the one hand, and the participating former customers, on the other hand, thereby providing certainty to such former customers that unpaid amounts incurred for electricity consumption by such former customers, including those amounts incurred by such former customers for the period February 15, 2021 through and including February 19, 2021 (when the Public Utilities Commission of Texas imposed the $9,000 per MWh price for wholesale power~~,~~). will not be collected by the Debtor or its successor or the other Released Parties~~;~~ or sent to collection by the Debtor.  The Plan also provides, that notwithstanding the mutual releases between the Released Parties and such Participating Customers, such Participating Customers that paid for electricity consumption during the period February 13, 2021 and February 19, 2021, will have an Allowed Class 5 Claim in the amount of such payment based on the Debtor's books and records and be entitled to receive their Pro Rata share of any Texas Storm Causes of Action Net Recovery Proceeds subject to such customers timely and properly filing a proof of claim for such amount by the Former Customers Bar Date in accordance with the Former Customers Bar Date Order; and (ii) recovery and distribution to the holders of Other General Unsecured Claims from any Available Cash and the net proceeds, if any, from any Causes of Action pursued by the Plan Administrator~~.~~, provided that any such net proceeds from Texas Storm Causes of Action shall be shared Pro Rata with holders of Allowed Participating Customer Potential Return Claims.  In addition, the Prepetition Secured Lenders have agreed to "give up" a portion of their recoveries (~~$600~~(approximately $550,000) for the benefit of the Debtor and its Estate.  The Debtor believes that this "give up" by the Prepetition Secured Lender is a material benefit that will inure to its Estate.

Certain significant provisions of the Plan, including the treatment of Claims against and Interests in the Debtor under the Plan, are described below.

## A.    **Unclassified Claims**

**Unclassified Claims Summary**

In accordance with Section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims.  The Claim recoveries for such unclassified Claims are set forth below:

| Claim | Plan Treatment | Projected Plan Recovery |
|---|---|---|
| Administrative Claims | Paid in full in Cash | 100% |
| Fee Claims | Paid in full in Cash | 100% |
| U.S. Trustee Fee Claims | Paid in full in Cash | 100% |
| Priority Tax Claims | Paid in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code | 100% |

**Unclassified Claims Detail**

(a)     **Administrative Claims**

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date an Administrative Expense Claim becomes an Allowed Claim, the holder of such Allowed Administrative Expense Claim shall receive from the Debtor Cash in an amount equal to such Allowed Claim; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtor, as debtor in possession, shall be paid by the Debtor in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such liabilities.

(b)     **Fee Claims**

All Allowed Fee Claims shall be paid in full in Cash in such amount as awarded by the Bankruptcy Court (i) no later than five (5) Business Days after the date an order is entered with respect to such award or (ii) upon such other terms as may be mutually agreed upon between such holder of a Fee Claim and the Debtor.  On the Effective Date, to the extent known, the Debtor shall reserve and hold in the Professional Expense Escrow, Cash an amount equal to accrued but unpaid Fee Claims as of the Effective Date, which Cash shall be used, until all Allowed Fee Claims have been paid in full, solely for the payment of Allowed Fee Claims.  To the extent the Cash in the Professional Expense Escrow exceeds the amount of the Allowed Fee Claims, such excess Cash shall be used by the Debtor in accordance with the terms of the Plan.

(c)     **U.S. Trustee Fee Claims**

The Debtor shall pay all outstanding U.S. Trustee Fees of the Debtor, together with interest pursuant to 31 U.S.C. § 3717, if any, on an ongoing basis on the later of (i) the Effective Date and (ii) the date such U.S. Trustee Fees become due, until such time as a final decree is entered closing

the Chapter 11 Case or the Chapter 11 Case is converted or dismissed, or the Bankruptcy Court orders otherwise.

(d)      **Priority Tax Claims**

Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtor prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Debtor either: (i) on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date a Priority Tax Claim becomes an Allowed Claim, Cash in an amount equal to such Claim, or (ii) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Petition Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim (with any interest to which the holder of such Priority Tax Claim may be entitled calculated in accordance with section 511 of the Bankruptcy Code); provided, however, that all Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as they become due.

**B.      Classified Claims and Interests**

**Summary of Classification and Treatment**

The Plan establishes a comprehensive classification of Claims and Interests.  The following table summarizes the classification and treatment of Claims and Interests under the Plan and the estimated distributions to be received by the holders of Allowed Claims and Interests under the Plan.  Amounts assumed in the recovery analysis are estimates only; actual recoveries received under the Plan, or in a liquidation scenario, may differ materially from the projected recoveries.

The summaries in this table are qualified in their entirety by the description of the treatment of such Claims and Interests in the Plan.

| Class | Claim or Interest | Summary of Treatment of Allowed Claims and Interests | Voting Rights | Estimated Amount of Claims in Class | Projected Plan Recovery |
|---|---|---|---|---|---|
| 1 | Prepetition Lender Claims | Pro Rata share of the Prepetition Lender Distribution | Impaired/ Entitled to Vote | $1,448,937.58 - $2,689,750[6] | [——]%62%- 80%[7] |
| 2 | Other Secured Claims | (i) Cash in an amount equal to such Allowed Other Secured Claim; (ii) title to the property securing such Claim to the holder; or (iii) such other treatment that leaves such Allowed Other Secured Claim unimpaired | Unimpaired/ Presumed to Accept | $[——]$0 | 100% |
| 3 | Priority Non-Tax Claims | Paid in full in Cash | Unimpaired/ Presumed to Accept | $0 | 100% |
| 4 | Other General Unsecured Claims | Pro Rata share of the Class 4 Distribution (subject to sharing pro rata in Texas Storm Causes of Action Net | Impaired/ Entitled to Vote | $[——]$3.7 million -- $33.1 million[8] | [——]%1.5% -- 13% on account of Available Cash[9] |

---

[6]  Such amount is exclusive of postpetition interest, legal fees and costs, and amounts that may be drawn under the Outstanding LC. The Debtor estimates, that the total amount of the foregoing plus the $1,448,937.58, is in the range of $1,448,937.58 to $2,700,000, and assumes no litigation.  The low end of the range is exclusive of accrued and unpaid interest, fees, letter of credit reimbursement obligations and other related amounts, which include the obligation to provide Macquarie cash or credit support in the form of letters of credit acceptable to Macquarie in its sole discretion in an amount not less than $307,500.00 as collateralization for 102.5% of the full undrawn amount of the EDF letter of credit, and certain fees and expenses of Macquarie, including reasonable and documented legal fees and expenses.

[7]  The projected Plan recovery depends on the total amount of the Claims in Class 1 (see footnote 5 above) and assumes the absence of litigation.

[8]  The bar date for holders of Claims against the Debtor other than Former Customers and governmental units expires on April 28, 2021. As of the date of this Disclosure Statement, a review of the filed claims has not been completed. Accordingly, the Allowed amount of Other General Unsecured Claims may be greater or less than the amount set forth herein. The estimated amount also does not include any claims by former customers or any estimates on account of litigation. If former customers opt out of Class 5 Customer Claims, they may assert a claim in Class 4 Other General Unsecured Claim. If any such claims are Allowed, the amount of Other General Unsecured Claims may be greater than the amount set forth herein.

[9]  For purpose of this Disclosure Statement, the Debtor has estimated that between $500,000 and $1 million will be available for distribution to holders of Allowed Other General Unsecured Claims and, assumed for illustrative purposes only, that the total amount of Available Cash will be $500,000. However, the total amount available for holders of Allowed Other General Unsecured Claims will depend upon the total amount of Administrative Expense

Active 61729485                                                                62112224

11

| Class | Claim or Interest | Summary of Treatment of Allowed Claims and Interests | Voting Rights | Estimated Amount of Claims in Class | Projected Plan Recovery |
|---|---|---|---|---|---|
| | | Recovery Proceeds with holders of Allowed Participating Customer Potential Return Claims). | | | |
| 5 | Customer Claims | In full satisfaction, settlement, and release of, and in exchange for its Customer Claim, each Participating Customer will grant and receive the Customer Releases as set forth in Section ~~Error! Reference source not found.~~ of the Plan 12.10 of the Plan and, solely to the extent a Participating Customer has an Allowed Participating Customer Potential Return Claim, receive its | Impaired/ Entitled to Vote | ~~N/A~~(a) In excess of $29.1 million on account of releases[10]<br><br>(b) $0 – $15.6 million on account of potential Participating Customer Total Return Claims[11] | ~~N/A~~Releases[12] |

_____

[footnotes]

Claims and all other Claims of a higher priority being paid in full in cash, as well as the amount of projected Wind Down Costs.  Further, the recovery from Causes of Action is too speculative to project at this time.  Accordingly, the total potential Plan recovery for holders of Allowed Other General Unsecured Claims does not include any projected recovery from Causes of Action and may be greater or less than the amount set forth herein.

[10]   The estimated amount of unpaid balances of Former Customers as of the Petition Date is $29.1 million.  This amount is included herein for illustrative purposes only.  It is not a maximum number and could be greater after the Debtor reconciles its books and records.

[11] As of the date of this Disclosure Statement, the deadline for filing proofs of claim by Former Customers against the Debtor that arose prior to the Petition Date had not yet expired.  Further, the general bar date for holders of Claims against the Debtor other than Former Customers and governmental units expired on April 28, 2021, but as of the date of this Disclosure Statement, the review of the Claims has not been completed.

The total number of former customers that elect to be treated as Participating Customers will not be known until the Voting Deadline.  Accordingly, the Debtor is unable to accurately predict the total amount of Participating Customer Total Return Claims in Class 5.  However, if every eligible former customer elects to be a Participating Customer and every Participating Customer timely and properly files a Participating Customer Total Return Claim, the total amount of Participating Customer Total Return Claims (calculated based on information available as of April 19, 2021) is approximately $15.6 million.  This amount is included herein for illustrative purposes only.  It is not a maximum number and could be greater after the Debtor reconciles its books and records.

[12] The potential recovery from Texas Storm Causes of Action is too speculative to project at this time.  Accordingly, the potential Plan recovery for holders of Allowed Customer Claims does not include any projected recovery from Texas Storm Causes of Action.

| Class | Claim or Interest | Summary of Treatment of Allowed Claims and Interests | Voting Rights | Estimated Amount of Claims in Class | Projected Plan Recovery |
|---|---|---|---|---|---|
| | | Pro Rata share of any Texas Storm Causes of Action Net Recovery Proceeds. | | | |
| 6 | Intercompany Claims | ~~Extinguished and/or cancelled in the Debtor's discretion~~If any Causes of Action are successfully prosecuted, settled and/or otherwise resolved, holders of Intercompany Claims will receive any and all Cash or other property after (a) all Allowed Claims (other than Intercompany Claims) are paid in full in Cash (including payment of postpetition interest at a rate sufficient to render all Allowed Other General Unsecured Claims unimpaired) in accordance with the Plan and (b) all other Wind Down Costs are paid in accordance with the Wind Down Budget. | Impaired/ ~~Presume~~Ent itled to ~~Reject~~Vote | ~~N/A~~$4,582[13] | ~~0%~~Unknow n[14] |
| 7 | Existing HoldCo Interests | ~~Cancelled~~If any Causes of Action are successfully prosecuted, settled and/or otherwise | Impaired/ ~~Deemed~~Enti tled to ~~Reject~~Vote | N/A | ~~0%~~Unknow n[15] |

[13] Estimated amount excludes any claims on account of indemnification, reimbursement or contribution.

[14] The potential recovery from Causes of Action is too speculative to project at this time.  Accordingly, the potential Plan recovery for holders of Allowed Intercompany Claims does not include any projected recovery from Causes of Action.

[15] The potential recovery from Causes of Action is too speculative to project at this time.  Accordingly, the potential recovery for the of holder of Allowed Existing Holdco Interests does not include any projected recovery from Causes of Action.

| Class | Claim or Interest | Summary of Treatment of Allowed Claims and Interests | Voting Rights | Estimated Amount of Claims in Class | Projected Plan Recovery |
|---|---|---|---|---|---|
| | | resolved, the holder of the Existing HoldCo Interests shall be entitled to receive any and all Cash or other property remaining with the Debtor after (a) all Allowed Claims are paid in full in Cash (including payment of postpetition interest at a rate sufficient to render all Allowed Other General Unsecured Claims unimpaired) in accordance with the Plan and (b) all other Wind Down Costs are paid in accordance with the Wind Down Budget. | | | |

**Classified Claims and Interests Detail**

1. **Class 1 – Prepetition Lender Claims**

    (1)i.  *Impairment and Voting*.  Class 1 is impaired by the Plan. Each holder of a Prepetition Lender Claim is entitled to vote to accept or reject the Plan.

    (2)ii.  *Treatment:*  Except to the extent that a holder of an Allowed Prepetition Lender Claim has been paid by the Debtor prior to the Effective Date or agrees to a different treatment with respect to such holder's Claim, on the Effective Date, or as soon as practicable thereafter, the Collateral Agent shall receive (for the benefit of itself and the Prepetition Secured Lenders) the Prepetition Lender Distribution, to be distributed in accordance with the applicable Prepetition Secured Agreements, including the Intercreditor Agreement. The Prepetition Lender Claims are Allowed Claims under the Plan.  Notwithstanding anything in the Plan to the contrary, upon the full payment or other satisfaction or release of such obligations, the Liens securing such Allowed

Prepetition Lender Claim shall be deemed released, terminated and extinguished against all parties, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person. All Cash held by the Prepetition Secured Lenders on the Effective Date that is in excess of the amount of the Prepetition Lender Distribution shall be promptly returned to the Debtor and utilized by the Debtor in accordance with the terms of the Plan.

2.  **Class 2 – Other Secured Claims.**

(1)i.   *Impairment and Voting.*  Class 2 is unimpaired by the Plan. Each holder of an Other Secured Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

(2)ii.   *Treatment*:  Except to the extent that a holder of an Allowed Other Secured Claim has been paid by the Debtor prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Other Secured Claim shall receive at the election of the Debtor on or before, the later of the Effective Date and thirty (30) days after the date on which a Class 2 Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter: (i) Cash in an amount equal to such Allowed Other Secured Claim; (ii) title to the property securing such Allowed Class 2 Claim to the holder of such Claim; or (iii) such other treatment that leaves such Allowed Other Secured Claim unimpaired pursuant to section 1124(2) of the Bankruptcy Code.  Notwithstanding anything in the Plan to the contrary, upon the full payment or other satisfaction of such obligations, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

(3)iii.   *Deficiency Claims.*  To the extent that the value of the Collateral securing an Other Secured Claim is less than the Allowed amount of such Other Secured Claim, the undersecured portion of such Allowed Claim shall be treated for all purposes under the Plan as an Allowed Other General Unsecured Claim and shall be classified as an Other General Unsecured Claim.

3. **Class 3 – Priority Non-Tax Claims.**

      (1)i. *Impairment and Voting.* Class 3 is unimpaired by the Plan. Each holder of an Allowed Priority Non-Tax Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

      (2)ii. *Treatment.* The legal, equitable and contractual rights of the holders of Priority Non-Tax Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed Priority Non-Tax Claim has been paid by the Debtor prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Non-Tax Claim shall receive Cash in an amount equal to such Allowed Priority Non-Tax Claim on the later of the Effective Date and the date such Allowed Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable.

4. **Class 4 – Other General Unsecured ~~Claim~~Claims.**

      (1)i. *Impairment and Voting.* Class 4 is impaired by the Plan. Each holder of an Other General Unsecured Claim is entitled to vote to accept or reject the Plan.

      (2)ii. *Treatment:* Except to the extent that a holder of an Allowed Other General Unsecured Claim has been paid by the Debtor prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Other General Unsecured Claim shall receive in full satisfaction, settlement, and release of, and in exchange for such Allowed Other General Unsecured Claim, its Pro Rata share of the Class 4 Distribution; provided that, notwithstanding the foregoing, all Texas Storm Causes of Action Net Recovery Proceeds, if any, shall be shared with holders of Allowed Participating Customer Potential Return Claims on a Pro Rata basis and be distributed (Pro Rata) to holders of (a) Allowed Other General Unsecured Claims and (b) Allowed Participating Customer Potential Return Claims.

