## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| GRIDDY ENERGY LLC,[1] | ) | Case No. 21-30923 (MI) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**DEBTOR'S OMNIBUS REPLY IN SUPPORT OF (I) CONDITIONALLY APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT; (II) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE PLAN; (III) APPROVING THE FORM OF VARIOUS BALLOTS AND NOTICES IN CONNECTION THEREWITH; AND (IV) APPROVING THE SCHEDULING OF CERTAIN <u>DATES IN CONNECTION WITH CONFIRMATION OF PLAN</u>**

---

[1]     The last four digits of the Debtor's federal tax identification number are 1396.  The mailing address for the Debtor is PO Box 1288, Greens Farms, CT 06838.

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT .................................................................................................1

RELEVANT FACTS ..............................................................................................................5
    A.    General Background ........................................................................................5
    B.    Background Regarding the Debtor ..........................................................6

REPLY..................................................................................................................................10
    A.    The Disclosure Statement Provides Adequate Information that would Enable a Creditor to Make an Informed Judgement about the Plan. ....................10
    B.    The Objections Should be Overruled....................................................14
    C.    Confirmation Objections Should be Overruled and Considered at the Confirmation Hearing. ........................................................................................21
    D.    The Plan is Not Patently Unconfirmable ...............................................22
    E.    The Attempts to Delay Consideration of the Disclosure Statement Should be Rejected.........................................................................................................31
    F.    The Committee's Request to Include a Letter in the Solicitation Packets Should Be Denied. ..........................................................................................32
    G.    The Court Should Overrule the Late Filed Prescott Objection.............................34

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bank of N.Y. v. Becker (In re Lower Bucks Hosp.)*,
    488 B.R. 303 (E.D.Pa. 2013) ................................................16

*In re Alta Mesa Res., Inc.*,
    No. 19-35133 (MI) (Bankr. S.D. Tex. May 27, 2020)........................27

*In re Approach Resources Inc.*,
    No. 19-36444 (MI) (Bankr. S.D. Tex. Dec. 16, 2020)........................23

*In re ASARCO LLC*,
    420 B.R. 314 (Bankr. S.D. Tex. 2009) ......................................23

*In re Benevis Corp.*,
    No. 20-33918 (MI) (Bankr. S.D. Tex. Dec. 30, 2020)........................23

*In re Bigler LP*,
    442 B.R. 537 (Bankr. S.D. Tex. 2010) ......................................25

*In re BJ Services, LLC*,
    No. 20-33627 (MI) (S.D. Tex. Nov. 6, 2020)................................24

*In re Block Shim Dev. Co.-Irving*,
    939 F2d 289 (5th Cir. 1991) ...............................................23

*In re Bristow Group Inc.*,
    No 19-32713 (DRJ) (Bankr. S.D. Tex. Oct. 8, 2019).........................27

*In re Cajun Elec. Power Coop. Inc.*,
    150 F.3d 503 (5th Cir. 1998) ..............................................11

*In re Calpine Corp.*,
    No. 05-60200, 2007 WL 2908200 (Bankr. S.D.N.Y. Oct. 4, 2007)..............21

*In re Camp Arrowhead, Ltd.*,
    451 B.R. 678 (Bankr. W.D. Tex. 2011)......................................25

*In re Carbo Ceramics Inc.*,
    No. 20-31973 (MI) (Bankr. S.D. Tex. June 18, 2020)........................27

*In re Cobalt Int'l Energy, Inc.*,
    No. 17-36709 (MI) (Bankr. S.D. Tex. Apr. 6, 2018).......................27, 31

*In re Copy Crafters Quickprint, Inc.*,
    92 B.R. 973 (Bankr. N.D.N.Y. 1988) ...................................................................21

*In re Cypress Land Partners, I*,
    409 B.R. 396 (Bankr. S.D. Tex. 2009) ...............................................................11

*In re Cypresswood Land Partners*,
    I, 409 BR 396 (Bankr. S.D. Tex. 2009) .............................................................19

*In re Drexel Burnham Lambert Group*,
    1992 WL 62758 (Bankr. S.D.N.Y. Mar. 5, 1992) ..............................................21

*In re Ellipso, Inc.*,
    No. 09-00148, 2012 WL 368281 (Bankr. D.D.C. Feb. 3, 2012) .........................21

*In re EP Energy Corp.*,
    No. 19-35654 (MI) (Bankr. S.D. Tex. Mar. 12, 2020) .......................................27

*In re Fiesta Homes of Ga., Inc.*,
    125 B.R. 321 (Bankr. S.D. Ga. 1990) .................................................................24

*In re First Republic Bank Corp.*,
    95 B.R. 58 (Bankr. N.D. Tex. 1998) ...................................................................32

*In re Gavilan Resources, LLC*,
    No. 20-32656 (Bankr. S.D. Tex. Nov. 30, 2020) ................................................24

*In re Granite Partners, L.*
    P., 210 B.R. 508 (Bankr. S.D.N.Y 1997) ............................................................32

*In re Houser Shoes, Inc.*,
    245 B.R. 486 (W.D.N.C. 2000) ..........................................................................29

*In re iHeartMedia, Inc.*,
    No. 18-31274 (MI) (Bankr. S.D. Tex. Sept. 13, 2018) ...........................16, 22, 27

*In re Lisanti Foods, Inc.*,
    329 B.R. 491 (D.N.J. 2005) ................................................................................11

*In re McDermott Int'l Inc.*,
    No. 20-30336 (DRJ) (Bankr. S.D. Tex. Mar. 14, 2020) .....................................27

*In re Metrocraft Pub. Servs. Inc.*,
    39 B.R. 567 (Bankr. N.D. Ga. 1984) ..............................................................11, 12

*In re Pearville, L.P.*,
    No.10-34074, 2010 Bankr. LEXIS 6240 (Bankr. S.D. Tex. Dec. 13, 2010) ..........24

*In re PWS Holding Corp.*,
    228 F.3d 224 (2d Cir. 2000).................................................................................32

*In re Quigley Co.*,
    377 B.R. 110 (Bankr. S.D.N.Y. 2007) ..................................................................21

*In re River Vill. Assoc.*,
    181 B.R. 795 (E.D. Pa. 1995) .............................................................................11

*In re Sanders*,
    No. 14-02271-NPO, 2015 WL 7568469 (Bankr. S.D.Miss. Nov. 23, 2015)...................12, 20

*In re Source Enters.*,
    Case No. 06-11707 (AJG), 2008 Bankr. LEXIS 940 (Bankr. S.D.N.Y Mar. 27, 2008) .........16

*In re Specialty Equip. Cos., Inc.*,
    1992 WL 279262 (N.D. Ill. Sept. 25, 1992), *aff'd.* 3 F.3d. 1043 (7th Cir. 1993) .................22

*In re Tex. Rangers Baseball Partners*,
    521 B.R. 134 (Bankr. N.D. Tex. 2014) ..................................................................10

*In re U.S. Brass Corp.*,
    194 B.R. 420 (Bankr. E.D. Tex. 1996) .............................................................11, 22

*In re Wash. Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) .....................................................................25

*In re Weatherford Int'l PLC*,
    No. 19-33694 (DRJ) (Bankr. S.D. Tex. Sept. 11, 2019).............................................27

*In re Westmoreland Coal Co.*,
    No. 18-35672 (DRJ) (Bankr. S.D. Tex. Mar. 2. 2019) .........................................24, 27

*In re Woerner*,
    783 F.3d 266 (5th Cir. 2015) .............................................................................10

*In re Wool Growlers Cent. Storage Co.*,
    371 B.R. 768 (Bankr. N.D. Tex. 2007)..........................................................25, 26, 27

*In re World Access, Inc.*,
    301 BR 217 (Bankr. N.D. Ill. 2003) .....................................................................17

*Search Mkt. Direct, Inc. v. Jubber (In re Paige)*,
    685 F.3d 1160 (10th Cir. 2012) ..........................................................................24

*Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*,
    844 F.2d 1142 (5th Cir. 1988) ............................................................................11

Griddy Energy LLC, the debtor and debtor in possession in the above-captioned case (the "Debtor"), submits this omnibus reply (the "Reply") (a) in support of (i) the *Disclosure Statement for Second Amended Plan of Liquidation for Griddy Energy LLC under Chapter 11 of the Bankruptcy Code* (as amended, modified and/or supplemented from time to time, the "Disclosure Statement") and (ii) *Debtor's Motion for Entry of an Order: (i) Conditionally Approving the Adequacy of the Disclosure Statement; (ii) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Plan; (iii) Approving the Form of Various Ballots and Notices in Connection Therewith; and (iv) Approving the Scheduling of Certain Dates in Connection with Confirmation of Plan* [Docket No. 24] (the "Motion") and (b) in response to (i) the Official Committee of Unsecured Creditors' (the "Committee") objection [Docket No. 188] (the "Committee Objection")[1] to the Motion; (ii) Electric Reliability Council of Texas's ("ERCOT") objection [Docket No. 186] (the "ERCOT Objection"); and (iii) Karen Prescott, in her individual capacity and on behalf of alleged similarly situated customers of the Debtor, suffering property damage or personally injuries' (collectively, "Prescott") objection [Docket No. 210] (the "Prescott Objection," and collectively with the Committee Objection and ERCOT Objection, the "Objections") to the Disclosure Statement and the Motion.  In support of the Reply, the Debtor respectfully states as follows:

## PRELIMINARY STATEMENT

1.     The question before the Court is a narrow one – does the Disclosure Statement contain "adequate information" as defined in section 1125(a)(1) of the Bankruptcy Code for holders of Claims and Interests entitled to vote to make an informed decision regarding whether to vote to accept or reject the Plan.  The Debtor respectfully submits that the Disclosure Statement

---

[1]    Capitalized terms not otherwise defined herein shall have the same meaning(s) given to them in the Disclosure Statement or Objection, as applicable.

easily meets this standard.

