**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **GRIDDY ENERGY LLC** | § | **Case No. 21-30923 (MI)** |
| **Debtor** | § | |
| | § | |

**MOTION TO LIFT ABATEMENT ORDER TO ALLOW TORT CLAIMANTS TO
PURSUE THEIR RESPECTIVE RIGHTS AND REMEDIES IN THIS
CHAPTER 11 CASE**

---

EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON **MAY 13, 2021 AT 9:00 AM** IN COURTROOM 404, 4TH FLOOR, 515 RUSK ST., HOUSTON, TX 77002. IT IS ANTICIPATED THAT ALL PERSONS WILL APPEAR TELEPHONICALLY AND ALSO MAY APPEAR VIA VIDEO AT THIS HEARING.

AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE ISGUR'S CONFERENCE ROOM NUMBER IS 954554.

YOU MAY VIEW VIDEO VIA GOTOMEETING. TO USE GOTOMEETING, THE COURT RECOMMENDS THAT YOU DOWNLOAD THE FREE GOTOMEETING APPLICATION. TO CONNECT, YOU SHOULD ENTER THE MEETING CODE "JUDGEISGUR" IN THE GOTOMEETING APP OR CLICK THE LINK ON JUDGE ISGUR'S HOME PAGE ON THE SOUTHERN DISTRICT OF TEXAS WEBSITE. ONCE CONNECTED, CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.

HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF THE HEARING. TO MAKE YOUR ELECTRONIC APPEARANCE, GO TO THE SOUTHERN DISTRICT OF TEXAS WEBSITE AND SELECT "BANKRUPTCY COURT" FROM THE TOP MENU. SELECT "JUDGES' PROCEDURES," THEN "VIEW HOME PAGE" FOR JUDGE ISGUR." UNDER "ELECTRONIC APPEARANCE" SELECT "CLICK HERE TO SUBMIT ELECTRONIC APPEARANCE." SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS, AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.

IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.

RELIEF IS REQUESTED FOR A DATE AFTER MAY 10, 2021 BUT NOT LATER THAN MAY 14, 2021.

---

TO THE HONORABLE MARVIN ISGUR, UNITED STATES BANKRUPTCY JUDGE:

NOW COMES Karen Prescott ("Movant") individually and on behalf of many similarly

situated customers of the Debtor suffering property damage or personal injuries who have engaged

common counsel with Ms. Prescott (collectively, the "Tort Claimant Customers")[1] arising from their respective relationships with Griddy Energy LLC and/or its affiliates, including non-debtor affiliates (collectively "Griddy"), and potentially arising derivatively from Griddy's relationships with third parties who failed to fulfill their obligations to Griddy, and files this Motion to Lift Abatement to Allow Tort Claimants to Pursue their Respective Rights and Remedies in this Chapter 11 Case, by separate motions, pleading, or claims before this Court ("Tort Claimants Rights and Remedies")[2] and would show as follows:

## I.
## PRELIMINARY STATEMENT

### A.    Posture

A hearing on Movant's *Emergency Motion for an Order Directing the United States Trustee to Appoint a Committee of Customer Claims Including Tort Claimant Customers* matter was initiated on April 1, 2021 (Docket #115). Shortly after the Court took up the Motion, the Court abated further proceedings and requested that additional information be provided relating to Movant's claim of damages for her personal injuries, including if she desired to pursue her request for a Tort Claimant Committee.

This Motion seeks specifically (1) to answer this Court's questions relating to tort claims against Debtor; (2) to vacate and lift the abatement order to allow the Tort Claimants to pursue their Tort Claimants Rights and Remedies; (3) to explain and support their state law right to do so;

---

[1]    Evaluation of whether disclosure of group membership and claims under Rule 9019 is underway.

[2]    Those Tort Claimants' "rights and remedies" include, but are not limited to, the following: (i) filing Tort Claimants' proofs of claims for property damages, business interruption, or personal injury; (ii) pursuing, if deemed advisable, the filed *Motion For An Order To the United States Trustee to Appoint a Tort Claimants' Committee*; (iii) seeking orders related to requiring the Debtor to notify all liability insurance carriers of the field and potential Tort Claims and to otherwise comply with any carrier's policy provisions regarding prompt notice of claims made; (iv) filing such requests for information or Bankruptcy Rule of Procedure 2004 examinations and subpoenas regarding insurance available to Tort Claimants; and (v) objecting to the Amended Plan provisions and the absence of disclosures, or the improper or misleading disclosures set out in the Debtor's Amended Disclosure Statement ("Tort Claimants' Rights and Remedies").

and (4) to do so by fully respecting this Court's order and jurisdiction to deal with those Tort

Claimants' Rights and Remedies as may be brought or pursued in this Court or otherwise.

### B.    Facts

There are presently 58 Tort Claimant Customers, including 16 who have personal injury,

property damage, and business loss claims.  Moreover, additional customers of Griddy who did

not engage common counsel with Movant may have asserted similar claims.  At present, known

losses include personal injury, property damage, and business losses as customers of Griddy

(which served as their "Retail Energy Provider" ["REP"]).

Movant believes the universe of similarly situated customers, including Tort Claimant

Customers, will grow substantially.

> [t]he Insurance Council of Texas (ICT) has said the storm 'may be the costliest
> winter weather event in the state's history.' Hundreds of thousands of claims are
> expected because of the storm, according to ICT spokesperson Camille Garcia.

*See* https://www.insurancejournal.com/news/southcentral/2021/02/18/601795.htm,   Ins. Journal,

Feb 15, 2021 [Judicial Notice]. More telling of the size and scope of the property damage Tort

Claimant Customers suffered is the just-released Federal Reserve Bank of Dallas's assessment of

Winter Storm Uri, which found:

> The power outages led to widespread damage to homes and businesses, foregone
> economic activity, contaminated water supplies and the loss of at least 111 lives.
> Early estimates indicate that the freeze and outage may cost the Texas economy
> $80 billion–$130 billion in direct and indirect economic loss.

*See* https://www.dallasfed.org/research/economics/2021/0415?utm_source=cvent&utm_medium

=email&utm_campaign=dfe. [Judicial Notice]. Likewise, substantial numbers of deaths and

personal injuries are reported:

> **Many Texans have died because of the winter storm. Just how many won't be known for weeks or months.**
>
> Across Texas, deaths related to the winter storm continued to mount this week amid freezing temperatures, widespread power outages and a scarcity of clean water. While there have been reports that dozens of deaths are tied to the storm in Texas, experts say the death toll is likely far larger. And it could be weeks or months before the true magnitude is known.

