UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GRIDDY ENERGY LLC,[1] | ) | Case No. 21-30923 (MI) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**DECLARATION OF MICHAEL FALLQUIST IN SUPPORT OF
DEBTOR'S OMNIBUS REPLY IN SUPPORT OF (I) CONDITIONALLY
APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT;
(II) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH
RESPECT TO CONFIRMATION OF THE PLAN; (III) APPROVING THE
FORM OF VARIOUS BALLOTS AND NOTICES IN CONNECTION THEREWITH;
AND (IV) APPROVING THE SCHEDULING OF CERTAIN DATES IN
CONNECTION WITH CONFIRMATION OF PLAN**

I, Michael Fallquist, hereby declare as follows under penalty of perjury:

1. I am the Chief Executive Officer of Griddy Energy LLC (the "Debtor"") and I have served in my current role since December 4, 2020. Prior to my appointment in my current role, I was the Chief Executive Officer of Crius Energy LLC until the business was acquired in July 2019. I hold a Bachelor of Arts degree in economics from Colgate University and a Master of Business Administration degree from Cornell University.

2. I submit this declaration (this "Declaration") in support of the Debtor's *Omnibus Reply in Support of (i) Conditionally Approving the Adequacy of the Disclosure Statement; (ii) Approving the Solicitation Procedures and Notice Procedures with Respect to Confirmation of the Plan; (iii) Approving the form of Various Ballots and Notices in Connection Therewith; and (iv) Approving the Scheduling of Certain Dates in Connection with Confirmation of Plan* (the

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its federal tax identification number, is Griddy Energy LLC (1396). The mailing address for the Debtor is PO Box 1288, Greens Farms, CT 06838.

"Reply") and in response to the *Objection of the Official Committee of Unsecured Creditors to the Debtor's Motion for Entry of an Order: (i) Conditionally Approving the Adequacy of the Disclosure Statement; (ii) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Plan; (iii) Approving the Form of Various Ballots and Notices in Connection Therewith; and (iv) Approving the Scheduling of Certain Dates in Connection with Confirmation of Plan* [Docket No. 187] (the "Committee Objection"). I am authorized to submit this Declaration on behalf of the Debtor.

3. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, my opinion based upon experience, knowledge and information concerning the Debtor's operations and financial condition, or my discussions with the Debtor's advisors. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4. Attached hereto as Exhibit 1 is a chart setting forth responses to inaccurate factual allegations made by the Official Committee of Unsecured Creditors in the Committee Objection. I have reviewed the chart and am familiar with its contents. Each of the responses set forth in the "Truth" column of the chart are true and correct to the best of my knowledge, information and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: April 27, 2021

/s/ *Michael Fallquist*
Michael Fallquist
Chief Executive Officer
Griddy Energy LLC

2

**Exhibit 1**

**Factual Inaccuracies Chart**

| *Committee Distortion* | *Truth* |
|---|---|
| **Timing of Plan Process** | |
| "[T]he Committee generally favors a fast-tracked plan process . . ." ¶ 1<br><br>"One week prior to filing this objection, the Committee requested that the Debtor continue the disclosure statement hearing to a later date. The Debtor declined to do so." ¶ 3 n. 3. | On April 18, 2021, the Committee requested a 12-week adjournment of the hearing on conditional approval of the Disclosure Statement. *See* Reply, Exh. C  Because a request for a 12-week extension is not reasonable under the circumstances here, in light of, among other things, the limited funds in the Estate, the Debtor would not agree to the request. *See* Reply, Exh. D.<br><br>On April 22, 2021, the day before objections to the conditional approval of the Disclosure Statement were due, the Committee asked for a two-week extension of the hearing date. In light of, among other things, the limited funds in the Estate, the Debtor would not agree to the request. *See* Reply, Exh. D. |
| "The Debtor has not provided any persuasive justification for expedited consideration. Instead, expedited consideration appears primarily motivated by an attempt to avoid scrutiny by the Committee and other parties in interest in this Chapter 11 Case." ¶ 38. | The proposed schedule for consideration of the Plan is not expedited. The Debtor filed the Plan and Disclosure Statement on the first day of the case, March 15, 2021. On March 26, 2021, the Debtor filed and served notice that a hearing would be held on the Motion on April 29, 2021. The objection deadline was set for April 23, 2021 at 4:00 p.m. (CDT), which was 28 days from the date that the notice was filed. *See* Docket No. 80.<br><br>The proposed timing for objections to confirmation of the Plan would be an additional 33 days following the hearing on the Disclosure Statement or a total of 79 days after the Plan was originally filed. The Committee would have 60 days from the date of its formation to formulate objections to the Plan.<br><br>The Debtor has extremely limited resources, which will be consumed by administrative expenses of the Chapter 11 Case if a |

