**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| GRIDDY ENERGY LLC,[1] | § | Case No. 21-30923 (MI) |
| | § | |
| Debtor. | § | **Re: Docket No. 24** |
| | § | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
THE DEBTOR'S MOTION FOR ENTRY OF AN ORDER: (I) CONDITIONALLY
APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT;
(II) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH
RESPECT TO CONFIRMATION OF THE PLAN; (III) APPROVING THE FORM OF
VARIOUS BALLOTS AND NOTICES IN CONNECTION THEREWITH; AND
(IV) APPROVING THE SCHEDULING OF CERTAIN DATES IN CONNECTION
WITH CONFIRMATION OF PLAN**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 bankruptcy case (the "Chapter 11 Case") of Griddy Energy LLC (the "Debtor") hereby submits this objection (the "Objection") to the *Debtor's Motion for Entry of an Order: (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures With Respect to Confirmation of the Plan; (III) Approving the Form of Various Ballots and Notices in Connection Therewith; and (IV) Approving the Scheduling of Certain Dates in Connection with Confirmation of Plan* [Docket No. 24] (the "Motion").[2] In support of this Objection, the Committee respectfully states as follows:

---

[1]    The last four digits of the Debtor's federal tax identification number are 1396. The mailing address for the Debtor is PO Box 1288, Greens Farms, CT 06838.

[2]    Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Motion.

## PRELIMINARY STATEMENT

1.      The Debtor has made clear its intention to move this Chapter 11 Case forward swiftly, with or without the Committee's support. Although the Committee generally favors a fast-tracked plan process, the Debtor's lack of cooperation with the Committee thus far is troubling and raises serious concerns about whether the Plan has been proposed in good faith. These concerns are amplified given the broad releases contemplated under the Plan in favor of (i) at least fourteen different affiliates of the Debtor (the "Non-Debtor Affiliates"), (ii) all former and current directors and officers of the Debtor and the Non-Debtor Affiliates, and (iii) Macquarie (collectively, the "Released Parties"). The Committee understands that the Debtor has conducted little or no investigation of potential claims against the Released Parties. This is of course unsurprising given that the Debtor's directors and officers are hopelessly conflicted and intertwined with the Non-Debtor Affiliates.

2.      Approximately one week after its appointment, the Committee began sending document and information requests to the Debtor under Bankruptcy Rule 2004. These requests were designed to assist the Committee in investigating the released claims on an expedited basis. Almost immediately after serving these requests, the Debtor made clear its belief that there are no claims against the Released Parties and that a plan needs to be confirmed immediately because this case is a "melting ice cube." To say that this case is a melting ice cube is to say that every bankruptcy case is a melting ice cube. "While the Debtor[] apparently believe[s] that it is in [its] best interests to confirm [its] proposed Chapter 11 plan quickly, the same could be said for almost every debtor." *In re Meldrum*, No. 19-14084, 2019 Bankr. LEXIS 3427, at *6 (Bankr. D. NV. Oct. 5. 2019). This is a liquidating chapter 11 case in which the Debtor has no business operations. In short, nothing is melting.

3.          Perhaps most concerning about the Debtor's lack of cooperation is its reluctance to produce information related to the Non-Debtor Affiliates, all of whom are receiving releases under the proposed plan. The Debtor formalized this position by moving to quash certain requests by the Committee related to the Non-Debtor Affiliates. The Debtor is apparently of the view that no one should be permitted to investigate anything related to the Non-Debtor Affiliates, including potential claims for substantive consolidation. Notably, Non-Debtor Affiliate Griddy Technologies LLC, an obligor and pledgor under the Macquarie credit agreement, owns technology that Griddy appears to have valued at at least ███████ in December 2020.

4.          The Debtor voluntarily sought protection under chapter 11. If the Debtor wants to continue in chapter 11 and confirm a plan, it must cooperate with the Committee and provide sufficient time for the Committee to review and comment on the proposed Plan and Disclosure Statement and investigate the propriety of the Debtor and third-party releases. If the Debtor feels compelled to move forward with the Plan process before the Committee can complete its review or investigation, then it must, at a minimum, remove the broad releases from the Plan so that a plan administrator or liquidation trust can later evaluate those claims on an appropriate timeline.[3]

5.          For these reasons and the others set forth below, the Motion should be denied.

**BACKGROUND**

6.          On March 15, 2021 (the "Petition Date"), the Debtor commenced this Chapter 11 Case and filed the *Plan of Liquidation for Griddy Energy LLC Under Chapter 11 of the Bankruptcy Code* and the *[Proposed] Disclosure Statement for Plan of Liquidation for Griddy Energy LLC Under Chapter 11 of the Bankruptcy Code*. Docket Nos. 1, 23, 24.

