IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION


IN RE:                              § CASE NO. 21-30923-11
                                    § HOUSTON, TEXAS
GRIDDY ENERGY, LLC,                 § TUESDAY,
ET AL,                              § MAY 25, 2021
                   DEBTORS.         § 1:30 P.M. TO 2:31 P.M.


STATUS CONFERENCE (VIA ZOOM)


BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:                            SEE NEXT PAGE

(Recorded via CourtSpeak; no log notes)


TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

<u>APPEARANCES VIA ZOOM</u>:


FOR THE DEBTORS:                    BAKER BOTTS, LLP
                                    Robin Spiegel, Esq.
                                    Chris Newcomb, Esq.
                                    30 Rockefeller Plaza
                                    New York, NY  10112
                                    212-408-2545



FOR THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS:             MCDERMOTT WILL & EMERY, LLP
                                    Charles R. Gibbs, Esq.
                                    Darren Azman, Esq.
                                    2501 N. Harwood St., Ste. 1900
                                    Dallas, TX  75201
                                    214-295-8063



FOR KAREN PRESCOTT, ET AL:          FOX ROTHSCHILD, LLP
                                    Trey A. Monsour, Esq.
                                    2843 Rusk Street
                                    Houston, TX  77003
                                    713-927-7460



FOR THE US TRUSTEE:                 STEVE STATHAM, ESQ.



(Please also see Electronic Appearances.)

1          HOUSTON, TEXAS; TUESDAY, MAY 25, 2021; 1:30 P.M.

2          THE COURT:  All right.  Good afternoon.  We're here

3     in the Griddy Energy case.  It is 21-30923.  Appearances have

4     been made electronically.

5          I'm going to start by getting just a status report

6     from Ms. Spigel and from Mr. Gibbs, and we'll see where we are

7     planning to go today from their point of view.  And then

8     anyone else that wishes to make a status report, feel free to

9     do so.

10          So, Ms. Spigel, why don't we start with you?  And

11     then we'll go to Mr. Gibbs.

12          MS. SPIGEL:  Thank you, Your Honor.  Can you hear

13     me?

14          THE COURT:  I can hear you fine, thank you.

15          MS. SPIGEL:  Okay.  Thank you.

16          I can't see you on the screen --

17          THE COURT:  Oh --

18          MS. SPIGEL:  -- but I'm --

19          THE COURT:  -- that's -- no that's me not clicking

20     my camera.  I apologize.  Let's try that.

21          MS. SPIGEL:  Okay.

22          THE COURT:  Thanks for telling me.

23          MS. SPIGEL:  No, no.  Thank you.  And good

24     afternoon.  Thank you, Your Honor.  Robin Spigel, Baker Botts,

25     counsel to the Debtor.  Thank you for your time today.

1          There is one item on the Agenda today.  But also, at

2     the end of the hearing, if it suits Your Honor, we'd also just

3     like to discuss the pending sealing motion very quickly.

4          The item on the Agenda today is the continued

5     Disclosure Statement hearing.  As I had indicated to you, Your

6     Honor, on the 20th, we had a deal in principle with the

7     Committee, the Debtors, the pre-petition secured lenders, and

8     the Debtors' non-Debtor affiliates, as well as a settlement in

9     principle with the Attorney General's Office.

10          I'm pleased to report that we have been able to

11     negotiate definitive documentation related to all of the

12     settlements.  On Sunday night, we filed an Amended Plan, as

13     well as a related Disclosure Statement and a revised proposed

14     Disclosure Statement Order, reflecting the global settlements,

15     and as well as partially reflecting the settlement with the

16     Attorney General's Office.  The settlement with the Attorney

17     General's Office will be subject to a filing of a Rule 9019

18     motion for approval of that settlement agreement.  And as I'll

19     explain in a bit, it will be subject to the Plan going

20     effective.

21          Before I go any further, though, I didn't know if

22     Mr. Gibbs wants to chime in.

23          THE COURT:  All right.  Mr. Gibbs, go ahead, please.

24          MR. GIBBS:  Yes, Your Honor.  Can you hear me okay?

25          THE COURT:  I can.  Thank you for improving your

1    phone.

2              MR. GIBBS:  You're quite welcome.  I'm glad that it

3    was fixed.

4              For the record, Chuck Gibbs.  With me is my partner

5    Darren Azman from the law firm of McDermott, Will & Emery.  We

6    represent the Official Unsecured Creditors Committee.

7              By way of chiming in, I would just agree with

8    everything you just heard from Ms. Spigel.  We did work in

9    good faith, tried to get it filed at a time to hold a hearing

10   on Friday afternoon.  That was impossible.  It was also

11   impossible to get the definitive documentation filed early

12   enough Friday to have the Friday afternoon -- or the Monday

13   morning setting, rather.  So we did work through the weekend

14   and what was filed reflects the agreement that's been approved

15   by my client and reflects the understanding that we've reached

16   with the Debtor.

17             And we are in agreement with the approval of the

18   Disclosure Statement, as amended, reflecting the Plan, as

19   amended, and as reflected in the Order, so.

20             THE COURT:  Mr. Gibbs, thank you.

21             Before we allow Ms. Spigel to sort of go on with

22   what she wants to present, let me ask if there's anyone else

23   that has any wish to make any kind of an opening comment or if

24   we should just move right into the question of whether we're

25   going to give conditional approval.

1           If you do wish to make any opening comments, please
2    press five-star.
3         (No verbal response)
4           THE COURT:  All right.  Ms. Spigel, are you aware of
5    any outstanding unresolved objections to conditional approval
6    itself?
7           MS. SPIGEL:  Your Honor, Karen Prescott and a
8    putative class of tort claimants had filed an objection to the
9    Disclosure Statement.  I am not sure whether they're going to
10   continue to press that forward.
11          THE COURT:  All right.  Let's see.  So I've got --
12   that may be her that wants to speak.  Let's see.
13          Mr. Monsour, good afternoon.
14        (No verbal response)
15          THE COURT:  I think you have your own line muted,
16   Mr. Monsour.
17          MR. MONSOUR:  You're correct, Your Honor.  Can you
18   hear me better now?
19          THE COURT:  I can hear you at all now, so it's good.
20          MR. MONSOUR:  Judge, we do have an objection.  I do
21   have some concerns I'd like to share with the Court, but we're
22   not going to stand in the way of the Court approving the
23   Disclosure Statement, so I think we'll be able to get through
24   today fine.
25          But I -- there are a few points I do want to make to

1    the Court, you know, before we conclude the hearing.

2           THE COURT:  All right.  Are any of them going to go

3    to any amendments that you think are required to have

4    Disclosure Statement approval, or are they more going to be in

5    the nature of preservation of rights to confirmation and final

6    approval?

7           MR. MONSOUR:  I think they're more in the context of

8    reservation of rights and confirmation approval, with the

9    exception of one disclosure item as it relates to the third-

10   party releases.  And I can get into that now or I can wait,

11   Your Honor.

12          THE COURT:  Well, I -- it seems to me that, if

13   that's going to be the only objection to the informational

14   portion of the Disclosure Statement, we probably ought to

15   address it sooner, rather than later, so that Ms. Spigel, when

16   she puts on her evidentiary record, if one is required, can

17   address it.

18          MR. MONSOUR:  Here -- and it probably -- the only

19   disclosure -- let me kind of walk the Court through.

20          If I'm a claimant, and let's say I bought energy

21   from Griddy and Griddy billed me for $50,000 during that ten-

22   day or five-day period of the freeze, and I can't pay that

23   money, but yet, my wife died of hypothermia here at the house,

24   then I may have a claim.

