**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| GRIDDY ENERGY LLC,[1] | ) | Case No. 21-30923 (MI) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**EXPERT REPORT AND DECLARATION OF TONY W. SPENCER**

---

[1]   The Debtor in this chapter 11 case, along with the last four digits of its federal tax identification number, is Griddy Energy LLC (1396).  The mailing address for the Debtor is PO Box 1288, Greens Farms, CT 06838.

## I.     <u>Qualifications</u>

My name is Tony W. Spencer and I am the Executive Vice President – Sales Operations of the National Loan Exchange, Inc. ("<u>NLEX</u>"). NLEX is the highest volume loan sale advisor of charged-off receivables in the United States and Canada. Among other things, NLEX provides debt buyers with bid opportunities for portfolios on behalf of many of the world's top financial institutions and provides full service loan sale advisory services, including, assisting companies with developing a comprehensive marketing strategy to optimize the value of receivables, assisting with market-based valuations by utilizing its extensive asset sales dataset and market insight, presenting bids, and assisting NLEX's clients with purchase and sale negotiations and closing portfolio sales. As Executive Vice President – Sale Operations at NLEX, I am responsible for the marketing of all portfolios across all NLEX clients.

I have been employed with NLEX since 2007. Prior to my current role at NLEX, I was a Vice President in business development. Prior to that time, I was a Vice President of Recovery at JPMorgan Chase card services where I managed the charged-off sale of consumer accounts receivables, external agency, litigation, and bankruptcy processes for the private label card services division. I was also the Group Manager of Recovery and Strategic Operations at First North American National Bank.

In my current role at NLEX, I will typically participate in approximately forty transactions per month involving the sale of charged-off debt. I am not aware of any other loan sale advisor who has as much transparency in today's market as NLEX. In a typical transaction, NLEX will (a) provide its clients with portfolio evaluations to assist in predicting the value of each individual portfolio, (b) prepare the portfolios for marketing, (c) market the portfolio, (d) present bids, and (e) assist with purchase and sale negotiations and closing the portfolio sale.

When marketing debt portfolios for sale, NLEX has over 400 potential buyers who are registered to bid on individual portfolios. NLEX typically has ten to fifteen buyers engaged with reviewing the portfolios that are marketed. Buyer engagement for any given transaction depends upon the type of portfolio being marketed, including asset type, age of asset, whether the asset is secured, and whether a bankruptcy is involved.

Throughout my professional career, I have gained experience selling and evaluating consumer debt, including utility-related debt and debt affected by unusual circumstances.

The Debtor is paying me a flat fee of $3,500 in connection with my services in this matter, plus reasonable and documented out-of-pocket expenses.

## II. Factual Background

Except as otherwise indicated below, I assume the following facts are true for purposes of my opinions.

Griddy Energy LLC ("Griddy") is a Texas retail electric provider and, prior to the end of February 2021, sold electricity to customers.[2] Griddy provided its customers with the ability to purchase wholesale electricity with no mark-up.[3] Prior to the events that precipitated Griddy's chapter 11 case, Griddy had approximately 29,000 customers.[4]

Griddy's business model involved charging a fixed monthly fee of $9.99 for each customer in exchange for access to wholesale electricity costs with no mark-up.[5] Prior to February 2021, Griddy's customers paid an average rate of $0.098 per kilowatt hour,[6] representing aggregate

---

[2] *Declaration of Michael Fallquist in Support of Chapter 11 Petition and First Day Pleadings* [Docket No. 21] ("Declaration of Michael Fallquist") ¶ 5.
[3] Declaration of Michael Fallquist ¶ 5.
[4] Declaration of Michael Fallquist ¶ 12.
[5] Declaration of Michael Fallquist ¶ 16.
[6] The average rate includes wholesale electricity costs, TDSP charges, ancillary services, the Griddy membership fee and other fees and credits. This rate excludes taxes. Declaration of Michael Fallquist ¶ 6 n.2.

savings of more than $17 million dollars since 2017 as compared with the Energy Information Agency ("<u>EIA</u>") Texas average.[7]

