# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| GRIDDY ENERGY LLC,[1] | ) |
| | ) Case No. 21-30923 (MI) |
| Debtor. | ) |
| | ) |

## DISCLOSURE STATEMENT FOR MODIFIED THIRD AMENDED PLAN OF LIQUIDATION FOR GRIDDY ENERGY LLC UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

David Eastlake, Texas Bar No. 24074165
**BAKER BOTTS L.L.P.**
910 Louisiana Street
Houston, Texas 77002
Telephone: (713) 229-1234
Facsimile: (713) 229-1522
Email: *david.eastlake@bakerbotts.com*

Robin Spigel (admitted *pro hac vice*)
Chris Newcomb (admitted *pro hac vice*)
**BAKER BOTTS L.L.P.**
30 Rockefeller Plaza
New York, New York  10112-4498
Telephone:  (212) 408-2500
Facsimile: (212) 408-2501
Email:  *robin.spigel@bakerbotts.com*
　　　　*chris.newcomb@bakerbotts.com*

Dated:  May 26, 2021

---

[1] The last four digits of the Debtor's federal tax identification number are 1396.  The mailing address for the Debtor is PO Box 1288, Greens Farms, CT 06838.

# TABLE OF CONTENTS

Page

I.  INTRODUCTION AND EXECUTIVE SUMMARY ...................................................... 1

II. THE GLOBAL SETTLEMENT ........................................................................................ 4

III. SETTLEMENT WITH THE ATTORNEY GENERAL OF THE STATE OF TEXAS ................................................................................................................................. 7

IV. THE PLAN ....................................................................................................................... 9

    A.  Unclassified Claims ............................................................................................... 9

        1.  Unclassified Claims Summary ................................................................. 9

        2.  Unclassified Claims Detail .................................................................... 10

    B.  Classified Claims and Interests ............................................................................ 11

        1.  Summary of Classification and Treatment ............................................ 11

    C.  Classified Claims and Interests Detail ................................................................ 16

        1.  Class 1 – Prepetition Lender Claims ...................................................... 16

        2.  Class 2 – Other Secured Claims. ........................................................... 16

        3.  Class 3 – Priority Non-Tax Claims. ....................................................... 17

        4.  Class 4 – Other General Unsecured Claims. .......................................... 18

        5.  Class 5 – Customer Claims. ................................................................... 18

        6.  Class 6 – Intercompany Claims. ............................................................ 21

        7.  Class 7 – Existing HoldCo Interests. ..................................................... 21

    D.  Releases and Exculpation ..................................................................................... 22

    E.  Plan Administrator ............................................................................................... 32

    F.  Other Significant Plan Provisions. ....................................................................... 36

        1.  Comprehensive Settlement of Claims and Controversies ..................... 36

        2.  Causes of Action .................................................................................... 36

        3.  Texas Storm Causes of Action ............................................................... 37

        4.  Cancellation of Agreements, Equity Interests and Security Interests. ................................................................................................... 37

        5.  Distributions under the Plan ................................................................... 37

        6.  Assumption and Rejection of Executory Contracts and Unexpired Leases ..................................................................................................... 38

V.  VOTING PROCEDURES AND REQUIREMENTS ...................................................... 38

    A.  Classes Entitled to Vote on the Plan .................................................................... 38

    B.  Votes Required for Acceptance by a Class ........................................................... 39

    C.  Certain Factors To Be Considered Prior to Voting ............................................. 39

i

| | | | |
|---|---|---|---|
| **D.** | | **Classes Not Entitled To Vote on the Plan** | 40 |
| **E.** | | **Cramdown** | 40 |
| **F.** | | **Allowed Claims** | 40 |
| **G.** | | **Impairment Generally** | 40 |
| **H.** | | **Solicitation and Voting Process** | 41 |
| | **1.** | **The Solicitation Package** | 41 |
| | **2.** | **Voting Deadlines** | 42 |
| | **3.** | **Voting Instructions** | 42 |
| **I.** | | **The Combined Hearing.** | 45 |
| **VI.** | | **DESCRIPTION OF THE DEBTOR AND EVENTS LEADING TO CHAPTER 11 FILING** | 45 |
| | **A.** | **Overview of the Debtor and Its Business** | 45 |
| | **B.** | **Overview of Capital Structure; December 4, 2020 Business Combination** | 47 |
| | | 1. Prepetition Secured Facility | 49 |
| | **C.** | **Prepetition Litigation** | 50 |
| | **D.** | **Prepetition Term Sheet with the Attorney General of the State of Texas** | 50 |
| | **E.** | **Events Leading to this Chapter 11 Case** | 51 |
| | **F.** | **The Debtor's Wind Down and Liquidation** | 52 |
| **VII.** | | **THE CHAPTER 11 CASE** | 53 |
| | **A.** | **Significant Events During the Chapter 11 Case** | 53 |
| | | **1. First Day Matters** | 53 |
| | | **2. Additional Motions Filed in the Chapter 11 Case** | 54 |
| | | **3. Formation of the Committee** | 55 |
| | | **4. Schedules and Statements.** | 55 |
| | | **5. Establishment of a Claims Bar Dates.** | 55 |
| **VIII.** | | **CONFIRMATION PROCEDURES** | 55 |
| | **A.** | **Combined Disclosure Statement and Confirmation Hearing** | 55 |
| | **B.** | **Confirmation of the Plan/Adequacy of Information in the Disclosure Statement** | 56 |
| | | **1. Best Interests Test/Liquidation Analysis** | 57 |
| | | **2. Feasibility** | 58 |
| | | **3. Confirmation Without Acceptance by All Impaired Classes** | 58 |
| | | **4. No Unfair Discrimination** | 58 |
| | | **5. Fair and Equitable Test** | 58 |
| | **C.** | **Alternatives to Confirmation and Consummation of the Plan** | 59 |

IX.    **CERTAIN RISK FACTORS TO BE CONSIDERED** ................................................. 59

    A.    **General** ........................................................................... 60

    B.    **Risk Relating to the Plan and Other Bankruptcy Considerations** ................. 60

        1.    **Parties in Interest May Object to the Debtor's Classification of Claims and Interests** ................................................ 60

        2.    **The Debtor May Fail to Satisfy Vote Requirements** ............................ 60

        3.    **The Debtor May Not Be Able to Secure Confirmation of the Plan** .... 60

        4.    **The Bankruptcy Court may not approve the Customer Releases** ....... 61

        5.    **The Bankruptcy Court may not approve the Treatment of Participating Customers** ....................................... 62

        6.    **The Plan Administrator is Likely to Object to Non-Participating Customer Claims** ................................................ 62

        7.    **Nonconsensual Confirmation** ......................................... 62

        8.    **The Debtor May Fail to Meet All Conditions Precedent to Effectiveness of the Plan** ............................................. 63

        9.    **The Debtor May Object to the Amount or Classification of a Claim or Interest** ................................................. 63

        10.    **Contingencies May Affect Distributions to Holders of Allowed Claims and Interests** .......................................... 63

        11.    **The Plan is Based Upon Assumptions the Debtor Developed That May Prove Incorrect and Could Render the Plan Unsuccessful** ................. 63

        12.    **The Debtor May Seek to Amend, Waive, Modify, or Withdraw the Plan at Any Time Prior to Confirmation** ................................... 64

        13.    **The Results of an Actual Chapter 7 Liquidation May Be Different from the Liquidation Analysis** ...................................... 64

        14.    **Failure to Confirm and Consummate the Plan Could Negatively Impact the Debtor and Its Creditors and Former Customers** ........... 64

    C.    **Additional Factors to Be Considered** ......................................... 65

        1.    **The Debtor Has No Duty to Update** ........................................ 65

        2.    **No Admissions Are Made By This Disclosure Statement** ................. 65

        3.    **No Representations Outside this Disclosure Statement Are Authorized** ................................................ 65

        4.    **Forward-Looking Statements are Not Assured, and Actual Results May Vary** ............................................... 65

        5.    **No Legal or Tax Advice is Provided to You By This Disclosure Statement** ................................................ 66

X.    **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ..................................................... 66

**A.**     **Introduction** .......................................................................................... **66**

**B.**     **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtor .. 68**

     **1.**     **U.S. Federal Income Tax Classification of the Debtor** ........................ **68**

     **2.**     **Cancellation of Debt Income** ................................................................... **68**

**C.**     **Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims** ................................................................................ **69**

     **1.**     **Consequences to U.S. Holders of Allowed Claims (Other Than Allowed Class 5 Claims)** .......................................................................... **69**

     **2.**     **Consequences to U.S. Holders of Allowed Class 5 Claims** ................. **70**

     **3.**     **Information Reporting and Backup Withholding** ............................... **72**

**D.**     **Importance of Obtaining Professional Tax Assistance** .................................... **72**

**XI.**     **RECOMMENDATION AND CONCLUSION** ........................................................... **73**

# TABLE OF EXHIBITS

**Exhibit A:**     Modified Third Amended Plan of Liquidation for Griddy Energy LLC Under Chapter 11 of the Bankruptcy Code

**Exhibit B:**     Liquidation Analysis

## IMPORTANT NOTICE

THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE MODIFIED THIRD AMENDED PLAN OF LIQUIDATION FOR GRIDDY ENERGY LLC UNDER CHAPTER 11 OF THE BANKRUPTCY CODE (THE "**PLAN**"). NO REPRESENTATIONS ABOUT THE DEBTOR HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT.

THE DEBTOR URGES YOU TO READ THIS DISCLOSURE STATEMENT CAREFULLY FOR A DISCUSSION OF VOTING INSTRUCTIONS, RECOVERY INFORMATION, CLASSIFICATION OF CLAIMS, THE HISTORY OF THE DEBTOR AND THE CHAPTER 11 CASE, THE DEBTOR'S BUSINESS, THE EVENTS LEADING TO THIS CASE AND, AND A SUMMARY AND ANALYSIS OF THE PLAN.

ALL CAPITALIZED TERMS IN THIS DISCLOSURE STATEMENT NOT OTHERWISE DEFINED HEREIN HAVE THE MEANINGS GIVEN TO THEM IN THE PLAN, A COPY OF WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS <u>EXHIBIT A</u>.

INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT. THE DEBTOR RESERVES THE RIGHT TO FILE AN AMENDED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER TO SELL, OR THE SOLICITATION OF AN OFFER TO BUY, ANY SECURITIES.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE. THE PLAN AND THIS DISCLOSURE STATEMENT WERE NOT REQUIRED TO BE PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NONBANKRUPTCY LAW. DISSEMINATION OF THIS DISCLOSURE STATEMENT IS CONTROLLED BY BANKRUPTCY RULE 3017. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE PARTIES IN INTEREST IN THIS CASE WITH "ADEQUATE INFORMATION" (AS DEFINED IN SECTION 1125 OF THE BANKRUPTCY CODE) SO THAT THOSE CREDITORS WHO ARE ENTITLED TO VOTE WITH RESPECT TO THE PLAN CAN MAKE AN INFORMED JUDGMENT REGARDING SUCH VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN. THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN; RATHER, THIS DISCLOSURE STATEMENT IS INTENDED ONLY TO AID AND SUPPLEMENT SUCH REVIEW. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE

PLAN, THE PLAN SUPPLEMENT (WHICH, UNLESS OTHERWISE SPECIFIED IN THE PLAN, WILL BE FILED NO LATER THAN FIVE (5) BUSINESS DAYS PRIOR TO THE DEADLINE FOR BALLOTS TO BE RECEIVED IN CONNECTION WITH VOTING TO ACCEPT OR REJECT THE PLAN) AND THE EXHIBITS ATTACHED THERETO AND THE AGREEMENTS AND DOCUMENTS DESCRIBED THEREIN.  IF THERE IS ANY CONFLICT BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN WILL GOVERN.  YOU ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND PLAN SUPPLEMENT AND TO READ CAREFULLY THE ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS, BEFORE DECIDING HOW TO VOTE WITH RESPECT TO THE PLAN.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M. (PREVAILING CENTRAL TIME) ON JUNE 25, 2021, UNLESS EXTENDED BY THE DEBTOR (THE "**VOTING DEADLINE**").  TO BE COUNTED, BALLOTS MUST BE RECEIVED BY THE VOTING AGENT (AS DEFINED HEREIN) ON OR BEFORE THE VOTING DEADLINE.

THE EFFECTIVENESS OF THE PLAN IS SUBJECT TO SEVERAL CONDITIONS PRECEDENT. THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF INTERESTS IN, THE DEBTOR (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

EXCEPT AS OTHERWISE SET FORTH HEREIN, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE BY THE DEBTOR AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF OR CREATE ANY DUTY TO UPDATE SUCH INFORMATION.  NO PERSON HAS BEEN AUTHORIZED BY THE DEBTOR IN CONNECTION WITH THE PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS, NOTICES AND SCHEDULES ATTACHED TO OR INCORPORATED BY REFERENCE OR REFERRED TO IN THIS DISCLOSURE STATEMENT AND/OR THE PLAN AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTOR.

IT IS THE DEBTOR'S POSITION THAT THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER

PERSON, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTOR OR HOLDERS OF CLAIMS OR INTERESTS.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISOR(S) WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

**THE DEBTOR AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (THE "COMMITTEE"), A COMMITTEE APPOINTED BY THE UNITED STATES TRUSTEE TO REPRESENT THE INTERESTS OF UNSECURED CREDITORS, BELIEVE THAT IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR AND ALL OF ITS STAKEHOLDERS.  FOR ALL OF THE REASONS DESCRIBED IN THIS DISCLOSURE STATEMENT, THE DEBTOR AND THE COMMITTEE URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN BY THE VOTING DEADLINE, (_I.E._, THE DATE BY WHICH YOUR BALLOT MUST BE ACTUALLY RECEIVED), WHICH IS JUNE 25, 2021 AT 5:00 P.M. (CENTRAL TIME).**

**INCLUDED WITH THIS DISCLOSURE STATEMENT IS A LETTER FROM THE COMMITTEE, WHICH URGES HOLDERS OF GENERAL UNSECURED CLAIMS AND CUSTOMER CLAIMS TO VOTE IN FAVOR OF THE PLAN.**

# I.    INTRODUCTION AND EXECUTIVE SUMMARY

Griddy Energy LLC, as debtor and debtor in possession (the "**Debtor**" or "**Griddy**") in the above-captioned chapter 11 case (the "**Chapter 11 Case**"), submits this Disclosure Statement pursuant to section 1125 of title 11 of the United States Code (the "**Bankruptcy Code**") for use in the solicitation of votes on the *Modified Third Amended Plan of Liquidation for Griddy Energy LLC Under Chapter 11 of the Bankruptcy Code* (as amended, supplemented or modified from time to time, the "**Plan**").   A copy of the Plan is annexed as **Exhibit A** to this Disclosure Statement. **Capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Plan**.

This Disclosure Statement sets forth certain information regarding the Debtor's proposed liquidation, prepetition operating and financial history, the need to seek chapter 11 protection, and the Debtor's strategy for winding down its operations, liquidating and distributing its remaining assets to its creditors.   FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS, APPENDICES, AND ANY SCHEDULES HERETO AND THERETO IN THEIR ENTIRETY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

Griddy is a retail electric provider ("**REP**") in Texas which provided its customers the ability to purchase wholesale electricity with no mark-up.   Prior to the events that precipitated this Chapter 11 Case, Griddy had approximately 29,000 customers in Texas and approximately 30 employees.   As a result of the forced transitioning of customers to a Provider of Last Resort ("**POLR**") commencing on February 26, 2021 by the Electric Reliability Council of Texas ("**ERCOT**"), Griddy currently has no customers and, as of the Petition Date, had reduced its employee headcount to 16.   The Debtor has filed this case to pursue a chapter 11 plan of liquidation and implement a wind down of its business.

The liquidation and orderly wind down provided for in the Plan and described herein will result in the distribution of the Debtor's assets to its creditors and interest holders consistent with the priorities set forth in the Bankruptcy Code.   The Plan reflects a global settlement among the Debtor, the Committee, the Non-Debtor Affiliates and the Prepetition Secured Lenders, which is described more fully herein.   The Plan also reflects a settlement between the Debtor, HoldCo and the State of Texas.   A high-level description of each settlement can be found in Sections II and III below.

The Plan provides, among other things, that:

- (a) the Debtor's secured lenders will, for the benefit of the Debtor's estate forego receipt of approximately $1.448 million of the principal face amount owed to them by the Debtor plus interest at the default contract rate in favor of other creditors in accordance with the terms of the Plan and (b) the Debtor's obligation to pay certain professional fees and expenses of the Prepetition Secured Lenders will be limited in amount and scope;

- holders of Allowed Class 5 Customer Claims (i.e., former customers of the Debtor):

(a) will have the opportunity to receive releases from the Debtor and the other Released Parties[2] for all claims, including, for unpaid amounts owed by such former customers for the electricity and related fees, taxes, expenses and other costs due as a result of the winter storm event that occurred in mid-February 2021 in Texas (commonly referred to as "**Winter Storm Uri**"), in exchange for such former customers giving the Released Parties a release of all claims the former customers have or may have against the Released Parties; and

(b) for those former customers that:

(i) do not opt out of the mutual releases described in (a) immediately above; and

(ii) paid the Debtor for electricity consumed by such Participating Customer (i.e., a former customer that does not opt-out of the Customer Releases, including a former customer that abstains from voting on the Plan and does not opt-out of the Customer Releases, and otherwise does not elect to become a Non-Participating Customer in accordance with the terms of the Plan) during the period February 13, 2021 through February 19, 2021 and timely and properly files a proof of claim for such amount as reflected on the Debtor's books and records by the Former Customers Bar Date in accordance with the Former Customers Bar Date Order, such former customer would have an Allowed Claim in Class 5 in such amount, *less* any amounts such Participating Customer successfully disputed and received a full or partial refund from such Participating Customer's credit card company (to the extent not accounted for in the Debtor's books and records) and receive its pro rata share of:

(x) any Texas Storm Causes of Action Net Recovery Proceeds in accordance with the terms of the Plan,

(y) any cash that is available from the Prepetition Lender Contribution of approximately $1.448 million (net of all Wind Down Costs and payment of other claims in accordance with the payment priorities under the Plan), and

---

[2] Under the Plan, "Released Parties" means, collectively, and each solely in its capacity as such: (a) the Debtor, (b) the Committee and its members, (c) the Prepetition Secured Lenders and the Collateral Agent, and (d) each of such parties' respective predecessors, successors, assigns, subsidiaries, affiliates, the Non-Debtor Affiliates, owners, and each of their respective current and former officers, directors, employees, managers, members, principals, shareholders, agents, advisors and professionals (including any attorneys, consultants, financial advisors, investment bankers and other professionals retained by such Persons) or other representatives, each in their capacities as such, together with their successors and assigns; provided, however, that such attorneys and professional advisors shall only include those that provided services related to the Chapter 11 Case and the transactions contemplated by the Plan; provided, further, that no Person shall be a Released Party if it elects to opt out of the releases provided for in Article XII of the Plan in its Ballot. "Non-Debtor Affiliates" means the Debtor's non-debtor affiliates, HoldCo, Griddy Technologies LLC, Griddy Pro LLC, Griddy VI Holdings LLC, Griddy VI Intermediate Holdings LLC, Griddy 6 Holdings LLC, Griddy VI Series A Holdings LLC, Beachside New Utility Holdings LLC, Beachside New Utility (VI) Holdings LLC, Elliot New Utility Holdings LLC, Elliot New Utility (VI) Holdings LLC, Janson New Utility Holdings LLC, Janson New Utility (VI) Holdings LLC, Grid Investments Inc., EDF Trading North America LLC, Niab Holdings Pty Limited and SRA Investments Pty Limited.

2

(z) if a settlement is reached between the Debtor and the Public Utilities Commission of Texas (the "**PUCT**") related to a certain letter of credit in the amount of $500,000 the PUCT drew upon prior to the Petition Date and the settlement is less than $500,000, each holder of an Allowed Class 5 Participating Customer Potential Return Claim will share Pro Rata in Available Cash with holders of Allowed Class 4 Claims in the amount of the difference between $500,000 and amount of any PUCT Settlement proceeds.[3]

Any former customer that does not wish to exchange releases will be considered a "Non-Participating Customer" and will not be treated as having an Allowed Class 5 Customer Claim. Rather, such Non-Participating Customer would have a temporarily Allowed Claim in Class 4 (Other General Unsecured Claims) for purposes of voting on the Plan. For all other purposes, if the Non-Participating Customer timely and properly files an unsecured nonpriority claim against the Debtor by the applicable Bar Date in accordance with the applicable Bar Date Order, the Non-Participating Customer will be treated as a holder of Other General Unsecured Claims. Other than for purposes of voting on the Plan, any former customer that does not wish to exchange releases and does not timely and properly file a proof of claim against the Debtor shall not have either a Class 4 Claims (Other General Unsecured Claims) or Class 5 Claims (Customer Claims) against the Debtor. Any Participating Customer will have the option to elect to become a Non-Participating Customer up until 45 days following the Effective Date of the Plan;

- Holders of Allowed Other General Unsecured Claims will receive on a Pro Rata basis (i) the aggregate amount of Available Cash of the Debtor and (ii) any Net Recovery Proceeds,[4] <u>provided</u> that, with respect to (a) any cash that is available from the Prepetition Lender Contribution of approximately $1.448 million (net of all Wind Down Costs and payment of other claims in accordance with the payment priorities under the Plan) and (b) any Causes of Action arising from, relating to or in connection with the winter storm event that occurred in Texas in mid-February 2021, holders of Allowed Other General Unsecured Claims will share any recoveries therefrom (net of all costs and expenses) on a Pro Rata basis with the holders of Allowed Class 5 Participating Customer Claims,[5] in each case, on account of the Participating

---

[3] As of the date of the Disclosure Statement, no settlement between the Debtor and the PUCT has been agreed. However, other than any Settlement Deficiency, any settlement would entail the PUCT (not the Debtor) distributing the proceeds of the letter of credit to holders of Allowed Class 5 Participating Customer Claims outside of the Plan.

[4] Net Recovery Proceeds means the Cash or other amounts received by the Debtor, if any, from the pursuit of any Cause of Action (formally or informally) not released under the Plan, net of all costs and expenses deducted therefrom, to be distributed (Pro Rata) to holders of Allowed Other General Unsecured Claims, subject to all Claims of a higher priority being paid in full or adequate reserves being set aside in accordance with the Plan.

[5] Participating Customer Potential Return means, for each applicable Participating Customer, the total amount such Participating Customer paid the Debtor for electricity consumed by such Participating Customer during the period February 13, 2021 through February 19, 2021, including when the Public Utilities Commission of Texas imposed the $9,000 per MWh price for wholesale power, as reflected on the Debtor's books and records, *less* any amounts

Customers' Allowed Participating Customer Potential Return Claims. To the extent there is a Settlement Deficiency, each holder of an Allowed Class 5 Participating Customer Potential Return Claim will receive its Pro Rata Share from Available Cash of the amount of the Settlement Deficiency;

- the Debtor and the Committee will jointly select a plan administrator (the "**Plan Administrator**") and, upon the Effective Date, the Liquidating Debtor will enter into a Plan Administrator Agreement with the Plan Administrator and the sole interest in the Liquidating Debtor will vest in the Plan Administrator. The Plan Administrator will act as a fiduciary and will have full authority to administer the liquidation and wind down of the Debtor under the provisions of the Plan, including to: (a) make Distributions to holders of Claims set forth in the Plan; (b) object to, dispute, compromise or settle the amount, validity, priority, treatment or Allowance of any Claim; (c) sell, abandon or dispose of any remaining property of the Debtor; and (d) pursue any Causes of Action consistent with the provisions of the Plan. Certain material actions of the Plan Administrator will be subject to consent by a three-member Oversight Committee that will be formed on the Effective Date. Two members will be appointed by the Committee and one member will be appointed by HoldCo. As set forth in the Plan, upon the occurrence of certain events, the Oversight Committee may be reconstituted such that the majority of the members are appointed by HoldCo.

Each holder of a Claim or Interest entitled to vote on the Plan should read this Disclosure Statement, the Plan, and the instructions accompanying the Ballots, in their entirety before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes. The statements contained in this Disclosure Statement are made only as of the date hereof unless otherwise specified, and there can be no assurance that the statements contained herein will be correct at any time hereafter. All creditors should also carefully read **Section VIII** of this Disclosure Statement – the "*Certain Risk Factors To Be Considered*" – before voting to accept or reject the Plan.

THE DEBTOR AND THE COMMITTEE BELIEVE THAT IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR AND ALL OF ITS STAKEHOLDERS. FOR ALL OF THE REASONS DESCRIBED IN THIS DISCLOSURE STATEMENT, THE DEBTOR AND THE COMMITTEE URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN BY THE VOTING DEADLINE, (*I.E.*, THE DATE BY WHICH YOUR BALLOT MUST BE **ACTUALLY RECEIVED**), WHICH IS **JUNE 25, 2021** AT 5:00 P.M. (CENTRAL TIME).

## II.    THE GLOBAL SETTLEMENT

On March 31, 2021, the U.S. Trustee filed *the United States Trustee's Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 116] notifying parties in interest

---

such Participating Customer successfully disputed and received a full or partial refund from such Participating Customer's credit card company (to the extent not accounted for in the Debtor's books and records).

that the U.S. Trustee appointed the Committee in the Chapter 11 Case. Shortly thereafter, the Committee retained professionals to assist it with the Chapter 11 Case.

Immediately following its formation, the Committee began its investigation into the Debtor's business and the actions and activities that preceded the filing of the Chapter 11 Case. In its effort to determine whether any potential claims and causes of action existed that may have benefited the Debtor's Estate, the Committee, pursuant to Bankruptcy Rule 2004, requested discovery, including the production of numerous documents and records as well as oral testimony from the Debtor's management team. The Debtor quickly provided thousands of documents to the Committee, participated in several interviews with the Committee and its advisors, and presented two members of its management team for depositions. The Debtor has always maintained and continues to maintain that potential causes of action against either it, the Non-Debtor Affiliates, and its directors and officers do not exist.

Following completion of its discovery, the Committee, the Debtor, the Prepetition Secured Lenders and the Non-Debtor Affiliates (collectively, the "Settlement Parties") entered into negotiations to seek to resolve the Committee's issues with the Plan and reach agreement on a plan of liquidation that would further benefit all of the Debtor's stakeholders and maximize the value of the Estate and its assets.

The Debtor reached a comprehensive settlement with the other Settlement Parties (the "Global Settlement") that resolves all disputes between and among such Parties, including disputes regarding the terms of the Plan.

The material terms of the Global Settlement are set forth below and, where appropriate, such terms have been incorporated into the Plan as more fully described immediately above and herein.

- The Prepetition Secured Lenders agree to waive the portion of their claims attributable to principal and default interest at the contract rate accruing in connection therewith owed under the Prepetition Secured Agreements;

- The Prepetition Lender Fee Claims shall be limited to a maximum amount of $225,000 for the period through the Effective Date, which amount shall be paid by one or more Non-Debtor Affiliates; provided, that, if there are any unanticipated litigation or contested matters, including any document requests or other discovery that arise during the period May 19, 2021 through the Effective Date in this case or any related adversary proceeding, that cause the Prepetition Secured Lenders or the Collateral Agent to incur fees and expenses in excess of $225,000, the Prepetition Secured Lenders or the Collateral Agent, as the case may be, may, promptly after expiration of the Outstanding LC, offset such reasonable and documented out-of-pocket fees and expenses incurred by the Prepetition Secured Lenders or the Collateral Agent in connection therewith (to the extent provided under the Prepetition Secured Agreements) against any undrawn amounts remaining from cash collateralizing the Outstanding LC. The reasonable and documented out-of-pocket fees and expenses described in the foregoing sentence shall be Allowed on the Effective

5

Date. Following satisfaction of the such fees and expenses, any remaining cash subject to the Prepetition Secured Lenders claims will be returned to the Debtor's Estate;

- The Available Prepetition Lender Contribution will be shared pro rata between holders of Allowed Class 5 Participating Customer Potential Return Claims and holders of Class 4 Other General Unsecured Claims;

- Subject to Court approval, holders of Class 5 Claims that are Participating Customers shall have 45 days following the Effective Date to elect to become Non-Participating Customers for all purposes under the Plan other than in respect of voting on the Plan if such election is made after the Voting Deadline;

- All proceeds of any PUCT Settlement will be distributed by the PUCT or its designee (as opposed to the Debtor) on a Pro Rata basis to holders of Allowed Class 5 Participating Customer Potential Return Claims and, to the extent the proceeds of the PUCT Settlement are less than $500,000, each holder of an Allowed Class 5 Participating Customer Potential Return Claim will share Pro Rata in Available Cash with holders of Allowed Class 4 Claims in the amount of the difference between $500,000 and amount of any PUCT Settlement proceeds;

- Former Customers will be included in the Third Party Release (as defined below) provision provided for in Section 12.07(b) of the Plan;

- Non-Debtor Affiliates will contribute their rights with respect to certain to be agreed causes of action that overlap with any Retained Causes of Action of the Debtor under the Plan;

- The Debtor and the Committee will jointly select the Plan Administrator and the Plan Administrator will be subject to oversight by an Oversight Committee consisting originally of two members selected by the Committee and one member selected by the Debtor. Certain actions by the Plan Administrator will require consent of the members of the Oversight Committee;

- Griddy Technologies LLC ("**Griddy Tech**") will provide a limited license of its technology to the Plan Administrator solely for purposes to enable the Plan Administrator to wind down the Debtor's Estate;

- Applicable Non-Debtor Affiliates and directors and officers will provide reasonable assistance to the Plan Administrator in connection with pursuit of Causes of Action, subject to be agreed limitations on the total uncompensated time and duration of such assistance;

- A suspension of payment of certain board of directors fees from May 14 through July 1 and potential limitations to be agreed on the amount and duration of fees for the independent director; and

- An agreement by all parties to the Global Settlement to support the Plan.

The Global Settlement is not an admission of liability or wrongdoing by the Debtor, HoldCo, any of the Non-Debtor Affiliates or the Prepetition Secured Lenders or any of their respective officers, directors, managers, members, affiliates, employees, agents or otherwise or an acknowledgment by any such Persons regarding the contentions or allegations of any third-parties against such Persons. The Global Settlement reflects a settlement and compromise that is intended to resolve issues by and among the various parties in order to allow the Debtor to proceed to confirmation of the Plan, which the Debtor and the Committee believe is in the best interests of all stakeholders.

In reaching this settlement, the Committee evaluated the merits of the settlement in comparison to any available alternatives. Ultimately, the Committee recognized that the contributions by the Prepetition Secured Lenders and the Non-Debtor Affiliates provided significant value to holders of Other General Unsecured Claims and Customer Claims, with no other alternative providing comparable value when factoring the uncertainty of litigation and the potential negative effects of such litigation on the Debtor's case, including the potential for administrative insolvency and/or a conversion to chapter 7. The Committee believes that the resolutions obtained by the Committee to: (a) have the Prepetition Secured Lender forego a significant portion of its claim against the Estate; (b) obtain a commitment from one or more Non-Debtor Affiliates to pay certain amounts owed to the Prepetition Secured Lenders up to $225,000; (c) jointly select the Plan Administrator and obtain certain oversight rights for unsecured creditors with respect to the Plan Administrator post-Effective Date; and (d) provide potential additional sources of recovery for holders of Allowed Class 5 Participating Customer Potential Return Claims as well as the ability to receive certain third party releases, substantially improve the potential distributions to holders of Allowed Other General Unsecured Clams and Customer Claims.

This Global Settlement represents a significant step forward in the Debtor's Chapter 11 Case. The compromises and settlements to be implemented pursuant to the Plan preserve value by enabling the Debtor to avoid costly and time-consuming litigation with the Committee and other parties in interest that could delay confirmation of the Plan and consume scarce estate resources. The Debtor strongly believes that the Plan is in the best interests of the Debtor's creditors and other stakeholders, and represents the best available alternative at this time.

## III.  SETTLEMENT WITH THE ATTORNEY GENERAL OF THE STATE OF TEXAS

Since the Petition Date, the Debtor and HoldCo have worked in good faith with the State of Texas, by and through the Attorney General of the State of Texas, to address issues related to the Debtor's former customers that occurred as a result of the February 2021 winter storm event. As a result of such efforts and following extensive arm's-length negotiations, the Debtor and HoldCo, on the one hand, and the State of Texas, on the other hand, have reached an agreement in principle regarding a settlement (the "Texas Settlement"). The Texas Settlement is subject to definitive documentation, Bankruptcy Court approval thereof and the Effective Date of the Plan. The Texas Settlement provides for, among other things:

- Inclusion of the following provisions in the Plan: (a) Participating Customers who do not opt out of the Customer Releases within the period of time provided in the Plan or the order confirming the Plan shall be deemed released from any and all outstanding balances due and owing to the Debtor; (b) for each Participating Customer that timely and properly files

a proof of claim in accordance with the Former Customers Bar Date Order, allowance of such claim as a Class 5 Claim in accordance with the Plan (as it pertains to amounts paid for electricity services during the period February 13, 2021 through February 19, 2021), subject to the right of the Debtor and its successor to object to the amount of such claim, but not the nature of such claim; and (c) any distributions under the Plan by the Debtor to former customers that are returned to the Debtor as undeliverable to be turned over to the Unclaimed Property Division of the State of Texas Comptroller of Public Accounts pursuant to applicable Texas unclaimed property law to enable such former customers to retrieve such funds in perpetuity;

- Filing in the action entitled *The State of Texas v. Griddy Energy LLC and Griddy Holdings LLC*, Cause No. 2021-11518 (the "Action") pending in the District Court of Harris County, Texas, 133rd Judicial District, an Agreed Final Judgment and Permanent Injunction (the "Consent Judgment") pursuant to which the Debtor and HoldCo, along with their respective officers, agents, servants, employees, successors in interest, and persons in active concert or participation with them who receive actual notice of the Consent Judgment, are permanently enjoined from taking certain actions and, upon the Plan becoming effective, from any and all collection or credit reporting efforts for electricity use from February 13 through February 19, 2021 solely as it pertains to Participating Customers who do not opt-out of the Customer Releases within the timeframe provided for in the Plan or the Confirmation Order;

- Release by the State of Texas of all claims against the Debtor, HoldCo and their respective present and former officers, agents, representatives, and employees from claims and disputes arising from or relating to the Action, including the claims asserted therein, and the Civil Investigative Demand; and

- Resolution of the Action and termination of the Civil Investigative Demand upon the Effective Date of the Plan.

The State, the Debtor, and HoldCo each agree that neither the Texas Settlement nor the related Consent Judgment shall constitute or be considered admissions of liability or wrongdoing by the Debtor or HoldCo, or an acknowledgment by the Debtor or HoldCo of the truth or correctness of the State's contentions or allegations.

The Debtor anticipates entering into an agreement with the State of Texas reflecting the Texas Settlement in the near term and filing a motion to approve such settlement pursuant to Bankruptcy Rule 9019 to be heard in advance of or contemporaneously with confirmation of the Plan.

If the Bankruptcy Court does not approve the Customer Releases for any reason, including because the Customer Releases include third-party releases, the Debtor may determine to proceed with confirmation of the Plan without such Customer Releases. In such event, all Participating Customers will be deemed to be Non-Participating Customers and will not receive releases from the Debtor or the other Released Parties under the Plan. In such case, the settlement with the Attorney General would not become effective.

The Texas Settlement is also a significant step forward in the Debtor's Chapter 11 Case.

## IV.     THE PLAN

As noted above, the Plan provides for a liquidation and orderly wind down in a manner that would result in, among other things, (i) mutual releases between the Debtor and the other Released Parties, on the one hand, and the participating former customers, on the other hand, thereby providing certainty to such former customers that unpaid amounts incurred for electricity consumption by such former customers, including those amounts incurred by such former customers for the period February 15, 2021 through and including February 19, 2021 (when the Public Utilities Commission of Texas imposed the $9,000 per MWh price for wholesale power), will not be collected by the Debtor or its successor or the other Released Parties or sent to collection by the Debtor.  The Plan also provides, that notwithstanding the mutual releases between the Released Parties and such Participating Customers, such Participating Customers that paid for electricity consumption during the period February 13, 2021 and February 19, 2021, will have an Allowed Class 5 Claim in the amount of such payment based on the Debtor's books and records and be entitled to receive their Pro Rata share of (x) any Texas Storm Causes of Action Net Recovery Proceeds, (y) any Available Prepetition Lender Contribution, and (z) any Settlement Deficiency, in each case, subject to such customers timely and properly filing a proof of claim for such amount by the Former Customers Bar Date in accordance with the Former Customers Bar Date Order; and (ii) recovery and distribution to the holders of Other General Unsecured Claims from any Available Cash and the net proceeds, if any, from any Causes of Action pursued by the Plan Administrator, _provided_ that any such net proceeds from Texas Storm Causes of Action and any Available Prepetition Lender Contribution shall be shared Pro Rata with holders of Allowed Participating Customer Potential Return Claims.  In addition, the Prepetition Secured Lenders have agreed to forego nearly all of their recoveries (approximately $1.448 million plus interest at the default contract rate) for the benefit of the Debtor and its Estate.  The Debtor believes that this contribution by the Prepetition Secured Lender is a material benefit that will inure to its Estate.

Certain significant provisions of the Plan, including the treatment of Claims against and Interests in the Debtor under the Plan, are described below.

### A.     <u>Unclassified Claims</u>

#### 1.     <u>Unclassified Claims Summary</u>

In accordance with Section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims.  The Claim recoveries for such unclassified Claims are set forth below:

| Claim | Plan Treatment | Projected Plan Recovery |
|---|---|---|
| Administrative Claims | Paid in full in Cash | 100% |
| Fee Claims | Paid in full in Cash | 100% |

9

| Claim | Plan Treatment | Projected Plan Recovery |
|---|---|---|
| U.S. Trustee Fee Claims | Paid in full in Cash | 100% |
| Priority Tax Claims | Paid in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code | 100% |

2.  **Unclassified Claims Detail**

(a)  **Administrative Claims**

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date an Administrative Expense Claim becomes an Allowed Claim, the holder of such Allowed Administrative Expense Claim shall receive from the Debtor Cash in an amount equal to such Allowed Claim; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtor, as debtor in possession, shall be paid by the Debtor in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such liabilities.

(b)  **Fee Claims**

All Allowed Fee Claims shall be paid in full in Cash in such amount as awarded by the Bankruptcy Court (i) no later than five (5) Business Days after the date an order is entered with respect to such award or (ii) upon such other terms as may be mutually agreed upon between such holder of a Fee Claim and the Debtor.  On the Effective Date, to the extent known, the Debtor shall reserve and hold in the Professional Expense Escrow, Cash an amount equal to accrued but unpaid Fee Claims as of the Effective Date, which Cash shall be used, until all Allowed Fee Claims have been paid in full, solely for the payment of Allowed Fee Claims.  To the extent the Cash in the Professional Expense Escrow exceeds the amount of the Allowed Fee Claims, such excess Cash shall be used by the Debtor in accordance with the terms of the Plan.

(c)  **U.S. Trustee Fee Claims**

The Debtor shall pay all outstanding U.S. Trustee Fees of the Debtor, together with interest pursuant to 31 U.S.C. § 3717, if any, on an ongoing basis on the later of (i) the Effective Date and (ii) the date such U.S. Trustee Fees become due, until such time as a final decree is entered closing the Chapter 11 Case or the Chapter 11 Case is converted or dismissed, or the Bankruptcy Court orders otherwise.

(d)  **Priority Tax Claims**

Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtor prior to the Effective Date or agrees to a different treatment, each holder of an Allowed

Priority Tax Claim shall receive, at the sole option of the Debtor either: (i) on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date a Priority Tax Claim becomes an Allowed Claim, Cash in an amount equal to such Claim, or (ii) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Petition Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim (with any interest to which the holder of such Priority Tax Claim may be entitled calculated in accordance with section 511 of the Bankruptcy Code); provided, however, that all Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as they become due.

### B. Classified Claims and Interests

#### 1. Summary of Classification and Treatment

The Plan establishes a comprehensive classification of Claims and Interests. The following table summarizes the classification and treatment of Claims and Interests under the Plan and the estimated distributions to be received by the holders of Allowed Claims and Interests under the Plan. Amounts assumed in the recovery analysis are estimates only; actual recoveries received under the Plan, or in a liquidation scenario, may differ materially from the projected recoveries.

The summaries in this table are qualified in their entirety by the description of the treatment of such Claims and Interests in the Plan.

| Class | Claim or Interest | Summary of Treatment of Allowed Claims and Interests | Voting Rights | Estimated Amount of Claims in Class | Projected Plan Recovery |
|---|---|---|---|---|---|
| 1 | Prepetition Lender Claims | Pro Rata share of the Prepetition Lender Distribution | Impaired/ Entitled to Vote | $1,448,937.58 - $2,689,750[6] | 0.92%-1.7%[7] |

---

[6] The low end of the range is exclusive of accrued and unpaid interest, fees, letter of credit reimbursement obligations and other related amounts, which include the obligation to provide the Prepetition Secured Lenders cash or credit support in the form of letters of credit acceptable to Prepetition Secured Lenders in its sole discretion in an amount not less than $307,500.00 as collateralization for 102.5% of the full undrawn amount of the Outstanding LC, and certain fees and expenses of Prepetition Secured Lenders, including reasonable and documented legal fees and expenses.

[7] The amount of the Prepetition Lender Distribution will be between $24,800 and $324,800 depending upon whether the Prepetition Secured Lenders or the Collateral Agent incur additional fees and expenses related to litigation or other contested matters during the remainder of this Chapter 11 Case and whether the Outstanding LC is drawn in whole or in part. The Projected Plan Recovery assumes the lower end of the potential range of recoveries will apply, but the range of recoveries depends on the foregoing. In addition, as part of the Global Settlement, the Non-Debtor Affiliates have agreed to pay any unpaid reasonable and documented out-of-pocket fees and expenses incurred by the Prepetition Secured Lenders or the Collateral Agent under the Prepetition Secured Agreements to the extent provided thereunder in an amount of no more than $225,000. Because such fees will be paid by non-Debtors, they are not included in the Projected Plan Recovery.

| Class | Claim or Interest | Summary of Treatment of Allowed Claims and Interests | Voting Rights | Estimated Amount of Claims in Class | Projected Plan Recovery |
|---|---|---|---|---|---|
| 2 | Other Secured Claims | (i) Cash in an amount equal to such Allowed Other Secured Claim; (ii) title to the property securing such Claim to the holder; or (iii) such other treatment that leaves such Allowed Other Secured Claim unimpaired | Unimpaired/ Presumed to Accept | $0 | 100% |
| 3 | Priority Non-Tax Claims | Paid in full in Cash | Unimpaired/ Presumed to Accept | $0 | 100% |
| 4 | Other General Unsecured Claims | Pro Rata share of the Class 4 Distribution (subject to sharing pro rata in Texas Storm Causes of Action Net Recovery Proceeds, if any, and any Available Prepetition Lender Contribution with holders | Impaired/ Entitled to Vote | $3.7 million -- $33.1 million[8] | 2.4% -- 8.7%, plus any recoveries from Causes of Action (in accordance with the terms of the Plan)[9] |

---

[8] The bar date for holders of Claims against the Debtor other than Former Customers and governmental units expired on April 28, 2021. As of the date of this Disclosure Statement, a review of the filed claims has not been completed. Accordingly, the Allowed amount of Other General Unsecured Claims may be greater or less than the amount set forth herein. The estimated amount also does not include any claims by former customers or any estimates on account of litigation. If former customers opt out of Class 5 Customer Claims, they may assert a claim in Class 4 Other General Unsecured Claim. If any such claims are Allowed, the amount of Other General Unsecured Claims may be greater than the amount set forth herein.

[9] For illustrative purposes only, the Debtor has estimated that $1 million of the Available Prepetition Lender Contribution will be available for distribution to holders of Allowed Other General Unsecured Claims and Allowed Participating Customer Potential Return Claims. Also for illustrative purposes only, the Debtor has assumed the midrange of $7.8 million for the amount of Allowed Participating Customer Potential Return Claims. However, the total amount available for holders of Allowed Other General Unsecured Claims will depend upon the total amount of Administrative Expense Claims and all other Claims of a higher priority being paid in full in cash, the amount of Allowed Participating Customer Potential Return Claims with whom Allowed Other General Unsecured Claims will share pro rata in any Texas Storm Causes of Action Net Recovery Proceeds and any Available Prepetition Lender Contribution as well as the amount of projected Wind Down Costs. Further, the recovery from Causes of Action is too speculative to project at this time. Accordingly, the total Projected Plan Recovery for holders of Allowed Other General Unsecured Claims does not include any projected recovery from Causes of Action and may be greater or less than the amount set forth herein.

| Class | Claim or Interest | Summary of Treatment of Allowed Claims and Interests | Voting Rights | Estimated Amount of Claims in Class | Projected Plan Recovery |
|---|---|---|---|---|---|
| | | of Allowed Participating Customer Potential Return Claims). | | | |
| 5 | Customer Claims | In full satisfaction, settlement, and release of, and in exchange for its Customer Claim, each Participating Customer will grant and receive the Customer Releases as set forth in Section 12.10 of the Plan and, solely to the extent a Participating Customer has an Allowed Participating Customer Potential Return Claim, receive its Pro Rata share of (x) any | Impaired/ Entitled to Vote | (a) In excess of $29.1 million on account of releases[10]<br><br>(b) $0 – $15.6 million on account of potential Participating Customer Total Return Claims[11] | (a) Releases; See also footnote 12[12] |

[10] The estimated amount of unpaid balances of Former Customers as of the Petition Date is $29.1 million. This amount is included herein for illustrative purposes only. It is not a maximum number and could be greater after the Debtor reconciles its books and records.

[11] As of the date of this Disclosure Statement, the deadline for filing proofs of claim by Former Customers against the Debtor that arose prior to the Petition Date had not yet expired. Further, the general bar date for holders of Claims against the Debtor other than Former Customers and governmental units expired on April 28, 2021, but as of the date of this Disclosure Statement, the review of the Claims has not been completed.

The total number of former customers that elect to be treated as Participating Customers will not be known until after the Effective Date. Accordingly, the Debtor is unable to predict the total amount of Participating Customer Total Return Claims in Class 5. However, if every eligible former customer elects to be a Participating Customer and every Participating Customer timely and properly files a Participating Customer Total Return Claim, the total amount of Participating Customer Total Return Claims (calculated based on information available as of April 17, 2021) is approximately $15.6 million. This amount is included herein for illustrative purposes only. It is not a maximum number and could be greater after the Debtor reconciles its books and records.

[12] Holders of Allowed Participating Customer Total Return Claims are entitled to recoveries from any Available Prepetition Lender Contribution, the Texas Storm Causes of Action and any Settlement Deficiency. However, as explained in footnote 11, the total number of former customers that elect to be treated as Participating Customers will not be known until after the Effective Date. Accordingly, the Debtor is unable to predict the total amount of Participating Customer Total Return Claims in Class 5. Further, the Debtor is unable to predict the amount of the Available Prepetition Lender Contribution that ultimately will be available for distribution to holders of Allowed Other General Unsecured Claims and Allowed Participating Customer Potential Return Claims and the recovery from the Texas Storm Causes of Action and any Settlement Deficiency is too speculative to project at this time. Accordingly, the Debtor is unable to provide a range of projected Plan recoveries for holders of Allowed Class 5 Claims.

| Class | Claim or Interest | Summary of Treatment of Allowed Claims and Interests | Voting Rights | Estimated Amount of Claims in Class | Projected Plan Recovery |
|---|---|---|---|---|---|
| | | Texas Storm Causes of Action Net Recovery Proceeds in accordance with the terms of the Plan, (y) any Available Prepetition Lender Contribution, and (z) any Settlement Deficiency. | | | |
| 6 | Intercompany Claims | If any Causes of Action are successfully prosecuted, settled and/or otherwise resolved, holders of Intercompany Claims will receive any and all Cash or other property after (a) all Allowed Claims (other than Intercompany Claims) are paid in full in Cash (including payment of postpetition interest from the Petition Date through the payment date at the Federal Judgment Rate; provided that, the contractual rate of interest shall apply, if applicable, based on the particular contractual agreement between the Debtor and the holder of an Allowed Claim) in accordance with the Plan and (b) all other Wind Down Costs are paid in | Impaired/ Entitled to Vote | $4,582[13] | Unknown[14] |

---

[13] Estimated amount excludes any claims on account of indemnification, reimbursement or contribution.

[14] The potential recovery from Causes of Action is too speculative to project at this time. Accordingly, the potential Plan recovery for holders of Allowed Intercompany Claims does not include any projected recovery from Causes of Action.

| Class | Claim or Interest | Summary of Treatment of Allowed Claims and Interests | Voting Rights | Estimated Amount of Claims in Class | Projected Plan Recovery |
|---|---|---|---|---|---|
| | | accordance with the Wind Down Budget. | | | |
| 7 | Existing HoldCo Interests | If any Causes of Action are successfully prosecuted, settled and/or otherwise resolved, the holder of the Existing HoldCo Interests shall be entitled to receive any and all Cash or other property remaining with the Debtor after (a) all Allowed Claims are paid in full in Cash (including payment of postpetition interest from the Petition Date through the payment date at the Federal Judgment Rate; provided that, the contractual rate of interest shall apply, if applicable, based on the particular contractual agreement between the Debtor and the holder of an Allowed Claim) in accordance with the Plan and (b) all other Wind Down Costs are paid in accordance with the Wind Down Budget. | Impaired/ Entitled to Vote | N/A | Unknown[15] |

---

[15] The potential recovery from Causes of Action is too speculative to project at this time. Accordingly, the potential recovery for the of holder of Allowed Existing Holdco Interests does not include any projected recovery from Causes of Action.

C.     **Classified Claims and Interests Detail**

1.     **Class 1 – Prepetition Lender Claims**

      i     *Impairment and Voting.* Class 1 is impaired by the Plan. Each holder of a Prepetition Lender Claim is entitled to vote to accept or reject the Plan.

      ii     *Treatment:* Except to the extent that a holder of an Allowed Prepetition Lender Claim has been paid in full by the Debtor prior to the Effective Date or agrees to a different treatment with respect to such holder's Claim, on the Effective Date, or as soon as practicable thereafter, the Collateral Agent shall receive (for the benefit of itself and the Prepetition Secured Lenders) the Prepetition Lender Distribution, to be distributed in accordance with the applicable Prepetition Secured Agreements, including the Intercreditor Agreement. The Prepetition Lender Claims are Allowed Claims under the Plan; provided that, notwithstanding the foregoing, the Prepetition Secured Lenders waive their right to receive the Prepetition Lender Contribution, which shall be contributed to the Debtor to be used and distributed in accordance with the payment priorities set forth in the Plan. Notwithstanding anything in the Plan to the contrary, upon the full payment or other satisfaction or release of such obligations, the Liens securing such Allowed Prepetition Lender Claim shall be deemed released, terminated and extinguished against all parties, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person. All Cash held by the Prepetition Secured Lenders on the Effective Date that is in excess of the amount of the Prepetition Lender Distribution shall be promptly returned to the Debtor and utilized by the Debtor in accordance with the terms of the Plan.

2.     **Class 2 – Other Secured Claims.**

      i     *Impairment and Voting.* Class 2 is unimpaired by the Plan. Each holder of an Other Secured Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

      ii     *Treatment*: Except to the extent that a holder of an Allowed Other Secured Claim has been paid in full by the Debtor prior to the Effective Date or agrees to a different treatment,

each holder of an Allowed Other Secured Claim shall receive at the election of the Debtor on or before, the later of the Effective Date and thirty (30) days after the date on which a Class 2 Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter: (i) Cash in an amount equal to such Allowed Other Secured Claim; (ii) title to the property securing such Allowed Class 2 Claim to the holder of such Claim; or (iii) such other treatment that leaves such Allowed Other Secured Claim unimpaired pursuant to section 1124(2) of the Bankruptcy Code. Notwithstanding anything in the Plan to the contrary, upon the full payment or other satisfaction of such obligations, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

iii    *Deficiency Claims.* To the extent that the value of the Collateral securing an Other Secured Claim is less than the Allowed amount of such Other Secured Claim, the undersecured portion of such Allowed Claim shall be treated for all purposes under the Plan as an Allowed Other General Unsecured Claim and shall be classified as an Other General Unsecured Claim.

3.    **Class 3 – Priority Non-Tax Claims.**

i    *Impairment and Voting.* Class 3 is unimpaired by the Plan. Each holder of an Allowed Priority Non-Tax Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

ii    *Treatment.* The legal, equitable and contractual rights of the holders of Priority Non-Tax Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed Priority Non-Tax Claim has been paid in full by the Debtor prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Non-Tax Claim shall receive Cash in an amount equal to such Allowed Priority Non-Tax Claim on the later of the Effective Date and the date such Allowed Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable.

4.    **Class 4 – Other General Unsecured Claims.**

    i    *Impairment and Voting.*  Class 4 is impaired by the Plan. Each holder of an Other General Unsecured Claim is entitled to vote to accept or reject the Plan.

    ii    *Treatment:*  Except to the extent that a holder of an Allowed Other General Unsecured Claim has been paid in full by the Debtor prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Other General Unsecured Claim shall receive in full satisfaction, settlement, and release of, and in exchange for such Allowed Other General Unsecured Claim, its Pro Rata share of the Class 4 Distribution; <u>provided</u> that, notwithstanding the foregoing, (a) all Texas Storm Causes of Action Net Recovery Proceeds, if any, and (b) any Available Prepetition Lender Contribution shall be shared with holders of Allowed Participating Customer Potential Return Claims on a Pro Rata basis and be distributed (Pro Rata) to holders of (a) Allowed Other General Unsecured Claims and (b) Allowed Participating Customer Potential Return Claims.

5.    **Class 5 – Customer Claims.**

    i    *Impairment and Voting.*  Class 5 is impaired by the Plan. Each holder of a Customer Claim is entitled to vote to accept or reject the Plan.

    ii    *Treatment*:  Except to the extent that a holder of an Allowed Customer Claim has been paid in full by the Debtor prior to the Effective Date or agrees to a different treatment:

    (a)    in full satisfaction, settlement, and release of, and in exchange for its Customer Claim, each Participating Customer will (a) grant and receive the Customer Releases as set forth in Section 12.10 of the Plan; and (b) solely to the extent a Participating Customer has an Allowed Participating Customer Potential Return Claim, receive its Pro Rata share of (w) any Texas Storm Causes of Action Net Recovery Proceeds in accordance with the terms of the Plan, (x) any Available Prepetition Lender Contribution, and (y) any Settlement Deficiency; or

    (b)    if a Customer Claim is held by a Non-Participating Customer, such holder (x) will not be treated as having an Allowed Class 5 Claim, (y) will not give

18

or receive the Customer Releases, and (z) (1) solely if the Non-Participating Customer timely and properly files an unsecured nonpriority proof of claim against the Debtor by the applicable Bar Date in accordance with the applicable Bar Date Order, such Customer Claim shall be classified as an Other General Unsecured Claim and treated for all purposes under the Plan as an Other General Unsecured Claim; or (y) solely if the Non-Participating Customer does not timely and properly file an unsecured nonpriority proof of claim against the Debtor by the applicable Bar Date in accordance with the applicable Bar Date Order, such Customer Claim shall not be treated as either a Class 5 Claim or a Class 4 Claim.

The Plan provides that, notwithstanding anything to the contrary in the Plan, all Non-Participating Customers will be treated as having temporarily Allowed Class 4 Other General Unsecured Claims solely for purposes of voting on the Plan.

iii    *If Class 5 Approves the Plan; Treatment Subject to Bankruptcy Court Approval.*  On the Effective Date, each Participating Customer shall be deemed to have an Allowed Class 5 Claim; <u>provided</u> that a Participating Customer Potential Return Claim shall only be Allowed: (1) if such Participating Customer timely and properly files a proof of claim for such Claim by the Former Customers Bar Date in accordance with the Former Customers Bar Date Order <u>and</u> (2) only in the amount up to the Participating Customer Potential Return; <u>provided</u> <u>further</u> that, subject to the last sentence of Section 4.05(c) of the Plan, if the Bankruptcy Court does not approve the Customer Releases pursuant to Bankruptcy Rule 9019 or otherwise, then each Participating Customer will not have an Allowed Class 5 Claim and, solely if such Participating Customer timely and properly filed an unsecured nonpriority proof of claim against the Debtor by the applicable Bar Date in accordance with the applicable Bar Date Order, such Customer Claim shall be classified as an Other General Unsecured Claim and treated for all purposes under the Plan as an Other General Unsecured Claim.  Notwithstanding the foregoing, if the PUCT Settlement is approved by the Bankruptcy Court but the amount of such settlement is less than $500,000, then each Participating Customer that timely and properly files a proof of claim for a Participating Customer Potential Return

Claim shall have an Allowed Claim in the amount of the Participating Customer Potential Return solely for purposes of sharing Pro Rata in the Settlement Deficiency.

iv    The Plan provides that, notwithstanding anything to the contrary contained in the Plan, Participating Customers shall have forty-five (45) days after the Effective Date to elect to become Non-Participating Customers by completing the Customer Release Opt-Out Form and returning it so that it is actually received by the Solicitation Agent by the forty-fifth (45th) day after the Effective Date by:

(a)    Electronic mail to the Plan Administrator, which email address is identified on the Customer Release Opt-Out Form; or

(b)    U.S. Mail or other hand delivery system at the following address:

> Griddy Energy LLC
> c/o Stretto
> 410 Exchange, Suite 100
> Irvine, CA 92602

Copies may also be obtained by contacting the Solicitation Agent via telephone at (855) 478-2725 (toll free U.S.) or for international calls at (949) 471-0997. If a Participating Customer elects to become a Non-Participating Customer in accordance with the foregoing, the former Participating Customer shall be treated as a Non-Participating Customer under the Plan for all purposes; provided that such Person's vote on the Plan shall not be deemed changed if the election is made after the Voting Deadline.

v    The Plan provides that, notwithstanding anything to the contrary contained in the Plan, if the Bankruptcy Court does not approve (i) (x) any Available Prepetition Lender Contribution, (y) any Settlement Deficiency being distributed to holders of Allowed Class 5 Claims in accordance with the terms of the Plan, or (ii) the releases of Participating Customers in Section 12.07(b) of the Plan, the provisions of the Plan relating to any or all such provisions, as applicable, shall be deemed stricken from the Plan and of no force and effect. In such event, holders of Allowed Class 5 Claims shall be entitled to the remainder of the treatment and Distributions provided for in the Plan as if either or both such provisions, as applicable, were not included in the Plan.

6. **Class 6 – Intercompany Claims.**

    i    *Impairment and Voting.*  Class 6 is impaired by the Plan. The holders of Intercompany Claims are entitled to vote to accept or reject the Plan.

    ii    *Treatment*:  Except to the extent that a holder of an Allowed Intercompany Claim agrees to a different treatment, if any Causes of Action are successfully prosecuted, settled and/or otherwise resolved, each holder of an Allowed Intercompany Claim shall be entitled to receive its Pro Rata share of any and all Cash or other property remaining with the Debtor after (a) all Allowed Claims (other than Intercompany Claims) are paid in full in Cash (including payment of postpetition interest from the Petition Date through the payment date at the Federal Judgment Rate; <u>provided</u> that, the contractual rate of interest shall apply, if applicable, based on the particular contractual agreement between the Debtor and the holder of an Allowed Claim) in accordance with the Plan and (b) all other Wind Down Costs are paid in accordance with the Wind Down Budget.

    iii     The Non-Debtor Affiliates shall be deemed to have contributed all claims and causes of action identified in the Plan Supplement.

7. **Class 7 – Existing HoldCo Interests.**

    i    *Impairment and Voting.*  Class 7 is impaired by the Plan. The holder of the Existing HoldCo Interests is entitled to vote to accept or reject the Plan.

    ii    *Treatment*:  Except to the extent that the holder of the Allowed Existing HoldCo Interest agrees to a different treatment, if any Causes of Action are successfully prosecuted, settled and/or otherwise resolved, the holder of the Existing HoldCo Interests shall be entitled to receive any and all Cash or other property remaining with the Debtor after (a) all Allowed Claims are paid in full in Cash (including payment of postpetition interest from the Petition Date through the payment date at the Federal Judgment Rate; <u>provided</u> that, the contractual rate of interest shall apply, if applicable, based on the particular contractual agreement between the Debtor and the holder of an Allowed Claim) in accordance with the Plan and (b) all other Wind Down Costs are paid in accordance with the Wind Down Budget.

21

Additional provisions regarding the treatment of Claims and Interests are set forth in **Article IV** of the Plan.

### D.  Releases and Exculpation

Article XII of the Plan contains certain provisions that propose to release and exculpate the Released Parties.

> ***Released Parties*** *means, collectively, and each solely in its capacity as such: (a) the Debtor, (b) the Committee and its members, (c) the Prepetition Secured Lenders and the Collateral Agent, and (d) each of such parties' respective predecessors, successors, assigns, subsidiaries, affiliates, including the Non-Debtor Affiliates,[16] owners, and each of their respective current and former officers, directors, employees, managers, members, principals, shareholders, agents, advisors and professionals (including any attorneys, consultants, financial advisors, investment bankers and other professionals retained by such Persons) or other representatives, each in their capacities as such, together with their successors and assigns;* _provided_, _however_, *that such attorneys and professional advisors shall only include those that provided services related to the Chapter 11 Case and the transactions contemplated by the Plan;* _provided, further_, *that no Person shall be a Released Party if it elects to opt out of the releases provided for in Article XII of the Plan in its Ballot.*

The releases, exculpation and injunction provisions included in the Plan are an integral part of the Debtor's Plan.

**Section 12.07(b) of the Plan does _not_ apply to Participating Customers (those customers that do not opt-out of the Customer Releases on their Class 5 Ballot, including those former customers that abstain from voting and do-not opt out of the Customer Releases, and otherwise do not timely elect to become Non-Participating Customers in accordance with the terms of the Plan) if the Bankruptcy Court approves the Customer Releases.  If the Bankruptcy Court does not approve the Customer Releases pursuant to Bankruptcy Rule 9019 or otherwise, then solely if such Participating Customer timely and properly files an unsecured nonpriority proof of claim against the Debtor by the applicable Bar Date in accordance with the applicable Bar Date Order, such Customer Claim shall be classified as an Other General Unsecured Claim and treated for all purposes under the Plan as an Other General Unsecured Claim, and the releases in Section 12.07(b) shall apply unless such claimant "opts out" of the releases on a timely and properly submitted Ballot.**

**Importantly, only holders of Claims entitled to vote on the Plan that do _not_ opt out of the releases provided for Section 12.07(b) of the Plan in accordance with the procedures set**

---

[16] "***Non-Debtor Affiliates***" **means the Debtor's non-debtor affiliates, HoldCo, Griddy Technologies LLC, Griddy Pro LLC, Griddy VI Holdings LLC, Griddy VI Intermediate Holdings LLC, Griddy 6 Holdings LLC, Griddy VI Series A Holdings LLC, Beachside New Utility (VI) Holdings LLC, Elliot New Utility Holdings LLC, Elliot New Utility (VI) Holdings LLC, Janson New Utility Holdings LLC, Janson New Utility (VI) Holdings LLC, Grid Investments Inc., EDF Trading North America LLC, Niab Holdings Pty Limited and SRA Investments Pty Limited.**

forth in the Ballots will be deemed to have consented to such releases of the Released Parties to the extent set forth in the Plan.

The Released Parties have made substantial and valuable contributions to the Debtor's orderly wind down plan through efforts to negotiate and implement the Plan, which will maximize the amount of assets available to be distributed to holders of Claims. For example, the Prepetition Secured Lenders have indicated that they will not object to the treatment of their Claims set forth in the Plan, which represents a compromise of a portion of their Allowed Claims. Accordingly, each of the Released Parties warrants the benefit of the release and exculpation provisions. The pertinent parts of the release, exculpation and injunction provisions of the Plan are copied below.

(a)     **Debtor Releases**

Section 12.07(a) of the Plan provides for a release by the Debtor of the Released Parties (as defined above), as set forth below (the "**Debtor Release**"). As explained below, the Debtor believes the Debtor Release is in the best interest of the Debtor's Estate and well within the Debtor's business judgment. Further, the Debtor does not believe that it has material claims or causes of action against any of the Released Parties and, thus, the benefits of providing the Debtor Release far outweighs any risks with respect to providing such releases.

First, with respect to the Prepetition Secured Lenders, (a) their liens on, among other things, cash, were properly perfected in December 2020 when the Debtor was solvent and (b) they were oversecured as of the Petition Date. On December 4, 2020, the Debtor, the Prepetition Secured Lenders and the Debtor's cash management bank entered into blocked account control agreements, which is the date the Macquarie Agreements were signed. Except for one account, which was and continues to be subject to the exclusive control of the Prepetition Secured Lenders as of December 4, 2020, the Debtor was permitted to use the cash in its bank accounts so long as there was no default. As a result of certain defaults under the Macquarie Agreements that occurred during the winter storm event, the Prepetition Secured Lenders exercised remedies against the Debtor by delivering a notice of shifting control of the Debtor's bank accounts, which gave the Prepetition Secured Lenders exclusive control of the Debtor's other bank accounts (other than an escrow account for a small PPP loan) and had the effect of blocking the Debtor's ability to use all of its bank accounts. As of the date hereof, the Prepetition Secured Lenders continue to have exclusive control over one account of the Debtor that contains approximately $2.689 million.

The Debtor believes that a release of the Prepetition Secured Lenders and its related parties benefits the Estate because, under the Plan, the Prepetition Secured Lenders will agree to forego distributions in the amount of approximately $1.448 million plus unpaid interest at the default contract rate. In light of the fact that the Debtor believes there will be approximately $1 million in the Estate upon consummation of the Plan (after payment of all Allowed Administrative Expense Claims, including Professional Fee Claims), the Debtor believes that this contribution of approximately $1.448 million plus unpaid interest at the default contract rate by the Prepetition Secured Lenders is material and provides further support for the Debtor Release under the Plan. The Debtor has been advised that the Prepetition Secured Lenders would not be willing to forego distributions in the amount of approximately $1.448 million plus unpaid interest at the default contract rate without the Debtor Release. Further, because the Prepetition Secured Lenders are secured creditors entitled to adequate protection and also oversecured, if any person were to

commence litigation with respect to the Debtor against the Prepetition Secured Lenders, the Prepetition Secured Lenders would be entitled to seek payment from the Debtor of reasonable professional fees incurred by the Prepetition Secured Lenders in connection with any litigation in accordance with the terms of the Macquarie Agreements. Thus, because the Debtor's cash would be used to pay the Prepetition Secured Lenders' fees and costs, for every dollar spent litigating against the Prepetition Secured Lenders, one less dollar ultimately would be available to the Estate. The Debtor also believes that any litigation against the Prepetition Secured Lenders would be time consuming, expensive and would delay the completion of the liquidation of the Debtor's assets and distributions to its creditors and result in the Debtor becoming administratively insolvent and the conversion of this case to chapter 7, which would mean that the Plan and its benefits could not be achieved for all stakeholders. Accordingly, the Debtor's release of the Prepetition Secured Lenders is an integral part of the Plan and is in the best interests of the Estate.

Second, the Debtor also believes that a release of the other Released Parties, including, the Debtor's non-Debtor affiliates including its and their respective officers and the directors (the "Directors") is in the best interests of the Estate. First, other than the limited amount of cash that will remain in the Estate at the conclusion of this case, the Debtor's only other asset is its viable Causes of Action related to the winter storm event. The Debtor believes that in order for the Plan Administrator to have the ability to pursue such Causes of Action, the Plan Administrator will need the input, cooperation and assistance of the officers and Directors, related to, among other things, the facts and circumstances that occurred prior to, during and after the winter storm event, including, the Debtor's interactions with ERCOT. The Plan Administrator also will likely need the assistance of the officers and employees in respect of claims reconciliation, including, assistance with the Debtor's information technology systems. The Debtor licenses its technology and intellectual property from its affiliate, Griddy Tech. In order for the Debtor to be able to use the technology and intellectual property that it licenses from Griddy Tech after the Effective Date of the Plan, Griddy Tech's cooperation and consent will be required. Thus, Griddy Tech providing such consent would materially benefit the Estate. Post Effective Date of the Plan, the officers and Directors will be employed by Griddy Tech and Griddy Pro LLC ("**Griddy Pro**"), the Debtor's affiliates, in connection with such entities' separate businesses. Griddy Tech and Griddy Pro permitting such persons to provide services to the Plan Administrator while such Persons are employed by Griddy Tech and Griddy Pro will be of material benefit to the Estate, the Plan Administrator and the pursuit of the Causes of Action. Importantly, while performing services for the Plan Administrator, such Persons will be prevented from performing their obligations to Griddy Tech and Griddy Pro resulting in additional value provided by such entities and persons for the benefit of the Estate. Thus, while the current officers and most of the Directors indirectly own substantially all of the equity of the Debtor and will have the opportunity to benefit from the Causes of Action after all creditors are repaid in full, the Estate will benefit materially from the post-Effective Date cooperation and assistance of the officers and Directors in pursuit of the Causes of Action and reconciliation of claims warranting the release of the Non-Debtor Affiliates, the Directors, the officers and their related parties.

Third, many of the Released Parties, such as HoldCo, the other Non-Debtor Affiliates, officers, directors, stockholders, employees, agents and representatives, and the stockholders, members, officers, directors, managers, employees, agents and representatives of such persons (in their capacities as such), have indemnification rights against the Debtor under the Debtor's limited liability company agreement and the Debtor agreed to defend and hold harmless such Released

Parties. As such, any indemnification or other claims could directly affect the Debtor's Estate. Including the Released Parties in the Debtor Release avoids any such claims. Moreover, there is no question that members, managers, officers and directors have provided and continue to provide valuable consideration to the Debtor as they commit substantial time and effort to winding down and liquidating the Debtor throughout this chapter 11 process.

Fourth, the Non-Debtor Affiliates have agreed to pay up to $225,000 to satisfy the Prepetition Lender Fee Claims. Absent such contribution, the Prepetition Lender Fee Claims would be payable in cash ahead of other unsecured creditors. The Non-Debtor Affiliates' contribution is therefore valuable and will provide a substantial benefit to the estate. The Non-Debtor Affiliates have informed the Debtor that they would not be willing to contribute the funds to pay the Prepetition Lender Fee Claims absent their inclusion in the Debtor Release.

Fifth, the Debtor is an additional insured on insurance policies issued to HoldCo. As such, the Debtor shares its insurance policies and coverage with HoldCo and certain other affiliates and their respective, members, managers, officers and Directors. With respect to such shared coverage, if the Debtor Release is not approved, claims against affiliated Released Parties could deplete the availability of insurance proceeds under the shared insurance policy limits, which, in turn, would leave less insurance available for the benefit of the Debtor and its Estate.

Importantly, not only does the Debtor believe that the Debtor Release materially benefits the Estate, but the Debtor does not believe there are any viable claims or Causes of Action against the Debtor's non-Debtor affiliates, including members, managers, Directors, officers, employees and/or shareholders, being released as part of the Debtor Release. The Debtor strongly believes that any litigation against any Released Parties would be time consuming, expensive and not yield any benefit to the Estate. Further, the Debtor believes that there are insufficient funds in the Estate to pursue any actions against such parties and pursuit thereof will cause this case to convert to a liquidation under chapter 7 of the Bankruptcy Code. In such instance, a chapter 7 trustee will be appointed and the Debtor believes that, among other things, the chapter 7 trustee will try to sell the outstanding customer unpaid accounts to a collection agency or otherwise pursue such actions, potentially leaving approximately 24,000 former customers subject to collection actions and being reported to credit agencies, which is antithetical to what the Debtor is trying to achieve under the Plan.

As previously discussed, the Debtor was solvent until mid-February. The Debtor's Schedules of Assets and Liabilities reflect one intercompany claim by a sister company of approximately $4,600. The Debtor's Statement of Financial Affairs do not reflect any cash transfers from the Debtor to any of its affiliates. The Debtor believes that it, its officers, Directors, members, managers, among others, acted in the best interests of the Debtor and its stakeholders at all times. Any payments to such parties were on account of salaries, fees and/or expenses paid in the ordinary course of business. Further, during the unprecedented crisis created by the winter storm event, the unpreparedness of the electricity grid in Texas, and the extreme pricing that occurred, the Debtor, through its management, among other things, (a) urged its customers to move to a different REP because the Debtor could not control the price of electricity (and approximately 10,000 customers did so), (b) requested ERCOT to mass transition its customers to POLR during the storm, which would have had the effect of mitigating damages for all parties, and (c) continued to procure electricity so that its customers would not be left without electricity notwithstanding

that a great number of those customers were unable or unwilling to pay for their own electricity consumption. The Debtor believes that the actions by such parties were appropriate under the circumstances.

Thus, as the Debtor believes that there are no viable claims, the Estate would not be prejudiced by the Debtor providing the Debtor Release. However, approval of the Debtor Release will benefit the Debtor, its Estate and the Debtor's former customers as set forth above and in the Plan.

Lastly, the treatment of Claims under the Plan is based on proposed compromises and settlements with numerous parties. The Debtor Release is integral to the Plan and such compromises and settlements. The Debtor Release and the Customer Releases are part and parcel of the overall Plan. Each component is a necessarily intertwined. As stated above, the Debtor does not believe that it has material claims or causes of action against any of the Released Parties that would justify risking the compromises and settlements under the Plan. In light of this fact, the implementation of the Debtor Release far outweighs the pursuit of any potential claims or causes of action being released. Importantly, the Debtor Release benefits the Estate as set forth above, provides finality and the inclusion thereof is worthwhile and inures to the benefit of all of the Debtor's stakeholders.

> **<u>Releases by the Debtor</u>. Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, the Debtor, as debtor in possession, and any person seeking to exercise the rights of the Debtor's Estate, including without limitation, any successor to the Debtor, including the Liquidating Debtor, the Plan Administrator or any representative of the Debtor's Estate appointed or selected pursuant to sections 1103, 1104, or 1123(b)(3) of the Bankruptcy Code or under chapter 7 of the Bankruptcy Code, shall be deemed to forever release and waive all claims (as such term "claim" is defined in section 101(5) of the Bankruptcy Code), obligations, suits, judgments, damages, demands, debts, rights, causes of action (including, but not limited to, the Causes of Action) and liabilities (other than the rights of the Debtor to enforce the Plan and the contracts, instruments, releases and other agreements or documents delivered thereunder) against any Released Party, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on and after December 4, 2020 through the Effective Date in any way relating to the Debtor, the Chapter 11 Case, the Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the Debtor or its Estate, whether directly, indirectly, derivatively or in any representative or any other capacity; <u>provided</u>, <u>however</u>, that in no event shall anything in Section 12.07(a) be construed as a release of any Person's gross negligence or willful misconduct, as determined by a Final Order, for matters with respect to the Debtor and/or their affiliates.**

For the avoidance of doubt, nothing in the Plan or the Confirmation Order shall constitute a release of the obligations of Griddy VI Holdings LLC under: (a) that certain Note Purchase Agreement,

dated as of December 4, 2020, by and between Griddy VI Holdings LLC and Macquarie Investments US Inc., (b) that certain Convertible Promissory Note, dated as of December 4, 2020, issued by Griddy VI Holdings LLC to Macquarie Investments US Inc., and (c) that certain Letter Agreement, dated as of December 4, 2020, by and between Griddy VI Holdings LLC and Macquarie Investments US Inc.

(b)    **Third Party Releases**

Section 12.07(b) of the Plan provides for a mutual release by holders of Claims entitled to vote on the Plan that do not opt out of the releases through the procedure set forth in the Ballot, on the one hand, and the Released Parties, on the other hand, as set forth below (the "**Third Party Release**").  The Third Party Release is integral to the Plan and is a key component of the Debtor's chapter 11 wind down.  Importantly, the Debtor believes that the Third Party Release is consensual because, other than with respect to certain affiliate claims, the Plan provides voting holders of Claims with the option to opt out of the Third Party Release by checking a box on the Ballot.  Each of the Disclosure Statement, Ballots, and Combined Hearing Notice state in bold-faced, conspicuous text that holders of Claims eligible to vote on the Plan that do not opt out or object to the Third Party Release will be bound by it.

> *__Releases by Holders of Claims.__  Except as otherwise provided in the Plan or the Confirmation Order, including Section 12.10 as to Participating Customers, on the Effective Date, (i) each holder of a Claim in a Class entitled to vote on the Plan and (ii) each Released Party (other than the pre-Effective Date Debtor, the Liquidating Debtor and the Plan Administrator), to the fullest extent permissible under applicable law as such law may be extended or interpreted subsequent to the Effective Date, in consideration for the obligations of the Debtor under the Plan, the Distributions under the Plan and other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, will be deemed to have consented to the Plan and the restructuring embodied herein for all purposes and deemed to forever release and waive all claims (as such term is defined in section 101(5) of the Bankruptcy Code) against any and all Released Parties and Participating Customers (solely in each such customer's capacity as such), including but not limited to any claim sounding in law or equity or asserting a tort, breach of any duty or contract, violations of the common law, any federal or state statute, any federal or state securities laws or otherwise, demands, debts, rights, causes of action (including without limitation, the Causes of Action) or liabilities (other than the right to enforce the obligations of any party under the Plan and the contracts, instruments, releases, agreements and documents delivered under or in connection with the Plan), including but not limited any claims for any such loss such holder may suffer, have suffered or be alleged to suffer as a result of the Debtor commencing the Chapter 11 Case or as a result of the Plan being consummated, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the pre-Effective Date Debtor, the Liquidating Debtor, the Plan Administrator,*

*the Chapter 11 Case, the Plan or the Disclosure Statement; provided, however, that the foregoing releases shall not apply to any holder of a Claim if such holder "opts out" of the releases provided in Section 12.07(b) in a timely and properly submitted Ballot; provided, further, that in no event shall anything in Section 12.07(b) be construed as a release of any Person's gross negligence or willful misconduct, as determined by a Final Order, for matters with respect to the Debtor. For the avoidance of doubt, the only parties that are bound by the releases set forth in Section 12.07(b) are (a) the Released Parties and (b) holders of Claims in a Class entitled to vote on the Plan that do not "opt out" of the releases provided in Section 12.07(b) of the Plan in a timely and properly submitted Ballot or Customer Release Opt-Out Form in accordance with the terms of the Plan.*

(c) <strong>Customer Releases</strong>

Section 12.10 of the Plan provides for a mutual release between each Participating Customer (i.e., a former customer of the Debtor that does not opt-out of the Customer Releases on a timely and properly submitted Class 5 Claim Ballot, including a former customer that abstains from voting on the Plan and does not opt-out of the Customer Releases, and otherwise does not timely elect to become a Non-Participating in accordance with the terms of the Plan), and the Released Parties, as set forth below. The Customer Releases are also consensual because any former customer that does not wish to grant such releases can opt-out of the Customer Releases and the Customer Releases would not apply. In that case, such former customer would have a temporarily Allowed Claim in Class 4 (Other General Unsecured Claims) for purposes of voting on the Plan and the ability to opt out of the proposed Third Party Release.[17]

The Debtor believes that if it pursued collections from former customers for amounts owed, the amount it would be able to collect would be a small fraction of the total amount due from its former customers. This belief is based on, among other things, prior experience with trying to collect such debt, and is exacerbated by the pandemic and loss of income by many families coupled with the extreme pricing imposed by the PUCT order. Further, the Debtor believes that if it brought such actions, the amount expended on litigation could far outweigh the total amount collected.

The Debtor was a licensed retail electric provider, which provided its customers the ability to purchase wholesale electricity with no mark-up. It did not make improper charges to former customers. As a passthrough, the Debtor had no say whatsoever in the extreme pricing of electricity that was charged. Putting aside that the Debtor does not believe there will be a high rate of success of collections from such former customer debt, the Debtor believes that it is appropriate and reasonable under the circumstances to (a) avoid having collection actions taken against approximately 24,000 people of the State of Texas and (b) avoid having the credit of such persons potentially damaged by reporting the overdue amounts to credit agencies. It is bad enough that the Debtor finds itself in a position of having had its business destroyed and commencing this

---

[17] Whether the Non-Participating Customer has an Other General Unsecured Claim under the Plan for purposes other than voting will depending upon whether such Non-Participating Customer timely and properly files an unsecured nonpriority proof of claim against the Debtor by the applicable Bar Date in accordance with the applicable Bar Date Order.

case as a result of the extreme pricing that occurred during the winter storm event. The Debtor proposed the Customer Releases in order to try give itself and its customers an ending to a terrible chapter, through no fault of its own, that affected both it, its business and most of its former customers in a materially negatively way.

> ***Customer Releases** means the mutual releases by and among the Participating Customers, on the one hand, and the Released Parties, on the other hand, whereby (i) the Debtor and each other Released Party releases and waives all Claims against each Participating Customer, solely in its capacity as such, including, for unpaid amounts owed by such Participating Customer to the Debtor for the electricity and related fees, taxes, expenses and other costs charged to such customers for the period February 13, 2021 through and including February 19, 2021, including when the Public Utilities Commission of Texas imposed the $9,000 per MWh price for wholesale power; and (ii) each Participating Customer releases and waives all Claims against each of the Released Parties relating to the pre-Effective Date Debtor, the Liquidating Debtor, the Plan Administrator, the Chapter 11 Case, the Plan or the Disclosure Statement, including, any Claims for any loss a Participating Customer may suffer, have suffered or be alleged to suffer as a result of or relating to the Participating Customer's agreements with the Debtor as well as the electricity and related fees, taxes and costs charged to such customers for any period while they were a customer of the Debtor, including, the period February 13, 2021 through and including February 19, 2021, including when the Public Utilities Commission of Texas imposed the $9,000 per MWh price for wholesale power; **provided**, that, notwithstanding the foregoing, each eligible Participating Customer may assert a Participating Customer Potential Return Claim in a timely and properly filed proof of claim form in accordance with the Former Customers Bar Date Order and, solely to the extent each Participating Customer has an Allowed Participating Customer Potential Return, receive its Pro Rata share of the Texas Storm Causes of Action Net Recovery Proceeds, if any, which proceeds shall be shared with holders of Allowed Other General Unsecured Claims on a Pro Rata basis and be distributed (Pro Rata) to holders of (a) Allowed Other General Unsecured Claims and (b) Allowed Participating Customer Potential Return Claims.*

> ***Agreement by Holders of Participating Customers; Release of Certain Customer Collections.** Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, (i) each Participating Customer will be deemed to have consented to the Plan and the restructuring embodied therein for all purposes and deemed to accept the Customer Releases as they pertain to such Participating Customer and the Released Parties and (ii) each Released Party will be deemed to accept the Customer Releases as they pertain to such Released Party and the Participating Customers; provided that, notwithstanding the foregoing, if the Bankruptcy Court does not approve the Customer Releases pursuant to Bankruptcy Rule 9019 through the Plan or otherwise, then each Participating Customer will not have an Allowed Class 5 Claim, the Customer Releases shall not become effective and, solely if such Participating Customer timely and*

***properly filed an unsecured nonpriority proof of claim against the Debtor by the applicable Bar Date in accordance with the applicable Bar Date Order, such Customer Claim shall be classified as an Other General Unsecured Claim and treated for all purposes under the Plan as an Other General Unsecured Claim. For the avoidance of doubt, if the Customer Releases become effective, each Participating Customer releases and waives all Claims against each of the Released Parties, including, any claim sounding in law or equity or asserting a tort, breach of any duty or contract, violations of the common law, any federal or state statute, any federal or state securities laws, fraud or otherwise, demands, debts, rights, causes of action (including without limitation, the Causes of Action) or liabilities (other than the right to enforce the obligations of any party under the Plan and the contracts, instruments, releases, agreements and documents delivered under or in connection with the Plan), including but not limited any Claims for any such loss such Participating Customer may suffer, have suffered or be alleged to suffer as a result of the Debtor selling electricity to such Participating Customer prior to the Petition Date, the Debtor commencing the Chapter 11 Case or as a result of the Plan being consummated, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the pre-Effective Date Debtor, the Liquidating Debtor, the Plan Administrator, the Chapter 11 Case, the Plan or the Disclosure Statement; provided, that, notwithstanding the foregoing, each eligible Participating Customer may assert a Participating Customer Potential Return Claim in a timely and properly filed proof of claim form in accordance with the Former Customers Bar Date Order and, solely to the extent each Participating Customer has an Allowed Participating Customer Potential Return Claim, receive its Pro Rata share of (i) the Texas Storm Causes of Action Net Recovery Proceeds, if any, and (ii) any Available Prepetition Lender Contribution, proceeds shall be shared with holders of Allowed Other General Unsecured Claims on a Pro Rata basis and be distributed (Pro Rata) to holders of (a) Allowed Other General Unsecured Claims and (b) Allowed Participating Customer Potential Return Claims.***

(d)     **Exculpation**

In addition to the releases, the exculpation clause in the Plan provides that the Debtor, the Liquidating Debtor, the Plan Administrator and the other Released Parties are exculpated from any liability arising out of any postpetition acts or omissions arising out of the Chapter 11 Case and certain related transactions as set forth therein—except for acts or omissions that are found to have been the product of willful misconduct or gross negligence.  As such, the Debtor believes the exculpation clause is reasonable, appropriate and vital to this Chapter 11 Case.  First, the Debtor is entitled to the benefits of the exculpation clause.  Upon a "good faith" finding within the meaning of section 1125(e) of the Bankruptcy Code, such parties are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation clause.  Second, certain other exculpated parties owe fiduciary duties in favor of the Debtor's estate, permitting them to receive

the benefits of the exculpation clause. The directors, officers, members and professionals that have acted on behalf of the Debtor in connection with the Chapter 11 Case and the Plan Administrator each owe the Debtor fiduciary duties similar to those the debtor in possession owes to the estate. Further, the Debtor and its fiduciaries could not possibly have developed the Plan without the support and contributions of the Released Parties. Accordingly, the failure to approve the exculpation clause would undermine the purpose of the Plan and the settlements set forth therein by allowing parties to pursue claims post-bankruptcy that are otherwise fully and finally resolved by the Plan when the Released Parties participated in the Chapter 11 Case in reliance upon the protections afforded to those constituents by the exculpation clause.

*__Exculpation and Limitation of Liability__ None of the pre-Effective Date Debtor, the Liquidating Debtor, the Plan Administrator nor the other Released Parties shall have or incur any liability to any holder of any Claim or Interest for any postpetition act or omission in connection with, or arising out of the Debtor's restructuring, including without limitation the negotiation and execution of the Plan, the Chapter 11 Case, the Disclosure Statement, the Disclosure Statement Supplement, the solicitation of votes for and the pursuit of the Plan (including that solicitation of acceptances of the Plan was not conducted in good faith nor in compliance with the applicable provisions of the Bankruptcy Code), the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, including, without limitation, all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all activities leading to the promulgation and confirmation of the Plan except gross negligence or willful misconduct as determined by a Final Order of the Bankruptcy Court. For purposes of the foregoing, it is expressly understood that any act or omission effected with the approval of the Bankruptcy Court conclusively will be deemed not to constitute gross negligence or willful misconduct unless the approval of the Bankruptcy Court was obtained by fraud or misrepresentation. The Debtor and the Released Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities with respect to the Chapter 11 Case, the Plan and the administration thereof.*

(e)    **Injunction**

The following injunction provisions in section 12.06 of the Plan:

(a) *Except as otherwise provided in the Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against or Interests in the Debtor or its Estate are, with respect to any such Claims or Interests, permanently enjoined from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the pre-Effective Date Debtor, the Liquidating Debtor, the Estate, the Plan Administrator, the Released Parties, or any of their respective property; (ii) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtor, the pre-Effective Date Debtor, the Liquidating*

31

*Debtor, the Estate, the Plan Administrator, the Released Parties or any of their respective property; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the pre-Effective Date Debtor, the Liquidating Debtor, the Estate, the Plan Administrator, the Released Parties; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained in the Plan shall preclude such persons from exercising their rights pursuant to and consistent with the terms of the Plan.*

*(b) Each holder of an Allowed Claim shall be deemed to have specifically consented to the injunctions set forth herein.*

Additionally, Section 12.09 contains the following injunction provisions related to the release and exculpation provisions:

*Injunction Related to Releases and Exculpation. The Confirmation Order shall permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released pursuant to the Plan, including but not limited to the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released under this Article XII of the Plan.*

### E.  Plan Administrator

The Debtor shall continue to exist as the Liquidating Debtor on and after the Effective Date, with all of the powers of a limited liability company under applicable law solely for the purposes of satisfying the Debtor's obligations under the Plan, including making distributions as required under the Plan and effectuating the wind down of the Debtor.  On the Effective Date, the sole membership interest in the Liquidating Debtor shall be issued to the Plan Administrator and all property of the Debtor will vest in the Liquidating Debtor free and clear of any liens, claims or encumbrances.  From and after the Effective Date, the Debtor shall be managed and administered through the Plan Administrator, who shall be appointed the sole officer of the Debtor and shall have full authority to administer the provisions of the Plan.

*Designation of Plan Administrator*.  Not less than ten (10) days prior to the commencement of the Combined Hearing and subject to Bankruptcy Court approval in connection with confirmation of the Plan, the Debtor and the Committee shall jointly select the person who initially will serve as the Plan Administrator; provided, however, that: (a) if the Debtor and the Committee jointly agree, they shall have the right at any time prior to the Effective Date to remove the Plan Administrator without cause; and (b) the Plan Administrator shall be subject to removal by the Bankruptcy Court for cause shown at any time.  The Plan Administrator shall act for the Debtor in a fiduciary capacity, shall have such qualifications and experience as are sufficient to enable the Plan Administrator to perform its obligations under the Plan and under the Plan

Administrator Agreement, and shall be compensated and reimbursed for expenses as set forth in, and in accordance with, the Plan Administrator Agreement. Sections 7.04 and 7.05 of the Plan contains provisions regarding replacement of the Plan Administrator under certain circumstances.

*Powers and Duties of Plan Administrator*. On or after the Confirmation Date but prior to the Effective Date, the Plan Administrator shall assume all of its obligations, powers and authority under the Plan to: (i) establish bank accounts as may be required to fulfill the Debtor's obligations under the Plan; and (ii) exercise such other power and authority as may be set forth in the Confirmation Order (collectively, the "**Pre-Effective Date PA Duties**"). On the Effective Date, the Plan Administrator shall assume all of its other obligations, powers and authority under the Plan and shall comply with all applicable provisions of the Plan. All other property of the Estate, including any Causes of Action not released by the Plan, shall be managed by the Plan Administrator and shall be held in the name of the Debtor free and clear of all Claims against the Debtor and Interests, except for the rights to such Distribution afforded to the holders of Allowed Claims under the Plan.

From and after the Effective Date, pursuant to the terms and provisions of the Plan and the Plan Administrator Agreement, the Plan Administrator shall be empowered and directed to: (i) take all steps and execute all instruments and documents necessary to make Distributions to holders of Allowed Claims and to perform the duties assigned to the Plan Administrator under the Plan and/or the Plan Administrator Agreement; (ii) comply with the Plan and the obligations hereunder; (iii) employ, retain, or replace professionals to represent it with respect to his or her responsibilities; (iv) object to Claims as provided in the Plan, and prosecute such objections; (v) compromise and settle any issue or dispute regarding the amount, validity, priority, treatment, or Allowance of any Claim; (vi) establish, replenish or release reserves as provided in the Plan, as applicable; (vii) seek a determination of tax liability under section 505 of the Bankruptcy Code, file tax returns and pay taxes, if any, related to the Debtor; (viii) abandon in any commercially reasonable manner, including abandonment or donation to a charitable organization of his or her choice, any assets of the Debtor if he or she concludes that they are of no benefit to the Estate or the Debtor; (ix) purchase or create and carry all insurance policies and paying all insurance premiums and costs he or she deems necessary or advisable, including that cover the liabilities and obligations of the Plan Administrator and the Oversight Committee under the Plan Administrator Agreement; (x) seek entry of a final decree in the Chapter 11 Case at the appropriate time; and (xi) exercise such other powers as may be vested in the Plan Administrator pursuant to the Plan, the Plan Administrator Agreement or any other Plan Documents or order of the Bankruptcy Court or otherwise act on behalf of and for the Debtor from and after the Effective Date in a manner consistent with the provisions of the Plan which the Plan Administrator deems reasonably necessary or desirable with respect to administering the Plan. The Debtor shall pay the Plan Administrator Expenses and the reasonable fees and expenses of the professional persons employed by the Plan Administrator in connection with his or her duties and responsibilities as set forth in the Plan.

The Plan Administrator shall make the remaining Distributions required under the Plan in accordance with the Plan's terms.

*Limitation of Plan Administrator Liability*. After the Effective Date, the Plan Administrator shall have no liability to holders of Claims or Interests other than as provided for in

the Plan. The Plan Administrator shall not be liable for any action it takes or omits to take that it believes in good faith to be authorized or within its rights or powers unless it is ultimately and finally determined by a court of competent jurisdiction that such action or inaction was the result of fraud, gross negligence or willful misconduct. Absent willful misconduct or fraud in connection therewith, no party in interest shall have a cause of action against the Plan Administrator, the Debtor or the Liquidating Debtor, or each of their respective managers, officers, employees, consultants, trustees, or similar persons, or professionals arising from or related to the disposition of non-Cash property in accordance with the Plan.

***The Oversight Committee***.

(a)     The Oversight Committee shall be comprised initially of (i) two members selected by the Committee and (ii) one member selected by the Debtor; provided that, (x) if the Plan Administrator recovers sufficient funds to deposit into a segregated account $7.7 million or (y) if the total amount of Allowed Claims (excluding the claim of the Electric Reliability Council of Texas, Inc.) is less than $7.7 million and the Plan Administrator recovers sufficient funds to deposit into a segregated account the total amount required to pay such Allowed Claims (excluding the claim of the Electric Reliability Council of Texas, Inc.) in full (excluding interest), and (z) the Plan Administrator deposits such applicable funds into a segregated account for the benefit of the holders of such Allowed Claims, the Oversight Committee shall be reconstituted to be comprised of (i) two members selected by HoldCo (or its successor or assign) and (ii) one remaining member (who was previously selected by the Committee); provided further that, notwithstanding the foregoing, upon all Allowed Class 4 and Class 5 Claims being paid in full in accordance with the terms of the Plan, the Oversight Committee shall be reconstituted to be comprised of three members selected by HoldCo (or its successor or assign) (each of the two immediately preceding provisos being referred to herein as a "Toggle Event"). If the trigger for a Toggle Event is as a result of the events occurring in the first proviso of this Section 7.05(a), the two members of the Oversight Committee that were selected by the Committee (or their successors, as applicable) shall determine between themselves which member shall resign. If such members cannot make a determination promptly, the Plan Administrator shall seek an order of the Bankruptcy Court in respect of same. The Oversight Committee members selected by (a) the Committee (and any successors) shall act in a fiduciary capacity the same as an official committee of unsecured creditors and (b) the Debtor (and any successors) shall act in a fiduciary capacity the same as required by officers under the Debtor's limited liability company agreement in effect as of the Petition Date. Vacancies on the Oversight Committee shall be filled by a Person designated by (x) as to a Committee selected member, the remaining member that was selected by the Committee (or his or her successor) from among the holders of Allowed Customer Claims or Allowed Other General Unsecured Claims and (y) as to the Debtor selected member, HoldCo or its successor or assign. Any successor appointed pursuant to this Section shall become fully vested with all of the rights, powers, duties and obligations of his or her predecessor. For the avoidance of doubt, no member on the Oversight Committee shall be compensated for serving as a member of the Oversight Committee; provided, if applicable, such members may be reimbursed by the Debtor for reasonable and documented out-of-pocket expenses, if any. In addition, the Plan Administrator may, but is not required to, seek an order of the Bankruptcy Court in respect of depositing the applicable funds described in this Section 7.05(a) into a segregated account as described above.

(b)     Prior to the Toggle Event, unanimous consent of the Oversight Committee shall be required for the following actions: (i) material modifications or amendments to the Plan Administrator Agreement; (ii) cancellation or modification of insurance covering the Plan Administrator or the Oversight Committee; (iii) the settlement, compromise, dismissal, abandonment, release, submission to binding arbitration or mediation, or waiver, in whole or in part, of any claims, rights, causes of action, appeals, or collection efforts arising thereunder or in connection therewith, of any claim by the Plan Administrator where the Disputed Amount at issue equals or exceeds $3 million; (iv) the decision whether to enter into an agreement with any entity respecting the joint prosecution of any claim and causes of action belonging to the Debtor; (v) choosing a successor Plan Administrator; (vi) removing the Plan Administrator; and (vii) the Plan Administrator's retention of professionals to pursue any Texas Storm Causes of Action.  All material actions by the Plan Administrator other than the foregoing shall require majority consent of the Oversight Committee, except as otherwise provided in Section 7.05(c).  After the Toggle Event, the actions listed in Section 7.05(b)(i)-(vii) shall require majority consent of the Oversight Committee.

(c)     Notwithstanding any other provision in the Plan, the Plan Administrator may only settle Causes of Action as follows: (i) without notice to, or consent from, the Oversight Committee where the Disputed Amount is less than $250,000; (ii) with written notice to the Oversight Committee where the Disputed Amount is between $250,000 and $2,999,999 and the Plan Administrator proposes to settle such claim; provided that no member of the Oversight Committee objects in writing to the proposed settlement within five (5) business days after receipt of such writing; provided, further that if a member of the Oversight Committee so objects, then the Plan Administrator may only proceed with the proposed settlement with the consent of a majority of the members of the Oversight Committee; and (iii) with written notice to, and the consent of all members of, the Oversight Committee where the Disputed Amount is more than $2,999,999.

***Dissolution of the Debtor and Termination of the Plan Administrator and the Oversight Committee***.  As soon as reasonably practicable after the Distributions have been made to holders of Allowed Claims in accordance with the terms of the Plan, the Debtor shall: (a) file its certificate of dissolution, together with all other necessary corporate documents, to effect its dissolution under the applicable Delaware state law; and (b) complete and file its final federal, state and local tax returns, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of the Debtor or its Estate for any tax incurred during the administration of the Chapter 11 Case, as determined under applicable tax laws.  After the Chapter 11 Case is closed and the Plan Administrator has completed all tasks necessary in order to fully and completely wind down and dissolve the Debtor and otherwise to comply with its obligations under the terms of the Plan and the Plan Administrator Agreement, the Plan Administrator shall be deemed to have fully completed his or her duties hereunder and thereunder and shall be fully released and discharged of its duties and obligations to carry out the terms of the Plan.  After the Plan Administrator has settled or otherwise resolved all Causes of Action and distributions of the proceeds thereof have been made to the beneficiaries thereof, the Oversight Committee shall terminate unless otherwise agreed between the Plan Administrator and the Oversight Committee.

### F. Other Significant Plan Provisions.

#### 1. Comprehensive Settlement of Claims and Controversies

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims or controversies relating to the rights that a holder of a Claim or Interest may have with respect to any Allowed Claim, including Allowed Participating Customer Claims, or any distribution to be made pursuant to the Plan on account of any Allowed Claim, including, Allowed Participating Customer Return Claims.  **The treatment of Allowed Class 5 Customer Claims is a good faith compromise and settlement of all Claims or controversies relating to the rights of the holders of such Claims and is not and should not be deemed to be an admission or waiver of rights or defenses of the Debtor or any other Released Party. But for the proposed settlement and compromise set forth in the Plan, the Debtor would not have proposed the treatment in Class 5, including, related to Participating Customer Potential Return Claims.  The Debtor and each other Released Party reserves all rights and defenses against any Non-Participating Customers, including in respect of an alleged credit, refund, return or otherwise in respect of any and all amounts paid for electricity and related fees, costs, taxes and other charges, or otherwise that is not released pursuant to the Plan**.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies, including the settlement and the Customer Releases set forth in Section 12.10 of the Plan, and the Bankruptcy Court's finding that all such compromises or settlements are: (a) in the best interest of the Debtor and its Estate and property, and of holders of Claims or Interests; and (b) fair, equitable and reasonable.  If the Effective Date does not occur, the settlements set forth in the Plan shall be deemed to have been withdrawn without prejudice to the respective positions of the parties.

#### 2. Causes of Action

The Plan provides for the retention of all Causes of Action other than those that are waived, relinquished, exculpated, released, compromised or settled.

In accordance with section 1123(b) of the Bankruptcy Code, the Debtor shall retain and enforce all rights to commence and pursue any and all Causes of Action of the Debtor, and the Debtor's right to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtor pursuant to the releases and exculpations contained in the Plan and Article XII of the Plan, which shall be deemed released and waived by the Debtor as of the Effective Date.

The Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Debtor.  **No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, the Disclosure Statement or any other document in this case to any Cause of Action against it as any indication that the Debtor will not pursue any and all available Causes of Action of the Debtor against it.  The Debtor expressly reserves all rights to prosecute any and all Causes of Action against any Person, except as otherwise provide in the Plan, including Article XII of the Plan.**  Unless any Cause of Action of the Debtor against a Person is waived, relinquished, exculpated, released, compromised or settled in the Plan or

pursuant to a Final Order, the Debtor expressly reserves all such Causes of Action for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or the Effective Date.

### 3. **Texas Storm Causes of Action**

Texas Storm Causes of Action means any and all Causes of Action of the Debtor arising from, relating to or in connection the winter storm (commonly referred to as "Winter Storm Uri") that occurred in Texas during the month of February 2021 (primarily February 13, 2021 through February 19, 2021). For the avoidance of doubt, such Causes of Action of the Debtor exclude any and all claims against the Released Parties.

### 4. **Cancellation of Agreements, Existing Securities and Security Interests.**

Except for the purpose of evidencing a right to distribution under the Plan, on the Effective Date, any document, agreement, or instrument evidencing any Claim or Interest shall be deemed cancelled without further act or action under any applicable agreement, law, regulation, order, or rule and the obligations of the Debtor under such documents, agreements, or instruments evidencing such Claims and Interests, as the case may be, shall be deemed extinguished. The holders of or parties to such cancelled instruments, securities and other documentation will have no rights arising from or relating to such instruments, securities and other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan.

Upon the full payment or other satisfaction of an Allowed Secured Claim, or promptly thereafter, the holder of such Allowed Secured Claim shall deliver to the Debtor any Collateral or other property of the Debtor held by such holder, and any termination statements, instruments of satisfactions, or releases of all security interests with respect to its Allowed Secured Claim that may be reasonably required in order to terminate any related financing statements, mortgages, mechanic's liens, or lis pendens.

### 5. **Distributions under the Plan**

The Distributions to be made in Cash under the terms of the Plan shall be funded from the Debtor's Cash on hand as of and after the Effective Date and any Cash or other amounts received by the Debtor, if any, from the pursuit of any Causes of Action (formally or informally) not released under the Plan, net of all costs and expenses deducted therefrom. Pursuant to the terms and provisions of the Plan, the Plan Administrator shall make the required Distributions specified under the Plan, on the Initial Distribution Date, Interim Distribution Date, or Final Distribution Date, as the case may be, under the Plan.

Additional provisions related to Distributions to be made under the Plan are set forth in **Article VIII** of the Plan. As part of the State of Texas Settlement, if such settlement is approved by the Bankruptcy Court and after the Effective Date of the Plan occurs, Section 8.12 of the Plan provides that all distributions to Former Customers that are unclaimed for a period of sixty (60) days after distribution thereof shall be turned over to the Unclaimed Property Division of the State

of Texas Comptroller of Public Accounts pursuant to applicable Texas state unclaimed property law to enable such Former Customer(s) to retrieve such funds in perpetuity. If the Bankruptcy Court does not approve the State of Texas Settlement or the Effective Date does not occur, the foregoing will not be effective.

6. **Assumption and Rejection of Executory Contracts and Unexpired Leases**

As set forth in Section 10.01 of the Plan, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases of the Debtor shall be deemed to be rejected by the Debtor as of the Effective Date, except for any executory contract or unexpired lease: (x) that previously has been assumed and/or assigned pursuant to an order of the Bankruptcy Court entered prior to the Effective Date; (y) as to which a motion for approval of the assumption and/or assignment of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date; or (z) that is specifically designated as a contract or lease to be assumed and/or assigned by the Debtor.

**Claims arising out of the rejection of an executory contract or unexpired lease pursuant to Section 10.01 of the Plan must be filed with the Bankruptcy Court and served upon the Debtor no later than thirty (30) days after the later of: (i) notice of entry of an order approving the rejection of such executory contract or unexpired lease; and (ii) notice of occurrence of the Effective Date. All such Claims not filed within such time will be forever barred from assertion against the Debtor and its Estate.**

Additional provisions regarding the Assumption and Rejection of Executory Contracts and Unexpired Leases under the Plan, including procedures governing the Debtor's designation of contracts for assumption and cure of monetary defaults, are set forth in **Article X** of the Plan.

## V. VOTING PROCEDURES AND REQUIREMENTS

### A. Classes Entitled to Vote on the Plan

The following Classes are the only Classes entitled to vote to accept or reject the Plan (the "**Voting Classes**"):

| Class | Claim or Interest | Status |
|---|---|---|
| 1 | Prepetition Secured Lender Claims | Impaired |
| 4 | Other General Unsecured Claims | Impaired |
| 5 | Customer Claims | Impaired |
| 6 | Intercompany Claims | Impaired |
| 7 | Existing Holdco Interests | Impaired |

If your Claim or Interest is not included in one of the Voting Classes, you are not entitled to vote. If your Claim or Interest is included in one of the Voting Classes, you should read your Ballot and carefully follow the instructions included in the Ballot. Please use only the Ballot that

accompanies this Disclosure Statement or the ballot that the Debtor, or Stretto, the Debtor's voting agent (the "**Voting Agent**"), on behalf of the Debtor, otherwise provided to you.

### B.     Votes Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a chapter 11 plan by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests, as applicable, voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted.  Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted.  Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.  **Your vote on the Plan is important**.  The Bankruptcy Code requires as a condition to confirmation of a chapter 11 plan that each class that is impaired and entitled to vote under a plan votes to accept such plan, unless the plan is being confirmed under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code.

### C.     Certain Factors To Be Considered Prior to Voting

There are a variety of factors that all holders of Claims or Interests entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan and include:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtor believes that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtor can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtor may request confirmation of the Plan without the acceptance of all impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either confirmation or consummation of the Plan could result in, among other things, increased Administrative Claims and Fee Claims.

While these factors could affect distributions available to holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Classes or necessarily require a re-solicitation of the votes of holders of Claims in such Voting Classes.

For a further discussion of risk factors, please refer to **Article VIII**, entitled "*Certain Risk Factors to be Considered*," of this Disclosure Statement.

39

### D.     Classes Not Entitled To Vote on the Plan

Under the Bankruptcy Code, holders of Claims or Interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the Plan. The following Classes of Claims are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Priority Non-Tax Claims | Unimpaired | Presumed to Accept |

### E.     Cramdown

Section 1129(b) permits confirmation of a chapter 11 plan notwithstanding the non-acceptance of the plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims or interests votes to accept a proposed plan. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

If any Class votes to reject the Plan, the Debtor will request confirmation of the Plan, as it may be modified and amended from time to time, under section 1129(b) of the Bankruptcy Code with respect to such Class(es). Subject to Section 14.07 of the Plan, the Debtor reserves the right to alter, amend, modify, revoke or withdraw the Plan or any Plan Document in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

### F.     Allowed Claims

Only Claims or Interests that are "*Allowed*" may receive distributions under a chapter 11 plan. An "Allowed" Claim or Interest means that the Debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines by Final Order, that the Claim or Interest, including the amount thereof, is in fact a valid obligation of, or equity interest in, the Debtor or otherwise a Allowed as part of the compromises and settlements under the Plan. Provisions governing the Allowance of Claims and Interests under the Plan are set forth in **Article IX** of the Plan.

### G.     Impairment Generally

Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is "impaired" unless, with respect to each claim or interest of such class, the chapter 11 plan (i) does not alter the legal, equitable or contractual rights of the holders of such claims or interests or (ii) irrespective of the holders' right to receive accelerated payment of such claims or interests after the occurrence of a default, cures all defaults (other than those arising from, among other things, the debtor's insolvency or the commencement of a bankruptcy case), reinstates the maturity of the claims or interests in the class, compensates the holders of such claims or interests for any damages incurred as a result of their reasonable reliance upon any acceleration rights and does not otherwise alter their legal, equitable or contractual rights.

**Only holders of Allowed Claims or Allowed Interests (including temporarily Allowed for voting purposes) in impaired Classes of Claims or Interests that receive or retain**

**property under a proposed chapter 11 plan, but are not otherwise deemed to reject the plan, are entitled to vote on such a plan**.

### H. Solicitation and Voting Process

Each holder of a Class 1 Claim (Prepetition Lender Claims), Class 4 Claim (Other General Unsecured Claims), Class 5 Claim (Customer Claims), Class 6 Claim (Intercompany Claims) or Class 7 Interest (Existing HoldCo Interests) as of the Voting Record Date is entitled to vote to accept or reject the Plan and shall receive the Solicitation Package in accordance with the solicitation procedures. Except as otherwise set forth herein, the Voting Record Date and all of the Debtor's solicitation and voting procedures shall apply to all of the Debtor's creditors and other parties in interest.

The following summarizes the procedures for voting to accept or reject the Plan (the "**Solicitation Procedures**"), which the Bankruptcy Court has approved through the Disclosure Statement Order (as defined below). Holders of Claims and Interests entitled to vote are encouraged to review the relevant provisions of the Bankruptcy Code and Bankruptcy Rules and to consult their own attorneys.

### 1. The Solicitation Package

The following materials are provided to each holder of a Claim or Interest that is entitled to vote on the Plan (collectively, the "**Solicitation Package**"):

- the Disclosure Statement (with all exhibits thereto, including the Plan);

- the Disclosure Statement Order (without exhibits);

- the Solicitation Procedures;

- the Combined Hearing Notice;

- the applicable form of Ballot for each Voting Class in which such Holder holds a Claim or Interest;

- a pre-addressed, postage pre-paid reply envelope (except for Class 5, who will receive their Solicitation Package by electronic means); and

- any supplemental documents that the Debtor may file with the Court or that the Court orders to be made available with the applicable Ballot and voting instructions.

If you (a) did not receive a Ballot and believe you are entitled to one; (b) received a damaged Ballot; (c) lost your Ballot; (d) have any questions concerning this Disclosure Statement, the Plan, or the procedures for voting on the Plan, or the Solicitation Package of materials you received; or (e) wish to obtain a paper copy of the Plan, this Disclosure Statement or any exhibits to such documents, please contact the Debtor's Solicitation Agent by (a) accessing the Solicitation Agent's website at https://cases.stretto.com/Griddy; (b) writing to the Solicitation Agent at Griddy Energy LLC, Ballots, c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602; (c) emailing

GriddyInquiries@stretto.com; and/or (d) calling the Solicitation Agent's toll-free information line with respect to the Debtor at (855) 478-2725 (toll free) or (949) 471-0997 (international). Copies of the Disclosure Statement and other Solicitation Package materials can be also accessed online in electronic form by accessing the Solicitation Agent's website at https://cases.stretto.com/Griddy or visiting the website maintained by the Court at http://www.txs.uscourts.gov/bankruptcy.

The Debtor intends to file the Plan Supplement no later than five (5) Business Days prior to the deadline for Ballots to be received in connection with voting to accept or reject the Plan. The Debtor will not serve paper or electronic copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement (or any update thereto) by visiting the Debtor's restructuring website, https://cases.stretto.com/Griddy; and/or by calling (855) 478-2725 (toll free U.S.) or (949) 471-0997 (international).

        2.     **Voting Deadlines**

**To be counted, your Ballot(s) must be actually received by the Solicitation Agent no later than:**

- June 25, 2021 at 5:00 p.m. (Central Time) for holders of Claims or Interests entitled to vote. This is the "Voting Deadline." If you miss the Voting Deadline your vote will not be counted.

        3.     **Voting Instructions**

> **THIS DISCUSSION OF THE VOTING PROCESS IS ONLY A SUMMARY. PLEASE REFER TO THE VOTING INSTRUCTIONS PROVIDED WITH YOUR BALLOT. IN THE EVENT OF ANY DISCREPANCY BETWEEN THE VOTING INSTRUCTIONS PROVIDED WITH YOUR BALLOT AND THE INFORMATION IN THIS SUMMARY, THE VOTING INSTRUCTIONS PROVIDED WITH YOUR BALLOT SHALL GOVERN.**

If you are entitled to vote to accept or reject the Plan, you may submit a Ballot for the purpose of voting on the Plan. Separate forms of Ballots are provided for the holders of Claims and Interests in different Voting Classes entitled to vote on the Plan.

The Plan provides that if a holder of a Class 5 Customer Claim opts-out of the Customer Releases as the holder of a Claim in Class 5 (i.e., a Non-Participating Customer), such holder (x) will not be treated as an Allowed Class 5 Claim, (y) will not give or receive the Customer Releases, and (z) (1) solely if the Non-Participating Customer timely and properly files an unsecured nonpriority proof of claim against the Debtor by the applicable Bar Date in accordance with the applicable Bar Date Order, such Customer Claim shall be classified as an Other General Unsecured Claim and treated for all purposes under the Plan as an Other General Unsecured Claim; or (y) solely if the Non-Participating Customer does not timely and properly file an unsecured nonpriority proof of claim against the Debtor by the applicable Bar Date in accordance with the applicable Bar Date Order, such Customer Claim shall not be treated as either a Class 5 Claim or a Class 4 Claim (other than for purposes of voting on the Plan as a Class 4 Claim). **The Plan provides that, notwithstanding anything to the contrary in the Plan, all Non-Participating**

Customers as of the Voting Record Date will be treated as having temporarily Allowed Class 4 Other General Unsecured Claims solely for purposes of voting on the Plan.

The Ballot for Class 5 Customer Claims includes a space to indicate a vote to accept or reject the Plan as a Class 5 Customer Claim as well as a space to elect to opt-out of the Customer Releases. The Ballot also includes a space to indicate to vote to accept or reject the Plan as a Class 4 Other General Unsecured Claim and a space to opt out of the Third Party Release applicable to a Class 4 Claims; provided that such Class 4 Other General Unsecured Claim and opt out will only be counted if the Bankruptcy Court does not approve the Customer Releases or the former customer opts-out of the Customer Releases. To have a valid claim as a Non-Participating Customer, the Non-Participating Customer must timely and properly file an unsecured nonpriority proof of claim against the Debtor by the applicable Bar Date in accordance with the applicable Bar Date Order. Holders of Class 5 Claims should complete the ballot as to their Class 4 Claim contained in the Class 5 Ballot (and should not fill out a separate Class 4 Ballot to avoid any duplication). **For purposes of treatment under the Plan only and not for purposes of voting on the Plan, Participating Customers shall have the option to elect to be Non-Participating Customers at any time prior to a date that is 45 days after the Effective Date**.

For all other Classes, a separate Ballot must be used for each Voting Class. Any Person who holds Claims or Interests in more than one Voting Class is required to submit a separate ballot for its Claims or Interests in each Voting Class.

**Holders of Claims or Interests are required to vote all of their Claims or Interests within a Class either to accept or reject the Plan and may not split their votes. Any Ballot received that does not indicate either an acceptance or rejection of the Plan or that indicates both acceptance and rejection of the Plan will be counted as an acceptance. Any Ballot received that is not signed or that contains insufficient information to permit the identification of the holder will be an invalid Ballot and will not be counted.**

Ballots that are not received by the Voting Deadline will not be counted. With respect to each Claim or Interest, you may submit a Ballot completing, dating, and signing the enclosed Ballot and returning your Ballot(s) directly to the Solicitation Agent so that is actually received by the Voting Deadline. Ballots can be submitted to the Solicitation Agent by:

1. E-Ballot Portal, by visiting https://cases.stretto.com/Griddy. Click on the "File a Ballot" section of the website and follow the instructions to submit the Ballot after entering the Unique E-Ballot ID# provided on the Ballot; or

2. First Class Mail, Overnight Delivery, or Hand Delivery at:

Griddy Energy LLC Ballots
c/o Stretto
410 Exchange, Suite 100
Irvine, CA 92602

**UNLESS THE DEBTOR AGREES OTHERWISE, BALLOTS WILL <u>NOT</u> BE ACCEPTED BY FAX OR EMAIL**

Only Ballots received by Stretto by the Voting Deadline will be counted. If delivery of a Ballot is by mail, it is recommended that voters use an air courier with guaranteed next day delivery or registered mail, properly insured, with return receipt requested. In all cases, sufficient time should be allowed to ensure timely delivery. The method of such delivery is at the election and risk of the voter.

EACH BALLOT FOR PREPETITION LENDER CLAIMS, OTHER GENERAL UNSECURED CLAIMS AND NON-PARTICIPATING CUSTOMERS IN CLASS 5 CUSTOMER CLAIMS ADVISES HOLDERS THAT IF THEY <u>DO NOT ELECT</u> TO OPT OUT OF THE THIRD PARTY RELEASE PROVISIONS CONTAINED IN SECTION 12.07(b) OF THE PLAN, THEY SHALL BE BOUND BY THE THIRD PARTY RELEASES SET FORTH IN SECTION 12.07(b) OF THE PLAN AND DEEMED TO HAVE FOREVER RELEASED AND WAIVED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES IN ACCORDANCE WITH THE PLAN.

EACH BALLOT FOR CUSTOMER CLAIMS ADVISES HOLDERS THAT (I) IF THEY DO NOT OPT-OUT OF THE CUSTOMER RELEASES ON THEIR CLASS 5 BALLOT (INCLUDING IF THEY ABSTAIN FROM VOTING AND DO NOT OPT-OUT OF THE CUSTOMER RELEASES) AS A HOLDER OF A CUSTOMER CLAIM, THEY SHALL BE BOUND BY THE CUSTOMER RELEASES AND PURSUANT TO SECTION 12.10 BE DEEMED TO HAVE FOREVER RELEASED AND WAIVED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES IN ACCORDANCE WITH THE PLAN – AND THE RELEASED PARTIES SHALL BE DEEMED TO HAVE FOREVER RELEASED AND WAIVED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE PARTICIPATING CUSTOMER (SOLELY IN ITS CAPACITY AS SUCH), AND (II) IF THEY OPT-OUT OF THE CUSTOMER RELEASES AS A HOLDER OF A CUSTOMER CLAIM AND, IF THEY HAVE A VALID CLASS 4 OTHER GENERAL UNSECURED CLAIM AND <u>DO NOT ELECT</u> TO OPT OUT OF THE RELEASE PROVISIONS CONTAINED IN SECTION 12.07(b) OF THE PLAN, THEY SHALL BE BOUND BY THE THIRD PARTY RELEASES SET FORTH IN SECTION 12.07(b) OF THE PLAN AND DEEMED TO HAVE FOREVER RELEASED AND WAIVED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES IN ACCORDANCE WITH THE PLAN.

PARTICIPATING CUSTOMERS THAT ELECT TO BECOME NON-PARTICIPATING CUSTOMERS FOLLOWING THE VOTING DEADLINE SHALL (I) NOT BE BOUND BY THE CUSTOMER RELEASES AND (II) IF THEY HAVE A VALID CLASS 4 OTHER GENERAL UNSECURED CLAIM AND <u>DO NOT ELECT</u> TO OPT OUT OF THE RELEASE PROVISIONS CONTAINED IN SECTION 12.07(b) AT THE TIME THEY ELECT TO BECOME A NON-PARTICIPATING CUSTOMER, BE BOUND BY THE THIRD PARTY RELEASES SET FORTH IN SECTION 12.07(b) OF THE PLAN AND DEEMED TO HAVE FOREVER RELEASED AND WAIVED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES IN ACCORDANCE WITH THE PLAN.

## I.    The Combined Hearing.

On May 26, 2021, the Bankruptcy Court entered the *Order: (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Plan; (III) Approving the Form of Various Ballots and Notices in Connection Therewith; and (IV) Approving the Scheduling of Certain Dates in Connection with the Confirmation of the Plan* [Docket No. 308] (the "**Disclosure Statement Order**").  As part of the Disclosure Statement Order, the Bankruptcy Court has scheduled the Combined Hearing for July 7, 2021, at 3:00 p.m. (prevailing Central Time).  The Combined Hearing may be adjourned from time to time without further notice.  In addition, pursuant to the Disclosure Statement Order, objections to confirmation of the Plan and the adequacy of the Disclosure Statement must be filed with the Court so that they are actually received by the Clerk of the Court by no later than June 25, 2021 at 5:00 p.m. (prevailing Central Time) in accordance with the notice of the Combined Hearing that accompanies the Disclosure Statement.

## VI.    DESCRIPTION OF THE DEBTOR AND EVENTS LEADING TO CHAPTER 11 FILING

### A.    Overview of the Debtor and Its Business

Griddy was a retail electric provider in Texas which provided its customers the ability to purchase wholesale electricity with no mark-up.  Prior to the events that precipitated this Chapter 11 Case, Griddy had approximately 29,000 customers in Texas and 30 employees.  On February 26, 2021, well after the winter storm event, ERCOT commenced the forced transition of Griddy's customers to a Provider of Last Resort ("**POLR**").  As a result, as of the date hereof, Griddy has no customers and Griddy has reduced its employee headcount to 15.  The Debtor has filed this case to pursue a chapter 11 plan of liquidation and implement a wind down plan of its business.

The Texas energy market has several key players, which are listed below.

    a.  **Electric Reliability Council of Texas**.  The Texas power grid is operated and managed by ERCOT.  ERCOT has certain market rules that have been developed in consultation with market participants.  In order to facilitate a REP's participation in the ERCOT market, each REP is required to be party to a Standard Form Market Participant Agreement with ERCOT pursuant to which the applicable REP and ERCOT agree to abide by certain standard protocols applicable to all REPs.

    b.  **Public Utility Commission of Texas**.  The PUCT is a state agency that regulates utilities within the State of Texas, including those participating in the ERCOT market.  The PUCT's oversight responsibility includes, among other things, monitoring activity of ERCOT market players, including ERCOT itself, power generators, transmission and distribution providers, power marketers and REPs.  The PUCT implements and enforces rules under the Public Utility Regulatory Act (PURA) and ERCOT's protocols.

    c.  **Power Generation Companies**.  Power generation companies own and operate facilities that generate electricity.  In Texas, such companies utilize coal, nuclear power, natural gas, and renewable power resources to generate electricity.  Through

ERCOT, power generating companies sell electricity to REPs who in return work with TDSPs (as defined below) to ensure that electricity reaches customers.

d. **Transmission and Distribution Service Providers ("TDSP")**. REPs do not deliver electricity to consumers. Instead, they contract with TDSPs that cover certain service areas that own and operate the physical power delivery infrastructure (i.e., the lines, wires, meters, etc.). There are several TDSPs in Texas including: AEP Texas, CenterPoint Energy, Oncor Electric Delivery Company and Texas – New Mexico Power.

e. **Retail Electric Providers**. REPs sell electric energy to retail customers in the areas of Texas where the sale of electricity is open to retail competition. A REP buys wholesale electricity, delivery service and related services, prices electricity for consumers and seeks consumers to buy electricity from them. REPs are licensed by the PUCT. Per PUCT regulations, the PUCT regulates the types of products that can be offered by REPs and the disclosures required for customers.

The process of opening the Texas power market to retail choice began in 2002 with Texas Senate Bill 7. Retail choice gives consumers freedom to shop for electricity providers that offer a variety of different types of electricity plans, including fixed rate plans, variable rate plans and index rate plans, with the rules for each type of plan set by the PUCT.[18]

Griddy's business model was simple. For a fixed monthly fee of $9.99, each customer had access to wholesale electricity pricing with no mark-up. Griddy used a prepayment model to charge customers for electricity. At the time of enrollment, customers added a payment method such as a credit or debit card to their accounts and an initial electricity prepayment of $49 was processed to establish an account balance. Billed amounts were calculated daily, one day in arrears for each customer using their meter data published on Smart Meter Texas, and automatically deducted from their account balance. Additional charges, such as ERCOT ancillary services, TDSP charges and transmission and distribution losses were calculated and allocated to the customer. When a customer's account balance fell below a threshold of $25, and in accordance with PUCT regulations for prepay products, Griddy automatically charged the payment method on file for a specified "Recharge Amount," which was set by the customer (not to be less than $49). If a customer chose to cease purchasing electricity from Griddy, Griddy refunded any positive prepayment balance that had not been applied to electricity charges.

In Texas, the wholesale price of electricity changes every five minutes, and is determined by ERCOT based on real-time supply and demand for electricity. The wholesale system wide offer cap is not permitted to exceed $9,000/MWh (which equates to $9/kWh per charged to customers) and it can be as low as $0/MWh or even negative. Prior to and after a customer signed up with Griddy, the range of wholesale electricity prices were disclosed by Griddy to the customer in multiple places.

---

[18] §25.475 *General Retail Electric Provider Requirements and Information Disclosures to Residential and Small Commercial Customers.*

Price spikes have occurred throughout Griddy's operating history, including several days in August 2019 during which real time electricity prices reached the $9,000 per MWh market cap for twelve 15-minute intervals over a three-day period (for a total of 3 hours). Griddy's customers experienced higher-than-normal bills during the month of August 2019; however, on average, customers who remained on the electricity product for the entire 2019 calendar 12-month period still achieved a lower cost of electricity as compared with the EIA Texas average.

Griddy's business model provided customers with information to mitigate the impact of electricity price spikes, including:

      a. allowing the customer to see the real-time price of wholesale electricity, and shift their electricity usage immediately in response to high prices;

      b. providing alerts when prices exceeded thresholds, such as a price spike;

      c. providing future price projections, based on ERCOT's day-ahead market prices, for the remainder of the current day and next day (once published), giving the customer the ability to plan their electricity usage and to adjust to times where the wholesale price may be lower;

      d. providing historical usage and cost patterns at a monthly, daily and hourly level, enabling customers to understand usage patterns and behavior; and

      e. historical billing, including the average cost of energy each day.

Griddy's business model had wider implications that could benefit the electricity grid. Other types of electricity rate plans, such as fixed price products, are designed to remove the customer as an active participant in the grid despite the fact that residential and small commercial electricity usage is generally the most weather-sensitive load on the grid. Customers on fixed-price products do not have the incentive to change their energy usage behavior when electricity supply is scarce, and therefore they do not. On the other hand, Griddy's customers demonstrated in August 2020 that they were price responsive and collectively worked to balance the electricity grid. Griddy believes that if there had been a functioning market with more load-responsive customers like Griddy's, those customers could have made a meaningful impact on grid conditions throughout the winter storm event in February 2021.

**B.**      **Overview of Capital Structure; December 4, 2020 Business Combination**

The Debtor is a Delaware limited liability company. It is wholly owned by Griddy Holdings, LLC. In a business combination transaction closed on December 4, 2020, the ownership of the Debtor was sold to a new ownership group and a new management team was appointed. A new holding company structure was formed in connection with the business combination (*i.e.*, the "**Griddy group**"). The Griddy group is comprised of (a) the Debtor, (b) two sister companies to the Debtor, Griddy Tech and Griddy Pro, (c) Griddy Holdings LLC ("**HoldCo**"), an intermediate holding company, (d) a parent holding company, Griddy VI Holdings LLC ("**Griddy**

47

**Holdings**"),[19] and (e) three additional parent holding companies owning the equity in Griddy Holdings directly or indirectly, with Griddy VI Series A Holdings LLC ("**Series A Holdings**") indirectly owning all of the Series A units in Griddy Holdings.

The BEJ Entities directly or indirectly own 50% of the Series A units and the Series B units in Griddy Holdings. The BEJ Entities are individually owned by the current officers of the Debtor. Grid Investments and EDF directly or indirectly own the remaining 50% of the Series A units and Series B units in Griddy Holdings.[20] Grid Investments and its corporate entity owners, Niab Holdings Pty Limited and SRA Investment Pty Limited, are partly owned directly or indirectly by certain prior officers of the Debtor prior to the business combination transaction (two of whom are directors on the Griddy Holdings Board).[21]

Griddy Tech and Griddy Pro have separate businesses from the Debtor that Griddy Holdings had planned to grow and provide services to third parties. Griddy Tech is a technology company that owns billing and customer facing technology that is intended to be used by energy companies to service their customers. The intent was to build a fulsome platform that could be licensed to third parties. The Debtor was the first customer to execute a non-exclusive license to that technology. Prior to the winter storm event, Griddy Tech was in discussions with a third-party retail electric provider about, among other things, licensing its technology. Griddy Pro is a sales and marketing business that was in the development stage both prior to and following the business combination transaction. Prior to the winter storm event, Griddy Pro was engaged in discussions with third-parties regarding the sale of their products through Griddy Pro's sales agents. However, when the winter storm event occurred, which was less than 2.5 months after the business combination was consummated, neither Griddy Tech nor Griddy Pro had entered into business agreements with other third-parties.

The business combination resulted in millions of dollars of new capital being available to the Debtor, all of which was either spent on behalf of the Debtor or remains in the Estate today, plus a new revolving credit line with Macquarie Investments US Inc. ("**Macquarie US**"). Each of Griddy Tech, Griddy Pro and HoldCo agreed to be a guarantor under the Macquarie Agreements – which had the effect of supporting the Debtor's acquisition of the revolving credit line.

At all points in time both prior to and following the business combination transaction, the Debtor never owned any technology or intellectual property assets. Prior to the business

---

[19] The common equity of Griddy Holdings is comprised of Series A and Series B units. The Series A units are all indirectly held by with Griddy VI Series A Holdings LLC ("**Series A Holdings**"). The equity in Series A Holdings and the Series B units of Griddy Holdings are held by eight corporate entities: Beachside New Utility Holdings LLC, Beachside New Utility (VI) Holdings LLC, Elliot New Utility Holdings LLC, Elliot New Utility (VI) Holdings LLC, Janson New Utility Holdings LLC, Janson New Utility (VI) Holdings LLC (collectively, the "**BEJ Entities**"), Grid Investments Inc. ("**Grid Investments**"), EDF Trading North America LLC ("**EDF**").

[20] EDF's ownership resulted from the equitization of debt that it was owed by the Debtor prior to the business combination transaction.

[21] The Debtor is managed by HoldCo and Holdco is managed by Griddy Holdings, which has a six person board, including an independent director that was a consultant to the Debtor during the winter storm event and became the independent director on the Board on the Petition Date.

combination, a non-Griddy entity owned certain technology and this entity was renamed and became Griddy Tech as part of the business combination. Also prior to the business combination transaction, all technology and intellectual property assets that were used by the Debtor were owned by the prior parent of the Debtor, and such assets were transferred to Griddy Tech in connection with the business combination. The license agreement between Griddy Tech and the Debtor is the only contract between the Debtor and any Non-Debtor Affiliate.

Because the business combination occurred less than 2.5 months prior to the winter storm event, the vast majority of the efforts of the Griddy group since the winter storm event have been centered around the Debtor's Plan and wind down.

## 1. **Prepetition Secured Facility**

On December 4, 2020, the Debtor entered into (i) that certain Borrowing Base Facility Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "**Macquarie Borrowing Base Agreement**") with Macquarie US, and non-Debtor affiliates HoldCo, Griddy Tech and Griddy Pro, as guarantors, pursuant to which Macquarie US extended credit to the Debtor subject to a borrowing base in an amount up to a maximum of $15,000,000.00.

The Macquarie Borrowing Base Agreement provided the Debtor with the ability to issue letters of credit to market participants, regulators and independent systems operators as required in the course of its business, and the Debtor is required to reimburse Macquarie US to the extent such letters of credit are drawn. The Debtor currently has a letter of credit posted to EDF Trading North America LLC as part of transition arrangements following the termination of the prior credit facility on December 4, 2020.

In connection with the Macquarie Borrowing Base Agreement, the Debtor entered into that certain ISDA 2002 Master Agreement (together with each schedule, annex, appendix and exhibit thereto, and confirmation thereunder, as each may be amended, restated, supplemented or otherwise modified from time to time, the "**Macquarie ISDA Agreement**" and together with the Macquarie Borrowing Base Agreement, the "**Macquarie Agreements**") by and between the Debtor and Macquarie Energy LLC ("**Macquarie Energy**" and, together with Macquarie US, "**Macquarie**" or the "**Prepetition Secured Lenders**"), pursuant to which the Debtor purchased electricity.

The Debtor's obligations under the Macquarie Borrowing Base Agreement and the Macquarie ISDA Agreement are secured by substantially all of the assets of the Debtor and the assets of Holdings, including on a limited recourse basis its equity interests in the Debtor, and its affiliates, Griddy Tech and Griddy Pro, as more fully described in related loan and security documents.

As of the Petition Date, the aggregate amount outstanding under the Macquarie Agreements is $1,448,937.58, exclusive of accrued and unpaid interest, fees, letter of credit reimbursement obligations and other related amounts, which include the obligation to provide Macquarie cash or credit support in the form of letters of credit acceptable to Macquarie in its sole discretion in an amount not less than $307,500.00 as collateralization for 102.5% of the full

undrawn amount of the EDF letter of credit, and certain fees and expenses of Macquarie, including reasonable and documented legal fees and expenses.

**C.      Prepetition Litigation**

The Debtor is involved in a number of lawsuits and other regulatory or government actions or investigations.

- The Debtor is subject to two enforcement investigations by PUCT arising from alleged violations of PUCT regulations in 2019.

- In addition, since the winter storm event in mid-February, the Debtor has been named as a defendant in (a) three civil actions filed by Griddy former customers alleging violations of the Texas Deceptive Trade Practices Act and other torts; and (b) a civil action filed by the Attorney General of the State of Texas, also alleging violations of the Texas Deceptive Trade Practices Act.  Each of these lawsuits is meritless.

- The Debtor also is subject to a Civil Investigative Demand initiated by the Attorney General of the State of Texas precipitated by the mid-February winter storm event. The Debtor was one of twelve electric industry market participants to receive a Civil Investigative Demand on February 19, 2021.

**D.      Prepetition Term Sheet with the Attorney General of the State of Texas**

On March 15, 2021, prior to filing for bankruptcy protection, the Debtor entered into a stipulation with the State of Texas, through the Attorney General of the State of Texas, whereby each party agreed to work in good faith to resolve all matters between them to the extent feasible. The term sheet provides for, among other things:

- The abatement of (a) the civil action filed by the Attorney General of the State of Texas described immediately above and (b) the Civil Investigative Demand initiated by the Attorney General of the State of Texas described immediately above, in each case, until further notice by the Attorney General, and such notice would give Griddy and HoldCo a minimum of fourteen (14) days to comply.

- The State of Texas and Griddy to work in good faith to resolve the civil action and Civil Investigative Demand.

- Griddy to use commercially reasonable efforts to provide certain information to the Attorney General related to the winter storm event that occurred in mid-February 2021.

- As set forth in the Plan, for Griddy to seek to exchange releases with former customers and waive all claims that it and its affiliates may have against such customers.

- The State of Texas and Griddy to work in good faith to address the issues facing consumers who paid Griddy for electricity while the index price was $9,000/MWh during the February 2021 winter storm.

As more fully described in Section II above, the Debtor, HoldCo and the State of Texas, by and through the Attorney General of the State of Texas, have settled the outstanding matters between them. *See Section II "Settlement With The Attorney General Of The State Of Texas" above.*

### E.    Events Leading to this Chapter 11 Case

Griddy is a REP in Texas which provided its customers the ability to purchase wholesale electricity with no mark-up. Griddy's business model was simple. For a fixed monthly fee of $9.99, each customer had access to wholesale electricity costs with no mark-up.

Winter Storm Uri brought extreme cold weather to Texas. Load on the power grid climbed to winter records and a host of other factors led to generation outages and forced the Electric Reliability Council of Texas ("ERCOT") to shed electric load, in the form of rolling blackouts, in order to match the available generation on the grid.

On February 15, 2021, in response to the grid experiencing unprecedented outages, the Public Utilities Commission of Texas ("PUCT") adopted an order instructing ERCOT to set the real time settlement point price for power at the high offer cap of $9,000 per MWh. This order went into effect immediately and stayed in effect until February 19, 2021, representing a total duration of 87.5 consecutive hours.

Although ERCOT rescinded load shed instructions at 11:55 pm on February 17, 2021, the price cap was not removed by it for another 32 hours. Potomac Economics, the Independent Market Monitor, has now reported in a letter to the PUCT that ERCOT's failure to remove the price cap was "inappropriate pricing intervention" that resulted in $16 billion in additional costs.[22] As of the date hereof, no action had been taken by regulators in connection therewith.

Prior to February 2021, Griddy's customers paid an average rate of $0.098 per kilowatt hour ("kWh"),[23] representing significant savings to its customers compared to the EIA Texas average. Griddy's business model provided customers with transparency regarding real-time electricity prices, forecasted electricity prices, and their energy usage and billings, which allowed its customers to control how much they spent on electricity.

During the February 2021 winter storm event in Texas, Griddy and its customers were subject to the extreme electricity prices resulting from the PUCT order. Griddy had to procure power for its customers at those elevated rates and pass those costs to its customers. Over the 87.5 hours while the $9,000 per MWh price was imposed, Griddy incurred significant debt to, among others, ERCOT, for the procurement of power for its customers. Many of Griddy's customers stopped paying their bills. ERCOT, however, continued to send Griddy multi-million dollar invoices for the power procured for the benefit of its customers during the storm and continued to

---

[22] See https://interchange.puc.texas.gov/Documents/51812_61_1114183.PDF.

[23] The average rate includes wholesale electricity costs, TDSP charges, ancillary services, the Griddy membership fee and other fees and credits. This rate excludes taxes.

make multi-million dollar collateral demands pursuant to ERCOT Protocols. Griddy earned only a fixed fee of $9.99 per month per customer regardless of whether the wholesale cost of electricity was high or low, and it also had little to no incoming funds at that point to pay these bills. As a result, ultimately, Griddy was unable to pay ERCOT for the outstanding charges or meet ERCOT's collateral call demands.

Griddy had also purchased physical electricity for the benefit of its customers through its secured lender. With respect to amounts owed in connection therewith, its secured lender exercised its rights under its secured credit agreement with Griddy and applied amounts from Griddy's bank accounts to satisfy the outstanding amounts due to the lender. At that point, while the offset greatly reduced the amount under the secured facilities, Griddy's cash on hand was also greatly reduced.

On February 26, 2021, ERCOT notified Griddy that it was in default and forced a mass transition of Griddy's customers to providers of last resort. As a result, Griddy was left with no customers and little to no incoming payments for outstanding accounts receivable. To that end, as of the Petition Date, Griddy had outstanding accounts receivable balances from its customers totaling in excess of $29 million and ERCOT has sent Griddy bills in excess of $29 million. Accordingly, Griddy was left in a position where it had no choice but to file this Chapter 11 Case and try to maximize value for the benefit of its creditors while balancing the desire to give its former customers relief from the uncertainty of being subject to collection actions as a result of the extreme wholesale electricity prices from the winter storm event.

## F.  The Debtor's Wind Down and Liquidation

The objective of the Debtor in this Chapter 11 Case is to maximize value to its estate for creditors while balancing the desire to give its former customers relief from the uncertainty of being subject to collection actions as a result of the extreme wholesale electricity prices from the winter storm event, facilitate the efficient resolution of claims, including pending and future litigation resulting from the events that occurred during the mid-February winter storm event, and enable the Debtor to wind down efficiently for the benefit of its creditors.

In furtherance of this goal, the Debtor has sought to work efficiently and in a time sensitive manner in prosecuting this Chapter 11 Case by seeking early in the case to: establish a bar date; review, evaluate, object to and where necessary settle claims; and seeking approval of this Disclosure Statement and confirmation of the Plan. The Debtor believes that an orderly wind down of its operations will maximize value for all of its creditors while balancing the desire to give its former customers relief, and fulfill the fundamental dual purposes of chapter 11, to maximize value and treat creditors appropriately.

In order to implement the Plan, liquidate the assets of the Debtor, and make distributions to creditors, on or after the Effective Date the Debtor will effectuate the following steps, as further described in **Article VI** of the Plan:

- **The Plan Administrator and the Liquidating Debtor shall enter into the Plan Administrator Agreement as of the Effective Date.**

- **The Plan Administrator will act as a fiduciary and will have full authority to administer the liquidation and wind down of the Debtor under the provisions of the Plan, including to (i) make Distributions to holders of Claims set forth in the Plan, (ii) object to, dispute, compromise or settle the amount, validity, priority, treatment, or Allowance of any Claim (iii) sell, abandon or dispose of any remaining property of the Debtor, and (iv) pursue any Causes of Action consistent with the provisions of the Plan.**

- **The releases provided for in Article XII of the Plan will become effective.**

The business and liquidity challenges the Debtor faces are substantial.  Having explored its alternatives, sought to maximize value for its stakeholders, and negotiated at arms' length with the Prepetition Secured Lenders—who have liens on substantially all assets—the Plan, and the orderly wind down provided for therein, represents the best outcome available for all stakeholders under the Debtor's circumstances.

## VII.  THE CHAPTER 11 CASE

### A.  <u>Significant Events During the Chapter 11 Case</u>

#### 1.  **First Day Matters**

On the Petition Date, the Debtor filed several motions requesting that the Bankruptcy Court enter orders authorizing the Debtor to maintain certain aspects of its operations in the ordinary course in order to facilitate the wind down provided for in the Plan (the "**First Day Motions**"). The First Day Motions were designed to facilitate a smooth transition into chapter 11 and ease the strain on the Debtor as a consequence of filing the Chapter 11 Case.

##### (a)  **Cash Management System**

The Company maintains a cash management system to collect, track, aggregate and disburse cash on a daily basis.  To facilitate a smooth transition into the Chapter 11 Case, the Debtor sought Bankruptcy Court approval to continue using its existing cash management system, bank accounts and business forms and to continue intercompany transactions.  The Court approved the relief sought in the motion on an interim basis on March 16, 2021 and on a final basis on April 14, 2021.

##### (b)  **Employee Motion**

The Debtor's employees rely on their compensation and benefits to pay their daily living expenses; absent which they would be exposed to significant financial difficulties.  The Debtor will need the sole focus of their employees during the Chapter 11 Case and cannot afford for their employees to be distracted by unnecessary concern over the payment of their wages and other benefits.  Accordingly, the Debtor sought authority to (a) honor and pay certain prepetition amounts due to its employees related to, among other things, compensation, benefit programs and reimbursable expenses; and (b) continue certain benefit programs and policies, consistent with the ordinary course of business and past practices, on a postpetition basis, whether arising before or after the Petition Date.  The Court approved the relief sought in the motion on March 16, 2021.

(c)     **Tax**

The Debtor sought authorization to remit and pay certain prepetition taxes and related obligations that the Debtor owes to various taxing authorities.  Such taxes are either trust fund taxes that do not constitute property of the estate or would be entitled to priority and would therefore be payable in full under the plan of liquidation.  Accordingly, payment does not negatively impact other stakeholders and avoids costly disruption that would result from failing to satisfy them when due.  The Court approved the relief sought in the motion on April 14, 2021.

(d)     **Use of Cash Collateral**

The Debtor sought authority from the Bankruptcy Court to use cash that is collateral for the obligations under the Macquarie Agreements.  The Prepetition Secured Lenders consented to the use of cash collateral in exchange for an adequate protection package that included replacement liens, periodic postpetition interests payments and stipulations with respect to the validity of the obligations under the Macquarie Agreements and the validity and perfection of the security interests securing such obligations.

The Court denied the Debtor's motion as filed but approved an oral motion made at the hearing on March 16, 2021 for use of cash collateral without the Prepetition Secured Lenders' consent, provided that the Debtor is not permitted to use funds in a restricted revenue account that is for the benefit of Macquarie.

2.     <u>**Additional Motions Filed in the Chapter 11 Case**</u>

(a)     **Rejection of Leases**

The Debtor is party to an unexpired non-residential real property leases and a license agreement for the use of certain property.  Given the Debtor's impending liquidation, the premises are no longer of any benefit to the Debtor.  The Debtor filed a motion seeking authorization to reject the leases, effective *nunc pro tunc* pursuant to Sections 105(a) and 365 of the Bankruptcy Code.  The Court approved rejection of the leases on April 22, 2021.

(b)     **Non-Insider Key Employee Retention Plan**

The Debtor's employees are critical to its ability to execute its chapter 11 wind down strategy and accordingly providing incentives for the employees to remain on the job is a significant priority for the Debtor.  The Debtor filed a motion seeking authorization to implement of a Key Employee Retention Program (the "<u>KERP</u>").  The participants in the KERP are 12 valuable non-insider members of the Debtor's workforce and the KERP is designed to retain those individuals through the Debtor's liquidation.  Importantly, none of the KERP recipients are "insiders" as such term is defined by the Bankruptcy Code.  The Court approved the KERP on April 14, 2021.

(c)     **Retention of Professionals**

The Debtor has been authorized to retain the following professionals to provide professional services in connection with the Chapter 11 Case:

- Baker Botts L.L.P., as counsel;

- Stretto, as notice, claims and solicitation agent; and

- other professionals relied upon in the Debtor's ordinary course of business.

### 3. **Formation of the Committee**

As set forth above, on March 31, 2021, the U.S. Trustee filed *the United States Trustee's Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 116] notifying parties in interest that the U.S. Trustee appointed the Committee in the Chapter 11 Case. The members of the Committee currently are: (a) Holland O'Neill; (b) Ty Williams; and (c) Lisa Khoury.

### 4. **Schedules and Statements**

On March 24, 2021, the Debtor filed its Schedules of Assets and Liabilities and Statement of Financial Affairs. On April 13, 2021, the Debtor filed amended versions of certain of its Schedules of Liabilities. On May 5, 2021, the Debtor filed a further amended version of certain of its Schedules of Liabilities and an amended version of its Statement of Financial Affairs.

### 5. **Establishment of Claims Bar Dates**

On the Petition Date, the Debtor filed the *Emergency Motion for Entry of an Order: (i) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9); (ii) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date; (iii) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9); (iv) Approving Notice of Bar Dates; and (v) Granting Related Relief* [Docket No. 16] (the "**Bar Date Motion**"). By the Bar Date Motion, the Debtor sought entry of an order by the Bankruptcy Court establishing deadlines by which claims of creditors must be filed in the Debtor's Chapter 11 Case. After a series of hearings on the Bar Date Motion and input from the Court and other parties in interest, the Debtor sought to set a separate bar date for "Former Customers" of the Debtor. A "**Former Customer**" is a person who was a retail electricity customer (or the legal representative of such customer) of the Debtor at any point from February 11, 2021 through February 19, 2021.

On March 30, 2021, the Bankruptcy Court entered an order [Docket No. 107] establishing the general claims bar date for all creditors other than Former Customers as April 28, 2021 and for governmental entities as September 13, 2021 at 4:00 p.m. (prevailing Central Time). Thereafter, the Debtor extensively negotiated the terms of the notices and bar date order applicable to Former Customers. The Debtor has proposed to establish the former customer bar date as July 19, 2021. As of the date of this Disclosure Statement, such relief is pending before the Bankruptcy Court.

## VIII.   CONFIRMATION PROCEDURES

### A.   **Combined Disclosure Statement and Confirmation Hearing**

Section 1129(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to hold a hearing on confirmation of a chapter 11 plan and section 1129(b) provides that any party in interest may object to the confirmation of the chapter 11 plan. In the Disclosure Statement Order,

the Bankruptcy Court conditionally approved this Disclosure Statement, approved the Solicitation Procedures and scheduled the Combined Hearing at which the Bankruptcy Court will consider the adequacy of the Disclosure Statement and confirmation of the Plan. Notice of the Combined Hearing will be provided to holders of Claims and Interests as provided in the Disclosure Statement Order.

The deadline to file objections to the Plan and the adequacy of information in the Disclosure Statement is <u>June 25, 2021 at 5:00 p.m.</u> prevailing Central Time (the "**<u>Plan Objection Deadline</u>**"). Any objection to the Plan and the adequacy of information in the Disclosure Statement and must: (a) be in writing; (b) conform to the Bankruptcy Rules, the Bankruptcy Local Rules and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the Plan and the Disclosure Statement; and (d) be filed with the Court so that it is received by the Clerk of the Court on or before the Plan Objection Deadline. UNLESS AN OBJECTION IS TIMELY FILED, IT MAY NOT BE CONSIDERED BY THE COURT.

### B.    Confirmation of the Plan/Adequacy of Information in the Disclosure Statement

At the Combined Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a plan are that the plan is (i) accepted by all impaired classes of Claims and Interests or, if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class; (ii) feasible; and (iii) in the "best interests" of creditors and equity interest holders that are impaired under the Plan.

The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm a plan. The Plan fully complies with the statutory requirements for confirmation listed below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtor has complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the Debtor or by a Person acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Case, in connection with the Plan or incident to the Chapter 11 Case is subject to the approval of the Bankruptcy Court as reasonable.

- With respect to each holder within an impaired Class of Claims or Interests, each such holder (a) has accepted the Plan or (b) will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such holder would so receive or retain

if the Debtor was liquidated under chapter 7 of the Bankruptcy Code on such date.

- With respect to each Class of Claims or Interests, such Class (a) has accepted the Plan or (b) is unimpaired under the Plan (subject to the "cram-down" provisions discussed below).

- The Plan provides for treatment of Claims, as applicable, in accordance with the provisions of Section 507(a) of the Bankruptcy Code.

- If a Class of Claims or Interests is impaired under the Plan, at least one Class of Claims or Interests that is impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any Insider (as defined in the Bankruptcy Code).

- All fees payable under 28 U.S.C. § 1930 have been paid or the Plan provides for the payment of all such fees on the Effective Date.

At the Combined Hearing, the Debtor also will seek final approval from the Court that the Disclosure Statement contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code.

1.      **Best Interests Test/Liquidation Analysis**

As described above, section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code. The Debtor believes that the Plan provides the same or a greater recovery for holders of Allowed Claims and Interests as would be achieved in a liquidation under chapter 7 of the Bankruptcy Code.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Case, the Debtor has determined that confirmation of the Plan will provide each holder of an Allowed Claim other than holders in Class 1 (Prepetition Lender Claims), who the Debtor believes will accept their treatment under the Plan, with a recovery that is not less than such holder would have received pursuant to the liquidation of the Debtor under chapter 7.

The Debtor, with the assistance of its advisors, has prepared an unaudited liquidation analysis, which is attached hereto as **Exhibit B** (the "**Liquidation Analysis**"), to assist holders of Claims in evaluating the Plan. The Liquidation Analysis compares the projected recoveries that would result from the liquidation of the Debtor in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to holders of Allowed Claims and Interests under the Plan. The Liquidation Analysis is based on the value of the Debtor's assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date. Further, the Liquidation Analysis is subject to potentially material changes, including with respect to economic and business conditions

and legal rulings. Therefore, the actual liquidation value of the Debtor could vary materially from the estimate provided in the Liquidation Analysis. The Debtor believes that the Plan satisfies the best interests test of Bankruptcy Code section 1129(a)(7).

2.  **Feasibility**

The Bankruptcy Code permits a plan to be confirmed only if confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan. The Plan is a plan of liquidation and meets this requirement. The Debtor believes that if it can move swiftly through this Chapter 11 Case, there will be sufficient funds from Cash on hand and/or other amounts received by the Debtor, if any, from the pursuit of any Causes of Action (formally or informally) not released under the Plan, net of all costs and expenses deducted therefrom, to fund the payments required under the Plan, as and when they become due.

3.  **Confirmation Without Acceptance by All Impaired Classes**

The Bankruptcy Court may confirm a plan of liquidation over the rejection of the plan of liquidation by a class of claims or interests if the plan of liquidation "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

4.  **No Unfair Discrimination**

A chapter 11 plan does not "discriminate unfairly" with respect to a non-accepting class if the value of the Cash and/or securities to be distributed to the non-accepting class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the non-accepting class. The Debtor does not believe the Plan discriminates unfairly against any impaired Class of Claims or Interests. The Debtor believes the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation.

5.  **Fair and Equitable Test**

To obtain non-consensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan is "fair and equitable" and "does not discriminate unfairly" with respect to each impaired, non-accepting Class. The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable" for, respectively, secured creditors, unsecured creditors and holders of equity interests. In general, section 1129(b) of the Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before a junior class may receive anything under the plan.

- Secured Creditors: Each holder of a secured claim: (1) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the chapter 11 plan, of at least the allowed amount of such claim; (2) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the

proceeds of the sale (or if sold, on the proceeds thereof); or (3) receives the "indubitable equivalent" of its allowed secured claim.

- <u>Unsecured Creditors</u>: Either (1) each holder of an impaired unsecured claim receives or retains under the chapter 11 plan property of a value equal to the amount of its allowed claim or (2) the holders of claims and interests that are junior to the claims of the non-accepting class will not receive any property under the chapter 11 plan.

- <u>Interests</u>: Either (1) each holder of an impaired interest will receive or retain under the chapter 11 plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the interest or (2) the holders of interests that are junior to the non-accepting class will not receive or retain any property under the chapter 11 plan.

The Debtor believes the Plan satisfies the "fair and equitable" requirement.

### C.  **Alternatives to Confirmation and Consummation of the Plan**

If the Plan cannot be confirmed, the Debtor would likely seek to liquidate under chapter 7 of the Bankruptcy Code. If the Debtor was to pursue a liquidation under chapter 7, the Chapter 11 Case would be converted to a case under chapter 7 of the Bankruptcy Code and a trustee would be elected or appointed to liquidate the assets of the Debtor, including collection of outstanding customer balances, for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on Holders' recoveries and the Debtor is described in the Liquidation Analysis, attached hereto as **Exhibit B**.

## IX.  **CERTAIN RISK FACTORS TO BE CONSIDERED**

**HOLDERS OF CLAIMS AND INTERESTS AGAINST THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED HEREIN BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION. ANY OF THE FOLLOWING RISKS, AS WELL AS ADDITIONAL RISKS AND UNCERTAINTIES NOT CURRENTLY KNOWN TO THE DEBTOR OR THAT THE DEBTOR DEEMS IMMATERIAL, COULD MATERIALLY ADVERSELY AFFECT THE DEBTOR AND EFFECT THE AMOUNT AVAILABLE FOR DISTRIBUTION TO CREDITORS. THE DEBTOR CANNOT ASSURE YOU THAT ANY OF THE EVENTS DISCUSSED IN THE RISK FACTORS BELOW WILL NOT OCCUR, AND IF SUCH EVENTS DO OCCUR, THEY COULD AFFECT THE DEBTOR'S ABILITY TO CONSUMMATE THE PLAN OR THE TREATMENT OF CREDITORS AND INTEREST HOLDERS THEREUNDER.**

A.    **General**

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive. In considering whether to vote to accept or reject the Plan, holders of Claims or Interests should read and carefully consider the risk factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.

B.    **Risk Relating to the Plan and Other Bankruptcy Considerations**

1.    **Parties in Interest May Object to the Debtor's Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a debtor may place a claim or an equity interest in a particular class under a chapter 11 plan only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtor believes that the classification of Claims and Interests in the Plan complies with the Bankruptcy Code requirements because the Debtor classified Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.    **The Debtor May Fail to Satisfy Vote Requirements.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtor intends to seek, as promptly as practicable thereafter, confirmation of the Plan. In the event that sufficient votes are not received, the Debtor may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims and Interests as those proposed in the Plan.

3.    **The Debtor May Not Be Able to Secure Confirmation of the Plan.**

i    Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; and (b) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

60

ii         There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim or Interest might challenge either the adequacy of this Disclosure Statement or whether the voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation are not met. If a chapter 11 plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtor will be able to confirm an alternative plan and what, if anything, holders of Allowed Claims and Interests against the Debtor would ultimately receive.

iii       The Debtor, subject to the terms and conditions of the Plan, reserves the right to modify the terms and conditions of the Plan, as necessary for confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 4.     **The Bankruptcy Court may not approve the Customer Releases.**

By the Plan, the Debtor is seeking to compromise its claims against former customers, if any, in exchange for former customers compromising their respective claims against the Debtor, if any. The Debtor is seeking to effectuate the Customer Releases as part of a compromise under the Plan. While the Debtor believes the Customer Releases are reasonable, there can be no assurance that the Bankruptcy Court will approve such Customer Releases.

Further, if the Bankruptcy Court does not approve the Customer Releases for any reason, including because the Customer Releases include third-party releases, the Debtor may determine to proceed with confirmation of the Plan without such Customer Releases. In such event, all Participating Customers will be deemed to be Non-Participating Customers and will not receive releases from the Debtor or the other Released Parties under the Plan. In such case, the settlement with the Attorney General would not become effective.

5.      **The Bankruptcy Court may not approve the Treatment of Participating Customers**

As part of the Debtor seeking to compromise its claims against former customers, the Debtor has proposed to (a) allow the claims of former customers in the amount that they paid the Debtor, as reflected on the Debtor's books and records, for the period February 13, 2021 through February 19, 2021 provided that such customers timely and properly file proofs of claim by the Former Customers Bar Date in accordance with the Former Customers Bar Date Order for such amount paid and (b) allow such holders to share pro rata with holders of Allowed Other General Unsecured Claims in any Texas Storm Causes of Action Net Recovery Proceeds in respect of such Allowed Claims. While the Debtor is seeking to effectuate the foregoing as part of a compromise under the Plan, there can be no assurance that the Bankruptcy Court will approve such compromise.

6.      **The Plan Administrator is Likely to Object to Non-Participating Customer Claims**

While former customers have the option to decide whether to opt into the Customer Releases and have an Allowed Participating Customer Potential Return Claim if they timely and properly file a proof of claim for such Participating Customer Potential Return as part of the compromise and settlement under the Plan, for any former customer that opts out of the Customer Releases and timely and properly files an unsecured nonpriority proof of claim against the Debtor by the applicable Bar Date in accordance with the applicable Bar Date Order, it is likely that the Plan Administrator will object to such claim. If any such objection is filed, the Bankruptcy Court will determine the merits of the claim.

Even if the Plan Administrator is unsuccessful in its objection of Non-Participating Customer Claims against the Debtor and Non-Participating Customers were found to have Allowed Other General Unsecured Claims against the Debtor, such Non-Participating Customers will share Pro Rata on account of their Allowed Other General Unsecured Claims with all other holders of Allowed Other General Unsecured Claims in the Class 4 Distribution (which is a combination of Available Cash and net proceeds from any successful Causes of Action). Excluding any estimate for potential recoveries from successful Causes of Action, which are too speculative to estimate, the Debtor currently projects there will be less than $500,000 for all holders of Allowed Other General Unsecured Claims to share on a Pro Rata basis regardless of the total amount of Allowed Claims in Class 4 (Other General Unsecured Claims). *See* Article II.B., *Summary of Classification and Treatment* above.

7.      **Nonconsensual Confirmation**

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtor believes that the Plan satisfies these requirements, and the Debtor

may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual confirmation or consummation of the Plan may result in, among other things, increased professional expenses.

8. **The Debtor May Fail to Meet All Conditions Precedent to Effectiveness of the Plan**

The confirmation and effectiveness of the Plan are subject to certain conditions that may or may not be satisfied. Such conditions are set forth in **Article XI** of the Plan. The Debtor cannot assure anyone that all requirements for confirmation and effectiveness required under the Plan will be satisfied.

9. **The Debtor May Object to the Amount or Classification of a Claim or Interest**

Except as otherwise provided in the Plan, the Debtor and other parties in interest reserve the right to object to the amount or classification of any Claim or Interest under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim or Interest where such Claim or Interest is subject to an objection. Any holder of a Claim or Interest that is subject to an objection may not receive its expected share of the estimated Distributions described in this Disclosure Statement.

10. **Contingencies May Affect Distributions to Holders of Allowed Claims and Interests**

The Distributions available to holders of Allowed Claims or Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders that certain disputed Claims become Allowed Claims or Interests. The occurrence of any and all such contingencies could affect Distributions under the Plan.

11. **The Plan is Based Upon Assumptions the Debtor Developed That May Prove Incorrect and Could Render the Plan Unsuccessful**

The Plan reflects assumptions and analyses based on the Debtor's experience and perception of current conditions and expected future developments, as well as other factors that the Debtor consider appropriate under the circumstances. Whether actual future results and developments will be consistent with the Debtor's expectations and assumptions depends on a number of factors, including but not limited to (i) the ability to implement the transactions contemplated by the Plan; and (ii) the ability to maintain adequate liquidity during the Chapter 11 Case. The failure of any of these factors could materially adversely the Debtor's ability to complete its efficient and orderly wind down.

Accordingly, the Debtor expects that its actual financial condition and course of its wind down will differ, perhaps materially, from what is anticipated. Consequently, there can be no assurance that the results or developments contemplated by the Plan will occur or, even if they do occur, that they will have the anticipated effects on the Debtor or its assets. Moreover, the rejection of certain contracts could result in an increase of Other General Unsecured Claims. The failure of

any such results or developments to materialize as anticipated could materially adversely affect the successful execution of the Plan or any other plan of liquidation.

12.      **The Debtor May Seek to Amend, Waive, Modify, or Withdraw the Plan at Any Time Prior to Confirmation**

The Debtor reserves the right, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and consistent with the terms of the Plan, to amend the terms of the Plan or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan. The potential impact of any such amendment or waiver on the holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan, either positively or negatively, on some or all of the proposed Classes or a change in the relative rights of such Classes.

13.      **The Results of an Actual Chapter 7 Liquidation May Be Different from the Liquidation Analysis**

Conversion to chapter 7 liquidation would, in the view of the Debtor, produce a less favorable outcome for holders of Allowed Claims than would the Plan. However, underlying the Liquidation Analysis set forth in **Exhibit B** is the extensive use of estimates and assumptions that, although considered reasonable by the Debtor's management, are inherently subject to significant business and economic uncertainties and contingencies beyond the control of the Debtor. The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change. Actual results may vary materially from the estimates and projections set forth in the Liquidation Analysis if the Debtor was, in fact, to undergo a liquidation in chapter 7. Events and circumstances subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed, or alternatively, may have been unanticipated.

14.      **Failure to Confirm and Consummate the Plan Could Negatively Impact the Debtor and Its Creditors and Former Customers**

If the Plan is not confirmed and consummated there may be various consequences, including:

- collection actions against former customers being pursued;

- eligible Participating Customers not having Allowed Potential Customer Return Claims (i.e., absent the proposed compromise and settlement under the Plan, the Debtor believes that those claims would be subject to objection);

- the incurrence of substantial costs and investment of time and resources by the Debtor in connection with the chapter 11 plan, without realizing any of its anticipated benefits;

- the possibility, for the Debtor, of being unable to repay indebtedness when due and payable; and

64

- the Debtor pursuing chapter 7 proceedings that would result in recoveries for creditors that are less than contemplated under the Plan and no recovery for certain creditors and interest holders.

## C.     Additional Factors to Be Considered

### 1.     The Debtor Has No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtor has no duty to update this Disclosure Statement under the Bankruptcy Code unless otherwise ordered to do so by the Bankruptcy Court.

### 2.     No Admissions Are Made By This Disclosure Statement

The information and statements contained in this Disclosure Statement will neither constitute an admission of any fact or liability by any entity (including, without limitation, the Debtor) nor be deemed evidence of the tax or other legal effects of the Plan on the Debtor, holders of Claims or any other parties in interest.  Except as otherwise provided in the Plan, the vote by a holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtor (or any party in interest, as the case may be) to object to that holder's Claim, or recover any preferential, fraudulent, or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtor or its estate are specifically or generally identified herein.

In addition, no reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement. The Debtor may seek to investigate, file, and prosecute objections to Claims and may object to Claims after the confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or objects to Claims.

### 3.     No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or related to the Debtor, the Chapter 11 Case, once commenced, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

### 4.     Forward-Looking Statements are Not Assured, and Actual Results May Vary

This Disclosure Statement contains forward-looking statements. These forward-looking statements are based on the current expectations and observations of the Debtor's management, and include factors that could cause actual results to differ materially such as the following:  the Debtor's ability to obtain Bankruptcy Court approval with respect to motions in the Chapter 11 Case; the effects of the Bankruptcy Court rulings in the Chapter 11 Case and the outcome of the

case in general; the length of time the Debtor will be in chapter 11; the pursuit by the Debtor's various creditors, equity holders and other constituents of their interests in the Chapter 11 Case; risks associated with third party motions in the Chapter 11 Case, which may interfere with the ability to consummate the Plan; the adverse effects of the Chapter 11 Case on the Debtor's liquidity; the increased administrative costs related to the Chapter 11 Case; the Debtor's ability to maintain adequate liquidity to fund the liquidation and wind down contemplated during the Chapter 11 Case; the timing and realization of the recoveries of assets and the payments of Claims and the amount of expenses projected to recognize such recoveries and reconcile such Claims; and the other factors described in this **Article VIII**.

5. **No Legal or Tax Advice is Provided to You By This Disclosure Statement**

The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each holder of Claims and Interests against the Debtor should consult his, her or its own legal counsel and accountants as to legal, tax and other matters concerning such holder's Claims or Interests. This Disclosure Statement is not legal advice to you and may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

## X.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.   **Introduction**

The following discussion summarizes certain U.S. federal income tax consequences of the Plan to the Debtor and to certain U.S. holders (as defined below) of Allowed Claims in their capacities as such.

This summary is provided for informational purposes only and is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), applicable Treasury regulations, judicial authority and published current administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change, possibly with retroactive effect. A substantial amount of time may elapse between the date of this Disclosure Statement and the receipt of a final distribution under the Plan. Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, court decisions or administrative changes, could affect the U.S. federal income tax consequences described below. No ruling will be sought from the Internal Revenue Service (the "**IRS**") with respect to any of the tax aspects of the Plan and no opinion of counsel has been obtained by the Debtor with respect thereto. No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Plan to the Debtor or any holder of a Claim. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein. This summary does not address any aspects of U.S. federal non-income, state, local, or non-U.S. taxation.

This summary does not address all aspects of U.S. federal income taxation that may be relevant to a particular U.S. holder of an Allowed Claim in light of its particular facts and circumstances or to particular types of U.S. holders subject to special treatment under the Tax

Code (for example, financial institutions; banks; broker-dealers; insurance companies; tax-exempt organizations; retirement plans or other tax-deferred accounts; mutual funds; real estate investment trusts; traders in securities that elect mark-to-market treatment; persons subject to the alternative minimum tax or the "Medicare" tax on net investment income; certain former U.S. citizens or long-term residents; persons who hold their Claims as part of a hedge, straddle, constructive sale, conversion or other integrated transaction; persons that have a functional currency other than the U.S. dollar; governments or governmental organizations; pass-through entities (including any entity or arrangement treated as a partnership for U.S. federal income tax purposes and any subchapter S corporation); investors in pass-through entities that hold Claims; persons that are required to conform their tax reporting of income to their financial statements under Section 451(b) of the Tax Code; and persons who received their Claims upon exercise of employee unit options or otherwise as compensation).

This summary assumes that the various debt and other arrangements to which the Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form. If any of the various debt and other arrangements to which the Debtor is a party are not respected in accordance with their form for U.S. federal income tax purposes, the U.S. federal income tax consequences of the Plan could be materially different than what is described below.

A "U.S. holder" for purposes of this summary is a beneficial owner of an Allowed Claim that is, for U.S. federal income tax purposes:

- an individual who is a U.S. citizen or U.S. resident alien;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, that was created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate whose income is subject to U.S. federal income taxation regardless of its source; or

- a trust (1) if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust, or (2) that has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

This summary does not apply to any holder of a Claim that is not a U.S. holder (a "**Non-U.S. holder**"). Non-U.S. holders are urged to consult their tax advisors regarding the tax consequences (including the U.S. federal income tax consequences) to them of the Plan, including the possible imposition of U.S. withholding taxes in certain circumstances if the Non-U.S. holder fails to establish an exemption therefor.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.**

**ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND NON-U.S. INCOME, ESTATE AND OTHER TAX CONSEQUENCES OF THE PLAN.**

### B. Certain U.S. Federal Income Tax Consequences of the Plan to the Debtor

#### 1. U.S. Federal Income Tax Classification of the Debtor

For U.S. federal income tax purposes, the Debtor is classified as an association taxable as a corporation.

#### 2. Cancellation of Debt Income

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("**COD Income**") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of cash paid, (y) the issue price of any new indebtedness of the taxpayer issued and (z) the fair market value of any other consideration.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt is granted by the court or is pursuant to a plan approved by the court. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income. In general, tax attributes will be reduced in the following order: (a) net operating losses ("**NOLs**") and NOL carryovers; (b) certain tax credit carryovers; (c) net capital losses and capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credit carryovers. A debtor with COD Income may elect first to reduce the basis of its depreciable assets. Any excess COD Income over the amount of tax attributes available for reduction will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

Under the Plan, holders of certain Allowed Claims are expected to receive less than full payment upon satisfaction or release of their Claims. The Debtor should not realize any COD Income attributable to the portion of the Claim that is not paid, however, to the extent that payment of the unpaid portion of such Claim would have given rise to a deduction to the Debtor had such unpaid portion of the Claim been paid. In addition, as described above, any COD Income that the Debtor realizes should be excluded from the Debtor's gross income pursuant to the bankruptcy exception described in the preceding paragraph, because the cancellation will occur in a chapter 11 case under the Bankruptcy Code, while the Debtor is under the jurisdiction of a bankruptcy court, and the cancellation is granted by the court or is pursuant to a plan approved by the court. The exclusion of the COD Income, however, will result in a reduction of certain tax attributes, such as any NOLs, as described above.

C.     **Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims**

1.     **Consequences to U.S. Holders of Allowed Claims (Other Than Allowed Class 5 Claims)**

A holder of an Allowed Claim should be treated as exchanging such Allowed Claim for Cash and any other property that it is entitled to receive under the Plan in a taxable exchange. Accordingly, other than with respect to any amounts received that are attributable to accrued but unpaid interest (discussed below), a holder of an Allowed Claim will generally recognize gain or loss equal to the difference between (a) the amount of Cash and the fair market value (if any) of the property received by the holder in respect of its Allowed Claim (other than any consideration attributable to an Allowed Claim for accrued but unpaid interest), and (b) the holder's adjusted tax basis in its Allowed Claim (other than any tax basis attributable to accrued but unpaid interest in respect of such Allowed Claim).

The character of any gain or loss that is recognized by a holder of an Allowed Claim will depend upon a number of factors, including the status of the holder, the nature of the Allowed Claim in the holder's hands, whether the Allowed Claim was purchased at a market discount (discussed in more detail in the succeeding paragraph), whether and to what extent the holder has previously claimed a bad debt deduction with respect to the Allowed Claim, and the holder's holding period in the Allowed Claim. If the Allowed Claim is a capital asset in the holder's hands, the gain or loss realized will generally be characterized as a capital gain or loss. Such gain or loss will constitute long-term capital gain or loss if the holder held such Allowed Claim for more than one year or short-term capital gain or loss if the holder held such Allowed Claim for one year or less. If a holder of an Allowed Claim realizes a capital loss, such holder's deduction of the loss may be subject to limitation under the Tax Code. In particular, for a non-corporate holder, capital losses may be used to offset any capital gains (without regard to holding periods and without limitation), but any remaining amount of capital losses may only be used to offset ordinary income to the extent of $3,000 annually ($1,500 for married individuals filing separate returns). A non-corporate holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For a corporate holder, capital losses may only be used to offset capital gains, and any unused capital losses may be (a) carried back to the three taxable years preceding the taxable year in which the capital loss arose and (b) carried over to the five taxable years following the taxable year in which the capital loss arose.

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a holder of an Allowed Claim that purchased its Allowed Claim from another person may be treated as ordinary income (instead of capital gain) to the extent of the amount of "market discount" with respect to such holder's Allowed Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue, and if the holder's adjusted tax basis in the debt instrument immediately after the acquisition is less than the stated redemption price of such Allowed Claim at maturity by at least a *de minimis* amount. Under these rules, any gain recognized by a holder on the taxable disposition of an Allowed Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon (on a straight line basis or, at the election of the holder, on a

constant yield basis) while the Allowed Claim was considered to be held by the holder (unless the holder elected to include market discount in income as it accrued).

Holders of Claims should consult their own tax advisors regarding the amount, timing and character of any gain or loss that may be recognized by holders with respect to their Claims.

A holder of an Allowed Claim will generally recognize ordinary income to the extent that the amount of Cash or property received (or to be received) by such holder with respect to its Allowed Claim under the Plan is attributable to interest that accrued on the Allowed Claim during its holding period but was not previously paid by the Debtor or included in income by the holder, regardless of whether such holder realizes an overall gain or loss with respect to its Allowed Claim. Conversely, a holder will generally recognize a deductible loss to the extent any interest that accrued on its Allowed Claim was previously included in its gross income and is not paid in full. Such loss may be ordinary, but the tax law is unclear on this point. The extent to which a holder of an Allowed Claim will be treated as receiving Cash or other property in respect of accrued but unpaid interest on its Allowed Claim for U.S. federal income tax purposes is unclear. Certain legislative history and case law indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes. On the other hand, certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The Plan provides that all distributions in respect of an Allowed Claim will be allocated first to the principal amount of the Claim (as determined for U.S. federal income tax purposes), with any excess allocated to accrued but unpaid interest (in contrast, for example, to a *pro rata* allocation of a portion of the exchange consideration received between principal and interest, or an allocation first to accrued but unpaid interest). However, the IRS could take the position that the consideration received by the holder should be allocated in some way other than as provided in the Plan. Holders of Claims are urged to consult their own tax advisors regarding the allocation of consideration and the taxation or deductibility of unpaid interest for U.S. federal income tax purposes.

2. **Consequences to U.S. Holders of Allowed Class 5 Claims**

The discussion below assumes that the Bankruptcy Court approves the Customer Releases, the distribution of a portion of Available Prepetition Lender Contribution and Settlement Deficiency to holders of Allowed Class 5 Claims, and other treatment in Class 5 pursuant to Bankruptcy Rule 9019.

Pursuant to the Plan, in exchange of and for full satisfaction, settlement, and release of Allowed Class 5 Claims and certain other claims, the holders thereof will receive and grant the Customer Releases, which include releases and waivers of all claims against such holders for all unpaid amounts owed by such holders to the Debtor for the electricity and related fees, taxes, expenses and other costs charged to such holders for the period of February 13, 2021 through and including February 19, 2021 when the Public Utilities Commission of Texas imposed the $9,000 per MWh price for wholesale power (the "**Winter Storm Power Bill Release**"), in exchange for the holders' releases and waivers of claims against the Released Parties. In addition to the Winter Storm Power Bill Release, to the extent holders of Allowed Class 5 Claims have Allowed Participating Customer Potential Return Claims, such holders would also receive their Pro Rata

share of any Texas Storm Causes of Action Net Recovery Proceeds, any Available Prepetition Lender Contribution, and any Settlement Deficiency in accordance with the Plan.

The tax treatment of the Winter Storm Power Bill Release to U.S. holders of Allowed Class 5 Claims is uncertain. To the extent the Winter Storm Power Bill Release qualifies as a reduction in the purchase price of property acquired by the holders of Allowed Class 5 Claims for U.S. federal income tax purposes, the holders of Allowed Class 5 Claims should generally not have taxable COD Income as a result of the exchange of their Allowed Class 5 Claims for Customer Releases under the Plan. Additionally, in cases where the debt cancelled is a debt whose existence or amount is disputed, case law holds that a taxpayer generally does not have taxable COD Income as to the contested and unpaid portion of the debt. Finally, a taxpayer does not have taxable COD Income in cases where the debt cancelled is one whose payment would have given rise to a tax deduction for the taxpayer. However, to the extent the Winter Storm Power Bill Release does not qualify as a purchase price reduction for U.S. federal income tax purposes, or qualify for the disputed claim exception or the debt whose payment would have been deductible exception, the holder would likely recognize taxable income (unless the Claim settled and released by such holder is for personal physical injuries or sickness or for certain loss in value of property).

Similarly, the tax treatment of the receipt of (or right to receive) a share of any Texas Storm Causes of Action Net Recovery Proceeds, any Available Prepetition Lender Contribution, and any Settlement Deficiency to a holder of an Allowed Class 5 Claim who also has an Allowed Participating Customer Potential Return Claim is uncertain. To the extent that such a holder has not claimed tax deductions for the amounts giving rise to the holder's Participating Customer Potential Return (and assuming that the holder's share of Texas Storm Causes of Action Net Recovery Proceeds, Available Prepetition Lender Contribution, and Settlement Deficiency, in the aggregate, does not exceed the holder's Participating Customer Potential Return), the U.S. federal income tax treatment to the holder would likely correspond to the treatment as described in the immediately preceding paragraph (except that (i) references to "taxable COD Income" in the immediately preceding paragraph should be replaced with "taxable income" where applicable and (ii) it is unlikely that any portion of the amounts so received by the holder for an Allowed Participating Customer Potential Return Claim could be considered to be for personal physical injuries or sickness or for loss in value of property). Conversely, to the extent that such a holder has previously claimed tax deductions for the amounts giving rise to the holder's Participating Customer Potential Return (and assuming that such tax deductions are not reversed), the holder would have taxable income from its receipt of (or right to receive) a share of Texas Storm Causes of Action Net Recovery Proceeds, Available Prepetition Lender Contribution, and Settlement Deficiency.

**Because of the inherently factual nature of this analysis, holders of Allowed Class 5 Claims are urged to consult their own tax advisors regarding the tax consequences to them of the exchange of their Class 5 Claims for receiving and granting the Customer Releases and, if applicable, their shares of any Texas Storm Causes of Action Net Recovery Proceeds, any Available Prepetition Lender Contribution, and any Settlement Deficiency.**

### 3.     __Information Reporting and Backup Withholding__

Payments made pursuant to the Plan will generally be subject to any applicable federal income tax information reporting and backup withholding requirements. The Tax Code imposes backup withholding tax on certain payments, including payments of interest and dividends, if a taxpayer (a) fails to furnish its correct taxpayer identification number (generally on IRS Form W-9 for a U.S. holder); (b) furnishes an incorrect taxpayer identification number; (c) is notified by the IRS that it has previously failed to report properly certain items subject to backup withholding tax; or (d) fails to certify, under penalty of perjury, that such taxpayer has furnished its correct taxpayer identification number and that the IRS has not notified such taxpayer that it is subject to backup withholding tax. However, taxpayers that are corporations generally are exempted from these information reporting and backup withholding requirements provided that evidence of such corporate status is properly furnished to the payor. Backup withholding is not an additional federal income tax. Any amounts withheld under the backup withholding tax rules will generally be allowed as a credit against a taxpayer's federal income tax liability, if any, or will be refunded to the extent the amounts withheld exceed the taxpayer's actual tax liability, if such taxpayer timely furnishes required information to the IRS. **Each taxpayer should consult its own tax advisor regarding the information reporting and backup withholding tax rules as they relate to distributions under the Plan.**

In addition, from an information reporting perspective, U.S. Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. **U.S. holders are urged to consult their tax advisors regarding these Treasury regulations and whether the transactions contemplated by the Plan would be subject to these Treasury regulations and require disclosure on the holders' tax returns.**

### D.     __Importance of Obtaining Professional Tax Assistance__

**The foregoing discussion is intended only as a summary of certain U.S. federal income tax consequences of the Plan, does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular holder of a Claim in light of such holder's circumstances and tax situation and is not a substitute for consultation with a tax professional. The above discussion is for informational purposes only and is not tax advice. The tax consequences of the Plan are complex and are in many cases uncertain and may vary depending on a claimant's particular circumstances. Accordingly, holders of Claims are strongly urged to consult their own tax advisors about the federal, state, local, and applicable foreign income and other tax consequences of the Plan, including with respect to tax reporting and record keeping requirements.**

## XI.    RECOMMENDATION AND CONCLUSION

The Debtor and the Committee believe that confirmation of the Plan is in the best interests of the Debtor and all holders of Claims and Interests and urges all creditors in the Voting Classes to vote in favor of the Plan.

Dated:  May 26, 2021

Respectfully submitted,

GRIDDY ENERGY LLC

By: */s/ Michael Fallquist*
Name:  Michael Fallquist
Title:   Chief Executive Officer

**<u>Exhibit A</u>**

**Modified Third Amended Plan of Liquidation for Griddy Energy LLC
Under Chapter 11 of the Bankruptcy Code**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | ) |
|  | )    Chapter 11 |
| GRIDDY ENERGY LLC,[1] | ) |
|  | )    Case No. 21-30923 (MI) |
| Debtor. | ) |
|  | ) |

**MODIFIED THIRD AMENDED PLAN OF LIQUIDATION FOR GRIDDY**
**ENERGY LLC UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

David Eastlake, Texas Bar No. 24074165
**BAKER BOTTS L.L.P.**
910 Louisiana Street
Houston, Texas 77002
Telephone: (713) 229-1234
Facsimile: (713) 229-1522
Email: *david.eastlake@bakerbotts.com*

Robin Spigel (admitted *pro hac vice*)
Chris Newcomb (admitted *pro hac vice*)
**BAKER BOTTS L.L.P.**
30 Rockefeller Plaza
New York, New York 10112-4498
Telephone: (212) 408-2500
Facsimile: (212) 408-2501
Email: *robin.spigel@bakerbotts.com*
      *chris.newcomb@bakerbotts.com*

Dated: May 26, 2021

---

[1]    The last four digits of the Debtor's federal tax identification number are 1396. The mailing address for the Debtor is PO Box 1288, Greens Farms, CT 06838.

**Table of Contents**

**Page**

ARTICLE I DEFINITIONS AND CONSTRUCTION OF TERMS ...............................................1
    A.     Definitions..................................................................................................1
    B.     Interpretation; Application of Definitions and Rules of Construction...................14
    C.     Appendices and Plan Documents..........................................................15
ARTICLE II ADMINISTRATIVE EXPENSE CLAIMS, FEE CLAIMS, U.S. TRUSTEE
FEES AND PRIORITY TAX CLAIMS ..................................................................................15
    2.01     Administrative Expense Claims..............................................................15
    2.02     Time for Filing Administrative Expense Claims ......................................16
    2.03     Fee Claims ...........................................................................................16
    2.04     U.S. Trustee Fees .................................................................................17
    2.05     Priority Tax Claims...............................................................................17
ARTICLE III CLASSIFICATION OF CLAIMS AND INTERESTS .........................................17

ARTICLE IV TREATMENT OF CLAIMS AND INTERESTS ................................................18
    4.01     CLASS 1 – PREPETITION LENDER CLAIMS .....................................18
    4.02     CLASS 2 – OTHER SECURED CLAIMS ..............................................18
    4.03     CLASS 3 –PRIORITY NON-TAX CLAIMS ..........................................19
    4.04     CLASS 4 – OTHER GENERAL UNSECURED CLAIMS .......................19
    4.05     CLASS 5 – CUSTOMER CLAIMS .......................................................20
    4.06     CLASS 6 – INTERCOMPANY CLAIMS ...............................................21
    4.07     CLASS 7 – EXISTING HOLDCO INTERESTS ....................................22
ARTICLE V ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF
REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR INTERESTS .........................22
    5.01     Class Acceptance Requirement..............................................................22
    5.02     Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or
           "Cramdown" ........................................................................................22
    5.03     Elimination of Vacant Classes ..............................................................22
    5.04     Voting Classes; Deemed Acceptance by Non-Voting Classes ...............23
ARTICLE VI IMPLEMENTATION OF THE PLAN ................................................................23
    6.01     The Liquidating Debtor.........................................................................23
    6.02     Officers, Managing Member..................................................................23
    6.03     Operating Agreement Amendments .......................................................23
    6.04     Plan Funding ........................................................................................24
    6.05     Cancellation of Existing Securities and Agreements..............................24
    6.06     Cancellation of Existing Security Interests............................................24
    6.07     Approval of Plan Documents.................................................................24
    6.08     Comprehensive Settlement of Claims and Controversies........................24
    6.09     Wind Down of the Estate and Distribution of Proceeds .........................25
    6.10     Intercompany Claims ............................................................................25
ARTICLE VII PLAN ADMINISTRATOR...............................................................................25
    7.01     General .................................................................................................25

7.02   Qualifications; Plan Administrator Agreement ....................................26
7.03   Powers and Duties...............................................................................26
7.04   Resignation, Death or Removal of Plan Administrator ......................27
7.05   The Oversight Committee....................................................................27
7.06   Liquidation of the Debtor....................................................................29
7.07   Termination of the Plan Administrator and Oversight Committee......29

ARTICLE VIII PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE PLAN ...........29

8.01   Disbursing Agent ................................................................................29
8.02   Distributions of Cash ..........................................................................30
8.03   Timing of Distributions.......................................................................30
8.04   Holders as of the Distribution Record Date ........................................30
8.05   Distributions to Address of Record .....................................................30
8.06   No Postpetition Interest on Claims; No More than Payment in Full ...................30
8.07   Minimum Distributions.......................................................................31
8.08   Withholding Taxes ..............................................................................31
8.09   Time Bar to Cash Payments by Check .................................................31
8.10   No Payments of Fractional Dollars .....................................................31
8.11   Setoff and Recoupment .......................................................................31
8.12   Unclaimed Distributions .....................................................................32

ARTICLE IX PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS OR EQUITY INTERESTS.........................................................32

9.01   Objections to Claims ..........................................................................32
9.02   Amendments to Claims.......................................................................33
9.03   Estimation of Claims;  Certain Reserves ...........................................33
9.04   Disputed Claims .................................................................................33
9.05   Plan Distributions to Holders of Subsequently Allowed Claims.........................34
9.06   Insurance Preservation and Proceeds..................................................34
9.07   Allocation of Plan Distributions Between Principal and Interest .........................35
9.08   No Recourse ........................................................................................35
9.09   Satisfaction of Claims and Interests....................................................35

ARTICLE X EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..................................35

10.01   Rejection or Assumption and Retention or Assignment......................35
10.02   Cure of Defaults..................................................................................36
10.03   Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan.................................................37
10.04   Indemnification of Directors, Officers and Employees .......................38

ARTICLE XI CONDITIONS PRECEDENT ....................................................................................38

11.01   Conditions to Confirmation ................................................................38
11.02   Conditions Precedent to the Effective Date.........................................38
11.03   Waiver of Conditions Precedent and Bankruptcy Rule 3020(e) Automatic Stay ....................................................................................................39

ARTICLE XII EXCULPATION, INJUNCTION AND RELATED PROVISIONS EFFECT OF CONFIRMATION ......................................................................................................39

12.01   Binding Effect.....................................................................................39
12.02   Vesting of Assets ................................................................................39

| | | |
|---|---|---|
| 12.03 | Release of Claims Against and Interests in the Debtor | 40 |
| 12.04 | Term of Pre-Confirmation Injunctions or Stays | 40 |
| 12.05 | Injunction Against Interference With Plan | 40 |
| 12.06 | Injunction | 40 |
| 12.07 | Releases | 41 |
| 12.08 | Exculpation and Limitation of Liability | 42 |
| 12.09 | Injunction Related to Releases and Exculpation | 43 |
| 12.10 | . Agreement by Holders of Participating Customers; Release of Certain Customer Collections | 43 |
| 12.12 | Termination of Subordination Rights and Settlement of Related Claims | 44 |
| 12.13 | Retention of Causes of Action/Reservation of Rights | 44 |
| 12.14 | Releases of Liens | 44 |

ARTICLE XIII RETENTION OF JURISDICTION .................................................................45

| | | |
|---|---|---|
| 13.01 | Scope of Bankruptcy Court Jurisdiction | 45 |

ARTICLE XIV MISCELLANEOUS PROVISIONS ..............................................................46

| | | |
|---|---|---|
| 14.01 | Effectuating Documents and Further Transactions | 46 |
| 14.02 | Corporate Action | 46 |
| 14.03 | Exemption from Transfer Taxes | 47 |
| 14.04 | Payment of Statutory Fees; Post Confirmation Reporting | 47 |
| 14.05 | Disallowance of Existing Securities Law Claims | 47 |
| 14.06 | Post-Effective Date Fees and Expenses | 47 |
| 14.07 | Amendment or Modification of this Plan | 47 |
| 14.08 | Revocation or Withdrawal of this Plan | 48 |
| 14.09 | Termination of Professionals | 48 |
| 14.10 | Dissolution of any Committee | 48 |
| 14.11 | Confirmation Order | 48 |
| 14.12 | Severability | 48 |
| 14.13 | Inconsistency | 48 |
| 14.14 | Governing Law | 49 |
| 14.15 | Binding Effect | 49 |
| 14.16 | Exhibits/Schedules | 49 |
| 14.17 | Filing of Additional Documents | 49 |
| 14.18 | Notices | 49 |
| 14.19 | Reservation of Rights | 50 |

Griddy Energy LLC, as debtor and debtor in possession, proposes the following liquidating plan under section 1121(a) of title 11 of the United States Code:

## ARTICLE I

## DEFINITIONS AND CONSTRUCTION OF TERMS

A.     Definitions.  As used herein, the following terms have the respective meanings specified below (such meanings to be equally applicable to both the singular and plural):

1.01     Administrative Bar Date has the meaning set forth in Section 2.02 of this Plan.

1.02     Administrative Expense Claim means any right to payment constituting a cost or expense of administration of the Chapter 11 Case of the kind specified in section 503(b) of the Bankruptcy Code, and entitled to priority pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code (other than a Fee Claim or U.S. Trustee Fees) for the period from the Petition Date to the Effective Date, including, without limitation: (a) any actual and necessary costs and expenses of preserving the Estate, any actual and necessary costs and expenses of winding down the Debtor's business, and (b) any indebtedness or obligations incurred or assumed by the Debtor during the Chapter 11 Case.

1.03     Allowed means any Claim (or portion thereof) (a) either (i) proof of which has been timely filed with the Bankruptcy Court or has been deemed timely filed by a Final Order; or (ii) if not so filed, scheduled by the Debtor (as the Schedules have been or may be amended from time to time in accordance with Bankruptcy Rule 1009) other than as disputed, contingent or unliquidated; and (b) allowed by a Final Order, by this Plan or because no party in interest timely has filed an objection, including an Omnibus Claims Objection, filed a motion to equitably subordinate, or otherwise sought to limit recovery or alter priority on such Claim; provided, however, that any Claim listed on the Schedules that has been paid by the Debtor (x) after the Petition Date pursuant to order of the Bankruptcy Court, (y) before the Petition Date and was inadvertently listed in the Schedules, shall not be considered an Allowed Claim. Notwithstanding anything herein to the contrary, Claims allowed solely for the purpose of voting to accept or reject this Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder.  Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Administrative Expense Claim" or "Allowed Claim" shall not, for any purpose under this Plan, include interest on such Administrative Expense Claim or Claim from and after the Petition Date.

1.04     Allowed [Class Designation/Type] Claim/Interest means a Claim or Interest, as applicable, that is Allowed in a specified class or of a specified type.

1.05     Allowed Secured Claim means an Allowed Prepetition Lender Claim and/or an Allowed Other Secured Claim, as the context requires, in each case, to the extent such Claim is secured by Collateral.

1.06     Available Cash means (a) all Cash of the Debtor less (b) the amount of Cash (i) necessary to pay holders of Allowed Prepetition Lender Claims, Other Secured Claims Administrative Expense Claims, Fee Claims, Priority Tax Claims, Priority Non-Tax Claims to

the extent provided in, and in accordance with, this Plan, and (ii) estimated and reserved by the Debtor to (x) adequately fund the reasonable and necessary projected costs to carry out the provisions of the Plan on and after the Effective Date, including the fees and expenses of the Liquidating Debtor (including Plan Administrator Expenses) and all other Wind Down Costs in accordance with the Wind Down Budget, (y) pay all U.S. Trustee Fees, and (z) fund and maintain any postpetition reserve requirements in connection any agreements or otherwise. Unless the Debtor determines in its reasonable discretion that the following is required to fund the amounts set forth in this Section 1.06(b), Available Cash shall include the applicable portions of (1) excess amounts retained for Disputed Claims that become available in accordance with Section 9.04 of this Plan and (2) amounts represented by undeliverable Distributions in accordance with and subject to the terms of Section 8.12 of the Plan.  To the extent there is a Settlement Deficiency, each holder of an Allowed Class 5 Participating Customer Potential Return Claim will share Pro Rata in Available Cash with holders of Allowed Class 4 Claims in the amount of the Settlement Deficiency.

1.07    <u>Available Prepetition Lender Contribution</u> means the amount of the Prepetition Lender Contribution less the amount of Cash (a) necessary to pay holders of Allowed Prepetition Lender Claims, Other Secured Claims, Administrative Expense Claims, Fee Claims, Priority Tax Claims, Priority Non-Tax Claims to the extent provided in, and in accordance with, this Plan, and (b) estimated and reserved by the Debtor to (x) adequately fund the reasonable and necessary projected costs to carry out the provisions of the Plan on and after the Effective Date, including the fees and expenses of the Liquidating Debtor (including Plan Administrator Expenses) and all other Wind Down Costs in accordance with the Wind Down Budget, (y) pay all U.S. Trustee Fees, and (z) fund and maintain any postpetition reserve requirements in connection any agreements or otherwise.

1.08    <u>Avoidance Actions</u> means any avoidance, equitable subordination or recovery actions or proceedings under chapter 5 of the Bankruptcy Code (e.g., 502(d), 510, 542 through 551, and 553) or applicable state law.

1.09    <u>Ballot</u> means the form distributed to each holder of an impaired Claim that is entitled to vote to accept or reject this Plan, on which is to be indicated acceptance or rejection of this Plan.

1.10    <u>Bankruptcy Code</u> means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Case.

1.11    <u>Bankruptcy Court</u> means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, having jurisdiction over the Chapter 11 Case.

1.12    <u>Bankruptcy Rules</u> means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, and the Local Rules of the Bankruptcy Court.

1.13    <u>Bar Date</u> means the applicable deadline for filing proofs of Claim, including, without limitation, Claims arising prior to the Petition Date (including 503(b)(9) Claims) and

Administrative Expense Claims, as established by an order of the Bankruptcy Court or under this Plan.

1.14    <u>Bar Date Order</u> means the Non-Former Customers Bar Date Order or the Former Customers Bar Date Order, as applicable.

1.15    <u>Business Day</u> means any day other than a Saturday, Sunday, or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

1.16    <u>Cash</u> means legal tender of the United States of America and equivalents thereof.

1.17    <u>Causes of Action</u> means, without limitation, any and all actions, causes of action, Avoidance Actions, controversies, liabilities, obligations, rights, suits, damages, judgments, Claims, and demands whatsoever owned by the Debtor, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, whether assertable directly, indirectly, derivatively or in any representative or other capacity, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act, failure to act, error, omission, transaction, occurrence or other event arising or occurring prior to the Petition Date or during the course of the Chapter 11 Case, including through the Effective Date.

1.18    <u>Chapter 11 Case</u> means the case under chapter 11 of the Bankruptcy Code commenced by the Debtor, which is under case caption Griddy Energy LLC, Chapter 11, Case No. 21-30923 and is currently pending before the Bankruptcy Court.

1.19    <u>Claim</u> means any "claim" (as defined in section 101(5) of the Bankruptcy Code) against the Debtor, including, without limitation, any Claim arising after the Petition Date.

1.20    <u>Claims Agent</u> means Bankruptcy Management Solutions, Inc. d/b/a Stretto, or any other entity approved by the Bankruptcy Court to act as the Debtor's claims and noticing agent pursuant to 28 U.S.C. § 156(c).

1.21    <u>Class</u> means each category of Claims or Interests established under Article III of this Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.22    <u>Class 4 Distribution</u> means, as of any given Distribution Date, (a) the aggregate amount of Available Cash and (b) any Net Recovery Proceeds.

1.23    <u>Collateral</u> means any property or interest in property of the Estate subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable non-bankruptcy law.

1.24    <u>Collateral Agent</u> means Macquarie Energy LLC, in its capacity as collateral agent for the Prepetition Secured Lenders.

1.25    <u>Committee</u> means any statutory committee of unsecured creditors appointed in the Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code, as the same may be reconstituted from time to time.

1.26     Confirmation Date means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

1.27     Confirmation Hearing means the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to Bankruptcy Code section 1129, as such hearing may be adjourned or continued from time to time.

1.28     Confirmation Order means the order of the Bankruptcy Court confirming the Plan pursuant to Bankruptcy Code section 1129, which shall be in form and substance acceptable to the Debtor and the Collateral Agent.

1.29     Cure Amounts has the meaning set forth in Section 10.02 of this Plan.

1.30     Cure Dispute has the meaning set forth in Section 10.02 of this Plan.

1.31     Cure Schedule has the meaning set forth in Section 10.02 of this Plan.

1.32     Customer Claim means any unsecured nonpriority claim of a former customer of the Debtor against the Debtor; provided that the foregoing shall not include:  (a) a Prepetition Lender Claim, (b) an Other Secured Claim, (c) an Administrative Expense Claim, (d) a Fee Claim, (e) a Priority Claim, (f) a Priority Non-Tax Claim, (g) an Other General Unsecured Claim, (h) an Intercompany Claim, (i) an Existing Securities Law Claim, and (j) U.S. Trustee Fees, and shall not include Claims that are not Allowed or are released, whether by operation of law or pursuant to order of the Bankruptcy Court, written release or settlement, the provisions of the Plan or otherwise; provided that, notwithstanding the foregoing exclusions, (x) the Customer Claim of a Non-Participating Customer shall be classified and treated as an Other General Unsecured Claim solely if such Non-Participating Customer properly and timely filed an unsecured nonpriority claim against the Debtor by the applicable Bar Date in accordance with the Bar Date Order, and (y) if the Bankruptcy Court does not approve the Customer Releases pursuant to Bankruptcy Rule 9019 through this Plan or otherwise, then each Participating Customer will not have an Allowed Class 5 Claim and, solely if such Participating Customer properly and timely filed an unsecured nonpriority claim against the Debtor by the applicable Bar Date in accordance with the Bar Date Order, such Customer Claim shall be classified and treated as an Other General Unsecured Claim.

1.33     Customer Release Opt-Out Form means the opt-out form that will enable a Participating Customer to elect to become a Non-Participating Customer under the Plan, subject to the terms and conditions of the Plan, which shall be included in substantially final form in the Plan Supplement.

1.34     Customer Releases means the mutual releases by and among the Participating Customers, on the one hand, and the Released Parties, on the other hand, whereby (i) the Debtor and each other Released Party releases and waives all Claims against each Participating Customer, solely in its capacity as such, including, for unpaid amounts owed by such Participating Customer to the Debtor for the electricity and related fees, taxes, expenses and other costs charged to such customers for the period February 13, 2021 through and including February 19, 2021, including when the Public Utilities Commission of Texas imposed the $9,000 per MWh price for wholesale power; and (ii) each Participating Customer releases and waives all

4

Claims against each of the Released Parties relating to the pre-Effective Date Debtor, the Liquidating Debtor, the Plan Administrator, the Chapter 11 Case, the Plan or the Disclosure Statement, including, any Claims for any loss a Participating Customer may suffer, have suffered or be alleged to suffer as a result of or relating to the Participating Customer's agreements with the Debtor as well as the electricity and related fees, taxes and costs charged to such customers for any period while they were a customer of the Debtor, including, the period February 13, 2021 through and including February 19, 2021, including when the Public Utilities Commission of Texas imposed the $9,000 per MWh price for wholesale power; provided, that, notwithstanding the foregoing, each eligible Participating Customer may assert a Participating Customer Potential Return Claim in a timely and properly filed proof of claim form in accordance with the Former Customers Bar Date Order and, solely to the extent each Participating Customer has an Allowed Participating Customer Potential Return, receive its Pro Rata share of (i) the Texas Storm Causes of Action Net Recovery Proceeds, if any, and (ii) any Available Prepetition Lender Contribution, which shall be shared with holders of Allowed Other General Unsecured Claims on a Pro Rata basis and be distributed (Pro Rata) to holders of (a) Allowed Other General Unsecured Claims and (b) Allowed Participating Customer Potential Return Claims.

1.35    Debtor means Griddy Energy LLC, prior to the Effective Date, and the Liquidating Debtor from and after the Effective Date, as the context requires.

1.36    Disallowed means a finding of the Bankruptcy Court in a Final Order, which may include one or more orders granting one or more Omnibus Claims Objections, or provision in the Plan providing that a Disputed Claim shall not be an Allowed Claim.

1.37    Disbursing Agent means, for purposes of making distributions under the Plan, the Debtor or a designee thereof (including the Plan Administrator).

1.38    Disclosure Statement means the disclosure statement relating to this Plan, as such disclosure statement may be amended, modified, or supplemented from time to time (including, without limitation, all exhibits and schedules thereto).

1.39    Disputed means, as of any relevant date, any Claim or Interest, or any portion thereof: (a) that is not an Allowed Claim, Allowed Interest, Disallowed Claim or Disallowed Interest as of the relevant date; or (b) for which a proof of Claim or Interest has been filed with the Bankruptcy Court or a written request for payment has been made, to the extent the Debtor or any party in interest has interposed a timely objection, including an Omnibus Claims Objection, or request for estimation, which objection or request for estimation has not been withdrawn or determined by a Final Order as of the relevant date.

1.40    Disputed Amount means, with respect to any Cause of Action that has not been released under the Plan, the amount initially sought to be recovered by the Plan Administrator in respect thereof, as determined in a commercially reasonable manner by the Plan Administrator in consultation with the Oversight Committee, and as documented by the Plan Administrator.

1.41    Disputed Claims Reserves means, collectively, the Disputed Other General Unsecured Claims Reserve and the Disputed Priority Claims Reserve.

5

1.42     Disputed Other General Unsecured Claims Reserve has the meaning set forth in Section 9.04(c) of this Plan.

1.43     Disputed Priority Claims Reserve has the meaning set forth in Section 9.04(b) of this Plan.

1.44     Distribution means a distribution of Cash or other property pursuant to this Plan.

1.45     Distribution Date means any date that is: (a) the Effective Date; (b) the Initial Distribution Date; (c) any Interim Distribution Date; or (d) the Final Distribution Date, as the context requires.

1.46     Distribution Record Date means the Confirmation Date, or such other later date as shall be established by the Bankruptcy Court in the Confirmation Order.

1.47     Effective Date means the first Business Day as soon as reasonably practicable after all conditions to the occurrence of the Effective Date set forth in Section 11.02 hereof have been satisfied or waived, and no stay of the Confirmation Order is in effect.

1.48     Estate means the estate created in the Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

1.49     Estimation Order means an order or orders of the Bankruptcy Court estimating for voting and/or distribution purposes (under section 502(c) of the Bankruptcy Code) the allowed amount of any Claim.  The defined term Estimation Order includes the Confirmation Order if the Confirmation Order grants the same relief that would have been granted in a separate Estimation Order.

1.50     Existing HoldCo Interests means the Interests in the Debtor outstanding immediately prior to the Effective Date.

1.51     Existing Securities Law Claim means any Claim, whether or not the subject of an existing lawsuit: (a) arising from rescission of a purchase or sale of any securities of the Debtor or an affiliate of the Debtor; (b) for damages arising from the purchase or sale of any such security; (c) for violations of the securities laws, misrepresentations, or any similar Claims, including, to the extent related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, any attorneys' fees, other charges, or costs incurred on account of the foregoing Claims; or (d) except as otherwise provided for in this Plan, including Section 10.04 hereof, for reimbursement, contribution, or indemnification allowed under section 502 of the Bankruptcy Code on account of any such Claim.

1.52     Federal Judgment Rate means the interest rate provided under 28 U.S.C. § 1961(a), calculated as of the Petition Date, compounded annually.

1.53     Fee Claim means a Claim by a Professional Person for compensation, indemnification or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) or 1103(a) of the Bankruptcy Code in connection with the Chapter 11 Case, including, without limitation, in connection with the final fee applications of such Professional Person.

6

1.54    Final Distribution means the distribution to be made by the Disbursing Agent after the Debtor's assets have been reduced to Cash, abandoned or otherwise disposed of, and the Debtor has resolved all Disputed Claims and paid all Fee Claims approved by the Bankruptcy Court by Final Order.

1.55    Final Distribution Date means the date upon which the Final Distribution occurs.

1.56    Final Order means an order or judgment, as entered on the docket of the applicable court, that has not been reversed, stayed, modified, or amended, and as to which: (a) the time to appeal, seek review or rehearing or petition for certiorari has expired and no timely-filed appeal or petition for review, rehearing, remand or certiorari is pending; or (b) any appeal taken or petition for certiorari filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; provided, however, that the possibility that a motion under Rule 50 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Civil Procedure or Bankruptcy Rules, may be filed relating to such order, ruling or judgment shall not cause such order, ruling or judgment not to be a Final Order; provided, further, that no order or judgment shall fail to be a Final Order solely because of the susceptibility of a Claim to a challenge under section 502(j) of the Bankruptcy Code.

1.57    Former Customers means a Person who (a) was a retail electricity customer (or the legal representative of such customer) of the Debtor at any point from February 11, 2021 through February 19, 2021 and (b) is the holder of a Claim of any kind against the Debtor that arose during or relates to the period from February 11, 2021 through February 19, 2021.

1.58    Former Customers Bar Date Order means the order of the Court that, among other things, sets the Bar Date in respect of Claims solely for Former Customers arising prior to the Petition Date.

1.59    HoldCo means Griddy Holdings LLC, the direct parent company of the Debtor.

1.60    Initial Distribution Date means, except as set forth in this Plan, the first Business Day 20 days after the Effective Date, or such longer or shorter period as may be reasonably determined by the Debtor, to make initial Distributions under this Plan.

1.61    Intercompany Claim means a Claim, Cause of Action or remedy held or asserted by or against the Debtor by a non-Debtor affiliate of the Debtor.

1.62    Intercreditor Agreement means the Macquarie Intercreditor Agreement, dated as of December 4, 2020, among the Prepetition Secured Lenders, the Collateral Agent, HoldCo, the Debtor and certain non-Debtor affiliates of the Debtor.

1.63    Interest means the interest (whether legal, equitable, contractual or other rights) of any holders of any class of equity securities of the Debtor represented by membership interests or other instruments evidencing an ownership interest in the Debtor, whether or not certificated, transferable, voting or denominated "unit" or a similar security, and any Claim or Cause of Action related to or arising from the foregoing, or any option, warrant or right, contractual or otherwise, to acquire any such interest.

1.64    Interim Distribution Date means any date, other than the Final Distribution Date, after the Initial Distribution Date on which the Debtor determines that an interim distribution should be made to holders of Allowed Claims in light of, inter alia, resolutions of Disputed Claims and the administrative costs of such a distribution.

1.65    Lien shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

1.66    Liquidating Debtor means the Debtor and its respective Estate from and after the Effective Date.

1.67    Net Recovery Proceeds means the Cash or other amounts received by the Debtor, if any, from the pursuit of any Cause of Action (formally or informally) not released under this Plan, net of all costs and expenses deducted therefrom, to be distributed (Pro Rata) to holders of Allowed Other General Unsecured Claims, subject to all Claims of a higher priority being paid in full or adequate reserves being set aside in accordance with this Plan.

1.68    Non-Debtor Affiliates means the Debtor's non-debtor affiliates, HoldCo, Griddy Technologies LLC, Griddy Pro LLC, Griddy VI Holdings LLC, Griddy VI Intermediate Holdings LLC, Griddy 6 Holdings LLC, Griddy VI Series A Holdings LLC, Beachside New Utility Holdings LLC, Beachside New Utility (VI) Holdings LLC, Elliot New Utility Holdings LLC, Elliot New Utility (VI) Holdings LLC, Janson New Utility Holdings LLC, Janson New Utility (VI) Holdings LLC, Grid Investments Inc., EDF Trading North America LLC, Niab Holdings Pty Limited and SRA Investments Pty Limited.

1.69    Non-Former Customers Bar Date Order means the order of the Court, dated March 30, 2021 [Docket No. 107], that, among other things, sets the general and governmental unit Bar Date in respect of Claims other than of Former Customers arising prior to the Petition Date.

1.70    Non-Participating Customer means any holder of a Customer Claim in Class 5 that opts-out of the Customer Releases.

1.71    Omnibus Claims Objection means one or more omnibus objections to Claims pursuant to Bankruptcy Rule 3007 or other applicable law objecting to or otherwise reconciling Claims filed against the Debtor.

1.72    Other General Unsecured Claim means any unsecured nonpriority claim against the Debtor, other than: (a) a Prepetition Lender Claim, (b) an Other Secured Claim, (c) an Administrative Expense Claim, (d) a Fee Claim, (e) a Priority Claim, (f) a Priority Non-Tax Claim, (g) a Customer Claim, (h) an Intercompany Claim, (i) an Existing Securities Law Claim, and (j) U.S. Trustee Fees, and shall not include Claims that are not Allowed or are released, whether by operation of law or pursuant to order of the Bankruptcy Court, written release or settlement, the provisions of the Plan or otherwise; provided that, notwithstanding the foregoing exclusions, (x) the Customer Claim of a Non-Participating Customer shall be classified and treated as an Other General Unsecured Claim solely if such Non-Participating Customer properly and timely filed an unsecured nonpriority claim against the Debtor by the applicable Bar Date in accordance with the applicable Bar Date Order, and (y) if the Bankruptcy Court does not approve the Customer Releases pursuant to Bankruptcy Rule 9019 through this Plan or otherwise, then

each Participating Customer will not have an Allowed Class 5 Claim and, solely if such Participating Customer properly and timely filed an unsecured nonpriority claim against the Debtor by the applicable Bar Date in accordance with the applicable Bar Date Order, such Customer Claim shall be classified and treated as an Other General Unsecured Claim.

1.73    Other Secured Claims means any Secured Claim against the Debtor other than a Prepetition Lender Claim.

1.74    Outstanding LC means the irrevocable standby letter of credit (ending 120) issued pursuant to the Prepetition Lender BBFA in favor of EDF Trading North America, LLC by order and for the account of the Debtor in the aggregate amount of $300,000, which letter of credit expires on September 25, 2021.

1.75    Oversight Committee means the committee appointed pursuant to Section 7.05 of the Plan to participate in the oversight of certain material actions of the Plan Administrator.

1.76    Participating Customer means any holder of a Customer Claim that does not opt-out of the Customer Releases, including those holders of Customer Claims that abstain from voting and do not opt-out of the Customer Releases.

1.77    Participating Customer Potential Return means, for each applicable Participating Customer, the total amount such Participating Customer paid the Debtor for electricity consumed by such Participating Customer during the period February 13, 2021 through February 19, 2021, including when the Public Utilities Commission of Texas imposed the $9,000 per MWh price for wholesale power, as reflected on the Debtor's books and records, less any amounts such Participating Customer successfully disputed and received a full or partial refund from such Participating Customer's credit card company (to the extent not accounted for in the Debtor's books and records).

1.78    Participating Customer Potential Return Claim mean any unsecured nonpriority claim against the Debtor for a Participating Customer Potential Return.

1.79    Person means any individual, corporation, partnership, association, indenture trustee, limited liability company, organization, joint stock company, joint venture, estate, trust, governmental unit or any political subdivision thereof, Interest holder, or any other entity or organization of whatever nature.

1.80    Petition Date means March 15, 2021.

1.81    Plan means this chapter 11 liquidating plan, including the Plan Supplement and all exhibits, supplements, appendices and schedules hereto, either in its present form or as the same may be altered, amended, or modified from time to time.

1.82    Plan Administrator means the responsible officer, acting in his or her capacity as such, designated by the Debtor (or any Bankruptcy Court approved successor) to serve as the sole officer of the Debtor who shall, among other things, implement this Plan pursuant to its terms and the terms of the Confirmation Order.

9

1.83   Plan Administrator Agreement means the agreement governing, among other things, the retention and duties of the Plan Administrator, as described in Section 7.03 of the Plan, which shall be in form and substance as contained in the Plan Supplement.

1.84   Plan Administrator Expenses means all actual and necessary costs and expenses incurred on and after the Effective Date in connection with the wind down of the Debtor and the administration of the Plan, including, but not limited to, the Debtor's costs, expenses and legal fees incurred related to: (a) filing and prosecuting objections to Claims; (b) if necessary, investigating, litigating, settling, negotiating, pursuing or otherwise associated with Causes of Action not released under the terms of the Plan, including, but not limited to, attorneys' fees, accounting fees, expert witness fees, and all costs relating to obtaining and distributing recoveries from such causes of action; (c) performing the duties set forth in Article VII of the Plan and the Plan Administrator Agreement; and (d) all U.S. Trustee Fees.

1.85   Plan Documents means those documents contained in the Plan Supplement necessary to effectuate this Plan following entry of the Confirmation Order, including the Plan Administrator Agreement, a form of amended limited liability company agreement for the Liquidating Debtor, any Cure Schedule and the Customer Release Opt-Out Form, which shall be subject to revision and modification prior to the Effective Date.

1.86   Plan Supplement means the supplemental appendix to this Plan, to be filed no later than five (5) Business Days prior to the deadline for Ballots to be received in connection with voting to accept or reject the Plan, which will contain, among other things, draft forms, signed copies, or summaries of material terms, as the case may be, of the Plan Documents and the names of the Plan Administrator and the initial members of the Oversight Committee, each of which shall be subject to revision and modification prior to the Effective Date.

1.87   Prepetition ISDA Master Agreement means the ISDA 2002 Master Agreement, dated as of December 4, 2020, between Macquarie Energy LLC and the Debtor, including all schedules thereto, confirmations thereunder and agreements, documents, notes, instruments and any other agreements delivered pursuant thereto or in connection therewith (in each case, as amended, modified or supplemented from time to time).

1.88   Prepetition Lender BBFA means the Borrowing Base Facility Agreement among the Debtor, as Counterparty, Griddy Holdings LLC, Griddy Technologies LLC and Griddy Pro LLC, as Guarantors and Macquarie Investments US Inc., dated as of December 4, 2020, including all agreements, documents, notes, instruments and any other agreements delivered pursuant thereto or in connection therewith (in each case, as amended, modified or supplemented from time to time).

1.89   Prepetition Lender Claim means any unpaid Claim as of the Effective Date arising under, related to or in connection with any and all of the Prepetition Secured Agreements, which shall be Allowed on the Effective Date in the aggregate principal amount of $1,448,937.58, plus (a) Cash in an amount sufficient to cash collateralize the Outstanding LC; (b) with respect to the Prepetition Lender BBFA, accrued and unpaid fees in respect of the Outstanding LC and all prior letters of credit through the Effective Date; and (c) the Prepetition Lender Fee Claim.

1.90    <u>Prepetition Lender Contribution</u> means the $1,448,937.58 that the Prepetition Secured Lenders would be entitled to receive on account of the Prepetition Lender Claim, which amount the Prepetition Secured Lenders will be deemed to have contributed (via waiver) to the Debtor under the Plan.

1.91    <u>Prepetition Lender Distribution</u> means the following to be distributed by the Debtor to the Collateral Agent: (a) Cash in an amount sufficient to fully cash collateralize the Outstanding LC, (b) accrued and unpaid fees due and owing under the Prepetition Lender BBFA in respect of the Outstanding LC and all prior letters of credit through the Effective Date, and (c) the Prepetition Lender Fee Claim; <u>provided</u> that, notwithstanding anything contained in this Plan to the contrary other than the proviso in the definition of "Prepetition Lender Fee Claim," which shall apply in all respects, if the Outstanding LC remains undrawn or partially drawn by the beneficiary thereof after September 25, 2021, the Prepetition Secured Lenders shall, on or prior to September 30, 2021, refund in full in Cash to the Debtor all such undrawn amounts; <u>provided</u> <u>further</u> that if, prior to or on September 25, 2021, the Outstanding LC is canceled, within four (4) Business Days, the Prepetition Secured Lenders shall refund in full in Cash to the Debtor all unused amounts.  Any and all such refunded Cash shall be used by the Debtor in accordance with the terms of the Plan.

1.92    <u>Prepetition Lender Fee Claim</u> means any unpaid reasonable and documented out-of-pocket fees and expenses incurred by the Prepetition Secured Lenders or the Collateral Agent under the Prepetition Secured Agreements to the extent provided thereunder in an amount of no more than $225,000 for the period through the Effective Date, which shall be paid solely by one or more of the Non-Debtor Affiliates as determined by the Non-Debtor Affiliates in their sole discretion; <u>provided</u>, that, if there are any unanticipated litigation or contested matters, including any document requests or other discovery that arise during the period May 19, 2021 through the Effective Date in this Chapter 11 Case or any related adversary proceeding that cause the Prepetition Secured Lenders or the Collateral Agent to incur fees and expenses in excess of $225,000, the Prepetition Secured Lenders or the Collateral Agent, as the case may be, may offset such reasonable and documented out-of-pocket fees and expenses incurred by the Prepetition Secured Lenders or the Collateral Agent in connection therewith (to the extent provided under the Prepetition Secured Agreements) solely against any undrawn amounts remaining from cash collateralizing the Outstanding LC promptly after expiration thereof.  The reasonable and documented out-of-pocket fees and expenses described in the foregoing sentence shall be deemed Allowed on the Effective Date.

1.93    <u>Prepetition Secured Agreements</u> means (a) the Prepetition Lender BBFA; and (b) the Prepetition ISDA Master Agreement.

1.94    <u>Prepetition Secured Lenders</u> means (a) Macquarie Investments US Inc. (and its respective successors and assigns), solely in its capacity as set forth in the Prepetition Lender BBFA, (b) Macquarie Energy LLC (and its respective successors and assigns), solely in its capacity as counterparty under the Prepetition ISDA Master Agreement.

1.95    <u>Priority Non-Tax Claim</u> means any Claim, other than an Administrative Expense Claim, a Fee Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.96    Priority Tax Claim means any Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the kind specified in Bankruptcy Code sections 502(i) and 507(a)(8).

1.97    Professional Expense Escrow means the segregated account maintained by the Debtor for payment of Fee Claims by Professional Persons.

1.98    Professional Persons means all Persons retained by order of the Bankruptcy Court in connection with the Chapter 11 Case, pursuant to sections 327, 328, 330 or 1103 of the Bankruptcy Code, excluding any ordinary course professionals retained pursuant to order of the Bankruptcy Court.

1.99    Pro Rata means proportionate, so that, for example, the ratio of (a) the amount of all consideration distributed on account of an Allowed Claim to (b) the amount of such Allowed Claim is the same as the ratio of (i) the amount of all consideration distributed on account of all Allowed Claims in the Class in which such Claim is classified to (ii) the amount of all Allowed Claims in such Class.

1.100    PUCT Settlement means the settlement, if any, between the Debtor and the Public Utilities Commission of Texas relating to that certain irrevocable standby letter of credit (ending 083) issued pursuant to the Prepetition Lender BBFA in favor of the Public Utility Commission of Texas by order and for the account of the Debtor in the aggregate amount of $500,000, which letter of credit was drawn in full prior to the Petition Date by the Public Utility Commission of Texas, which settlement, if any, would be subject to (a) the consent of the Committee (not to be unreasonably withheld) and (b) Bankruptcy Court approval.  It is anticipated that the Public Utilities Commission of Texas will directly administer any distribution of funds under the PUCT Settlement and that such funds would not become property of the Debtor's Estate.

1.101    Released Parties means, collectively, and each solely in its capacity as such: (a) the Debtor, (b) the Committee and its members, (c) the Prepetition Secured Lenders and the Collateral Agent, and (d) each of such parties' respective predecessors, successors, assigns, subsidiaries, affiliates, the Non-Debtor Affiliates, owners, and each of their respective current (as of the Petition Date) officers, directors, employees, managers, members, principals, shareholders, agents, advisors and professionals (including any attorneys, consultants, financial advisors, investment bankers and other professionals retained by such Persons) or other representatives, each in their capacities as such, together with their successors and assigns; provided, however, that such attorneys and professional advisors shall only include those that provided services related to the Chapter 11 Case and the transactions contemplated by the Plan; provided, further, that no Person shall be a Released Party if it elects to opt out of the releases provided for in Article XII of the Plan in its Ballot.

1.102    Schedules means the schedules of assets and liabilities, the lists of holders of Interests, and the statements of financial affairs filed by the Debtor pursuant to Bankruptcy Code section 521 and Bankruptcy Rule 1007, and all amendments and modifications thereto filed with the Bankruptcy Court through and including the Confirmation Date.

1.103   Secured Claim means a Claim, either as set forth in this Plan, as agreed to by the holder of such Claim and the Debtor or as determined by a Final Order in accordance with sections 506(a) or 1111(b) of the Bankruptcy Code: (a) that is secured by a valid, perfected and enforceable Lien on Collateral that is not subject to avoidance under bankruptcy or nonbankruptcy law, to the extent of the value of the Claim holder's interest in such Collateral as of the relevant date or (b) to the extent that the holder thereof has a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

1.104   Settlement Deficiency means, if the PUCT Settlement is approved by the Bankruptcy Court but the amount of such settlement that is to be distributed to holders of Allowed Class 5 Claims in accordance with Section 4.05(c) of this Plan is less than $500,000, the difference between $500,000 and the total amount of the PUCT Settlement that is to be distributed under the PUCT Settlement.

1.105   State of Texas Settlement means the settlement between the Debtor, Holdco and the State of Texas, by and through the Attorney General of Texas, resolving (a) the action styled *The State of Texas v. Griddy Energy LLC and Griddy Holdings, LLC*, Cause No. 2021-11518, filed in the 133rd District Court of Harris County, Texas and (b) the Civil Investigative Demand issued by the State of Texas to the Debtor on February 19, 2021, which settlement is subject to Bankruptcy Court approval and the occurrence of the Effective Date of this Plan.

1.106   Supplemental Cure Schedule has the meaning set forth in Section 10.02 of this Plan.

1.107   Texas Storm Causes of Action means any and all Causes of Action of the Debtor arising from, relating to or in connection the winter storm (commonly referred to as "Winter Storm Uri") that occurred in Texas during the month of February 2021 (primarily February 13, 2021 through February 19, 2021).  For the avoidance of doubt, such Causes of Action of the Debtor exclude any and all claims against the Released Parties.

1.108   Texas Storm Causes of Action Net Recovery Proceeds means the Cash or other amounts received by the Debtor, if any, from the pursuit of any Texas Storm Causes of Action (formally or informally) not released under this Plan, net of all costs and expenses deducted therefrom, to be distributed (Pro Rata) to holders of (a) Allowed Other General Unsecured Claims and (b) Allowed Participating Customer Potential Return Claims, subject to all Claims of a higher priority being paid in full or adequate reserves being set aside in accordance with this Plan.

1.109   U.S. Trustee means the United States Trustee for Region 7.

1.110   U.S. Trustee Fees means fees arising under 28 U.S.C. § 1930(a)(6), and accrued interest thereon arising under 31 U.S.C. § 3717, if any.

1.111   Voting Deadline means June 25, 2021 at 5:00 p.m. (prevailing Central Time), which is the deadline set by the Bankruptcy Court to accept or reject the Plan.

1.112   Wind Down Costs includes the fees and expenses incurred by the Debtor following the Effective Date (including reasonable fees and costs of attorneys and other

professionals) for the purpose of: (a) resolving Disputed Claims, if any, and effectuating distributions to holders of Allowed Claims; (b) otherwise implementing the Plan, the wind down of the Debtor and the closing of the Chapter 11 Case; and (c) undertaking such other matters relating to implementation of the Plan as are deemed necessary and appropriate by the Debtors.

1.113  Wind Down Budget means a budget to be prepared by the Debtor to be filed with the Court no later than five (5) Business Days prior to the Confirmation Hearing and which may be amended from time to time after entry of the Confirmation Order, and shall estimate the funds necessary to administer the Plan, continue the Debtor's wind down, and otherwise unwind the Debtor's affairs, including the costs of holding and liquidating the Estate's remaining property, if any, objecting to Claims, making the Distributions required by the Plan, prosecuting Claims and Causes of Action, if any, that may be held by the Estate against third parties that are not released, waived or transferred pursuant to the Plan (including pursuant to Article XII) or otherwise, paying taxes, filing tax returns, paying the Plan Administrator's Professional fees, funding payroll and other employee costs, if any, providing for the purchase of errors and omissions insurance and/or other forms of indemnification for the Plan Administrator, and creating appropriate reserves for all such items and other costs of administering the Plan, the Estate and the Debtor.

B.      Interpretation; Application of Definitions and Rules of Construction.

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, this Plan.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein.  Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural.  Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of this Plan.  The word "including" as used in this Plan means "including, without limitation" regardless of whether so specified.  Any reference in this Plan to a contract, instrument, release, credit agreement or other agreement or documents being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, and any reference in this Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, amended and restated, modified, or supplemented from time to time.  Subject to the provisions of any contract, limited liability company agreements, instruments, releases, or other agreements or documents entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules.  The captions and headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  Any reference to an entity as a holder of a Claim or Interest includes that entity's successors and assigns.

14

C.    Appendices and Plan Documents.

All Plan Documents and appendices to the Plan are incorporated into the Plan by reference and are a part of the Plan as if set forth in full herein.  The documents contained in the exhibits and Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.  Holders of Claims and Interests may inspect copies of the Plan Documents, once filed, in the Office of the Clerk of the Bankruptcy Court during normal business hours, or via the Claims Agent's website at https://cases.stretto.com/Griddy, or obtain a copy of the Plan Documents by a written request sent to the Claims Agent at the following address:

Griddy Energy LLC
c/o Stretto
410 Exchange, Suite 100
Irvine, CA 92602

Copies may also be obtained by contacting Stretto via telephone at (855) 478-2725 (toll free U.S.)  or for international calls at (949) 471-0997.

**ARTICLE II**

**ADMINISTRATIVE EXPENSE CLAIMS,
FEE CLAIMS, U.S. TRUSTEE FEES AND PRIORITY TAX CLAIMS**

All Claims and Interests, except Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims are placed in the Classes set forth in Article III below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims of the Debtor have not been classified, and the holders thereof are not entitled to vote on this Plan.  A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.

A Claim or Interest also is placed in a particular Class for all purposes, including voting, confirmation and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code.  However, a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

2.01    Administrative Expense Claims.  Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date an Administrative Expense Claim becomes an Allowed Claim, the holder of such Allowed Administrative Expense Claim shall receive from the Debtor Cash in an amount equal to such Allowed Claim; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtor, as debtor in possession, shall be paid by the Debtor in the ordinary

15

course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such liabilities.

2.02    Time for Filing Administrative Expense Claims.  The holder of an Administrative Expense Claim, other than:

(a)    a Fee Claim;

(b)    an Administrative Expense Claim that has been Allowed on or before the Effective Date;

(c)    an Administrative Expense Claim on account of fees and expenses incurred on or after the Petition Date by ordinary course professionals retained by the Debtor pursuant to an order of the Bankruptcy Court;

(d)    an Administrative Expense Claim held by an officer, manager, member or employee of the Debtor employed as of the Petition Date for indemnification, contribution, or advancement of expenses pursuant to: (i) the Debtor's operating agreement or similar organizational document, or (ii) any indemnification or contribution agreement approved by the Bankruptcy Court;

(e)    an Administrative Expense Claim arising, in the ordinary course of business, out of the employment by the Debtor of an individual from and after the Petition Date, but only to the extent that such Administrative Expense Claim is solely for outstanding wages, commissions, accrued benefits, or reimbursement of business expenses; or

(f)    an Intercompany Claim,

must file with the Bankruptcy Court and serve on the Debtor, the Claims Agent, and the United States Trustee, **notice of such Administrative Expense Claim so as to be received by 5:00 p.m. prevailing Eastern time on the date that is thirty (30) days after service of notice of occurrence of the Effective Date (the "Administrative Bar Date").**  Such notice must include at a minimum: (i) the name of the Debtor; (ii) the name of the holder of the Administrative Expense Claim; (iii) the amount of the Administrative Expense Claim; (iv) the basis of the Administrative Expense Claim; and (v) supporting documentation for the Administrative Expense Claim.  **FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE EXPENSE CLAIM TIMELY AND PROPERLY SHALL RESULT IN THE ADMINISTRATIVE EXPENSE CLAIM BEING FOREVER BARRED AND RELEASED**.

2.03    Fee Claims.  All Professional Persons seeking allowance by the Bankruptcy Court of a Fee Claim shall: (i) file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by no later than the date that is forty-five (45) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court; and (ii) if granted such an award by the Bankruptcy Court, be paid in full in Cash such amount as awarded by the Bankruptcy Court (A) no later than five (5) Business Days after the date an order is entered with respect to such award or (B) upon such

16

other terms as may be mutually agreed upon between such holder of a Fee Claim and the Debtor. On the Effective Date, to the extent known, the Debtor or the Plan Administrator shall reserve and hold in the Professional Expense Escrow Cash in an amount equal to accrued but unpaid Fee Claims as of the Effective Date, which Cash shall be used, until all Allowed Fee Claims have been paid in full, solely for the payment of Allowed Fee Claims.  Objections to Fee Claims, if any, must be filed and served pursuant to the procedures set forth in the Confirmation Order no later than sixty-five (65) days after the Effective Date.  To the extent the Cash in the Professional Expense Escrow exceeds the amount of the Allowed Fee Claims, such excess Cash shall be used by the Debtor in accordance with the terms of this Plan.

2.04    U.S. Trustee Fees.  The Debtor shall pay all outstanding U.S. Trustee Fees of the Debtor, together with interest pursuant to 31 U.S.C. § 3717, if any, on an ongoing basis on the later of (i) the Effective Date and (ii) the date such U.S. Trustee Fees become due, until such time as a final decree is entered closing the Chapter 11 Case or the Chapter 11 Case is converted or dismissed, or the Bankruptcy Court orders otherwise.

2.05    Priority Tax Claims.  Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtor prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Debtor either: (i) on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date a Priority Tax Claim becomes an Allowed Claim, Cash in an amount equal to such Claim, or (ii) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Petition Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim (with any interest to which the holder of such Priority Tax Claim may be entitled calculated in accordance with section 511 of the Bankruptcy Code); provided, however, that all Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as they become due.

### ARTICLE III

### CLASSIFICATION OF CLAIMS AND INTERESTS

Claims, other than Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims, and Interests are classified for all purposes, including voting, confirmation, and distribution pursuant to the Plan, as follows:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Prepetition Lender Claims | Impaired | Yes (entitled to vote) |
| Class 2 | Other Secured Claims | Unimpaired | No (conclusively presumed to accept) |
| Class 3 | Priority Non-Tax Claims | Unimpaired | No (conclusively presumed to accept) |
| Class 4 | Other General Unsecured Claims | Impaired | Yes (entitled to vote) |

17

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 5 | Customer Claims | Impaired | Yes (entitled to vote) |
| Class 6 | Intercompany Claims | Impaired | Yes (entitled to vote) |
| Class 7 | Existing HoldCo Interests | Impaired | Yes (entitled to vote) |

# ARTICLE IV

## TREATMENT OF CLAIMS AND INTERESTS

### 4.01    CLASS 1 – PREPETITION LENDER CLAIMS.

(a)    <u>Impairment and Voting</u>.  Class 1 is impaired by the Plan.  Each holder of a Prepetition Lender Claim is entitled to vote to accept or reject the Plan.

(b)    <u>Treatment</u>.  Except to the extent that a holder of an Allowed Prepetition Lender Claim has been paid in full by the Debtor prior to the Effective Date or agrees to a different treatment with respect to such holder's Claim, on the Effective Date, or as soon as practicable thereafter, the Collateral Agent shall receive (for the benefit of itself and the Prepetition Secured Lenders) the Prepetition Lender Distribution, to be distributed in accordance with the applicable Prepetition Secured Agreements, including the Intercreditor Agreement.  The Prepetition Lender Claims are Allowed Claims under the Plan; provided that, notwithstanding the foregoing, the Prepetition Secured Lenders waive their right to receive the Prepetition Lender Contribution, which shall be contributed to the Debtor to be used and distributed in accordance with the payment priorities set forth in this Plan.  Notwithstanding anything herein to the contrary, upon the full payment or other satisfaction or release of such obligations, the Liens securing such Allowed Prepetition Lender Claim shall be deemed released, terminated and extinguished against all parties, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.  All Cash held by the Prepetition Secured Lenders on the Effective Date that is in excess of the amount of the Prepetition Lender Distribution shall be promptly returned to the Debtor and utilized by the Debtor in accordance with the terms of this Plan.

### 4.02    CLASS 2 – OTHER SECURED CLAIMS.

(a)    <u>Impairment and Voting</u>.  Class 2 is unimpaired by the Plan.  Each holder of an Other Secured Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

(b)    <u>Treatment</u>.  Except to the extent that a holder of an Allowed Other Secured Claim has been paid in full by the Debtor prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Other Secured Claim shall receive at the election of the Debtor on or before, the later of the Effective Date and thirty (30) days after the date on which a Class 2 Claim becomes an Allowed Claim, or as soon as reasonably practicable

18

thereafter: (i) Cash in an amount equal to such Allowed Other Secured Claim; (ii) title to the property securing such Allowed Class 2 Claim to the holder of such Claim; or (iii) such other treatment that leaves such Allowed Other Secured Claim unimpaired pursuant to section 1124(2) of the Bankruptcy Code. Notwithstanding anything herein to the contrary, upon the full payment or other satisfaction of such obligations, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

(c) <u>Deficiency Claims</u>. To the extent that the value of the Collateral securing each Other Secured Claim is less than the Allowed amount of such Other Secured Claim, the undersecured portion of such Allowed Claim shall be treated for all purposes under this Plan as an Allowed Other General Unsecured Claim and shall be classified as an Other General Unsecured Claim.

(d) <u>Separate Classification of Secured Claims</u>. Although all Other Secured Claims have been placed in one Class for purposes of nomenclature, each Other Secured Claim, to the extent secured by a Lien on Collateral different than that securing any other Secured Claims, shall be treated as being in a separate sub-Class for the purpose of voting on the Plan and receiving Distributions.

4.03    <u>CLASS 3 –PRIORITY NON-TAX CLAIMS</u>.

(a) <u>Impairment and Voting</u>. Class 3 is unimpaired by the Plan. Each holder of an Allowed Priority Non-Tax Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

(b) <u>Treatment</u>. The legal, equitable and contractual rights of the holders of Priority Non-Tax Claims are unaltered by this Plan. Except to the extent that a holder of an Allowed Priority Non-Tax Claim has been paid in full by the Debtor prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Non-Tax Claim shall receive Cash in an amount equal to such Allowed Priority Non-Tax Claim on the later of the Effective Date and the date such Allowed Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable.

4.04    <u>CLASS 4 – OTHER GENERAL UNSECURED CLAIMS</u>.

(a) <u>Impairment and Voting</u>. Class 4 is impaired by the Plan. Each holder of an Other General Unsecured Claim is entitled to vote to accept or reject the Plan.

(b) <u>Treatment</u>. Except to the extent that a holder of an Allowed Other General Unsecured Claim has been paid in full by the Debtor prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Other General Unsecured Claim shall receive in full satisfaction, settlement, and release of, and in exchange for such Allowed Other General Unsecured Claim, its Pro Rata share of the Class 4 Distribution; <u>provided</u> that, notwithstanding the foregoing, (i) all Texas Storm Causes of Action Net Recovery Proceeds, if any, and (ii) any Available Prepetition Lender Contribution shall be shared with holders of Allowed Participating

Customer Potential Return Claims on a Pro Rata basis and be distributed (Pro Rata) to holders of (a) Allowed Other General Unsecured Claims and (b) Allowed Participating Customer Potential Return Claims.

4.05    CLASS 5 – CUSTOMER CLAIMS.

(a)    Impairment and Voting.  Class 5 is impaired by the Plan.  Each holder of a Customer Claim is entitled to vote to accept or reject the Plan.

(b)    Treatment.  Except to the extent that a holder of an Allowed Customer Claim has been paid in full by the Debtor prior to the Effective Date or agrees to a different treatment,

(i)    in full satisfaction, settlement, and release of, and in exchange for its Customer Claim, each Participating Customer will (a) grant and receive the Customer Releases as set forth in Section 12.10 of the Plan; and (b) solely to the extent a Participating Customer has an Allowed Participating Customer Potential Return Claim, receive its Pro Rata share of (w) any Texas Storm Causes of Action Net Recovery Proceeds in accordance with the terms of this Plan, (x) any Available Prepetition Lender Contribution, and (y) any Settlement Deficiency.

(ii)    if a Customer Claim is held by a Non-Participating Customer, such holder (x) will not be treated as an Allowed Class 5 Claim, (y) will not give or receive the Customer Releases, and (z) (1) solely if the Non-Participating Customer timely and properly files an unsecured nonpriority proof of claim against the Debtor by the applicable Bar Date in accordance with the applicable Bar Date Order, such Customer Claim shall be classified as an Other General Unsecured Claim and treated for all purposes under this Plan as an Other General Unsecured Claim; or (y) solely if the Non-Participating Customer does not timely and properly file an unsecured nonpriority proof of claim against the Debtor by the applicable Bar Date in accordance with the applicable Bar Date Order, such Customer Claim shall not be treated as either a Class 5 Claim or a Class 4 Claim (other than for purposes of voting on the Plan as a Class 4 Claim).

(c)    If Class 5 Approves the Plan; Treatment Subject to Bankruptcy Court Approval.  On the Effective Date, each Participating Customer shall be deemed to have an Allowed Class 5 Claim; provided that a Participating Customer Potential Return Claim shall only be Allowed: (1) if such Participating Customer timely and properly files a proof of claim for such Claim by the Former Customers Bar Date in accordance with the Former Customers Bar Date Order and (2) only in an amount up to the Participating Customer Potential Return; provided further that, subject to the last sentence of this Section 4.05(c), if the Bankruptcy Court does not approve the Customer Releases pursuant to Bankruptcy Rule 9019 or otherwise, then each Participating Customer will not have an Allowed Class 5 Claim and, solely if such Participating Customer timely and properly filed an unsecured nonpriority proof of claim against the Debtor by the applicable Bar Date in accordance with the applicable Bar Date Order, such Customer Claim shall be classified as an Other General Unsecured Claim and treated for all purposes under this Plan as an Other General Unsecured Claim.  Notwithstanding the foregoing, if the PUCT Settlement is approved by the Bankruptcy Court but the amount of such settlement

20

is less than $500,000, then each Participating Customer that timely and properly files a proof of claim for a Participating Customer Potential Return Claim shall have an Allowed Claim in the amount of the Participating Customer Potential Return solely for purposes of sharing Pro Rata in the Settlement Deficiency.

(d)  Notwithstanding anything to the contrary contained in this Plan, Participating Customers shall have forty-five (45) days after the Effective Date to elect to become Non-Participating Customers by completing the Customer Release Opt-Out Form and returning it so that it is actually received by the Claims Agent or Plan Administrator by the forty-fifth (45th) day after the Effective Date by:

(i)  Electronic mail to the Plan Administrator, which email address is identified on the Customer Release Opt-Out Form; or

(ii)  U.S. Mail or other hand delivery system at the following address:

> Griddy Energy LLC
> c/o Stretto
> 410 Exchange, Suite 100
> Irvine, CA 92602

Copies may also be obtained by contacting the Claims Agent via telephone at (855) 478-2725 (toll free U.S.) or for international calls at (949) 471-0997.  If a Participating Customer elects to become a Non-Participating Customer in accordance with the foregoing, the former Participating Customer shall be treated as a Non-Participating Customer under the Plan for all purposes; provided that such Person's vote on the Plan shall not be deemed changed if the election is made after the Voting Deadline.

(e)  Notwithstanding anything to the contrary contained in the Plan, if the Bankruptcy Court does not approve (i) (x) any Available Prepetition Lender Contribution or (y) any Settlement Deficiency being distributed to holders of Allowed Class 5 Claims in accordance with the terms of this Plan, or (ii) the releases of Participating Customers in Section 12.07(b) of this Plan, the provisions of the Plan relating to any or all such provisions, as applicable, shall be deemed stricken from the Plan and of no force and effect.  In such event, holders of Allowed Class 5 Claims shall be entitled to the remainder of the treatment and Distributions provided for in the Plan as if either or both such provisions, as applicable, were not included in the Plan.

4.06  CLASS 6 – INTERCOMPANY CLAIMS.

(a)  Impairment and Voting.  Class 6 is impaired by the Plan.  The holders of Intercompany Claims are entitled to vote to accept or reject the Plan.

(b)  Treatment.  Except to the extent that a holder of an Allowed Intercompany Claim agrees to a different treatment, if any Causes of Action are successfully prosecuted, settled and/or otherwise resolved, each holder of an Allowed Intercompany Claim shall be entitled to receive its Pro Rata share of any and all Cash or other property remaining with the Debtor after

(i) all Allowed Claims (other than Intercompany Claims) are paid in full in Cash (including payment of postpetition interest from the Petition Date through the payment date at the Federal Judgment Rate; provided that, the contractual rate of interest shall apply, if applicable, based on the particular contractual agreement between the Debtor and the holder of an Allowed Claim) in accordance with the Plan and (ii) all other Wind Down Costs are paid in accordance with the Wind Down Budget.

(c) The Non-Debtor Affiliates shall be deemed to have contributed all claims and causes of action identified in the Plan Supplement.

4.07 CLASS 7 – EXISTING HOLDCO INTERESTS.

(a) Impairment and Voting. Class 7 is impaired by the Plan. The holder of the Existing HoldCo Interests is entitled to vote to accept or reject the Plan.

(b) Treatment. Except to the extent that the holder of the Allowed Existing HoldCo Interest agrees to a different treatment, if any Causes of Action are successfully prosecuted, settled and/or otherwise resolved, the holder of the Existing HoldCo Interests shall be entitled to receive any and all Cash or other property remaining with the Debtor after (i) all Allowed Claims are paid in full in Cash (including payment of postpetition interest from the Petition Date through the payment date at the Federal Judgment Rate; provided that, the contractual rate of interest shall apply, if applicable, based on the particular contractual agreement between the Debtor and the holder of an Allowed Claim) in accordance with the Plan and (ii) all other Wind Down Costs are paid in accordance with the Wind Down Budget.

## ARTICLE V

## ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR INTERESTS

5.01 Class Acceptance Requirement. A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in dollar amount of the Allowed Claims in such Class and more than one-half (1/2) in number of holders of such Claims that have voted on the Plan. A Class of Interests shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount of the Allowed Interests in such Class that have voted on the Plan.

5.02 Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or "Cramdown". If any Class rejects this Plan, the Debtor will request confirmation of the Plan, as it may be modified and amended from time to time, under section 1129(b) of the Bankruptcy Code with respect to such Classes. Subject to Section 14.07 of this Plan, the Debtor reserves the right to alter, amend, modify, revoke or withdraw this Plan or any Plan Document in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

5.03 Elimination of Vacant Classes. Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of

determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

5.04    Voting Classes; Deemed Acceptance by Non-Voting Classes.  If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the holders of such Claims or Interests in such Class.

## ARTICLE VI

## IMPLEMENTATION OF THE PLAN

6.01    The Liquidating Debtor.  The Debtor shall continue to exist as the Liquidating Debtor on and after the Effective Date, with all of the powers of a limited liability company under applicable law solely for the purposes of satisfying the Debtor's obligations under the Plan, including making distributions as required under the Plan and effectuating the wind down of the Debtor.  The operating agreement of the Liquidating Debtor shall, inter alia, prohibit the issuance of nonvoting stock to the extent required by section 1123(a)(6) of the Bankruptcy Code. On the Effective Date, the Liquidating Debtor shall issue one membership interest to the Plan Administrator in exchange for payment of one dollar ($1.00).  On the Effective Date, except as provided in this Plan, all property of the Debtor shall vest in the Liquidating Debtor, free and clear of all Claims, Interests, liens, charges or other encumbrances.

6.02    Officers, Managing Member.

(a)    On the Effective Date, the authority, power and incumbency of the persons then acting as officers, as managing member or board of the Debtor shall be deemed to have resigned without the necessity of any act on the part of such parties.

(b)    From and after the Effective Date, the Debtor shall be managed and administered through the Plan Administrator, who shall be appointed the sole officer of the Debtor and shall have full authority to administer the provisions of the Plan.  The Plan Administrator may employ one or more Persons to assist it with performing its duties under the Plan.  If the Plan Administrator in its discretion decides not to sell any non-Cash property or if such property cannot, in the Plan Administrator's judgment, be sold in a commercially reasonable manner prior to the Final Distribution Date, the Debtor shall have the right to abandon or otherwise dispose of such property in it business judgment.  Absent willful misconduct or fraud in connection therewith, no party in interest shall have a cause of action against the Plan Administrator, the Debtor or the Liquidating Debtor, or each of their respective managers, officers, employees, consultants, trustees, or similar persons, or professionals arising from or related to the disposition of non-Cash property in accordance with this Section 6.02 of the Plan.

6.03    Operating Agreement Amendments.  The operating agreement and/or other constituent documents and agreements of the Debtor shall be revised as necessary and appropriate to comport with the terms of the Plan.

6.04    Plan Funding.  The Distributions to be made in Cash under the terms of this Plan shall be funded from the Debtor's Cash on hand as of and after the Effective Date and any Net Recovery Proceeds, consistent with the terms of this Plan.

6.05    Cancellation of Existing Securities and Agreements.  Except for the purpose of evidencing a right to distribution under this Plan, on the Effective Date, any document, agreement, or instrument evidencing any Claim or Interest shall be deemed cancelled without further act or action under any applicable agreement, law, regulation, order, or rule and the obligations of the Debtor under such documents, agreements, or instruments evidencing such Claims and Interests, as the case may be, shall be deemed extinguished.  The holders or parties to such cancelled instruments, securities and other documentation will have no rights arising from or relating to such instruments, securities and other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan.  Notwithstanding anything to the contrary herein, the Prepetition Lender Secured BBFA shall continue in effect solely to the extent necessary to allow the Prepetition Secured Lenders to hold Cash for any reimbursement obligations under the Outstanding LCs.

6.06    Cancellation of Existing Security Interests.  Upon the full payment or other satisfaction of an Allowed Secured Claim, or promptly thereafter, the holder of such Allowed Secured Claim shall deliver to the Debtor any Collateral or other property of the Debtor held by such holder, and any termination statements, instruments of satisfactions, or releases of all security interests with respect to its Allowed Secured Claim that may be reasonably required in order to terminate any related financing statements, mortgages, mechanic's liens, or lis pendens.

6.07    Approval of Plan Documents.  The solicitation of votes on the Plan shall be deemed a solicitation for the approval of the Plan Documents and all transactions contemplated hereunder.  Entry of the Confirmation Order shall constitute approval of the Plan Documents and such transactions.  On the Effective Date, the Debtor shall be authorized to enter into, file, execute and/or deliver each of the Plan Documents and any other agreement or instrument issued in connection with any Plan Document without the necessity of any further corporate, board or shareholder action.

6.08    Comprehensive Settlement of Claims and Controversies.  Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under this Plan, the provisions of this Plan will constitute a good faith compromise and settlement of all Claims or controversies relating to the rights that a holder of a Claim or Interest may have with respect to any Allowed Claim, including Allowed Participating Customer Claims, or any distribution to be made pursuant to this Plan on account of any Allowed Claim, including, Allowed Participating Customer Return Claims.  The treatment of Allowed Class 5 Customer Claims is a good faith compromise and settlement of all Claims or controversies relating to the rights of the holders of such Claims and is not and should not be deemed to be an admission or waiver of rights or defenses of the Debtor or any other Released Party.  But for the proposed settlement and compromise set forth in the Plan, the Debtor would not have proposed the treatment in Class 5, including, related to Participating Customer Potential Return Claims.  The Debtor and each other Released Party reserves all rights and defenses against any Non-Participating Customers, including in respect of an alleged credit, refund, return or otherwise in respect of any and all amounts paid for electricity and related fees, costs, taxes and other charges, or otherwise that is

24

not released pursuant to this Plan. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies, including the settlement and the Customer Releases set forth in Section 12.10 of this Plan, and the Bankruptcy Court's finding that all such compromises or settlements are: (a) in the best interest of the Debtor and its Estate and property, and of holders of Claims or Interests; and (b) fair, equitable and reasonable. If the Effective Date does not occur, the settlements set forth herein shall be deemed to have been withdrawn without prejudice to the respective positions of the parties.

6.09    <u>Wind Down of the Estate and Distribution of Proceeds</u>. After the Effective Date, all non-Cash assets of the Estate not previously released, disposed of or transferred shall be sold or otherwise liquidated or abandoned.

6.10    <u>Intercompany Claims</u>. Except as provided in this Plan or the Confirmation Order, the Debtor may take such steps as necessary or required to cancel, release and extinguish Intercompany Claims including, in connection therewith, taking such steps as necessary or required to facilitate the cancellation, release and extinguishment of intercompany claims between or among the Debtor and HoldCo as well as any other non-Debtor affiliate(s) of the Debtor.

## ARTICLE VII

## PLAN ADMINISTRATOR

7.01    <u>General</u>. Not less than ten (10) days prior to the commencement of the Confirmation Hearing and subject to Bankruptcy Court approval in connection with confirmation of the Plan, the Debtor and the Committee shall jointly select the person who initially will serve as the Plan Administrator; <u>provided</u>, <u>however</u>, that: (a) if the Debtor and the Committee jointly agree, they shall have the right at any time prior to the Effective Date to remove the Plan Administrator without cause; and (b) the Plan Administrator shall be subject to removal by the Bankruptcy Court for cause shown at any time. On or after the Confirmation Date but prior to the Effective Date, the Plan Administrator shall assume all of its obligations, powers and authority under the Plan to: (i) establish bank accounts as may be required to fulfill the Debtor's obligations under this Plan, including, to the extent not previously established by the Debtor, to establish and fund the Disputed Claims Reserves in accordance with the terms hereof; and (ii) exercise such other power and authority as may be set forth in the Confirmation Order (collectively, the "Pre-Effective Date PA Duties"). On the Effective Date, the Plan Administrator shall assume all of its obligations, powers and authority under the Plan and shall comply with all applicable provisions of the Plan. All other property of the Estate, including any Causes of Action not released by the Plan, shall be managed by the Plan Administrator and shall be held in the name of the Debtor free and clear of all Claims against the Debtor and Interests, except for the rights to such Distribution afforded to the holders of Allowed Claims under the Plan. The Plan Administrator shall make the remaining Distributions required under the Plan in accordance with the Plan's terms. After the Effective Date, the Plan Administrator shall have no liability to holders of Claims or Interests other than as provided for in the Plan. The Plan will be administered, and actions will be taken in the name of the Debtor through the Plan Administrator irrespective of whether the Debtor has been dissolved.

25

7.02    Qualifications; Plan Administrator Agreement.

(a)    Plan Administrator as Fiduciary.  The Plan Administrator shall act for the Debtor in a fiduciary capacity, shall have such qualifications and experience as are sufficient to enable the Plan Administrator to perform its obligations under this Plan and under the Plan Administrator Agreement, and shall be compensated and reimbursed for expenses as set forth in, and in accordance with, the Plan Administrator Agreement.  To the extent necessary, following the Effective Date, the Plan Administrator shall be deemed to be a judicial substitute for the Debtor as the party-in-interest in the Chapter 11 Case, under the Plan or in any judicial proceeding or appeal to which the Debtor is a party, consistent with section 1123(b)(3)(B) of the Bankruptcy Code.  The Plan Administrator shall not be liable for any action it takes or omits to take that it believes in good faith to be authorized or within its rights or powers unless it is ultimately and finally determined by a court of competent jurisdiction that such action or inaction was the result of fraud, gross negligence or willful misconduct.

(b)    Provisions of Agreement and Order.  The Plan Administrator Agreement and the Confirmation Order shall provide that:  (i) the Plan Administrator (x) prior to the Effective Date, shall be independent of the Debtor; and (y) shall be a fiduciary of the Estate; (ii) neither the Debtor (except as expressly set forth in the Plan Administrator Agreement) nor its managing member, officers, employees, if any, and professionals shall have any liability for any action taken or omitted to be taken by the Plan Administrator in performing the Pre-Effective Date PA Duties and all Persons are enjoined from pursuing any Claims against the foregoing pursuant to this Plan on account of any such action taken or omitted to be taken; (iii) any determinations made by the Plan Administrator with respect to the establishment of reserves under this Plan shall not be binding on any party if the Effective Date fails to occur; and (iv) if the Plan is withdrawn or otherwise abandoned prior to the occurrence of the Effective Date, the Plan Administrator position shall thereafter be dissolved automatically.

7.03    Powers and Duties.

(a)    General Powers and Duties.  From and after the Effective Date, pursuant to the terms and provisions of this Plan and the Plan Administrator Agreement, the Plan Administrator shall be empowered and directed to:  (i) take all steps and execute all instruments and documents necessary to make Distributions to holders of Allowed Claims and to perform the duties assigned to the Plan Administrator under this Plan and/or the Plan Administrator Agreement; (ii) comply with this Plan and the obligations hereunder; (iii) employ, retain, or replace professionals to represent it with respect to his or her responsibilities; (iv) object to Claims as provided in this Plan, and prosecute such objections; (v) compromise and settle any issue or dispute regarding the amount, validity, priority, treatment, or Allowance of any Claim; (vi) establish, replenish or release reserves as provided in this Plan, as applicable; (vii) seek a determination of tax liability under section 505 of the Bankruptcy Code, file tax returns and pay taxes, if any, related to the Debtor; (viii) abandon in any commercially reasonable manner, including abandonment or donation to a charitable organization of his or her choice, any assets of the Debtor if he or she concludes that they are of no benefit to the Estate or the Debtor; (ix) purchase or create and carry all insurance policies and paying all insurance premiums and costs he or she deems necessary or advisable, including that cover the liabilities and obligations of the Plan Administrator and the Oversight Committee under the Plan Administrator

26

Agreement; (x) seek entry of a final decree in the Chapter 11 Case at the appropriate time; and (xi) exercise such other powers as may be vested in the Plan Administrator pursuant to the Plan, the Plan Administrator Agreement or any other Plan Documents or order of the Bankruptcy Court or otherwise act on behalf of and for the Debtor from and after the Effective Date in a manner consistent with the provisions of the Plan which the Plan Administrator deems reasonably necessary or desirable with respect to administering the Plan. The Debtor shall pay the Plan Administrator Expenses and the reasonable fees and expenses of the professional persons employed by the Plan Administrator in connection with his or her duties and responsibilities as set forth in this Plan.

(b)     <u>Distributions</u>.  Pursuant to the terms and provisions of the Plan, the Plan Administrator shall make the required Distributions specified under the Plan, on the Initial Distribution Date, Interim Distribution Date, or Final Distribution Date, as the case may be, under the Plan.

(c)     <u>Compromise of Claims or Causes of Action</u>.  On and after the Effective Date, the Plan Administrator may, in the name of the Debtor, take such action and settle and compromise Claims or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan or the Confirmation Order.  Notwithstanding the foregoing, the Plan Administrator may seek an order of the Bankruptcy Court in respect of any Claims or Causes of Action, including in respect of any settlement or any dispute or otherwise.

7.04    <u>Resignation, Death or Removal of Plan Administrator</u>.  The Plan Administrator may resign at any time upon application to the Bankruptcy Court.  In the event of any such resignation, or the removal, death or incapacity of the Plan Administrator, the Oversight Committee shall appoint a successor to serve as the Plan Administrator in accordance with the Plan Administrator Agreement.  No successor Plan Administrator hereunder shall in any event have any liability or responsibility for the acts or omissions of any of his or her predecessors. Every successor Plan Administrator appointed pursuant hereto shall execute, acknowledge and file with the Bankruptcy Court, and deliver to the holders of Other General Unsecured Claims (at the addresses as provided in Section 8.05) an instrument in writing accepting such appointment hereunder, and thereupon such successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties and obligations of his or her predecessor.  Any resigning or removed Plan Administrator (or the executor or other representative of any deceased or incapacitated Plan Administrator) shall transfer, in exchange for consideration of one dollar ($1.00), the membership interest of the Debtor owned by such Plan Administrator to the successor Plan Administrator.

7.05    <u>The Oversight Committee</u>.

(a)     The Oversight Committee shall be comprised initially of (i) two members selected by the Committee and (ii) one member selected by the Debtor; <u>provided</u> that, (x) if the Plan Administrator recovers sufficient funds to deposit into a segregated account $7.7 million or (y) if the total amount of Allowed Claims (excluding the claim of the Electric Reliability Council of Texas, Inc.) is less than $7.7 million and the Plan Administrator recovers sufficient funds to deposit into a segregated account the total amount required to pay such Allowed Claims

27

(excluding the claim of the Electric Reliability Council of Texas, Inc.) in full (excluding interest), and (z) the Plan Administrator deposits such applicable funds into a segregated account for the benefit of the holders of such Allowed Claims, the Oversight Committee shall be reconstituted to be comprised of (i) two members selected by HoldCo (or its successor or assign) and (ii) one remaining member (who was previously selected by the Committee); provided further that, notwithstanding the foregoing, upon all Allowed Class 4 and Class 5 Claims being paid in full in accordance with the terms of the Plan, the Oversight Committee shall be reconstituted to be comprised of three members selected by HoldCo (or its successor or assign) (each of the two immediately preceding provisos being referred to herein as a "Toggle Event"). If the trigger for a Toggle Event is as a result of the events occurring in the first proviso of this Section 7.05(a), the two members of the Oversight Committee that were selected by the Committee (or their successors, as applicable) shall determine between themselves which member shall resign. If such members cannot make a determination promptly, the Plan Administrator shall seek an order of the Bankruptcy Court in respect of same. The Oversight Committee members selected by (a) the Committee (and any successors) shall act in a fiduciary capacity the same as an official committee of unsecured creditors and (b) the Debtor (and any successors) shall act in a fiduciary capacity the same as required by officers under the Debtor's limited liability company agreement in effect as of the Petition Date. Vacancies on the Oversight Committee shall be filled by a Person designated by (x) as to a Committee selected member, the remaining member that was selected by the Committee (or his or her successor) from among the holders of Allowed Customer Claims or Allowed Other General Unsecured Claims and (y) as to the Debtor selected member, HoldCo or its successor or assign. Any successor appointed pursuant to this Section shall become fully vested with all of the rights, powers, duties and obligations of his or her predecessor. For the avoidance of doubt, no member on the Oversight Committee shall be compensated for serving as a member of the Oversight Committee; provided, if applicable, such members may be reimbursed by the Debtor for reasonable and documented out-of-pocket expenses, if any. In addition, the Plan Administrator may, but is not required to, seek an order of the Bankruptcy Court in respect of depositing the applicable funds described in this Section 7.05(a) into a segregated account as described above.

(b)     Prior to the Toggle Event, unanimous consent of the Oversight Committee shall be required for the following actions: (i) material modifications or amendments to the Plan Administrator Agreement; (ii) cancellation or modification of insurance covering the Plan Administrator or the Oversight Committee; (iii) the settlement, compromise, dismissal, abandonment, release, submission to binding arbitration or mediation, or waiver, in whole or in part, of any claims, rights, causes of action, appeals, or collection efforts arising thereunder or in connection therewith, of any claim by the Plan Administrator where the Disputed Amount at issue equals or exceeds $3 million; (iv) the decision whether to enter into an agreement with any entity respecting the joint prosecution of any claim and causes of action belonging to the Debtor; (v) choosing a successor Plan Administrator; (vi) removing the Plan Administrator; and (vii) the Plan Administrator's retention of professionals to pursue any Texas Storm Causes of Action. All material actions by the Plan Administrator other than the foregoing shall require majority consent of the Oversight Committee, except as otherwise provided in Section 7.05(c). After the Toggle Event, the actions listed in Section 7.05(b)(i)-(vii) shall require majority consent of the Oversight Committee.

(c)     Notwithstanding any other provision in this Plan, the Plan Administrator may only settle Causes of Action as follows: (i) without notice to, or consent from, the Oversight Committee where the Disputed Amount is less than $250,000; (ii) with written notice to the Oversight Committee where the Disputed Amount is between $250,000 and $2,999,999 and the Plan Administrator proposes to settle such claim; provided that no member of the Oversight Committee objects in writing to the proposed settlement within five (5) business days after receipt of such writing; provided, further that if a member of the Oversight Committee so objects, then the Plan Administrator may only proceed with the proposed settlement with the consent of a majority of the members of the Oversight Committee; and (iii) with written notice to, and the consent of all members of, the Oversight Committee where the Disputed Amount is more than $2,999,999.

7.06     Liquidation of the Debtor.  As soon as reasonably practicable after the Distributions have been made to holders of Allowed Claims in accordance with the terms of the Plan, the Debtor shall:  (a) file its certificate of dissolution, together with all other necessary corporate documents, to effect its dissolution under the applicable Delaware state law; and (b) complete and file its final federal, state and local tax returns, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of the Debtor or its Estate for any tax incurred during the administration of the Chapter 11 Case, as determined under applicable tax laws.  The filing by the Debtor of its certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order or rule, including, without limitation, any action by the equity holders or the board of managers of the Debtor and expressly without the need to pay any franchise or similar taxes in order to effectuate such dissolution.

7.07     Termination of the Plan Administrator and Oversight Committee.

(a)     After the Chapter 11 Case is closed and the Plan Administrator has completed all tasks necessary in order to fully and completely wind down and dissolve the Debtor and otherwise to comply with its obligations under the terms of the Plan and the Plan Administrator Agreement, the Plan Administrator shall be deemed to have fully completed his or her duties hereunder and thereunder and shall be fully released and discharged of its duties and obligations to carry out the terms of this Plan.

(b)     After the Plan Administrator has settled or otherwise resolved all Causes of Action and distributions of the proceeds thereof have been made to the beneficiaries thereof, the Oversight Committee shall terminate unless otherwise agreed between the Plan Administrator and the Oversight Committee.

# ARTICLE VIII

## PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE PLAN

8.01     Disbursing Agent.  Except as otherwise provided herein, all distributions under the Plan shall be made by the Disbursing Agent.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court and, in the event that the Disbursing Agent is so otherwise

ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Debtor. Furthermore, any such entity required to give a bond shall notify the Bankruptcy Court and the U.S. Trustee in writing before terminating any such bond that is obtained.

8.02    Distributions of Cash.  Any payment of Cash made by the Disbursing Agent pursuant to the Plan shall, at the Disbursing Agent's option, be made by check drawn on a domestic bank or wire transfer.

8.03    Timing of Distributions.  In the event that any payment, distribution, or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  Any requirement under the Plan that the Debtor or Disbursing Agent make a payment or Distribution on a date shall mean that such party is required to commence the process of making a payment or Distribution on such date.

8.04    Holders as of the Distribution Record Date.  As of the close of business on the Distribution Record Date: (a) the claims register maintained in the Debtor's Chapter 11 Case shall be closed and (b) any transfer of any Claim or any Interest therein shall not be recognized by the Debtor.  The Debtor shall have no obligation to recognize any transfer of any Claim occurring after 4:00 p.m. (Houston time) on the Distribution Record Date, and shall instead be entitled to recognize and deal for all purposes under this Plan with only those holders of record as of 4:00 p.m. (Houston time) on the Distribution Record Date.

8.05    Distributions to Address of Record.  Subject to Bankruptcy Rule 9010, and except as set forth in this Section 8.05 of the Plan, all Distributions under the Plan to holders of Allowed Claims shall be made to the holder of each Allowed Claim at the address of such holder as listed on the Schedules as of the Distribution Record Date, unless the Debtor has been notified in writing of a change of address, including, without limitation, by the timely filing of a proof of claim by such holder that provides an address for such holder different from the address reflected on the Schedules.  In the event that any Distribution to any such holder is returned as undeliverable, no distribution to such holder shall be made unless and until the appropriate Disbursing Agent has been notified of the then current address of such holder, at which time or as soon as reasonably practicable thereafter, such distribution shall be made to such holder without interest; provided, however, that, at the later of the expiration of sixty (60) days after: (a) the Effective Date and (b) the first Distribution Date after a Claim becomes an Allowed Claim, such Distributions shall be deemed unclaimed property and shall revest in the Debtor and be distributed to other holders of Allowed Other General Unsecured Claims, in accordance with the Plan or as otherwise ordered by the Bankruptcy Court, as set forth in Section 8.12 of the Plan.

8.06    No Postpetition Interest on Claims; No More than Payment in Full.

(a)    Unless otherwise specifically provided for in the Plan, Confirmation Order or other order of the Bankruptcy Court, or required by applicable bankruptcy or non-bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

30

(b)     No holder of an Allowed Claim shall be entitled to receive more than payment in full of such Allowed Claim (excluding postpetition interest), and such Claims will be administered and treated in the manner provided in this Plan.

8.07     <u>Minimum Distributions</u>.  No payment of Cash of less than 100 dollars ($100) shall be made by the Debtor to any holder of an Allowed Claim unless a request therefor is made in writing to the Debtor.  If no request is made as provided in the preceding sentence within sixty (60) days of the later of: (a) the Effective Date and (b) the first Distribution Date such Claim is Allowed, all such distributions shall be distributed to other holders of Allowed Other General Unsecured Claims in accordance with the Plan or as otherwise ordered by the Bankruptcy Court.  Notwithstanding anything contained herein to the contrary, if, on any Distribution Date there remains $10,000 or less available for distribution to holders of Allowed Other General Unsecured Claims, in lieu of making any further Distributions to the holders of such Claims, the Debtor may distribute such Cash to the charity of the Debtor's choice.

8.08     <u>Withholding Taxes</u>.  Any federal or state withholding taxes or other amounts required to be withheld under any applicable law shall be deducted and withheld from any Distributions hereunder, and any property so withheld will then be paid by the Debtor to the appropriate authority.  All Persons holding Claims shall be required to provide any information necessary to effect the withholding of such taxes.  The Debtor may, if necessary or appropriate to comply with applicable withholding requirements imposed on them, withhold the entire Distribution due to any holder of an Allowed Claim until such time as such holder provides the necessary information to comply with any withholding requirements of any governmental unit.  Any property so withheld will then be paid by the Debtor to the appropriate authority.  If the holder of an Allowed Claim fails to provide the information necessary to comply with any withholding requirements of any governmental unit within sixty (60) days from the date of first notification to the holder of the need for such information or for the Cash necessary to comply with any applicable withholding requirements, then such holder's Distribution shall be treated as unclaimed property in accordance with Section 8.12 herein or the amount required to be withheld may be so withheld and turned over to the applicable authority.

8.09     <u>Time Bar to Cash Payments by Check</u>.  Checks issued by the Debtor on account of Allowed Claims shall be null and void if not negotiated within sixty (60) days after the date of issuance thereof.  After that date, all Claims in respect of void checks shall be released and forever barred and the proceeds of those checks shall, subject to the proviso in Section 8.12 herein, be deemed unclaimed property in accordance with section 347(b) of the Bankruptcy Code and be distributed as provided in Section 8.12 herein.

8.10     <u>No Payments of Fractional Dollars</u>.  Notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars shall be made pursuant to the Plan.  Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding down of such fraction to the nearest whole dollar.

8.11     <u>Setoff and Recoupment</u>.  The Debtor may, but shall not be required to, setoff against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any claims or defenses of any nature whatsoever that the Debtor or its Estate

may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor or their respective Estate of any right of setoff, recoupment claims, or other rights or Causes of Action that the Debtor or their respective Estate or any of their respective successors may possess against such holder.

8.12    Unclaimed Distributions.  All distributions to holders of Allowed Claims under the Plan that are unclaimed for a period of sixty (60) days after distribution thereof shall be deemed unclaimed property under Bankruptcy Code section 347(b), and any entitlement of any holder of any Claim to such distributions shall be extinguished and forever barred; provided that, if the Bankruptcy Court approves the State of Texas Settlement and after the Effective Date occurs, then all distributions to Former Customers that are unclaimed for a period of sixty (60) days after distribution thereof shall be turned over to the Unclaimed Property Division of the State of Texas Comptroller of Public Accounts pursuant to applicable Texas state unclaimed property law to enable such Former Customer(s) to retrieve such funds in perpetuity.  Except as set forth in the immediately preceding proviso, all such unclaimed property shall revest in the Debtor and, subject to Section 8.07, be distributed to other holders of Allowed Claims in accordance with the Plan or as otherwise ordered by the Bankruptcy Court.

### ARTICLE IX

### PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS OR EQUITY INTERESTS

9.01    Objections to Claims.  Other than with respect to Fee Claims, only the Debtor shall be entitled to object to Claims after the Effective Date.  Any objections to Claims (other than Fee Claims), which Claims have been filed on or before the later of the Confirmation Date and the applicable Bar Date, if any, shall be served and filed on or before the later of:  (a) one year after the Effective Date (or such applicable Bar Date if such applicable Bar Date is after the Effective Date); or (b) such other date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clause (a) of this Section.  Any Claims filed after the applicable Bar Date shall be deemed Disallowed and expunged in their entirety without further order of the Bankruptcy Court or any action being required on the part of the Debtor unless the Person or entity wishing to file such Claim has received prior Bankruptcy Court authority to file such Claim after the applicable Bar Date.  Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the claimant if the Debtor effects service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) by first class mail, postage prepaid, on the signatory on the proof of claim as well as all other representatives identified in the proof of claim or any attachment thereto; or (c) by (i) first class mail, postage prepaid, or (ii) if available, electronic mail, on any counsel that has appeared on the claimant's behalf in the Chapter 11 Case (so long as such appearance has not been subsequently withdrawn).  From and after the Effective Date, the Debtor may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.  After the Effective Date, the Debtor shall be entitled to determine, in its reasonable discretion, that the cost and expense of pursuing claims objections outweighs the benefits to be advanced by filing one or more objections.

9.02    Amendments to Claims.  After the Confirmation Date, a proof of Claim may not be amended without the authorization of the Bankruptcy Court.  Any Claim amended after the Confirmation Date shall be deemed Disallowed in full and expunged without any action by the Debtor, unless the holder of the Claim has obtained prior Bankruptcy Court authorization to file the amendment.

9.03    Estimation of Claims;  Certain Reserves.  For purposes of calculating and making Distributions under the Plan, the Debtor shall be entitled to estimate, in good faith and with due regard to litigation risks associated with Disputed Claims, the maximum dollar amount of Allowed and Disputed Claims, inclusive of contingent and/or unliquidated Claims in a particular Class.  The Debtor also shall be entitled to seek one or more Estimation Orders from the Bankruptcy Court for such purposes, regardless of whether the Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim for purposes of determining the Allowed amount of such Claim at any time.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.  Appropriate Disputed Claims reserves shall be established for each category of Claims as to which estimates are utilized or sought. Unless otherwise expressly set forth herein, the Debtor shall not be obligated to physically segregate and maintain separate accounts for reserves.  Accordingly, reserves may be merely bookkeeping entries or accounting methodologies, which may be revised from time to time, as appropriate.  Unless otherwise ordered by the Bankruptcy Court, no reserves shall be required to be established or maintained with respect to Claims filed after the applicable Bar Date.

9.04    Disputed Claims.

(a)    No Distributions Pending Allowance.  Notwithstanding any other provision hereof, if any portion of a Claim is Disputed, no payment or distribution provided hereunder shall be required to be made on account of such Claim unless and until such Disputed Claim becomes Allowed in its entirety.

(b)    Establishment of Disputed Priority Claims Reserve.  Subject to Section 9.03, on the Effective Date or as soon thereafter as is reasonably practicable, the Debtor shall reserve from Cash on hand for the benefit of each holder of a Disputed Administrative Expense Claim, Disputed Priority Tax Claim and Disputed Priority Non-Tax Claim, Cash in an amount equal to (i) the amount of such Claim as estimated by the Bankruptcy Court pursuant to an Estimation Order; (ii) if no Estimation Order has been entered with respect to such Claim, the amount in which such Disputed Claim is proposed to be allowed in any pending objection filed by the Debtor; or (iii) if no Estimation Order has been entered with respect to such Claim and no objection to such Claim is pending on the Effective Date, (A) the amount listed in the Schedules or (B) if a timely filed proof of claim or application for payment has been filed with the Bankruptcy Court or Claims Agent, as applicable, the amount set forth in such timely filed proof of claim or application for payment, as applicable.  The Debtor, in its reasonable discretion, may

33

increase the amount reserved as to any such particular Disputed Claim. Such reserved amounts, collectively, shall constitute the "Disputed Priority Claims Reserve".

(c)     Establishment of Disputed Other General Unsecured Claims Reserve. Subject to Section 9.03, prior to any Distributions to holders of Allowed Class 4 or Class 5 Claims, the Debtor shall reserve from the Cash on hand, for the benefit of each holder of a Disputed Other General Unsecured Claim, Cash in an amount equal to the Pro Rata Distribution to which the holder of such Disputed Claim would be entitled if such Disputed Claim were an Allowed Claim, in an amount equal to (i) the amount of such Claim as estimated by the Bankruptcy Court pursuant to an Estimation Order; (ii) if no Estimation Order has been entered with respect to such Claim, the amount in which such Disputed Claim is proposed to be allowed in any pending objection filed by the Debtor; or (iii) if no Estimation Order has been entered with respect to such Claim and no objection to such Claim is pending, (A) the amount listed in the Schedules or (B) if a timely filed proof of claim or application for payment has been filed with the Bankruptcy Court or Claims Agent, as applicable, the amount set forth in such timely filed proof of claim or application for payment, as applicable. If and to the extent that a Disputed Claim becomes an Allowed Claim, on the first Distribution Date that is at least thirty (30) Business Days after such allowance, the Debtor shall distribute to the holder thereof the amount of Cash to which such holder is entitled under the provisions of this Plan. If a Disputed Claim is Disallowed, in whole or in part, pursuant to a Final Order, on the first Distribution Date that is at least thirty (30) Business Days after such disallowance, the Debtor shall: (a) first, reallocate Cash that had been reserved on account of such Disallowed Disputed Other General Unsecured Claim to the holders of then Allowed and Disputed Claims in such Class; and (b) second, distribute to each holder of an Allowed Claim in such Class and allocate to the reserves established for remaining Disputed Claims in such Class, Pro Rata, the Cash that has been so reallocated to such Class in accordance with clause (a) of this section. The Debtor, in its reasonable discretion, may increase the amount reserved as to any particular Disputed Claim. Such reserved amounts, collectively, shall constitute the "Disputed Other General Unsecured Claims Reserve".

9.05     Plan Distributions to Holders of Subsequently Allowed Claims. On each Distribution Date (or such earlier date as determined by the Debtor in its sole discretion), the Disbursing Agent will make distributions or payments from the applicable Disputed Claims reserve on account of any Disputed Claim that has become an Allowed Claim since the occurrence of the previous Distribution Date. The Disbursing Agent shall distribute in respect of such newly Allowed Claims the Pro Rata Distributions to which holders of such Claims would have been entitled under this Plan if such newly Allowed Claims were fully or partially Allowed, as the case may be, on the Effective Date, less direct and actual expenses, fees or other direct costs.

9.06     Insurance Preservation and Proceeds. Except with regard to Claims against the Released Parties that are released hereunder, nothing in the Plan shall diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtor or any related Person. Notwithstanding anything to the contrary contained herein, to the extent the Debtor has insurance with respect to an Allowed Claim, such Allowed Claim shall (a) be paid from the proceeds of insurance to the extent that the Claim is insured, and (b) receive the treatment provided for herein to the extent the applicable insurance policy does not provide coverage with respect to any portion of the Allowed Claim. Holders of Claims which are eligible to be

34

satisfied, in whole or in part, through any such policy shall be obligated, as a condition to receiving any Distributions under the Plan, to seek recovery (or, if applicable, assist the Debtor in seeking recovery) under such policies with regard to such Claims.

9.07    Allocation of Plan Distributions Between Principal and Interest.  To the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

9.08    No Recourse.  Notwithstanding that the Allowed amount of any particular Disputed Claim is reconsidered under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules or is Allowed in an amount for which, after application of the payment priorities established by this Plan, there is insufficient value to provide a recovery equal to that received by other holders of Allowed Claims in the respective Class, no Claim holder shall have recourse against the Disbursing Agent, the pre-Effective Date Debtor, the Liquidating Debtor, the Plan Administrator or any of their respective professionals, consultants, officers, directors, employees or members or their successors or assigns, or any of their respective property.  **THE ESTIMATION OF CLAIMS AND THE ESTABLISHMENT OF RESERVES UNDER THE PLAN MAY LIMIT THE DISTRIBUTION TO BE MADE ON INDIVIDUAL DISPUTED CLAIMS, REGARDLESS OF THE AMOUNT FINALLY ALLOWED ON ACCOUNT OF SUCH DISPUTED CLAIMS.**

9.09    Satisfaction of Claims and Interests.  Unless otherwise provided in the Plan or the Confirmation Order, any Distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete settlement and satisfaction of such Allowed Claims.

## ARTICLE X

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

10.01    Rejection or Assumption and Retention or Assignment.

(a)    Assumption or Rejection of Executory Contracts and Unexpired Leases. Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code:

(i)    all executory contracts and unexpired leases of the Debtor shall be deemed to be rejected by the Debtor as of the Effective Date, except for any executory contract or unexpired lease: (x) that previously has been assumed and/or assigned pursuant to an order of the Bankruptcy Court entered prior to the Effective Date; (y) as to which a motion for approval of the assumption and/or assignment of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date; or (z) that is specifically designated as a contract or lease to be assumed and/or assigned by the Debtor.  Any order entered after the Confirmation Date by the Bankruptcy Court, after notice and a hearing, authorizing the rejection of an executory contract or unexpired lease shall cause such rejection to be a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code, as if such relief was granted and such order was entered prior to the Confirmation Date.  All Claims arising from the rejection of executory

35

contracts or unexpired leases, if any, will be treated as Other General Unsecured Claims. Notwithstanding anything herein to the contrary, all compensation and benefits programs shall continue in effect until there are no employees of the Debtor, at which time all compensation and benefit programs shall be deemed terminated.

(ii) notwithstanding anything otherwise herein to the contrary, the Debtor reserves the right, on or prior to the Effective Date, to amend the Cure Schedule, if any, to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, as applicable, rejected, assumed and/or assigned or retained. The Debtor shall provide notice of any amendments to any Cure Schedule to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on any Cure Schedule shall not constitute an admission by the Debtor that such document is an executory contract or an unexpired lease or that the Debtor have any liability thereunder.

(b) Approval of Assumptions and Rejections by Confirmation Order. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumption and assignments, and rejections contemplated by this Plan pursuant to sections 365 and 1123 of the Bankruptcy Code. Notwithstanding anything herein to the contrary, any agreement, obligation, security interest, transaction or similar undertaking that the Debtor believes is not executory or a lease that is later determined by the Bankruptcy Court to be an executory contract or unexpired lease that is subject to assumption or rejection under section 365 of the Bankruptcy Code, shall be subject to assumption or rejection within thirty (30) days of any such determination or such longer period as may be authorized by the Bankruptcy Court.

10.02   Cure of Defaults.

(a) Generally. Except as may otherwise be agreed to by the Debtor and the non-Debtor party to the contract or lease, the Debtor shall cure any and all undisputed monetary defaults under each executory contract or unexpired lease assumed by the Debtor pursuant to the Plan, in accordance with Bankruptcy Code section 365(b) (the "Cure Amount"). Subject to the last sentence of Section 10.02(b) of the Plan, all disputed defaults that are required to be cured shall be cured either within thirty (30) days of the entry of a Final Order determining the amount, if any, of the Debtor's liability with respect thereto, or as may otherwise be agreed to by the parties.

(b) Cure Schedule. With respect to all executory contracts and unexpired leases to which the Debtor is a party, no later than five (5) Business Days prior to the deadline for Ballots to be received in connection with voting to accept or reject the Plan, the Debtors shall file a schedule (the "Cure Schedule"), which may be the Schedule of Assumed Contracts and Leases, setting forth the Cure Amount, if any, for each executory contract and unexpired lease to be assumed and assigned pursuant to Section 10.01 of this Plan, and serve such Cure Schedule on each applicable counterparty. Any party to an executory contract or unexpired lease to which a Debtor is a counterparty that fails to object to the applicable Cure Amount listed on the Cure Schedule within fourteen (14) calendar days of the filing thereof, shall be forever barred, estopped and enjoined from disputing the Cure Amount set forth on the Cure Schedule (including a Cure Amount of $0.00) and/or from asserting any Claim against the pre-Effective

Date Debtor, the Liquidating Debtor and the Plan Administrator arising under section 365(b)(1) of the Bankruptcy Code except as set forth on the Cure Schedule. If, prior to the Confirmation Date, the Debtor identifies additional executory contracts and unexpired leases to which the Debtor is a counterparty that might be assumed or assumed and assigned by the Debtor, the Debtor will promptly file a supplemental Cure Schedule ("Supplemental Cure Schedule") and serve such Supplemental Cure Schedule on each applicable counterparty and each applicable counterparty shall have fourteen (14) calendar days of the filing thereof to object to the applicable Cure Amount set forth on the Supplemental Cure Schedule.

(c)     Objections to Proposed Cure Amount. The non-Debtor parties to such contracts and leases shall have until fourteen (14) calendar days following service of the Cure Schedule (or individualized notice of the Cure Amount) to object (a "Cure Dispute") in writing regarding: (i) the Cure Amount; (ii) the ability of the Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (iii) any other matter pertaining to assumption. The cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the Cure Dispute and approving the assumption. If the Cure Dispute relates solely to the Cure Amount, the Debtor may assume and/or assume and assign the subject contract prior to resolution of such dispute provided that the Debtor reserves Cash in an amount sufficient to pay the full amount asserted by the non-Debtor party to the subject contract (or such other amount as may be fixed or estimated by the Bankruptcy Court). In the event that no objection is timely filed, the applicable party shall be deemed to have consented to the cure proposed by the Debtor (including amounts of compensation for actual pecuniary loss) and shall be forever enjoined and barred from seeking from the Debtor any additional amount on account of the Debtor's cure obligations under section 365 of the Bankruptcy Code. If an objection is timely filed with respect to the Cure Amount proposed by the Debtor for an executory contract or unexpired lease, the Bankruptcy Court shall hold a hearing to determine the amount of any Cure Dispute. Notwithstanding anything otherwise to the contrary, at all times through the date that is thirty (30) days after the entry of a Final Order resolving and fixing the amount of a Cure Dispute, whether such date is before or after the Effective Date, the Debtor shall be authorized to reject such executory contract or unexpired lease by notice to the non-debtor party to such executory contract or unexpired lease. **Any party that fails to object to the applicable Cure Amount listed on the Cure Schedule within fourteen (14) calendar days following service of the Cure Schedule (or individualized notice of the Cure Amount), shall be forever barred, estopped and enjoined from disputing the Cure Amount set forth on the Cure Schedule (including a Cure Amount of $0.00) and/or from asserting any claim against the Debtor arising under section 365(b)(1) of the Bankruptcy Code except as set forth on the Cure Schedule.**

10.03   **Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan. Claims arising out of the rejection of an executory contract or unexpired lease pursuant to Section 10.01 of the Plan must be filed with the Bankruptcy Court and served upon the Debtor no later than thirty (30) days after the later of: (i) notice of entry of an order approving the rejection of such executory contract or unexpired lease; and (ii) notice of occurrence of the Effective Date. All such Claims not filed within such time will be forever barred from assertion against the Debtor and its Estate.**

10.04   <u>Indemnification of Directors, Officers and Employees</u>.  For purposes of the Plan, the obligation of the Debtor to indemnify and reimburse any Person or entity serving at any time on or after the Petition Date as one of its directors, member, officers or employees by reason of such Person's or entity's service in such capacity, or as a director, member, officer or employee of the Debtor or any other company or legal entity, to the extent provided in such Debtor's constituent documents, a written agreement with the Debtor, in accordance with any applicable law, or any combination of the foregoing, shall survive confirmation of the Plan and the Effective Date, remain unaffected thereby, become an obligation of the Liquidating Debtor solely to the extent of available insurance, and not be released, irrespective of whether indemnification or reimbursement is owed in connection with an event occurring before, on, or after the Petition Date.  For the avoidance of doubt, nothing herein shall be construed as the Debtor assuming any obligation with respect to any self-insured retention for which the applicable insurer has the ability to assert a prepetition Claim against the Debtor in accordance with the applicable Bar Date Order or other order of the Court.  On and after the Effective Date, the coverage under any directors' and officers' insurance policies in effect on the Petition Date shall not be terminated or otherwise reduced by or on behalf of the Debtor, and all directors and officers of the Debtor at any time shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Effective Date.

**ARTICLE XI**

**<u>CONDITIONS PRECEDENT</u>**

11.01   <u>Conditions to Confirmation</u>.  The following are conditions precedent to confirmation of the Plan that may be satisfied or waived in accordance with <u>Section 11.03</u> of this Plan:

(a)      the Debtor shall have sufficient Cash on hand to pay in full, or reserve for, the projected Allowed Administrative Expense Claims, Allowed Fee Claims, Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims; and

(b)      the Bankruptcy Court shall have entered the Confirmation Order.

11.02   <u>Conditions Precedent to the Effective Date</u>.  The occurrence of the Effective Date is subject to:

(a)      the Confirmation Order having become a Final Order;

(b)      the operating agreement of the Debtor having been amended or amended and restated as provided in the Plan;

(c)      the Plan Documents having been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Debtor that the Effective Date has occurred) contained therein having been satisfied or waived in accordance therewith; and

38

(d)     One or more of the Non-Debtor Affiliates having paid the Prepetition Lender Fee Claim in an amount no greater than $225,000 as provided in the definition of "Prepetition Lender Fee Claim".

11.03   Waiver of Conditions Precedent and Bankruptcy Rule 3020(e) Automatic Stay.

(a)     The Debtor, with the consent of the Committee, if any, (which shall not be unreasonably withheld, delayed or conditioned), shall have the right to waive one or more of the conditions precedent set forth in Sections 11.01 and 11.02 of the Plan at any time without leave of or notice to the Bankruptcy Court and without formal action other than proceeding with consummation of the Plan.  For the avoidance of doubt, if all conditions precedent of the Plan are satisfied or waived in accordance the immediately preceding sentence, the Effective Date of the Plan as to the Debtor may occur.  If any condition precedent to the Effective Date is waived pursuant to this Section 11.03 and the Effective Date occurs, the waiver of such condition shall benefit from the "mootness doctrine," and the act of consummation of the Plan shall foreclose any ability to challenge the Plan in any court.  Unless otherwise provided herein, any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

(b)     Pursuant to Bankruptcy Rule 3020(e), the Confirmation Order shall be immediately effective upon its entry and shall not be subject to the stay provided in Bankruptcy Rule 3020(e).

## ARTICLE XII

## EXCULPATION, INJUNCTION AND
## RELATED PROVISIONS EFFECT OF CONFIRMATION

12.01   Binding Effect.  This Plan shall be binding and inure to the benefit of the pre-Effective Date Debtor, the Liquidating Debtor, the Plan Administrator, each of the Released Parties, all present and former holders of Claims and Interests, and their respective successors and assigns.

12.02   Vesting of Assets.  On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Estate shall vest in the Debtor, free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as otherwise provided herein or in the Confirmation Order, including with respect to the rights to receive any Distribution hereunder.  On and after the Effective Date, the Debtor may effectuate the wind down of the Estate, including payment of all Wind Down Costs in accordance with the Wind Down Budget, and may use, acquire and dispose of property and prosecute, compromise or settle any Claims (including any Administrative Expense Claims) and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by this Plan or the Confirmation Order.

12.03   **_Release of Claims Against and Interests in the Debtor_**.  **_Upon the Effective Date and in consideration of the Distributions to be made hereunder, except as otherwise provided herein or in the Confirmation Order, each holder (as well as any trustees and agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived and released the Debtor of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date.  Except as otherwise provided herein, upon the Effective Date, all such holders of Claims and Interests and their affiliates shall be forever precluded and enjoined from prosecuting or asserting any such waived and released Claim against or terminated Interest in the Debtor.  Nothing in this Section shall preclude any holder of an Allowed Claim or Interest from receiving the applicable Distribution provided for under the Plan._**

12.04   Term of Pre-Confirmation Injunctions or Stays.  Unless otherwise provided herein, all injunctions or stays arising prior to the Confirmation Date in accordance with sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

12.05   Injunction Against Interference With Plan.  Upon the entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former affiliates, employees, agents, officers, directors, managers, members or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

12.06   **_Injunction_**.

(a)     **_Except as otherwise provided in the Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against or Interests in the Debtor or its Estate are, with respect to any such Claims or Interests, permanently enjoined from:  (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the pre-Effective Date Debtor, the Liquidating Debtor, the Estate, the Plan Administrator, the Released Parties, or any of their respective property; (ii) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtor, the pre-Effective Date Debtor, the Liquidating Debtor, the Estate, the Plan Administrator, the Released Parties or any of their respective property; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the pre-Effective Date Debtor, the Liquidating Debtor, the Estate, the Plan Administrator, the Released Parties; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained herein shall preclude such persons from exercising their rights pursuant to and consistent with the terms of the Plan._**

(b)     *Each holder of an Allowed Claim shall be deemed to have specifically consented to the injunctions set forth herein*.

12.07   *Releases.*

(a)     *Releases by the Debtor.  Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, the Debtor, as debtor in possession, and any person seeking to exercise the rights of the Debtor's Estate, including without limitation, any successor to the Debtor, including the Liquidating Debtor, the Plan Administrator or any representative of the Debtor's Estate appointed or selected pursuant to sections 1103, 1104, or 1123(b)(3) of the Bankruptcy Code or under chapter 7 of the Bankruptcy Code, shall be deemed to forever release and waive all claims (as such term "claim" is defined in section 101(5) of the Bankruptcy Code), obligations, suits, judgments, damages, demands, debts, rights, causes of action (including, but not limited to, the Causes of Action) and liabilities (other than the rights of the Debtor to enforce the Plan and the contracts, instruments, releases and other agreements or documents delivered thereunder) against any Released Party, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on and after December 4, 2020 through and including the Effective Date in any way relating to the Debtor, the Chapter 11 Case, the Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the Debtor or its Estate, whether directly, indirectly, derivatively or in any representative or any other capacity; provided, however, that in no event shall anything in this Section 12.07(a) be construed as a release of any Person's gross negligence or willful misconduct, as determined by a Final Order, for matters with respect to the Debtor and/or their affiliates.*

(b)     *Releases by Holders of Claims.  Except as otherwise provided in the Plan or the Confirmation Order, including Section 12.10 as to Participating Customers, on the Effective Date, (i) each holder of a Claim in a Class entitled to vote on the Plan and (ii) each Released Party (other than the pre-Effective Date Debtor, the Liquidating Debtor and the Plan Administrator), to the fullest extent permissible under applicable law as such law may be extended or interpreted subsequent to the Effective Date, in consideration for the obligations of the Debtor under the Plan, the Distributions under the Plan and other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, will be deemed to have consented to the Plan and the restructuring embodied herein for all purposes and deemed to forever release and waive all claims (as such term is defined in section 101(5) of the Bankruptcy Code) against any and all Released Parties and Participating Customers (solely in each such customer's capacity as such), including but not limited to any claim sounding in law or equity or asserting a tort, breach of any duty or contract, violations of the common law, any federal or state statute, any federal or state securities laws or otherwise, demands, debts, rights, causes of action (including without limitation, the Causes of Action) or liabilities (other than the right to enforce the obligations of any party under the Plan and the contracts, instruments, releases, agreements and documents delivered under or in connection with the Plan), including but not limited any claims for any such loss such holder may suffer, have suffered or be alleged to suffer as a result of the Debtor commencing the Chapter 11 Case or as a result of the Plan being consummated, whether liquidated or*

*unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the pre-Effective Date Debtor, the Liquidating Debtor, the Plan Administrator, the Chapter 11 Case, the Plan or the Disclosure Statement; provided, however, that the foregoing releases shall not apply to any holder of a Claim if such holder "opts out" of the releases provided in this Section 12.07(b) in a timely and properly submitted Ballot; provided, further, that in no event shall anything in this Section 12.07(b) be construed as a release of any Person's gross negligence or willful misconduct, as determined by a Final Order, for matters with respect to the Debtor. For the avoidance of doubt, the only parties that are bound by the releases set forth in this Section 12.07(b) are (a) the Released Parties and (b) holders of Claims in a Class entitled to vote on the Plan that do not "opt out" of the releases provided in Section 12.07(b) of the Plan in a timely and properly submitted Ballot or Customer Release Opt-Out Form in accordance with the terms of the Plan.*

(c) *Notwithstanding anything to the contrary contained herein: (i) except to the extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, the releases provided for in this Section 12.07 of the Plan shall not release any non-Debtor entity from any liability arising under (x) the Internal Revenue Code or any state, city or municipal tax code or (y) any criminal laws of the United States or any state, city or municipality; (ii) the releases set forth in this Section 12.07 shall not release any (x) any claims against any Person to the extent such Person asserts a crossclaim, counterclaim and/or claim for setoff which seeks affirmative relief against the Debtor or any of its officers, directors, or representatives, and (y) claims against any Person arising from or relating to such Person's gross negligence or willful misconduct, each as determined by a Final Order of the Bankruptcy Courts. In addition, for the avoidance of doubt, nothing in the Plan or the Confirmation Order shall constitute a release of the obligations of Griddy VI Holdings LLC under: (1) that certain Note Purchase Agreement, dated as of December 4, 2020, by and between Griddy VI Holdings LLC and Macquarie Investments US Inc.; (2) that certain Convertible Promissory Note, dated as of December 4, 2020, issued by Griddy VI Holdings LLC to Macquarie Investments US Inc.; and (3) that certain Letter Agreement, dated as of December 4, 2020, by and between Griddy VI Holdings LLC and Macquarie Investments US Inc.*

12.08 *Exculpation and Limitation of Liability. None of the pre-Effective Date Debtor, the Liquidating Debtor, the Plan Administrator nor the other Released Parties shall have or incur any liability to any holder of any Claim or Interest for any postpetition act or omission in connection with, or arising out of the Debtor's restructuring, including without limitation the negotiation and execution of the Plan, the Chapter 11 Case, the Disclosure Statement, the Disclosure Statement Supplement, the solicitation of votes for and the pursuit of the Plan (including that solicitation of acceptances of the Plan was not conducted in good faith nor in compliance with the applicable provisions of the Bankruptcy Code), the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, including, without limitation, all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all activities leading to the promulgation and confirmation of the Plan except gross negligence or willful misconduct as*

determined by a Final Order of the Bankruptcy Court. For purposes of the foregoing, it is expressly understood that any act or omission effected with the approval of the Bankruptcy Court conclusively will be deemed not to constitute gross negligence or willful misconduct unless the approval of the Bankruptcy Court was obtained by fraud or misrepresentation. The Debtor and the Released Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities with respect to the Chapter 11 Case, the Plan and the administration thereof.

12.09 *Injunction Related to Releases and Exculpation*. The Confirmation Order shall permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released pursuant to the Plan, including but not limited to the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released under this Article XII of the Plan.

12.10 *Agreement by Holders of Participating Customers; Release of Certain Customer Collections*. Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, (i) each Participating Customer will be deemed to have consented to the Plan and the restructuring embodied herein for all purposes and deemed to accept the Customer Releases as they pertain to such Participating Customer and the Released Parties and (ii) each Released Party will be deemed to accept the Customer Releases as they pertain to such Released Party and the Participating Customers; *provided that, notwithstanding the foregoing, if the Bankruptcy Court does not approve the Customer Releases pursuant to Bankruptcy Rule 9019 through this Plan or otherwise, than each Participating Customer will not have an Allowed Class 5 Claim, the Customer Releases shall not become effective and, solely if such Participating Customer timely and properly filed an unsecured nonpriority proof of claim against the Debtor by the applicable Bar Date in accordance with the applicable Bar Date Order, such Customer Claim shall be classified as an Other General Unsecured Claim and treated for all purposes under this Plan as an Other General Unsecured Claim*. For the avoidance of doubt, if the Customer Releases become effective, each Participating Customer releases and waives all Claims against each of the Released Parties, including, any claim sounding in law or equity or asserting a tort, breach of any duty or contract, violations of the common law, any federal or state statute, any federal or state securities laws, fraud or otherwise, demands, debts, rights, causes of action (including without limitation, the Causes of Action) or liabilities (other than the right to enforce the obligations of any party under the Plan and the contracts, instruments, releases, agreements and documents delivered under or in connection with the Plan), including but not limited any Claims for any such loss such Participating Customer may suffer, have suffered or be alleged to suffer as a result of the Debtor selling electricity to such Participating Customer prior to the Petition Date, the Debtor commencing the Chapter 11 Case or as a result of the Plan being consummated, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the pre-Effective Date Debtor, the Liquidating Debtor, the Plan Administrator, the Chapter 11 Case, the Plan or the Disclosure Statement; *provided*, that, notwithstanding the foregoing, each eligible Participating Customer may assert a Participating Customer Potential Return Claim in a timely and properly filed

*proof of claim form in accordance with the Former Customers Bar Date Order and, solely to the extent each Participating Customer has an Allowed Participating Customer Potential Return Claim, receive its Pro Rata share of (i) the Texas Storm Causes of Action Net Recovery Proceeds, if any, and (ii) any Available Prepetition Lender Contribution, which shall be shared with holders of Allowed Other General Unsecured Claims on a Pro Rata basis and be distributed (Pro Rata) to holders of (a) Allowed Other General Unsecured Claims and (b) Allowed Participating Customer Potential Return Claims.*

12.12    <u>Termination of Subordination Rights and Settlement of Related Claims</u>.  Except as expressly provided herein, the classification and manner of satisfying all Claims and Interests and the respective distributions, treatments and other provisions under the Plan take into account or conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a) and 510(b) of the Bankruptcy Code or otherwise, and any and all such rights are settled, compromised and released pursuant to the Plan.  The Confirmation Order shall permanently enjoin, effective as of the Effective Date, all Persons and entities from enforcing or attempting to enforce any such contractual, legal and equitable rights satisfied, compromised and settled pursuant to the Plan.  Any disagreement with the priorities or distributions set forth in the Plan or any right to assert contractual subordination shall be raised on or prior to the deadline to object to the Plan, and decided at or prior to the Confirmation Hearing, and all issues with respect to contractual subordination not raised or resolved at the Confirmation Hearing shall be governed pursuant to the Plan or, if the decision of the Bankruptcy Court at the Confirmation Hearing differs from the Plan, then such decision shall govern.

12.13    <u>Retention of Causes of Action/Reservation of Rights</u>.  Except with respect to the Released Parties or any other beneficiary of the releases, injunctions, and exculpations contained in this Article XII, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims or Causes of Action, right of setoff, or other legal or equitable defense that the Debtor had immediately prior to the Effective Date, on behalf of the Estate or of itself in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law.  The Debtor shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or other legal or equitable defenses which the Debtor had immediately prior to the Petition Date as fully as if the Chapter 11 Case had not been commenced, and all of the Debtor's legal and/or equitable rights respecting any Claim may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Case had not been commenced.  Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the Debtor shall have the exclusive right to institute, prosecute, abandon, settle, or compromise all Causes of Action (excluding those Causes of Action released pursuant to this <u>Article XII</u>), in its sole discretion and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in the Chapter 11 Case.

12.14    <u>Releases of Liens</u>.  Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, in consideration for the Distributions granted hereunder, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against property of any of the Estate shall be fully

released and deemed satisfied and all of the right, title and interest of any holder of such mortgages, deeds of trust, liens, pledges or other security interest shall revert to the Debtor. On the Effective Date, the holder of each such mortgage, deed of trust, lien, pledge or other security interest against property of the Estate shall be deemed to have appointed the Debtor as agent to such holder for the purpose of filing and recording all releases with respect to each such mortgage, deed of trust, lien, pledge or other security interest held against property of the Estate.

## ARTICLE XIII

## RETENTION OF JURISDICTION

13.01 <u>Scope of Bankruptcy Court Jurisdiction</u>. On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction, pursuant to 28 U.S.C. § 1334, over all matters arising in, arising under, or related to the Chapter 11 Case for, among other things, the following purposes:

(a) To hear and determine pending applications for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases and the allowance of Cure Amounts, if any, and Claims resulting therefrom or from the assumption, assumption and assignment or rejection of executory contracts or unexpired leases pursuant to this Plan;

(b) To hear and determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date and to order appropriate relief in connection therewith (including issuance and/or enforcement of releases);

(c) To consider and resolve any disputes arising from or relating to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004, or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d) To consider and resolve any Claims or Interests, or the allowance, classification, priority, compromise, estimation, or payment of any Claim or Interest;

(e) To consider and resolve any matters arising from or related to the Plan Administrator Agreement;

(f) To ensure that Plan Distributions to holders of Allowed Claims are accomplished as provided herein;

(g) To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(h) To issue such orders in aid of execution and consummation of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(i) To consider any amendments to, or modifications of, the Plan and the Plan Supplement, and any dispute or controversy relating to execution, delivery or compliance with

any document included in the Plan Supplement, and to cure any defect or omission, or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

        (j)      To hear and determine all Fee Claims;

        (k)      To resolve disputes concerning any reserves, including with respect to Disputed Claims, cure disputes, if any, or the administration thereof;

        (l)      To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

        (m)      To recover all assets and property of the Debtor, wherever located;

        (n)      To hear and determine matters concerning state, local, and federal taxes, including as provided by sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of tax under section 505(b) of the Bankruptcy Code);

        (o)      To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan;

        (p)      To hear any other matter not inconsistent with the Bankruptcy Code; and

        (q)      To a final decree closing the Chapter 11 Case.

# ARTICLE XIV

## MISCELLANEOUS PROVISIONS

    14.01   <u>Effectuating Documents and Further Transactions</u>.  The Debtor is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to this Plan.

    14.02   <u>Corporate Action</u>.  On the Effective Date, all matters provided for under this Plan that would otherwise require approval of the equity security holders, directors, members, managing members or managers of the Debtor, including (a) the effectiveness of the certificates of incorporation and operating agreement of the Debtor and (b) the election or appointment, as the case may be, of directors, managers and/or officers of the Debtor, shall be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to Section 303 of the Delaware General Corporation Law, without any requirement of further action by the equity holders, directors, members, managing members or managers of the Debtor.  On the Effective Date, or as soon thereafter as is practicable, the Debtor shall, if required, file its certificate of incorporation with the Secretary of State of Delaware, in accordance with the applicable general corporation law of such state.

14.03   Exemption from Transfer Taxes.  To the fullest extent permitted by applicable law, any transfer or encumbrance of assets or any portion(s) of assets pursuant to, or in furtherance of, or in connection with the Plan shall constitute a "transfer under a plan" within the purview of section 1146(a) of the Bankruptcy Code and shall not be subject to transfer, stamp or similar taxes.

14.04   Payment of Statutory Fees; Post Confirmation Reporting.

(a)   Payment of Statutory Fees. On the Effective Date, and thereafter as may be required, the Debtor shall pay all fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code, together with interest pursuant to section 31 U.S.C. 3717, if any, through the entry of a final decree closing and/or dismissing its Chapter 11 Case, or an order converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

(b)   Post-Confirmation Reporting.  After the Effective Date, in accordance with the Guidelines established by the United States Trustee, the Debtor will file quarterly operating reports with Bankruptcy Court until entry of a final decree in the Chapter 11 Case.

14.05   Disallowance of Existing Securities Law Claims.  On the Effective Date, any and all Existing Securities Law Claims shall be deemed Disallowed and expunged in their entirety under and pursuant to this Plan without further order of the Bankruptcy Court or any action being required on the part of the Debtor.

14.06   Post-Effective Date Fees and Expenses.  From and after the Effective Date, the Debtor shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professional Persons thereafter incurred by the Debtor, including those fees and expenses incurred in connection with the implementation and consummation of this Plan and the Plan Administrator Expenses.

14.07   Amendment or Modification of this Plan.  Alterations, amendments, or modifications of or to the Plan (including to provide for treatment different than that set forth herein with respect to any class of Claim or Interest, including establishment of subclasses of Classes of Claims or Interests to the extent required if so elected by the Debtor, the unimpairment of Classes that are impaired hereunder, and the impairment of Classes that are unimpaired hereunder) may be proposed in writing by the Debtor at any time prior to the Confirmation Date, provided that the Plan, as altered, amended, or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtor shall have complied with section 1125 of the Bankruptcy Code.  This Plan may be altered, amended, or modified at any time after the Confirmation Date and before substantial consummation, provided that this Plan, as altered, amended, or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended, or modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments, or modifications.  A holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim or Interest of such holder.

14.08 <u>Revocation or Withdrawal of this Plan</u>. The Debtor reserves the right to revoke or withdraw the Plan prior to the Effective Date in whole or in part. If the Debtor revokes or withdraws the Plan prior to the Effective Date, then except as set forth in this Section 14.08 of the Plan, the Plan shall be deemed null and void. In the event of any such waiver or revocation, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Debtor or any other Person or to prejudice in any manner the rights of the Debtor or any Person in any further proceedings involving the Debtor.

14.09 <u>Termination of Professionals</u>. On the Effective Date, the engagement of each Professional Person retained by the Debtor or the Committee shall be terminated without further order of the Bankruptcy Court or act of the parties; <u>provided</u>, <u>however</u>, such Professional Persons shall be entitled to prosecute their respective Fee Claims and represent their respective constituents with respect to applications for payment of such Fee Claims and the Debtor shall be responsible for the fees, costs and expenses associated with such Fee Claims. Nothing herein shall preclude the Debtor from engaging a Professional Person on and after the Effective Date in the same capacity as such Professional Person was engaged prior to the Effective Date.

14.10 <u>Dissolution of any Committee</u>. Subject to the proviso in Section 14.09 of this Plan, the functions of any Committee shall terminate on the later of: (i) the Effective Date; and (ii) the conclusion of any appeals with respect to the Confirmation Order or an Omnibus Claims Objection that any Committee is a party to (but such functions shall relate solely to services performed related to such appeal), and any Committee shall be deemed dissolved as of such date and shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Case.

14.11 <u>Confirmation Order</u>. The Confirmation Order shall, and is hereby deemed to, ratify all transactions effected by the Debtor during the period commencing on the Petition Date and ending on the Confirmation Date except for any acts constituting willful misconduct, gross negligence, recklessness or fraud.

14.12 <u>Severability</u>. If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

14.13 <u>Inconsistency</u>. In the event of any inconsistency among or between any of the Plan, the Disclosure Statement, the Plan Documents, any exhibit to the Plan or any other instrument or document created or executed pursuant to the Plan, the provisions of the Plan shall govern. The Confirmation Order shall govern all of the foregoing.

48

14.14 <u>Governing Law</u>.  Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit or schedule hereto or in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to any contrary result otherwise required under applicable choice or conflict of law rules.

14.15 <u>Binding Effect</u>.  The Plan shall be binding upon and inure to the benefit of the Debtor, the holders of Claims and Interests, and their respective successors and assigns.

14.16 <u>Exhibits/Schedules</u>.  All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein.

14.17 <u>Filing of Additional Documents</u>.  On or before substantial consummation of the Plan, the Debtor shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any such agreements or other documents relating specifically to the terms and conditions of the Plan.

14.18 <u>Notices</u>.  All notices, requests, and demands to or upon the Debtor to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

**Griddy Energy LLC**
c/o Stretto
410 Exchange, Suite 100
Irvine, CA 92602
-and-

**Baker Botts LLP**
Robin Spigel
Chris Newcomb
30 Rockefeller Plaza
New York, New York 10112
Telephone: (212) 408-2500
Facsimile: (212) 408-2501

*Counsel for the Debtor and Debtor in Possession*

14.19   Reservation of Rights.  Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of this Plan, any statement or provision contained herein, or the taking of any action by the Debtor with respect to this Plan shall be or shall be deemed to be, an admission or waiver of any rights of the Debtor with respect to any Claims or Interests prior to the Effective Date.

Dated:  May 26, 2021

Respectfully submitted,

GRIDDY ENERGY LLC

By: */s/  Michael Fallquist*
Name:  Michael Fallquist
Title:   Chief Executive Officer

## **Exhibit B**

**Unaudited Liquidation Analysis**

# LIQUIDATION ANALYSIS

### *Projected as of July 15, 2021*

> **NOTHING CONTAINED IN THE FOLLOWING LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTOR. THE ESTIMATED AMOUNT OF ALLOWED CLAIMS AND INTERESTS SET FORTH HEREIN ARE FOR PURPOSES OF THIS LIQUIDATION ANALYSIS ONLY AND SHOULD NOT BE RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING ANY DETERMINATION OF THE VALUE OF ANY DISTRIBUTION TO BE MADE ON ACCOUNT OF ALLOWED CLAIMS AND INTERESTS UNDER THE PLAN. THE ACTUAL AMOUNT OF ALLOWED CLAIMS AND INTERESTS IN THIS CHAPTER 11 CASE COULD DIFFER MATERIALLY FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.**

Introduction

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to confirmation of the Plan, that each holder of a Claim or Interest in each Impaired Class: (i) has accepted the Plan; or (ii) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Person would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the Bankruptcy Court must: (1) estimate the cash proceeds (the "Net Estimated Liquidation Proceeds") that a chapter 7 trustee would generate if the Debtor's Chapter 11 Case was converted to a chapter 7 case on the Effective Date and the assets of such Debtor's estate were liquidated; (2) determine the distribution (the "Estimated Recovery Under Liquidation") that each non-accepting holder of a Claim or Interest would receive from the Net Estimated Liquidation Proceeds under the priority scheme dictated in chapter 7; and (3) compare each holder's Estimated Recovery Under Liquidation to the distribution under the Plan that such holder would receive if the Plan were confirmed and consummated.

Asset values discussed herein may be different than amounts referred to in the Plan. The Liquidation Analysis is based upon certain assumptions discussed herein and in the Disclosure Statement. Asset values discussed herein may be different than amounts referred to in the Plan.

Significant Assumptions

Hypothetical recoveries to creditors and equity holders of the Debtor in chapter 7 were determined through multiple steps, as set forth below.

The basis of the Liquidation Analysis is the Debtor's projected cash balance and assets as of July 15, 2021 (the "Conversion Date").  It is assumed that the Debtor will terminate remaining employees and cease the maintenance and operation of all non-critical network and systems on that date in both a chapter 7 and chapter 11 scenario in order to minimize costs associated with the wind down and liquidation.  It is further assumed that each of a chapter 7 trustee and the Plan Administrator would want to hire approximately 5 pre-Conversion Date employees, to the extent such employees would be available, at an hourly rate to assist the trustee or Plan Administrator in accessing and utilizing the Debtor's customer and financial records.

In the event of a conversion to chapter 7, the Debtor assumes that the Prepetition Secured Lenders would assert that all of the Debtor's assets are subject to their liens.  In addition, in either a chapter 7 or chapter 11 scenario, any amounts in excess of amounts necessary to satisfy the Debtor's obligations to the Prepetition Secured Lenders or that are not otherwise subject to liens would first satisfy any amounts attributable to administrative expense claims, which must be paid in full before any prepetition unsecured creditors may receive any recovery.

For the purposes of the Liquidation Analysis, the Debtor has attempted to ascribe value to the assets and liabilities of the Debtor as they would be liquidated by a chapter 7 trustee and the professionals retained by the trustee.  Where applicable, asset recoveries below are shown net of the costs associated with achieving those recoveries. The statements in the Liquidation Analysis, including estimates of Allowed Claims, were prepared solely to assist the Bankruptcy Court in making the findings required under section 1129(a)(7) of the Bankruptcy Code and they may not be used or relied upon for any other purpose.

THE DEBTOR BELIEVES THAT ANY ANALYSIS OF A HYPOTHETICAL CHAPTER 7 LIQUIDATION IS NECESSARILY SPECULATIVE.  THERE ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS UNDERLYING THE LIQUIDATION ANALYSIS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTOR OR A CHAPTER 7 TRUSTEE.  NEITHER THE LIQUIDATION ANALYSIS, NOR THE FINANCIAL INFORMATION ON WHICH IT IS BASED, HAS BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.  THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS WILL NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS PRESENTED IN THE LIQUIDATION ANALYSIS.

Summary Notes to Liquidation Analysis

1. *Dependence on assumptions*. The Liquidation Analysis is based on a number of estimates and assumptions that, although developed and considered reasonable by management and

the Debtor's advisors, are inherently subject to significant economic, business, legal, regulatory and competitive uncertainties and contingencies beyond the control of the Debtor. Accordingly, there can be no assurance that the values reflected in this Liquidation Analysis would be realized if the Debtor was, in fact, to undergo such a liquidation and actual results could vary materially and adversely from those contained herein.

2. *Accounts Receivable*. As of the Petition Date, the Debtor had on its books accounts receivable from former customers relating to the Debtor's retail electric provider business in excess of $29.1 million. The Debtor ceased business operations prior to the Petition Date and has not sought to collect such receivables during the Chapter 11 Case.

In a chapter 11 liquidation, the Plan would release former customer receivable balances to the extent such customers do not opt out of the Customer Releases. However, the Debtor is unable to project how many and which customers will opt out of the Customer Releases or the corresponding aggregate amounts owed by such former customers. Additionally, eligible former customers subject to the Customer Releases would have Allowed Participating Customer Potential Return Claims in the amount of their applicable Participating Customer Potential Return if they timely and properly file proofs of claim for such amount. The Debtor is unable to predict how many and which customers will assert such claims or the corresponding aggregate amounts. Alternatively, any former customer that opts out of the Customer Releases would have the opportunity to assert claims against the Debtor, but the Debtor does not know and cannot predict the amount, type or probability of success of any such claims. Overall, the Debtor believes that the net amount of receivables that could be collected by the Plan Administrator in a chapter 11 liquidation is too speculative to project.

In a chapter 7 liquidation, former customers' receivable balances would not be released and such claims could be pursued by the chapter 7 trustee or sold to a collection agency. However, the Debtor is currently the defendant in an action by the Attorney General for the State of Texas, part of which seeks injunctive relief from the pursuit of collection from customers, and it is unclear whether the Attorney General would seek through that action or otherwise to enjoin or limit the collection of the receivables owed to the Debtor by its former customers. Although the Debtor does not believe that the action has any merit, at a minimum, the Debtor believes that there would be litigation over whether the chapter 7 trustee could pursue such collections, which could be expensive and protracted. Further, because the mutual Customer Releases in the Plan would not apply, former customers would be free to assert claims against the Debtor for, among other things, amounts collected during the winter storm at elevated prices. Although the Debtor believes such claims will not or are not likely to succeed, the costs of defending such claims, while impossible to estimate given the uncertain number of claimants, could be significant. The

Debtor believes that such unknown costs and the potential costs and difficulty of collecting receivables from former customers makes any net recovery from such receivables by the chapter 7 trustee too speculative to project.

As a result, for purposes of the Liquidation Analysis, the Debtor has not included any estimated recoveries on account of accounts receivable in either a chapter 7 liquidation or chapter 11 liquidation.

3. *Preference and Fraudulent Transfer Claims.* No recovery or related litigation costs have been attributed to any potential fraudulent transfer or preference causes of action under the Bankruptcy Code. The Debtor was solvent until some point during the course of the winter storm event in mid-February 2021. Therefore, no such claims related to transfers made prior to that period of time would exist. A thorough avoidance action analysis for Liquidation Analysis purposes, however, has not been conducted by the Debtor. Additionally, the Debtor believes that there would be no difference in the viability of any fraudulent transfer or preference causes of action that may exist or the amount of recoveries therefrom in a chapter 7 or chapter 11 scenario and, accordingly, the Debtor does not believe that such causes of action would have a material effect on the Liquidation Analysis for purposes of section 1129(a)(7) of the Bankruptcy Code.

4. *Other Causes of Action.* The Debtor may have additional causes of action against third parties, including ERCOT. However, the Debtor believes that the amount of any potential recoveries from such causes of action are too speculative to project at this time. In any event, the Debtor believes that the probability of success and potential amount of recovery will be substantially similar regardless of whether such causes of action are pursued in a chapter 7 or chapter 11. Based on its investigation and consultation with its advisors, the Debtor does not believe there to be any viable causes of action against the Released Parties. The Debtor has therefore not ascribed any value to recovery from, nor included any costs related to, any causes of action pursued in a chapter 7 liquidation or chapter 11 liquidation for purposes of the Liquidation Analysis.

Because the Debtor believes recovery with respect to causes of action are too speculative to project and has not included such recoveries in the Liquidation Analysis, the Debtor has also not accounted for any costs of pursuing such causes of action in either a chapter 7 or chapter 11 scenario. The Debtor anticipates that such costs would only be incurred in the event that the chapter 7 trustee or Plan Administrator, as applicable, believed recoveries were likely and that any costs would be paid for from such recoveries.

In addition, for purposes of this Liquidation Analysis, the claims reconciliation process excludes any objection to any claim filed by ERCOT in both chapter 11 and chapter 7,

which the Debtor assumes will be included as part of any action against ERCOT by both the Plan Administrator and the chapter 7 trustee, as applicable.

5. *Dependence on a forecasted balance sheet.* This Liquidation Analysis is dependent on a forecasted balance sheet and the Debtor's current best estimates with respect to forecasted balances, based on the Debtor's legal and financial review. Forecasted balances could vary from the Debtor's estimates and additional legal or financial analysis, as well as litigation and other unanticipated expenses prior to the Conversion Date, could cause the Debtor's estimates to vary materially and adversely from those contained herein.

6. *Claims Estimates*. Unless otherwise noted, claims are estimated based upon accounts payables balances and real property lease or other agreements as of March 15, 2021.

7. *Distribution of Net Proceeds.* Upon satisfaction of the Prepetition Lender Claim, distributions of remaining assets would be paid in accordance with the priority scheme provided in the Bankruptcy Code.

**Conclusion: The Debtor has determined, as summarized in the following analysis, that confirmation of the Plan will provide all creditors with a recovery (if any) that is not less than what they would otherwise receive pursuant to a liquidation of the Debtor under chapter 7 of the Bankruptcy Code.**

The following Liquidation Analysis should be reviewed with the accompanying notes.

|  | Chapter 7 Proceeds | | | Chp 11 Proceeds |
| --- | --- | --- | --- | --- |
|  | Book Value | Proceeds | % of BV | Proceeds |
| Cash Accounts | $2,353,953 | $2,353,953 | 100% | $2,353,953 |
| Prepayments | $200,490 | $0 | 0% | $0 |
| Plant, Property & Equipment | $0 | $0 | - | $0 |
| Intangible Assets | $0 | $0 | - | $0 |
| Goodwill | $0 | $0 | - | $0 |
| Other long-term assets | $0 | $0 | - | $0 |
| Investment in subsidiaries | $0 | $0 | - | $0 |
| **Net estimated liquidation proceeds** | **$2,554,443** | **$2,353,953** | **92%** | **$2,353,953** |

|  | Chapter 7 Proceeds | | | Chapter 11 Proceeds | | |
| --- | --- | --- | --- | --- | --- | --- |
|  | Claims | Recovery | % | Claims | Recovery | % |
| Chapter 7 Administrative Claims | $303,869 | $151,512 | 50% |  |  |  |
| Chapter 11 Administrative Claims | $887,571 | $0 | 0% | $887,571 | $887,571 | 100% |
| Chapter 11 Wind-down Costs |  |  |  | $118,832 | $118,832 | 100% |
| Priority Tax Claims | $0 | $0 | - | $0 | $0 | - |
| Class 1:Prepetition Lender Claims | $2,202,441 | $2,202,441 | 100% | $324,800 | $324,800 | 100% |
| Class 2: Other Secured Claims | $0 | $0 | - | $0 | $0 | - |
| Class 3: Priority Non-Tax Claims | $0 | $0 | - | $0 | $0 | - |
| Class 4: Other General Unsecured Claims | $33,057,800 | $0 | 0% | $33,057,800 | $827,501 | 3% |
| Class 5: Customer Claims | $0 | $0 | - | $7,800,000 | $195,249 | 3% |
| Class 6: Intercompany Claims | $4,582 | $0 | 0% | $4,582 | $0 | 0% |
| Class 7: Existing HoldCo Interests | $0 | $0 | - | $0 | $0 | - |
| Class 8: Parent Interests | $0 | $0 | - | $0 | $0 | - |
| **Total Recoveries** | **$36,456,263** | **$2,353,953** |  | **$42,193,585** | **$2,353,953** |  |

## Detailed Assumptions

### *Asset Recovery Estimates*

Asset recovery estimates presented in this Liquidation Analysis are based on the Debtor's projected balance sheet for July 15, 2021. When assets could not be projected, March 15, 2021 balances were used as noted.

(a) <u>Cash Accounts:</u> The cash balances at July 15, 2021 are based on projections prepared by management and are reflective of cash on hand in the Debtor's bank accounts at the exit of bankruptcy, before payment of priority administrative professional fees and wage claim expenses, if applicable.

(b) <u>Prepayments</u>: This amount represents prepaid expenses, such as retainers, as of the Petition Date, which are assumed to have no recovery under both a chapter 7 liquidation and chapter 11 liquidation.

(c) <u>Goodwill and Intangibles:</u> The Debtor does not ascribe any value to Goodwill or Intangibles in either a chapter 11 or chapter 7 liquidation scenario.

### *Other Items*

The Debtor has reviewed off balance sheet items for other potential recoveries in the context of a liquidation, including assignment of contracts (other than customer contracts) and the sale of Debtor's former customer list. However, management believes (i) the Debtor's contracts have no material value in either a chapter 7 or chapter 11 liquidation and (ii) putting aside potential legal issues with respect to such sale, the Debtor does not believe that a residential customer list has material value and the costs required to retain a consumer privacy ombudsman as well as market and consummate a sale of the Debtor's list of former customers would exceed the proceeds of such a sale.

### *Claims/Interests*

(a) <u>Chapter 7 Administrative Claims:</u> The "Chapter 7 Administrative Claims" include amounts that would be incurred in connection with the chapter 7 trustee resolving claims and distributing the Debtor's remaining funds to holders of allowed claims. The chapter 7 trustee would be required to review, reconcile and, if appropriate, object to claims received from the Debtor's numerous former customers, all of which could conceivably assert claims against the estate. Because of the large number of potential customer claims, the Liquidation Analysis assumes that the claim reconciliation process would take 6

months and estimates costs of legal and financial professionals and former employees retained to assist the chapter 7 trustee in the aggregate amount of $35,000 per month. Additionally, the Chapter 7 Administrative Claims includes estimated chapter 7 trustee fees based on the permitted amounts set forth in 11 U.S.C. § 326(a). This estimate is highly speculative and could vary significantly.

(b) <u>Chapter 11 Administrative Claims</u>: The "Chapter 11 Administrative Claims" consist of estimated Debtor and Committee professional fees and holdbacks that were unpaid as of the Conversion Date. The estimates provided for in the Liquidation Analysis assume the absence of litigation. Further, the Chapter 11 Wind Down Costs include quarterly fees payable to the United States Trustee incurred during the Chapter 11 Case. Additionally, although certain parties have filed proofs of claim asserting that all or a portion of their claims are entitled to administrative expense priority, the Debtor does not believe that any such claims would be properly classified as Administrative Expense Claims and the Liquidation Analysis therefore assumes that such Claims will be reclassified as Other General Unsecured Claims. The Chapter 11 Administrative Claims will be satisfied before claims of unsecured creditors.

(c) <u>Chapter 11 Wind Down Costs</u>: The "Chapter 11 Wind Down Costs" include amounts that would be incurred in connection with the Plan Administrator resolving claims and distributing the Debtor's remaining funds to holders of allowed claims. Because the Debtor believes that a significant percentage of the Debtor's former customers would be subject to the Customer Releases and their Allowed Participating Customer Potential Return Claims would be allowed in the amount of the Participating Customer Potential Return if the eligible former customer timely and properly files a proof of claim by the applicable Bar Date in accordance with the applicable Bar Date Order, the claims reconciliation process would be less complex and lengthy than the process in a chapter 7 liquidation. The Liquidation Analysis therefore assumes that the claims reconciliation process would take 2 months and estimates costs of legal and financial professionals and former employees retained to assist the Plan Administrator in the aggregate amount of $35,000 per month. The Chapter 11 Wind Down Costs also include the monthly fees of the Plan Administrator. The amount of such fees will be subject to negotiation between the Plan Administrator and the Debtor and could vary significantly. Further, the Chapter 11 Wind Down Costs include quarterly fees payable to the United States Trustee.

(d) <u>Priority Tax Claims</u>: Reflects preliminary estimated unpaid prepetition and postpetition tax claims as of the Conversion Date.

(e) <u>Prepetition Lender Claims</u>: For purposes of a chapter 7 liquidation, Prepetition Lender Claims are estimates and made up of the balance of the obligations owed as of the Petition Date under the Macquarie Agreements and assume calculation of postpetition interest at

the default rate specified in the Prepetition Secured Agreements. For purposes of a chapter 11 liquidation, the Prepetition Secured Lender Claims are estimated consistent with their treatment in the Plan, including that (i) the Prepetition Secured Lenders will forego their entire distribution on account of outstanding principal and interest under the Prepetition Secured Agreements to the Debtor's Estate and (ii) the Debtor's obligation to pay the fees and expenses incurred by the Prepetition Secured Lenders or the Collateral Agent under the Prepetition Secured Agreements will be limited in amount and scope. For both the chapter 7 and chapter 11 scenarios, the Liquidation Analysis assumes that the outstanding letter of credit is drawn and the amount thereof, along with additional amounts for related fees and interest, are paid by the Debtor.

(f) <u>Other Secured Claims</u>: The Debtor is not aware of any Other Secured Claims.

(g) <u>Priority Non-Tax Claims</u>: No Priority Non-Tax Claims have been identified.

(d) <u>Other General Unsecured Claims</u>: For purposes of the Liquidation Analysis, the Debtor and its advisors estimate that there will be between $3.7 million and $33.1 million of Other General Unsecured Claims in either a chapter 7 or chapter 11 liquidation scenario. This amount excludes any Claims of former customers. For purposes of the Liquidation Analysis, the Debtor has used the high end of this range. All amounts are estimates and the actual claims could be higher or lower. The Debtor reserves all rights to object to any claim.

(h) <u>Customer Claims</u>: In a chapter 11 liquidation, former customers that do not opt out of the Customer Releases provided for under the Plan would have Allowed Participating Customer Potential Return Claims against the Debtor in the total amount such customer paid the Debtor for electricity consumed during the period from February 13, 2021 through February 19, 2021, as reflected on the Debtor's books and records, less any amounts such customer successfully disputed and received a full or partial refund from the customer's credit card company, if they timely and properly file a proof of claim for such amount by the applicable Bar Date in accordance with the applicable Bar Date Order. The Debtor is unable to predict how many and which former customers will opt out of the Customer Releases or how many that do not opt out would actually assert such Allowed Participating Customer Return Claims and, correspondingly, the amount of such claims. For purposes of the Liquidation Analysis, the Debtor estimates that there will be between $0 and $15.6 million of such Allowed Participating Customer Return Claims and have used the midrange for estimating recovery in a chapter 11.

Under the Plan, the holders of Allowed Participating Customer Potential Return Claims will share pro rata in (x) any Texas Storm Causes of Action Net Recovery Proceeds, (y) any

Available Prepetition Lender Contribution, and (z) any Settlement Deficiency. Such holders would not receive any other distributions under the Plan. The Debtor believes ascribing any value to the Texas Storm Causes of Action Net Recovery Proceeds to be too speculative Additionally, the Settlement Deficiency would only be distributed to holders of Allowed Participating Customer Potential Return Claims to the extent that the amount distributed to holders of such claims from any PUCT Settlement is less than $500,000. The Debtor assumes for purposes of the Liquidation Analysis that the proceeds distributed from any PUCT Settlement, which the Debtor anticipates will occur without the involvement of the Debtor or its Estate, will not be less than $500,000.

While (a) former customers that opt out of the Customer Releases under the Plan in a chapter 11 liquidation and all former customers in a chapter 7 liquidation would be able to assert claims against the Debtor seeking the return of the amount the customer paid for electricity during the period from February 13, 2021 through February 19, 2021 and on other theories and (b) such former customer claimants would also, if such claims were allowed, be permitted to receive pro rata distributions with respect to all of the estate's property, rather than just any Texas Storm Causes of Action Net Recovery Proceeds, any Available Prepetition Lender Contribution, and any Settlement Deficiency, the Debtor does not believe that former customers have any viable claims against the Debtor and, accordingly, does not believe that any such claims will be allowed. Accordingly, the Debtor has not included any amount with respect to such claims by former customers in the Liquidation Analysis as Customer Claims in a chapter 7 scenario or Other General Unsecured Claims in either a chapter 7 or chapter 11 scenario.

(i) <u>Intercompany Claims</u>: Intercompany claim amounts are *de minimus* and recoveries are based on the success of Causes of Action and subject to payment of all Claims (other than Intercompany Claims) and Wind Down Costs in accordance with the Wind Down Budget and, for purposes of this Liquidation Analysis, are assumed to be zero in both chapter 7 and chapter 11 liquidation scenarios.

(j) <u>Existing HoldCo Interests</u>: For the purposes of this Liquidation Analysis, recoveries for Existing HoldCo Interests are based on the success of Causes of Action and subject to payment of all Claims and Wind Down Costs in accordance with the Wind Down Budget and, for purposes of this Liquidation Analysis, are estimated at zero in both chapter 7 and chapter 11 liquidation scenarios.