5. **Class 5 – Customer Claims.**

      (1)i. *Impairment and Voting.* Class 5 is impaired by the Plan. Each holder of a Customer Claim is entitled to vote to accept or reject the Plan.

(2)ii.     *Treatment*:  Except to the extent that a holder of an Allowed Customer Claim has been paid by the Debtor prior to the Effective Date or agrees to a different treatment:

(a)     in full satisfaction, settlement, and release of, and in exchange for its Customer Claim, each Participating Customer will (a) grant and receive the Customer Releases as set forth in Section 12.10 of the Plan; and (b) solely to the extent a Participating Customer has an Allowed Participating Customer Potential Return Claim, receive its Pro Rata share of any Texas Storm Causes of Action Net Recovery Proceeds in accordance with the terms of the Plan; or

(b)     if a Customer Claim is held by a Non-Participating Customer, such holder (x) will not be treated as having an Allowed Class 5 Claim, (y) will not give or receive the Customer Releases, and: (a (z) (1) solely if the Non-Participating Customer timely and properly filedfiles an unsecured nonpriority proof of claim against the Debtor by the applicable Bar Date in accordance with the applicable Bar Date Order, such Customer Claim will not be an Allowed Class 5 Claim and, instead, shall be classified as an Other General Unsecured Claim and treated for all purposes under thethis Plan as an Other General Unsecured Claim; or (by) solely if the Non-Participating Customer diddoes not timely and properly file an unsecured nonpriority proof of claim against the Debtor by the applicable Bar Date in accordance with the applicable Bar Date Order, such Customer Claim shall not be treated as either a Class 5 Claim or a Class 4 Claim.

(3)Notwithstanding anything to the contrary herein or in the Plan, all Non-Participating Customers will be treated as having temporarily Allowed Class 4 Other General Unsecured Claims solely for purposes of voting on the Plan.

iii.     *If Class 5 Approves the Plan; Treatment Subject to Bankruptcy Court Approval*.  On the Effective Date, all Participating Customers shall be deemed to have Allowed Class 5 Claims; provided, that a Participating Customer Potential Return Claim shall only be Allowed if such Participating Customer timely and properly files a proof of claim for such Claim by the Former Customers Bar Date in

accordance with the Former Customers Bar Date Order and shall only be Allowed in the amount of the Participating Customer Potential Return; provided further that, if the Bankruptcy Court does not approve the Customer Releases pursuant to Bankruptcy Rule 9019 or otherwise, than each Participating Customer will not have an Allowed Class 5 Claim and, solely if such Participating Customer timely and properly filed an unsecured nonpriority proof of claim against the Debtor by the applicable Bar Date in accordance with the applicable Bar Date Order, such Customer Claim shall be classified as an Other General Unsecured Claim and treated for all purposes under the Plan as an Other General Unsecured Claim.

6.   **Class 6 – Intercompany Claims.**

   (1)i.   *Impairment and Voting.*  Class 6 is impaired by the Plan. ~~In accordance with section 1126(g) of the Bankruptcy Code,~~ The holders of Intercompany Claims are ~~conclusively presumed to reject the Plan and are not~~ entitled to vote to accept or reject the Plan~~, and the votes~~.

   ii.   *Treatment*:  Except to the extent that a holder ~~of such holders will not be solicited with respect to such~~an Allowed Intercompany ~~Claims.~~ Claim agrees to a different treatment, if any Causes of Action are successfully prosecuted, settled and/or otherwise resolved, each holder of an Allowed Intercompany Claim shall be entitled to receive its Pro Rata share of any and all Cash or other property remaining with the Debtor after (a) all Allowed Claims (other than Intercompany Claims) are paid in full in Cash (including payment of postpetition interest at a rate sufficient to render all Allowed Other General Unsecured Claims unimpaired) in accordance with the Plan and (b) all other Wind Down Costs are paid in accordance with the Wind Down Budget.

   (2)   ~~*Treatment*:  Any and all Intercompany Claims, shall, at the option of the Debtor, either be extinguished and/or cancelled on, or as soon as reasonably practicable after, the Effective Date.~~

7.   **Class 7 – Existing HoldCo Interests.**

   (1)i.   *Impairment and Voting.*  Class 7 is impaired by the Plan. ~~In accordance with section 1126(g) of the Bankruptcy Code, the holders of~~ The holder of the Existing HoldCo Interests

~~are conclusively presumed to reject the Plan and are not~~is entitled to vote to accept or reject the Plan~~, and~~.

ii.      *Treatment*:  Except to the extent that the ~~votes~~holder of ~~such holders will not be solicited with respect to such~~the Allowed Existing HoldCo ~~Interests.~~

~~(2)      *Treatment*:  On the Effective Date, all Existing HoldCo Interests shall be cancelled, and holders of Existing HoldCo Interests shall receive no distribution on account of such Interests.~~Interest agrees to a different treatment, if any Causes of Action are successfully prosecuted, settled and/or otherwise resolved, the holder of the Existing HoldCo Interests shall be entitled to receive any and all Cash or other property remaining with the Debtor after (a) all Allowed Claims are paid in full in Cash (including payment of postpetition interest at a rate sufficient to render all Allowed Other General Unsecured Claims unimpaired) in accordance with the Plan and (b) all other Wind Down Costs are paid in accordance with the Wind Down Budget.

Additional provisions regarding the treatment of Claims and Interests are set forth in **Article IV** of the Plan.

C.      **Releases and Exculpation**

Article XII of the Plan contains certain provisions that propose to release and exculpate the Released Parties.

**_Released Parties_** *means, collectively, and each solely in its capacity as such: (a) the Debtor, (b) the Committee and its members, (c) the Prepetition Secured Lenders and the Collateral Agent, and (d) each of such parties' respective predecessors, successors, assigns, subsidiaries, affiliates, including the Non-Debtor Affiliates,[16] owners, and each of their respective current and former officers, directors, employees, managers, members, principals, shareholders, agents, advisors and professionals (including any attorneys, consultants, financial advisors, investment bankers and other professionals retained by such Persons) or other representatives, each in their capacities as such, together with their successors and assigns;* _provided_*,* _however_*, that such attorneys and professional advisors shall only include those that provided services related to the Chapter 11 Case and the transactions contemplated by the Plan;* _provided_*,* _further_*, that no Person shall be a Released Party if it elects to opt out of the releases provided for in Article XII of the Plan in its Ballot.*

---

[16] **_Non-Debtor Affiliates_" means the Debtor's non-debtor affiliates, including, HoldCo, Griddy Technologies LLC, Griddy Pro LLC, Griddy VI Holdings LLC, Griddy VI Intermediate Holdings LLC, Griddy 6 Holdings LLC and Griddy VI Series A Holdings LLC.**

The releases, exculpation and injunction provisions included in the Plan are an integral part of the Debtor's Plan.

**Section 12.07(b) of the Plan does not apply to Participating Customers (those customers that vote in favor of the Plan on their Class 5 Ballot or abstain from voting) if the Bankruptcy Court approves the Customer Releases.  If the Bankruptcy Court does not approve the Customer Releases pursuant to Bankruptcy Rule 9019 or otherwise, than solely if such Participating Customer timely and properly files an unsecured nonpriority proof of claim against the Debtor by the applicable Bar Date in accordance with the applicable Bar Date Order, such Customer Claim shall be classified as an Other General Unsecured Claim and treated for all purposes under the Plan as an Other General Unsecured Claim, and the releases in Section 12.07(b) shall apply unless such claimant "opts out" of the releases on a timely and properly submitted Ballot.**

**Importantly, only holders of Claims entitled to vote on the Plan that do not opt out of the releases provided for Section 12.07(b) of the Plan in accordance with the procedures set forth in the Ballots will be deemed to have consented to such releases of the ~~Release~~Released Parties to the extent set forth in the Plan.**

The Released Parties have made substantial and valuable contributions to the Debtor's orderly wind down plan through efforts to negotiate and implement the Plan, which will maximize the amount of assets available to be distributed to holders of Claims.  For example, the Prepetition Secured Lenders have indicated that they will not object to the treatment of their Claims set forth in the Plan, which represents a compromise of a portion of their Allowed Claims.  ~~In addition, certain of the Released Parties are entitled to indemnification by the Debtor.~~ Accordingly, each of the Released Parties warrants the benefit of the release and exculpation provisions.  The pertinent parts of the release, exculpation and injunction provisions of the Plan are copied below.

        (a)      **Debtor Releases**

Section 12.07(a) of the Plan provides for a release by the Debtor and certain other related parties of the Released Parties, as set forth below (the "**Debtor Release**").  The Debtor does not believe that it has material claims or causes of action against any of the Released Parties and believes the Debtor Release is in the best interest of the Debtor's estate and well within the Debtor's business judgment.  ~~Prosecution of any potential claims or causes of action released under the Debtor Release would be complex and~~

First, until the winter storm event that occurred in Texas in mid-February 2021, the Debtor was solvent, and at all times maximized the value of the company.  Second, the Debtor believes that the Prepetition Secured Lenders' liens were properly perfected in December 2020 when the Debtor was solvent.  The Prepetition Secured Lenders activated the deposit account control agreements (that were put in place in December 2020) during the winter storm event and continue to have control over one account of the Debtor that contains approximately $2.689 million.  The Debtor believes the Prepetition Secured Lenders are oversecured and that any litigation against the Prepetition Secured Lenders would be time consuming and could mire the Debtor and parties in interest in litigation that would delay the completion of the liquidation of the Debtor's assets and distributions to its creditors. ~~As of~~, or end up causing the Debtor to become administratively

insolvent and force the Debtor to convert this ~~time~~case to chapter 7.  The Debtor believes that a conversion of the case to chapter 7 would not be in the Debtor's or the Estate's best interests. Moreover, under the Plan, if consummated, the Prepetition Secured Lenders would "give up" approximately $550,000 for the benefit of the Debtor's estate.  The Debtor believes that the Prepetition Secured Lenders would not be willing to contribute the approximately $550,000 without the Debtor Release.  Accordingly, the Debtor's release of the Prepetition Secured Lenders is an integral part of the Plan and that the approximately $550,000 is a substantial contribution to this case and the Plan.

Third, the Debtor also believes that there are no viable claims against its non-Debtor affiliates.  As set forth above, the Debtor was solvent until mid-February.  The Debtor's Schedules of Assets and Liabilities reflect one intercompany claim by a sister company of approximately $4,600.  The Debtor's Statement of Financial Affairs do not reflect any cash transfers from the Debtor to any of its affiliates.  Fourth, the Debtor does not believe there are any viable claims against its members, controlling directors and/or officers.  The Debtor believes that it and such parties acted in the best interests of it and its stakeholders at all times.  Any payments to such parties were on account of salaries, fees and/or expenses paid in the ordinary course of business. Further, during the unprecedented crisis created by the winter storm event, the unpreparedness of the electricity grid in Texas, and the extreme pricing that occurred, the Debtor, through its management, among other things, (a) urged its customers to move to a different REP because the Debtor could not control the price of electricity (and approximately 10,000 customers did so), (b) requested ERCOT to mass transition its customers to POLR during the storm, which would have had the effect of mitigating damages for all parties, and (c) continued to procure electricity so that its customers would not be left without electricity notwithstanding that a great number of those customers were unable or unwilling to pay for their own electricity consumption.  The Debtor believes that the actions by such parties were appropriate under the circumstances.

Lastly, the treatment of Claims under the Plan is based on proposed compromises and settlements with numerous parties.  The Debtor Release is integral to the Plan and such compromises and settlements.  The Debtor Release and the Customer Releases are part and parcel of the overall Plan.  Each component is a necessarily intertwined.  As stated above, the Debtor does not believe that it has material claims or ~~cause~~causes of action against any of the Released Parties that would justify ~~the risk, expense and delay attendant to their~~ risking the compromises and settlements under the Plan.  In light of this fact, the implementation of the Debtor Release far outweighs the pursuit of any potential claims or causes of action being released.  Importantly, the Debtor Release provides finality, and therefore, the inclusion of the Debtor Release is worthwhile and inures to the benefit of all of the Debtor's stakeholders.

***Releases by the Debtor.  Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, the Debtor, as debtor in possession, and any person seeking to exercise the rights of the Debtor's Estate, including without limitation, any successor to the Debtor, including the Liquidating Debtor, the Plan Administrator or any representative of the Debtor's Estate appointed or selected pursuant to sections 1103, 1104, or 1123(b)(3) of the Bankruptcy Code or under chapter 7 of the Bankruptcy Code, shall be deemed to forever release and waive all claims (as such term "claim" is defined in section 101(5) of the Bankruptcy Code), obligations, suits,***

*judgments, damages, demands, debts, rights, causes of action (including, but not limited to, the Causes of Action) and liabilities (other than the rights of the Debtor to enforce the Plan and the contracts, instruments, releases and other agreements or documents delivered thereunder) against any Released Party, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Chapter 11 Case, the Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the Debtor or its Estate, whether directly, indirectly, derivatively or in any representative or any other capacity; provided, however, that in no event shall anything in this Section 12.07(a) be construed as a release of any Person's gross negligence or willful misconduct, as determined by a Final Order, for matters with respect to the Debtor and/or their affiliates.*

(b)    **Third Party Releases**

Section 12.07(b) of the Plan provides for a mutual release by holders of Claims entitled to vote on the Plan that do not opt out of the releases through the procedure set forth in the Ballot, on the one hand, and the Released Parties, on the other hand, as set forth below (the "**Third Party Release**").  The Third Party Release is integral to the Plan and is a key ~~components~~component of the Debtor's chapter 11 wind down.  Importantly, the Debtor believes that the Third Party Release is consensual because, other than with respect to certain affiliate claims, the Plan provides voting holders of Claims with the option to opt out of the Third Party Release by checking a box on the Ballot.  Each of the Disclosure Statement, Ballots, and Combined Hearing Notice state in bold-faced, conspicuous text that holders of Claims eligible to vote on the Plan that do not opt out or object to the Third Party Release will be bound by it.