2.      The Disclosure Statement and the Disclosure Statement Motion describe, among other things, the events that led the Debtor to file this case.  The winter storm event that occurred in Texas in mid-February 2021 and the concomitant events that occurred as a result thereof, including the PUCT pricing order,[2] ERCOT not removing the price cap for 32 hours beyond when it absolutely should have, ERCOT's other actions during and after the winter storm, and the unpreparedness of the electric grid in Texas, are what destroyed the Debtor's business and left more than 24,000 former customers of the Debtor subject to unpaid balances to the Debtor in excess of $29 million.  Further, many former customers paid for a portion or all of their electricity consumption at the extreme pricing – pricing over which the Debtor had absolutely no control. The Plan is the Debtor's attempt to balance the harms caused to it, its business, its creditors and its customers as a result of these events.

3.      The Debtor received only two timely filed objections to the Disclosure Statement: one filed by the Committee and one filed by the ERCOT.[3]  As discussed below, substantially all of the issues raised by the Committee and certain of the issues raised by ERCOT are plan confirmation objections rather than objections to the adequacy of the information contained in the Disclosure Statement.  None of the confirmation issues raised, either individually or together, render the Plan unconfirmable as a matter of law, and therefore, are more appropriately addressed in connection with the confirmation of the Plan.

4.      With respect to the ERCOT Objection, ERCOT's myriad alleged disclosure issues

---

[2]   On February 15, 2021, in response to the grid experiencing unprecedented outages, the PUCT adopted an order instructing ERCOT to set the real time settlement point price for power at the high offer cap of $9,000 per MWh. This order went into effect immediately and stayed in effect until February 19, 2021, representing a total duration of 87.5 consecutive hours.

[3]   The Prescott Objection was filed four days after the objection deadline and is discussed in Section G below.

are nothing more than an attempt to deflect from the fact that ERCOT is the primary target of the Debtor's claims and causes of action to be asserted for the massive damages suffered by the Debtor during and after the winter storm event.  But for (a) ERCOT keeping the extreme pricing in place for 32 hours beyond when it absolutely should have; (b) ERCOT having ignored the Debtor's request to mass transition the Debtor's customers *during* the extreme pricing period; and (c) ERCOT's actions of selectively determining to mass transition the Debtor's customers on February 26, 2021, well after the storm period when, to the Debtor's knowledge, it did not target any other retail electric provider, ERCOT's own damages, the amounts owed to certain of the Debtor's creditors, and the amounts customers paid and owed to the Debtor would have been substantially mitigated.

5.     With respect to the Committee Objection, the Committee ignores the undeniable fact that, but for the winter storm event and the extreme pricing that occurred during such time, this case would not have been commenced.  The Committee would like to spend the estate's limited resources chasing a bankruptcy playbook of unfounded, unsupported and unsupportable theories. The Committee – the members of which are individual former customers of the Debtor that actually *owe* the Debtor money and are not actual creditors of the Debtor but for the compromises and settlements in the Plan – are grasping at straws to try and create value where none exists.  The value that exists is getting as much of the Debtor's remaining cash to general unsecured creditors with allowed claims as soon as possible – which necessarily requires an efficient bankruptcy process – and the pursuit of causes of action against third parties related to the winter storm event through counsel retained on a contingency basis.

6.     Inexplicably, however, the Committee is doing everything in its power to crater this case by causing it to be administratively insolvent.  The Committee misses the mark when it says the case is not a melting ice cube.  It is far worse.  The Debtor has very limited resources and for

every dollar spent on entertaining wild accusations without any legal or factual basis, there is one less dollar to be distributed to creditors.  And wild accusations appear to be the Committee's calling card in its Objection, as it is rife with reckless accusations about some kind of untoward behavior by the Debtor – not a single one of which is supported by the facts.  Tellingly, the Committee makes no attempt to do so either.

7.      Ironically, the Committee main focus is the Debtor Release, but apparently has no objection to the Customer Release.  The Plan is a compromise and settlement of all matters leading up to this case.  Each part of the Plan is part and parcel of the other parts of the Plan.  And all matters must be settled together in order for the Plan to work.

8.      The original draft of the Plan was filed on the first day of this case.  To assist creditors in interpreting the terms of the Plan and to provide information regarding, among other things, the Plan's treatment of potential creditor recoveries under the Plan, the releases that former customers may exchange with the Debtor and certain other Released Parties, other releases in the Plan and the risks associated with the Plan, the Debtor submitted the Disclosure Statement to this Court for approval.  As the Debtor noted on day one of this case, the Debtor has extremely limited resources.  In order to achieve the benefits of the Plan for all stakeholders, the Debtor believes it is imperative for this case to move forward expeditiously to conclusion.

9.      This Reply addresses (a) threshold issues regarding standards for approving a disclosure statement and the proper scope of the issues to be considered at the hearing on the Disclosure Statement and (b) the issues raised by the Objections.

## RELEVANT FACTS[4]

### A.     General Background

10.     On March 15, 2021, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  That same day, the Debtor filed initial versions of the *Plan of Liquidation for Griddy Energy LLC Under Chapter 11 of the Bankruptcy Code* [Docket No. 22] (as same may be amended, modified and/or supplemented from time to time, the "Plan") and the original version of the Disclosure Statement.

11.     On April 19, 2021, the Debtor filed (a) the *Amended Plan of Liquidation for Griddy Energy LLC Under Chapter 11 of the Bankruptcy Code*, dated April 19, 2021 [Docket No. 175-1]; (b) the amended Disclosure Statement, dated April 19, 2021 [Docket No. 16-1]; and (c) a revised proposed order granting the Disclosure Statement Motion, including conditionally approving the Disclosure Statement, which includes revised forms of ballots for voting to accept or reject the Plan and redlines reflecting changes to the initial versions filed on March 15, 2021 [Docket No. 177].

12.     Concurrently herewith, the Debtor filed (a) the *Second Amended Plan of Liquidation for Griddy Energy LLC Under Chapter 11 of the Bankruptcy Code*; (b) a further amended Disclosure Statement to address a number of the concerns raised by ERCOT and the Committee in the Objection; and (c) a further revised proposed order granting the Disclosure Statement Motion, including conditionally approving the Disclosure Statement, which includes

---

[4]     The Committee makes a number of allegations in the Committee Objection which are factually inaccurate or misleading.  Attached hereto as Exhibit A is the *Declaration of Michael Fallquist in Support of the Reply in Support of (i) Conditionally Approving the Adequacy of the Disclosure Statement; (ii) Approving the Solicitation Procedures and Notice Procedures with Respect to Confirmation of the Plan; (iii)  Approving the form of Various Ballots and Notices in Connection Therewith; and (iv) Approving the Scheduling of Certain Dates in Connection with Confirmation of Plan* which contains a chart setting forth each false allegation in order to provide the Court with an accurate representation of the relationship between the Debtor and the Committee as of the date of the Reply (the "Factual Inaccuracies Chart").

further revised forms of ballots for voting to accept or reject the Plan and redlines reflecting changes to the initial versions filed on March 15, 2021 and on April 19, 2021.

**B.      Background Regarding the Debtor**

13.      The Committee makes much noise in its Objection related to the Debtor Release and attempts to paint a picture that the Debtor, its officers and directors and the Non-Debtor Affiliates have done or are doing something untoward.  Nothing can be further from the truth.

14.      While the Debtor does not believe the information in this Section is necessary to include in the Disclosure Statement, it has done so now solely to demonstrate that nothing more than a business transaction occurred in December 2020 at which time the Debtor obtained new ownership, new financing, and new management.  Of key significance, none of the Debtor's assets were transferred to any Non-Debtor Affiliates or any of the other Released Parties, including the directors and officers of the Released Parties, either as part of or subsequent to the business combination transaction, other than ordinary course director and officer compensation payments. *See* Schedules of Assets and Liabilities and Statement of Financial Affairs [Docket Nos. 71, 72 & 156].  Officers of the Debtor are not paid Board fees and salaries are not outsized (which they began to be paid only as of January 1, 2021).  *See id*.; *see also* Debtor's monthly operating report [Docket No. 182].  All of the Committee's insinuations and accusations mistake a good faith and well-intentioned business transaction for something other than it was.  And if the winter storm event and destruction of the Debtor's business was not devastating enough, now the Committee falsely alleges that the officers and directors of the Debtor are running this case solely for their own benefit.  A simple reading of the Plan and review of the officers' and directors' actions during and since the winter storm event demonstrates that the Committee is way off the mark.

15.      On December 4, 2020, the Debtor was involved in a business combination transaction.  A new holding company structure was formed in connection with the business

combination (*i.e.*, the "Griddy group").  The Griddy group is comprised of (a) the Debtor, (b) two sister companies to the Debtor, Griddy Technologies LLC ("Griddy Tech") and Griddy Pro LLC ("Griddy Pro"), (c) Griddy Holdings LLC ("HoldCo"), an intermediate holding company, (d) a parent holding company, Griddy VI Holdings LLC ("Griddy Holdings"),[5] and (e) three additional parent holding companies owning the equity in Griddy Holdings directly or indirectly, with Griddy VI Series A Holdings LLC ("Series A Holdings") indirectly owning all of the Series A units in Griddy Holdings.

16.     The BEJ Entities directly or indirectly own 50% of the Series A units and the Series B units in Griddy Holdings.  The BEJ Entities are individually owned by the current officers of the Debtor.  Grid Investments and EDF directly or indirectly own the remaining 50% of the Series A units and Series B units in Griddy Holdings.[6]  Grid Investments and its corporate entity owners, Niab Holdings Pty Limited and SRA Investment Pty Limited, are partly owned directly or indirectly by certain prior officers of the Debtor prior to the business combination transaction (two of whom are directors on the Griddy Holdings Board).[7]

17.     Griddy Tech and Griddy Pro have separate businesses from the Debtor that Griddy Holdings had planned to grow and provide services to third parties.  Griddy Tech is a technology company that owns billing and customer facing technology that is intended to be used by energy

---

[5]     The common equity of Griddy Holdings is comprised of Series A and Series B units.  The Series A units are all indirectly held by with Griddy VI Series A Holdings LLC ("Series A Holdings").  The equity in Series A Holdings and the Series B units of Griddy Holdings are held by eight corporate entities:  Beachside New Utility Holdings LLC, Beachside New Utility (VI) Holdings LLC, Elliot New Utility Holdings LLC, Elliot New Utility (VI) Holdings LLC, Janson New Utility Holdings LLC, Janson New Utility (VI) Holdings LLC (collectively, the "BEJ Entities"), Grid Investments Inc. ("Grid Investments"), EDF Trading North America LLC ("EDF").