*See*,   https://www.texastribune.org/2021/02/19/texas-power-outage-winter-storm-deaths/,   TEX. TRIBUNE, Feb. 21, 2021 [Judicial Notice]. Thus losses asserted by Tort Claimant Customers and similarly situated persons may come to include wrongful death.

Over 50,000 customers relied on Griddy for power during the Storm. Yet Griddy now refuses to recognize that these customers have viable tort claims and refuses even to disclose the addresses of its customers and / or to notify these potential claimants that their tort claims against Griddy *could be discharged or otherwise impaired in this bankruptcy proceeding*[3].  The fact that there is not now, and may never be, any representative of tort claimants on any Official Committee in these Chapter 11 Cases makes proper notice to potential tort claimants that much more important.

### C.    Nature of Tort Claims

During the April 1, 2021 hearing, the Court explored the legal basis for Movant's tort claims based on property damages, business losses, or personal injury. This can and should be answered within the framework of non-bankruptcy (i.e., common-law, and statutory) tort concepts of duty, breach, and resulting harm. Movant's claim is based on Griddy's failure to fulfill various statutory and common law duties it owed to the Movant, other Tort Claimant Customers (and to thousands of similarly situated customers of Griddy), and Griddy's strict liability for to its failure

---

[3] The Amended Plan purports to discharge all tort claims (§ 12.03, Amended Plan) and enjoin all tort claimants from prosecuting their claims (§12.06 Amended Plan).

to warn its customers.

First, Griddy owed its customers a duty to warn under Texas law in the marketing of electricity. *See, e.g.*, *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 426 (Tex. 1997); *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 382 (Tex. 1995); *Houston Light & Power Co. v. Reynolds*, 765 SW2d 784, 785 (Tex. 1988); *Armstrong Rubber Co. v. Urquidez*, 570 S.W.2d 374, 376 (Tex. 1978). Under Texas law, it is well-established that product liability duties to warn extend to electricity. As the Texas Supreme Court has explained:

> Because it is a commodity that can be manufactured, transported, and sold like other goods, ***electricity is considered a product for strict liability purposes*** after it has been converted, as it had been here, to a form usable by consumers. Because it is a commodity that can be manufactured, transported, and sold like other goods, electricity is considered a product for strict liability purposes after it had been converted, as it had been here, to a form usable by consumers.

*Houston Light & Power Co. v. Reynolds*, 765 SW2d 784, 785 (Tex. 1988) (emphasis added).

Griddy therefore had a duty to warn its customers of the potentially life-threatening dangers within its knowledge, including the possibility and attendant dangers of its inability to provide electricity to its customers as a result of extreme weather conditions. These duties arose not just days before or during the February storm, but months and years before the storm, and Griddy's breach of those duties occurred not just days before or during the storm, but months and years before the storm.

It is also thoroughly established under Texas law that sellers owe buyers a duty to warn when their product or service may be restricted or withdrawn with life-threatening consequences when the risk of such restriction or withdrawal eludes the common perception of the product. *See Joseph E. Seagram & Sons, Inc. v. McGuire*, 814 S.W.2d 385, 387–88 (Tex. 1991). *Hanus v. Tex. Utils. Co.* 71 S.W.3d 874, 880 (Tex. App.—Ft. Worth 2002). In this case, there was no "common perception" among utility customers that the electricity they rely on for everyday use, and

especially in extreme weather conditions, was produced by unreliable power generating companies, transported by unreliable transmission and distribution companies, and overseen by an unreliable grid operator, and thus Griddy's ability to delivery electricity would be disabled when it was needed most—during a winter storm with several days of sub-freezing temperatures.

Whether Griddy's warning would have prevented the loss of power over the Texas electric grid is immaterial to its duty to warn. Indeed, the inability of the seller to forestall an injury lies at the heart of its duty to warn. Were it otherwise, strict liability law would be limited to design and manufacturing defects. Just like the warnings on ladders may not prevent an injury *if ignored*, but may if heeded, a warning exist to provide customers knowledge of unknown dangers—here, the danger of an extended loss of electricity in an extreme weather. Had Griddy warned its customers of this danger in advance of the extreme weather event, its customers would have had an opportunity to be prepared and protect themselves, whether through the acquisition of back-up power sources (especially important for customers who relied on electrically powered medical equipment), preparation of the home for extreme weather, back-up plans to tend to vulnerable relatives or relocate to safer circumstances, or any number of the various other protective measures consumers could have taken to protect themselves in the event of, and well in advance of, extended loss of power that Griddy knew could be caused by an extreme weather event.

In addition, Texas law further imposes duties on those who, like Griddy, voluntarily undertake to perform services for another, such as:

    a. when Griddy mandated that it be provided contact information for its customers so that it could issue "disconnection warnings,"

    b. when Griddy Energy did in fact "warn" its customers of summer potential rolling blackouts and service interruption, and

   c.   that entity must provide those services and provide them in a reasonable and prudent manner.

**D.    Analysis the Facts Giving Rise to the Griddy Duties**

After the extreme weather events over the past two decades, regulators advised Texas power generating companies that they needed to be better prepared for such events, [*See* ¶¶ 12, 13, Motion for Order to Appoint Tort Claimants' Committee]. The power generating companies did not heed that advice, but instead ignored the advice for profit. Thus, the power generating companies remained unreliable in "an extreme weather event"[4] which was by the regulators' and Griddy's own admissions not a "black swan" or "once in a century" event, but rather an anticipated, foreseeable, and expected event that needed to be dealt with ***before*** the forecast event.

Griddy knew or should have known which power generating companies (maybe all of them) were unreliable in extreme weather events even after the notice of deficiencies, notice of the likelihood of an extreme weather event, and notice of the advice given the industry by regulators in prior years.  Griddy nonetheless, with this knowledge, chose to buy power from these unreliable power generating companies to sell to Griddy's customers.  Griddy either should have chosen to buy power only from reliable power generating companies, OR Griddy should have warned its customers that Griddy was passing on power from unreliable power generating companies, whose ability to provide power could fail in "an extreme weather event" of freezing weather for more than 48 hours, or both.  Had Griddy warned its customers at the time those customers signed up for Griddy service and repeated those warnings in the months and weeks leading up to periods

---

[4]    *See, Terms of Service Agreement, attached hereto as Exhibit "A", at pg. 6* defining extreme weather emergency":

    "… (A) the previous day's highest temperature did not exceed 32 degrees Fahrenheit, and the temperature is predicted to remain at or below that level for the next 24 hours anywhere in the county, according to the nearest National Weather Service (NWS) reports …"

when extreme weather foreseeably hits, and repeated those warnings when Uri was forecast, those customers would have had ample time, or at a minimum sufficient time, to prepare for a life-threatening event in the various ways described above.