| *Committee Distortion* | *Truth* |
|---|---|
|  | Plan is not confirmed in June. *See* Reply, Exh. D. There is simply no money to sustain the Committee's scorched-earth, kitchen-sink baseless litigation strategy, especially when it is seeking to retain counsel and a financial advisor each paid on an hourly basis (the Debtor does not have a financial advisor). |
| **Cooperation with Discovery Requests** |  |
| "Of the approximately 7,000 pages of documents produced, only a single document discusses the assets and operations of the Non-Debtor Affiliates, and only in a cursory manner. . . Notably, despite the Committee's request, the Debtor has not produced documents that identify all of the former or current directors and officers of each Non-Debtor Affiliate." ¶ 13.<br><br>"Perhaps most concerning about the Debtor's lack of cooperation is its reluctance to produce information related to the Non-Debtor Affiliates, all of whom are receiving releases under the proposed plan." ¶ 3. | On April 22, 2021, the Debtor completed its production to the Committee with respect to each and every one of the requests in the 2004 Notices that were not subject to dispute. *See* Docket No. 17. In total, the Debtor produced 2,686 documents and the production spans over 7,266 pages.<br><br>The Debtor has produced all responsive documents in existence that are relevant to its relationship with the Non-Debtor Affiliates. But there are very few such documents because there is not a significant relationship. *See* Reply ¶¶ 15-22. The Debtor also made its Chief Executive Officer, Michael Fallquist, available for a call with the Committee's advisors specifically to discuss the Non-Debtor Affiliates. The Debtor also made its officers available for a call with the Committee's financial advisors in part, to discuss the Non-Debtor Affiliates. The Debtor has also provided informal discovery based on the requests of the Committee's proposed financial advisor. In short, the Committee has the information it needs to assess any purported claims it believes the Debtor may have against the Non-Debtor Affiliates. *See Debtor and Non-Debtor Affiliates' Reply in Support of Motion to Quash and for a Protective Order* filed concurrently herewith. |

2

| *Committee Distortion* | *Truth* |
|---|---|
| | In any event, the Debtor has narrowed the definition of "Released Parties" in the Disclosure Statement to exclude former directors and officers of the Debtor and the Non-Debtor Affiliates and has narrowed the period in which the Debtor Release applies to December 4, 2020 through the Effective Date. *See* Plan §§ 1.96 & 12.07(a). |
| "The Debtor formalized this position by moving to quash certain requests by the Committee related to the Non-Debtor Affiliates." ¶ 3. | The Committee could have sought informal discovery from the Debtor in the first instance but instead chose to serve the Debtor with overly-broad formal discovery under Bankruptcy Rule 2004. [Docket No. 165-1] (the "First Notice"). The First Notice requested that the Debtor complete its production in six days by April 14, 2021. On April 9, 2021 the Debtor informed the Committee that the Debtor "intend[s] to object to certain of the Committee's Bankruptcy Rule 2004 requests," that it was not waiving its rights to object by producing documents on a rolling basis and that "[w]e are working to start production as soon as today." See Reply, Exh. E. From April 9 through April 13, 2021, the Debtor made three productions to the Committee. *See* Committee Objection ¶ 17.<br><br>Pursuant to Local Rule 2004-1(f), the Debtor was required to file a motion to quash within 7 days to the extent it objected to any part of the request. On April 14, 2021, the Debtor filed the *Debtor and Non-Debtor Affiliates' Motion to Quash and For a Protective Order* [Docket No. 165] (the "Motion to Quash"). In the Motion to Quash, the Debtor objected to the requests relating to the Non-Debtor Affiliates because, among other reasons, the 2004 Notices "call for documents wholly unrelated to the Debtor or the administration of the estate and exceed the scope of permissible discovery pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure" *See* Motion to Quash, p. 3. However, the |