---

[3]    One week prior to filing this objection, the Committee requested that the Debtor continue the disclosure statement hearing to a later date. The Debtor declined to do so.

7.     On April 19, 2021, the Debtor filed the *Amended Plan of Liquidation for Griddy Energy LLC Under Chapter 11 of the Bankruptcy Code* (the "Plan") and the *[Proposed] Disclosure Statement for Amended Plan of Liquidation for Griddy Energy LLC Under Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement"). Docket Nos. 175, 176. The Plan proposes to release any and all claims against the Released Parties held by the Debtor or by third parties (subject to opt-out). Plan, 37–38.

8.     On the Petition Date, the Debtor filed the *Declaration of Michael Fallquist in Support of the Debtor's Chapter 11 Petitions and First Day Relief* [Docket No. 21] (the "First Day Declaration"). The First Day Declaration provides that ownership of the Debtor was purchased by the current ownership group in a transaction that closed on December 4, 2020 (the "Business Combination"). First Day Declaration, ¶ 23. The First Day Declaration does not provide any additional information regarding the Business Combination or the Non-Debtor Affiliates.

9.     Attached hereto as **Exhibit A** is an organizational chart produced by the Debtor (which was not attached to the First Day Declaration). Notably, Griddy Technologies LLC ("Griddy Technologies"), Griddy Pro LLC, and Griddy Holdings LLC are obligors under the Macquarie credit agreement. Macquarie also has an all-asset pledge of collateral from Griddy Technologies and Griddy Pro LLC under the credit agreement. As discussed in more detail below, the Committee recently learned that Griddy Technologies owns valuable technology worth at least ██████, as evidenced by ████████████████████████ ████████ in favor of ██████████████████████████████ ██████ which contributed the assets.

10.     On March 31, 2021, the United States Trustee for Region 7 appointed the Committee. Docket No. 116. On April 6, 2021, the Committee retained the undersigned counsel as its proposed bankruptcy counsel. On April 14, 2021, the Committee retained Province as its proposed financial advisor. Since its appointment, the Committee has informally and formally requested information from the Debtor necessary to investigate a number of issues related to the Plan.

11.     On April 14, 2021, the Debtor filed the *Debtor and Non-Debtor Affiliates' Motion to Quash and for a Protective Order* [Docket No. 165] (the "Motion to Quash"), seeking to quash any examination of the Non-Debtor Affiliates and to limit the examination of the Debtor.

12.     The Debtor's counsel has confirmed that it does not represent the majority of the Non-Debtor Affiliates and has not responded to the Committee's request to provide counsel or other contact information for those entities.

13.     As detailed below, the Debtor has produced certain documents and engaged in limited discussions with the Committee and its advisors.

| Date Produced | Bates Range | Notes |
|---|---|---|
| 4/9/2021 | GRIDDY_0000001 – GRIDDY_0000584 | Credit Agreement documents; Intercompany Agreements; Debtor Org. Docs; Lien search |
| 4/10/2021 | GRIDDY_0000585 – GRIDDY_0000890 | Customer Contracts; Insurance Policies |
| 4/13/2021 | GRIDDY_0000891 – GRIDDY_0000959 | ERCOT Agreements |
| 4/16/2021 | GRIDDY_0000960 – GRIDDY_0000986 | Macquarie Communications related to Winter Storm Uri |
| 4/19/2021 | GRIDDY_0000987 – GRIDDY_0005153 | Emails from 1/1/2021 through Petition Date |
| 4/21/2021 | GRIDDY_0005154 – GRIDDY_0007257 | Emails from 1/1/2021 through Petition Date |
| 4/22/2021 | GRIDDY_0007258 – GRIDDY_0007266 | Macquarie Shifting Control Notice |
| 4/23/2021 | n/a | Responses to Province informal requests |

Of the approximately 7,000 pages of documents produced, only a single document discusses the assets and operations of the Non-Debtor Affiliates, and only in a cursory manner.[4] Notably, despite the Committee's request, the Debtor has not produced documents that identify all of the former or current directors and officers of each Non-Debtor Affiliate.

14.     On April 20, 2021, Province met with the Debtor's management team to discuss a number of topics. Throughout the meeting, the Debtor's counsel repeatedly objected to any questions related to the Non-Debtor Affiliates. After further discussions on this issue, the Debtor finally offered to allow the Committee to have a 30-minute discussion with the Debtor's CEO to discuss the Non-Debtor Affiliates. This call was held on April 22, 2021, but significant questions relating to the Non-Debtor Affiliates remain unanswered.

---

[4]     The Debtor produced a large number of documents on the day of the Committee's objection deadline. Accordingly, the undersigned counsel's review of these documents remains ongoing.