25          And under the Debtors' Plan, what it says,

1    basically, is, if I have a claim, I go into Class 5; and, if I

2    opt out of that claim, then I go to Class 4, and rights to

3    pursue insurance and, you know, those things are preserved

4    under the Plan.

5            The problem that I've got as the claimant is I can't

6    make an informed decision of consent and opt out of that

7    unless I know what the insurance policies say, if there's any

8    liability resulting that could -- that insurance would cover,

9    or if the officers or directors or third parties being

10   released have any culpability that's not being disclosed

11   during in Disclosure Statement.  Other than that piece, the

12   rest of it really goes to confirmation, and that is whether or

13   not they can confirm these releases if I haven't really had

14   informed consent to know how to opt out or opt in because, as

15   a claimant, I need to know what I'm releasing.

16           If I decide to stay in Class 5, I know that the

17   claims Griddy has against me for the nonpayment of energy goes

18   away.  But if I have to balance that against do I have claims

19   against Griddy or anyone else, there's maybe a tort liability,

20   what am I releasing by opting out, and I don't know until I

21   see the insurance policies.

22           And what we had proposed was show us the insurance

23   policies, we'll look at them confidentiality, we'll even limit

24   our liability recovery to the insurance policies, but let us

25   see them.  And the Debtor felt like, at this time, it wasn't

1       appropriate to do it.

2              So, at some point, we're going to have to address

3       that issue because how can you ever give consent if we don't

4       know what we're releasing.  And that was the fundamental

5       problem that I see with the disclosure, is they're not

6       mentioning anything in the Plan with respect to a Disclosure

7       Statement, with respect to what is being released for these

8       third-party participants.

9              And they're only contributing, in the aggregate,

10      about $250,000 for these releases.  And that's a confirmation

11      issue, whether or not that's adequate consideration or

12      gifting.  That doesn't have to be heard today.  But that's the

13      only disclosure point that I think might be missing in the

14      Disclosure Statement.

15             THE COURT:  All right.  Mr. Monsour, thank you.

16             Does anyone else have any informational issues that

17      you want to raise today, so that Ms. Spigel knows what the

18      universe of things is she has to deal with?

19         (No verbal response)

20             THE COURT:  It looks like we're back to you,

21      Ms. Spigel, and that's the one issue.

22             I will tell you, from the Court's point of view, I

23      have some issues with the Form of Order, and we can go through

24      those, I've got them in detail.  I don't have any issues that

25      the Court is going to raise about whether the information in

1    the Disclosure Statement is adequate.  So you don't have to

2    deal with *sua sponte* informational issues from the Court.  You

3    do need to deal with Mr. Monsour's, of course.

4                    MS. SPIGEL:  Okay.  Thank you, Your Honor.

5                    Should I go through my presentation, including the

6    settlements and I can get to Mr. Monsour's objection towards

7    the end, or do you want me to just go -- deal with that first?

8                    THE COURT:  Whatever you're happy doing.

9                    MS. SPIGEL:  Okay.  Fine.  I'm going to go through

10   the settlements, give some background here, and then I can

11   address his comments.

12                   So, as I mentioned, since we were here last, we were

13   able to negotiate and draft definitive documentation with all

14   the parties.  And I do want to thank all the parties involved

15   with the settlements because everyone worked really

16   tirelessly, including throughout the weekend, to make sure we

17   got everything on file by Sunday night.  This is a continued

18   hearing which originally began on April 27th and was continued

19   to May 20th, to allow the Committee additional time to perform

20   its investigation, which it did.

21                   At the April 27th hearing, I had gone through the

22   background of how we got here and the Plan and the standards

23   for approving the Disclosure Statement.  So, unless Your Honor

24   wants me to repeat any of that, I was planning to just go

25   through the settlements from a high level and then walk

1    through any of the documents, the Plan and the Disclosure

2    Statement -- the Disclosure Statement, that you would like.

3              THE COURT:  However you want to make your

4    presentation is fine.

5              MS. SPIGEL:  Sure.  So I just incorporate, you know,

6    the standards from the April 27th hearing that I went through.

7              With respect to the global settlement with the

8    Committee, the Debtors' pre-petition lenders, and the Debtors'

9    non-Debtor affiliates, some of the following terms that I'll

10   read are incorporated already into the Plan and others are

11   being read into the Record.  And because, as I've said many

12   times in this case, we have limited resources, there will not

13   be a Plan Support Agreement or other type of agreement

14   documenting these other terms.  So the parties have agreed

15   that we're going to rely on the Record.  And the terms that I

16   read into the Record I'll flag, in particular, that aren't

17   necessarily yet reflected in the -- you know, through

18   documentation, but will be.

19             With respect to the settlement, the pre-petition

20   secured lenders agree to waive a portion of their claims that

21   is attributable to both principal and interest at the default

22   contract rate.

23             The non-Debtor affiliates will be responsible for

24   paying the pre-petition secured lender's professional fees and

25   expenses, which is up to 225,000, which we expect to pay in

1    full.

2         The pre-petition secured lenders will not seek

3    payment of any additional professional fees, except if there

4    is any unanticipated litigation or any contested matters that

5    cause those lenders or the collateral agent to incur fees and

6    expenses in excess of the 225.  Then the lenders or the agent

7    can offset such amounts to the extent that a cash collateral

8    LC that they issued remains undrawn by the expiration of that

9    LC, which is that LC is in the amount of 300,000.

10        The approximately 1.448 million principal face

11   amount of the pre-petition secured lenders' claims that they

12   are foregoing will be contributed to the estates.  And any

13   unused amounts, after claims of higher priorities are paid and

14   the costs of administering the estate are paid, will be shared

15   pro rata between the holders of the allowed Class 5 customer

16   claims that timely filed claims for electricity usage, in

17   accordance with the terms of the Plan, and holders of Class 4

18   other general unsecured claims.

19        Subject to court approval, customers that don't opt

20   out of the customer relief will have 45 days following the

21   effective date to change their minds and become Class 4, other

22   general unsecured creditors, for all purposes under the Plan,

23   other than in respect of voting, if such election is made

24   after the voting deadline.

25        The following is a little bit nuanced, but I'll try

1    to make it as simple as I can.  We are discussing a settlement
2    with the PUCT regarding a $500,000 letter of credit that it
3    drew pre-petition.  If there's a settlement with the PUCT --
4    which we do expect to happen -- and the settlement is less
5    than 500,000 -- which we don't expect -- customers with claims
6    that are allowed under the Plan will share pro rata in
7    available cash with the holders of allowed Class 4 claims in
8    the amount of the difference between the 500 and whatever the
9    settlement amount is.  But we do expect, if we get to the
10   settlement, that it will be 500.
11           Former customers are included in the third-party
12   releases in the Plan.
13           Non-Debtor affiliates will contribute their rights
14   with respect to certain to-be-agreed causes of action that
15   overlap with the causes of action that are deemed retained by
16   the Debtors under the Plan.
17           The Debtor and the Committee will jointly select the
18   Plan Administrator, and the Plan Administrator will be subject
19   to an oversight Committee that consists initially of two
20   members selected by the Committee and one member selected by
21   the Debtor.  Certain actions of the Plan Administrator will
22   require consent of the members of the oversight Committee.
23           With respect to those, all of those terms are in the
24   Plan.  With respect to those terms that are not yet in a
25   document that I'm reading into the Record that -- so the

1     parties have agreed.  I'm actually going to read the terms

2     that we have agreed to.