Griddy used a prepayment model to charge customers for electricity.[8]  At the time of enrollment, customers added a payment method such as a credit or debit card to their accounts and an initial electricity prepayment of $49 was processed to establish an account balance.[9]  Typically, billed electricity amounts were calculated daily, one day in arrears for each customer using their meter data published on Smart Meter Texas, and automatically deducted from their account balance.[10]  Additional charges, such as (a) Energy Reliability Council of Texas, Inc. ("<u>ERCOT</u>") ancillary services, (b) transmission and distribution service providers charges, and (c) transmission and distribution losses were calculated and allocated to the customer.[11]

In Texas, the wholesale price of electricity changes every five minutes and is determined by ERCOT based on real-time supply and demand for electricity.[12]  The wholesale price of electricity is subject to a $9,000 per megawatt hour ("<u>MWh</u>") market cap, and it can be as low as $0 per MWh or even negative.[13]

In February 2021, Winter Storm Uri brought extreme cold weather to Texas.[14]  On February 15, 2021, in response to the electric load shedding required to balance a grid experiencing unprecedented outages, the Public Utilities Commission of Texas (the "<u>PUCT</u>") adopted an order instructing ERCOT to set the real-time settlement point price at the high offer cap of $9,000 per

---

[7]        Declaration of Michael Fallquist ¶ 6.
[8]        Declaration of Michael Fallquist ¶ 17.
[9]        Declaration of Michael Fallquist ¶ 17.
[10]      Declaration of Michael Fallquist ¶ 17.
[11]      Declaration of Michael Fallquist ¶ 17.
[12]      Declaration of Michael Fallquist ¶ 18.
[13]      Declaration of Michael Fallquist ¶ 18.
[14]      Declaration of Michael Fallquist ¶ 33.

MWh.[15]  This order went into effect immediately and ERCOT held this pricing in place until February 19, 2021, representing a total duration of 87.5 consecutive hours.[16]

Also on February 15, 2021, ERCOT issued an Energy Emergency Alert 3 resulting in rolling blackouts that left millions of Texans without power.[17]

In advance of these high rates taking effect, Griddy had urged its customers to switch providers to avoid the high rates being passed-through directly to the customers.[18]  In total, 9,722 of Griddy's customers were able to switch providers prior to the catastrophic market failure on February 15, 2021.[19]  Many customers, however, did not switch providers prior to this date and were charged at the unusually high wholesale rates.[20]

Griddy contends that the PUCT order instructing ERCOT to set the real-time settlement point price at the high offer cap of $9,000 per MWh should have been lifted on February 17, 2021 at 11:55 p.m. when ERCOT rescinded load shed instructions.[21]  Potomac Economics, Ltd., the Independent Market Monitor, reported in a letter to the PUCT, dated March 4, 2021, that ERCOT's failure to remove the price cap in accordance with the intent of the PUCT price order was "inappropriate pricing intervention" that resulted in $16 billion in additional costs.[22]

Around this time, many of Griddy's customers stopped paying their bills.[23]  ERCOT, however, continued to send Griddy multi-million dollar invoices for the power procured for the benefit of its customers during the storm and continued to make multi-million dollar collateral

---

[15]     Declaration of Michael Fallquist ¶ 34.
[16]     Declaration of Michael Fallquist ¶ 34.
[17]     Declaration of Michael Fallquist ¶ 41.
[18]     Declaration of Michael Fallquist ¶ 10.
[19]     Declaration of Michael Fallquist ¶ 40.
[20]     Declaration of Michael Fallquist ¶ 40.
[21]     Declaration of Michael Fallquist ¶ 35.
[22]     Declaration of Michael Fallquist ¶ 35; *see also*
http://interchange.puc.texas.gov/Documents/51812_61_1114183.PDF.
[23]     Disclosure Statement for Modified Third Amended Plan of Liquidation for Griddy Energy LLC Under Chapter 11 of the Bankruptcy Code, Docket No. 312 at pp. 51-52.

demands pursuant to ERCOT protocols.[24]  Griddy earned only a fixed fee of $9.99 per month per customer regardless of whether the wholesale cost of electricity was high or low, and it also had little to no incoming funds at that point to pay these bills.[25] As a result, ultimately, Griddy was unable to pay ERCOT for the outstanding charges or meet ERCOT's collateral call demands.[26]

Griddy currently has no customers as a result of ERCOT's forced mass transition of Griddy's customers on February 26, 2021.[27]

Reports of Griddy customers receiving high bills (due to the circumstances described above outside of Griddy's control) circulated in the media following Winter Storm Uri.  Certain of these reports noted that Griddy customers were generally surprised or upset by the bills they incurred in connection with the winter storm.