*Releases by Holders of Claims*.  *Except as otherwise provided in the Plan or the Confirmation Order, including Section 12.10 as to Participating Customers, on the Effective Date, (i) each holder of a Claim in a Class entitled to vote on the Plan and (ii) each Released Party (other than the pre-Effective Date Debtor, the Liquidating Debtor and the Plan Administrator), to the fullest extent permissible under applicable law as such law may be extended or interpreted subsequent to the Effective Date, all holders of Claims, in consideration for the obligations of the Debtor under the Plan, the Distributions under the Plan and other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, will be deemed to have consented to the Plan and the restructuring embodied herein for all purposes and deemed to forever release and waive all claims (as such term is defined in section 101(5) of the Bankruptcy Code) against any and all Released Parties, including but not limited to any claim sounding in law or equity or asserting a tort, breach of any duty or contract, violations of the common law, any federal or state statute, any federal or state securities laws or otherwise, demands, debts, rights, causes of action (including without limitation, the Causes of Action) or liabilities (other than the right to enforce the obligations of any party under the Plan and*

*the contracts, instruments, releases, agreements and documents delivered under or in connection with the Plan), including but not limited any claims for any such loss such holder may suffer, have suffered or be alleged to suffer as a result of the Debtor commencing the Chapter 11 Case or as a result of the Plan being consummated, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the pre-Effective Date Debtor, the Liquidating Debtor, the Plan Administrator, the Chapter 11 Case, the Plan or the Disclosure Statement; **provided, however,** that the foregoing releases shall not apply to any holder of a Claim if such holder "opts out" of the releases provided in* ~~this~~ *Section 12.07(b) in a timely and properly submitted Ballot; **provided, further,** that in no event shall anything in* ~~this~~ *Section 12.07(b) be construed as a release of any Person's gross negligence or willful misconduct, as determined by a Final Order, for matters with respect to the Debtor. For the avoidance of doubt, the only parties that are bound by the releases set forth in* ~~this~~ *Section 12.07(b) are (a) the Released Parties and (b) holders of Claims in a Class entitled to vote on the Plan that do not "opt out" of the releases provided in Section 12.07(b) of the Plan in a timely and properly submitted Ballot.*

(c)   **Customer Releases**

Section 12.10 of the Plan provides for a mutual release between each Participating Customer (*i.e.*, a former customer of the Debtor that votes in favor of the Customer Releases on a timely and properly submitted Class 5 Claim Ballot or abstains from voting on the Plan), and the Released Parties, as set forth below. The Customer Releases are also consensual because any former customer that ~~wishes~~does not wish to grant such releases can vote to reject the Plan ~~and (a) solely if~~ as the ~~Non-Participating Customer timely and properly files an unsecured nonpriority proof~~holder of ~~claim against the Debtor by the applicable Bar Date in accordance with the Bar Date Order, such Customer Claim will not be an Allowed~~ a Class 5 Claim and~~, instead, shall be classified as an~~ the Customer Releases would not apply. In that case, such former customer would have a temporarily Allowed Claim in Class 4 (Other General Unsecured ~~Claim and treated~~Claims) for ~~all~~purposes ~~under~~of voting on the Plan ~~as an Other General Unsecured Claim; or (b) solely if~~ and the ability to opt out of the proposed Third Party Release.[17]

The Debtor believes that if it pursued collections from former customers for amounts owed, the ~~Non-Participating Customer did not timely and properly file an unsecured nonpriority proof of claim against~~amount it would be able to collect would be a small fraction of the total amount due from its former customers. This belief is based on, among other things, prior experience with trying to collect such debt, and is exacerbated the pandemic and loss of income by many families coupled with the extreme pricing imposed by the PUCT order. Further, the Debtor ~~by the~~

---

[17] Whether the Non-Participating Customer has an Other General Unsecured Claim under the Plan for purposes other than voting will depending upon whether such Non-Participating Customer timely and properly files an unsecured nonpriority proof of claim against the Debtor by the applicable Bar Date in accordance with the applicable Bar Date Order.

applicable Bar Date~~believes that if it brought such actions, the amount expended on litigation could far outweigh the total amount collected.

The Debtor was a licensed retail electric provider, which provided its customers the ability to purchase wholesale electricity with no mark-up.  It did not make improper charges to former customers.  As a passthrough, the Debtor had no say whatsoever in ~~accordance with the Bar Date Order, such Customer Claim shall~~the extreme pricing of electricity that was charged.  Putting aside that the Debtor does ~~not~~ believe there will ~~be~~ ~~treated as either a Class 5 Claim or a Class 4 Claim.~~ a high rate of success of collections from such former customer debt, the Debtor believes that it is appropriate and reasonable under the circumstances to (a) avoid having collection actions taken against approximately 24,000 people of the State of Texas and (b) avoid having the credit of such persons potentially damaged by reporting the overdue amounts to credit agencies.  It is bad enough that the Debtor finds itself in a position of having had its business destroyed and commencing this case as a result of the extreme pricing that occurred during the winter storm event.  The Debtor proposed the Customer Releases in order to try give itself and its customers an ending to a terrible chapter, through no fault of its own, that affected both it, its business and most of its former customers in a materially negatively way.

**_Customer Releases_** **means the mutual releases by and among the Participating Customers, on the one hand, and the Released Parties, on the other hand, whereby (i)** ~~each~~ **_the Debtor and each other Released Party releases and waives all Claims against each Participating Customer, solely in its capacity as such, including, for unpaid amounts owed by such Participating Customer to the Debtor for the electricity and related fees, taxes, expenses and other costs charged to such customers for the period February 13, 2021 through and including February 19, 2021, including when the Public Utilities Commission of Texas imposed the $9,000 per MWh price for wholesale power; and (ii) each_** **Participating Customer releases and waives all Claims against each of the Released Parties relating to the pre-Effective Date Debtor, the Liquidating Debtor, the Plan Administrator, the Chapter 11 Case, the Plan or the Disclosure Statement, including, any Claims for any loss a Participating Customer may suffer, have suffered or be alleged to suffer as a result of or relating to the Participating Customer's agreements with the Debtor as well as the electricity and related fees, taxes and costs charged to such customers for any period while they were a customer of the Debtor, including, the period February** ~~15~~**_13_, 2021 through and including February 19, 2021_, including_ when the Public Utilities Commission of Texas imposed the $9,000 per MWh price for wholesale power;** ~~and (ii)~~**_provided, that, notwithstanding the foregoing,_ each** ~~Released Party releases and waives all Claims against each~~**_eligible_** **Participating Customer**~~, solely in its capacity as such, including, unpaid amounts owed by such~~ **_may assert a_** **Participating Customer** **_Potential Return Claim in a timely and properly filed proof of claim form in accordance with the Former Customers Bar Date Order and, solely_** **to the** ~~Debtor for the electricity and related fees, taxes, expenses and other costs charged to such customers, including, for the period February 15, 2021 through and including February 19, 2021 when~~**_extent each Participating Customer has an Allowed Participating Customer Potential Return, receive its Pro Rata share of_** **the** ~~Public Utilities Commission of~~ **Texas** ~~imposed the $9,000~~

*per MWh price for wholesale power*Storm Causes of Action Net Recovery Proceeds, if any, which proceeds shall be shared with holders of Allowed Other General Unsecured Claims on a Pro Rata basis and be distributed (Pro Rata) to holders of (a) Allowed Other General Unsecured Claims and (b) Allowed Participating Customer Potential Return Claims.

**Agreement by Holders of Participating Customers; Release of Certain Customer Collections.** **Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, (i) each Participating Customer will be deemed to have consented to the Plan and the restructuring embodied *in the Plan*therein for all purposes and deemed to accept the Customer Releases as they pertain to such Participating Customer and the Released Parties and (ii) each Released Party will be deemed to accept the Customer Releases as they pertain to such Released Party and the Participating Customers; provided that, notwithstanding the foregoing, if the Bankruptcy Court does not approve the Customer Releases pursuant to Bankruptcy Rule 9019 through the Plan or otherwise, than each Participating Customer will not have an Allowed Class 5 Claim, the Customer Releases shall not become effective*, and*, solely if such Participating Customer timely and properly filed an unsecured nonpriority proof of claim against the Debtor by the applicable Bar Date in accordance with the applicable Bar Date Order, such Customer Claim shall be classified as an Other General Unsecured Claim and treated for all purposes under the Plan as an Other General Unsecured Claim. For the avoidance of doubt, if the Customer Releases become effective, each Participating Customer releases and waives all Claims against each of the Released Parties, including, any claim sounding in law or equity or asserting a tort, breach of any duty or contract, violations of the common law, any federal or state statute, any federal or state securities laws, fraud or otherwise, demands, debts, rights, causes of action (including without limitation, the Causes of Action) or liabilities (other than the right to enforce the obligations of any party under the Plan and the contracts, instruments, releases, agreements and documents delivered under or in connection with the Plan), including but not limited any Claims for any such loss such Participating Customer may suffer, have suffered or be alleged to suffer as a result of the Debtor selling electricity to such Participating Customer prior to the Petition Date, the Debtor commencing the Chapter 11 Case or as a result of the Plan being consummated, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the pre-Effective Date Debtor, the Liquidating Debtor, the Plan Administrator, the Chapter 11 Case, the Plan or the Disclosure Statement; provided, that, notwithstanding the foregoing, each eligible Participating Customer may assert a Participating Customer Potential Return Claim in a timely and properly filed proof of claim form in accordance with the Former Customers Bar Date Order and, solely to the extent each Participating Customer has an Allowed Participating Customer Potential Return Claim, receive its Pro Rata share of**

*the Texas Storm Causes of Action Net Recovery Proceeds, if any, which proceeds shall be shared with holders of Allowed Other General Unsecured Claims on a Pro Rata basis and be distributed (Pro Rata) to holders of (a) Allowed Other General Unsecured Claims and (b) Allowed Participating Customer Potential Return Claims.*

    (d)    **Exculpation**

In addition to the releases, the exculpation clause in the Plan provides that the Debtor, the Liquidating Debtor, the Plan Administrator and the other Released Parties are exculpated from any liability arising out of any postpetition acts or omissions arising out of the Chapter 11 Case and certain related transactions as set forth therein—except for acts or omissions that are found to have been the product of willful misconduct or gross negligence.  As such, the Debtor believes the exculpation clause is reasonable, appropriate and vital to this Chapter 11 Case.  First, the Debtor is entitled to the benefits of the exculpation clause.  Upon a "good faith" finding within the meaning of section 1125(e) of the Bankruptcy Code, such parties are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation clause.  Second, certain other exculpated parties owe fiduciary duties in favor of the Debtor's estate, permitting them to receive the benefits of the exculpation clause.  The directors, officers, members and professionals that have acted on behalf of the Debtor in connection with the Chapter 11 Case and the Plan Administrator each owe the Debtor fiduciary duties similar to those the debtor in possession owes to the estate.  Further, the Debtor and its fiduciaries could not possibly have developed the Plan without the support and contributions of the Released Parties.  Accordingly, the failure to approve the exculpation clause would undermine the purpose of the Plan and the settlements set forth therein by allowing parties to pursue claims post-bankruptcy that are otherwise fully and finally resolved by the Plan when the Released Parties participated in the Chapter 11 Case in reliance upon the protections afforded to those constituents by the exculpation clause.

*<u>Exculpation and Limitation of Liability</u>  None of the pre-Effective Date Debtor, the Liquidating Debtor, the Plan Administrator nor the other Released Parties shall have or incur any liability to any holder of any Claim or Interest for any postpetition act or omission in connection with, or arising out of the Debtor's restructuring, including without limitation the negotiation and execution of the Plan, the Chapter 11 Case, the Disclosure Statement, the Disclosure Statement Supplement, the solicitation of votes for and the pursuit of the Plan (including that solicitation of acceptances of the Plan was not conducted in good faith nor in compliance with the applicable provisions of the Bankruptcy Code), the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, including, without limitation, all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all activities leading to the promulgation and confirmation of the Plan except gross negligence or willful misconduct as determined by a Final Order of the Bankruptcy Court.  For purposes of the foregoing, it is expressly understood that any act or omission effected with the approval of the Bankruptcy Court conclusively will be deemed not to constitute gross negligence or willful misconduct unless the approval of the Bankruptcy Court was obtained by fraud or misrepresentation.  The Debtor and the Released*

*Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities with respect to the Chapter 11 Case, the Plan and the administration thereof.*

(e)     **Injunction.**

The following injunction provisions in section 12.06 of the Plan:

*(a) Except as otherwise provided in the Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against or Interests in the Debtor or its Estate are, with respect to any such Claims or Interests, permanently enjoined from:  (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the pre-Effective Date Debtor, the Liquidating Debtor, the Estate, the Plan Administrator, the Released Parties, or any of their respective property; (ii) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtor, the pre-Effective Date Debtor, the Liquidating Debtor, the Estate, the Plan Administrator, the Released Parties or any of their respective property; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the pre-Effective Date Debtor, the Liquidating Debtor, the Estate, the Plan Administrator, the Released Parties; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained in the Plan shall preclude such persons from exercising their rights pursuant to and consistent with the terms of the Plan.*

*(b) Each holder of an Allowed Claim shall be deemed to have specifically consented to the injunctions set forth herein.*

Additionally, Section 12.09 contains the following injunction provisions related to the release and exculpation provisions:

*Injunction Related to Releases and Exculpation. The Confirmation Order shall permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released pursuant to the Plan, including but not limited to the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released under this Article XII of the Plan.*

D.      **Plan Administrator**

The Debtor shall continue to exist as the Liquidating Debtor on and after the Effective Date, with all of the powers of a limited liability company under applicable law solely for the purposes of satisfying the Debtor's obligations under the Plan, including making distributions as required under the Plan and effectuating the wind down of the Debtor.  On the Effective Date, the sole membership interest in the Liquidating Debtor shall be issued to the Plan Administrator and all property of the Debtor will vest in the Liquidating Debtor free and clear of any liens, claims or encumbrances.  From and after the Effective Date, the Debtor shall be managed and administered through the Plan Administrator, who shall be appointed the sole officer of the Debtor and shall have full authority to administer the provisions of the Plan.

*Designation of Plan Administrator*.  Not less than ten (10) days prior to the commencement of the Combined Hearing and subject to Bankruptcy Court approval in connection with confirmation of the Plan, the Debtor shall designate the person who initially will serve as the Plan Administrator; provided, however, that: (a) the Debtor shall have the right at any time prior to the Effective Date to remove the Plan Administrator without cause; and (b) the Plan Administrator shall be subject to removal by the Bankruptcy Court for cause shown at any time. The Plan Administrator shall act for the Debtor in a fiduciary capacity, shall have such qualifications and experience as are sufficient to enable the Plan Administrator to perform its obligations under the Plan and under the Plan Administrator Agreement, and shall be compensated and reimbursed for expenses as set forth in, and in accordance with, the Plan Administrator Agreement.  Section 7.04 of the Plan contains provisions regarding replacement of the Plan Administrator under certain circumstances.

*Powers and Duties of Plan Administrator*.  On or after the Confirmation Date but prior to the Effective Date, the Plan Administrator shall assume all of its obligations, powers and authority under the Plan to: (i) establish bank accounts as may be required to fulfill the Debtor's obligations under the Plan; and (ii) exercise such other power and authority as may be set forth in the Confirmation Order (collectively, the "**Pre-Effective Date PA Duties**").  On the Effective Date, the Plan Administrator shall assume all of its other obligations, powers and authority under the Plan and shall comply with all applicable provisions of the Plan.  All other property of the Estate, including any Causes of Action not released by the Plan, shall be managed by the Plan Administrator and shall be held in the name of the Debtor free and clear of all Claims against the Debtor and Interests, except for the rights to such Distribution afforded to the holders of Allowed Claims under the Plan.

From and after the Effective Date, pursuant to the terms and provisions of the Plan and the Plan Administrator Agreement, the Plan Administrator shall be empowered and directed to: (i) take all steps and execute all instruments and documents necessary to make Distributions to holders of Allowed Claims and to perform the duties assigned to the Plan Administrator under the Plan and/or the Plan Administrator Agreement; (ii) comply with the Plan and the obligations hereunder; (iii) employ, retain, or replace professionals to represent it with respect to his or her responsibilities; (iv) object to Claims as provided in the Plan, and prosecute such objections; (v) compromise and settle any issue or dispute regarding the amount, validity, priority, treatment, or Allowance of any Claim; (vi) establish, replenish or release reserves as provided in the Plan, as applicable; (vii) seek a determination of tax liability under section 505 of the Bankruptcy Code,

file tax returns and pay taxes, if any, related to the Debtor; (viii) abandon in any commercially reasonable manner, including abandonment or donation to a charitable organization of his or her choice, any assets of the Debtor if he or she concludes that they are of no benefit to the Estate or the Debtor; (ix) purchase or create and carry all insurance policies and paying all insurance premiums and costs he or she deems necessary or advisable; (x) seek entry of a final decree in the Chapter 11 Case at the appropriate time; and (xi) exercise such other powers as may be vested in the Plan Administrator pursuant to the Plan, the Plan Administrator Agreement or any other Plan Documents or order of the Bankruptcy Court or otherwise act on behalf of and for the Debtor from and after the Effective Date in a manner consistent with the provisions of the Plan which the Plan Administrator deems reasonably necessary or desirable with respect to administering the Plan. The Debtor shall pay the Plan Administrator Expenses and the reasonable fees and expenses of the professional persons employed by the Plan Administrator in connection with his or her duties and responsibilities as set forth in the Plan.

The Plan Administrator shall make the remaining Distributions required under the Plan in accordance with the Plan's terms.