[6]     EDF's ownership resulted from the equitization of debt that it was owed by the Debtor prior to the business combination transaction.

[7]     The Debtor is managed by HoldCo and Holdco is managed by Griddy Holdings, which has a six person board, including an independent director that was a consultant to the Debtor during the winter storm event and became the independent director on the Board on the Petition Date.

companies to service their customers.  The intent was to build a fulsome platform that could be licensed to third parties.  The Debtor was the first customer to execute a non-exclusive license to that technology.  Prior to the winter storm event, Griddy Tech was in discussions with a third-party retail electric provider about, among other things, licensing its technology.  Griddy Pro is a sales and marketing business that was in the development stage both prior to and following the business combination transaction.  Prior to the winter storm event, Griddy Pro was engaged in discussions with third-parties regarding the sale of their products through Griddy Pro's sales agents.  However, when the winter storm event occurred, which was less than 2.5 months after the business combination was consummated, neither Griddy Tech nor Griddy Pro had entered into business agreements with other third-parties.

18.     There was nothing nefarious about the business combination.  To the contrary, the business combination resulted in approximately ███████████ of new capital being available to the Debtor,[8] *all of which was either spent on behalf of the Debtor or remains in the estate today*, plus a new revolving credit line with Macquarie.  Each of Griddy Tech, Griddy Pro and HoldCo agreed to be a guarantor under the Macquarie Agreements – which had the effect of supporting the Debtor's acquisition of the revolving credit line.

19.     At all points in time both prior to and following the business combination transaction, the Debtor never owned any technology or intellectual property assets.  Prior to the business combination, a non-Griddy entity owned certain technology and this entity was renamed and became Griddy Tech as part of the business combination.  Also prior to the business combination transaction, all technology and intellectual property assets that were used by the

---

[8]     On December 4, 2020, Griddy Holdings issued a ███████████ convertible promissory note to Macquarie Investments US Inc.  The approximately ██████████ is inclusive of ██████████ in capital contributions made from HoldCo and Griddy Holdings to the Debtor.

Debtor were owned by the prior parent of the Debtor, and such assets were transferred to Griddy Tech in connection with the business combination. The license agreement between Griddy Tech and the Debtor is the only contract between the Debtor and any Non-Debtor Affiliate.

20.    Moreover, the only cash transfer between the Debtor and any Non-Debtor Affiliate since the business combination was an inbound $10,000 cash transfer from Griddy Tech to the Debtor on the day of the closing of the business combination, which transfer was for the benefit of the Debtor to prevent a technical default under the Macquarie Agreements pending availability of other capital in connection with the transaction.

21.    Because the business combination occurred less than 2.5 months prior to the winter storm event, the vast majority of the efforts of the Griddy group since the winter storm event have been centered around the Debtor's Plan and wind down. However, to assert that any of the assets of the Griddy Tech or Griddy Pro somehow belong to the Debtor is simply contrary to the facts and runs against fundamental corporate law allowing businesses to form their own corporate structures and pursue their own business plans.

22.    Businesses fail for many different reasons. The Debtor's business did not fail as a result of the business combination or some untoward behavior of its Non-Debtor Affiliates or its directors or officers or because it was over-levered. Rather, as the facts clearly demonstrate and as the Committee is well aware, the business failed because of the extreme pricing during the winter storm event and related events described elsewhere in this Reply. The Committee can chase ghosts, but the simple reality is that such chasing will be at the expense of the Debtor and its stakeholders when this case is rendered administratively insolvent.

# REPLY

A.  **The Disclosure Statement Provides Adequate Information that would Enable a Creditor to Make an Informed Judgement about the Plan.**

    i.  **Whether a Disclosure Statement Provides Adequate Information Under Section 1125(b) of the Bankruptcy Code is Determined on a Case-by-Case Basis.**

23.  Section 1125(b) of the Bankruptcy Code provides, in relevant part, that:

> [a]n acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

11 U.S.C. § 1125(b).  The Fifth Circuit has stated that "[t]he proponent of a reorganization plan—usually, but not necessarily, the debtor-in-possession—must provide a court-approved disclosure statement that contains 'adequate information' about the assets, liabilities, and financial affairs of the debtor sufficient to enable creditors to make an 'informed judgment' about the plan."  *In re Woerner*, 783 F.3d 266, 271 (5th Cir. 2015); *In re Tex. Rangers Baseball Partners,* 521 B.R. 134, 176 (Bankr. N.D. Tex. 2014) ("Section 1125 of the Bankruptcy Code entitles creditors to 'adequate information' so they can make an informed decision on whether to accept or reject a chapter 11 plan.").  Further, section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and the other parties in interest, and the cost of providing additional

information;

11 U.S.C. § 1125(a)(1).

24.     "The determination of what is adequate information is subjective and made on a case by case basis . . . [and] is largely within the discretion of the bankruptcy court." *Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.),* 844 F.2d 1142, 1157 (5th Cir. 1988); *see In re Cajun Elec. Power Coop. Inc.,* 150 F.3d 503, 518 (5th Cir. 1998) ("[W]ith respect to a particular disclosure statement, 'both the kind and form of information are left essentially to the judicial discretion of the court . . . '" (quoting S. Rep. No. 95-989, at 121 (1978)); *see also In re Lisanti Foods, Inc.,* 329 B.R. 491, 507 (D.N.J. 2005) ("Section 1125 affords the Bankruptcy Court substantial discretion in considering the adequacy of a disclosure statement." (citing *In re River Vill. Assoc.,* 181 B.R. 795, 804 (E.D. Pa. 1995)).

25.     To determine whether the information contained in a disclosure statement is adequate, courts in the Fifth Circuit have considered the factors set forth in set forth in *In re Metrocraft Pub. Servs. Inc.,* 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984).  *See In re Cypress Land Partners, I,* 409 B.R. 396, 424 (Bankr. S.D. Tex. 2009) (stating that the disclosure statement met standard set forth in *Metrocraft*); *In re U.S. Brass Corp.,* 194 B.R. 420, 424–25 (Bankr. E.D. Tex. 1996) (finding that the disclosure statement met the standard set forth in *Metrocraft*).  The *Metrocraft* factors include the following non-exhaustive factors that bankruptcy courts may consider for purposes of considering the sufficiency of "adequate information":

> (1) the events which led to the filing of a bankruptcy petition;
> (2) a description of the available assets and their value;
> (3) the anticipated future of the company;
> (4) the source of information stated in the disclosures statement;
> (5) a disclaimer;
> (6) the present condition of the debtor while in chapter 11;
> (7) the scheduled claims;
> (8) the estimated return to creditors under a chapter 7 liquidation;
> (9) the accounting method utilized to produce financial information and

11

the name of the accountants responsible for such information;
(10) the future management of the debtor;
(11) the chapter 11 plan or a summary thereof;
(12) the estimated administrative expenses, including attorneys'
and accountants' fees;
(13) the collectability of accounts receivable;
(14) financial information, data, valuations or projections relevant
to the creditors' decision to accept or reject the chapter 11 plan;
(15) information relevant to the risks posed to creditors under the plan;
(16) the actual or projected realizable value from recovery of preferential
or otherwise voidable transfers;
(17) litigation likely to arise in a non-bankruptcy context;
(18) tax attributes of the debtor; and
(19) the relationship of the debtor with the affiliates

*Metrocraft*, 39 B.R. at 568.  Disclosure of all factors is not necessary in every case.  *See  In re*

*U.S. Brass Corp.*, 190 B.R. at 425; *In re Sanders*, No. 14-02271-NPO, 2015 WL 7568469, at * 5

(Bankr. S.D.Miss. Nov. 23, 2015) ("a disclosure statement does not have to include all of the

above-listed information to be deemed adequate.").

### ii.     The Disclosure Statement Provides Adequate Information for Approval Under Section 1125 of the Bankruptcy Code.

26.     The Disclosure Statement contains adequate information and should be approved.

The Disclosure Statement contains over 60 pages of disclosure, plus exhibits, for parties in interest

to consider in connection with voting on the Plan.  The Disclosure Statement is extensive,

comprehensive and, as detailed below, includes information pertinent to each relevant *Metrocraft*

factor.  Among other things, the Disclosure Statement includes the following:

(a)     Introduction and executive summary of the Plan and treatment of Claims and Interests (Article I);

(b)     Description of the Plan, including the types of Claims and Interests, Classification and Treatment thereof (Article II);

(c)     Description of the releases and exculpation in the Plan (Article II, § C.);

(d)     Description of the Plan Administrator, including the designation thereof and the powers and duties of the Plan Administrator (Article II, § D.);

(e)     Description of the comprehensive settlement of Claims and controversies

under the Plan (Article II, § E.);

(f)    Description of the designation of a Creditors' Representative post-Effective Date (Article II);

(g)    Description of voting procedures and requirements in connection with the Plan (Article III);

(h)    Description of the Debtor and the events leading to the chapter 11 filing (Article IV);

(i)    Overview of the Debtor and its business (Article IV, § A.);

(j)    Overview of the Debtor's capital structure (Article IV, § A.);

(k)    Description of prepetition litigation and prepetition term sheet with the Attorney General of the State of Texas (Article IV, §§  A. & B.);

(l)    Description of the Debtor's wind down and liquidation (Article IV, § F.);

(m)    Significant events during the chapter 11 case (Article V);

(n)    Description of the confirmation procedures, including a description of the combined Disclosure Statement and confirmation hearing and standards (Article VI), and financial information that would be relevant to a determination whether to accept or reject the Plan (Exhibit B, Liquidation Analysis);

(o)    Alternatives to confirmation and consummation of the Plan (Article VI, § C.; Exhibit B, Liquidation Analysis);

(p)    Description of certain risk factors to be considered (Article VII);

(q)    Description of certain U.S. federal income tax consequences of the Plan (Article VIII);

27.    Accordingly, the information in the Disclosure Statement is sufficient to allow creditors to make a decision whether to vote to accept or reject the Plan and provides "adequate information" under section 1125.