## II.
## GRIDDY'S DUTIES AND ABILITY TO COMPLY WITH SAME

### A.     Griddy Had Common Law and Regulatory Duties to Its Customers

Electric providers in Texas have an "obligation to serve" generally recognized as a "legal obligation to serve all comers on an equal basis. "*Hand v. Dean Witter Reynolds Inc.*, 889 S.W.2d 483, 494 (Tex. App. 1994)[5]  Because these providers perform a "proprietary function,"[6] each has liability for a "failure to follow prudent utility practice." *See, e.*g., *Mirant Peaker, LLC v. S. Md. Elec. Coop., Inc. (In re Mirant Corp.)*, Nos. 03-46590 (DML), 04-4073, 2005 Bankr. LEXIS 2309 (Bankr. N.D. Tex. Nov. 22, 2005).   In other words, Griddy has a legal duty to follow "prudent utility practices."

The TEX. UTIL. CODE. ANN. § 31.002(17) (2007) defines a REP as a person that *sells electric energy* to retail customers in this state but does not "own or operate generation assets." *Ellis v. Reliant Energy Retail Servs., L.L.C.*, 418 S.W.3d 235, 240 (Tex. App.—Houston [14th

---

[5]      "The *utility's obligation to serve* all customers in its certificated area obviously does not carry with it the kind of extra agreements made in the contract… the trial court correctly concluded the contract at issue was valid and the evidence is legally sufficient to support the trial court's implied finding that the contract encompassed non-utility "extras" …."]; *Sw. Pub. Serv. Co. v. Pub. Util. Com.*, 578 S.W.2d 507, 512 (Tex. Civ. App. 1979) ["…it was error to deprive Southwestern of its "vested … obligation to serve the area annexed by the City of Lubbock."]; *Hand v. Dean Witter Reynolds Inc.*, 889 S.W.2d 483, 494 (Tex. App. 1994) ["Brokers, despite the regulations to which they are subject are not public utilities with the legal obligation to serve all comers on an equal basis. They are permitted to exercise business judgment in the acceptance of clients and clients' orders."]; *Ball v. Texarkana Water Corp.*, 127 S.W. 1068, 1071 (Tex. Civ. App. 1910) [Public utilities have a public franchise. "The conferring of this privilege imposes upon it the obligation to serve the public in a reasonable way for a reasonable compensation … a public agency created to promote the public comfort and welfare…". *N. Belt 28.019, Ltd. v. Wildwood Constr.*, No. A14-88-00001-CV, 1989 Tex. App. LEXIS 1733, at *8 (Tex. App. June 29, 1989).

[6]      *Douglas Energy Relief Ass'ns (DERA) v. City of Douglas,* No. CV 510-083, 2012 U.S. Dist. LEXIS 124496, at *4 (S.D. Ga. Aug. 31, 2012) ("A publicly owned utility engaged in the service of providing gas and electricity to inhabitants is a 'Proprietary Function.'").

Dist.] 2013) (emphasis added).  *Ellis v. Reliant Energy* explains further the nature of the REP as a "seller" of the electric product and a service:

> 16 Tex. Admin. Code § 25.5(115) (2010) defines retail electric provider as a person that sells electric energy to retail customers in this state but may not own or operate generation assets.
> . . .
>
> Reliant claimed and acknowledged that it was '… a retail electric provider ("REP").'  *See … also* 16 Tex. Admin. Code § 25.5(115) (2010) (Pub. Util. Comm'n, Definitions) (defining "retail electric provider as "[a] person that sells electric energy to retail customers in this state" but "may not own or operate generation assets); 16 Tex. Admin. Code § 25.107 (2009) (Pub. Util. Comm'n, Certification of Retail Electric Providers (REPs)) (defining "retail electric provider" as "[a] person that sells electric energy to retail customers in this state").

*Id. Ellis* at 240.  Griddy sells a product coupled with a common service with duties and obligations that arise from its sale of a product and service, by common law, Restatement, and the Texas Utility Code.  As a seller, Griddy had several tort duties, as discussed above.

### B.    Griddy Was Fully Capable of Timely Disclosures of Service Interruptions and the Conditions of Such Interruptions

It is certain that many Texas consumers knew nothing about the vulnerabilities of the Texas energy "grid" before the winter storm of 2021, and that many Texans had no clue that whether or not they lived on the outer borders of the state, near the borders of Louisiana, New Mexico, or Oklahoma, would determine whether or not they might be subjected to long and extended power outages of the Texas energy grid, unlike their neighbors or persons in other counties who were on the "national" grid.

It can hardly be disputed that prior to the winter storm of 2021, virtually no Texas consumers actually understood or appreciated: (1) the roles and responsibilities of the various

entities involved in the energy generation, distribution and marketing[7] system; (2) the difference between a Retail Energy Provider such as Griddy ("REP") or a "Transmission and Distribution Utility ("TDU") such as Brazos, or an Independent System Operator ("ISO"); and/or (3) the entities making up the Texas energy generation and distribution which wore the multiple hats (such as Brazos). Nor should consumers be expected to understand these arcane intricacies of the grid.

By contrast, Griddy knew or should have known of these Texas energy grid vulnerabilities (high temperature-driven peak loads, generation scarcity issues, lack of adequate customer control/load shedding, unreliable energy generation and transmission, freezing-driven high peak loads) and their impacts (ERCOT's EEA protocols, leading up to potentially rolling outages), but failed to warn its customers at the outset of and during its relationship with its customers about the life safety/property damage implications of these vulnerabilities. REPs—including Griddy—can select which power generating companies the buy electricity from, and it was Griddy that knew or should have known of those power generating companies' unreliability in extreme weather conditions.

Of all the parties involved in generation, transmission, and distribution of electricity, it is REPs like Griddy that have direct communication with the end user, the Customer. Griddy had the duty to warn its customers of known vulnerabilities in the grid and dangerous events that would cause Griddy's product and service to fail. Griddy indisputably knew its ability to deliver its product could fail regularly with respect to summer heat,[8] which might be uncomfortable but not fatal for most customers and won't burst pipes, but Griddy did not warn its customers that winter freezing conditions could also lead to loss of power, which poses the risk both of life-threatening

---

[7]     To be strictly liable in tort, it is not necessary that the defendant actually sell the product, but only that he, like Griddy, be engaged in the business of introducing the product into channels of commerce. *See, e.g.*, *Darryl v. Ford Motor Company*, 440 S.W.2d 630 (Tex. 1969); *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787 (Tex. 1967).
[8]     *See, infra* § B and footnote 11 pg. 14.

hypothermia and property damage.  Armed with such advance warnings, Customer would have had ample opportunity in the preceding weeks, months, years to prepare for the Texas energy grid's failure.