3

| *Committee Distortion* | *Truth* |
|---|---|
| | Debtor noted that the Motion to Quash was being filed to "preserve [the Debtor and Non-Debtor Affiliates] rights but [they] will continue to work cooperatively with the Committee to resolve these issues by agreement." *See id.* <br><br> Counsel for the Committee indicated on a call with counsel for the Debtor on April 16, 2021 that it believed the discovery disputes could be resolved consensually and that the parties should abate consideration of the Motion to Quash. It continued in communications with the Debtor's counsel to express this belief and the parties agreed to submit a stipulation abating consideration of the motion to quash. However, the day that the Committee filed its objection, it made an abrupt about face without providing any rationale for the change demanding that the Debtor schedule the Motion to Quash for the hearing on the Disclosure Statement. The Committee clearly wanted to manufacture a dispute in order to bolster its unsubstantiated theory that something untoward has occurred between the Debtor and its Non-Debtor Affiliates. |
| "In order to fulfill this critical role, some level of cooperation from the Debtor is required. The Debtor's proposed Plan timeline simply does not allow for any meaningful input from the Committee." ¶ 29. | The original versions of the Plan and Disclosure Statement were filed on the Petition Date. The Committee was appointed on March 31, 2021 notwithstanding that no general unsecured creditors sought to be members of the Committee. At the request of the Committee members, counsel for the Debtor spoke to the Committee members the following day on April 1, 2021 to discuss the case and the Plan. The Committee retained counsel on or around April 5, 2021, and counsel for the Debtor sought to have and had calls with Committee counsel right away. Counsel for the Debtor and counsel for the Committee have worked cooperatively on several matters that have arisen in this case. |

| *Committee Distortion* | *Truth* |
|---|---|
| | The Debtor's counsel shared a term sheet of proposed Plan revisions with the Committee's counsel on April 6, 2021, but never received comments from Committee counsel.<br><br>The Debtor understands that the Committee wants to try and create additional value for creditors, but value cannot be created where it does not exist. The value in this case is preserving assets, minimizing professional fees and pursuing causes of action against ERCOT and other parties that contributed to the destruction of the Debtor's business. |
| **This Case is Being Run Solely to Benefit Directors and Officers** | |
| "Based on additional information the Committee has learned, two things have become clear: (i) the Debtor's directors and officers are running this Chapter 11 Case primarily for their own benefit; and (ii) the directors and officers intend to use the technology owned by Griddy Technologies to continue the Debtor's business after this Chapter 11 Case concludes." ¶ 40. | The Chapter 11 Case is not being run for the benefit of the directors of Griddy Holdings and the officers of the Debtor.<br><br>The Debtor is being liquidated. That the directors and the officers will continue to develop and grow separate and distinct businesses from the Debtor is not relevant to the Debtor's wind down. Nor does it create claims and causes of action where none exists. The Debtor believes it does not have any viable claims for substantive consolidation, viable preference or fraudulent transfer claims, or viable claims for breach of fiduciary duty against the Released Parties. *See* Disclosure Statement Art. IV § D(a).<br><br>Griddy Tech is a separate and distinct business from the Debtor. The Debtor never owned the technology and intellectual property assets of Griddy Tech. Rather, the Debtor licensed the technology from Griddy Tech for use in its business pursuant to a licensing agreement. *See* Reply ¶ 19. |