## THE DISCLOSURE STATEMENT DOES NOT PROVIDE
## "ADEQUATE INFORMATION"

15.     Under Bankruptcy Code section 1125, the proponent of a chapter 11 plan must provide holders of impaired claims and interests entitled to vote on the plan "adequate information" regarding that plan. "Adequate information" means information that is "reasonably practicable" to permit "informed judgment." *In re Divine Ripe, L.L.C.*, 554 B.R. 395, 401-02 (Bankr. S.D. Tex. 2009) (*citing In re Metrocraft*, 39 B.R. 567 (Bankr. N.D. Ga. 1984)).

16.     Disclosure is "pivotal" in chapter 11, and Bankruptcy Code section 1125 is designed to "protect creditors from a debtor who may be trying to hide assets." *Westland Oil dev. Corp v. MCorp Management Solutions, Inc.*, 157 B.R. 100, 103 (S.D. Tex. 1993). "A claim with potential is a potential asset. The creditors have a right to know what the debtor's assets are even though the potential may be contingent, dependent, or conditional." *Id.* If the Debtor has causes of action, whether actual or potential, the Bankruptcy Code requires disclosure. *Id.*

## I.     The Disclosure Statement Lacks Adequate Information Regarding Released Claims.

17.     The Plan contemplates broad releases from the Debtor in favor of (i) at least 14 different affiliates of the Debtor, (ii) all current and former directors and officers, and (iii) Macquarie. Plan, 35–36. Although the Committee is moving as quickly as possible to evaluate the merits of potential claims against the Released Parties, the investigation is in its early stages. Moreover, the Committee's requests for critical information necessary to evaluate the claims may ultimately need to be adjudicated by this Court, further delaying the Committee's efforts. *See* Motion to Quash. The Debtor cannot push the Plan forward with broad releases on the Debtor's desired timeline while simultaneously hampering the Committee's discovery efforts and denying the Committee the time it needs to complete its investigation.

18.     The Committee is not aware of any meaningful investigation conducted by the
Debtor into claims against the Released Parties. The Disclosure Statement simply states that the
Debtor "believes" it has no claims or causes of action against any of the Released Parties.
Disclosure Statement, 19–20. This statement bears little weight given the inherent conflicts of
the Debtor's management, which is proposing the Plan. Perhaps more importantly, the Debtor
does not affirmatively state that it has actually *investigated* whether it has claims against the
Released Parties. Regardless of what the Debtor has investigated to date, the Committee has a
fiduciary obligation to investigate the Released Parties and intends to do so.

19.     Although the "adequate information" test is flexible, there is an "irreducible
minimum." *See Official Committee of Unsecured Creditors v. Michelson*, 141 B.R. 715, 718
(Bankr. E.D. Ca. 1992). The court in *Michelson* held that:

> The availability of discovery to objectors does not mean that the plan proponent
> can pass off the burden of disclosing adequate information. Inquiry notice is
> antithetical to reorganization procedure. It is inappropriate to require that others
> presume that they are being misled . . . The purpose to the disclosure process is to
> obviate, not necessitate, independent investigation before agreeing to a
> reorganization.

*Id.* at 719. Furthermore, "[t]he doctrine of *caveat emptor* has no application to reorganizations
[and] [t]he proponent should be biased towards more disclosure than less. *Id.* at 720.

20.     If the Plan releases claims, the Disclosure Statement must disclose the merits of
those claims on an informed basis. *Bank of N.Y. v. Becker (In re Lower Bucks Hosp.)*, 488 B.R.
303, 321 (E.D. Pa. 2013) *affirmed by In re Lower Bucks Hosp.*, 571 Fed. Appx. 139 (3d Cir.
2014) ("the Bankruptcy Court found that the disclosure statement did not provide the
Bondholders with information about the merits of value of the potential claims against BNYM in
the class action that they would be relinquishing. Consequently, the Bondholders could not
evaluate whether the benefits of the proposed plan outweighed what they would give up")

(internal citations omitted); *In re Source Enters.*, No. 06-11707, 2008 Bankr. LEXIS 940, at *18 (Bankr. S.D.N.Y. Mar. 27, 2008) ("conditional approval of the amended disclosure statement was unwarranted because relevant information regarding valuation, third party releases and the treatment of unsecured creditors had not been provided").

21.     The Debtor may have claims against: (i) Macquarie, including avoidance, preference, fraudulent transfer, marshalling, and other contract, tort, or equitable claims; (ii) the Non-Debtor Affiliates, including substantive consolidation, claims related to intercompany transactions and agreements, and claims related to the Business Combination; and (iii) the current and former directors and officers for breach of fiduciary duties regarding their conduct in relation to Winter Storm Uri or the Business Combination.[5] These claims must be investigated.