3           Griddy Technologies, LLC, which is an affiliate of

4     the Debtor, will grant the Plan Administrator a limited

5     license to use its technology to assist the Plan

6     Administrator, to the extent needed, to wind down the Debtors'

7     estate, including in connection with the prosecution of claims

8     of action -- causes of action and claims reconciliation.  This

9     limited license agreement will be included in the Plan

10    supplement.

11          The directors and officers will provide reasonable

12    assistance to the Plan Administrator in connection with the

13    prosecution of causes of action and claims reconciliation on

14    terms and conditions to be agreed, which will include that a

15    portion of their time will be uncompensated.  The terms of

16    that arrangement will be include in the Plan supplement, as

17    well.

18          Directors, other than the independent director, will

19    waive directors' fees for services rendered after May 31st.

20    If the case is extended beyond July, which we hope that it

21    will not be, such directors' fees, subject to cost allocation

22    with the affiliates, are to resume prospectively only.

23          Subject to the Court approving the Disclosure

24    Statement, the Committee, the Debtors' pre-petition secured

25    lenders, and the Debtors' non-Debtor affiliates agree to

1    support the Plan and not take any action to impede or

2    otherwise delay confirmation or consummation of the Plan.

3          The parties also agree to work cooperatively with

4    one another to get the Plan confirmed and consummated it, and

5    use good faith efforts to work cooperatively on all other

6    matters that arise in the case.

7          In addition, I also want to note, just because

8    Griddy has received so much negative attention, that I think

9    it's also important to put on the Record that the global

10   settlement is not an admission of liability or wrongdoing by

11   the Debtor or any of the affiliates or the pre-petition

12   secured lenders.  Rather, it's -- it reflects a settlement and

13   compromise that's intended to resolve the issues by and among

14   the various parties, in order to allow the Debtor to proceed

15   to confirmation, which the Debtor believes is in the best

16   interests of all the stakeholders.

17         Unless Your Honor has any questions, I can move on

18   to the settlement with the Attorney General's Office.

19         THE COURT:  No, I think that's fine.  Thank you.

20         MS. SPIGEL:  Thank you.

21         As I mentioned, we intend to file a 9019 motion to

22   approve a settlement agreement with the State of Texas in the

23   near term, but the settlement would not go effective until the

24   Plan goes effective because certain components of that

25   settlement agreement are directly tied to the Plan.

1          Since the petition date, the Debtor and its parents

2     have worked in good faith with the State of Texas, by and

3     through the Attorney General, to address issues related to the

4     Debtors' former customers that occurred as a result of the

5     February 2021 winter storm event.  The settlement agreement

6     that we've arrived at provides for, among other things:

7          Inclusion of various provisions in the Plan; namely,

8     that the customer class treatment didn't change from what's

9     been filed, meaning that those participating customers will be

10    released from their obligations to the Debtor, and those same

11    customers who paid for electricity during the winter storm

12    event will have an allowed claim against the Debtor for such

13    electricity usage if they file a claim, subject to the

14    Debtors' ability to object to the amounts, but not the nature

15    of the claim.

16         And any distributions under the Plan by the Debtor

17    to former customers that are returned to the Debtor as

18    undeliverable will be turned over to the Unclaimed Property

19    Division of the State of Texas Comptroller of Public Accounts,

20    pursuant to applicable Texas unclaimed property law, which

21    will enable the former customers, in perpetuity, to retrieve

22    such funds.

23         The state court action filed by the State of Texas

24    against the Debtor and its parents pre-petition will be

25    resolved, and the Debtor and its parent, including on behalf

1    of certain other parties, will agree to be enjoined from

2    taking certain actions and, upon the effective date, from any

3    -- will be enjoined from any collection or credit reporting

4    efforts for electricity use on February 13th through

5    February 19th, solely as it pertains to those participating

6    customers who don't opt of the customer releases within the

7    time frame provided for in the Plan or the confirmation order.

8    And that would be reflected in the consent judgment that would

9    be filed in the state court action.

10          A release by the State of Texas of all claims

11   against the Debtor and the Debtors' parents and their

12   respective officers, agents, representatives from claims and

13   disputes arising from or relating to the state court action,

14   including claims asserted therein and the civil investigative

15   demands.  Under the state court action and termination of the

16   civil investigative demand upon the effective date of the

17   Plan.

18          Again, I think it's important to note that the

19   State, the Debtor, and its parent are each agreeing that,

20   neither the settlement, nor the related consent judgment

21   constitute or are admissions of liability or wrongdoing by the

22   Debtor or its parents or an acknowledgment by the Debtor or

23   its parent of the truth or correctness of the State's

24   contentions or allegations.

25          The Debtor believes that both settlements are very

1      significant steps forward in the Chapter 11 case.

2              And before I move on to, you know, the Plan and the

3      Disclosure Statement, does Your Honor have any questions?

4              THE COURT:  I do not.  We'll see if any parties do,

5      if you want.

6              Does anyone else have any questions for Mr. Spigel

7      on either of the announced settlements?

8          (No verbal response)

9              THE COURT:  All right.  Ms. Spigel.

10             MS. SPIGEL:  Okay.  Thank you, Your Honor.

11             The Debtor filed its Third Amended Plan and related

12     Disclosure Statement on Sunday night.  Those documents can be

13     found at document -- and Docket Numbers 294 and 295, including

14     redlines against the prior versions.  The revised order was

15     also filed on Sunday night and can be found at Docket Number

16     296.  A redline was also filed accompanying that order.

17             And yesterday, the Debtor and the UCC jointly filed

18     a proposed letter from the UCC in support of the Plan that

19     would be included in the solicitation package, subject to Your

20     Honor's consent.

21             With respect to the original (indiscernible) related

22     to the original Disclosure Statement, the only objection

23     that's left is from Ms. Prescott.  Did Your Honor want to go

24     through the Plan and the Disclosure Statement revisions or

25     should I address Mr. Monsour's concerns at this point?

1          THE COURT:  So let me ask you one question about how

2     the Plan functions, and then I don't see a reason to go

3     through the visions, since what I looked at was the new one

4     and not the old one.

5          If I'm a member of Class 5 and if I opt out, I then

6     become a member of Class 4.  I think there's a little

7     confusion in the order, though, and I just want to be sure

8     I've got this right.  If I'm a member of Class 5, and I don't

9     opt out, but I do vote "no," then I'm still a member of

10    Class 5.  Is that right?

11         MS. SPIGEL:  No.  If you vote no as a Class 5 claim

12    holder, you automatically become a Class 4 claim holder, which

13    is why the ballot has both Class 5 --

14         THE COURT:  Okay.  Well, that's what --

15         MS. SPIGEL:  -- and Class 4.

16         THE COURT:  Then that's what concerned me because

17    that means you've --

18         MS. SPIGEL:  Okay.

19         THE COURT:  -- guaranteed, by not allowing anyone to

20    vote no, that Class 5 votes yes, and I don't think you can

21    say, if you vote no, we're taking you out of the class;

22    therefore, we, by definition, have a consenting impaired

23    class.  People have to be able to vote no within the class at

24    some point, don't they?

25         MS. SPIGEL:  I don't think that they have to vote

1       no --

2               THE COURT:  Well, no --

3               MS. SPIGEL:  -- in the --

4               THE COURT:  -- if they want to --

5               MS. SPIGEL:  -- in the class.

6               THE COURT:  If --

7               MS. SPIGEL:  If they vote no --

8               THE COURT:  If somebody wants to vote no so that

9       Class 5 doesn't become a consenting -- you've forced Class 5

10      into always being a consenting impaired class because anyone

11      that votes no, you're moving them out of the class.  And I

12      understand that, if they want to opt out of the releases, but

13      I don't understand how you can do that if they simply want to

14      vote no because now we no longer have a vote.  We now have a

15      fiat that this is a consenting impaired class.