After the occurrence of the winter storm event, several customers filed actions against Griddy seeking, among other things, to enjoin the collection of the Griddy's customer debt incurred in connection with the winter storm on grounds the Debtor believes are baseless.  On February 28, 2021, the State of Texas, by and through the Attorney General, brought a civil suit against Griddy and its parent company.[28]  This suit also sought to enjoin the collection of the Griddy's customer debt incurred in connection with the winter storm.[29]

---

[24]     Disclosure Statement for Modified Third Amended Plan of Liquidation for Griddy Energy LLC Under Chapter 11 of the Bankruptcy Code, Docket No. 312 at pp. 51-52.
[25]     Disclosure Statement for Modified Third Amended Plan of Liquidation for Griddy Energy LLC Under Chapter 11 of the Bankruptcy Code, Docket No. 312 at pp. 51-52.
[26]     Disclosure Statement for Modified Third Amended Plan of Liquidation for Griddy Energy LLC Under Chapter 11 of the Bankruptcy Code, Docket No. 312 at pp. 51-52.
[27]     Declaration of Michael Fallquist ¶ 5.
[28]     Plaintiff's Original Petition, *State of Texas v. Griddy,* Case No. 2021-11518, 133rd Judicial District Court of Harris County, Texas (Feb. 28, 2021).
[29]     I understand that a motion to approve a settlement between the State of Texas, Griddy and its parent company has been filed with the Court.  *See* Docket No. 338.  There is no admission of wrongdoing or liability in connection with the settlement.

On March 15, 2021, Griddy filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.  As of that date, Griddy had accounts receivable balances from its former customers in excess of $29.1 million.

## III.      Assignment

I have been asked by counsel for the Debtor to opine on (a) how the market for consumer debt functions generally, (b) how factors affect the value of consumer debt for resale under circumstances where the debt is not incurred as a result of an unusual or unexpected circumstance, (c) how unusual or unexpected circumstances affect the value of consumer debt, (d) how these factors generally affect the value and marketability of the Griddy portfolio of outstanding customer receivables debt, and (e) the amount for which the Griddy portfolio of outstanding customer receivables debt might be sold.

## IV.      Summary of Opinions

Based on my knowledge and experience with how the market for consumer debt generally functions and how normal and usual factors may affect the value of a consumer debt portfolio, I conclude:

- But for unusual characteristics, such as those that are present with the Griddy consumer debt portfolio and its surrounding circumstances, typical utility debt in the amounts and ages of the Griddy portfolio could be sold in the range of 8 to 10 cents on the dollar.

- Unusual and unexpected circumstances such as those described in Section VI.d below most certainly would negatively impact that value of a debt portfolio.

- In the case of Griddy, in light of the unexpected nature of the debt, the fact that customers may argue the debt was beyond their control, the litigation risks associated with the debt, the current (and potential future) negative publicity surrounding the debt, and the fact that the debt would likely need to be sold on an "as-is, where is" basis, I believe that the Griddy portfolio of outstanding customer receivables would be difficult to market and worth far less than the 8 to 10 cents on the dollar range described above.

7

- The most a seller could expect to receive for debt such as the Griddy portfolio of outstanding customer receivables debt is 1 to 1.75 cents on the dollar.

## V.     Materials Relied Upon

The materials I relied upon in forming my opinions are listed in Appendix A to this Report.

## VI.    Analysis and Opinions

### a.    Opinions Regarding the Market for Griddy Outstanding Consumer Receivables Debt

From time to time, consumer debt holders such as Griddy choose to sell a portfolio of receivables in the debt market in order to salvage some value from the receivables. These receivables often include hundreds or thousands of individual accounts which the seller has been unable to collect for a variety of reasons including the type of the debt, the age of the receivable, or previous attempts to collect the receivables. Often companies find that selling consumer debt provides a more efficient and effective way to capitalize on outstanding receivables than pursuing the accounts individually. Sellers of ordinary consumer debt are often able to find buyers in the debt market. However, Sellers of debt with unusual characteristics often face much more uncertainty.