*Limitation of Plan Administrator Liability*.   After the Effective Date, the Plan Administrator shall have no liability to holders of Claims or Interests other than as provided for in the Plan.  The Plan Administrator shall not be liable for any action it takes or omits to take that it believes in good faith to be authorized or within its rights or powers unless it is ultimately and finally determined by a court of competent jurisdiction that such action or inaction was the result of fraud, gross negligence or willful misconduct.  Absent willful misconduct or fraud in connection therewith, no party in interest shall have a cause of action against the Plan Administrator, the Debtor or the Liquidating Debtor, or each of their respective managers, officers, employees, consultants, trustees, or similar persons, or professionals arising from or related to the disposition of non-Cash property in accordance with the Plan.

*Dissolution of the Debtor and Termination of the Plan Administrator*.  As soon as reasonably practicable after the Distributions have been made to holders of Allowed Claims in accordance with the terms of the Plan, the Debtor shall:  (a) file its certificate of dissolution, together with all other necessary corporate documents, to effect its dissolution under the applicable Delaware state law; and (b) complete and file its final federal, state and local tax returns, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of the Debtor or its Estate for any tax incurred during the administration of the Chapter 11 Case, as determined under applicable tax laws.  After the Chapter 11 Case is closed and the Plan Administrator has completed all tasks necessary in order to fully and completely wind down and dissolve the Debtor and otherwise to comply with its obligations under the terms of the Plan and the Plan Administrator Agreement, the Plan Administrator shall be deemed to have fully completed his or her duties hereunder and thereunder and shall be fully released and discharged of its duties and obligations to carry out the terms of the Plan.

### E.       Other Significant Plan Provisions.

### Comprehensive Settlement of Claims and Controversies

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims or controversies relating to the rights that a holder of a Claim or Interest may have with respect to any Allowed Claim, including Allowed Participating Customer Claims, or any distribution to be made pursuant to the Plan on account of any Allowed Claim, including, Allowed Participating Customer Return Claims.  **The treatment of Allowed Class 5 Customer Claims is a good faith compromise and settlement of all Claims or controversies relating to the rights of the holders of such Claims and is not and should not be deemed to be an admission or waiver of rights or defenses of the Debtor or any other Released Party. But for the proposed settlement and compromise set forth in the Plan, the Debtor would not have proposed the treatment in Class 5, including, related to Participating Customer Potential Return Claims.  The Debtor and each other Released Party reserves all rights and defenses against any Non-Participating Customers, including in respect of an alleged credit, refund, return or otherwise in respect of any and all amounts paid for electricity and related fees, costs, taxes and other charges, or otherwise that is not released pursuant to the Plan.**  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies, including the settlement and the Customer Releases set forth in Section 12.10 of the Plan, and the Bankruptcy Court's finding that all such compromises or settlements are: (a) in the best interest of the Debtor and its Estate and property, and of holders of Claims or Interests; and (b) fair, equitable and reasonable.  If the Effective Date does not occur, the settlements set forth in the Plan shall be deemed to have been withdrawn without prejudice to the respective positions of the parties.

### Texas Storm Causes of Action

Texas Storm Causes of Action means any and all Causes of Action of the Debtor arising from, relating to or in connection the winter storm (commonly referred to as "Winter Storm Uri") that occurred in Texas during the month of February 2021 (primarily February 13, 2021 through February 19, 2021).  For the avoidance of doubt, such Causes of Action of the Debtor exclude any and all claims against the Released Parties.

### Creditors' Representative

As of the Effective Date, a Creditors' Representative shall be appointed.  The Creditors' Representative shall be identified in the Plan Supplement and will be a member of the Committee or other Person selected by the Committee to participate in the oversight of the prosecution and any settlement and/or other resolution of the Texas Storm Causes of Action.

After the Effective Date, the Plan Administrator shall be required to consult with the Creditors' Representative on all material decisions of the Plan Administrator in connection with the Texas Storm Causes of Action, including any settlement thereof.  The compensation of the Creditors' Representative shall be determined by the Debtor and the Committee and included in the Plan Supplement.  Upon the closing of the Chapter 11 Case, the Creditors' Representative shall have no further duties, responsibilities and obligations in connection with the Chapter 11 Case or the Plan and its implementation.

### Cancellation of Agreements, Equity Interests and Security Interests.

On the Effective Date, any document, agreement, or instrument evidencing any Claim or Interest shall be deemed cancelled without further act or action under any applicable agreement, law, regulation, order, or rule and the obligations of the Debtor under such documents, agreements, or instruments evidencing such Claims and Interests, as the case may be, shall be deemed extinguished.  The holders of or parties to such cancelled instruments, securities and other documentation will have no rights arising from or relating to such instruments, securities and other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan.

Upon the full payment or other satisfaction of an Allowed Secured Claim, or promptly thereafter, the holder of such Allowed Secured Claim shall deliver to the Debtor any Collateral or other property of the Debtor held by such holder, and any termination statements, instruments of satisfactions, or releases of all security interests with respect to its Allowed Secured Claim that may be reasonably required in order to terminate any related financing statements, mortgages, mechanic's liens, or lis pendens.

### Distributions under the Plan

The Distributions to be made in Cash under the terms of the Plan shall be funded from the Debtor's Cash on hand as of and after the Effective Date and any Net Recovery Proceeds, consistent with the terms of the Plan.  "Net Recovery Proceeds" means the Cash or other amounts received by the Debtor, if any, from the pursuit of any Cause of Action (formally or informally) not released under the Plan, net of all costs and expenses deducted therefrom.  Pursuant to the terms and provisions of the Plan, the Plan Administrator shall make the required Distributions specified under the Plan, on the Initial Distribution Date, Interim Distribution Date, or Final Distribution Date, as the case may be, under the Plan.

Additional provisions related to Distributions to be made under the Plan are set forth in **Article VIII** of the Plan.

### Assumption and Rejection of Executory Contracts and Unexpired Leases

As set forth in Section 10.01 of the Plan, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases of the Debtor shall be deemed to be rejected by the Debtor as of the Effective Date, except for any executory contract or unexpired lease: (x) that previously has been assumed and/or assigned pursuant to an order of the Bankruptcy Court entered prior to the Effective Date; (y) as to which a motion for approval of the assumption and/or assignment of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date; or (z) that is specifically designated as a contract or lease to be assumed and/or assigned by the Debtor.

**Claims arising out of the rejection of an executory contract or unexpired lease pursuant to Section 10.01 of the Plan must be filed with the Bankruptcy Court and served upon the Debtor no later than thirty (30) days after the later of: (i) notice of entry of an order approving the rejection of such executory contract or unexpired lease; and (ii) notice of occurrence of the Effective Date.  All such Claims not filed within such time will be forever barred from assertion against the Debtor and its Estate.**

Additional provisions regarding the Assumption and Rejection of Executory Contracts and Unexpired Leases under the Plan, including procedures governing the Debtor's designation of contracts for assumption and cure of monetary defaults, are set forth in **Article X** of the Plan.

## III.     VOTING PROCEDURES AND REQUIREMENTS

### A.     Classes Entitled to Vote on the Plan

The following Classes are the only Classes entitled to vote to accept or reject the Plan (the "**Voting Classes**"):

| Class | Claim or Interest | Status |
|---|---|---|
| 1 | Prepetition Secured Lender Claims | Impaired |
| 4 | Other General Unsecured Claims | Impaired |
| 5 | Customer Claims | Impaired |
| 6 | Intercompany Claims | Impaired |
| 7 | Existing Holdco Interests | Impaired |

If your Claim or Interest is not included in one of the Voting Classes, you are not entitled to vote.  If your Claim or Interest is included in one of the Voting Classes, you should read your Ballot and carefully follow the instructions included in the Ballot.  Please use only the Ballot that accompanies this Disclosure Statement or the ballot that the Debtor, or Stretto, the Debtor's voting agent (the "**Voting Agent**"), on behalf of the Debtor, otherwise provided to you.

### B.     Votes Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a chapter 11 plan by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests, as applicable, voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted.  Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted.  Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.  **Your vote on the Plan is important**.  The Bankruptcy Code requires as a condition to confirmation of a chapter 11 plan that each class that is impaired and entitled to vote under a plan votes to accept such plan, unless the plan is being confirmed under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code.

### C.   Certain Factors To Be Considered Prior to Voting

There are a variety of factors that all holders of Claims or Interests entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan and include:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtor believes that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtor can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtor may request confirmation of the Plan without the acceptance of all impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either confirmation or consummation of the Plan could result in, among other things, increased Administrative Claims and Fee Claims.

While these factors could affect distributions available to holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Classes or necessarily require a re-solicitation of the votes of holders of Claims in such Voting Classes.

For a further discussion of risk factors, please refer to **Article VIII**, entitled "*Certain Risk Factors to be Considered*," of this Disclosure Statement.

### D.   Classes Not Entitled To Vote on the Plan

Under the Bankruptcy Code, holders of Claims or Interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the Plan.  The following Classes of Claims and Interests are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Priority Non-Tax Claims | Unimpaired | Presumed to Accept |
| 6 | Intercompany Claim | Impaired | Presumed to Reject |
| 7 | Existing HoldCo Interests | Impaired | Presumed to Reject |

### E.   Cramdown

Section 1129(b) permits confirmation of a chapter 11 plan notwithstanding the non-acceptance of the plan by one or more impaired classes of claims or equity interests, so long as at

least one impaired class of claims or interests votes to accept a proposed plan. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

~~Because certain classes are deemed to have rejected~~If any Class votes to reject the Plan, the Debtor will request confirmation of the Plan, as it may be modified and amended from time to time, under section 1129(b) of the Bankruptcy Code with respect to such ~~Classes.~~Class(es). Subject to Section 14.07 of the Plan, the Debtor reserves the right to alter, amend, modify, revoke or withdraw the Plan or any Plan Document in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

F.     **Allowed Claims**

Only ~~Administrative Expenses and~~ Claims or Interests that are "*Allowed*" may receive distributions under a chapter 11 plan. An "Allowed" ~~Administrative Expense or~~ Claim or Interest means that the Debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines by Final Order, that the ~~Administrative Expense or~~ Claim or Interest, including the amount thereof, is in fact a valid obligation of, or equity interest in, the Debtor, or otherwise a Allowed as part of the compromises and settlements under the Plan. Provisions governing the Allowance of Claims and Interests under the Plan are set forth in **Article IX** of the Plan.

G.     **Impairment Generally**

Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is "impaired" unless, with respect to each claim or interest of such class, the chapter 11 plan (i) does not alter the legal, equitable or contractual rights of the holders of such claims or interests or (ii) irrespective of the holders' right to receive accelerated payment of such claims or interests after the occurrence of a default, cures all defaults (other than those arising from, among other things, the debtor's insolvency or the commencement of a bankruptcy case), reinstates the maturity of the claims or interests in the class, compensates the holders of such claims or interests for any damages incurred as a result of their reasonable reliance upon any acceleration rights and does not otherwise alter their legal, equitable or contractual rights.

**Only holders of Allowed Claims or Allowed Interests in impaired Classes of Claims or Interests that receive or retain property under a proposed chapter 11 plan, but are not otherwise deemed to reject the plan, are entitled to vote on such a plan**.

H.     **Solicitation and Voting Process**

Each holder of a Class 1 Claim (Prepetition ~~Secured~~ Lender Claims), Class 4 Claim (Other General Unsecured Claims~~) or~~), Class 5 Claim (Customer Claims), Class 6 Claim (Intercompany Claims) or Class 7 Interest (Existing HoldCo Interests) as of the Voting Record Date is entitled to vote to accept or reject the Plan and shall receive the Solicitation Package in accordance with the solicitation procedures. Except as otherwise set forth herein, the Voting Record Date and all of the Debtor's solicitation and voting procedures shall apply to all of the Debtor's creditors and other parties in interest.

The following summarizes the procedures for voting to accept or reject the Plan (the "**Solicitation Procedures**"), which the Bankruptcy Court has approved through the Disclosure Statement Order (as defined below). Holders of Claims and Interests entitled to vote are encouraged to review the relevant provisions of the Bankruptcy Code and Bankruptcy Rules and to consult their own attorneys.

### The Solicitation Package.

The following materials are provided to each holder of a Claim or Interest that is entitled to vote on the Plan (collectively, the "**Solicitation Package**"):

- the Disclosure Statement (with all exhibits thereto, including the Plan);

- the Disclosure Statement Order (without exhibits);

- the Solicitation Procedures;

- the Combined Hearing Notice;

- the applicable form of Ballot for each Voting Class in which such Holder holds a Claim or Interest;

- a pre-addressed, postage pre-paid reply envelope (except for Class 5, who will receive their Solicitation Package by electronic means); and

- any supplemental documents that the Debtor may file with the Court or that the Court orders to be made available with the applicable Ballot and voting instructions.

If you (a) did not receive a Ballot and believe you are entitled to one; (b) received a damaged Ballot; (c) lost your Ballot; (d) have any questions concerning this Disclosure Statement, the Plan, or the procedures for voting on the Plan, or the Solicitation Package of materials you received; or (e) wish to obtain a paper copy of the Plan, this Disclosure Statement or any exhibits to such documents, please contact by (ithe Debtor's Solicitation Agent by (a) accessing the Solicitation Agent's website at https://cases.stretto.com/Griddy; (b) writing to the Solicitation Agent at Griddy Energy LLC, Ballots, c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602 (ii); (c) emailing TeamGriddyGriddyInquiries@stretto.com; and/or (iiid) calling the Solicitation Agent's toll-free information line with respect to the Debtor at (855) 478-2725 (toll free U.S.)) or (949) 471-0997 (international). Copies of the Disclosure Statement and other Solicitation Package materials can be also accessed online in electronic form by accessing the Solicitation Agent's website at https://cases.stretto.com/Griddy or visiting the website maintained by the Court at http://www.txs.uscourts.gov/bankruptcy.

The Debtor intends to file the Plan Supplement no later than five (5) Business Days prior to the deadline for Ballots to be received in connection with voting to accept or reject the Plan. The Debtor will not serve paper or electronic copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement (or any update thereto) by visiting the Debtor's restructuring

website, https://cases.stretto.com/Griddy; and/or by calling (855) 478-2725 (toll free U.S.) or (949) 471-0997 (international).

**Voting Deadlines.**

**To be counted, your Ballot(s) must be actually received by the Solicitation Agent no later than:**

- **[_____], 2021 at 5:00 p.m.** (Central Time) for holders of Claims or Interests entitled to vote.  This is the "**Voting Deadline**."  **If you miss the Voting Deadline your vote will not be counted.**

**Voting Instructions.**

> **THIS DISCUSSION OF THE VOTING PROCESS IS ONLY A SUMMARY. PLEASE REFER TO THE VOTING INSTRUCTIONS PROVIDED WITH YOUR BALLOT.  IN THE EVENT OF ANY DISCREPANCY BETWEEN THE VOTING INSTRUCTIONS PROVIDED WITH YOUR BALLOT AND THE INFORMATION IN THIS SUMMARY, THE VOTING INSTRUCTIONS PROVIDED WITH YOUR BALLOT SHALL GOVERN.**

If you are entitled to vote to accept or reject the Plan, you may submit a Ballot for the purpose of voting on the Plan.  Separate forms of Ballots are provided for the holders of Claims and Interests in different Voting Classes entitled to vote on the Plan.