**B.**      **The Objections Should be Overruled**[9]

28.      The Committee and ERCOT Objections allege that there is not adequate information regarding the Debtor Release.  But, as set forth below, the Committee and ERCOT are wrong.  Further, most of the remaining objections are misplaced as they primarily challenge Plan provisions and, thus, are premature confirmation objections. Although the majority of the Objections have nothing to do with inadequate disclosure, to the extent the Debtor believed it was able to address any of the objections by adding language to the Disclosure Statement, the Debtor has attempted to do so.[10]  Accordingly, the Objections should be overruled.[11]

**i.**      **The Justifications for the Debtor Release are Adequately Disclosed.**

29.      The Committee and ERCOT both allege that the Disclosure Statement may not be approved because it does not provide adequate information in relation to the Debtor Release and the Released Parties. *See* Committee Objection ¶¶ 21-26; ERCOT Objection ¶¶ 13, 15, 16, 17, 19, 20, 23 – 32.

30.      As an initial matter, a continued theme in the Committee's Objection to the Debtor Release is that the Debtor has not cooperated with the Committee to enable it to conduct an investigation regarding any claims the Debtor may have against the Released Parties.  Despite the Committee's protestations regarding this supposed lack of cooperation, the Committee admits that (a) the Debtor has provided over 7,000 pages of documents to the Committee (*see* Objection ¶ 13), including having provided responsive documents regarding the Debtor's prepetition

---

[9]      For the avoidance of doubt, the Debtor reserves all rights with respect to the arguments made herein, including the right to respond to any and all objections asserted in connection with final approval of the Disclosure Statement and confirmation of the Plan.

[10]      Despite being invited to do so, the Committee has not proposed any language to be included in the Disclosure Statement to remedy any alleged disclosure deficiencies.  Nor did ERCOT include any proposed language in its Objection for inclusion in the Disclosure Statement to remedy any alleged disclosure deficiencies.

[11]      Annexed hereto as <u>Exhibit B</u> is a chart setting forth the various objections and responses thereto.

secured lenders and the perfection of their liens the day after having received the Committee's formal document requests, and (b) one or more of the Debtor's officers have twice met with the Committee's proposed financial advisors and counsel (*see id.* ¶ 14).[12]  The Committee then makes baseless accusations about this case being run for the benefit of the officers and directors (*i.e.*, the Griddy Holdings Board).  The blatant distortion of the facts is addressed in the Factual Inaccuracies Chart annexed hereto as <u>Exhibit A</u>.

31.    Second, both the Committee and ERCOT set forth a laundry list of alleged claims and causes of action that they contend should have been investigated by the Debtor and discussed in the Disclosure Statement.[13]  As set forth in the Disclosure Statement, the Debtor has analyzed potential claims and causes of action that it could have against the Released Parties, and its advisors have reviewed the prepetition transfers to Released Parties, which are listed in the Debtor's Statement of Financial Affairs.  While, as discussed below, this is an issue for confirmation and the Debtor is not required under applicable law to name and dismiss every claim and cause of action in existence in order to provide adequate information, the Disclosure Statement provides thorough disclosures concerning the Debtor Release.  *See* Disclosure

---

[12]  The Debtor's management and counsel have had discussions and meetings with the Committee's proposed financial advisor and provided documents to the proposed financial advisor despite that the Debtor has informed the Committee, through its advisors, that it intends to object to the retention of a financial advisor by the Committee.  The Debtor has not seen the financial advisor's engagement letter, but understands that the financial advisor is not being retained on a contingency basis.  The Debtor is at a loss to understand why the Committee needs a financial advisor, let alone a financial advisor on an hourly basis.  This is just another indication of the Committee's disregard for the fact there are extremely limited resources in this estate.

[13]  *See, e.g.,* Committee Objection ¶21 (stating, without any evidence, that the Debtor "may" have claims against the Prepetition Secured Lenders, the Non-Debtor Affiliates, and the current and former officer and directors both arising from Winter Storm Uri and the Business Combination); *id.* ¶ 22 ("because the claims against the Released Parties may include preferences and voidable transactions"); *id.* ¶ 22 ("no representation is made regarding transfers between mid-February and the Petition Date, the specific time period within which the Debtor paid almost $15 million to Macquarie"); ERCOT Objection ¶ 17 ("It appears that there are some claims that the Debtor possess against the Prepetition Secured Lenders and/or Collateral Agent evidenced by the Prepetition Secured Lenders agreeing to forego payment of approximately $550,000. . . ."); *id.* ¶ 17 ("Given that the Prepetition Lenders made their loan around 100 days preceding the Petition Date and seized the Debtor's accounts shortly before the bankruptcy filing it would appear that some claims may exist.").

Statement, Article II, § D.(a).  Article II, § D. of the Disclosure Statement restates in full the definition of "Released Parties" from the Plan and includes as a footnote the Plan definition of "Non-Debtor Affiliates."[14]  *See* Disclosure Statement, Article II, § D, n. 15.  Further, although an issue for confirmation of the Plan, the Debtor provides specific justifications for releasing the (i) Prepetition Secured Lenders; (ii) the Non-Debtor Affiliates; (iii) the Debtors' officers, members, directors and managers; and (iv) former customers.  *See id.* Article II, § D.  In response to the Committee and ERCOT Objections, the Debtor has provided further detail in the Disclosure Statement regarding its rationale with respect to the releases related to the Prepetition Secured Lenders and the other Released Parties.  *See id*.  The Debtor has provided more than sufficient detail[15] of the Debtor Release to provide the Debtor's creditors with sufficient information to vote to accept or reject the Plan.[16]

32.    What the Committee ignores is that it has had documents related to the Prepetition Secured Lenders' perfection of their liens on the Debtor's assets since April 9, 2021.  There is

---

[14]  In order to address the Committee's confusing comment in paragraph 24 of the Committee Objection that the list of Non-Debtor Affiliates in the Plan is inclusive, the Debtor has further clarified the definition of Non-Debtor Affiliates to clarify that it is limited to the specific entities listed therein.  *See* Plan § 1.66 (Non-Debtor Affiliates).

[15]  *See* Discl. Stmt. Hr'g Tr. at 18:25 – 19:1-4, *In re iHeartMedia, Inc.,* No. 18-31274 (MI) (Bankr. S.D. Tex. Sept. 13, 2018) [ECF No. 1461] (stating that it is appropriate for a debtor to provide justification for releases in its Disclosure Statement).

[16]  The Committee only cites two cases, and ERCOT cites no cases, to support their respective arguments that the Disclosure Statement does not contain adequate information concerning the Debtor Release.  *See* Committee Objection ¶ 20.  The cases cited by the Committee to support the proposition that the Disclosure Statement must disclose the merits of the claims (which the Debtor does in the Disclosure Statement) to be released are easily distinguishable or irrelevant.  First, *Bank of N.Y. v. Becker (In re Lower Bucks Hosp.)*, 488 B.R. 303 (E.D. Pa. 2013), involved a third-party release provision where the debtor did not have conspicuous language emphasizing the releases, there was nothing in the notices alerting the voting bondholders that potential clams for failure to perfect a security interest were being released or the value of actual claims being released.  *See* 488 B.R. at 317-21.  Here, the Debtor sets out in the Disclosure Statement that it has done an analysis and it does not believe it has any viable claims or causes of action.  Second, *In re Source Enters.*, Case No. 06-11707 (AJG), 2008 Bankr. LEXIS 940 (Bankr. S.D.N.Y Mar. 27, 2008), does not concern the adequacy of information in a disclosure statement, but rather addresses a law firm's fee application. *See* 2008 Bankr. LEXIS 940, at *1.  The bankruptcy court only states in passing in the background section that "[o]n July 31, 2007, the Court determined that its prior conditional approval of the amended disclosure statement was unwarranted because relevant information regarding valuation, third party releases and the treatment of unsecured creditors had not been provided at the time of solicitation." *Id.* at * 18.  Thus, the holding of this case is not relevant here.

16

one collateral agent under the Macquarie Agreements; one UCC-1 statement that was filed on December 4, 2020; and blocked account control agreements on each of the Debtor's bank accounts (other than an escrow account for a small PPP loan) since December 4, 2020. The Committee has had ample time to review the limited set of documents to conclude that the Prepetition Secured Lenders are properly perfected – in particular, on substantially all of the Debtor's cash. Further, as the Committee knows, the guaranty agreement between the Collateral Agent and each Non-Debtor Affiliate guarantor waives marshalling.

33. Moreover, the Debtor has produced responsive documents to the Committee regarding its Non-Debtor Affiliates. But the Debtor cannot provide documents regarding its Non-Debtor Affiliates where none exist. The only written agreement between the Debtor and a Non-Debtor Affiliate is the license agreement between the Debtor and Griddy Tech. That has been produced to the Committee. Most of the entities in the Griddy group were created in connection with the December 4, 2020 business combination and most of the Griddy group entities are holding companies with no operations so there are no documents to be produced. The Committee's desire to substantively consolidate the Debtor with its Non-Debtor Affiliates because there is overlap in directors and officers – despite creditors of the Debtor having dealt with the Debtor individually and the lack of entanglement of the affairs between the Debtor and any Non-Debtor affiliate – is devoid of any legal basis. *See* 2 Collier on Bankruptcy § 105.09 (16th Ed. 2021) ("Common ownership or a parent/subsidiary relationship, common directors and officers, inter-affiliate transfers, incorporation caused by the parent, the existence of inter-corporate claims, and consolidated financial statements or tax returns are all typical of most affiliated corporations, yet substantive consolidation is not typically ordered on the presence of the close corporate relationship represented by these elements."); *In re World Access, Inc.*, 301 BR 217, 276 (Bankr. N.D. Ill. 2003) (phenomena like "unity of ownership [and that] the

17

companies have overlapping officers and boards of directors . . . are, however, quite common in today's corporate groups" and do not themselves provide the basis for ignoring corporate separateness).