Griddy had a duty to warn its customers of the grid's unreliability and vulnerabilities at the time those customers signed up to purchase Griddy's electricity and service as well as periodically during the customer relationship, particularly well in advance of the seasons of extreme weather that pose the most danger, and certainly long before Uri was forecast, as well as in the five plus days of forecasted freezing conditions before Uri arrived, and finally, during the storm when it quickly became clear that the "rolling outages" were, in truth, a grid of "non-essential" customers facing total, prolonged blackout.

Illustrating its role in the process, at least with respect to its customers, Griddy made representations to its customers that were posted on its website, https://www.griddy.com/legal, and within its *Terms Of Service Agreement*, attached hereto as Exhibit "A", in which it represents that Griddy was the entity that "provide[s] electric service to your home or business" by "arranging delivery" of their electricity through transmission and delivery lines:

> *LET'S GET STARTED*
>
> *Who is Griddy?*
> *Griddy is a retail electric provider, or "REP." We provide electric service to your home or business by purchasing power at the market rate and arranging delivery on transmission and distribution lines . . . .*

[*See, Terms of Service Agreement, at pg. 1.*] So, while Griddy Energy's role in delivering electricity into the homes and businesses of its customers is somewhat understood now that it has come under the bright lights of the national attention which the winter storm of 2021 has cast upon it, that role was far less understood prior to the storm, particularly considering the representations made by Griddy Energy itself within its *Terms of Service Agreement*.

To further cloud the picture to its customers, as to whether Griddy Energy had the ability to affect the supply of electricity to their home or business, particularly during an "extreme weather emergency," Griddy's *Terms of Service Agreement*, promises that Griddy Energy will "<u>not</u> interrupt or disconnect" it's customers electric service … during an extreme weather emergency, as defined by the Public Utilities Commission of Texas Substantive Rule 25.483(j)(1):

> **Under what circumstances can you interrupt**
> **or disconnect my service?**
> . . .
> *We will not interrupt or disconnect your electric service on weekend days,*
> *during any periods in which the mechanisms for payment specified to you in*
> *your PDS are unavailable or our call center is not operating, <u>or during an</u>*
> <u>*extreme weather emergency*</u>*, as defined in PUCT Substantive Rule 25.483(j)(1)*.[9]

*See, Terms of Service Agreement, attached hereto as Exhibit "A", at pg. 6* defining extreme weather emergency":

> "… (A) the previous day's highest temperature did not exceed 32 degrees Fahrenheit, and the temperature is predicted to remain at or below that level for the next 24 hours anywhere in the county, according to the nearest National Weather Service (NWS) reports …"

Notwithstanding this promise and representation made as their "sales pitch," Griddy knew or should have known that service could be interrupted during prolonged freezing weather as was predicted to occur in 2011 by several governmental agencies including PUC and FERC. [*See*, ¶¶ 11, 12 and 13, Movant's original Motion].

**C.    Griddy Had the Means to Warn its Customers of the Life-Threating Limitations of its Product and Services**

---

[9] PUCT Substantive Rule 25.483(j)(1) provides:
    (1)  The term "extreme weather emergency" shall mean a day when:
        (A) the previous day's highest temperature did not exceed 32 degrees Fahrenheit, and the temperature is predicted to remain at or below that level for the next 24 hours anywhere in the county, according to the nearest National Weather Service (NWS) reports; or
        (B)  the NWS issues a heat advisory for a county, or when such advisory has been issued on any one of the preceding two calendar days in a county.

Potentially more significant is the fact that as a term and condition of its relationship to its customers as set out in Griddy Energy's *Terms of Service Agreement*. Under that agreement, Griddy's customers were required to maintain current phone numbers and email addresses with Griddy so that it could, when and as it saw fit, "push" communications to those customers who specifically included, among other rate and payment related issues, a "disconnection warnings":

> COMMUNICATIONS
> **How will you communicate with me?**
> *To use Griddy's services, you are required to provide and maintain a valid email address and mobile phone number. We may communicate with you via email, phone, text message or app push notifications to relay important account information, such as payment confirmation, impending Recharge Amounts, payment failure, **and disconnection warnings**.* (Emphasis Added).

*See Terms of Service Agreement*, attached hereto as Exhibit "A" at pg. 8. With the contact information provided by its customers pursuant to its *Terms and Conditions of Service*, Griddy had the means to warn its customers of what it knew would happen in a prolonged winter freeze because it knew of the vulnerabilities of the Texas energy supply and distribution system.[10] Although such a warning would not have stopped the storm, its customers could have taken prophylactic measures in the years, months, weeks, and even days before the winter storm of 2021 to protect themselves, their property, and their businesses in the event of a prolonged power outage in a winter storm.

### III.
### WHAT GRIDDY SHOULD HAVE DONE: THE BASIS FOR THE CLAIMS AND CAUSES OF ACTION AGAINST GRIDDY ENERGY

> A.  **Griddy Had Specific Knowledge of the Dangers of a Prolonged Power Blackout**

---

[10]     In fact, there are examples from other REPs conveying emergency information from the TDUs, ERCOT, and others about the status of the outages, potential duration of the outages, and recommendations and tips for surviving without power.

While it is undisputed that Griddy had, due to its position as an integral member of the Texas energy distribution system with direct communication with both the power-generating companies it bought from and the end-user (its Customer) it sold to, unique knowledge directly relevant to the vulnerabilities of the Texas electricity distribution system and that system's inability to withstand the demands of winter storms prior to the winter storm of 2021, the full extent of Griddy's knowledge is as yet unknown. In a communication posted on its website following its bankruptcy filing, Griddy described the Texas power distribution system as "antiquated" and the Texas grid in need of "balancing." *See* https://www.griddy.com/. Because weather events that exposed the weaknesses of the grid have occurred repeatedly in the decades prior to February 2021, Griddy knew or should have known that the power-generating companies Griddy was contracting with had not heeded the lessons from those previous weather events. Griddy should therefore have warned its customers that the power it was buying from these generators could fail.