5

| *Committee Distortion* | *Truth* |
|---|---|
| | As part of additional disclosure, the Disclosure Statement now includes a section describing the December 4, 2020 business combination and the Debtor's ownership structure. *See* Disclosure Statement, Article IV, § B. |
| "The Committee's investigation has revealed that the Debtor's remaining employees are devoting significant time to customer outreach, consumer services, and attempting to convince ERCOT not to revoke the Debtor's license to supply electricity. The Debtor has no operating business, and thus these services of course cannot and will not benefit the Debtor's estate in any way." ¶ 42. | The Committee's unsupported assertions are simply wrong. The Debtor continues to receive inquiries from its former customers regarding the status of their accounts, the Chapter 11 case/claims process and similar issues. The Debtor's employees are actively attempting to assist customers to the extent possible. There is no active outreach other than to provide former customers information regarding, and facilitate their participation in, the Chapter 11 Case. This is being done for the benefit of the Debtor's former customers, not the officers, directors and equity holders.<br><br>ERCOT has no involvement in licensing retail electric providers ("REP"). The Debtor's management and advisors have been in discussions with Public Utility Commission of Texas ("PUCT") with respect to a variety of issues relating to the fallout from the winter storm event including the PUCT's petition to revoke the Debtor's REP license dated March 2, 2021. There is nothing inappropriate about such discussions and it neither detracts from this case nor materially impacts the assets of the Estate. |
| "The Debtor is also seeking to retain the services of a corporate PR firm, which would similarly provide no benefit to a liquidating debtor with no business operations. The only potential beneficiaries of these rehabilitative actions are the reputations of the Debtor's directors and officers." ¶ 42. | The public relations professional to which the Committee is referring, Sitrick and Company ("Sitrick"), has assisted the Debtor in communicating with its customers and combatting misinformation reported in the public domain that, among other things, may have confused customers. The Debtor believes such |

6

| *Committee Distortion* | *Truth* |
|---|---|
| | services are valuable to its stakeholders and benefits the Debtor's estate. |
| | This is not a run-of-the-mill case. The Debtor is high profile and reported on in the public media often. Customers in particular read the headlines and draw conclusions. Sitrick provides expert communications services. Notwithstanding that the Debtor believes that Sitrick provided valuable services, in light of objections received from the Committee and the Attorney General for the State of Texas, the Debtor has agreed to cease using the services of Sitrick as of the date the objections were filed and will be submitting an order approving its motion to retain professionals in the ordinary course that would allow for Sitrick to be retained from the Petition Date to April 19, 2021 (the date of the objection to its retention was filed), which would allow it to be compensated for the services it has provided to date in amount that is approximately $11,000 after application of its retainer. |
| | The Committee's objection to the retention of Sitrick has now been resolved. The Debtor will be submitting an order to the Court. |

| *Committee Distortion* | *Truth* |
|---|---|
| **Directors' and Officers' Purported Conflict** | |
| "The Disclosure Statement simply states that the Debtor 'believes' it has no claims or causes of action against any of the Released Parties . . . . This statement bears little weight given the inherent conflicts of the Debtor's management, which is proposing the Plan." ¶ 18. | The board of directors of Griddy VI Holdings LLC has a seasoned former bankruptcy professional as its independent manager. *See* Reply ¶ 45.<br><br>The Disclosure Statement has been further revised to include additional disclosure regarding the bases for the Debtor Release. The Committee can choose not to believe the Debtor's statements, but the Debtor believes that there are no viable claims for substantive consolidation, no viable preference or fraudulent transfer claims, and no viable claims for breach of fiduciary duty. *See Reply* ¶¶ 31-35. The Committee can choose to ignore the truth, but it does not turn the truth into a lie. |
| "Despite the lack of information provided by the Debtor regarding the Non-Debtor Affiliates and their respective directors and officers, it is clear that the Debtor is controlled by directors and officers that have significant equity interests in the Non-Debtor Affiliates. For example, Michael Fallquist, the Debtor's CEO, Christian McArthur, the Debtor's COO, and Roop Bhullar, the Debtor's CFO, each have significant interest in Griddy VI Series A Holdings LLC, a company that indirectly owns 100% of the equity in the Debtor and six of the Non-Debtor Affiliates. As such, these officers are not independent." ¶ 34. | *See* Reply ¶¶ 15-21. There is no dispute that the Debtor's officers are officers of the other Griddy group entities, which is typical in almost any corporate group situation, and they own a majority of the economic interests in the Griddy group. That does not mean they are hopelessly conflicted. The Committee wants this Court to infer that there are hidden claims or causes of action. But there is not a scintilla of evidence to support this claim. The Debtor's books and records, and information in the Chapter 11 case filings and information produced to the Committee and its advisors, support that there are no claims or causes of action. Despite the Committee's complaints, there are very few documents related to Non-Debtor Affiliates and the Debtor because there are no or few business transactions by and among such parties.<br><br>And, regardless of the purported value of Griddy Tech's technology and intellectual property assets, which the Committee highlights, those assets were never the Debtor's assets. A |