22.     Likewise, because the claims against the Released Parties may include preferences and voidable transactions, the "actual or projected realizable value from recovery of [those claims]" must be disclosed. *Metrocraft Pub. Services, Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984). The Debtor states that "no such [preference and fraudulent transfer] claims related to transfer made prior to [mid-February 2021] would exist" because the Debtor was solvent at the time. Disclosure Statement, Exhibit B, 4. Notably, no representation is made regarding transfers between mid-February and the Petition Date, the specific time period within which the Debtor paid almost $15 million to Macquarie. Additionally, fraudulent transfer laws cover transfers made "with actual intent to hinder, delay, or defraud any creditor," regardless of solvency. *See, e.g.*, Texas Uniform Fraudulent Transfer Act, Tex. Bus. & Com. Code § 24.005.

23.     The Disclosure Statement does not provide any information regarding the merits or value of the claims that will be released by the Debtor and third parties. Accordingly, the

---

[5]     The Committee reserves all rights to assert any other claim against the Released Parties and any other person. Nothing contained herein shall be deemed a waiver or limitation of such rights.

Disclosure Statement does not meet the "irreducible minimum" and should not be conditionally approved.

## II.   The Disclosure Statement Lacks Adequate Information Regarding Released Parties.

24.   The Plan contemplates releases in favor of:

(a) the Debtor, (b) the Committee and its members, (c) the Prepetition Secured Lenders and the Collateral Agent, and (d) each of such parties' respective predecessors, successors, assigns, subsidiaries, affiliates, including the Non-Debtor Affiliates, owners, and each of their respective current and former officers, directors, employees, managers, members, principals, shareholders, agents, advisors and professionals (including any attorneys, consultants, financial advisors, investment bankers and other professionals retained by such Persons) or other representatives, each in their capacities as such, together with their successors and assigns;

Plan, 11. The list of Released Parties is so broad that it is impossible for the Committee (or any creditor) to determine who is being released. Additionally, the list of Non-Debtor Affiliates in the Plan is *inclusive*, not *exclusive*, and thus it is possible that the Plan releases claims against parties that are not identified.

25.   As an example, the Disclosure Statement identifies seven Non-Debtor Affiliates. Disclosure Statement, 4 n. 2. Yet, the interested parties list prepared by Baker Botts for its retention application identifies fourteen "5% or More Direct Equity Holders" and "Affiliates and/or Indirect Equity Holders." *See Declaration of Robin Spigel in Support of Debtor's Application for Entry of an Order Authorizing Retention and Employment of Baker Botts L.L.P. as Counsel to the Debtor Effective as of the Petition Date* [Docket No. 134, Exhibit B, Schedule 1]. Thus, the Plan's release provision would appear to release all fourteen Non-Debtor Affiliates (and others that have not been disclosed anywhere in this Chapter 11 Case), notwithstanding the fact that only seven are identified in the Disclosure Statement.

26.   Because the Disclosure Statement does not provide information sufficient for creditors to determine who the Plan proposes to release, it does not contain adequate information.

III.   **The Disclosure Statement Lacks Adequate Information Regarding the Business Combination.**

27.     Among the types of information that should be included in a disclosure statement is "the events which led to the filing of the bankruptcy petition." *Metrocraft*, 39 B.R. at 568. The Debtor discloses that "[i]n a transaction closed on December 4, 2020, the ownership of the Debtor was sold to a new ownership group and a new management team, including myself as CEO, was appointed." First Day Declaration, ¶ 23. This transformative event (the "<u>Business Combination</u>") is written off with a single carbon copy sentence in the Disclosure Statement. This is not an adequate description of the pre-bankruptcy events. Disclosure Statement, 39. The Debtor was founded in 2016 and the Debtor would have creditors believe that nothing from 2016 through 2020 is relevant to the eventual bankruptcy petition.

28.     Furthermore, the Plan proposes to release the current and former directors and officers of the Debtor, presumably including the directors and officers prior to the Business Combination. It is not possible for a creditor to evaluate whether the Debtor has any claims against the Released Parties dating to before the Business Combination, whether there are any claims relating to the Business Combination, or even the identities of the directors and officers of the Debtor prior to the Business Combination. Additionally, despite requests for information by the Committee, the Debtor has not yet provided sufficient information regarding the Business Combination or the commonality of equity owners and management pre- and post-Business Transaction. For this reason as well, the Disclosure Statement does not contain adequate information.