16              MS. SPIGEL:  I'm not aware of anything that would

17      preclude a consenting impaired class.  But if they vote no,

18      then -- and they don't opt out of their releases, I would

19      think that that would be -- to me, that doesn't make sense.

20      It would make sense for them to be in Class 4 and be another

21      general unsecured claim.

22              THE COURT:  Fair enough.  But people get to vote --

23      what if somebody just wants to vote no because they don't like

24      the Plan and they think their vote will count more in Class 5?

25      I just don't see how we can fiat in that we have a consenting

1    impaired class, which is what you've done.  And that explains

2    why I'm having trouble interpreting it because I didn't think

3    that it would be possible to create a class under the Code

4    that, by definition, is both consenting and impaired.  But

5    that's what you've by saying, if you vote no, we're taking you

6    out of the class.

7          I do get it that somebody should have the option to

8    move into Class 4 if they want to.  They opt out of the

9    release, now they're in Class 4, they get a vote in Class 4,

10   fine.  But you're saying, if they don't opt out of the

11   release, so they're agreeing to the release.  Can't they still

12   vote no to the Plan?  Why are we moving them?

13         MS. SPIGEL:  Well, I'm not sure that (indiscernible)

14         MR. GIBBS:  Your Honor, this is --

15         MS. SPIGEL:  Go ahead.

16         MR. GIBBS:  I apologize, Ms. Spigel, I didn't mean

17   to interrupt you.

18         To me, it's more a question of the no vote would

19   still count for purposes of tallying the voting to determine

20   whether we've carried in numerosity and in dollar amount, but

21   the no vote is really a signal that their treatment becomes as

22   if they are in Class 4.  That's the treatment and the result

23   of their no vote.  But they can -- I don't think that it

24   emasculates the vote.  You still count the yeses and nos.

25         THE COURT:  Well, you -- I don't see how you count

1      -- I don't think that's the way it's written, we'll start with

2      that.  But why can't somebody have an allowed Class 5 claim,

3      they don't opt out of the release, and they vote no?  Then

4      they get the release by a matter of law because, you know,

5      they're part of a consenting impaired class.  I just -- I have

6      a -- and maybe this is sounding like a theoretical problem,

7      and I don't mean to be terribly theoretical about it.  But

8      there's just a fundamental problem of creating something that

9      guarantees an outcome.

10             And I think that's -- maybe what Mr. Gibbs says is

11     right, that it's a no vote, but we're going to -- they will

12     receive alternative treatment if they vote no?  What if they

13     just want to vote no, but they want -- they're not opting out,

14     they're giving the release, they're getting all those rights.

15     They just don't like the Plan and want to vote no to it.  Why

16     should they be forced into Class 4?

17             MS. SPIGEL:  Because the consideration as to giving

18     that release is as part of Class 5.  So, if --

19             THE COURT:  They're getting a release, they didn't

20     opt out.

21             MS. SPIGEL:  But --

22             THE COURT:  They don't like the consideration, they

23     voted no, but they would rather have that, if a Plan is going

24     to be confirmed, than the paltry amount they're going to get

25     in Class 4.  They want to vote no to the Plan, but they'll

1      take the release.  You've said, if they vote no, they don't

2      get the release and --

3                 MS. SPIGEL:  But if they --

4                 THE COURT:  -- but they didn't --

5                 MS. SPIGEL:  I mean --

6                 THE COURT:  -- opt out --

7                 MS. SPIGEL:  -- you're right --

8                 THE COURT:  -- of the release.

9                 MS. SPIGEL:  -- the way the Plan --

10                 THE COURT:  Yeah, they didn't opt out of the

11     release, right?  I'm uncomfortable.  We can get to that, but

12     at least I now understand it.  I don't see how we can do it

13     the way it's currently written.  Their vote doesn't control

14     whether they have an allowed claim or not, it can't.  We

15     aren't going to give people one claim if they vote no and

16     another claim if they vote yes.  That occurs with their opting

17     in and opting out, I've got that.  But it doesn't -- it can't

18     affect their treatment.  They have the right to say, "I don't

19     like your damn Plan, but if it's going to get confirmed, I

20     want the release under it."

21                 MS. SPIGEL:  So, just to be clear, Your Honor,

22     you're saying that you would like the -- well, that the Plan

23     should say that the former customers who want to get the

24     releases but don't like the Plan, if they vote no they're not

25     automatically in Class 4, it's only those people who opt out

1       of the releases would go into Class 4.

2              THE COURT:  I -- well, I think so, unless you can

3       explain to me how it is consistent with the Code to create a

4       class -- I mean, let's leave your case and go to some

5       hypothetical case, where you say, okay, we're going to have a

6       class of unsecured creditors and they're going to get this

7       treatment and everyone has the right to this treatment, but if

8       you vote no, you're going to get that treatment and you're no

9       longer going to be a member of the unsecured creditor class.

10      So now we've guaranteed in every case, in a theoretical way,

11      that the only people that count for voting are yes votes

12      because, otherwise, we'll move you out of the class.  So we've

13      eliminated voting under the Bankruptcy Code.  It just can't be

14      this way.

15             MS. SPIGEL:  I don't think anything in the

16      Bankruptcy Code requires people to be able to say no in a

17      class; however, I don't think that we necessarily have an

18      issue with the change over.

19             THE COURT:  I think it does require them to be able

20      to say no because you count votes two-thirds/one-third.

21      You've just eliminated the ability for there to be any no

22      votes, so I do think it would violate the Code.  And if you

23      don't care, then let's at least comply with my view of the

24      Code, even if it isn't your view, and eliminate that risk for

25      everybody.

1        I don't think it's a very -- it's not a significant

2   change, I don't need to re-review it.  But you'll see it when

3   we get to the Disclosure Statement Order.  And so -- but we

4   can go ahead now and --

5        MS. SPIGEL:  Thank you.

6        THE COURT:  I think that's the only structural

7   question that I had, and I did misunderstand what was going on

8   there, so I'm glad I asked you.  But if you want to proceed

9   then to go ahead and address Mr. Monsour's concerns, that

10  would be helpful.

11       MS. SPIGEL:  Yes, Your Honor.  By the way, I do

12  think -- well, the ballots are attached to the Order, but I

13  think that the ballots already need to be revised slightly to

14  accommodate that change.

15       So, with respect to Mr. Monsour's concern, I need to

16  take a step back because, on April 1st, this Court asked

17  counsel for Ms. Prescott what the Debtor could have done, so

18  that their clients, the tort claimants, would have -- what the

19  Debtor could have done, so that their clients would not have

20  lost power, right?  And counsel was unable to answer that

21  question and still has not.

22       There is some presumption here that there are valid

23  tort claims and we would say that there are not valid tort

24  claims, that it's not even a threshold issue, that there is

25  nothing to disclose and that those parties do not -- like they

1    have baseless claims against the company.

2         There has been no explanation has to how any alleged

3    injuries -- which we have no idea what those are, including

4    with respect to mister -- Ms. Prescott's alleged injuries --

5    could be causally linked to the Debtor, right?  Because, as a

6    retail electric provider, Griddy was precluded from

7    participating in the generation, transmission, and

8    distribution of electricity, right?  Griddy purchased

9    electricity from ERCOT, but it had no knowledge of which

10   generators provided the electricity to ERCOT, right?  It acted

11   as a market access tool, right?  It marketed and sold

12   electricity.