My employer, NLEX, and a handful of other companies like it act as loan sale advisors connecting holders of receivables with potential buyers. When loan sale advisors such as NLEX are approached by a seller with a portfolio of receivables, the advisors collect information from the seller about the debt and then contact various purchasers of debt who might be interested given the characteristics of the debt in question.

If a portfolio of receivables is purchased, the rights to collect the debt therein are transferred to the buyer. For even the most attractive portfolios, the price paid generally is pennies on the dollar. This is usually because the original debt holder has already made a determination that, from its perspective, the effort needed to collect the receivables in question outweighs the probable

8

amount of collection and/or because the original debt holder would prefer a lesser amount now as opposed to waiting on collections in the future.  These concerns are especially true for those debt holders who do not regularly perform collections-related activity with its attendant costs, risks, and regulatory burdens.  Large-scale debt purchasers, however, are in the business of performing such collections.  Most have developed businesses purchasing and collecting consumer debt on a large scale and in a manner which is efficient, compliant with regulatory constraints, and in keeping with the ethical standards of the industry.

After purchasing the consumer debt, buyers will employ a variety of strategies to collect the outstanding receivables, including contacting the customer via various means and, if the customer appears able but unwilling to pay, considering legal action.  At times, buyers will refer the debt to another third-party collection agency working on commission or resell the debt to another buyer.

The collection efforts of these buyers are subject to myriad local, state, and national regulations, including the Fair Debt Collection Practices Act, and oversight by agencies, including the Federal Trade Commission and the Consumer Financial Protection Bureau (the "CFPB").  These agencies devote substantial resources on oversight activities designed to ensure debt collection activities do not violate applicable law.  The CFPB, for example, can initiate investigations of debt collection activities, conduct hearings, assess penalties, and require refunds to customers, among other oversight and enforcement actions.

**b.      Opinions Regarding Valuing Consumer Debt for Resale Under Normal Circumstances**

In my role at NLEX and in past positions, I have assessed many times the value at which consumer debt can be resold to a buyer on the debt market.  For the majority of portfolios of receivables, value on the debt market is primarily a function of the following factors:

- Type of debt (*i.e.*, mortgage, credit card, utility, etc.);

- Age of the receivables;

- Average balance of the receivables;

- Current market conditions and overall economic environment; and

- Previous work undertaken to attempt to collect the receivables.

Secured debt, for example, is typically more valuable than unsecured debt. More recent debt is typically more valuable than older debt. Portfolios with higher average balances are typically more valuable than those with lower balances.

I understand that the debt incurred by Griddy's former customers stems from unpaid bills for the electricity the former customers consumed at any given time, with most or all of the unpaid bills arising from the Texas winter storm event. One or more of the factors listed above are typically used in valuing utility debt portfolios for sale. On average, consumer utility debt may be sold in the range of 1 to 10 cents on the dollar, assuming there are no unusual circumstances associated with the portfolio.

I have reviewed the characteristics of the Griddy portfolio, including the age of the receivables and average balance.[30] I am also familiar with current market conditions for debt portfolios generally and the overall economic environment. But for the unusual characteristics of the Griddy portfolio, it is feasible it otherwise could be sold in the range of 8 to 10 cents on the dollar. As described in further detail below, however, the unusual circumstances associated with this portfolio render it far less valuable, and difficult to market.

---

[30] *See* Exhibit 1, Griddy Customer Data.xlsx.

10

### c. Opinions Regarding Consumer Debt with Unusual Characteristics

The factors discussed above in Section VI.b are employed by most market participants in valuing debt portfolios. While some participants view such factors differently than others, they are quantifiable metrics that can usually be described with a reasonable degree of objectivity. From time-to-time, however, a debt portfolio is considered for sale with unusual characteristics undermining its value. Such circumstances may include:

- Bankruptcy or litigation involving the original owner of the debt;

- Negative publicity and/or negative reputational implications of purchasing debt associated with negative publicity;

- Debt that is unexpected from the consumer's perspective; and/or

- Debt that is incurred through circumstances beyond the control of the consumer.

I have experience attempting to market debt with many of the above-listed characteristics. The presence of such characteristics drives down the value of the portfolio and, generally, reduces any buyer interest.