The Plan provides that if a holder of a Class 5 Customer ClaimsClaim votes to reject the Plan as the holder of a Claim in Class 5, (i.e., a Non-Participating Customer), such holder (x) will not be treated as an Allowed Class 5 Claim, (y) will not give or receive the Customer Releases, and: (a)  (z) (1) solely if the Non-Participating Customer timely and properly filedfiles an unsecured nonpriority proof of claim against the Debtor by the applicable Bar Date in accordance with the applicable Bar Date Order, such Customer Claim will not be an Allowed Class 5 Claim and, instead, shall be classified as an Other General Unsecured Claim and treated for all purposes under thethis Plan as an Other General Unsecured Claim; or (byby) solely if the Non-Participating Customer diddoes not timely and properly file an unsecured nonpriority proof of claim against the Debtor by the applicable Bar Date in accordance with the applicable Bar Date Order, such Customer Claim shall not be treated as either a Class 5 Claim or a Class 4 Claim (other than for purposes of voting on the Plan as a Class 4 Claim).  **Notwithstanding anything to the contrary herein or in the Plan, all Non-Participating Customers will be treated as having temporarily Allowed Class 4 Other General Unsecured Claims solely for purposes of voting on the Plan.**

The Ballot for Class 5 Customer Claims includes a space to indicate a vote to accept or reject the Plan as a Class 5 Customer Claim; and if the holder rejects the Plan in Class 5, than the Ballot includes a space to indicate to vote to accept or reject the Plan as a Class 4 Other General Unsecured Claim and a space to opt out of the Third Party Release applicable to a Class 4 Claims; provided that such Class 4 Other General Unsecured Claim and opt out will only be counted if the Non-Participating Customer timely and properly filed an unsecured nonpriority proof of claim against the Debtor by the applicable Bar Date in accordance with the applicable Bar Date Order.

Holders of Class 5 Claims that vote to reject the Plan should complete the ballot as to their Class 4 Claim ~~as well~~ contained in the Class 5 Ballot (and should not fill out a separate Class 4 Ballot. to avoid any duplication).

For all other Classes, a separate Ballot must be used for each Voting Class. Any Person who holds Claims or Interests in more than one Voting Class is required to submit a separate ballot for its Claims or Interests in each Voting Class.

**Holders of Claims or Interests are required to vote all of their Claims or Interests within a Class either to accept or reject the Plan and may not split their votes. Any Ballot received that does not indicate either an acceptance or rejection of the Plan or that indicates both acceptance and rejection of the Plan will be counted as an acceptance. Any Ballot received that is not signed or that contains insufficient information to permit the identification of the holder will be an invalid Ballot and will not be counted.**

Ballots that are not received by the Voting Deadline will not be counted. With respect to each Claim or Interest, you may submit a Ballot completing, dating, and signing the enclosed Ballot and returning your Ballot(s) directly to the Solicitation Agent so that is actually received by the Voting Deadline. Ballots can be submitted to the Solicitation Agent by:

1. E-Ballot Portal, by visiting https://~~balloting~~cases.stretto.com/~~and after entering the Unique E-Ballot ID# provided in the Ballot, clicking~~Griddy. Click on the "File a Ballot" section of the website and follow the instructions to submit the Ballot after entering the Unique E-Ballot ID# provided on the Ballot; or

2. First Class Mail, Overnight Delivery, or Hand Delivery at:

Griddy Energy LLC Ballots
c/o Stretto
410 Exchange, Suite 100
Irvine, CA 92602

**UNLESS THE DEBTOR AGREES OTHERWISE, BALLOTS WILL <u>NOT</u> BE ACCEPTED BY FAX OR EMAIL**

**Only Ballots received by Stretto by the Voting Deadline will be counted. If delivery of a Ballot is by mail, it is recommended that voters use an air courier with guaranteed next day delivery or registered mail, properly insured, with return receipt requested. In all cases, sufficient time should be allowed to ensure timely delivery. The method of such delivery is at the election and risk of the voter.**

**EACH BALLOT FOR PREPETITION ~~SECURED~~ LENDER CLAIMS ~~AND~~, OTHER GENERAL UNSECURED CLAIMS AND NON-PARTICIPATING CUSTOMERS IN CLASS 5 CUSTOMER CLAIMS ADVISES HOLDERS THAT IF THEY <u>DO NOT ELECT</u> TO OPT OUT OF THE THIRD PARTY RELEASE PROVISIONS CONTAINED IN SECTION 12.07(b) OF THE PLAN, THEY SHALL BE BOUND BY THE**

**THIRD PARTY RELEASES SET FORTH IN SECTION 12.07(b) OF THE PLAN AND DEEMED TO HAVE FOREVER RELEASED AND WAIVED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES IN ACCORDANCE WITH THE PLAN.**

**EACH BALLOT FOR CUSTOMER CLAIMS ADVISES HOLDERS THAT (I) IF THEY VOTE TO ACCEPT THE PLAN AS A HOLDER OF A CUSTOMER CLAIM OR IF THEY ABSTAIN FROM VOTING, THEY SHALL BE BOUND BY THE CUSTOMER RELEASES AND PURSUANT TO SECTION 12.10 BE DEEMED TO HAVE FOREVER RELEASED AND WAIVED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES IN ACCORDANCE WITH THE PLAN – AND THE RELEASED PARTIES SHALL BE DEEMED TO HAVE FOREVER RELEASED AND WAIVED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE PARTICIPATING CUSTOMER (SOLELY IN ITS CAPACITY AS SUCH), AND (II) IF THEY VOTE TO REJECT THE PLAN AS A HOLDER OF A CUSTOMER CLAIM AND, IF THEY HAVE A VALID CLASS 4 OTHER GENERAL UNSECURED CLAIM ANDS <u>DO NOT ELECT</u> TO OPT OUT OF THE RELEASE PROVISIONS CONTAINED IN SECTION 12.07(b) OF THE PLAN, THEY SHALL BE BOUND BY THE THIRD PARTY RELEASES SET FORTH IN SECTION 12.07(b) OF THE PLAN AND DEEMED TO HAVE FOREVER RELEASED AND WAIVED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES IN ACCORDANCE WITH THE PLAN.**

## I. <u>The Combined Hearing.</u>

On [_____], 2021, the Bankruptcy Court entered the *Order: (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Plan; (III) Approving the Form of Various Ballots and Notices in Connection Therewith; and (IV) Approving the Scheduling of Certain Dates in Connection with the Confirmation of the Plan* [Docket No. [_____]] (the "**Disclosure Statement Order**").  As part of the Disclosure Statement Order, the Bankruptcy Court has scheduled the Combined Hearing for [____], 2021, at _:00 _.m. (prevailing Central Time).  The Combined Hearing may be adjourned from time to time without further notice.  In addition, pursuant to the Disclosure Statement Order, objections to confirmation of the Plan and the adequacy of the Disclosure Statement must be filed and served on the Debtor, and certain other parties, by no later than [_____], 2021 at 4:00 p.m. (prevailing Central Time) in accordance with the notice of the Combined Hearing that accompanies the Disclosure Statement.

## IV.    DESCRIPTION OF THE DEBTOR AND EVENTS LEADING TO CHAPTER 11 FILING

### A.    <u>Overview of the Debtor and Its Business</u>

Griddy was a retail electric provider (~~("REP")~~ in Texas which provided its customers the ability to purchase wholesale electricity with no mark-up.  Prior to the events that precipitated this chapter 11 case, Griddy had approximately 29,000 customers in Texas and 30 employees.  On February 26, 2021, well after the winter storm event, ERCOT commenced the forced ~~transitioning~~transition of Griddy's customers to a Provider of Last Resort ("**POLR**").  As a result,

as of the date hereof, Griddy has no customers and Griddy has reduced its employee headcount to ~~16.~~ 15. The Debtor has filed this case to pursue a chapter 11 plan of liquidation and implement a wind -down plan of its business.

The Texas energy market has several key players, which are listed below.

a. ~~Energy~~**Electric Reliability Council of Texas**.  The Texas power grid is operated and managed by ERCOT.  ERCOT has certain market rules that have been developed in consultation with market participants.  In order to facilitate a REP's participation in the ERCOT market, each REP is required to be party to a Standard Form Market Participant Agreement with ERCOT pursuant to which the applicable REP and ERCOT agree to abide by certain standard protocols applicable to all REPs.

b. **Public Utility Commission of Texas**.  The PUCT is a state agency that regulates utilities within the State of Texas, including those participating in the ERCOT market.  The PUCT's oversight responsibility includes, among other things, monitoring activity of ERCOT market players, including ERCOT itself, power generators, transmission and distribution providers, power marketers and REPs.  The PUCT implements and enforces rules under the Public Utility Regulatory Act (PURA) and ERCOT's protocols.

c. **Power Generation Companies**.  Power generation companies own and operate facilities that generate electricity.  In Texas, such companies utilize coal, nuclear power, natural gas, and renewable power resources to generate electricity.  Through ERCOT, power generating companies sell electricity to REPs who in return work with TDSPs (as defined below) to ensure that electricity reaches customers.

d. **Transmission and Distribution Service Providers ("TDSP")**.  REPs do not deliver electricity to consumers.  Instead, they contract with TDSPs that cover certain service areas that own and operate the physical power delivery infrastructure (<u>i.e.</u>, the lines, wires, meters, etc.).  There are several TDSPs in Texas including: AEP Texas, CenterPoint Energy, Oncor Electric Delivery Company and Texas – New Mexico Power.

e. **Retail Electric Providers**.  REPs sell electric energy to retail customers in the areas of Texas where the sale of electricity is open to retail competition.  A REP buys wholesale electricity, delivery service and related services, prices electricity for consumers and seeks consumers to buy electricity from them.  REPs are licensed by the PUCT.  Per PUCT regulations, the PUCT regulates the types of products that can be offered by REPs and the disclosures required for customers.

The process of opening the Texas power market to retail choice began in 2002 with Texas Senate Bill 7.  Retail choice gives consumers freedom to shop for electricity providers that offer a

variety of different types of electricity plans, including fixed rate plans, variable rate plans and index rate plans, with the rules for each type of plan set by the PUCT.[18]

Griddy's business model was simple. For a fixed monthly fee of $9.99, each customer had access to wholesale electricity pricing with no mark-up. Griddy used a prepayment model to charge customers for electricity. At the time of enrollment, customers added a payment method such as a credit or debit card to their accounts and an initial electricity prepayment of $49 was processed to establish an account balance. Billed amounts were calculated daily, one day in arrears for each customer using their meter data published on Smart Meter Texas, and automatically deducted from their account balance. Additional charges, such as ERCOT ancillary services, TDSP charges and transmission and distribution losses were calculated and allocated to the customer. When a customer's account balance fell below a threshold of $25, and in accordance with PUCT regulations for prepay products, Griddy automatically charged the payment method on file for a specified "Recharge Amount," which was set by the customer (not to be less than $49). If a customer chose to cease purchasing electricity from Griddy, Griddy refunded any positive prepayment balance that had not been applied to electricity charges.

In Texas, the wholesale price of electricity changes every five minutes, and is determined by ERCOT based on real-time supply and demand for electricity. The wholesale system wide offer cap is not permitted to exceed $9,000/MWh (which equates to $9/kWh per charged to customers) and it can be as low as $0/MWh or even negative. Prior to and after a customer signed up with Griddy, the range of wholesale electricity prices were disclosed by Griddy to the customer in multiple places.

Price spikes have occurred throughout Griddy's operating history, including several days in August 2019 during which real time electricity prices reached the $9,000 per MWh market cap for twelve 15-minute intervals over a three-day period (for a total of 3 hours). Griddy's customers experienced higher-than-normal bills during the month of August 2019; however, on average, customers who remained on the electricity product for the entire 2019 calendar 12-month period still achieved a lower cost of electricity as compared with the EIA Texas average.

Griddy's business model provided customers with information to mitigate the impact of electricity price spikes, including:

    a.  allowing the customer to see the real-time price of wholesale electricity, and shift their electricity usage immediately in response to high prices;

    b.  providing alerts when prices exceeded thresholds, such as a price spike;

    c.  providing future price projections, based on ERCOT's day-ahead market prices, for the remainder of the current day and next day (once published), giving the customer the ability to plan their electricity usage and to adjust to times where the wholesale price may be lower;

---

[18]  §25.475 *General Retail Electric Provider Requirements and Information Disclosures to Residential and Small Commercial Customers.*

d.   providing historical usage and cost patterns at a monthly, daily and hourly level, enabling customers to understand usage patterns and behavior; and

e.   historical billing, including the average cost of energy each day.

Griddy's business model had wider implications that could benefit the electricity grid. Other types of electricity rate plans, such as fixed price products, are designed to remove the customer as an active participant in the grid despite the fact that residential and small commercial electricity usage is generally the most weather-sensitive load on the grid. Customers on fixed-price products do not have the incentive to change their energy usage behavior when electricity supply is scarce, and therefore they do not. On the other hand, Griddy's customers demonstrated in August 2020 that they were price responsive and collectively worked to balance the electricity grid. Griddy believes that if there had been a functioning market with more load-responsive customers like Griddy's, those customers could have made a meaningful impact on grid conditions throughout the winter storm event in February 2021.

## B.   Overview of Capital Structure

The Debtor is a Delaware limited liability company. It is wholly-owned by Griddy Holdings, LLC. In a transaction closed on December 4, 2020, the ownership of the Debtor was sold to a new ownership group and a new management team was appointed.

### Prepetition Secured Facility

On December 4, 2020, the Debtor entered into (i) that certain Borrowing Base Facility Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "**Macquarie Borrowing Base Agreement**") with Macquarie Investments US Inc. ("**Macquarie US**") and certain non-debtor affiliates of the Debtor, Griddy Holdings LLC ("**Holdings**"), Griddy Technologies LLC ("**Griddy Tech**") and Griddy Pro LLC ("**Griddy Pro**"), as guarantors, pursuant to which Macquarie US extended credit to the Debtor subject to a borrowing base in an amount up to a maximum of $15,000,000.00.

The Macquarie Borrowing Base Agreement ~~provides~~provided the Debtor with the ability to issue letters of credit to market participants, regulators and independent systems operators as required in the course of its business, and the Debtor is required to reimburse Macquarie US to the extent such letters of credit are drawn. The Debtor currently has a letter of credit posted to EDF Trading North America LLC as part of transition arrangements following the termination of the prior credit facility on December 4, 2020.

In connection with the Macquarie Borrowing Base Agreement, the Debtor entered into that certain ISDA 2002 Master Agreement (together with each schedule, annex, appendix and exhibit thereto, and confirmation thereunder, as each may be amended, restated, supplemented or otherwise modified from time to time, the "**Macquarie ISDA Agreement**" and together with the Macquarie Borrowing Base Agreement, the "**Macquarie Agreements**") by and between the Debtor and Macquarie Energy LLC ("**Macquarie Energy**" and, together with Macquarie US,

"**Macquarie**" or the "**Prepetition Secured Lenders**"), pursuant to which the Debtor purchased electricity.

The Debtor's obligations under the Macquarie Borrowing Base Agreement and the Macquarie ISDA Agreement are secured by substantially all of the assets of the Debtor and the assets of Holdings, including on a limited recourse basis its equity interests in the Debtor, and its affiliates, Griddy Tech and Griddy Pro, as more fully described in related loan and security documents.

As of the Petition Date, the aggregate amount outstanding under the Macquarie Agreements is $1,448,937.58, exclusive of accrued and unpaid interest, fees, letter of credit reimbursement obligations and other related amounts, which include the obligation to provide Macquarie cash or credit support in the form of letters of credit acceptable to Macquarie in its sole discretion in an amount not less than $307,500.00 as collateralization for 102.5% of the full undrawn amount of the EDF letter of credit, and certain fees and expenses of Macquarie, including reasonable and documented legal fees and expenses.

C.     **Prepetition Litigation**

The Debtor is involved in a number of lawsuits and other regulatory or government actions or investigations.

- The Debtor is subject to two enforcement investigations by PUCT arising from alleged violations of PUCT regulations in 2019.

- In addition, since the winter storm event in mid-February, the Debtor has been named as a defendant in (a) three civil actions filed by Griddy former customers alleging violations of the Texas Deceptive Trade Practices Act and other torts; and (b) a civil action filed by the Attorney General of the State of Texas, also alleging violations of the Texas Deceptive Trade Practices Act.  Each of these lawsuits is meritless.