34.     Notwithstanding the foregoing, and despite that all of the releases in the Plan are consensual, including the Debtor Release, the Debtor has revised the Debtor Release so that (a) the releases therein are limited to the period on and after December 4, 2020 through the Effective Date and (b) the definition of "Released Parties" no longer includes a reference to "former" such that the Debtor Release now applies only to those current officers, directors, employees, managers, members, principals, shareholders, agents, advisors or other professionals and representative (each in their capacities as such; and, with respect to attorneys and professionals advisors, only related to the chapter 11 cases and the transactions related to the Plan), as of the Petition Date.  Therefore, the Debtor Release now is limited to the time period since the business combination on December 4, 2020 and includes only officers, directors, managers, etc. in their positions as such as of the Petition Date.

35.     For the reasons set forth above combined with the proposed other compromises and settlements in the Plan, including the Customer Releases, the Debtor and the other Released Parties should be entitled to finality from this terrible chapter and not be subject to potential baseless claims.

36.     Accordingly, the Debtor respectfully submits that the Disclosure Statement contains adequate information concerning the Debtor Release.

### ii.     The Liquidation Analysis Contains Adequate Information.

37.     ERCOT contends the Debtor's Liquidation Analysis is inadequate and levels a number of specific criticisms, each of which is refuted in the chart below.  However, at bottom, most of ERCOT's complaints go to the substance of the Debtor's estimates and assumptions

18

rather than deficiencies in disclosure.  As such, they go to whether the Debtor has presented adequate evidence that the Plan satisfies the "best interests test" and should be considered with other evidence at the combined hearing on final approval of the Disclosure Statement and confirmation of the Plan.

| ERCOT Objection | Debtor Response |
|---|---|
| "The Liquidation Analysis fails to take into account that under a Chapter 7 scenario, none of the releases proposed by the Debtor in the Plan will have been given." ERCOT Objection, ¶ 34. | The Debtor does in fact account for this difference between the Debtor's proposed plan and a chapter 7 liquidation.[17]  The Liquidation Analysis explicitly states that "the Debtor does not believe there to be any viable causes of action against the Released Parties."  Moreover, the body of the Disclosure Statement details the Debtor's belief for this statement.  *See* Disclosure Statement, Article II § D.  The Debtor has been clear about this assumption and the basis for it, which satisfies the adequate information standard. |
| "In connection therewith, the Debtor makes the assumption that the Prepetition Secured Lenders would be unwilling to waive $550,000.00 of their claim and also assumes no recovery by the Chapter 7 Trustee of any claims against the Prepetition Secured Lenders." ERCOT Objection, ¶ 35. | The Debtor negotiated with the Prepetition Secured Lenders prior to the Petition Date and the Debtor has no basis to believe based on discussions with the Prepetition Secured Lenders that, outside of the context of the Plan, where the Prepetition Secured Lenders are receiving certain releases under the Plan and where the Plan is providing approximately 24,000 customers with the ability to have their unpaid balances to the Debtor released (i.e., assisting thousands of people of the State of Texas), that the Prepetition Secured Lenders would consensually contribute a portion of their claims to the Estate.  Further, as detailed in the Disclosure Statement, the Prepetition Secured Lenders have properly perfected liens on all of the Debtor's cash. |
| "The Debtor also assumes only $129,188.00 in Chapter 11 Wind-down Costs and ultimately comes to the conclusion that there would supposedly be a lesser recovery in a Chapter 7 scenario. . . The projected $129,188.00 in Chapter 11 | The Debtor has clearly disclosed in the Liquidation Analysis its estimates and assumptions associated with each of the chapter 7 liquidation and chapter 11 liquidation.  ERCOT does not indicate what additional information it believes should be disclosed, only that it disagrees with the Debtor's estimates.  However, ERCOT |

---

[17]   Generally, in a liquidating plan, the recovery should be equivalent to that in a chapter 7 liquidation subject to any variations in the plan from the chapter 7 priority scheme.  *See In re Cypresswood Land Partners*, I, 409 BR 396, 428 (Bankr. S.D. Tex. 2009)  "[L]iquidating plans may be more cost effective than liquidation under Chapter 7 because liquidating plans provide[ ] for the expeditious payment of available proceeds of the [e]state to [a]llowed [c]laims and [e]quity [i]nterests, without the need for the delay and expense occasioned by the appointment of a Chapter 7 trustee.")

| ERCOT Objection | Debtor Response |
|---|---|
| Wind-down Costs seems optimistic." ERCOT Objection ¶¶ 35-36. | will have ample opportunity to present evidence to rebut the Debtor's estimates and assumptions at the confirmation hearing. |
| "It does not seem realistic that this Bankruptcy Case could be wound down in *two months*. This is, notwithstanding, the fact that the deadline to file objections to claims is *120 days after the Effective Date*. Plan § 9.01. Therefore, ERCOT suspects that a much higher amount of Chapter 11 Wind-down Costs will be incurred, thereby, making a Chapter 7 liquidation result in a better estimated recovery for unsecured creditors." ERCOT Objection ¶ 36. | The appropriateness of assumptions underlying the Liquidation Analysis should be considered at confirmation. ERCOT will have the ability to present evidence at confirmation to challenge the Debtor's estimates and assumptions, and the resulting conclusion that the Plan satisfies the best interest test, if it so chooses.<br><br>The Debtor's Schedules of Liabilities indicate a limited number of claims against the Debtor. Resolution of that limited number of claims should not be complicated or take a significant amount of time and the Debtor can begin filing claim objections in May once the Non-Former Customer Bar Date passes on April 28, and the Debtor's claims agent processes all filed claims.<br><br>Moreover, the Debtor explicitly carved out the timing, costs and recoveries from causes of action against third parties (including ERCOT) because such timing and amounts are too speculative. However, the Debtor has made clear that because of the speculative nature of the causes of action, it has "not accounted for any costs of pursuing such causes of action in either a chapter 7 or chapter 11 scenario" and that it anticipates that "any costs would be paid for from . . . recoveries" in both a chapter 7 and chapter 11 scenario. Accordingly, such costs are outside the scope of the Liquidation Analysis, but such costs and timing would likely be similar to prosecute both in chapter 7 and chapter 11, thereby evenly increasing costs in both scenarios if they had been accounted for. |

38.     The Liquidation Analysis is clear regarding its sources of information, estimates and assumptions. As such, it provides adequate information for voting creditors that do not accept the Plan to assess whether the Plan satisfies the best interests test as to them.

### C.     Confirmation Objections Should be Overruled and Considered at the Confirmation Hearing.

39.     Courts have held that challenges to elements of the chapter 11 plan itself are not proper disclosure statement objections and should instead be addressed at confirmation.  *See e.g., In re Sanders,* No. 14-02271, 2015 WL 7568469, at *5 (Bankr. S.D. Miss. Nov. 23, 2015) ("Whether the plan is feasible is an issue for the plan-confirmation hearing."); *In re Ellipso, Inc.,* No. 09-00148, 2012 WL 368281, at *2 (Bankr. D.D.C. Feb. 3, 2012) (holding certain disclosure statement objections were confirmation issues "more appropriately dealt with at a confirmation hearing" including "(i) the contention that the classification of claims is improper; (ii) a claim that the Proponents do not have the means to fund the plan; (iii) an objection to the disclosure statement's admission that if [certain] claims are allowed, there will be nothing left to pay the other creditors; and (iv) allegations that the plan is being proposed in bad faith."); *In re Calpine Corp.,* No. 05-60200, 2007 WL 2908200, at *1 (Bankr. S.D.N.Y. Oct. 4, 2007) (reserving the determination of the debtors' enterprise value for the confirmation hearing). "[C]are must be taken to ensure that the hearing on the disclosure statement does not turn into a confirmation hearing, due process considerations are protected and objections are restricted to those defects that could not be cured by voting . . . " *In re Copy Crafters Quickprint, Inc.,* 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988); *see In re Quigley Co.,* 377 B.R. 110, 119 (Bankr. S.D.N.Y. 2007) (approving debtor's disclosure statement despite noting that debtor's parent's prepetition settlement with certain asbestos plaintiffs raised, *inter alia,* questions concerning good faith and vote designation after finding that such issues were "confirmation issues that require an evidentiary hearing").

40.     The Committee Objection and the ERCOT Objection raise a cadre of objections that are confirmation objections not Disclosure Statement objections.  *See* Committee Objection ¶¶ 15-28, 45-53;  ERCOT Objection ¶¶ 13-32; *id.* ¶¶ 33-37.  These objections are not objections to the adequacy of information provided in the Disclosure Statement, but are instead objections

to the substance of the Plan itself that should be deferred to the confirmation hearing, and to the extent necessary, considered then. *See In re Drexel Burnham Lambert Group*, 1992 WL 62758, at \*1 (Bankr. S.D.N.Y. Mar. 5, 1992) (stating that objections to a plan's release and injunction provisions were in the nature of confirmation objections and therefore improperly raised as objections to disclosure statement); *In re Specialty Equip. Cos., Inc.*, 1992 WL 279262 at \*3 (N.D. Ill. Sept. 25, 1992), *aff'd.* 3 F.3d. 1043 (7th Cir. 1993) (noting that bankruptcy court below held that "the validity of releases [is] a plan confirmation issue" and overruled objections to disclosure statement regarding appropriateness of third-party releases); *see also* Discl. Stmt. Hr'g Tr. at 17:4–19, *In re iHeartMedia, Inc.,* No. 18-31274 (MI) (Bankr. S.D. Tex. Sept. 13, 2018) [ECF No. 1461] (holding that objections to releases are generally best addressed at confirmation).