### B.    Griddy Knew it Had a Duty to Warn its Customers of Rolling Blackouts

It is beyond dispute that Griddy was well-equipped to warn of rolling outages as well as rolling blackouts—it previously did exactly that in warning its customers about summer heat and the stress on the grid.[11] Yet although Griddy went to great lengths to disclose and warn about summer heat, most people do not die if their air conditioner is temporarily shut off. They can easily travel (roads are not blocked or frozen) and seek alternative and temporary housing or simply deal with no electricity. But, not so for the winter storm. In a prolonged freeze without electric power, the entire population is put at risk because everyone's travel is restricted or prevented by freezing conditions, and anyone can die of hypothermia exposure unless protected.

---

[11] https://twitter.com/GoGriddy/status/1294051774005878784?s=20;
https://twitter.com/GoGriddy/status/1294052053266788352?s=20;
https://twitter.com/GoGriddy/status/1294052158715785219?s=20.

In an entry on its website, which appears to have been dated February 15, 2021, while its customers were in the grip of the 2021 Winter Storm, and many without the energy needed to operate computers or charge cell phones so as to receive email or text messages, Griddy posted the following "letter," which confirms that (1) it had been tracking the storm before it arrived in Texas, (2) it had known that the storm would be far worse than anticipated, (3) it knew that many in Texas would be especially vulnerable because of how structures are designed and constructed in Texas, (4) it knew this storm would "wreak havoc" and all that entails:

> ***Letter from Griddy about the storm and prices***
> *How Did We Get Here?*
> *We've been tracking the prices and the storm since late last week. <u>But on Thursday, we knew things were shaping up to be much worse</u>. ERCOT under-forecasted system load on Thursday by nearly 20%, caused largely by a weather forecast failure in Houston. ERCOT had forecasted temperatures in Houston to remain in the high 50s through most of the day on Thursday. Temperatures hovered around 40 through most of the day. This forecast failure meant that ERCOT had an insufficient generation plan for Thursday, which caused them to rely on fast-responding, expensive replacement generation to meet the higher actual system load caused by the cold temperatures. Real-time prices started spiking around 9am and the elevated pricing persisted through the day. Freezing temperatures also locked up wind turbine towers and spiked energy demand across Texas, according to the state grid operator.*
>
> *As soon as we could see that this storm, coupled with ERCOT's forecast errors, were going to wreak havoc and result in record-breaking price surges, we knew that many of our members wouldn't be able to reduce their energy consumption sufficiently ... particularly when Texas homes are not built for below-freezing temperatures.*

*See* https://www.griddy.com/post/letter-from-griddy-about-the-storm-and-prices.[12]   Incredibly, *after the fact*, Griddy instructed its customers on exactly what to do about their loss of power, suggesting two remedies for its consumers at a point when it was already too late and its consumers

---

[12]     This letter is again geared toward disclosure and warnings of financial exposure of the Customer and the cost aspects of the emergency situation. There is no communication about occupant health and safety in this emergency or who to seek information from about that, even though Griddy knew, or should have known, that the risk of a multi-day blackout had been predicted and was inevitable if freezing temperatures lasted more than 24 hours.

were cold and in the dark: (1) "please contact your utility company immediately"; and (2) it *suggested that its customers switch to a different electric service provider. Id*.

Whether these communications were public relations stunts, educational messages, or warnings relating to high energy demands as correspondingly high electric bills, Griddy's website contains numerous instructive and educational entries relating to ways in which Texas consumers, including its own customers, may take actions to keep their energy bills down. These entries include items such as the following February 11, 2021, entry, which Griddy posted at a time when it knew that a ferocious winter storm was about to 'wreak havoc" on the Texas power grid:

February 11, 2021
By: Morgan Harvey
### How to save energy in winter

What's the first thing people do when they wake up and it's freezing outside? They run their heater. They make coffee. They take a warm shower. They do what they can to wake up and stay warm, which can cause prices to spike during cold mornings in the winter.

When this happens it's good to remember how rare these occurrences are: prices spike over 6¢/kWh only 3.9% of the time.

It's also good to know prices spike during the same time in the winter, usually around 7-11 a.m. Here are some tips on what you can do around the house during price spikes. You'll save money and learn how to take advantage of the wholesale market.

**Tips to save on electricity in the winter: . . . .**

*See How to Save Energy in The Winter* (https://www.griddy.com/post/how-to-save-during-a-price-a-spike-winter-edition). What is noticeably missing from its communications and from its website, at least prior to the winter storm of 2021, was Griddy Energy's assessment of the vulnerability of the Texas grid to withstand high energy demands from freezing temperatures, and the need of its customers to prepare for sustained periods of time without electricity in their homes and businesses during freezing temperatures causing high energy demand due to the condition of the Texas grid. Remarkably, Griddy did frequently warn its customers of the need of its customers to prepare for

sustained periods of heat (far less potentially deadly than sustained periods of freezing weather). *See supra* notes 11, 12, 13.  Yet Griddy not only failed to warn its customers so they could prepare to protect their life and property but now claims it had no duty or obligation to do so and, according to Griddy, no liability for the loss of life and property.

Thus, Griddy customers' failure to warn claims include:

(1)     Griddy's failure to warn its customers far in advance of this storm of the vulnerabilities of the "grid" to a prolonged and widespread power outage in the event of severe winter storm, a fact known to the industry since 2011; and

(2)     Griddy's failure to warn its customers of the imminent threat that it knew that this particular storm posed to them when it became aware that the storm would be "worse than expected" and its knowledge that the storm was going to "wreak havoc" on the Texas electric system, which would have given its customers several days to prepare, coordinate with family, and make plans knowing that electric power would be out for potentially days; and

(3)      Griddy's failure to warn during the event of the ongoing threat/emergency so that days would not pass with anticipation of "power will be back on in a few hours." Roads were still passable for the most part on February 14 in Texas. Power went offline in the early morning hours of February 15. Griddy was aware of and warning customers of high demand *and anticipated high pricing* due to the storm as early as February 11, so days in advance of when things got bad, but there is no evidence of any communications conveying potential life-threatening conditions or potential for sustained blackouts.

Had Griddy provided any of these warnings to its customers, they could have taken steps on their own to protect themselves, their property, and their businesses if prolonged power outage were to occur, including at the very least:

(1)     acquiring small generators or other backup sources of energy which were not dependent on the grid for electricity, and which could have heated at least a small room for survival;

(2)     winterizing their homes or businesses so that the structures could withstand winter temperatures during a prolonged loss of power; and

(3)     making contingency plans to travel to a safe place before extreme weather events that threaten the grid, such as Uri, which was predicted in severity almost a week before the first freeze (just as evacuation plans are urged for obvious life-threatening weather such as hurricanes).