8

| *Committee Distortion* | *Truth* |
|---|---|
| | substantive consolidation claim cannot be made on the basis of a license agreement between Griddy Tech, a payment by Griddy Tech to the Debtor of $10,000 (which was made on the day of closing of the business combination to ensure that the Debtor did not have a technical default immediately under the Macquarie Agreements) and overlapping officers.<br><br>The Debtor's officers, who indirectly own a majority of the Debtor, contributed substantial cash and other property to the Griddy group as part of the December 4, 2020 business combination. In addition, approximately $▇ million in new capital was contributed to Debtor as part of the business combination transaction from its prior and current parent companies. Those investments have been lost as a result of the winter storm event, the extreme pricing and related events.<br><br>Other than the Debtor and certain equity holders that were affiliated with the Debtor prior to the business combination, all of the non-operating holding companies in the Griddy group were newly created in connection with the December 4, 2020 business combination transaction. All transfers from the Debtor are listed in the Debtor's Statement of Financial Affairs and Schedules of Assets and Liabilities; the salaries of the officers are listed therein and in the Debtor's monthly operating report. Those funds invested by the officers were spent to acquire the Debtor and fund its working capital needs.<br><br>The Committee has no basis to sue the officers, as officer, managers or equity holders.<br><br>Further, as discussed below, the Board has an independent director who was heavily involved in the formulation of the |

9

| *Committee Distortion* | *Truth* |
|---|---|
| | Debtor's Plan, including the release provisions set forth therein. *See* Reply ¶ 45. |
| "Similarly, Greg Craig, the Debtor's former CEO, Nicholas Bain, the Debtor's Executive Chairman and co-founder, and EDF Trading North America, LLC also have significant equity interests in Griddy VI Series A Holdings LLC. Accordingly, the Debtor and the Non-Debtor Affiliates are controlled by the same group of conflicted directors and officers." ¶ 35. | Similarly, there is no dispute that the former CEO of the Debtor and the Board of Griddy Holding's chairman and co-founder, and EDF have equity interests in both the Debtor and Non-Debtor Affiliates, but the Committee fails to state what makes them conflicted. Are they conflicted because the Committee wants them to be? The answer is no. |
| "There is no evidence that the Debtor was independent of these conflicted officers at any time. The bankruptcy petition was signed by Roop Bhullar." ¶ 36.<br><br>"The Debtor has not provided any evidence that there were arm's-length negotiations (or any negotiations, for that matter). The results are self-evident: each of the parties who control the Debtor is being released." ¶ 37. | The Debtor's indirect parent, where the Board sits, hired an independent consulting firm during the winter storm event, and the independent consultant from that firm, Mr. Paul Aronzon, was appointed as the independent director on the Petition Date. Mr. Aronzon, who is a seasoned former bankruptcy professional, was specifically designated to focus on the Texas winter storm impacts and the restructuring of the Debtor. Mr. Aronzon has no ownership interest in the Debtor nor any of its Non-Debtor Affiliates, refuting the notion that all of its directors were interested. Mr. Aronzon was heavily involved in the formulation of the Debtor's Plan, including the release provisions set forth therein. *See* Reply ¶ 45.<br><br>In any event, it is nonsensical to say that the Chief Financial Officer of the Debtor should not have signed the bankruptcy petition. The Committee does not even articulate the basis for any claims against the officers, managers or equity holders. It just continues to say the officers are conflicted because the Plan provides for their release as part of the Debtor Release. |