IV.   **The Debtor's Lack of Cooperation is Preventing the Committee From Fulfilling its Fiduciary Duties.**

29.     One of the most important functions of an unsecured creditor's committee is to "negotiate with the debtor in possession in the formulation of a plan," *In re Arkansas Company*

*Inc.*, 798 F.2d 645, 649 (3d Cir. 1986), and to "represent and protect the interests of the unsecured creditors in the plan negotiation process and throughout the entire bankruptcy case." *In re ABC Auto. Prods. Corp.*, 210 B.R. 437, 441 (Bankr. E.D. Pa. 1997). In order to fulfill this critical role, some level of cooperation from the Debtor is required. The Debtor's proposed Plan timeline simply does not allow for any meaningful input from the Committee.

## V.   Conditional Approval of the Disclosure Statement Should be Denied.

30.     The Committee recognizes that the April 29 hearing is for *conditional* approval of the Disclosure Statement, and that the Disclosure Statement will be subject to final approval at a later date. Nonetheless, "conditional approval of a Chapter 11 disclosure statement is discretionary and remains the exception rather than the rule." *Meldrum*, 2019 Bankr. LEXIS 3427, at *5–6. As discussed above, the Disclosure Statement is fatally flawed. These flaws are fundamental, cannot be saved by minor alterations, and reflect the Debtor's cavalier attitude to both its disclosure obligations under the Bankruptcy Code and its fiduciary duties. The Court should not conditionally approve the Disclosure Statement and permit the Debtor to incur significant solicitation expenses only to ultimately deny approval of the Disclosure Statement on a final basis. *See, e.g.*, *Source Enters.*, 2007 Bankr. LEXIS 4770, at *2 (requiring resolicitation after rescinding conditional approval but recognizing that doing so would result in additional costs).

## THE PLAN CANNOT BE CONFIRMED

31.     In addition to the foregoing disclosure statement objections, there are a number of issues that render the plan unconfirmable.[6] "[I]t is well settled that a bankruptcy court may disapprove a disclosure statement . . . if there is a defect that renders a proposed plan inherently

---

[6]   The Committee's review of the Plan is ongoing, and the Committee reserves all rights to raise additional objections to the Plan. Nothing contained herein shall be deemed a waiver or limitation of such right.

or patently unconfirmable." *In re Sanders*, No. 14-02271, 2015 Bankr. LEXIS 3987, at *16 (Bankr. S.D. MS. Nov. 23, 2015); *see also In re Brass Corp.*, 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996).

**A.     The Plan Was Not Proposed in Good Faith.**

32.     The Plan was not "proposed in good faith" because it fails the "totality of the circumstances" test. *Lowe v. Antelope Techs. Inc. (In re Antelope Techs. Inc.)*, 07-4135, 2008 U.S. Dist. LEXIS 62364, at *17 (S.D. Tex. Aug. 11, 2008) (*citing In re Chaffin*, 836 F.2d 215, 216 (5th Cir. 1988)). Under this test, courts consider a number of factors including "whether there is any evidence of misrepresentation, unfair manipulation, or other inequities" and "whether the plan shows an attempt to abuse the spirit of the bankruptcy code." *Id.* (*citing Stanley v. Stanley*, 224 Fed. Appx. 343, 346 (5th Cir. 2007)).

33.     "As promulgated by the Fifth Circuit, the § 1129(a)(3) inquiry is ultimately fact-specific, fully empowering the bankruptcy courts to deal with chicanery." *In re Northbelt, LLC*, No. 19-30388, 2020 Bankr. LEXIS 1409, at *79 (Bankr. S.D. Tex. May 29, 2020). The Committee submits that chicanery is afoot in this Chapter 11 Case.

34.     Despite the lack of information provided by the Debtor regarding the Non-Debtor Affiliates and their respective directors and officers, it is clear that the Debtor is controlled by directors and officers that have significant equity interests in the Non-Debtor Affiliates. For example, Michael Fallquist, the Debtor's CEO, Christian McArthur, the Debtor's COO, and Roop Bhullar, the Debtor's CFO, each have significant interest in Griddy VI Series A Holdings LLC, a company that indirectly owns 100% of the equity in the Debtor and six of the Non-Debtor Affiliates. As such, these officers are not independent.

35.     Similarly, Greg Craig, the Debtor's former CEO, Nicholas Bain, the Debtor's Executive Chairman and co-founder, and EDF Trading North America, LLC also have

13

significant equity interests in Griddy VI Series A Holdings LLC. Accordingly, the Debtor and the Non-Debtor Affiliates are controlled by the same group of conflicted directors and officers.