13        And as I said, it wasn't involved in generation,

14   transmission or distribution, and it was precluded under state

15   law from doing so, right?  The obligations to its customers

16   are defined and limited to those set forth in the rules of the

17   PUCT because it had exclusive jurisdiction to determine

18   compliance with those rules.  In other words, there was no

19   duty to customers that was breached and there was no causation

20   related to alleged injuries.

21        And we're talking about, you know, a Disclosure

22   Statement here.  And in connection with insurance rights, I

23   mean, I am not aware of any obligation to provide an insurance

24   policy to purported claimants, which, if we did provide it,

25   could lead to, you know, essentially depleting assets of the

1    estate based on baseless claims.  There's no claim or

2    controversy before the Court related to tort claimants.

3            So, you know, when they talk about the fact that

4    there should be some information related to insurance in the

5    Disclosure Statement, I just think that there's no basis here

6    to include any information related to insurance.  The fact is

7    that the customer releases and customer class are totally

8    voluntary, right?  They can choose -- and the Plan is clear

9    that the release is of everything, including tort claims.  It

10   would be -- is it -- it is a release, give and get the release

11   or don't.  You don't have to give and get the release.  You

12   can opt into Class 4, as we just discussed, and then you can

13   assert your claim.

14           So I don't think that there's any further

15   information that needs to be in the Disclosure Statement

16   related to torts or related to insurance that the company has.

17   I don't think it's appropriate, I think it emboldens tort

18   claimants when it shouldn't.  And I think that it would

19   unnecessarily deplete assets of the estate, to the extent that

20   they have to spend, you know, money on defense costs related

21   to these types of claims that have no causal relationship to

22   the Debtor.

23           I also think that the tort claimants never responded

24   to Your Honor's -- what I think is a fairly simple question:

25   How did we -- what is -- how did Griddy cause those injuries?

1    And I don't think that they should be able to get additional

2    information in the Disclosure Statement related to any of this

3    because it's unrelated to this case.

4              THE COURT:  All right.  Mr. Monsour.

5              MR. MONSOUR:  Thank you, Your Honor.

6              The claim exist -- the elements of the claim are

7    duty,  breach, injury, and injury resulting from the breach.

8    Your Honor, the claimants bought energy from Griddy; Griddy

9    didn't deliver energy during a period of time, their injuries

10   resulted.  There is a claim.  The question is really not is

11   there a claim; the question is:  Does Griddy have a defense or

12   is there liability on that claim?  And I think they're being

13   meshed together.  I think Griddy -- I think the claimants have

14   a claim.  It's whether or not, ultimately, Griddy is going to

15   be held culpable or proportionately with the other parties up

16   the food chain who would be held culpable.

17             But that doesn't mean that the claimant doesn't have

18   the right to look at insurance because we don't know what the

19   insurance policies say.  If the insurance policies say we

20   don't -- you know, we don't have any liability, then the

21   claimant -- it's very simple for the claimant.  They don't opt

22   out and they're going to get the claims that Griddy has

23   against them released and they stay where they are.

24             But you know, depleting the assets of the estate,

25   there are a lot of cases where there are tort claims.  We're

1    not looking to deplete the assets of the estate.  The

2    insurance company is going to pay all of the expenses and

3    costs of the litigation if we were to pursue the litigation.

4    But we've got to know what's there, in order to make an

5    informed decision.  And all I'm saying is let us see what's

6    there, and if there's nothing there, we move on.  If there's

7    something there, then we can have the fight whether or not

8    there's causation.

9         But the causation exists by the mere fact that Duty

10   [sic] sold the energy to the customer and Duty didn't deliver

11   that energy for five days.

12             THE COURT:  I am over --

13             MR. MONSOUR:  They breached it.

14             THE COURT:  I am overruling --

15             MR. MONSOUR:  They --

16             THE COURT:  -- the objection by the tort claimants.

17   It is premised on the Debtor failing to deliver energy.  The

18   Debtor was prohibited by state law from delivering energy, it

19   couldn't deliver energy.  It had no ability ever to deliver

20   energy, it would have been illegal to deliver energy, all as a

21   matter of law, which means that the claim as stated fails,

22   which means this is extraneous information, which means that a

23   reasonably informed voter doesn't need to it to make a

24   decision, so I'm overruling the objection.  I'm going to

25   approve the Disclosure Statement without that information.

1          All right.  I want to go through the proposed form

2     of order.  This is a conditional approval hearing.  I don't

3     really even need evidence at a conditional approval hearing.

4     It's the Court's review of the Disclosure Statement.  I do

5     think the Disclosure Statement contains adequate information.

6     I'm concerned about some of the provisions in the order, I'm

7     putting it up on the screen.  And I've made -- and I hope that

8     you will excuse whatever might be rude in my comments.  But

9     essentially, I'm showing you the redline of comments to

10     myself, Ms. Spigel.  And please pardon it if I talk to myself

11     more openly than maybe I should.  It's just going to be easier

12     to look at it this way.

13          MS. SPIGEL:  Thank you.

14          THE COURT:  So what I did is I took your PDF version

15     and I downloaded it into Word, so you'll see a couple of

16     formatting issues that are just from that downloading feature.

17          I don't have any jurisdiction -- if you -- do you

18     have somebody that can take notes on this for you, Ms. Spigel.

19     And just some of these are obvious changes.  I don't have any

20     --

21          MS. SPIGEL:  Yes.  Thank you, Your Honor.

22          THE COURT:  All of our jurisdiction arises under 28

23     U.S.C. 1334.  The standing order gives no jurisdiction, it

24     only implements 28 U.S.C.'s authority provision.  So I'm

25     taking that out.

1        I have given you July 8th for the hearing on the

2    Disclosure Statement and Plan.  I've left your other dates in

3    this section.  But in a couple of minutes, you're going to see

4    that I think some of your timing may not work, which just

5    means we're going to need to move some dates potentially, and

6    you'll see that as we get through it.  But July 8th at 9, I

7    can do the combined hearing.

8        MS. SPIGEL:  Thank you.

9        THE COURT:  I don't believe that a party that is

10    objecting to a Plan must propose how to resolve their own

11    objection, I think that's your problem.  So I'm not going to

12    make people propose a solution to a Plan.  I've taken out

13    Subparagraph, I believe it was (e).

14        And then I'm not going to make people serve their

15    objections.  Once they file it with CM/ECF, everyone gets the

16    CM/ECF filing.  And given the tight deadlines, I don't think

17    we need to have them -- then have to also get things served

18    out by mail.

19        So this is the issue we talked about.  I don't think

20    the vote can determine whether they have an allowed classified

21    claim.  They either have an allowed classified claim or not.

22    I don't need to re-review it once you fix that provision that

23    we talked about.  But you'll need to fix this section.  People

24    get to vote no.  If they opt out, they don't have a Class 5

25    claim, but if they vote no, they're voting no, and they still

1    have whatever their allowed Class 5 claim was before they

2    voted.

3              I'm going to hold the ERCOT 3018 motion along with

4    -- on June 29th at 9:00 a.m.  I think that was the -- you said

5    on or before, so I set it on that date and gave you a time for

6    it.