### d. Opinions Regarding the Presence of Factors Negatively Impacting the Griddy Customer Receivables Portfolio

Based on my experience and expertise with the market for consumer debt, I believe that the value of Griddy's customer receivables portfolio of approximately $29 million is greatly reduced due to its unusual characteristics. I believe that NLEX would not agree to sell this debt and very few potential buyers would be interested in assessing this portfolio for purchase.

An important provision generally included in a purchase and sale agreement for the purchase a portfolio of receivables is the refund mechanism for "ineligible accounts." Ineligible accounts are individual accounts for which the consumer challenges the debt for one or more specific reasons set forth in the agreement or the debt is otherwise compromised or uncollectible as a result of, for example, bankruptcy, death, or a representation or warranty regarding the

receivables being untrue.  In a typical purchase and sale agreement, if the consumer challenges the debt for one such reason, the buyer has the ability to seek a refund from the seller for the amount paid for that account.

Here, it is my understanding that Griddy is in liquidation and it would be highly unlikely that Griddy would be in a position to agree to provide refunds in respect of any ineligible accounts.  As a result, the Griddy portfolio would likely be sold on an "as-is, where-is" basis, meaning the buyer would have no right to seek a refund for ineligible accounts after purchase.  Such sales are not typical and would likely result in at least a 50% reduction in the sale price of the portfolio.

Additional factors affecting the value of the debt are described below.

i.     *Griddy customers likely view the debt as unexpected and incurred due to circumstances at least partly beyond their control.*

Much of the debt in the Griddy consumer accounts receivable portfolio represents amounts customers were not expecting to incur.  My understanding is that:

- Prior to mid-February 2021, Griddy's customers paid an average rate of $0.098 per kilowatt hour.[31]

- During the February Texas winter storm, the PUCT ordered electricity prices be set to $9,000 per megawatt hour and ERCOT's held prices at this rate for 32 hours after firm load shed had stopped.[32]

- While Griddy customers had experienced price spikes in the past, they were of a short duration.  For example, for several days in August 2019, real-time electricity prices reached the $9,000 per MWh market cap for twelve 15-minute intervals over a three-day period (for a total of 3 hours).[33]  While Griddy's customers experienced higher-than-normal bills during the month of August 2019, customers who remained for the entire 2019 calendar 12-month period still achieved a lower cost of electricity as compared with the EIA Texas average.[34]

---

[31]     Declaration of Michael Fallquist ¶ 6.
[32]     Declaration of Michael Fallquist ¶ 9.
[33]     Declaration of Michael Fallquist ¶ 19.
[34]     Declaration of Michael Fallquist ¶ 19.

- Moreover, the storm and resulting cold temperatures were worse than expected catching both electricity generating entities and customers off-guard.[35]

In short, a buyer would assume that many Griddy customers did not intend or plan to incur utility debt at the levels caused by the winter storm.

Collecting from consumers whose debt has been sold by the original owner is already difficult. In my experience, consumers who were not expecting to incur debt and dispute whether it was incurred voluntarily are less likely to pay compared to consumers who were simply unable or unwilling to pay at the time the debt was owed. For example, medical debt is sometimes incurred in circumstances where the person does not plan to incur the debt. Such debt is typically resold at a lower value than, for example, consumer credit card debt. Participants in the consumer debt market understand that collecting from customers such as this is difficult and expensive. Medical debt, however, is commonly seen in the consumer debt market and the participants are familiar with its risks and valuation. The circumstances surrounding the Griddy customer receivables portfolio are far less common, meaning the recovery of the portfolio is less certain and the value lower.

> ii. *There is a risk the State of Texas could seek to enjoin collection of the debt.*

A buyer of the Griddy consumer debt would also be faced with the possibility that the State of Texas could seek to enjoin collection of the Griddy consumer debt. As noted above, the State of Texas brought a civil suit against Griddy seeking, among other things, to enjoin the collection of the receivables. Although this suit has been settled without an admission of liability or wrongdoing, my understanding is that the settlement is based on the current chapter 11 bankruptcy plan of liquidation and the release of customers as described in the plan. I understand that, if the

---

[35]     Declaration of Michael Fallquist ¶¶ 37-41.

customer releases described in the plan are not approved by the Bankruptcy Court, the settlement does not become effective. In a situation where there was no settlement and Griddy was seeking to sell the consumer debt portfolio, it is highly likely that a hypothetical buyer either (a) if the portfolio is not sold on an "as-is, where-is" basis, would negotiate into the definition of ineligible accounts any suit by the State of Texas related to the collection of customer accounts receivable and require a refund for the debt in such event, or (b) if the portfolio is sold on an "as-is, where-is" basis, which I believe would be the case, significantly reduce the price for the portfolio. From the perspective of a buyer, the possibility that collection could be hampered, delayed or enjoined severely undermines the value of the portfolio.