- The Debtor also is subject to a Civil Investigative Demand initiated by the Attorney General of the State of Texas precipitated by the mid-February winter storm event. The Debtor was one of twelve electric industry market participants to receive a Civil Investigative Demand on February 19, 2021.

~~D~~D.     **Prepetition Term Sheet with the Attorney General of the State of Texas**

On March 15, 2021, prior to filing for bankruptcy protection, the Debtor entered into a stipulation with the State of Texas, through the Attorney General of the State of Texas, whereby each party agreed to work in good faith to resolve all matters between them to the extent feasible. The term sheet provides for, among other things:

- The abatement of (a) the civil action filed by the Attorney General of the State of Texas described immediately above and (b) the Civil Investigative Demand

> > initiated by the Attorney General of the State of Texas described immediately above.

- The State of Texas and Griddy to work in good faith to resolve the civil action and Civil Investigative Demand.

- Griddy to use commercially reasonable efforts to provide certain information to the Attorney General related to the winter storm event that occurred in mid-February 2021.

- As set forth in the Plan, for Griddy to seek to exchange releases with former customers and waive all claims that it and its affiliates may have against such customers.

- The State of Texas and Griddy to work in good faith to address the issues facing consumers who paid Griddy for electricity while the index price was $9,000/MWh during the February 2021 winter storm.

### E.     **Events Leading to this Chapter 11 Case**

Griddy is a ~~retail electricity provider ("~~REP~~")~~ in Texas which provided its customers the ability to purchase wholesale electricity with no mark-up.  Griddy's business model was simple. For a fixed monthly fee of $9.99, each customer had access to wholesale electricity costs with no mark-up.

Winter Storm Uri brought extreme cold weather to Texas.  Load on the power grid climbed to winter records and a host of other factors led to generation outages and forced the Electric Reliability Council of Texas ("ERCOT") to shed electric load, in the form of rolling blackouts, in order to match the available generation on the grid.

On February 15, 2021, in response to the ~~electric load shedding required to balance a~~ grid experiencing unprecedented outages, the Public Utilities Commission of Texas ("PUCT") adopted an order instructing ERCOT to set the real time settlement point price for power at the high offer cap of $9,000 per MWh.  This order went into effect immediately and stayed in effect until February 19, 2021, representing a total duration of 87.5 consecutive hours.

Although ERCOT rescinded load shed instructions at 11:55 pm on February 17, 2021, the price cap was not removed by it for another ~~33~~32 hours.  Potomac Economics, the Independent Market Monitor, has now reported in a letter to the PUCT that ERCOT's failure to remove the price cap was "inappropriate pricing intervention" that resulted in $16 billion in additional costs.[19] As of the ~~Petition Date~~date hereof, no action had been taken by regulators in connection therewith.

---

[19] See https://interchange.puc.texas.gov/Documents/51812_61_1114183.PDF.

Prior to February 2021, Griddy's customers paid an average rate of $0.098 per kilowatt hour ("kWh"),[20] representing significant savings to its customers compared to the EIA Texas average. Griddy's business model provided customers with transparency regarding real-time electricity prices, forecasted electricity prices, and their energy usage and billings, which allowed its customers to control how much they spent on electricity.

During ~~Winter Storm Uri~~ the February 2021 winter storm event in Texas, Griddy and its customers were subject to the extreme electricity prices resulting from the PUCT order. Griddy had to procure power for its customers at those elevated rates and pass those costs to its customers. Over the 87.5 hours while the $9,000 per MWh price was imposed, Griddy incurred significant debt to, among others, ERCOT, for the procurement of power for its customers. Many of Griddy's customers stopped paying their bills ~~and, on February 21, 2021, the PUCT issued a press release related to emergency actions to protect Texas electricity customers which "strongly urged" REPs to delay billing and collections for residential and small commercial customers, including invoices with estimated meter reads.[21]~~

. ERCOT, however, continued to send Griddy multi-million dollar invoices for the power procured for the benefit of its customers during the storm and continued to make multi-million dollar collateral demands pursuant to ERCOT Protocols. Griddy earned only a fixed fee of $9.99 per month per customer regardless of whether the wholesale cost of electricity was high or low, and it also had little to no incoming funds at that point to pay these bills. As a result, ultimately, Griddy was unable to pay ERCOT for the outstanding charges or meet ERCOT's collateral call demands.

Griddy had also purchased physical electricity for the benefit of its customers through its secured lender. With respect to amounts owed in connection therewith, its secured lender exercised its rights under its secured credit agreement with Griddy and applied amounts from Griddy's bank accounts to satisfy the outstanding amounts due to the lender. At that point, while the offset greatly reduced the amount under the secured facilities, Griddy's cash on hand was also greatly reduced.

On February 26, 2021, ERCOT notified Griddy that it was in default and forced a mass transition of Griddy's customers to providers of last resort. As a result, Griddy was left with no customers and little to no incoming payments for outstanding accounts receivable. To that end, as of the Petition Date, Griddy had outstanding accounts receivable balances from its customers totaling ~~approximately~~ in excess of $29 million and ERCOT has sent Griddy bills in excess of $29 million. Accordingly, Griddy was left in a position where it had no choice but to file this chapter 11 case and try to maximize value for the benefit of its creditors while balancing the desire to give its former customers relief from the uncertainty of being subject to collection actions as a result of the extreme wholesale electricity prices from the winter storm event.

---

[20] The average rate includes wholesale electricity costs, TDSP charges, ancillary services, the Griddy membership fee and other fees and credits. This rate excludes taxes.

[21] ~~See https://www.puc.texas.gov/agency/resources/pubs/news/2021/PUCTX-REL-COLD21-022121-EOM.pdf.~~

### ~~E~~F.     The Debtor's Wind -Down and Liquidation

The objective of the Debtor in this chapter 11 case is to maximize value to its estate for creditors while balancing the desire to give its former customers relief from the uncertainty of being subject to collection actions as a result of the extreme wholesale electricity prices from the winter storm event, facilitate the efficient resolution of claims, including pending and future litigation resulting from the events that occurred during the mid-February winter storm event, and enable the Debtor to wind down efficiently for the benefit of its creditors.

In furtherance of this goal, the Debtor has sought to work efficiently and in a time sensitive manner in prosecuting this chapter 11 case by seeking early in the case to:  establish a bar date; review, evaluate, object to and where necessary settle claims; and seeking approval of this Disclosure Statement and confirmation of the Plan.  The Debtor believes that an orderly wind down of its operations will maximize value for all of its creditors while balancing the desire to give its former customers relief, and fulfill the fundamental dual purposes of chapter 11, to maximize value and treat creditors appropriately.

In order to implement the Plan, liquidate the assets of the Debtor, and make distributions to creditors, on or ~~before~~after the Effective Date the Debtor will effectuate the following steps, as further described in **Article VI** of the Plan:

- The Plan Administrator and the Liquidating Debtor shall enter into the Plan Administrator Agreement as of the Effective Date~~;~~.

- The Plan Administrator will act as a fiduciary and will have full authority to administer the liquidation and ~~winddown~~wind down of the Debtor under the provisions of the Plan, including to (i) make Distributions to holders of Claims set forth in the Plan, (ii) object to, dispute, compromise or settle the amount, validity, priority, treatment, or Allowance of any Claim (iii) sell, abandon or dispose of any remaining property of the Debtor, and (iv) pursue any Causes of Action consistent with the provisions of the Plan.

- The releases provided for in Article XII of the Plan will become effective.

The business and liquidity challenges the Debtor faces are substantial.  Having explored its alternatives, sought to maximize value for its stakeholders, and negotiated at arms' length with the Prepetition Secured Lenders—who have liens on substantially all assets—the Plan, and the orderly wind -down provided for therein, represents the best outcome available for all stakeholders under the Debtor's circumstances.

## V.     THE CHAPTER 11 CASE

### A.     Significant Events During the Chapter 11 Case.

### First Day Matters

On the Petition Date, the Debtor filed several motions requesting that the Bankruptcy Court enter orders authorizing the Debtor to maintain certain aspects of its operations in the ordinary

course in order to facilitate the wind down provided for in the Plan (the "**First Day Motions**"). The First Day Motions were designed to facilitate a smooth transition into chapter 11 and ease the strain on the Debtor as a consequence of filing the Chapter 11 Case.

(a)  Cash Management System

The Company maintains a cash management system to collect, track, aggregate and disburse cash on a daily basis.  To facilitate a smooth transition into the Chapter 11 Case, the Debtor sought Bankruptcy Court approval to continue using its existing cash management system, bank accounts and business forms and to continue intercompany transactions.  The Court approved the relief sought in the motion on an interim basis on March 16, 2021 and on a final basis on April 14, 2021.

(b)  Employee Motion

The Debtor's employees rely on their compensation and benefits to pay their daily living expenses; absent which they would be exposed to significant financial difficulties.  The Debtor will need the sole focus of their employees during the Chapter 11 Case and cannot afford for their employees to be distracted by unnecessary concern over the payment of their wages and other benefits.  Accordingly, the Debtor sought authority to (a) honor and pay certain prepetition amounts due to its employees related to, among other things, compensation, benefit programs and reimbursable expenses; and (b) continue certain benefit programs and policies, consistent with the ordinary course of business and past practices, on a post-petition basis, whether arising before or after the Petition Date.  The Court approved the relief sought in the motion on March 16, 2021.

(c)  Tax

The Debtor sought authorization to remit and pay certain prepetition taxes and related obligations that the Debtor owes to various taxing authorities.  Such taxes are either trust fund taxes that do not constitute property of the estate or would be entitled to priority and would therefore be payable in full under the plan of liquidation.  Accordingly, payment does not negatively impact other stakeholders and avoids costly disruption that would result from failing to satisfy them when due.  The Court approved the relief sought in the motion on April 14, 2021.

(d)  Bar DateUse of Cash Collateral

To facilitate the Debtor's ability to execute its chapter 11 plan and windown in an efficient, expeditious manner, the Debtor is seeking to have the Bankruptcy Court establish a bar date for the filing of unsecured claims.

The Debtor sought authority from the Bankruptcy Court to use cash that is collateral for the obligations under the Macquarie Agreements.  The Prepetition Secured Lenders consented to the use of cash collateral in exchange for an adequate protection package that included replacement liens, periodic postpetition interests payments and stipulations with respect to the validity of the

obligations under the Macquarie Agreements and the validity and perfection of the security interests securing such obligations.

The Court denied the Debtor's motion as filed but approved an oral motion made at the hearing on March 16, 2021 for use of cash collateral without the Prepetition Secured Lenders' consent, provided that the Debtor is not permitted to use funds in a restricted revenue account that is for the benefit of Macquarie.

### Additional Motions Filed ~~To Be Filed~~ in the Chapter 11 Case

~~[To be added in advance of~~ (a)    Rejection of Leases

The Debtor is party to an unexpired non-residential real property leases and a license agreement for the use of certain property.  Given the Debtor's impending liquidation, the premises are no longer of any benefit to the Debtor.  The Debtor filed a motion seeking authorization to reject the leases, effective *nunc pro tunc* pursuant to Sections 105(a) and 365 of the Bankruptcy Code.  A hearing on the motion is scheduled for April 29, 2021.

(b)    Non-Insider Key Employee Retention Plan

The Debtor's employees are critical to its ability to execute its chapter 11 wind down strategy and accordingly providing incentives for the employees to remain on the job is a significant priority for the Debtor.  The Debtor filed a motion seeking authorization to implement of a Key Employee Retention Program (the "KERP").  The participants in the KERP are 12 valuable non-insider members of the Debtor's workforce and the KERP is designed to retain those individuals through the Debtor's liquidation.  Importantly, none of the KERP recipients are "insiders" as such term is defined by the Bankruptcy Code.  The Court approved the KERP on April 14, 2021.

(c)    Retention of Professionals

The Debtor has sought authorization to retain the following professionals to provide professional services in connection with the Chapter 11 Case:

- Baker Botts L.L.P., as counsel;

- Stretto, as notice, claims and solicitation] agent; and

- other professionals relied upon in the Debtor's ordinary course of business.

On March 15, 2021, the Court entered an order approving Stretto's retention.  A hearing on the other motions is scheduled for April 29, 2021.

### Formation of the Committee

On March 31, 2021, the U.S. Trustee filed *the United States Trustee's Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 116] notifying parties in interest

that the U.S. Trustee appointed the Committee in the Chapter 11 Case.  The members of the Committee currently are: (a) Holland O'Neill; (b) Ty Williams; and (c) Lisa Khoury.

### Schedules and Statements.

On March 24, 2021, the Debtor filed its Schedules of Assets and Liabilities and Statements of Financial Affairs.  On April 13, 2021, the Debtor filed amended versions of certain of its Schedules of Liabilities.

### Establishment of a Claims Bar Dates.

On the Petition Date, the Debtor filed the *Emergency Motion for Entry of an Order: (i) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9); (ii) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date; (iii) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9); (iv) Approving Notice of Bar Dates; and (v) Granting Related Relief* [Docket No. 16] (the "**Bar Date Motion**").  By the Bar Date Motion, the Debtor sought entry of an order by the Bankruptcy Court establishing deadlines by which claims of creditors must be filed in the Debtor's Chapter 11 Case.  After a series of hearings on the Bar Date Motion and input from the Court and other parties in interest, the Debtor sought to set a separate bar date for "Former Customers" of the Debtor.  A "**Former Customer**" is a person who (a) was a retail electricity customer (or the legal representative of such customer) of the Debtor at any point from February 11, 2021 through February 19, 2021 and (b) is the holder of a claim of any kind against the Debtor that arose during or relates to the period from February 11, 2021 through February 19, 2021.

On March 30, 2021, the Bankruptcy Court entered an order [Docket No. 107] establishing the general claims bar date for all creditors other than Former Customers as April 28, 2021 and for governmental entities as September 13, 2021 at 4:00 p.m. (prevailing Central Time).  The Debtor subsequently proposed that the bar date for Former Customers be set as July 19, 2021.  Thereafter, the Debtor extensively negotiated the terms of the notices and bar date order applicable to Former Customers. [On [_____], 2021, the Bankruptcy Court enter an order [Docket No. ___] approving the proposed bar date for Former Customers as proposed.]

## VI.    CONFIRMATION PROCEDURES

### A.    Combined Disclosure Statement and Confirmation Hearing

Section 1129(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to hold a hearing on confirmation of a chapter 11 plan and section 1129(b) provides that any party in interest may object to the confirmation of the chapter 11 plan.  In the Disclosure Statement Order, the Bankruptcy Court conditionally approved this Disclosure Statement, approved the Solicitation Procedures and scheduled the Combined Hearing at which the Bankruptcy Court will consider the adequacy of the Disclosure Statement and confirmation of the Plan.  Notice of the Combined Hearing will be provided to holders of Claims and Interests as provided in the Disclosure Statement Order.

The deadline to file objections to the Plan and the adequacy of information in the Disclosure Statement is [_____, 2021,] at 4:00 p.m. prevailing Central Time (the "**Plan

**Objection Deadline**")."]].  Any objection to the Plan and the adequacy of information in the Disclosure Statement and must:  (a) be in writing; (b) conform to the Bankruptcy Rules, the Bankruptcy Local Rules and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the Plan and the Disclosure Statement and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be *actually received* on or before the Plan Objection Deadline: (i) [proposed] counsel to the Debtor: Baker Botts L.L.P., 910 Louisiana Street, Houston, Texas 77002 (Attn.: David R. Eastlake), and 30 Rockefeller Plaza, New York, NY 10112 (Attn. Robin Spigel and Chris Newcomb); and (ii) [proposed] counsel to the Committee, McDermott Will & Emery, McDermott Will & Emery LLP, 340 Madison Avenue, New York, NY 10173-1922 (Attn: Darren Azman); and (iii) each of the entities listed on the Master Service List (available on the Solicitation Agent's website at https://cases.stretto.com/Griddy or the Court's website at http://www.txs.uscourts.gov/bankruptcy).  UNLESS AN OBJECTION IS TIMELY FILED AND SERVED, IT MAY NOT BE CONSIDERED BY THE COURT.