### D. The Plan is Not Patently Unconfirmable

41. The Committee Objection fails to identify any defect in the Plan that would render it "patently unconfirmable." To rise to the level of "patently unconfirmable," a plan must be "so fatally flawed that confirmation is impossible." *In re U.S. Brass Corp.,* 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996). Though the Court may deny approval of a disclosure statement for a plan that is patently unconfirmable, "such action is discretionary and must be used carefully so as not to convert the disclosure statement hearing into a confirmation hearing, and to insure that due process concerns are protected." *Id.* at 422 (citation omitted). The Committee does not have a supportable legal basis for asserting that the purported flaws in the Plan would prevent confirmation, but instead relies in large part on fiery unsupported rhetoric and wild accusations that are not appropriate in a chapter 11 case where one of the Debtor's primary objectives are to

22

shield approximately 24,000 Texans from collection actions and negative credit ratings while trying to preserve the estate's limited resources to maximize distributions to its creditors.[18]

42.     While each of these objections are confirmation issues that should not be considered at this stage, the Debtor addresses certain of those arguments below.

### i.     The Plan is Proposed in Good Faith

43.     The Committee alleges that the Plan is not proposed in good faith based on unsupported and unsupportable allegations. *See Committee Objection* ¶¶ 32-39.  The Debtor has proposed the Plan for the lawful purposes of liquidating its assets, winding down its affairs and distributing its assets to its creditors, consistent with the Bankruptcy Code.  As such, it has been proposed in good faith within the meaning of section 1129(a)(4).  *See In re Block Shim Dev. Co.-Irving*, 939 F2d 289, 292 (5th Cir. 1991) ("To be proposed in good faith, a plan must fairly achieve a result consistent with the Code."); *In re ASARCO LLC*, 420 B.R. 314, 331 (Bankr. S.D. Tex. 2009) ("the good faith standard . . . requires that 'there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'").

44.     The Committee suggests that the Plan is not proposed in good faith based on the fact that "the Debtor is controlled by directors and officers that have significant equity interests

---

[18]   The Debtor respectfully submits that the Committee should take care when presenting and later advocating positions in pleadings that are not based on its knowledge, information or belief formed after a reasonable inquiry under the circumstances.  There are many statements in the Committee's objection that are problematic.  *See e.g.,* Committee Objection ¶ 17 (alleging that the Debtor is hampering the Committee's investigation despite producing over two thousand documents); *id.* ¶ 26 (alleging that the Debtor is being uncooperative); *id.* ¶ 30 ("These flaws are fundamental, cannot be saved by minor alterations, and reflect the Debtor's cavalier attitude both to its disclosure obligations under the Bankruptcy Code and its fiduciary obligations"); *id.* ¶ 33 ("The Committee submits that chicanery is afoot in this Chapter 11 Case."); *id.* ¶¶ 36-37 (despite having knowledge that the Debtor has an independent director, stating "[t]here is no evidence that the Debtor was independent of these conflicted officers at any time" and "[t]he results are self evident: each of the parties who control the Debtor is being released"); ¶ 38 (alleging that the Debtor is committing fraud and despite not seeking consideration of the Disclosure Statement on an emergency basis that "expedited consideration primarily motivated by an attempt to avoid scrutiny by the Committee and other parties in interest in this Chapter 11 Case."); *id.* ¶ 39 ("The sum total of the Debtor's actions demonstrate a distinct 'abuse of the spirit of the bankruptcy code'"); *id.* 44 (stating that its allegations are based on facts, yet also stating that "[t]he Committee expects that further discovery efforts will yield additional corroborating facts.").

in the Non-Debtor Affiliates." *See* Committee Objection ¶ 34.  While the Committee seems to believe this is some jaw-dropping revelation, in fact, it is common and does not demonstrate impropriety on the part of the Debtor or its management.  In fact, it is often the case that chapter 11 plans provide for releases similar to Debtor Releases.  *See In re Benevis Corp.*, No. 20-33918 (MI) (Bankr. S.D. Tex. Dec. 30, 2020) (confirming liquidating plan that provided debtor release of non-debtor affiliates and current and former directors and officers); *In re Approach Resources Inc.,* No. 19-36444 (MI) (Bankr. S.D. Tex. Dec. 16, 2020) (same); *In re Gavilan Resources, LLC*, No. 20-32656 (Bankr. S.D. Tex. Nov. 30, 2020) (same); *In re BJ Services, LLC*, No.  20-33627 (MI) (S.D. Tex. Nov. 6, 2020) (same); *In re Westmoreland Coal Co.*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. Mar. 2. 2019) (same).

45.     The Committee further states that the Debtor and its decision makers were conflicted, that the Debtor has a "cavalier attitude to both its disclosure obligations under the Bankruptcy Code and its fiduciary duties," and that the Debtor could not have acted "independent" of its "conflicted officers."  Committee Objection ¶¶ 30, 36.[19]  However, as the Committee is well aware and as was disclosed by the Debtor at the first day hearing in this case,[20] the Debtor's indirect parent,[21] where the Board of Griddy Holdings sits, hired an independent

---

[19]   Curiously, the Committee cites to *In re Pearville, L.P.*, No.10-34074, 2010 Bankr. LEXIS 6240, at *10 (Bankr. S.D. Tex. Dec. 13, 2010), a confirmation order that contains a finding of good faith and confirms the plan, and *Search Mkt. Direct, Inc. v. Jubber (In re Paige)*, 685 F.3d 1160, 1179 (10th Cir. 2012), a case holding, in affirming a conclusion of good faith and confirmation of a plan, that some but not all conflicts may be problematic.  The Committee also cites to *In re Fiesta Homes of Ga., Inc.*, 125 B.R. 321, 325 (Bankr. S.D. Ga. 1990), in which the Court held a plan lacked adequate means of implementation and was not proposed in good faith because the Debtor's existing management was alone in charge of recovering preferences from insiders, including family members, which they had failed to do in the full year the case was pending.  That case is clearly distinguishable from the instant case because the Debtor's current management will not be pursuing such claims.  The Plan proposes to empower a Plan Administrator to do so.

[20]   First Day Hr'g. Tr. at 23:23-24 to 24:1-3, *In re Griddy Energy LLC*, Case No. 21-30923 (MI) (Bankr. S.D. Tex. Mar. 16, 2021) ("[Ms. Spigel:] First, Griddy has put in an independent director in place as a seasoned, former bankruptcy professional.  This person was a consultant to the company in the last few weeks and is up-to-speed both on the company and the proposed Plan.").

[21]   The Debtor does not have its own board of directors.  Its sole manager is HoldCo and HoldCo's sole manager is

consulting firm during the winter storm event,[22] and the independent consultant from that firm, Mr. Paul Aronzon, was appointed as the independent manager on the Petition Date. Mr. Aronzon was specifically designated to focus on the restructuring of the Debtor. Mr. Aronzon has no ownership interest in the Debtor or any of its Non-Debtor Affiliates, refuting the notion that all of its directors were interested.

46.     In the end, the Debtor's suggestion that a plan that provides release of directors, officers and affiliates of a debtor is inherently improper is unsupported and incorrect.

47.     The Committee's unsupported allegations are wholly insufficient to establish a lack of good faith. *See, e.g., In re Wash. Mut., Inc.,* 442 B.R. 314, 364 (Bankr. D. Del. 2011) ("More than mere innuendo and speculation is needed to establish a lack of good faith.").

### ii.     The Consensual Third Party Releases are Permissible

48.     Next, the Committee argues that the Plan cannot be confirmed because the third party releases are not permissible. *See* Committee Objection ¶¶ 45-49. It is unclear whether the Committee is complaining about the Customer Releases in section 12.10 of the Plan or the releases applicable to all other voting creditors in section 12.07(b) of the Plan.[23] Regardless, all of the releases proposed in the Plan are consensual.

49.     While the Committee concedes, as it must, that consensual non-debtor releases are permissible in the Fifth Circuit,[24] it asserts that the opt out mechanism proposed by the Debtor

---

Griddy Holdings, where the board of directors sits.

[22]  Mr. Aronzon has over 40 years restructuring experience and was the former co-leader of Milbank LLP's financial restructuring group.

[23]  The Disclosure Statement defines "Third Party Release" as those releases contained in section 12.07(b) of the Plan, which do not apply to Participating Customers (*i.e.*, the Customer Releases contained in section 12.10 of the Plan).

[24]  *See, e.g., CJ Holdings Co.*, 597 B.R. 597, 608 (S.D. Tex. 2019) ("The Fifth Circuit does not preclude bankruptcy courts from approving a 'consensual non-debtor release.' Bankruptcy Courts within the Fifth Circuit commonly exercise jurisdiction to approve nonparty releases based on agreed plans") (*citing In re Wool Growlers Cent. Storage Co.*, 371 B.R. 768, 755-76 (Bankr. N.D. Tex. 2007); *In re Bigler LP*, 442 B.R. 537, 543-44 (Bankr. S.D.

necessarily renders them non-consensual.  *See id.*  The Committee does not cite to any cases from this District for this proposition and, whether as a result of purposeful evasion or unfamiliarity, it is clear that the Committee has not grappled with this Court's well-established guidance on what constitutes a consensual third party release.  Put simply, the third party releases are consensual as the term has been defined by the Courts in this District and, therefore, permissible.

50.     Bankruptcy Courts in the Fifth Circuit have looked to whether third party releases are (a) consensual, (b) specific in language, (c) integral to the plan, (d) a condition of the settlement, and (e) given for consideration when determining whether it is permissible under the Bankruptcy Code.  *See, e.g., Wool Growers Cent. Storage Co.*, 371 B.R. at 776 ("Consensual nondebtor releases that are specific in language, integral to the plan, a condition of the settlement, and given for consideration do not violate section 524(e).").  Paragraph 36 of the Complex Case Procedures of this Court has, in part, codified what is required for a consensual release:

> If a proposed plan seeks consensual releases with respect to claims that creditors may hold against non-debtor parties, then a ballot must be sent to creditors entitled to vote on the proposed plan and notices must be sent to non-voting creditors and parties in interest. The ballot and the notice must inform the creditors of such releases and provide a box to check to indicate assent or opposition to such consensual releases together with a method for returning the ballot or notice.