The options that would have been available to Griddy Energy customers to protect themselves had they been warned by Griddy of the facts known of the unreliable condition of the Texas grid in light of the predicted future storms and the actual forecast of the severity of this particular storm were countless, and range from long term solutions such as winterizing structures and acquiring power sources that do not depend on the Texas energy supply and distribution system, to very short term solutions such as buying candles and firewood, draining water pipes, and seeking refuge in to a safer place where power supplies did not depend on the Texas grid for electricity, such as, ironically, the coldest part of the State, the Texas Panhandle:



**C.**    **Griddy Denies That it Had Any Duty to Warn About Prolonged Freezing Conditions and Denies That Movant Even has a Remedy Against Griddy for Failure to Warn**

Importantly, now that Griddy is in Chapter 11, it claims that it had no duty to warn about these known facts, and no duty to even notify its customers of its position that its customers have no claims against Griddy. Consistent with this inequitable position in this Chapter 11 Griddy is keeping secret the contact information for this potentially huge class of creditors. And while refusing to acknowledge that a Tort Claimant may have claims, refusing to disclose the contract information for these customers, Griddy is swiftly moving its Chapter 11 Plan to Confirmation, and intends to discharge all such Tort Claims or otherwise impair such Tort Claims under its Chapter 11 Plan.[13]

**IV.**
**ARGUMENTS AND AUTHORITIES**

**A.**    **Griddy Energy Had A Recognized Legal Duty to Warn Its Customers**

---

[13]    The Amended Plan purports to discharge all tort claims (§ 12.03, Amended Plan) and enjoin all tort claimants from prosecuting their claims (§12.06 Amended Plan).

Initially, without addressing whether negligent misrepresentation claims may exist against Griddy arising from the statements that it made, and those it didn't make, in its Terms of Service Agreement, and in other communications which it directed to its customers, Karen Prescott and other Griddy customers who sustained property loss, business losses, and physical injuries during and as a result of the winter storm of 2021 have viable causes of action against Griddy which have been recognized under Texas law.

### 1.     Products Liability/Negligent Failure to Warn

First, it has been established under Texas law that, because it is a commodity that can be manufactured, transported, marketed, and sold like other goods, electricity is a "product" for strict liability purposes. *Houston Light & Power Co. v. Reynolds*, 765 SW2d 784, 785 (Tex. 1988). In Texas a product, such as electricity, may be defective in its manufacture, in its design or there may be a defect because of a failure to provide adequate warnings or instructions relative to that product. *Am. Tobacco Co. v Grinnell*, 951 SW2d 420 , 426 (Tex. 1997).

While Griddy may argue that the electricity to be provided was not in and of itself defective, the Texas law recognizes that a lack of adequate warnings and / or instructions can render an otherwise adequate product unreasonably dangerous and defective. *Caterpillar, Inc., v. Shears*, 911 SW2d 379, 382 (Tex. 1995); *Hanus v. Texas Utilities Co.,* 71 SW3d 874, 878-879 (Tex. App. – Ft Worth, 2002).

Specifically related to the facts and circumstances of the issues now before this Court, Subparts 4 and 5 of Section 82.003 of the *Texas Civil Practices and Remedies Code* define the elements of a cause of action against a "seller" of the product (electricity)  such as Griddy Energy, for its failure to issue adequate warnings about the electricity which was being provided under its agreement with its customers:

Sec. 82.003.   LIABILITY OF NONMANUFACTURING SELLERS.   (a) *A seller that did not manufacture a product is not liable for harm caused to the claimant by that product unless the claimant proves:*

> *. . . .*
>
> *(4)  that:*
>> *(A)   the seller exercised substantial control over the content of a warning or instruction that accompanied the product;*
>> *(B) the warning or instruction was inadequate;  and*
>> *(C)  the claimant's harm resulted from the inadequacy of the warning or instruction;*
>
> *(5)  that:*
>> *(A)  the seller made an express factual representation about an aspect of the product;*
>> *(B) the representation was incorrect;*
>> *(C)   the claimant relied on the representation in obtaining or using the product;  and*
>> *(D) if the aspect of the product had been as represented, the claimant would not have been harmed by the product or would not have suffered the same degree of harm; . . . .*

In addition to the elements of the causes of action defined in *Tex. Civ. Pract & Rem. Code, Section 82.003*, it is also the law of the State of Texas that where an entity such as Griddy Energy voluntarily undertakes to perform services for another, such as:

a.  where Griddy Energy mandated that it be provided contact information for its customers so that it could issue "disconnection warnings", and

b.  where Griddy Energy did in fact "warn" its customers of summer potential rolling blackouts and service interruption; and

c.  that entity must provide those services and provide them in a reasonable and prudent manner.

Karen Prescott has filed her proof of claim and other Griddy Energy customers who sustained physical injuries, property damage, and injuries to their businesses, will file, in good faith, their proofs of claims in this bankruptcy including claims that: (1) Griddy voluntarily undertook to

perform services (providing information and warnings about their electric service) that it knew or should have known were necessary for their protection, (2) Griddy Energy failed to exercise reasonable care in performing those services, and either (3) these customers relied upon the Griddy performance or (4)  Griddy's performance increased the plaintiff's risk of harm.  *See, Torrington Co., v. Stutzman*, 46 S.W.3d 829, at 837-838 (Tex. 2000); *Torres v. FCA US, LLC*, 2020 WL 1809835 (SD Tex., 2020).

      **B.**      **An Abatement of Any of the Tort Claimants Rights and Remedies is Neither Appropriate or Justified**

Although this Motion does not at this time seek a hearing on the prior motion for appointment of an additional creditors' committee of Tort Claimants, this Motion does seek to have the abatement lifted and permit the Tort Claimant Customers and similarly situated customers to exercise their Rights and Remedies as the core stakeholders in these Chapter 11 Cases that they are.

Continuance of the abatement creates risk of grave and irreparable injury to the interests of customers, given the Debtors' strategy to ignore customers while at the same time seeking to discharge their claims through misleading disclosures and without full and complete disclosures and due process.