10

| *Committee Distortion* | *Truth* |
|---|---|
| **Investigation of Claims** | |
| "The Committee understands that the Debtor has conducted little or no investigation of potential claims against the Released Parties. This is of course unsurprising given that the Debtor's directors and officers are hopelessly conflicted and intertwined with the Non-Debtor Affiliates." ¶ 1.<br><br>"Perhaps more importantly, the Debtor does not affirmatively state that it has actually investigated whether it has claims against the Released Parties." ¶ 18. | The Debtor, with the assistance of counsel, analyzed the information in its possession to determine whether there were any potential claims or causes of action the Debtor might have with respect to the Released Parties. As stated in the Disclosure Statement, the Debtor believes it has no viable causes of action against any of these parties. *See* Disclosure Statement, Article II, § D. |
| **Purported Claims** | |
| "The Debtor may have claims against: (i) Macquarie, including avoidance, preference, fraudulent transfer, marshalling, and other contract, tort, or equitable claims; (ii) the Non-Debtor Affiliates, including substantive consolidation, claims related to intercompany transactions and agreements, and claims related to the Business Combination; and (iii) the current and former directors and officers for breach of fiduciary duties regarding their conduct in relation to Winter Storm Uri or the Business Combination. These claims must be investigated." ¶ 21. | The Committee fails to provide a single fact or circumstance that supports why it believes the Debtor may have the claims listed. Nor does it point to a single authority that indicates that the Debtor must list and dismiss every cause of action that could theoretically exist. *See* Reply ¶ 31.<br><br>The Debtor is not doing anything to stop the Committee from investigating claims. Based on the Debtor's proposed timeline, which fully complies with the notice requirements under the Bankruptcy Rules, more than 10 weeks will have passed from the formation of the Committee before the confirmation hearing. This is more than sufficient time for an investigation that covers a single debtor with no remaining business operations and a limited set of disclosed interactions with the Released Parties. |

| *Committee Distortion* | *Truth* |
|---|---|
| "The Debtor may have claims against: (i) Macquarie, including avoidance, preference, fraudulent transfer, marshalling, and other contract, tort, or equitable claims . . ." ¶ 21.<br><br>"Notably, no representation is made regarding transfers between mid-February and the Petition Date, the specific time period within which the Debtor paid almost $15 million to Macquarie." ¶ 22. | The Debtor, with advice of its counsel, has analyzed its 4-month prepetition relationship with the Prepetition Secured Lenders, the perfection of their security interests and transfers made over the life of the facility. Based on that analysis, the Debtor believes that all transfers were normal course transfers related to the purchase of energy or the financing of purchases of energy and does not believe it has any viable causes of action against such parties. The Debtor has added additional clarifying disclosure with respect to the Prepetition Secured Lenders in the Disclosure Statement. *See* Disclosure Statement, Article II § D(a).<br><br>The Debtor provided the Committee with the Macquarie Agreements and lien searches conducted prior to the Petition Date on April 9, 2021, the day after receiving the Committee's Bankruptcy Rule 2004 request and, thereafter, on April 16, 2021, provided correspondence between the Debtor and the Prepetition Secured Lenders. The Committee has had all of the information it needs with respect to the Prepetition Secured Lenders for weeks and the perfection analysis should be straightforward given that the Debtor's only asset is cash in its bank accounts and claims against third parties such as ERCOT related to the winter storm event and extreme pricing. *See Reply* ¶ 32.<br><br>The Committee has provided no theory or other indication of why it believes any claims against the Prepetition Secured Lenders "may" exist. The Committee is free to investigate further to the extent it feels the need to do so, but its unsupported suppositions provide no basis for delaying solicitation. |