36.     There is no evidence that the Debtor was independent of these conflicted officers at any time. The bankruptcy petition was signed by Roop Bhullar. Docket No. 1; *see, e.g.*, *Search Mkt. Direct, Inc. v. Jubber (In re Paige)*, 685 F.3d 1160, 1179 (10th Cir. 2012) ("A plan may, in light of its proponent's actions or relationships, be incapable of achieving goals consistent with the Code."). In *In re Fiesta Homes*, the court found that the plan proponent's conflicts of interest made diligent pursuit of certain preference actions unlikely and made an appearance of impropriety inevitable. *In re Fiesta Homes of Ga., Inc.*, 125 B.R. 321, 325 (Bankr. S.D. Ga. 1990) (denying proposed chapter 11 plan).

37.     In light of the Debtor's significant conflicts of interest, the Plan cannot possibly have been negotiated "at arm's-length, without collusion, and in good faith." *In re Pearville, L.P.*, No.10-34074, 2010 Bankr. LEXIS 6240, at *10 (Bankr. S.D. Tex. Dec. 13, 2010). The Debtor has not provided any evidence that there were arm's-length negotiations (or any negotiations, for that matter). The results are self-evident: each of the parties who control the Debtor is being released. Plan, 37–38.

38.     In certain circumstances, accelerated consummation of a plan may be an "indicium of fraud." *Antelope Techs*, 2008 U.S. Dist. LEXIS 62364, at *22. The Debtor has not provided any persuasive justification for expedited consideration. Instead, expedited consideration appears primarily motivated by an attempt to avoid scrutiny by the Committee and other parties in interest in this Chapter 11 Case.

39.     The sum total of the Debtor's actions demonstrate a distinct "abuse of the spirit of the bankruptcy code." *Id.*, at *17. As such, the Plan is not proposed in good faith and cannot be confirmed. The Debtor should not waste estate resources soliciting votes for the Plan.

**B.     The Cases Are Being Run For The Benefit Of The Directors and Officers.**

40.     The Committee's brief investigation has revealed that Griddy Technologies, a Non-Debtor Affiliate, holds valuable assets that were valued by Griddy Technologies at least at ███████ in December 2020. Based on additional information the Committee has learned, two things have become clear: (i) the Debtor's directors and officers are running this Chapter 11 Case primarily for their own benefit; and (ii) the directors and officers intend to use the technology owned by Griddy Technologies to continue the Debtor's business after this Chapter 11 Case concludes.

41.     As an initial matter, the Committee and its professionals found it puzzling and suspect that Griddy Technologies, an obligor and pledgor under the Macquarie credit agreement, did not file for bankruptcy protection with the Debtor. These two entities have identical ownership and management, and Griddy Technologies licenses its technology to the Debtor ███ ███

42.     Since the Committee's appointment, the Debtor's rationale for not including Griddy Technologies as a debtor in this Chapter 11 Case has become apparent. The Committee's investigation has revealed that the Debtor's remaining employees are devoting significant time to customer outreach, consumer services, and attempting to convince ERCOT not to revoke the Debtor's license to supply electricity. The Debtor has no operating business, and thus these services of course cannot and will not benefit the Debtor's estate in any way. The Debtor is also seeking to retain the services of a corporate PR firm, which would similarly provide no benefit to a liquidating debtor with no business operations. *See The State of Texas's Objection to the*

15

*Debtor's Motion for Entry of an Order Authorizing Retention and Compensation of Certain Professionals in the Ordinary Course of Business* [Docket No. 173]; *Limited Joinder of the Official Committee of Unsecured Creditors to the State of Texas's Objection to the Debtor's Motion for Entry of an Order Authorizing Retention and Compensation of Certain Professionals Used in the Ordinary Course of Business* [Docket No. 174]. The only potential beneficiaries of these rehabilitative actions are the reputations of the Debtor's directors and officers.

43.     Finally, the Debtor has made clear to the Committee that it is adamantly opposed to even *exploring* a potential sale of the Debtor's customer list. The Debtor's customer list is a valuable asset. Based on the Committee's professionals' prior experience with restructuring retail electricity providers, the Committee is confident that competitors would purchase the list, thereby maximizing value to the Debtor. The Committee sees no legitimate reason why the Debtor would forgo such a sale process.

44.     All of these facts suggest that the Debtor is prosecuting this Chapter 11 Case for the benefit of its directors and officers.  The Committee expects that further discovery efforts will yield additional corroborating facts.

**C.     The Third Party Releases Are Not Consensual.**

45.     As noted above, the Plan proposes to release third-party claims against the Released Parties using an opt-out mechanism. The Disclosure Statement avers that the "Released Parties have made substantial and valuable contributions to the Debtor's orderly wind down plan." Disclosure Statement, 18. Other than Macquarie's proposed contribution, the Debtor does not identify any contribution that has been made by the Released Parties beyond what certain of the Released Parties, such as directors and officers, are legally obligated to do in their fiduciary capacities. A director or officer's involvement in negotiating a chapter 11 plan is "nothing more than what is required of directors and officers of debtors in possession (for which they have

16

received compensation and will be exculpated)," *In re Washington Mutual, Inc.*, 442 B.R. 314, 354 (Bankr. D. Del. 2011), and is not a substantial contribution.