7              MS. SPIGEL:  Thank you, Your Honor.

8              I just also want to be clear, it's not certain that

9    we will be using that date --

10             THE COURT:  Again --

11             MS. SPIGEL:  -- but we will be on that date.

12             THE COURT:  -- I know it's not certain you need it,

13   but by the time we get the objection, it's going to be too

14   late to set it, so I'm going to have that date in here --

15             MS. SPIGEL:  Okay.

16             THE COURT:  -- so that people will know what it is.

17             MS. SPIGEL:  Thank you, Your Honor.

18             THE COURT:  And I just don't think I should order

19   myself to do things, so I'm just telling you what I will do,

20   not what I shall do, so.

21             MS. SPIGEL:  Fair.

22             MR. GIBBS:  Your Honor, this is Chuck Gibbs.  Can

23   you hear me?

24             THE COURT:  Yes, sir.

25             MR. GIBBS:  Would it be possible to consider as an

1    alternative to this hearing on the Plan the afternoon on the

2    7th, rather than morning of the 8th.  If you can't

3    (indiscernible) I'm supposed to take off on a vacation with my

4    wife at 9:00 o'clock on the 8th, is when my flight leaves, and

5    I think there's one flight a day.  So, if possible; otherwise,

6    I'll go on the vacation later and fly the next day.

7              THE COURT:  I could do it at 3:00 o'clock on the

8    7th.

9              MR. GIBBS:  I can say I sprung that on counsel for

10   the Debtor and the other parties, and if anyone else has a

11   problem, I'll make changes, but I -- if it's possible, it

12   would, for the moment, keep me out of the doghouse, but I

13   usually end up back there anyway.

14             THE COURT:  Okay.  In Paragraph 18, I'm not going to

15   reserve rights for the Debtor that I don't preserve for

16   everyone.  So anyone that wants to designate ballots, their

17   rights are preserved.

18             This is a change I made a couple of times because I

19   think the definition was misplaced.  And if I'm reading that

20   wrong, tell me.  But I think that it's four o'clock or seven

21   days, whichever is later, and that then becomes the cure

22   objection deadline.  So I think it was a misplaced definition.

23             MS. SPIGEL:  I think you're right.  Thank you, Your

24   Honor.

25             THE COURT:  Okay.  I'm not going to include 26, I

1       just think that's too dangerous.  I shouldn't be adopting

2       parts of the Plan as part of an order before  confirm the

3       Plan.  So whatever rights you have under the law you have

4       under the law.  So I took that out.

5              This is basically the same issue, that the

6       objections have to get filed, not served.  Service will occur

7       by CM/ECF on everyone that's listed there.

8              I didn't understand this sentence, the last sentence

9       right here, just to put it in context.  It says there's a

10      combined hearing.  Then it says:

11             "In accordance with the Plan, the Plan may be

12      modified, if necessary, before, during, or as a result of the

13      combined hearing without further action by the Debtor and

14      without further notice to or action, order, or approval of the

15      Court or any other person or entity."

16             How in the world do we do that?  Because I think

17      maybe that sentence should just come out.  But it seems to me

18      you've got to move to amend, maybe it's oral.  I've got to

19      approve it.  And this is saying this can happen sort of

20      without you or me worried about it.  And I just -- unless I'm

21      misunderstanding the purpose of the sentence, I think it comes

22      out.

23             MS. SPIGEL:  I suppose there are certain

24      modifications that could be made without -- that conform to

25      1127, but don't require -- but don't require court approval.

1        But I agree that it's not drafted artfully.

2                    THE COURT:  Okay.

3                    MS. SPIGEL:  We can just --

4                    THE COURT:  Probably just taking it out.

5                    MS. SPIGEL:  We can take it out, yeah.

6                    THE COURT:  Okay.

7                    MS. SPIGEL:  Yeah.

8                    THE COURT:  This is the same definitional issue that

9        we had before.

10                   MS. SPIGEL:  Thank you.

11                   THE COURT:  I don't think the word "later" belongs

12       here.  If they've made the election before, they've made it

13       before, so I think it just comes out.

14                   I'm now into solicitation procedures.  And so I

15       don't think your voting time works.  This is going to be

16       pretty easy to fix once you figure out what you need and we

17       can move a date or two.  But the way that this is written is

18       you've got up until seven days before confirmation in order to

19       file an objection.  And so I did these based on the date I've

20       given you.  But that meant that -- I'm sorry, the voting

21       deadline to object.

22                   So the voting deadline is the 25th, so that means

23       that you have to resolve all objections by the 23rd, but you

24       don't have to object to them until the 18th, which is a

25       Friday, and you serve them by U.S. Mail, and they're received

1    on Tuesday.  And that means we have to get an order entered on

2    Wednesday.  It just doesn't work.  And I need you to figure

3    out how the timing can work, so that you can get to an orderly

4    confirmation hearing, you can make the objections you need,

5    and somehow people have due process time to file an objection.

6    And I have to have an opportunity to rule on the objection.

7    So --

8             MS. SPIGEL:  Okay.

9             THE COURT:  -- unless I'm missing these dates, what

10   I've written here on the redline is what you've proposed.  And

11   if that's right, it doesn't work, and I'll let you figure out

12   what does, but ...

13            MS. SPIGEL:  Okay.  We can just propose different

14   language.

15            THE COURT:  Yeah.  And it may be that we can move

16   the voting deadline and maybe you can move up your objection

17   deadline.  I'm going to let -- I'm happy to talk through it

18   right now, but I think probably you need to sit down with a

19   calendar and figure out what you need, now that you got real

20   dates.  And instead of -- probably, if you don't mind, instead

21   of putting in, you know, it will be X number of days before,

22   now that you have real dates, why don't you put the real dates

23   on in here, and then everyone will be able to see what needs

24   to happen.

25            MS. SPIGEL:  I think I can probably simplify all of

1    this by just doing what we've agreed to do with ERCOT.

2                    THE COURT:  Sure.  That may work.

3                    MS. SPIGEL:  Okay.  Well, we can propose language.

4                    THE COURT:  And then, in Paragraph 3(e), I don't

5    think this works, either.  So, if we allow a claim on

6    Wednesday, which is the date you've said I need to allow the

7    claim on, and the voting deadline is Friday, how does Stretto

8    get out something and people have an opportunity to vote by

9    four o'clock, and then it's all counted.  It just -- it's an

10   impossibly short period of time, I think.

11                   MS. SPIGEL:  Okay.  We'll go back through that.  But

12   this is not an issue.  We'll make sure that there's sufficient

13   time.

14                   THE COURT:  Okay.  This is the same issue and you

15   don't need to serve people, you just need to file things.

16                   So, and filed and scheduled claims for establishing

17   claim amounts, I didn't understand what (iii) that wasn't (I)

18   because, if the Debtor settles and agrees with the creditor,

19   fine; if we ordered it, fine.  But otherwise, I don't know how

20   the Debtor does it in any way that isn't also signed up by the

21   creditors.  So I think (iii) comes out, but maybe I'm missing

22   the point.

23                   In 2(c), the Debtor can't determine that a claim

24   that is filed in a dollar amount doesn't count because the

25   Debtor doesn't think it's liquidated.  You've got to object to

1       it.  You don't have the unilateral right to disallow a claim.

2       If somebody says I'm owed a million dollars and you don't

3       object to it, they're owed a million dollars, and you don't

4       get to say not really, we don't think that's been properly

5       liquidated or liquidated at all.  So I'm going to require that

6       change to be made.

7               Same problem in Subparagraph (c) with one that's

8       partially liquidated and partially unliquidated.

9               Subparagraph (e) is the allowed Class 5 claim

10      problem that just repeats itself there.