> iii.      *There is a greater than usual risk Griddy customers would mount legal challenge to the debt.*

There is also a greater than usual risk that customers could mount legal challenges to the Griddy consumer debt portfolio. Debt buyers typically focus their initial efforts on contacting consumers and determining whether they are unable or simply unwilling to pay the outstanding receivable. While litigation is an avenue pursued by debt buyers, litigation can be expensive and time consuming and any factor making it more expensive or less likely to succeed subtracts from the value of the portfolio. Here, Griddy customers could try to challenge the validity of the debt by echoing concerns raised by the State of Texas. Indeed, I understand several customers filed actions against Griddy seeking, among other things, to enjoin the collection of the Griddy's customer debt incurred in connection with the winter storm. While I understand Griddy believes such claims have no merit whatsoever, pre-existing litigation challenging the validity of debt can serve as a roadmap for future challenges and entangle the buyer in litigating the merit of such claims. This further undermines the value of the portfolio and reduces buyer interest.

        iv.       *A sale of the Griddy portfolio could result in negative publicity and reputational risk for the buyer and any loan sale advisor associated with the transaction.*

The amounts charged to Griddy customers as a result of the extreme pricing during the February winter storm has received significant negative media attention. Continued pursuit of the customer debt by a buyer could lead to negative publicity for the buyer which is, in and of itself, undesirable. The same is true for a potential loan sale advisor for the portfolio. Negative publicity surrounding a transaction likely means market participants think twice before future dealings with the loan sale advisor who facilitated that transaction. Moreover, negative publicity may increase the chance of regulatory scrutiny, litigation risk, and political pressure on the industry. All of these concerns regarding publicity reduce the likelihood that a buyer could be found willing to pay any meaningful amount.

        **e.**       **Opinions Regarding the Value of the Portfolio**

As discussed above, typical utility debt in the amounts and ages of the Griddy portfolio could be sold in the range of 8 to 10 cents on the dollar. Several factors discussed above, however, make the Griddy portfolio unlike typical utility debt. In light of these factors, I believe that market interest for the portfolio would be low and any price would likely be in the maximum range of 2 to 3.5 cents on the dollar. I also believe that the debt, if sold, would likely be sold on an "as-is, where-is" basis, reducing the likely value by at least 50%. Therefore, the likely sale value of the Griddy portfolio, if it could be sold, would be in the range of 1 to 1.75 cents on the dollar.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 30, 2021

_____

Tony W. Spencer

16

## APPENDIX A

### Materials Considered

1.  Declaration of Michael Fallquist in Support of Chapter 11 Petition and First Day Pleadings, dated March 15, 2021, filed with the Bankruptcy Court, Bankruptcy Court Docket No. 21

2.  Disclosure Statement for Modified Third Amended Plan of Liquidation for Griddy Energy LLC Under Chapter 11 of the Bankruptcy Code, Bankruptcy Court Docket No. 312

3.  Plaintiff's Original Petition, *Khoury v. Griddy Energy LLC*, Case No. 2021-10004, 133rd Judicial District Court of Harris County, Texas (Feb. 22, 2021)

4.  Plaintiff's Original Petition, *Clark v. Griddy Energy LLC et al.*, Case No. 2021-12017, 151st Judicial District Court of Harris County, Texas (March 2, 2021)

5.  Plaintiff's Original Petition, *Huppert v. Griddy Energy LLC et al.*, Case No. 2021-12101, 270th Judicial District Court of Harris County, Texas (March 3, 2021)

6.  Plaintiff's Original Petition, *State of Texas v. Griddy*, Case No.2021-11518, 133rd District Court of Harris County, Texas (Feb. 28, 2021)

7.  Griddy Customer Data.xlsx, Attached hereto as Exhibit 1

Exhibit 1

Filed Under Seal