### B.    Confirmation of the Plan/Adequacy of Information in the Disclosure Statement

At the Combined Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation of a plan are that the plan is (i) accepted by all impaired classes of Claims and Interests or, if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class,: (ii) feasible,: and (iii) in the "best interests" of creditors and equity interest holders that are impaired under the Plan.

The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm a plan.  The Plan fully complies with the statutory requirements for confirmation listed below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtor has complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the Debtor or by a Person acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Case, in connection with the Plan or incident to the Chapter 11 Case is subject to the approval of the Bankruptcy Court as reasonable.

- With respect to each holder within an impaired Class of Claims or Interests, each such holder (a) has accepted the Plan or (b) will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective

Date, that is not less than the amount that such holder would so receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code on such date.

- With respect to each Class of Claims or Interests, such Class (a) has accepted the Plan or (b) is unimpaired under the Plan (subject to the "cram-down" provisions discussed below).

- The Plan provides for treatment of Claims, as applicable, in accordance with the provisions of Section 507(a) of the Bankruptcy Code.

- If a Class of Claims or Interests is impaired under the Plan, at least one Class of Claims or Interests that is impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any Insider (as defined in the Bankruptcy Code).

- All fees payable under 28 U.S.C. § 1930 have been paid or the Plan provides for the payment of all such fees on the Effective Date.

At the Combined Hearing, the Debtor also will seek final approval from the Court that the Disclosure Statement contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code.

### Best Interests Test/Liquidation Analysis

As described above, section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code. The Debtor believes that the Plan provides the same or a greater recovery for holders of Allowed Claims and Interests as would be achieved in a liquidation under chapter 7 of the Bankruptcy Code.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Case, the Debtor has determined that confirmation of the Plan will provide each holder of an Allowed Claim other than holders in Class 1 (Prepetition Lender Claims), who ~~are accepting~~the Debtor believes will accept their treatment under the Plan, with a recovery that is not less than such holder would have received pursuant to the liquidation of the Debtors under chapter 7.

The Debtor, with the assistance of its advisors, has prepared an unaudited liquidation analysis, which is attached hereto as **Exhibit B** (the "**Liquidation Analysis**"), to assist holders of Claims in evaluating the Plan. The Liquidation Analysis compares the projected recoveries that would result from the liquidation of the Debtor in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to holders of Allowed Claims and Interests under the Plan. The Liquidation Analysis is based on the value of the Debtor's assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date. Further, the Liquidation Analysis is

subject to potentially material changes, including with respect to economic and business conditions and legal rulings. Therefore, the actual liquidation value of the Debtor could vary materially from the estimate provided in the Liquidation Analysis. The Debtor believes that the Plan satisfies the best interests test of Bankruptcy Code section 1129(a)(7).

### Feasibility

The Bankruptcy Code permits a plan to be confirmed only if confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan. The Plan is a plan of liquidation and meets this requirement. The Debtor believes that if it can move swiftly through this Chapter 11 Case, there will be sufficient funds from Cash on hand and, if available, Net Recovery Proceeds to fund the payments required under the Plan, as and when they become due.

### Confirmation Without Acceptance by All Impaired Classes

The Bankruptcy Court may confirm a plan of liquidation over the ~~rejection or deemed~~ rejection of the plan of liquidation by a class of claims or interests if the plan of liquidation "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

### No Unfair Discrimination

A chapter 11 plan does not "discriminate unfairly" with respect to a non-accepting class if the value of the Cash and/or securities to be distributed to the non-accepting class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the non-accepting class. The Debtor does not believe the Plan discriminates unfairly against any impaired Class of Claims or Interests. The Debtor believes the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation.

### Fair and Equitable Test

To obtain non-consensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan is "fair and equitable" and "does not discriminate unfairly" with respect to each impaired, non-accepting Class. The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable" for, respectively, secured creditors, unsecured creditors and holders of equity interests. In general, section 1129(b) of the Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before a junior class may receive anything under the plan.

- Secured Creditors: Each holder of a secured claim: (1) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the chapter 11 plan, of at least the allowed amount of such claim; (2) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the

proceeds of the sale (or if sold, on the proceeds thereof); or (3) receives the "indubitable equivalent" of its allowed secured claim.

- Unsecured Creditors:  Either (1) each holder of an impaired unsecured claim receives or retains under the chapter 11 plan property of a value equal to the amount of its allowed claim or (2) the holders of claims and interests that are junior to the claims of the non-accepting class will not receive any property under the chapter 11 plan.

- Interests:  Either (1) each holder of an impaired interest will receive or retain under the chapter 11 plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the interest or (2) the holders of interests that are junior to the non-accepting class will not receive or retain any property under the chapter 11 plan.

The Debtor believes the Plan satisfies the "fair and equitable" requirement.

### C.     Alternatives to Confirmation and Consummation of the Plan

If the Plan cannot be confirmed, the Debtor ~~may~~would likely seek to liquidate under chapter 7 of the Bankruptcy Code.  If the Debtor was to pursue a liquidation under chapter 7, the Chapter 11 Case would be converted to a case under chapter 7 of the Bankruptcy Code and a trustee would be elected or appointed to liquidate the assets of the Debtor, including collection of outstanding customer balances, for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on Holders' recoveries and the Debtor is described in the Liquidation Analysis, attached hereto as **Exhibit B**.

## VII.     CERTAIN RISK FACTORS TO BE CONSIDERED

**HOLDERS OF CLAIMS AND INTERESTS AGAINST THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED HEREIN BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.  ANY OF THE FOLLOWING RISKS, AS WELL AS ADDITIONAL RISKS AND UNCERTAINTIES NOT CURRENTLY KNOWN TO THE DEBTOR OR THAT THE DEBTOR DEEMS IMMATERIAL, COULD MATERIALLY ADVERSELY AFFECT THE DEBTOR AND EFFECT THE AMOUNT AVAILABLE FOR DISTRIBUTION TO CREDITORS.  THE DEBTOR CANNOT ASSURE YOU THAT ANY OF THE EVENTS DISCUSSED IN THE RISK FACTORS BELOW WILL NOT OCCUR, AND IF SUCH EVENTS DO OCCUR,**

**THEY COULD AFFECT THE DEBTOR'S ABILITY TO CONSUMMATE THE PLAN OR THE TREATMENT OF CREDITORS AND INTEREST HOLDERS THEREUNDER.**

### A.   General

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive.  In considering whether to vote to accept or reject the Plan, holders of Claims or Interests should read and carefully consider the risk factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.

### B.   Risk Relating to the Plan and Other Bankruptcy Considerations

Parties in Interest May Object to the Debtor's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a debtor may place a claim or an equity interest in a particular class under a chapter 11 plan only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtor believes that the classification of Claims and Interests in the Plan complies with the Bankruptcy Code requirements because the Debtor classified Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Debtor May Fail to Satisfy Vote Requirements.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtor intends to seek, as promptly as practicable thereafter, confirmation of the Plan.  In the event that sufficient votes are not received, the Debtor may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims and Interests as those proposed in the Plan.

The Debtor May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; and (b) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting holder of an Allowed Claim or Interest might challenge either the adequacy of this Disclosure Statement or whether the voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement and voting results are appropriate, the Bankruptcy

Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation are not met. If a chapter 11 plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtor will be able to confirm an alternative plan and what, if anything, holders of Allowed Claims and Interests against them̶the Debtor would ultimately receive.

The Debtor, subject to the terms and conditions of the Plan, reserves the right to modify the terms and conditions of the Plan, as necessary for confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

<u>The Bankruptcy Court may not approve the Customer Releases.</u>

By the Plan, the Debtor is seeking to compromise its claims against former customers, if any, in exchange for former customers compromising their respective claims against the Debtor, if any. The Debtor is seeking to effectuate the Customer Releases as part of a compromise under the Plan. While the Debtor believes the Customer Releases are reasonable, there can be no assurance that the Bankruptcy Court will agree̶approve such Customer Releases.

<u>The Bankruptcy Court may not approve the Treatment of Participating Customers</u>

As part of the Debtor seeking to compromise its claims against former customers, the Debtor has proposed to (a) allow the claims of former customers in the amount that they paid the Debtor, as reflected on the Debtor's books and records, for the period February 13, 2021 through February 19, 2021 provided that such customers timely and properly file proofs of claim by the Former Customers Bar Date in accordance with the Former Customers Bar Date Order for such amount paid and (b) allow such holders to share pro rata with holders of Allowed Other General Unsecured Claims in any Texas Storm Causes of Action Net Recovery Proceeds. While the Debtor is seeking to effectuate the foregoing as part of a compromise under the Plan, there can be no assurance that the Bankruptcy Court will approve such compromise.

<u>The Plan Administrator is Likely to Object to Non-Participating Customer Claims</u>

While former customers have the option to decide whether to opt into the Customer Releases and have an Allowed Participating Customer Potential Return Claim if they timely and properly file a proof of claim for such Participating Customer Potential Return as part of the compromise and settlement under the Plan, for any former customer that opts out of the Customer Releases and timely and properly files an unsecured nonpriority proof of claim against the Debtor by the applicable Bar Date in accordance with the applicable Bar Date Order, it is likely that the Plan Administrator will object to such claim. If any such objection is filed, the Bankruptcy Court will determine the merits of the claim.

Even if the Plan Administrator is unsuccessful in its objection of Non-Participating Customer Claims against the Debtor and Non-Participating Customers were found to have Allowed Other General Unsecured Claims against the Debtor, such Non-Participating Customers will share Pro Rata on account of their Allowed Other General Unsecured Claims with all other holders of Allowed Other General Unsecured Claims in the Class 4 Distribution (which is a

combination of Available Cash and net proceeds from any successful Causes of Action). Excluding any estimate for potential recoveries from successful Causes of Action, which are too speculative to estimate, the Debtor currently projects there will be between $500,000 and $1 million or less for all holders of Allowed Other General Unsecured Claims to share on a Pro Rata basis regardless of the total amount of Allowed Claims in Class 4 (Other General Unsecured Claims).  *See* Article II.B., *Summary of Classification and Treatment* above.

Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtor believes that the Plan satisfies these requirements, and the Debtor may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual confirmation or consummation of the Plan may result in, among other things, increased professional expenses.

The Debtor May Fail to Meet All Conditions Precedent to Effectiveness of the Plan

The confirmation and effectiveness of the Plan are subject to certain conditions that may or may not be satisfied.  Such conditions are set forth in **Article XI** of the Plan.  The Debtor cannot assure anyone that all requirements for confirmation and effectiveness required under the Plan will be satisfied.

The Debtor May Object to the Amount or Classification of a Claim or Interest

Except as otherwise provided in the Plan, the Debtor and other parties in interest reserves reserve the right to object to the amount or classification of any Claim or Interest under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim or Interest where such Claim or Interest is subject to an objection.  Any holder of a Claim or Interest that is subject to an objection may not receive its expected share of the estimated Distributions described in this Disclosure Statement.

Contingencies May Affect Distributions to Holders of Allowed Claims and Interests

The Distributions available to holders of Allowed Claims or Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders that certain disputed Claims become Allowed Claims or Interests.  The occurrence of any and all such contingencies could affect Distributions under the Plan.

### The Plan is Based Upon Assumptions the Debtor Developed That May Prove Incorrect and Could Render the Plan Unsuccessful

The Plan reflects assumptions and analyses based on the Debtor's experience and perception of current conditions and expected future developments, as well as other factors that the Debtor consider appropriate under the circumstances. Whether actual future results and developments will be consistent with the Debtor's expectations and assumptions depends on a number of factors, including but not limited to (i) the ability to implement the transactions contemplated by the Plan; and (ii) the ability to maintain adequate liquidity during the Chapter 11 Case. The failure of any of these factors could materially adversely the Debtor's ability to complete its efficient and orderly ~~winddown~~wind down.

Accordingly, the Debtor expects that its actual financial condition and course of its ~~winddown~~wind down will differ, perhaps materially, from what is anticipated. Consequently, there can be no assurance that the results or developments contemplated by the Plan will occur or, even if they do occur, that they will have the anticipated effects on the Debtor or its assets. Moreover, the rejection of certain contracts could result in an increase of Other General Unsecured Claims. The failure of any such results or developments to materialize as anticipated could materially adversely affect the successful execution of the Plan or any other plan of liquidation.

### The Debtor May Seek to Amend, Waive, Modify, or Withdraw the Plan at Any Time Prior to Confirmation

The Debtor reserves the right, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and consistent with the terms of the Plan, to amend the terms of the Plan or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan. The potential impact of any such amendment or waiver on the holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan, either positively or negatively, on some or all of the proposed Classes or a change in the relative rights of such Classes.

### The Results of an Actual Chapter 7 Liquidation May Be Different from the Liquidation Analysis

Conversion to chapter 7 liquidation would, in the view of the Debtor, produce a less favorable outcome for holders of Allowed Claims than would the Plan. However, underlying the Liquidation Analysis set forth in **Exhibit B** is the extensive use of estimates and assumptions that, although considered reasonable by the Debtor's management, are inherently subject to significant business and economic uncertainties and contingencies beyond the control of the Debtor. The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change. Actual results may vary materially from the estimates and projections set forth in the Liquidation Analysis if the Debtor was, in fact, to undergo a liquidation in chapter 7. Events and circumstances subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed, or alternatively, may have been unanticipated.

Failure to Confirm and Consummate the Plan Could Negatively Impact the Debtor and Its Creditors and Former Customers

If the Plan is not confirmed and consummated there may be various consequences, including:

- collection actions against former customers being pursued;

- eligible Participating Customers not having Allowed Potential Customer Return Claims (i.e., absent the proposed compromise and settlement under the Plan, the Debtor believes that those claims would be subject to objection);

- the incurrence of substantial costs and investment of time and resources by the Debtor in connection with the chapter 11 plan, without realizing any of its anticipated benefits;

- the possibility, for the Debtor, of being unable to repay indebtedness when due and payable; and

- the Debtor pursuing chapter 7 proceedings that would result in recoveries for creditors that are less than contemplated under the Plan and no recovery for certain creditors and interest holders.

**C.     Additional Factors to Be Considered**

The Debtor Has No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtor has no duty to update this Disclosure Statement under the Bankruptcy Code unless otherwise ordered to do so by the Bankruptcy Court.

No Admissions Are Made By This Disclosure Statement

The information and statements contained in this Disclosure Statement will neither constitute an admission of any fact or liability by any entity (including, without limitation, the Debtor) nor be deemed evidence of the tax or other legal effects of the Plan on the Debtor, holders of Claims or any other parties in interest.  Except as otherwise provided in the Plan, the vote by a holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtor (or any party in interest, as the case may be) to object to that holder's Claim, or recover any preferential, fraudulent, or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtor or its estate are specifically or generally identified herein.

In addition, no reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement. The Debtor may seek to investigate, file, and prosecute objections to Claims and may object to Claims

after the confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or objects to Claims.

<u>No Representations Outside this Disclosure Statement Are Authorized</u>

No representations concerning or related to the Debtor, the Chapter 11 Case, once commenced, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

<u>Forward-Looking Statements are Not Assured, and Actual Results May Vary</u>

This Disclosure Statement contains forward-looking statements. These forward-looking statements are based on the current expectations and observations of the Debtor's management, and include factors that could cause actual results to differ materially such as the following: the Debtor's ability to obtain Bankruptcy Court approval with respect to motions in the Chapter 11 Case; the effects of the Bankruptcy Court rulings in the Chapter 11 Case and the outcome of the case in general; the length of time the Debtor will be in chapter 11; the pursuit by the Debtor's various creditors, equity holders and other constituents of their interests in the Chapter 11 Case; risks associated with third party motions in the Chapter 11 Case, which may interfere with the ability to consummate the Plan; the adverse effects of the Chapter 11 Case on the Debtor's liquidity; the increased administrative costs related to the Chapter 11 Case; the Debtor's ability to maintain adequate liquidity to fund the liquidation and ~~winddown~~wind down contemplated during the Chapter 11 Case; the timing and realization of the recoveries of assets and the payments of Claims and the amount of expenses projected to recognize such recoveries and reconcile such Claims; and the other factors described in this **Article VIII**.