Complex Case Procedures ¶ 36.

51.     The third party releases comply with each of these requirements.  The releases are consensual because, with the exception to the Classes 6 (Intercompany Claims) and 7 (Existing HoldCo Interests), which are comprised of affiliates of the Debtor, each of the Ballots sent to the

---

Tex. 2010)); *In re In re Camp Arrowhead, Ltd.*, 451 B.R. 678, 701-02 (Bankr. W.D. Tex. 2011) ("the Fifth Circuit does allow permanent injunctions *so long as there is consent. . . .*").

Voting Classes advises the holder in bold type of the release (including the language of the release in its entirety), the opportunity to opt out and that the release will apply if they fail to do so.  Each ballot provides detailed instructions regarding how to properly complete the ballot, including the opt out, and how to submit the ballot so that the holder's opt out will be counted.[25]  Additionally, the third party releases are integral to the Plan, which effectuates a global settlement of claims of and against the Debtor, the Released Parties and former customers, and a condition of the Released Parties to agreeing to such settlement.[26]  Finally, the third party releases are given for consideration in that each party that is bound by the release receives a mutual release.[27]

52.    Courts in this District routinely approve third party releases with an opt out mechanism substantially identical to that which the Debtor proposes to utilize.[28]  Accordingly,

---

[25]  It is not clear what the Committee is referring to when it states that "[t]he Plan effectively imposes a double opt-out structure in which a creditor must first opt-out by returning a ballot and then opt-out using the affirmative opt-out on the ballot."  Committee Objection ¶ 48.  Each party that could be bound by a release will receive a single ballot that provides the holder with the opportunity to opt out of any releases that may be applicable to such party. In the case of former customers, they are given the opportunity to choose to be treated as Class 5 claimants and be bound by (and receive the benefit of) the Customer Release or to vote against the Plan and not be bound by the Customer Release.  On the same ballot, the former customer has the opportunity to opt out of the Third Party Release as a Class 4 holder.  All that is required is that they complete a single ballot and return it in order to opt out of the releases.  This is consistent with the approach approved time and again by Courts in this District.

[26]  The Debtor is surprised that the Committee would refer to the Debtor's former customers as "unsophisticated consumers".  Committee Objection ¶ 47.  The Debtor's former customers chose the Debtor out of more than 100 other potential providers in the Texas deregulated energy market.  The consumers chose a product that allowed them to determine their electricity usage based on the price of electricity on the wholesale market.  Thus, when a customer saw that the prices were high or low, they could adjust their behavior accordingly.  The Debtor takes issue with such characterization.

[27]  *See, e.g., In re Westmoreland Coal Co.*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. Mar. 1, 2019), Hr'g Tr. at 125 [Docket No. 1559] (finding mutual releases to constitute consideration); *In re Cobalt Int'l Energy, Inc.*, No. 17-36709 (MI) (Bankr. S.D. Tex. Apr. 6, 2018), Conf. Hr'g Tr. at 244 [Docket No. 790] (same).

[28]  See *In re Carbo Ceramics Inc.*, No. 20-31973 (MI) (Bankr. S.D. Tex. June 18, 2020) [Docket No. 539] (approving third-party release as consensual where voting classes are entitled to opt-out of the third-party releases through ballot and non-voting classes are entitled to opt-out of third-party releases through an opt-out form); *In re Alta Mesa Res., Inc.*, No. 19-35133 (MI) (Bankr. S.D. Tex. May 27, 2020) [Docket No. 1777] (same); *In re McDermott Int'l Inc.*, No. 20-30336 (DRJ) (Bankr. S.D. Tex. Mar. 14, 2020) [Docket No. 684] (same); *In re EP Energy Corp.*, No. 19-35654 (MI) (Bankr. S.D. Tex. Mar. 12, 2020) [Docket No. 1049] (same); *In re Bristow Group Inc.*, No 19-32713 (DRJ) (Bankr. S.D. Tex. Oct. 8, 2019) [Docket No. 825] (approving third-party release as consensual where voting classes are entitled to opt-out of the third party releases through ballot and impaired non-voting classes are entitled to opt-out of third-party releases through an opt-out form); *In re Weatherford Int'l PLC*, No. 19-33694 (DRJ) (Bankr. S.D. Tex. Sept. 11, 2019) [Docket No. 343] (same); *In re iHeartMedia*, Inc., No 18-31274 (MI) (Bankr. S.D. Tex. Jan. 22, 2019) [Docket No. 2525] (approving third-party release as consensual

the third party releases are consensual and permissible and do not render the Plan unconfirmable, as the Committee asserts.

### iii. The Remaining Objections Do Not Render the Plan Patently Unconfirmable

53. In furtherance of its argument that the Plan is not confirmable, the Committee argues that (a) the Plan contains improper gerrymandering, (b) the Plan discriminates unfairly against holders of Class 5 Customer Claims, (c) former customers should have up to six months after emergence to opt into Class 4 (Other General Unsecured Claims), (d) the Plan Administrator should be selected by the Committee, and (e) Class 5 proofs of claims should be automatically allowed. *See* Committee Objection ¶¶ 50-63. All of these objections are without merit and do not render the Plan patently unconfirmable.

54. First, the Committee's assertion that the Plan contains improper gerrymandering because Classes 6 (Intercompany Claims) and 7 (Existing HoldCo Interests) can vote on the Plan, which the Committee asserts is for the purpose of "creating an impaired accepting class" and cramming up Classes 4 (Other General Unsecured Claims) and 5 (Customer Claims) is simply wrong. *See* Committee Objection ¶ 50-53. As Class 6 (Intercompany Claims) and Class 7 (Existing Holdco Interests) are comprised solely of claims and interests held by insiders, section 1129(a)(10) expressly excludes them from acting as the impaired accepting class needed to confirm a plan. *See* 11 U.S.C. § 1129(a)(10) ("[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined

---

where voting classes are entitled to opt-out of the third party releases through ballot, unimpaired non-voting classes are entitled to opt-out of third party releases through formal objections to the third-party releases, and non-voting classes are entitled to opt-out of third-party releases through an opt-out form); *see also CJ Holdings Co.*, 597 B.R. 597, 608 (S.D. Tex. 2019) ("The Fifth Circuit does not preclude bankruptcy courts from approving a 'consensual non-debtor release.' Bankruptcy Courts within the Fifth Circuit commonly exercise jurisdiction to approve nonparty releases based on agreed plans") (*citing In re Wool Growlers Cent. Storage Co.*, 371 B.R. 768, 755-76 (Bankr. N.D. Tex. 2007)).

without including any acceptance by the plan by any insider.").  The Committee's "cram up conspiracy" is debunked by a simple read of the Bankruptcy Code and no gerrymandering scheme exists.

55.     Second, the Plan does not unfairly discriminate against Class 5 claimants. Although the Committee is correct that treatment of Class 5 (Customer Claims) is different than that the Class 4 (Other General Unsecured Claims) treatment, it fails to accurately characterize the Plan.  *See* Committee Objection ¶¶ 54-56.  The Plan provides former customers with the Customer Releases and Allowed Participating Customer Potential Return Claims solely as a compromise and settlement under the Plan.  Further, Class 5 claimants may elect to opt out of Class 5 and participate in Class 4.  *See* Plan § 4.5(b).  It cannot possibly be discriminatory treatment if the affected claimants can choose the alternate treatment if they prefer it.

56.     Third, the Committee makes the odd request that the deadline for Class 5 claimants to opt into Class 4 be at least 6 months after the Effective Date of the Plan because "customer claimants potentially have valuable claims that have not been investigated and would be released by the Customer Release."  *See* Committee Objection ¶ 58.  This request should be rejected. Again, the Customer Releases and Allowed Participating Customer Potential Return Claims in the Plan are part of a proposed compromise and settlement under the Plan.  The Debtor is puzzled that the Committee is putting forth a proposition that, even if permissible, would require the Plan Administrator to delay making any distributions for a minimum of six months after the Effective Date and potentially dilute the recovery available to general unsecured creditors.  Moreover, having the ability to opt into Class 4 six months after the Effective Date would be tantamount to the claimant changing its vote.  There simply is no basis to allow any voting creditor with the ability to change its vote six months after the confirmation hearing, let alone the Effective Date. *See In re Houser Shoes, Inc.*, 245 B.R. 486, 492 (W.D.N.C. 2000) (affirming bankruptcy court

opinion denying motion to change vote on chapter 11 plan to allow creditor to change classes months after confirmation and distributions).

57. Fourth, the Committee argues that the Plan Administrator should be selected by the Committee not the Debtor. *See* Committee Objection ¶¶ 59-61. Under the Plan, the Debtor designates the Plan Administrator. *See* Plan § 1.78. Subject to extension, the Debtor has exclusivity to file a Plan during the first 120 days of the Bankruptcy Code and has determined that it will select the Plan Administrator in the Plan that it is proposing. *See* 11 U.S.C. § 1121(b) ("only the debtor may file a plan until after 120 days after the date of the order for relief under this chapter."). Designating the Plan Administrator is the Debtor's prerogative.