The Official Committee of Unsecured Creditors presently appointed and serving in these Chapter 11 Cases (the "UCC") has no tort claimant members; by contrast, half the Official Committee members in the *other* "Texas freeze" case (*In re. Brazos Electric Cooperative*) are tort claimants.  This adds further to the need for the Tort Claimant Customers to have active standing and voice before this Court. The UCC's recently filed Objection to the Debtor's Amended Disclosure Statement, does not even mention tort claims (e.g. property damage or personal injury) and does not complain of the lack of meaningful disclosures regarding tort claims.

Griddy's schedules indicate that it has more than 50,000 customers, upon all of whom Griddy is seeking to obtain or impose a discharge of some or all of their claims.  If only 20% of the Griddy customers deprived of power suffered property damage, business interruption losses or personal injuries, there could be over 10,000 tort claimants, many of whom would be Tort Claimant Customers.  Because Griddy claims and started position is that as a class, no customer can have viable tort claims, and accordingly opposes any contact of these customers about their respective potential tort claims by this Chapter 11 process, there will be no communications, forwarding forms of proofs of claims for such injuries, and no due process for a recognized distinct class of creditors.

There are also certain issues that organized tort claimants are best positioned to lead, on their own or in collaboration with one or more Official Committees, including access to insurance coverage which may be limited to coverage for injuries that sound in tort.  (This is especially so given no member of the Official Committee of Unsecured Creditors as presently constituted [the "UCC"] is a tort claimant.)  If the Debtor fails to put its carriers on notice timely of these claims or therefore to pursue them properly, the value of that coverage could be forfeited to no one's benefit.

Without the ability to exercise their Rights and Remedies, Tort Claimant Customers are limited in, and perhaps in some cases prohibited from, effectively filing, and defending Proofs of Claim, file, and advocate for objections to solicitation procedures, Disclosure Statement adequacy or Plan confirmation.

To the extent of personal injury claims, the treatment, estimation, and liquidation or these claims is distinct from any other class of unsecured unliquidated claims.  Handling of tort claims must be wrapped in due process notice of the existence of these claims denied by the Debtor as

even existent, of full and fair disclosure of available insurance proceeds, and of the unique nature

of handling.

Personal injury claims can be liquidated only under 28 USC § 157(b)(5) by jury trial in the

District Court.  The Plan purports to discharge all tort claims (§ 12.03, Amended Plan) and enjoin

all tort claimants from prosecuting their claims (§12.06 Amended Plan) and the "Release"

furnished by a creditor releases not only "tort" claims, but also the right to assert a tort claim

against a liability policy in place.[14]  Disclosure of the existing and potential tort claimants and tort

claims is almost non-existent in the Amended Disclosure Statement.  The only disclosure of the

existence of substantial potential claims of property damage, business losses, and personal injuries

(i.e., "tort" claims) occurs in only on place in this misleading and deficient disclosure statement:

> ¶ C.    Prepetition Litigation
> The Debtor is involved in a number of lawsuits and other regulatory or
> government actions or investigations.
> - The Debtor is subject to two enforcement investigations by PUCT arising
>   from
>   alleged violations of PUCT regulations in 2019.
> - In addition, since the winter storm event in mid-February, the Debtor has
>   been
>   named as a defendant in (a) three civil actions filed by Griddy former
>   customers
>   alleging violations of the Texas Deceptive Trade Practices Act and other
>   torts; and (b) a civil action filed by the Attorney General of the State of
>   Texas, also alleging violations of the Texas Deceptive Trade Practices
>   Act. Each of these lawsuits is meritless.
> - The Debtor also is subject to a Civil Investigative Demand initiated by the
>   Attorney General of the State of Texas precipitated by the mid-February
>   winter storm event.  The Debtor was one of twelve electric industry

---

[14]      *See*, Amended Plan and Disclosure Statement:
§9.06 Insurance Preservation and Proceeds. ***Except with regard to Claims against the Released
Parties that are released hereunder***, nothing in the Plan shall diminish or impair the enforceability
of any insurance policy that may cover Claims against the Debtor or any related Person.
The Release required for an agreed exchange of billing liability is set out in §§ 12.07 and 12.10 of the Plan,
both sections providing for the release of all "tort" claims.  Yet there is no disclosure regarding the nature of
those potential claims or the nature of what a creditor is required to release.   Likewise, all tort claims are
discharged (§12.03 of the Amended Plan) and enjoined permanently (§12.06 of the Amended Plan).

market participants to receive a Civil Investigative Demand on February
19, 2021.

[*See*, Amended Disclosure Statement Pg. 38].  These statements are inaccurate and misleading,
furnishing no notice of the Tort Claimants efforts to be recognized as legitimate creditors of this
estate.

## V.
## RELIEF REQUESTED

Movant respects this Court's initial comments and concerns regarding the validity and
propriety of Movant's proof of claim (that is, the "Tort Claims") and Movant's request for a Tort
Claimant Committee, and deeply appreciates the willingness of this Court to allow Movant to
better explain and support the validity of her state law claims as valid and enforceable claims
against Griddy.  Movant believes that this Motion to Lift the Abatement addresses the Court's
concerns and further illustrates the threat to many potential claimants of having their claims
discharged without ever having notice in this bankruptcy regarding of the existence of those
potential tort claims before they are discharged.  The Committee's recently filed Objection to the
Debtor's Amended Disclosure Statement, does not even mention Tort Claims (e.g. property
damage or personal injury) and does not complain of the lack of meaningful disclosures regarding
Tort Claims.  Thus compliance by the Debtor of "adequate information" regarding the issue of
Tort Claims is absolutely necessary and vital to the Tort Claims Rights and Remedies, the absence
of which is a denial of due process and invites litigation on the discharge and injunctive relief that
normally follows confirmation of a Chapter 11 Plan.  All of this should be avoided by allowing
Tort Claimants to seek any Rights and Remedies with pre-judgment of the validity of Tort Claims
(especially concerns of frivolous claims) arising in this case from the conduct of this Debtor.

Accordingly, Movant respectfully requests that this Motion be granted, and that Movant receive such other and further relief as may be appropriate.