| *Committee Distortion* | *Truth* |
|---|---|
| "The Debtor may have claims against: . . . (ii) the Non-Debtor Affiliates, including substantive consolidation, claims related to intercompany transactions and agreements . . ." ¶ 21. | The Committee's invocation of substantive consolidation, without articulating a single basis warranting such an extreme remedy, is irresponsible and designed solely to imply a justification for its scorched-earth litigation strategy. The Debtor and the Non-Debtor Affiliates have always maintained corporate formalities and separate financial statements. The Debtor's assets are clearly identifiable and maintained separately from those of the Non-Debtor Affiliates and no creditor has ever been led to believe that the Debtor and any Non-Debtor Affiliate are the same entity or own any of the other's assets. In fact, the Prepetition Secured Lenders required a guaranty from such entities, demonstrating a belief on their part that the entities and their assets were wholly distinct. |
| "The Debtor may have claims against . . . the current and former directors and officers for breach of fiduciary duties regarding their conduct in relation to Winter Storm Uri . . ." ¶ 21. | The Committee has not articulated a single theory under which the directors and officers could be said to have breached their fiduciary duty. The Debtor, with advice of counsel, has analyzed such claims, discussed same with the independent director, and determined that no viable claims exist. |
| "Likewise, because the claims against the Released Parties may include preferences and voidable transactions, the "actual or projected realizable value from recovery of [those claims]" must be disclosed. . . . The Debtor states that "no such [preference and fraudulent transfer] claims related to transfer made prior to [mid-February 2021] would exist" because the Debtor was solvent at the time. Disclosure Statement, Exhibit B, 4. Notably, no representation is made regarding transfers between mid-February and the Petition Date . . . ." ¶ 22. | The Debtor, with advice of its counsel, has analyzed payments made to any Released Parties within the time frame between mid-February and the Petition Date and the preference period more generally. It has determined that no viable causes of action exist with respect to any transfers to the Released Parties. Potential causes of action with regard to transfers to all other parties during the preference period will be retained by the Liquidating Debtor and may be pursued by the Plan Administrator. *See* Plan § 7.1. |

| *Committee Distortion* | *Truth* |
|---|---|
| **Business Combination Disclosure and Purported Claims** | |
| "The Debtor may have claims against: . . . the Non-Debtor Affiliates . . . related to the Business Combination" ¶ 21. | There was nothing nefarious about the business combination. To the contrary, the combination resulted in approximately $▮ million of new capital being available to the Debtor, all of which was either spent on behalf of the Debtor or remains in the estate today. *See* Reply ¶¶ 15-21. |
| "This transformative event (the "Business Combination") is written off with a single carbon copy sentence in the Disclosure Statement. This is not an adequate description of the pre-bankruptcy events. The Debtor was founded in 2016 and the Debtor would have creditors believe that nothing from 2016 through 2020 is relevant to the eventual bankruptcy petition." ¶ 27. | The business combination occurred when the Debtor was solvent and is not relevant to this case other than for the fact that the new owners and management were the ones that had to address the winter storm event and the fallout therefrom.<br><br>However, the Debtor has added a detailed description of the business combination to the Disclosure Statement. *See* Disclosure Statement, Article IV § B. |
| **Non-Debtor Affiliates** | |
| "The First Day Declaration does not provide any additional information regarding the Business Combination or the Non-Debtor Affiliates." ¶ 8. | As required under the Bankruptcy Rules, the Debtor filed a corporate ownership statement that disclosed all corporate entities that directly or indirectly owned 10% or more of the Debtor's equity interests. *See* Chapter 11 Petition [Docket No. 1].<br><br>In any event, the Reply and the Disclosure Statement now contain a discussion regarding the December 4, 2020 business combination and the Non-Debtor Affiliates. *See* Disclosure Statement, Article V, § B. |
| "As an initial matter, the Committee and its professionals found it puzzling and suspect that Griddy Technologies, an obligor and pledgor under the Macquarie credit agreement, did not file for | The Committee does not provide any explanation regarding why an entity must also file bankruptcy when an affiliate with common ownership does so. The Debtor is the primary obligor under the |