46.     If the Released Parties have made substantial contributions to the Debtor, then additional disclosure is required.

47.     The Committee recognizes that the debate over whether opt-out releases are consensual is contentious and unsettled. Nevertheless, where a plan proposes to release claims held by tens of thousands of unsophisticated consumers (who have already suffered significant harm) against Released Parties that have not made substantial contributions to the Chapter 11 Case, consent should not be inferred from the failure to opt-out. *In re Emerge Energy Servs. LP*, 19-11563, 2019 Bankr. LEXIS 3717 (Bankr. D. Del. 2019) ("a waiver [of claims] cannot be discerned through a party's silence or inaction").

48.     Implied consent is particularly inappropriate here for creditors who do not return a ballot. The Plan effectively imposes a double opt-out structure in which a creditor must first opt-out by returning a ballot and then opt-out using the affirmative opt-out on the ballot. *See Washington Mutual*, 442 B.R. at 355 ("any third party release is effective only with respect to those who affirmatively consent to it by voting in favor of the Plan and not opting out of the third party releases").

49.     The third-party releases in the Plan are non-consensual, and non-consensual releases are not permitted in this Circuit. *Bank of New York Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229, 252 (5th Cir. 2009) (citing *In re Coho Resources, Inc.*, 345 F.3d 338, 342 (5th Cir. 2003); *Hall v. National Gypsum Co.*, 105 F.3d 225, 229 (5th Cir. 1997); *Zale Corporation v. Feld*, 62 F.3d 746 (5th Cir. 1995); and *Matter of*

*Edgeworth*, 993 F.2d 51, 53−54 (5th Cir. 1993)) ("These cases seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions").

**D.    The Plan Contains Improper Gerrymandering.**

50.    The Court may confirm the Plan only if it "complies with the applicable provisions of [chapter 11]." 11 U.S.C. § 1129(a)(1). "Classification of claims [] affects the integrity of the voting process." *In re Greystone III Joint Venture*, 995 F.2d 1274, 1277 (5th Cir. 1991). The classifications must be scrutinized because otherwise "it would almost always be possible for the debtor to manipulate 'acceptance' by artful classification," *id*, and "[a] debtor's motives must be scrutinized to prevent the possibility of vote manipulation." *One Times Square Assocs. Ltd. Partnership v. Banque Nationale De Paris*, 165 B.R. 773, 778 (S.D.N.Y. 1996).

51.    "[N]otions of basic fairness and good faith are the source of the rule." *In re Save Our Springs (S.O.S.) Alliance, Inc.*, 388 B.R. 202, 234 (Bankr. W.D. Tex. 2008) (internal citations omitted). Classic gerrymandering cases involve separate classification of similar claims for the purpose of creating an impaired accepting class. The Debtor's proposed Plan goes further and creates two *junior* voting classes that are completely out of the money, apparently for the purpose of cramming up Class 4 – Other General Unsecured Claims and Class 5 – Customer Claims. Plan, 19, 20. These junior classes consist of Non-Debtor Affiliates, ultimately owned by the directors and officers, all of which are receiving Debtor releases and opt-out third party releases for no consideration.

52.    Not only does this gerrymandering provide further evidence that the Plan was not filed in good faith, but Bankruptcy Code section 1126(g) expressly prohibits it because out of the money classes are "deemed not to have accepted a plan." The Debtor cannot escape this conclusion by labeling Class 6 and Class 7 recoveries as "unknown," Disclosure Statement, 12,

18

particularly where the Debtor separately acknowledges that these classes have no projected

recovery. Disclosure Statement, 12 n. 13, 14. Where "the Plan does not contemplate any

distribution to that class," such class is *not permitted to vote*. *In re Plant Insulation Co.*, No. 09-

31347, 2012 Bankr. LEXIS 1716, at 10 (Bankr. N.D. Ca. Mar. 15, 2012).

53.     For this reason, the Plan cannot be confirmed.

**E.     The Plan Discriminates Unfairly Against Class 5 Claimants.**

54.     Despite the Debtor's assertion that it will seek to cramdown (or cram up, as the

case may be) the Plan, it can't. A plan cannot be crammed down if it "discriminate[s] unfairly"

against a dissenting class. 11 U.S.C. § 1129(b)(1). A dissenting class must "receive treatment

which allocates value to the class in a manner consistent with the treatment afforded to other

classes with similar legal claims against the debtor." *In re Mcorp Fin., Inc.*, 137 B.R. 219, 234

(Bankr. S.D. Tex. 1992).