11              So the ballots, I'll tell people they have to cast

12      their ballots by 5, and everything else says they've got to

13      cast their ballots by 4.  So this is probably 30 changes.  I

14      didn't mark them; I just marked the 1.  I don't care between 4

15      and 5, I just want to be sure the ballots are the same as the

16      order.

17              Wait a minute.  I think I've -- that may be the end

18      of the comments.  Hold on just a second.

19          (Pause in proceedings)

20              THE COURT:  On the nonvoting status, this may not

21      matter because of who the nonvoting folks are, but they didn't

22      end up with opt-out rights, I don't think.  And I think,

23      technically, you want to be sure that, even if they don't

24      intend to exercise them, that they have opt-out rights for the

25      nonvoting parties.

1          MS. SPIGEL:  I think the Plan only provides for

2     those people who vote on the Plan are subject to the third-

3     party releases.

4          THE COURT:  Well, you impair someone if you take

5     away their right.  And so, if you're going to make them give

6     the release, you've impaired them.  You have to give them the

7     option not to give a release.

8          MS. SPIGEL:  But they wouldn't be nonvoting, then

9     they would get a ballot.

10         THE COURT:  No, they're --

11         MS. SPIGEL:  Am I --

12         THE COURT:  This --

13         MS. SPIGEL:  -- misunderstanding you?

14         THE COURT:  Yeah, this is an unimpaired class of

15    creditors.  I think you want those folks given releases.  The

16    only way that I can make somebody that is unimpaired give a

17    released is if they have the right not to give a release, or

18    lease I've suddenly impaired them by making them give a

19    release.

20         MS. SPIGEL:  If you'd give me one second, Your

21    Honor.

22         THE COURT:  Sure.  I think these are like your

23    secured creditors.  I don't think this is an issue, other than

24    a technical one, where I can't impose releases without giving

25    people opt-out rights.

1          MS. SPIGEL:  Well, the Plan -- I mean, I'd like to

2     change the Plan then because the Plan provides that, you know,

3     the people who are giving releases are holders of the claims

4     and the class entitled to vote on the Plan.  So, if they're

5     not voting, then they don't --

6          THE COURT:  Oh, okay.

7          MS. SPIGEL:  They're not (indiscernible).

8          THE COURT:  Oh, okay.  Then that's my fault.

9          MS. SPIGEL:  (Indiscernible).

10          THE COURT:  Yep.  Then, if these folks aren't giving

11     releases, that's fine.  That will -- you can ignore that

12     comment.  Thank you.

13          MS. SPIGEL:  I --

14          THE COURT:  You're right; I'm wrong.

15          MS. SPIGEL:  I'd rather change -- I'd rather change

16     the Plan, if Your Honor is amenable, and make that change.

17          THE COURT:  Okay.  That's it.  Those are all of my

18     comments.

19          So what I would suggest you do, since some of that

20     is just you working through a calendar and figuring out hgow

21     do to it -- I don't think we need another hearing, unless

22     somebody else believes we do need another hearing.  What I

23     would request is, is that you upload a revised form of order

24     and a revised Plan.  The revised Plan only needs to be revised

25     to deal with this voting issue for Class 5.  And then the

1    revised form of order needs to deal with, you know, the

2    different issues I've shown you, unless you want another

3    hearing.  I'll just ask you to contact Ms. Do, and she'll

4    bring it in to me, and I should be able to do it the same day

5    that you get it filed, which I'm assuming will be overnight

6    tonight, and probably tomorrow I'll be able to sign the order.

7            I know that my comments aren't extensive, but I just

8    want to be sure that the public has a clear understanding of

9    what we're doing and that, you know, there's no ambiguity

10   about how these different deadlines are going to work in

11   there.  Do you want another hearing or are you okay just doing

12   it with submission?

13           MS. SPIGEL:  No, thank you, Your Honor.  Thank you.

14   You've been generous with your time.  I'm fine doing a

15   submission.

16           THE COURT:  So let me ask Mr. Gibbs.  Does the

17   Committee -- my preference would be for you to simply work

18   informally with the Debtor to be sure you're happy and trust

19   that, when they file it, they -- you're not going to object.

20   But if you want to formally participate in the submission,

21   that's fine.  What do you need?

22           MR. GIBBS:  Well, we'll work with them in good

23   faith, which has been done fine that way and we'll continue to

24   do so.

25           And for the Record, on behalf of the Committee, I

1    wanted the Record to reflect that the summary of the

2    settlement that Ms. Spigel read into the Record, as well as a

3    summary of the terms that are not reflected in the Plan as

4    yet, was complete and accurate and consistent with our

5    understanding of the agreements.

6                THE COURT:  Thank you, Mr. Gibbs.

7                Mr. Gibbs, with respect to the letter that you

8    filed.  I have reviewed the letter --

9                MR. GIBBS:  Yes, sir.

10               THE COURT:  I have reviewed the letter -- I have

11   reviewed the letter.  It is my belief under applicable law

12   that I cannot and should not control your communications with

13   your clients.  And so, to the extent that the Debtor has

14   agreed to include that letter from you to your clients in

15   their informational packets, I don't believe I play a role in

16   approving or disapproving of that.

17               MR. GIBBS:  We're fine with that, Your Honor.

18               THE COURT:  Thank you.

19               What else should we accomplish today?  I really

20   appreciate all the hard work --

21               MS. SPIGEL:  So --

22               THE COURT:  -- everybody has put into this, by the

23   way.  It's very helpful.  Thank you all.

24               MS. SPIGEL:  Thank you, Your Honor.

25               I think the one thing that we'd like to talk about,

1        if it's okay with you, is just some conceptual issues with the

2        sealing that was -- that we sought from Your Honor before we

3        had a global settlement.  If that would be okay, we'd just

4        like to preview what we're thinking about that.  I know we

5        have to respond to Your Honor by tomorrow.  But if I could

6        turn the virtual podium to my colleague, Chris Newcomb, that

7        would be helpful.

8                    THE COURT:  Of course.

9                    Mr. Newcomb, would you press five-star one time on

10       your phone, please?  I see you.  It will take me just a second

11       to get your line open.

12                   Mr. Newcomb, is that you from the 646 area code?

13                   MR. NEWCOMB:  It is, Your Honor.  Good afternoon.

14                   THE COURT:  Good afternoon.

15                   MR. NEWCOMB:  Again, for the Record, it's Chris

16       Newcomb of Baker Botts on behalf of the Debtor.

17                   Your Honor, at the hearing on the 29th, April 29th,

18       you asked the parties to take another look at the material

19       that was redacted in the Committee's objections with respect

20       to the Disclosure Statement and the Debtors' motion to quash,

21       and you asked us to scale back the redactions to the extent

22       appropriate.  And subsequently, you issued an order to confer

23       that instructed the Debtor and the Committee to discuss the

24       necessity for some of the redactions and see if -- and then

25       report back to you on sort of where we came out there.

1          And so we thought it would be helpful to address

2     those issues, if it's okay with Your Honor today, rather than

3     --  before we're scheduled to file something in the next day

4     or so.

5          THE COURT:  All right.  Sure.  I'm not technically

6     prepared on that question, but it's not like I've forgotten it

7     either, but I haven't reviewed the stuff in the last day.

8          MR. NEWCOMB:  Sure.  Yeah, we just thought we'd sort

9     of preview sort of where we're headed, just so you can -- just

10    so you had a sense of what we're doing there.