<u>No Legal or Tax Advice is Provided to You By This Disclosure Statement</u>

The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each holder of Claims and Interests against the Debtor should consult his, her or its own legal counsel and accountants as to legal, tax and other matters concerning such holder's Claims or Interests. This Disclosure Statement is not legal advice to you and may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

## VIII.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.   <u>Introduction</u>

The following discussion summarizes certain U.S. federal income tax consequences of the Plan to the Debtor and to certain U.S. holders (as defined below) of Allowed Claims in their capacities as such.

This summary is provided for informational purposes only and is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), applicable Treasury regulations, judicial authority and published current administrative rulings and practice, all as in effect as of the date

hereof and all of which are subject to change, possibly with retroactive effect. A substantial amount of time may elapse between the date of this Disclosure Statement and the receipt of a final distribution under the Plan. Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, court decisions or administrative changes, could affect the U.S. federal income tax consequences described below. No ruling will be sought from the Internal Revenue Service (the "**IRS**") with respect to any of the tax aspects of the Plan and no opinion of counsel has been obtained by the Debtor with respect thereto. No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Plan to the Debtor or any holder of a Claim. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein. This summary does not address any aspects of U.S. federal non-income, state, local, or non-U.S. taxation.

This summary does not address all aspects of U.S. federal income taxation that may be relevant to a particular U.S. holder of an Allowed Claim in light of its particular facts and circumstances or to particular types of U.S. holders subject to special treatment under the Tax Code (for example, financial institutions; banks; broker-dealers; insurance companies; tax-exempt organizations; retirement plans or other tax-deferred accounts; mutual funds; real estate investment trusts; traders in securities that elect mark-to-market treatment; persons subject to the alternative minimum tax or the "Medicare" tax on net investment income; certain former U.S. citizens or long-term residents; persons who hold their Claims as part of a hedge, straddle, constructive sale, conversion or other integrated transaction; persons that have a functional currency other than the U.S. dollar; governments or governmental organizations; pass-through entities (including any entity or arrangement treated as a partnership for U.S. federal income tax purposes and any subchapter S corporation); investors in pass-through entities that hold Claims; persons that are required to conform their tax reporting of income to their financial statements under Section 451(b) of the Tax Code; and persons who received their Claims upon exercise of employee unit options or otherwise as compensation).

This summary assumes that the various debt and other arrangements to which the Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form. If any of the various debt and other arrangements to which the Debtor is a party are not respected in accordance with their form for U.S. federal income tax purposes, the U.S. federal income tax consequences of the Plan could be materially different than what is described below.

A "U.S. holder" for purposes of this summary is a beneficial owner of an Allowed Claim that is, for U.S. federal income tax purposes:

- an individual who is a U.S. citizen or U.S. resident alien;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, that was created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate whose income is subject to U.S. federal income taxation regardless of its source; or

○ a trust (1) if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust, or (2) that has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

This summary does not apply to any holder of a Claim that is not a U.S. holder (a "**Non-U.S. holder**").  Non-U.S. holders are urged to consult their tax advisors regarding the tax consequences (including the U.S. federal income tax consequences) to them of the Plan, including the possible imposition of U.S. withholding taxes in certain circumstances if the Non-U.S. holder fails to establish an exemption therefor.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND NON-U.S. INCOME, ESTATE AND OTHER TAX CONSEQUENCES OF THE PLAN.**

B.       **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtor**

1.       **U.S. Federal Income Tax Classification of the Debtor**

For U.S. federal income tax purposes, the Debtor is classified as an association taxable as a corporation.

2.       **Cancellation of Debt Income**

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("**COD Income**") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of cash paid, (y) the issue price of any new indebtedness of the taxpayer issued and (z) the fair market value of any other consideration.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt is granted by the court or is pursuant to a plan approved by the court.  Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income.  In general, tax attributes will be reduced in the following order: (a) net operating losses ("**NOLs**") and NOL carryovers; (b) certain tax credit carryovers; (c) net capital losses and capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credit carryovers.  A debtor with COD Income may elect first to reduce the basis of its depreciable assets.  Any excess COD Income over the amount of tax

attributes available for reduction will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

Under the Plan, holders of certain Allowed Claims are expected to receive less than full payment upon satisfaction or release of their Claims.  The Debtor should not realize any COD Income attributable to the portion of the Claim that is not paid, however, to the extent that payment of the unpaid portion of such Claim would have given rise to a deduction to the Debtor had such unpaid portion of the Claim been paid.  In addition, as described above, any COD Income that the Debtor realizes should be excluded from the Debtor's gross income pursuant to the bankruptcy exception described in the preceding paragraph, because the cancellation will occur in a chapter 11 case under the Bankruptcy Code, while the Debtor is under the jurisdiction of a bankruptcy court, and the cancellation is granted by the court or is pursuant to a plan approved by the court. The exclusion of the COD Income, however, will result in a reduction of certain tax attributes, such as any NOLs, as described above.

C.    **Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims**

1.    **Consequences to U.S. Holders of Allowed Claims (Other Than Allowed Class 5 Claims)**

A holder of an Allowed Claim should be treated as exchanging such Allowed Claim for Cash and any other property that it is entitled to receive under the Plan in a taxable exchange. Accordingly, other than with respect to any amounts received that are attributable to accrued but unpaid interest (discussed below), a holder of an Allowed Claim will generally recognize gain or loss equal to the difference between (a) the amount of Cash and the fair market value (if any) of the property received by the holder in respect of its Allowed Claim (other than any consideration attributable to an Allowed Claim for accrued but unpaid interest), and (b) the holder's adjusted tax basis in its Allowed Claim (other than any tax basis attributable to accrued but unpaid interest in respect of such Allowed Claim).

The character of any gain or loss that is recognized by a holder of an Allowed Claim will depend upon a number of factors, including the status of the holder, the nature of the Allowed Claim in the holder's hands, whether the Allowed Claim was purchased at a market discount (discussed in more detail in the succeeding paragraph), whether and to what extent the holder has previously claimed a bad debt deduction with respect to the Allowed Claim, and the holder's holding period in the Allowed Claim.  If the Allowed Claim is a capital asset in the holder's hands, the gain or loss realized will generally be characterized as a capital gain or loss.  Such gain or loss will constitute long-term capital gain or loss if the holder held such Allowed Claim for more than one year or short-term capital gain or loss if the holder held such Allowed Claim for one year or less.  If a holder of an Allowed Claim realizes a capital loss, such holder's deduction of the loss may be subject to limitation under the Tax Code.  In particular, for a non-corporate holder, capital losses may be used to offset any capital gains (without regard to holding periods and without limitation), but any remaining amount of capital losses may only be used to offset ordinary income to the extent of $3,000 annually ($1,500 for married individuals filing separate returns).  A non-corporate holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For a corporate holder,

capital losses may only be used to offset capital gains, and any unused capital losses may be (a) carried back to the three taxable years preceding the taxable year in which the capital loss arose and (b) carried over to the five taxable years following the taxable year in which the capital loss arose.

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a holder of an Allowed Claim that purchased its Allowed Claim from another person may be treated as ordinary income (instead of capital gain) to the extent of the amount of "market discount" with respect to such holder's Allowed Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue, and if the holder's adjusted tax basis in the debt instrument immediately after the acquisition is less than the stated redemption price of such Allowed Claim at maturity by at least a *de minimis* amount. Under these rules, any gain recognized by a holder on the taxable disposition of an Allowed Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon (on a straight line basis or, at the election of the holder, on a constant yield basis) while the Allowed Claim was considered to be held by the holder (unless the holder elected to include market discount in income as it accrued).

Holders of Claims should consult their own tax advisors regarding the amount, timing and character of any gain or loss that may be recognized by holders with respect to their Claims.

A holder of an Allowed Claim will generally recognize ordinary income to the extent that the amount of Cash or property received (or to be received) by such holder with respect to its Allowed Claim under the Plan is attributable to interest that accrued on the Allowed Claim during its holding period but was not previously paid by the Debtor or included in income by the holder, regardless of whether such holder realizes an overall gain or loss with respect to its Allowed Claim. Conversely, a holder will generally recognize a deductible loss to the extent any interest that accrued on its Allowed Claim was previously included in its gross income and is not paid in full. Such loss may be ordinary, but the tax law is unclear on this point. The extent to which a holder of an Allowed Claim will be treated as receiving Cash or other property in respect of accrued but unpaid interest on its Allowed Claim for U.S. federal income tax purposes is unclear. Certain legislative history and case law indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes. On the other hand, certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The Plan provides that all distributions in respect of an Allowed Claim will be allocated first to the principal amount of the Claim (as determined for U.S. federal income tax purposes), with any excess allocated to accrued but unpaid interest (in contrast, for example, to a *pro rata* allocation of a portion of the exchange consideration received between principal and interest, or an allocation first to accrued but unpaid interest). However, the IRS could take the position that the consideration received by the holder should be allocated in some way other than as provided in the Plan. Holders of Claims are urged to consult their own tax advisors regarding the allocation of consideration and the taxation or deductibility of unpaid interest for U.S. federal income tax purposes.

2.      **Consequences to U.S. Holders of Allowed Class 5 Claims**

The discussion below assumes that the Bankruptcy Court approves the Customer Releases and other treatment in Class 5 pursuant to Bankruptcy Rule 9019.

Pursuant to the Plan, in exchange of and for full satisfaction, settlement, and release of Allowed Class 5 Claims, the holders thereof will receive and grant the Customer Releases, which include releases and waivers of all claims against such holders for all unpaid amounts owed by such holders to the Debtor for the electricity and related fees, taxes, expenses and other costs charged to such holders for the period of February 15, 2021 through and including February 19, 2021 when the Public Utilities Commission of Texas imposed the $9,000 per MWh price for wholesale power (the "**Winter Storm Power Bill Release**"), in exchange for the holders' releases and waivers of claims against the Released Parties.  In addition to the Winter Storm Power Bill Release, to the extent holders of Allowed Class 5 Claims have Allowed Participating Customer Potential Return Claims, such holders would also receive their Pro Rata share of any Texas Storm Causes of Action Net Recovery Proceeds in accordance with the Plan.

The tax treatment of the Winter Storm Power Bill Release to U.S. holders of Allowed Class 5 Claims is uncertain.  To the extent the Winter Storm Power Bill Release qualifies as a reduction in the purchase price of property acquired by the holders of Allowed Class 5 Claims for U.S. federal income tax purposes, the holders of Allowed Class 5 Claims should generally not have taxable COD Income as a result of the exchange of their Allowed Class 5 Claims for Customer Releases under the Plan.  Additionally, in cases where the debt cancelled is a debt whose existence or amount is disputed, case law holds that a taxpayer generally does not have taxable COD Income as to the contested and unpaid portion of the debt.  Finally, a taxpayer does not have taxable COD Income in cases where the debt cancelled is one whose payment would have given rise to a tax deduction for the taxpayer.  However, to the extent the Winter Storm Power Bill Release does not qualify as a purchase price reduction for U.S. federal income tax purposes, nor qualify for the disputed claim exception, or for the debt whose payment would have been deductible exception, the ~~tax treatment of each holder of an Allowed Class 5 Claim under the Plan will depend on, among other things, the nature of the holder's Allowed Class 5 Claim (e.g., whether and to what extent~~holder would likely recognize taxable income (unless the Claim settled and released by such holder is for personal physical injuries or sickness, or for certain loss in value of property~~,~~).

Similarly, the tax treatment of the receipt of (or right to receive) a share of any Texas Storm Causes of Action Net Recovery Proceeds to a holder of an Allowed Class 5 Claim who also has an Allowed Participating Customer Potential Return Claim is uncertain.  To the extent that such a holder has not claimed tax deductions for ~~lost wages or profits, or otherwise).~~ the amounts giving rise to the holder's Participating Customer Potential Return (and assuming that the holder's share of Texas Storm Causes of Action Net Recovery Proceeds does not exceed the holder's Participating Customer Potential Return), the U.S. federal income tax treatment to the holder would likely correspond to the treatment as described in the immediately preceding paragraph (except that (i) references to "taxable COD Income" in the immediately preceding paragraph should be replaced with "taxable income" where applicable and (ii) it is unlikely that any portion of the amounts so received by the holder for an Allowed Participating Customer Potential Return Claim could be considered to be for personal physical injuries or sickness or for loss in value of property).  Conversely, to the extent that such a holder has previously claimed tax deductions for the amounts

giving rise to the holder's Participating Customer Potential Return (and assuming that such tax deductions are not reversed), the holder would have taxable income from its receipt of (or right to receive) a share of Texas Storm Causes of Action Net Recovery Proceeds.

**Because of the inherently factual nature of this analysis, holders of Allowed Class 5 Claims are urged to consult their own tax advisors regarding the tax consequences to them of the exchange of their Class 5 Claims for receiving and granting the Customer Releases and, if applicable, their shares of any Texas Storm Causes of Action Net Recovery Proceeds.**

3.  **Information Reporting and Backup Withholding**

Payments made pursuant to the Plan will generally be subject to any applicable federal income tax information reporting and backup withholding requirements.  The Tax Code imposes backup withholding tax on certain payments, including payments of interest and dividends, if a taxpayer (a) fails to furnish its correct taxpayer identification number (generally on IRS Form W-9 for a U.S. holder); (b) furnishes an incorrect taxpayer identification number; (c) is notified by the IRS that it has previously failed to report properly certain items subject to backup withholding tax; or (d) fails to certify, under penalty of perjury, that such taxpayer has furnished its correct taxpayer identification number and that the IRS has not notified such taxpayer that it is subject to backup withholding tax.  However, taxpayers that are corporations generally are exempted from these information reporting and backup withholding requirements provided that evidence of such corporate status is properly furnished to the payor.  Backup withholding is not an additional federal income tax.  Any amounts withheld under the backup withholding tax rules will generally be allowed as a credit against a taxpayer's federal income tax liability, if any, or will be refunded to the extent the amounts withheld exceed the taxpayer's actual tax liability, if such taxpayer timely furnishes required information to the IRS.  **Each taxpayer should consult its own tax advisor regarding the information reporting and backup withholding tax rules as they relate to distributions under the Plan.**

In addition, from an information reporting perspective, U.S. Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  **U.S. holders are urged to consult their tax advisors regarding these Treasury regulations and whether the transactions contemplated by the Plan would be subject to these Treasury regulations and require disclosure on the holders' tax returns.**

D.  **Importance of Obtaining Professional Tax Assistance**

**The foregoing discussion is intended only as a summary of certain U.S. federal income tax consequences of the Plan, does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular holder of a Claim in light of such holder's circumstances and tax situation and is not a substitute for consultation with a tax professional.  The above discussion is for informational purposes only and is not tax advice.  The tax consequences of the Plan are complex and are in many cases uncertain and may vary depending on a claimant's particular circumstances.  Accordingly, holders of Claims are strongly urged to consult their own tax advisors about the federal, state, local, and applicable foreign income**

**and other tax consequences of the Plan, including with respect to tax reporting and record keeping requirements.**

## IX.    RECOMMENDATION AND CONCLUSION

The Debtor believes that confirmation of the Plan is in the best interests of the Debtor and all holders of Claims and Interests and urges all creditors in the Voting Classes to vote in favor of the Plan.

Dated: March 15April 19, 2021

Respectfully submitted,

GRIDDY ENERGY LLC

By: */s/  Michael Fallquist*
Name:  Michael Fallquist
Title:   Chief Executive Officer

## Exhibit A

**Amended Plan of Liquidation for Griddy Energy LLC
Under Chapter 11 of the Bankruptcy Code**

## Exhibit B

**Unaudited Liquidation Analysis**

**[To be filed.]**