58. Finally, with respect to automatic allowance of Class 5 Claims, the Committee has simply misread the Plan and is criticizing the Plan for not doing something it already does. *See* Committee Objection ¶ 62. The Plan expressly states that, subject to the conditions set for in the Plan, if Class 5 claimants approve the Plan and the Court approves their treatment, "a Participating Customer Potential Return Claim shall . . . be Allowed if such Participating Customer timely and properly files a proof of claim for such Claim by the Former Customers Bar Date in accordance with the Former Customers Bar Date Order and shall . . . be Allowed in the amount of the Participating Customer Potential Return," which is equal to "the total amount such Participating Customer paid the Debtor for electricity consumed by such Participating Customer during the period February 13, 2021 through February 19, 2021 . . . as reflected on the Debtor's books and records, less any amounts such Participating Customer successfully disputed and received a full or partial refund from such Participating Customer's credit card company (to the extent not accounted for in the Debtor's books and records"). *See* Plan §§ 1.74, 4.05(c).[29]

---

[29]   The Debtor also does not understand why the Committee is providing comments to the Former Customer Bar Date Order and related materials in its Objection. The Debtor sent the Former Customer Bar Date Order and related documents, including the proposed proof of claim form, which the Debtor had negotiated with the Attorney

**E.** **The Attempts to Delay Consideration of the Disclosure Statement Should be Rejected.**

59.     The Committee and ERCOT, without making any reference to the Debtor's actual financial situation, both argue that the Debtor does not need to progress the case towards confirmation because the Debtor is not a "melting ice cube" and that because the Debtor no longer has operations "nothing is melting."  *See* Committee Objection ¶ 2 ("This is a liquidating chapter 11 case in which the Debtor has no business operations. In short, nothing is melting."); ERCOT Objection ¶ 47 ("This is a liquidating 11 where the assets of the estate do not appear to be diminishing solely as a function of the passage of time.").  Absent from all Objections is acknowledgement of a principal germane to all bankruptcy proceedings – administrative expenses, including those incurred by estate professionals, must be paid.

60.     The Debtor provided the Committee with a three month cash forecast, which does not take into account the Committee's professional fees or the increased costs of administration caused by the Committee's litigation strategy.  *See* Cash Forecast.  If the Debtor's Plan is not confirmed in June or if the chapter 11 case remains contested, this case will be administratively insolvent.  In this scenario, a chapter 7 trustee will almost certainly pursue collection efforts against the Debtor's former customers and any hope of recovery for general unsecured creditors will be solely from the pursuit of causes of action, the success and recoveries related thereto is unknown.

61.     The limited discovery dispute and any Committee investigation is not a reason to delay approval of the Disclosure Statement.  The Committee can review documents produced by the Debtor and conduct any additional discovery that it believes is necessary prior to the combined

---

General, to the Committee on April 8, 2021.  Despite repeatedly asking for comments, the Debtor has received no comments in writing since April 8, 2021 and has made the one change the Committee has requested.  *See* Committee Objection ¶ 63.

hearing on final approval of the Disclosure Statement and confirmation of the Plan.  *See* Discl. Stmt. Hr'g Tr. at 9:4–16, *In re Cobalt International Energy, Inc.*, Case No. 17-36709 (MI) (Bankr. S.D. Tex.  March 8, 2018) [Docket No. 579] ("I don't think it's very controversial to say that if we approve the disclosure statement, there can be discovery afterward.").  The Committee can balance its alleged fiduciary duty to investigate claims and at the same time be mindful of the expenditure of estate resources and its fiduciary duty to maximize recovery for its constituency.[30]

62.     Accordingly, the Debtor respectfully request that the Court deny the Committee's and ERCOT's request to adjourn consideration of the Disclosure Statement.

**F.     The Committee's Request to Include a Letter in the Solicitation Packets Should Be Denied.**

63.     In the conclusion paragraph of the Committee Objection, the Committee throws in a request that, in the alternative, the Court order the Debtor to include a negative solicitation letter from the Committee in its solicitation materials.  *See* Committee Objection, "Wherefore" paragraph, p. 22.  The Committee says it will advise creditors to vote to reject the Plan and proposes to reiterate the inaccurate information and unsupported allegations that it made in its objection. *See id.*

64.     After the commencement of a chapter 11 case, the Bankruptcy Code requires that solicitation materials be approved by the Court.  *See* 11 U.S.C. §§ 1125(b)-(c).  The Debtor does not believe the inclusion of such a letter is appropriate.  The Committee, through its objection,

---

[30] It is well settled that members of a statutory committee owe fiduciary duties to their constituents. *See In re PWS Holding Corp.*, 228 F.3d 224, 246 (2d Cir. 2000) ("Section 1103(c) of the Bankruptcy Code. . . . has been interpreted to imply. . . . a fiduciary duty to committee constituents"); In re Residential Capital, LLC, 480 B.R. at 559 (Bankr. S.D.N.Y. 2012) ("It is well settled that statutory unsecured creditors' committees owe a fiduciary duty to the entire class of creditors represented by such committee and are required to place the collective interest of the class they represent above their own personal stake in the bankruptcy case"); *In re Granite Partners, L.P.*, 210 B.R. 508, 516 (Bankr. S.D.N.Y 1997) ("The committee and its members owe a fiduciary duty to the class of creditors that the committee represents.") (emphasis in original); *In re First Republic Bank Corp.*, 95 B.R. 58, 61 (Bankr. N.D. Tex. 1998) ("A member of a creditors' committee owes a fiduciary duty to all creditors represented by the committee.")

has sought to spread distortions and untruths in the public record regarding the Debtor, its Non-Debtor Affiliates and its officers and directors.  The Plan includes compromises and settlements that would not be available in a chapter 7 liquidation, which is where this case is heading if the Plan is not confirmed.  The Debtor should not be required to include a letter from the Committee filled with unsubstantiated factual assertions and misapplications of the law.  However, the Debtor has included the following language at the end of the "Important Notice" section of the Disclosure Statement (i.e., the initial pages of the Disclosure Statement) in bolded capitalized letters:  "The Creditors' Committee does not support the Plan and believes it should have additional time to investigate claims against the Debtor's Non-Debtor Affiliates, the Debtor's prepetition secured lenders and the Debtor's officers and directors, and that the Plan is not confirmable under applicable law."

65.    Further, because the letter will be separate from the Disclosure Statement (which will in mailed to creditors in a flash drive or CD-ROM, or provided in a separate link by email to former customers), the holders of Other General Unsecured Claims and Customer Claims entitled to vote on the Plan may give such letter more weight than is intended or warranted by its inclusion in the solicitation package and such creditor may be unduly influenced to reject the Plan.  Thus, if the Court is inclined to allow the Committee to include such a letter, either:  (a) the Committee's position in the letter should be contained in a separate section of the Disclosure Statement (with a notation in the "Introduction" section of the Disclosure Statement pointing creditors to the applicable section of the Disclosure Statement); or (b) the Debtor should be permitted to include a separate letter in support of the Plan.

66.    Notably, the Committee added the request to the "Wherefore" paragraph of its objection and did not bother to include a proposed letter.  The Debtor has not included a proposed letter because it should be entitled to see the Committee's proposed letter so it can include

33

appropriate responsive language. The Committee should not be rewarded with its delay tactics of not including a proposed letter. On this basis alone, the request should be denied.

67.     Accordingly, the Debtor respectfully requests that the Court deny the alternative relief sought by the Committee in the Motion.

> **G.      The Court Should Overrule the Late Filed Prescott Objection.**

68.     The Prescott Objection was filed four days after the April 23, 2021 deadline to object to the Motion and a little more than a day prior to the hearing on the Motion. *See* Docket No. 210. On March 31, 2021, Ms. Prescott filed an emergency motion seeking an order directing the U.S. Trustee to appoint an official committee of customers in this case that would include tort claimants ("Prescott Motion"). *See* Docket No. 115. On April 1, 2021, this Court held a hearing on, among other things, the Prescott Motion. At the hearing, the Court stated "If there's something Griddy could have done so that your clients would have had power, I understand the claim, but if there's nothing Griddy could have done so that your clients would get power, I don't understand it . . . ."[31] Ultimately, the Court determined to abate the motion and provide Ms. Prescott with the opportunity to file a motion to terminate the abatement and "include with it an explanation of what Griddy could have done so that [the tort claimants] would not have lost power."[32] Yet, Ms. Prescott filed an objection to the Motion without having filed a motion to terminate the abatement.

69.     As an initial matter, the Debtor respectfully submits that Ms. Prescott is not a party in interest in this chapter 11 case (and no evidence has been presented to the Court to the contrary despite 26 days having elapsed since the Prescott Motion was abated). Second, it is implausible

---

[31] *April 1 Hr'g. Tr.*, *In re Griddy Energy, LLC*, Case No. 21-30923 (MI) (Bankr. S.D. Tex. April 1, 2021) at pp.: 15:25, 16:1-5.

[32] *April 1 Hr'g. Tr.*, *In re Griddy Energy, LLC*, Case No. 21-30923 (MI) (Bankr. S.D. Tex. April 1, 2021) at p. 17:19-24.

that a retail energy provider, such as the Debtor is responsible in any way for alleged personal injury or property damage for the events stemming from the winter storm event. The Debtor provided its customers access to electricity at wholesale prices. The Debtor was not involved in the generation, transmission or physical distribution of electricity to its former customers and had no role whatsoever in the failure of the electricity grid to supply power to the people of Texas. Accordingly, there is no basis for any additional disclosure related to alleged tort claimants, and the Debtor respectfully requests that the Court overrule the Prescott Objection.

**WHEREFORE**, for the reasons set forth herein, the Debtor respectfully requests that the Court overrule the Objections, grant the relief requested in the Disclosure Statement Motion, and grant such other and further relief as is just or proper.

Dated: April 28, 2021

Respectfully submitted,

**BAKER BOTTS L.L.P.**

By: */s/ Robin Spigel*
Robin Spigel (admitted *pro hac vice*)
*Robin.Spigel@bakerbotts. com*
Chris Newcomb (admitted *pro hac vice*)
*Chris.Newcomb@bakerbotts. com*
30 Rockefeller Plaza
New York, New York 10012-4498
Telephone: (212) 408-2500
Facsimile: (212) 259-2501

– and –

David R. Eastlake
Texas Bar No. 24074165
*David.Eastlake@bakerbotts.com*
910 Louisiana Street
Houston, Texas 77002-4995
Telephone: (713) 229-1234
Facsimile: (713) 229-1522

***Proposed Counsel to the Debtor and Debtor in Possession***

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on April 28, 2021, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Robin Spigel*