Dated: April 28, 2021

<div style="margin-left: 40%;">

Respectfully submitted,

 */s/ Shelby A. Jordan*
Shelby A. Jordan
Texas Bar No. 11016700
Fed Bar No. 2195
Jordan, Holzer & Ortiz, P.C.
500 N. Shoreline Blvd., Suite 900
Corpus Christi, Texas 78401
Telephone: (361) 884-5678
Facsimile: (361) 888-5555
sjordan@jhwclaw.com
Bankruptcy Counsel for
Karen Prescott

Sander L. Esserman
Texas Bar No. 06671500
Peter C. D'Apice
Texas Bar No. 05377783
**STUTZMAN BROMBERG ESSERMAN & PLIKFA**
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
Email: esserman@sbep-law.com
        dapice@sbep-law.com
Telephone: (214) 969-4900
Facsimile: (214) 969-4999

</div>

**State Court Counsel for Movants**
Larry F. Taylor, Jr.
Texas Bar No. 24071156
**THE COCHRAN FIRM**
3400 Carlisle St., Ste. 550
Dallas, TX 75204
Email: ltaylor@cochrantexas.com
Telephone: (214) 651-4260
Facsimile: (214) 651-4261

Mikal C. Watts
Texas Bar No. 20981820
**WATTS GUERRA LLP**
Four Dominion Drive
Bldg. 3, Suite 100
San Antonio, TX 78257
Email: mcwatts@wattsguerra.com
Telephone: (210) 447-0500
Facsimile: (210) 447-0501

Patrick A. Luff
Texas Bar No. 24092728
Matthew R. McCarley
Texas Bar No. 24041426
C. Bryan Fears
Texas Bar No. 24040886
N. Majed Nachawati
Texas Bar No. 24038319
**FEARS NACHAWATI, PLLC**
5473 Blair Road
Dallas, TX 75231
Email: pluff@fnlawfirm.com
        mccarley@fnlawfirm.com
        fears@fnlawfirm.com
        mn@fnlawfirm.com
Telephone: (214) 890-0711
Facsimile: (214) 890-0712

Jerrold S. Parker
New York Bar No. 1894666
*Pro hac vice application to be filed*
Raymond Silverman
New York Bar No. 3033743
*Pro hac vice application to be filed*

Melanie Muhlstock
New York Bar No. 2858900
*Pro hac vice application to be filed*
Nicholas F. Morello New Jersey Bar No. 322572020
*Pro hac vice application to be filed*
**PARKER WAICHMAN LLP**
6 Harbor Park Drive
Port Washington, NY 11050
Email: jerry@yourlawyer.com
rsilverman@yourlawyer.com
mmuhlstock@yourlawyer.com

nmorello@yourlawyer.com
Telephone: (516) 723-4629
Facsimile: (516) 723-4729

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that notice of the filing of this document has been served on the below named parties by available knowledge by the Court's CM/ECF system on April 28, 2021.

Jamil N Alibhai on behalf of Creditor ERCOT
jalibhai@munsch.com, atellez@munsch.com

Karen Hope Beyea-Schroeder on behalf of Creditor Charles Huppert
karen.schroeder@rburnettlaw.com

Karen Hope Beyea-Schroeder on behalf of Creditor Thomas Clark
karen.schroeder@rburnettlaw.com

Jason B. Binford on behalf of Interested Party Public Utility Commission of Texas
Jason.binford@oag.texas.gov

Riley Burnett on behalf of Creditor Charles Huppert
rburnett@rburnettlaw.com

Riley Burnett on behalf of Creditor Thomas Clark
rburnett@rburnettlaw.com

Kevin Chiu on behalf of Debtor Griddy Energy LLC
kevin.chiu@bakerbotts.com

Shawn M Christianson on behalf of Creditor Buchalter, a Professional Corporation
schristianson@buchalter.com, cmcintire@buchalter.com

Jeffrey R Cox on behalf of Interested Party Bernice Willman
jcox@slmpc.com

David Robert Eastlake on behalf of Debtor Griddy Energy LLC
david.eastlake@bakerbotts.com

James Ryan Fowler on behalf of Creditor Lisa Sandifer Khoury
rfowler@potts-law.com, pcolburn@potts-law.com

James Ryan Fowler on behalf of Plaintiff Lisa Khoury
rfowler@potts-law.com, pcolburn@potts-law.com

Charles R Gibbs on behalf of Creditor Committee Official Committee Of Unsecured Creditors
crgibbs@mwe.com, dnorthrop@mwe.com;cgreer@mwe.com

Tara L Grundemeier on behalf of Creditor Harris County, et al.
houston_bankruptcy@publicans.com

John Lawrence on behalf of Debtor Griddy Energy LLC
john.lawrence@bakerbotts.com, jessica.aquino@bakerbotts.com

John Lawrence on behalf of Defendant Griddy Energy LLC
john.lawrence@bakerbotts.com, jessica.aquino@bakerbotts.com

John Lawrence on behalf of Defendant Griddy Holdings LLC
john.lawrence@bakerbotts.com, jessica.aquino@bakerbotts.com

Kevin M Lippman on behalf of Creditor ERCOT
klippman@munsch.com, pmoore@munsch.com

Christopher R. Newcomb on behalf of Debtor Griddy Energy LLC
chris.newcomb@bakerbotts.com, jacob.herz@bakerbotts.com

Kelli S. Norfleet on behalf of Creditor Macquarie Energy LLC
kelli.norfleet@haynesboone.com, kenneth.rusinko@haynesboone.com

Kelli S. Norfleet on behalf of Creditor Macquarie Investments US Inc.
kelli.norfleet@haynesboone.com, kenneth.rusinko@haynesboone.com

Rachel Ruth Obaldo on behalf of Interested Party State of Texas
bk-robaldo@oag.texas.gov, sherri.simpson@oag.texas.gov

Deborah Michelle Perry on behalf of Creditor ERCOT
dperry@munsch.com

Michael Alan Rosenthal on behalf of Interested Party Luminant Energy Company LLC
MBischoping@gibsondunn.com;kmatorana@gibsondunn.com

Jonathan Rubenstein on behalf of Defendant Griddy Energy LLC
jonathan.rubenstein@bakerbotts.com

Jonathan Rubenstein on behalf of Defendant Griddy Holdings LLC
jonathan.rubenstein@bakerbotts.com

Bruce J Ruzinsky on behalf of Creditor Texas-New Mexico Power Company
bruzinsky@jw.com, msalinas@jw.com;kgradney@jw.com;dtrevino@jw.com

Abigail R. Ryan on behalf of Interested Party State of Texas
Abigail.Ryan@oag.texas.gov

Robin Spigel on behalf of Debtor Griddy Energy LLC
robin.spigel@bakerbotts.com

Stephen Douglas Statham on behalf of U.S. Trustee US Trustee
stephen.statham@usdoj.gov

US Trustee
USTPRegion07.HU.ECF@USDOJ.GOV

Jana Smith Whitworth on behalf of U.S. Trustee US Trustee
jana.whitworth@usdoj.gov

 

                                           */s/ Shelby A. Jordan*
                                           Shelby A. Jordan