14

| *Committee Distortion* | *Truth* |
|---|---|
| bankruptcy protection with the Debtor. These two entities have identical ownership and management, and Griddy Technologies licenses its technology to the Debtor (for free)." ¶ 41. | Prepetition Lender Agreements and had an overwhelming amount of liabilities asserted against it relative to its limited assets and lack of operations as of the Petition Date. Moreover, the Debtor's Prepetition Secured Lenders are oversecured based on their properly perfected security interests in the Debtor's bank accounts and cash. <br><br>Even if Griddy Tech had filed for bankruptcy, the Debtor's creditors would not be entitled to distribution of its assets. |
| "As discussed in more detail below, the Committee recently learned that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓" ¶ 9. <br><br>"The Committee's brief investigation has revealed that ▓▓▓▓▓▓▓▓▓▓▓▓" ¶ 40. <br><br>"Notably, ▓▓▓▓▓▓▓▓▓▓▓▓" ¶ 3. | A non-Griddy entity owned certain technology prior to the business combination, and this entity was renamed and became Griddy Tech as part of the business combination. Prior to the business combination transaction, all technology and intellectual property assets that were used by the Debtor were owned by the prior parent of the Debtor, and such assets were transferred to Griddy Tech in connection with the business combination. *See Reply* ¶ 19. <br><br>▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ |

| *Committee Distortion* | *Truth* |
|---|---|
|  | ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. The net result of the business combination was the availability of approximately $██ million in new capital for the Debtor, plus a revolving credit line. The fact that a sister subsidiary owns other assets and its own line of business does not mean that the Debtor or its creditors would be entitled to share in the value of those assets, absent a successful substantive consolidation claim. As noted above, the facts for such a claim simply do not exist here.<br><br>Griddy Tech is a separate company from the Debtor and the Debtor has never owned Griddy Tech's assets. Rather, prior to the transaction, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ |
| "Of the approximately 7,000 pages of documents produced, only a single document discusses the assets and operations of the Non-Debtor Affiliates, and only in a cursory manner." ¶ 13. | The Debtor has produced responsive documents that are relevant to its relationship with the Non-Debtor Affiliates. Any documents of the Non-Debtor Affiliates that do not relate directly to the Debtor have no relevance to the Chapter 11 Case and are therefore not subject to proper discovery. The Debtor has posited no theory on which such documents could possibly be relevant to the Debtor's liquidation. |

16

| *Committee Distortion* | *Truth* |
|---|---|
| **Sale of Customer List** | |
| "[T]he Debtor has made clear to the Committee that it is adamantly opposed to even *exploring* a potential sale of the Debtor's customer list. The Debtor's customer list is a valuable asset. Based on the Committee's professionals' prior experience with restructuring retail electricity providers, the Committee is confident that competitors would purchase the list, thereby maximizing value to the Debtor. The Committee sees no legitimate reason why the Debtor would forgo such a sale process." ¶ 43. | The Debtor currently has no customers and all of its former customers have been receiving electricity from another provider for at least two months. The Debtor's management team has more than 40 combined years of experience in the retail energy business. Based on this extensive experience and the nature of customer relationships in the deregulated Texas electricity market, the Debtor does not believe that a list of former residential customers has material value and the costs required to retain a consumer privacy ombudsman as well as market and consummate a sale of the Debtor's list of former customers would exceed the proceeds of such a sale.<br><br>Additionally, the Debtor represented to its customers that it would not sell their data to third parties. To do so without their consent would be antithetical to one of the purposes of this Chapter 11 Case, which is to provide customers with relief from their debts to the Debtor and closure on their relationships with the Debtor. |