55.     The Plan provides that if a Class 5 claimant files a proof of claim, such claimant

will only be entitled to share pro rata in the Texas Storm Causes of Action Net Recovery

Proceeds. Plan, 18–19. Class 4 claimants, on the other hand, share pro rata in all of the Debtor's

remaining assets, *including* the Texas Storm Causes of Action Net Recovery Proceeds. Plan, 18.

Class 4 claimants therefore recover more on their claims than Class 5 claimants do, despite both

claimants holding allowed unsecured claims.

56.     Accordingly, the Plan discriminates unfairly against Class 5 claimants.

**F.     The Debtor Should Not Waste Estate Resources Soliciting for an Unconfirmable Plan.**

57.     The Plan is unconfirmable because it was not proposed in good faith and it

contains impermissible non-consensual third-party releases. The Debtor should not waste limited

estate resources to solicit votes for a Plan that ultimately cannot be confirmed.

**G.      Customers Should Have More Time to Opt Into Class 4.**

58.      The Plan provides that a customer claimant who votes to reject the Plan will be placed into Class 4 instead of Class 5. Plan, 8. Class 4 claimants do not give the Customer Releases. Plan, 18. Accordingly, the deadline to opt into Class 4 is the voting deadline. The customer claimants potentially have valuable claims that have not been investigated and would be released by the Customer Releases. These claimants should have the ability to opt into Class 4 once there has been a broader investigation, such that they may make an informed decision. The deadline to opt into Class 4 should be at least 6 months after the Plan effective date.

**H.      The Plan Administrator Should be Selected by the Committee.**

59.      The Plan contemplates the appointment of a plan administrator who will, among other things, investigate and pursue causes of action on behalf of the Debtor. The Debtor proposes that the Debtor, not the Committee, select the plan administrator.

60.      This is a liquidating chapter 11 case. If a plan of liquidation is confirmed the only true party in interest will be the Debtor's creditors. The creditors will bear the costs of administration, and they will benefit from successful pursuit of causes of action. The Debtor will cease to have an equitable interest in the case. As the representative for all general unsecured creditors, the Committee should select the plan administrator.

61.      Although the Plan provides for a Creditors' Representative, the Plan requires only that the plan administrator "consult with the Creditors' Representative on all material decisions." Plan, 21. No authority is vested in the Creditors' Representative.

**I.      Class 5 Proofs of Claim Should be Automatically Allowed.**

62.      The Plan permits Class 5 claimants to file proofs of claim for amounts paid to the Debtor during Winter Storm Uri. Plan, 18–19. To the extent these proofs of claim accurately reflect amounts paid, they should be automatically allowed up to that amount.

63.     The Debtor informed the Committee that it intends to email former customers, affixing the proof of claim form and other documents. It should be clear to the recipient that this email is not a bill or invoice of any kind. Moreover, this email should clearly and conspicuously inform the recipient of the amount such recipient paid to the Debtor during Winter Storm Uri.

## <u>RESERVATION OF RIGHTS</u>

64.     The Committee reserves all rights to raise additional objections to conditional approval of the Disclosure Statement, approval of the Disclosure Statement on a final basis, and confirmation of the Plan. Nothing contained herein is intended to, or should be construed as, a waiver of such rights.


*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Committee respectfully requests that the Court deny the Motion in its entirety. In the alternative, the Committee respectfully requests that the Court order the Debtor to include a letter from the Committee in the solicitation packets recommending that creditors vote against the Plan for the reasons set forth herein, among others.

Dated: April 23, 2021

Respectfully submitted,

**MCDERMOTT WILL & EMERY LLP**

_/s/  Charles R. Gibbs_
Charles R. Gibbs
Texas State Bar No. 7846300
Shelby Perry (admitted _pro hac vice_)
2501 North Hardwood Street, Suite 1900
Dallas, TX 75201-1664
Telephone:  (214) 295-8000
Facsimile:    (972) 232-3098
Email:        crgibbs@mwe.com

- and -

Darren Azman (admitted _pro hac vice_)
Blaine Adams (admitted _pro hac vice_)
340 Madison Ave.
New York, NY 10173-1922
Telephone:  (212) 547-5615
Facsimile:    (212) 547-5444
Email        dazman@mwe.com

_Proposed Counsel to the Official_
_Committee of Unsecured Creditors_

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 23, 2021, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *Charles R. Gibbs*
Charles R. Gibbs

## Exhibit A

<u>Griddy Group Organizational Chart</u>

# Griddy Group Organizational Chart
### (Series A ownership)