11         Following the April 29th hearing, we reviewed the

12    information that was redacted and we worked to scale it back

13    based on what we believed were the appropriate, given the

14    understanding of the Bankruptcy Code and what Your Honor's

15    statements were on the Record.  We have reached an agreement

16    with the Committee and the non-Debtor affiliates regarding the

17    redactions to the Committee's objections to the Disclosure

18    Statement and the motion to quash.  We also consulted with the

19    U.S. Trustee's Office, and they didn't have any objection to

20    the approach that we took.

21         So, if the Court is agreeable, we can simply refile

22    those objections with the redactions and you can take a look.

23    I think you'll find that there's very little redacted now, and

24    what is redacted is simply some information regarding the

25    valuation of non-Debtor assets that the Committee alluded to,

45

1    and then also some sensitive data in the IP license agreement,

2    each of which we think is appropriate to redact.

3              THE COURT:  So do you --

4              MR. NEWCOMB:  The Committee also filed a --

5              THE COURT:  Are you -- could you refresh my

6    recollection.  Did I put you on a deadline for filing

7    something besides that?

8              MR. NEWCOMB:  Yes, I believe the order said that we

9    should confer by yesterday and then we're supposed to file

10   something by tomorrow.

11             THE COURT:  Okay.  And you're going to be doing

12   that.

13             MR. NEWCOMB:  Yeah.  And that's with respect to the

14   two objections.

15             The Committee also filed a declaration of counsel in

16   support of the objections, and that attached a number of

17   exhibits, some of which were filed fully under seal.  And some

18   of those sealed documents do pose some confidentiality

19   concerns.

20             The Debtor and the Committee and the non-Debtor

21   affiliates have gone back and reviewed those and we've come to

22   an agreement on what we think is the appropriate scope of, you

23   know, what should be sealed, what should be redacted in part,

24   and what can be unsealed in full.  However, on those

25   documents, we thought it might make sense to do something a

1    little bit different.  We'd like to propose an alternative

2    approach that we think would be a little less burdensome and

3    can avoid the parties having to get into the substance and the

4    exhibits.

5           Specifically, we proposed that, since the Committee

6    -- since the Court hasn't ruled -- hadn't ruled on the

7    Committee's Disclosure Statement objection and the Committee

8    is no longer pressing it, but they could simply withdraw those

9    documents, and you know, without prejudice to having to

10   refile, you know (indiscernible) to the Committee down the

11   line.  And that would make it so that, you know, the Court

12   would no longer have to rule on the sealing of those

13   documents.  The Committee and the non-Debtor affiliates are

14   both on board with that approach, and we raised it with the

15   U.S. Trustee, and they didn't have any issues with that

16   approach, either.

17          So I would note that the Court did rule on the

18   motion to quash previously, but we're not aware and we do

19   think that the Court was specifically alluding to those

20   documents or the information in those documents when it ruled,

21   so we think it still works procedurally.

22          THE COURT:  All right.  Does anybody else want to

23   address the redaction question?

24       (No verbal response)

25          THE COURT:  Okay.  Look, I thank you.  Now that the

1    objections have resolved, the issue takes on less importance

2    to me, now that the parties have agreed on appropriate

3    redactions, the issue takes on less importance.  This is the

4    Court acting *sua sponte*.  The only part of what you have

5    suggested -- and obviously, I need to look at what you file,

6    but I'm just accepting it at face value and doubt that I'm

7    going to have a problem.

8         You know, one of the problems with the world is, is

9    once you do it, you can't undo it.  So I don't think

10   withdrawing them does any good at all.  They are there and

11   they're there permanently.  Having said that, the focus

12   shouldn't be on whether an exhibit is redacted that isn't

13   going to be used.  The focus ought to be on what the

14   substantive relief is that people are arguing with.  And that,

15   you're telling me, is going to largely be unredacted.

16        So I'm just going to withdraw that portion of my

17   order that applies to the exhibits for now.  We're just going

18   to leave them under seal.  If it comes up that maybe they

19   ought to be unsealed, any party can seek to do that, and then

20   you're going to file the other matters largely unredacted, and

21   I suspect that will simply resolve the question.  Is that okay

22   with you, Mr. Newcomb?

23        MR. NEWCOMB:  That's great, Your Honor.  We really

24   do appreciate that, and we will get the redacted versions of

25   the objections on file as quickly as we can.

1          THE COURT:  Is there any party that has any

2    objection to that?  And if so, I'd particularly like to hear

3    form the Attorney General's Office, as well as the U.S.

4    Trustee's Office, you know, both of whom, like me, should be

5    worried about whether the public has adequate information when

6    they're reviewing documents that are filed.  And this seems

7    like a fairly decent way to approach the problem.

8          Ms. Ryan, if you want to speak up.  Mr. Statham, if

9    you want to speak up.  If somebody thinks we need, you know,

10   something different than that, I'm perfectly willing to hear

11   it.  But this is something I raised *sua sponte*.  So that

12   doesn't preclude you, but I need to hear from you.  Let me get

13   your lines active.

14         I've got Ms. Ryan, you should be authorized now.  Go

15   ahead, Ms. Ryan.

16         MS. RYAN:  Good afternoon, Your Honor.  And for the

17   record, it's Abigail Ryan with the Office of the Texas

18   Attorney General.

19         I think the way that you've handled the redaction

20   issue here is appropriate in this case, and I appreciate the

21   way that you've decided to handle it, Your Honor.  I think

22   that's fine.

23         THE COURT:  Thank you.

24         Mr. Statham?

25         MR. STATHAM:  Thank you, Your Honor.  Steve Statham

1    for the U.S. Trustee.

2         We had an opportunity to visit with the UCC counsel

3    and Debtor and are in agreement with the Court's approach in

4    this particular matter.  Thanks.  Thanks for the opportunity

5    to weigh in.

6         THE COURT:  Thank you.

7         Well, then, Mr. Newcomb let's do that.  What else --

8         MR. NEWCOMB:  Thank you, Your Honor.

9         THE COURT:  What else should we try and accomplish

10   today?

11       (No verbal response)

12        THE COURT:  All right.  Thank you for all the hard

13   work.

14        MS. SPIGEL:  I think --

15        THE COURT:  And Ms. Spigel, you will contact or have

16   someone contact Ms. Do to get me that material just as soon as

17   it's filed.  I know that you're sensitive on time and I

18   promise it will get really quick attention.  So, you know, if

19   you file it in the morning, I'll get it done tomorrow

20   afternoon or maybe even tomorrow morning.

21        MS. SPIGEL:  Okay.  Thank you, Your Honor.  We want

22   to make sure Mr. Gibbs gets the vacation, so we'll get it to

23   you as soon as we can.

24        THE COURT:  All right.  He needs one.  Maybe he'll

25   be in a better mood in the next case.

1        (Laughter)

2            THE COURT:  All right.

3            MR. GIBBS:  I wouldn't miss it.

4            MS. SPIGEL:  Thank you.

5            THE COURT:  Thank you all.  We're in adjournment.

6            MR. GIBBS:  Thank you.

7            MS. SPIGEL:  Thank you very much.

8            COUNSEL:  Thank you, Your Honor.  Thank you.

9            THE COURT:  Thank you.

10       (Proceedings adjourned at 2:30 p.m.)

11                         * * * * *

12       *I certify that the foregoing is a correct transcript*

13   *to the best of my ability produced from the electronic sound*

14   *recording of the proceedings in the above-entitled matter.*

15     */S./ MARY D. HENRY*

16   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

17   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

18   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

19   *JTT TRANSCRIPT #64030*

20   *DATE FILED:  MAY 25, 2021*

21

22

23

24

25