# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| GRIDDY ENERGY LLC, [1] | ) | Case No. 21-30923 (MI) |
|  | ) |  |
| Debtor. | ) | **Relates to Docket No. 311** |
|  | ) |  |

## NOTICE OF FILING OF PLAN SUPPLEMENT FOR
## MODIFIED THIRD AMENDED PLAN OF LIQUIDATION FOR
## <u>GRIDDY ENERGY LLC UNDER CHAPTER 11 OF THE BANKRUPTCY CODE</u>

**PLEASE TAKE NOTICE** that, Griddy Energy LLC, as debtor in possession in the above-captioned chapter 11 case (the "<u>Debtor</u>"), hereby files this plan supplement (the "<u>Plan Supplement</u>") in support of the *Modified Third Amended Plan of Liquidation for Griddy Energy LLC Under Chapter 11 of the Bankruptcy Code* [Docket No. 311] (as may be amended, supplemented, or otherwise modified from time to time, the "<u>Plan</u>"),[2] filed in the above-captioned chapter 11 case (this "<u>Chapter 11 Case</u>") on May 26, 2021.

**PLEASE TAKE FURTHER NOTICE** that, on May 26, 2021, the United States Bankruptcy Court for the Southern District of Texas (the "<u>Bankruptcy Court</u>") entered an order [Docket No. 308] (the "<u>Conditional Disclosure Statement Order</u>"): (a) conditionally approving the adequacy of the *Disclosure Statement for Modified Third Amended Plan of Liquidation for Griddy Energy LLC Under Chapter 11 of the Bankruptcy Code* [Docket No. 312] (the "<u>Disclosure Statement</u>") for solicitation of votes on the Plan; (b) approving the notice of the combined hearing to consider approval of the Disclosure Statement on a final basis and confirmation of the Plan; (c) approving the solicitation and notice procedures with respect to confirmation of the Plan; (d) approving the form of ballots and notices in connection therewith; and (e) approving the scheduling of certain dates with respect to solicitation and confirmation of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, as contemplated by the Plan and the Conditional Disclosure Statement Order, the Plan Supplement includes certain draft documents to be executed, delivered and/or performed in connection with the consummation of the Plan on the Effective Date, in each case as may be modified, amended or supplemented from time to time:

- Exhibit A    Plan Administrator Agreement
- Exhibit B    Second Amended and Restated Limited Liability Company Agreement of Griddy Energy LLC

---

[1]  The last four digits of its federal tax identification number of the Debtor are 1396.  The mailing address for the Debtor is PO Box 1288, Greens Farms, CT 06838.

[2]  Capitalized terms not otherwise defined herein have the meanings given to them in the Plan.

- Exhibit C    Amended and Restated Intellectual Property License Agreement
- Exhibit D    Consulting Agreement
- Exhibit E    Schedule of Retained Causes of Action
- Exhibit F    Customer Opt-Out Form
- Exhibit G    Members of Oversight Committee

**PLEASE TAKE FURTHER NOTICE** that the documents attached as <u>Exhibits A</u> through <u>G</u> hereto are current drafts and remain subject to continuing negotiations in accordance with the terms of the Plan and the final versions may contain material differences from the versions filed herewith.

**PLEASE TAKE FURTHER NOTICE** that the Debtor reserves the right, subject to the terms and conditions set forth in the Plan, to add additional documents to the Plan Supplement or to alter, amend, modify or supplement any document in the Plan Supplement on or before the Effective Date of the Plan, or any such other date as may be permitted by order of the Bankruptcy Court; <u>provided</u> that if any document in the Plan Supplement is altered, amended, modified or supplemented in any material respect prior to the hearing to consider confirmation of the Plan, the Debtor will file a blackline of such document with the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that copies of the Plan Supplement can be obtained (a) for a fee through the Bankruptcy Court's electronic case filing system at <u>https://ecf.txsb.uscourts.gov</u> or (b) free of charge on the website maintained by the Debtor's noticing and claims agent at <u>http://cases.stretto.com/Griddy</u>.

*[The Remainder of this Page is Intentionally Blank.]*

Dated: June 18, 2021

Respectfully submitted,

**BAKER BOTTS L.L.P.**

By: */s/ Chris Newcomb*
Robin Spigel (admitted *pro hac vice*)
*Robin.Spigel@bakerbotts.com*
Chris Newcomb (admitted *pro hac vice*)
*Chris.Newcomb@bakerbotts.com*
30 Rockefeller Plaza
New York, New York 10012-4498
Telephone: (212) 408-2500
Facsimile: (212) 259-2501

– and –

David R. Eastlake
Texas Bar No. 24074165
*David.Eastlake@bakerbotts.com*
910 Louisiana Street
Houston, Texas 77002-4995
Telephone: (713) 229-1234
Facsimile: (713) 229-1522

*Counsel to the Debtor and Debtor in Possession*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 18, 2021, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Chris Newcomb*

# **EXHIBIT A**

Plan Administrator Agreement

# PLAN ADMINISTRATOR AGREEMENT

This Plan Administrator Agreement (the "Agreement"), dated July __, 2021, is between Griddy Energy LLC (the "Debtor") and [__] (the "Plan Administrator"). This Agreement sets forth, among other things, the rights, powers, duties and scope of the services to be provided by the Plan Administrator. Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the *Modified Third Amended Plan of Liquidation for Griddy Energy LLC Under Chapter 11 of the Bankruptcy Code*, dated May 26, 2021 [Docket No. 305] (as may be altered, amended, modified, or supplemented from time to time in accordance with its terms, the "Plan").

## RECITALS

WHEREAS, on March 15, 2021 (the "Petition Date"), the Debtor filed a voluntary petition (the "Chapter 11 Case") under title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court").

WHEREAS, on May 26, 2021, the Debtor filed the solicitation version of the Plan.

WHEREAS, on or after the Confirmation Date but prior to the Effective Date, the Plan Administrator assumed all of its obligations, powers and authority under the Plan to: (i) establish bank accounts as may be required to fulfill the Debtor's obligations under the Plan, including, to the extent not previously established by the Debtor, to establish and fund the Disputed Claims Reserves in accordance with the terms thereof; and (ii) exercised such other power and authority as may be set forth in the Confirmation Order.

WHEREAS, pursuant to the Plan, effective as of the date hereof (the "Effective Date"), the Plan Administrator has assumed all of its other obligations, powers and authority under the Plan and shall comply with all applicable provisions of the Plan.

WHEREAS, pursuant to article 7.05 of the Plan, effective as of the Effective Date, a committee was appointed to participate in the oversight of certain material actions of the Plan Administrator (the "Oversight Committee").

WHEREAS, pursuant to the Plan, the Plan Administrator will carry out and implement all provisions of the Plan, including, among other things, implementing the wind down of the Debtor, prosecuting certain claims and causes of action on behalf of the Debtor, and making distributions to holders of Allowed Claims.

WHEREAS, on [June 18, 2021], the Debtor filed the Plan Supplement for the Plan, which included, among other things, forms of this Agreement and the amended and restated limited liability company operating agreement of the Debtor (the "Operating Agreement") [Docket No. __].

WHEREAS, on [July 7], 2021, the Court entered an Order confirming the Plan and approving, among other things this Agreement [Docket No. __] (the "Confirmation Order").

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements set forth herein, the sufficiency of which is hereby acknowledged by the parties, the parties hereto agree as follows:

1.    *Acceptance and Effectiveness*. The Plan Administrator hereby agrees to accept appointment as the Plan Administrator and ownership of the membership interest of the Debtor and to provide the Services (as defined below) pursuant to the Plan and the Confirmation Order, and as set forth herein.

2.    *Duties, Powers, and Rights of Plan Administrator*. Sections 7.03 and 7.04 of the Plan are incorporated herein by reference. From and after the Effective Date, the Plan Administrator will act for the Debtor's Estate in the same fiduciary capacity as applicable to a

2

board of directors or officers of a Delaware corporation, subject to the provisions hereof and of the Plan. The Plan Administrator will have, subject to the powers and rights of the Oversight Committee set forth herein, the Plan and the Confirmation Order, all duties, powers, and rights set forth herein, in the Plan, and in the Confirmation Order to perform the services set forth in the Plan, the Confirmation Order, and this Agreement (the "Services"), including the following:

a.   take all steps and execute all instruments and documents necessary to make Distributions to holders of Allowed Claims and Allowed Interests and to perform the duties assigned to the Plan Administrator under the Plan and this Agreement;

b.   observe and comply with the Plan, the Confirmation Order and any and all obligations set forth therein and herein;

c.   employ, retain, or replace professionals to represent the Plan Administrator with respect to the Plan Administrator's responsibilities;

d.   object to Claims as provided in the Plan, and prosecute such objections;

e.   compromise and settle any issue or dispute regarding the amount, validity, priority, treatment, or Allowance of any Claim;

f.   prosecute Causes of Action that are not released under the Plan or Confirmation Order;

g.   compromise and settle any Causes of Action;

h.   establish, replenish, or release reserves as provided in the Plan, as applicable;

i.   seek a determination of tax liability under Bankruptcy Code section 505, file tax returns, and pay taxes, if any, related to the Debtor;

j.   abandon in any commercially reasonable manner, including abandonment or donation to a charitable organization of the Plan Administrator's choice, any assets of the Debtor if the Plan Administrator concludes that they are of no benefit to the Estate or the Debtor;

k.   purchase or create and carry all insurance policies and paying all insurance premiums and costs the Plan Administrator deems necessary or advisable, including that cover the liabilities and obligations of the Plan Administrator and the Oversight Committee under this Agreement;

3

l.    seek entry of a final decree in the Chapter 11 Case at the appropriate time; and

m.    exercise such other powers as may be vested in the Plan Administrator pursuant to the Plan, this Agreement, or any other Plan Documents or order of the Bankruptcy Court or otherwise act on behalf of and for the Debtor from and after the Effective Date in a manner consistent with the provisions of the Plan which the Plan Administrator deems reasonably necessary or desirable with respect to administering the Plan.

The Debtor (including the Plan Administrator as the sole member, manager and equity holder of the Debtor) shall not be required to post a bond in favor of the United States.

3.    *Reports to be Filed by the Plan Administrator.* On a quarterly basis, the Plan Administrator will file with the Bankruptcy Court a reasonably detailed report summarizing the Plan Administrator's work, including the status of any pending actions initiated by the Plan Administrator and any material settlements entered into with respect to any Claims against the Debtor or Causes of Action of the Debtor, and the Debtor's finances, including the amount of fees and expenses incurred and paid to Professionals and the Plan Administrator, which reports with respect to the Debtor's finances may be in the form of quarterly operating reports filed with the Bankruptcy Court as required by the United States Trustee.

4.    *Distributions.* Pursuant to the terms and provisions of the Plan, the Plan Administrator will make the required Distributions specified in the Plan to holders of Allowed Claims and Interests as of the Distribution Date in accordance with the Plan and Confirmation Order.

Other than the obligations set forth in the proviso in Section 8.12 of the Plan, the Plan Administrator shall have no duty or obligation whatsoever to attempt to locate the holder of any Allowed Claim entitled to unclaimed distributions other than to review the Debtor's books and records, or proofs of claim filed against the Debtor.

4

5.      *Winddown and Dissolution of Debtor*. As soon as reasonably practicable after all Distributions have been made to holders of Allowed Claims and Allowed Interests in accordance with the terms of the Plan, the Plan Administrator shall cause the Debtor to: (a) file its certificate of dissolution, together with all other necessary corporate documents, to effect its dissolution under the applicable Delaware state law; and (b) complete and file its final federal, state and local tax returns, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of the Debtor or its Estate for any tax incurred during the administration of the Chapter 11 Case, as determined under applicable tax laws.

6.      *No Other Duties; Amendments to Operating Agreement*. Other than the duties and obligations of the Plan Administrator specifically set forth in this Agreement, the Plan, or the Confirmation Order, the Plan Administrator will have no duties or obligations of any kind or nature with respect to such position. The Plan Administrator will not amend or modify (whether through waiver or otherwise) the Operating Agreement without the prior unanimous written consent of the Oversight Committee.

7.      *Retention of Counsel and Agents*. Subject to the terms of this Agreement, the Plan Administrator may hire attorneys, accountants, consultants, independent contractors, and other professionals (collectively, the "Professionals") which the Plan Administrator deems in his or her discretion to be required or appropriate in connection with the Plan Administrator's duties hereunder. The Plan Administrator shall pay to any Professionals retained by the Plan Administrator reasonable compensation for services rendered and reimbursement of reasonable and documented costs and expenses incurred in connection with the Plan Administrator's performance of the Services. The payment of any reasonable fees, costs, and expenses of the Professionals will be made in the ordinary course of business and will not be subject to the

5

approval of the Bankruptcy Court; *provided*, *however*, that any disputes related to such fees, costs, and expenses will be resolved by the Bankruptcy Court.

8. *Fees*. The fees of the Plan Administrator (collectively, the "Fees") will be [$_____],[1] commencing on the Effective Date and payable until the removal of the Plan Administrator or the termination of this Agreement and will be prorated, if appropriate. [The initial payment of $_____ will be made within five (5) business days following the Effective Date, and each successive payment will be made on the same date (or the first subsequent business day) of each month going forward.] The Fees will be payable out of the Debtor's Available Cash.

9. *Expenses*. The reasonable and documented out-of-pocket expenses of the Plan Administrator incurred in performance of the Services will be reimbursed from the Debtor's Available Cash.

10. *Service of Plan Administrator*. The Plan Administrator will serve until the earlier of (a) the termination of this Agreement and (b) the effective date of any resignation or other discharge of the Plan Administrator. The Plan Administrator may resign at any time upon thirty (30) days' written notice delivered to the Bankruptcy Court and the Oversight Committee; *provided*, *that*, such resignation will only become effective upon the appointment of a permanent or interim successor Plan Administrator, unless either (1) the insurance policies covering the Plan Administrator terminates for any reason other than the Plan Administrator's unreasonable refusal to renew such insurance policies or (2) the Plan Administrator determines in the Plan Administrator's reasonable judgment that insufficient assets and financial resources are available to complete the duties and powers assigned to the Plan Administrator under the Plan, the

---

[1] Fees to be updated based on agreement with the Plan Administrator.

Confirmation Order, and/or this Agreement, in either of which case such resignation may become effective without appointment of a successor Plan Administrator, provided that, in the case of 10(2), the Plan Administrator shall also provide (30) days' written notice to all holders of Allowed Claims and Interests thereof, and shall take such steps as may be necessary to close or convert the Chapter 11 Case prior to the effective date of such resignation. The resignation or removal of a Plan Administrator will not terminate this Agreement, revoke any existing agency created pursuant to this Agreement, or invalidate any prior action taken by the Plan Administrator.

11. *Removal of the Plan Administrator for Cause.* The Oversight Committee may remove the Plan Administrator, by unanimous written consent, for cause upon written notice containing a reasonably detailed explanation of the basis for the Plan Administrator's removal ("Cause Notice") by the Oversight Committee to the Plan Administrator. In the event the Plan Administrator disputes its termination for cause set forth in the Cause Notice, the Plan Administrator may file, within ten (10) days of receipt of the Cause Notice (the "Dispute Period"), a motion with the Bankruptcy Court contesting such termination for Cause (a "Cause Dispute Motion"). If the Plan Administrator fails to file a Cause Dispute Motion prior to expiration of the Dispute Period, the Plan Administrator will be automatically removed without any further action required upon the expiration of the Dispute Period. If the Plan Administrator files a Cause Dispute Motion, the Plan Administrator will be automatically removed without any further action required upon the entry of an order of the Bankruptcy Court removing the Plan Administrator.

12. *Successor Plan Administrator.* In the event of the resignation, death, Disability (as defined below), or removal of the Plan Administrator in accordance with this Agreement, the

7

Oversight Committee will appoint a replacement Plan Administrator in accordance with the Plan; *provided*, *however*, if the Oversight Committee fails to appoint a replacement Plan Administrator within twenty (20) days of such resignation, death, Disability, or removal of the Plan Administrator, the Bankruptcy Court may appoint a replacement. For purposes hereof, the term "Disability" means incapacity resulting in the inability to perform the Services for thirty (30) consecutive days or in the aggregate of sixty (60) days during any twelve-month period. Any resigning or removed Plan Administrator (or the executor or other representative of any deceased or incapacitated Plan Administrator) shall transfer, in exchange for consideration of one dollar ($1.00), the membership interest of the Debtor owned by such Plan Administrator to the successor Plan Administrator.

13.     *Indemnification*.

Except as otherwise set forth in the Plan or Confirmation Order, the Plan Administrator and all Professionals (collectively, the "Indemnified Parties") will be, to the fullest extent permitted by law, indemnified, defended, and held harmless by the Debtor from and against loss, liability, damages, cost, or expense (including reasonable and documented legal fees and expenses and any amounts reasonably paid in settlement) (each, a "Loss" and, collectively, "Losses") resulting from a claim, demand, lawsuit, action, or proceeding caused by, relating to, based on, or arising out of (directly or indirectly) the Plan Administrator's performance or nonperformance of the Services or the Plan Administrator's other obligations or fulfillment or nonfulfillment of the Plan Administrator's fiduciary duties under this Agreement, the Plan, or the Confirmation Order; *provided*, *that*, such acts or omissions of such Indemnified Person are not found by a Final Order of a court of competent jurisdiction to constitute actual fraud, gross negligence, or willful misconduct. Any obligation of the Debtor arising pursuant to the terms of

8

this section will be payable only from the Debtor's Available Cash and may with the approval of the Oversight Committee be advanced to the applicable Indemnified Person prior to the conclusion of the matter from which such obligation arises, and such right to payment will be prior and superior to the rights of any other party to receive a distribution of the Debtor's Available Cash.

Any former director, officer, affiliate, employee, employer, professional, agent, or representative of the Debtor (collectively, the "Debtor Indemnified Parties") shall be defended, held harmless, and indemnified from time to time by the Debtor against any and all Losses arising from or relating to any third party claims brought or asserted against the Debtor Indemnified Parties (including any purported counterclaims or claims for contribution) that arise from any action or omission by the Plan Administrator or related to any Cause of Action that the Plan Administrator elects to prosecute, *provided*, *that*, such acts or omissions of such Debtor Indemnified Parties are not found by a Final Order of a court of competent jurisdiction to constitute actual fraud, gross negligence, or willful misconduct.

The Plan Administrator will be permitted to pay from the Debtor's Available Cash expenses reasonably incurred by any Indemnified Party or Debtor Indemnified Party in defending, participating in, or settling any action, proceeding, or investigation in which such Indemnified Party or Debtor Indemnified Party is a party or is threatened to be made a party or otherwise is participating in connection with the duties, acts, or omissions of the Plan Administrator, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise.

Each Indemnified Party and Debtor Indemnified Party will, and by its acceptance of the indemnification rights hereunder, hereby undertakes to, repay any and all such amounts so

advanced if it is ultimately determined that such Indemnified Party or Debtor Indemnified Party is not entitled to be indemnified therefor under this Agreement.

The provisions of this section will survive the termination of this Agreement. The Indemnified Parties and Debtor Indemnified Parties are third-party beneficiaries of this Agreement solely with respect to the provisions of this Section [13] and are entitled to enforce the terms hereof against the applicable Persons.

14.     *Standard of Care; Exculpation*. Neither the Plan Administrator nor any director, officer, member, affiliate, employee, employer, professional, agent, or representative (collectively, "Representatives") of the Plan Administrator will be liable for losses, claims, damages, liabilities, or expenses in connection with the affairs or property of the Debtor to any Holder of an Allowed Claim, or any other Person, for the acts or omissions of the Plan Administrator under this Agreement or the Plan (other than for acts or omissions constituting willful misconduct, bad faith, gross negligence, or actual fraud of such Person as determined by Final Order of a court of competent jurisdiction). Every act done, power exercised, or obligation assumed by any Representative of the Plan Administrator pursuant to the provisions of this Agreement will be deemed to be done, exercised, or assumed, as the case may be, by such Representative for and on behalf of the Plan Administrator and not otherwise; *provided*, *however*, that none of the foregoing Persons will be deemed to be responsible for any other such Persons' actions or inactions outside of the scope of the authority provided by the Plan Administrator. Except as provided in the proviso of the first sentence of this section, every holder of an Allowed Claim, Person, or entity contracting or otherwise dealing with or having any relationship with the Plan Administrator or any Representative, will have recourse only to the Debtor's Available Cash for payment of any liabilities arising in connection with such

contracts, dealings, or relationships, and the Plan Administrator or any Representative will not be individually liable therefor. For the avoidance of doubt, except as provided in the proviso of the first sentence of this section, the Plan Administrator, in the Plan Administrator's capacity as such, will have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtor.

15.      *Limitation of Liability*. In connection with all actions taken by the Plan Administrator as such, the Plan Administrator will be entitled to rely upon the applicable exculpation, release, indemnification, and limitation of liability provisions set forth in any corporate organizational document (including the Operating Agreement), this Agreement, the Plan, and the Confirmation Order; *provided*, *that*, the Plan Administrator will not be entitled to any release, exculpation, or indemnification if the Plan Administrator is determined to have engaged in actual fraud, gross negligence, or willful misconduct as determined by a Final Order of a court of competent jurisdiction.

16.      *Reliance by Plan Administrator*. To the fullest extent permitted by applicable law, the Plan Administrator may rely, and will be fully protected in acting or refraining from acting if the Plan Administrator relies, upon any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order, or other instrument or document that the Plan Administrator reasonably believes to be genuine and to have been signed or presented by the proper party or parties or, in the case of e-mails or facsimiles or other electronic communication, that the Plan Administrator reasonably believes to have been sent by the proper party or parties, and the Plan Administrator may conclusively rely as to the truth of the statements and correctness of the opinions expressed therein. To the fullest extent permitted by applicable law, the Plan Administrator may consult with counsel, accountants, financial advisors, and other

11

Professionals with respect to matters in their area of expertise, and any opinion of counsel will be full and complete authorization and protection in respect of any action taken or not taken by the Plan Administrator (other than for acts or omissions constituting willful misconduct, bad faith, gross negligence, or actual fraud of the Plan Administrator as determined by Final Order of a court of competent jurisdiction). To the fullest extent permitted by applicable law, the Plan Administrator will be entitled to rely upon the advice of Professionals in acting or not acting and will not be liable for any act taken or not taken in reliance thereon (other than for acts or omissions constituting willful misconduct, bad faith, gross negligence, or actual fraud of the Plan Administrator as determined by Final Order of a court of competent jurisdiction). To the fullest extent permitted by applicable law and subject to providing reasonable notice to the other parties and the Oversight Committee, the Plan Administrator will have the right at any time to seek and rely upon instructions from the Bankruptcy Court concerning this Agreement, the Plan, the Operating Agreement, or any other document executed in connection herewith or therewith, and the Plan Administrator will be entitled to rely upon such instructions in acting or not acting and will not be liable for any act taken or not taken in reliance thereon.

17. *Ratification of Prior Acts*. In order to effectuate an orderly and efficient transition of the administration of the Plan, the Plan Administrator may perform certain services in connection with the Plan Administrator's duties and obligations under this Agreement prior to the Effective Date, and the authorization for such performance and ratification of acts taken by the Plan Administrator prior to the Effective Date is evidenced by the execution hereof to the extent not already authorized by the Plan or the Confirmation Order.

18. *Insurance*. The Plan Administrator may purchase, using Available Cash, and carry all insurance policies and pay all insurance premiums and costs that the Oversight

Committee or the Plan Administrator deem reasonably necessary or advisable, including, without limitation, purchasing any errors and omissions insurance with regard to any liabilities, losses, damages, claims, costs, and expenses it may incur, including but not limited to attorneys' fees, arising out of or due to its actions or omissions, or consequences of such actions or omissions, other than as a result of its fraud, gross negligence or willful misconduct with respect to the implementation and administration of the Plan or this Agreement as determined by a Final Order of a court of competent jurisdiction.

19.     *Preservation of Privilege*. Any attorney-client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether oral or written) in respect of any right, claim, Cause of Action or other asset of the Debtor (collectively, the "Privileges") will vest in the Plan Administrator on the Effective Date, and thereafter, such Privileges will belong to the Plan Administrator and will be enforceable and waivable by the Plan Administrator. The Plan Administrator will seek to preserve and protect all applicable Privileges and any Causes of Action of the Debtor. The Plan Administrator's receipt of any information subject to the Privileges will not waive any such Privileges, and all such Privileges are expressly preserved.

20.     *Powers of the Oversight Committee*. Section 7.05 of the Plan is incorporated herein by reference. The Oversight Committee has been constituted pursuant to Section 7.05 of the Plan, including the provisions relating to Toggle Events (as defined in the Plan) as provided therein. The members of the Oversight Committee (i) selected by the Committee will act in a fiduciary capacity the same as an official committee of unsecured creditors and (ii) selected by the Debtor (and any affiliate of the Debtor, as provided in the Plan) will act in a fiduciary capacity the same as required by officers under the Debtor's limited liability company agreement

13

in effect as of the Petition Date. Vacancies on the Oversight Committee will be filled pursuant to Section 7.05 of the Plan. The Oversight Committee will dissolve and its members shall cease to have any duties at such time as the Plan Administrator has settled or otherwise resolved all Causes of Action and distributions of the proceeds thereof have been made to the beneficiaries thereof pursuant to the terms of the Plan or at such time as shall otherwise be agreed upon between the Plan Administrator and all members of the Oversight Committee.

No member of the Oversight Committee will be compensated by the Debtor for their service thereon; *provided, that*, such members may be reimbursed by the Debtor for reasonable and documented out-of-pocket expenses, if any, incurred during the performance of services by such member as a member of the Oversight Committee.

Notwithstanding anything contained herein to the contrary, prior to a Toggle Event, unanimous consent of the Oversight Committee will be required for the following actions:

    a.    material modifications or amendments to the Plan Administrator Agreement, including any modification of any provision that governs amendments to the Plan Administrator Agreement, Plan, Confirmation Order or Operating Agreement;

    b.    cancellation or modification of insurance covering the Plan Administrator or the Oversight Committee;

    c.    the settlement, compromise, dismissal, abandonment, release, submission to binding arbitration or mediation, or waiver, in whole or in part, of any claims, rights, causes of action, appeals, or collection efforts arising thereunder or in connection therewith, of any claim by the Plan Administrator where the Disputed Amount at issue equals or exceeds $3 million;

    d.    the decision whether to enter into an agreement with any entity respecting the joint prosecution of any claim and causes of action belonging to the Debtor;

    e.    choosing a successor Plan Administrator;

    f.    removing the Plan Administrator; and

g. the Plan Administrator's retention of professionals to pursue any Texas Storm Causes of Action.

All material actions by the Plan Administrator other than the foregoing will require majority consent of the Oversight Committee, except as otherwise provided in Section 7.05(c) of the Plan. After the Toggle Event, the actions listed above and in Section 7.05(b)(i)-(vii) of the Plan will require majority consent of the Oversight Committee.

Notwithstanding any other provision in the Plan or this Agreement, the Plan Administrator may only settle Causes of Action as follows: (i) without notice to, or consent from, the Oversight Committee where the Disputed Amount is less than $250,000; (ii) with written notice to the Oversight Committee where the Disputed Amount is between $250,000 and $2,999,999 and the Plan Administrator proposes to settle such claim; *provided*, *that*, no member of the Oversight Committee objects in writing to the proposed settlement within five (5) business days after receipt of such writing; *provided*, *further*, that if a member of the Oversight Committee so objects, then the Plan Administrator may only proceed with the proposed settlement with the consent of a majority of the members of the Oversight Committee; and (iii) with written notice to, and the consent of, all members of the Oversight Committee where the Disputed Amount is more than $2,999,999.

21. *Termination of Agreement; Survival*. This Agreement will terminate when the Bankruptcy Court enters a final decree contemplated by Bankruptcy Code section 350 and Bankruptcy Rule 3022 closing the Chapter 11 Case, unless otherwise set forth in such final decree. Upon termination of this Agreement, the Plan Administrator will have no further duties or obligations hereunder or as Plan Administrator, except as specifically provided herein. Sections [___] of this Agreement and any other provision in the Agreement that, by its terms, specifically survives termination of the Agreement will survive termination of this Agreement.

22.    *Headings*. The section headings contained in this Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement or of any term or provision hereof.

23.    *Amendment; Waiver*. Upon notice to the Oversight Committee, the Plan Administrator may modify, supplement, or amend this Agreement to clarify any ambiguity or inconsistency, or render the Agreement in compliance with its stated purposes, if such amendment is not material and does adversely affect the interests, rights or treatment of the parties or the Oversight Committee. With respect to all other amendments of this Agreement, the Plan Administrator may amend this Agreement with the unanimous consent of the Oversight Committee.

24.    *Third-Party Beneficiaries*. The Oversight Committee is a third-party beneficiary of this Agreement and is entitled to enforce the terms hereof. Except as otherwise specifically provided in this Agreement, the Plan, or the Confirmation Order, nothing herein is intended or shall be construed to confer on or to give any person other than the parties hereto and any rights or remedies under or by reason of this Agreement.

25.    *Governing Law*. This Agreement will be governed by and construed in accordance with the laws of the State of Delaware without regard to the rules of conflict of laws of the State of Delaware or any other jurisdiction.

26.    *Retention of Jurisdiction*. The Bankruptcy Court will retain jurisdiction over the Debtor to the fullest extent permitted by law, including, but not limited to, for the purposes of interpreting and enforcing the provisions of this Agreement. Each party to this Agreement hereby irrevocably consents to the jurisdiction of the Bankruptcy Court in any action to enforce, interpret, or construe any provision of this Agreement or of any other agreement or document

16

delivered in connection with this Agreement, and also hereby irrevocably waives any defense of improper venue, forum non conveniens, or lack of personal jurisdiction to any such action brought in the Bankruptcy Court. Each party further irrevocably agrees that any action to enforce, interpret, or construe any provision of this Agreement will be brought only in the Bankruptcy Court. Each party hereby irrevocably consents to the service of any process in any action to enforce, interpret or construe any provision of this Agreement through the method of notice provided for in this Agreement. Notwithstanding the preceding, nothing herein shall be interpreted as requiring the commencement or prosecution of any Causes of Action in the Bankruptcy Court, and all determinations regarding the proper forum for initiating any Cause of Action shall be at the discretion of the Plan Administrator consistent with applicable law.

27. *Dispute Resolution*. Except as authorized by an order of the Bankruptcy Court, no judicial, administrative, arbitral, or other action or proceeding may be commenced against the Plan Administrator in the Plan Administrator's official capacity as such with respect the Plan Administrator's status, duties, powers, acts, or omissions in any forum other than the Bankruptcy Court.

28. *Conflict with Plan*. The principal purpose of this Agreement is to aid in the implementation of the Plan and Confirmation Order and, therefore, this Agreement incorporates and is subject to the provisions of the Plan and the Confirmation Order. In the event that the provisions of this Agreement are found to be inconsistent with the provisions of the Plan or the Confirmation Order, the provisions of the Plan or the Confirmation Order, as applicable, will control.

29. *Severability*. If any provision of this Agreement is held by a court of competent jurisdiction to be unenforceable, this Agreement will be deemed to be amended to the extent

necessary to make such provision enforceable, or, if necessary, this Agreement will be deemed amended to delete the unenforceable provision or portion thereof. In the event any provision is deleted or amended, the remaining provisions will remain in full force and effect. Notwithstanding the foregoing, the parties recognize and agree that this Agreement is to be interpreted and applied in such manner as to, as nearly as possible, give effect to the parties' intent as to all provisions hereof, including, without limitation, such provisions as may be declared to be unenforceable.

30. *Integration*. This Agreement (together with the Plan, the Operating Agreement, and the Confirmation Order) sets forth the whole agreement between the parties with respect to the transactions contemplated herein, superseding all other discussions, promises, representations, warranties, agreements, and understandings, whether written or oral, between the parties with respect thereto.

31. *Successors and Assigns*. Except as provided herein, no party hereto will have the right to assign its rights hereunder.

32. *Notice*. Notices or other documents required to be delivered to the Plan Administrator under this Agreement shall be in writing and shall be deemed to have been duly given to a person, if delivered in person or if sent by overnight mail, registered mail, certified mail, regular mail, with postage prepaid or e-mail, to the following addresses::

If to the Debtor or the Plan Administrator:

[_____]

with a copy to:

[_____]

If the Plan Administrator is required to provide notice to the Oversight Committee pursuant to this Agreement, such notice will be served to the address (or, in the case of electronic communication, email address) for the members of the Oversight Committee last known to the Plan Administrator as of the Effective Date, or as otherwise updated in writing (which may be email) to the Plan Administrator.

33. *Counterparts; Effectiveness*. This Agreement may be executed in one or more counterparts, each of which will be an original, but all such counterparts together constitute one and the same agreement. Provided that the Effective Date has occurred, this Agreement will become effective when each party hereto has received a counterpart thereof signed by the other parties hereto. The parties agree that this Agreement will be considered signed when the signature of a party is delivered by facsimile or e-mail transmission. Such facsimile or e-mail signature will be treated in all respects as having the same effect as an original signature.

[*The remainder of this page is intentionally left blank.*]

**[SIGNATURE PAGE FOLLOWS.]**

IN WITNESS WHEREOF, the parties hereto have either executed and acknowledged this Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers or representatives, all as of the date first above written.

**<u>DEBTOR</u>**

**GRIDDY ENERGY LLC**


**By:** _____
**Name:** _____
**Title:** _____


**<u>PLAN ADMINISTRATOR</u>**


**By:** _____


<u>AGREED AND ACKNOWLEDGED BY:</u>

<u>Members of the Oversight Committee</u>

<u>[To be Added]</u>


_____

## EXHIBIT B

Second Amended and Restated Limited Liability Company Agreement of Griddy Energy LLC

**SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**GRIDDY ENERGY LLC**

**A DELAWARE LIMITED LIABILITY COMPANY**

**EFFECTIVE AS OF [●], 2021**

# TABLE OF CONTENTS

**Page**

ARTICLE I ORGANIZATION ................................................................................................ 2

Section 1.1    Formation .................................................................................................... 2
Section 1.2    Name ............................................................................................................ 2
Section 1.3    Purpose ......................................................................................................... 2
Section 1.4    Term ............................................................................................................. 2
Section 1.5    Principal Office ............................................................................................ 2
Section 1.6    Registered Office; Registered Agent .......................................................... 2
Section 1.7    Powers of the Company ................................................................................ 3

ARTICLE II MEMBERS; LIMITED LIABILITY COMPANY INTERESTS ........................... 3

Section 2.1    Initial Member ............................................................................................. 3
Section 2.2    Limited Liability Company Interests ........................................................... 3
Section 2.3    Effect of Resignation, Death or Removal of the Member ........................... 3
Section 2.4    Powers of Member ....................................................................................... 4
Section 2.5    Officers. ....................................................................................................... 4
Section 2.6    Title to Company Property........................................................................... 5
Section 2.7    No State Law Partnership ............................................................................. 5
Section 2.8    Maintenance of Separate Existence ............................................................. 5

ARTICLE III MANAGEMENT OF THE COMPANY ............................................................. 5

Section 3.1    Authority, Power and Duties of the Member................................................ 5

ARTICLE IV UNITS ............................................................................................................. 5

Section 4.1    Authorized Units .......................................................................................... 5
Section 4.2    Initial Issuance of Common Unit; Admission of The Member ..................... 5

ARTICLE V CAPITAL CONTRIBUTIONS; DISTRIBUTIONS .............................................. 5

Section 5.1    Capital Contributions ................................................................................... 6
Section 5.2    Distributions................................................................................................. 6

ARTICLE VI DISSOLUTION; DEEMED LIQUIDATION EVENT; TERMINATION ............. 6

Section 6.1    Dissolution ................................................................................................... 6
Section 6.2    Termination................................................................................................... 6

ARTICLE VII TRANSFERS OF UNITS ................................................................................. 6

Section 7.1    General; Permitted Transfers ....................................................................... 6
Section 7.2    Restrictions on Transfer ............................................................................... 7

ARTICLE VIII ADMINISTRATIVE MATTERS ...................................................................... 7

Section 8.1    Maintenance of Records ............................................................................... 7
Section 8.2    Accounting Methods ..................................................................................... 7
Section 8.3    Fiscal Year; Taxable Year ............................................................................ 7
Section 8.4    Tax Classification ......................................................................................... 7

Section 8.5     Tax Returns ........................................................................................... 7

ARTICLE IX LIMITED LIABILITY; INDEMNIFICATION & EXCULPATION ..................... 8

Section 9.1     Limited Liability of Member ..................................................................... 8
Section 9.2     Indemnification ....................................................................................... 8
Section 9.3     Payment of Expenses in Advance........................................................... 8
Section 9.4     No Impairment ......................................................................................... 8

ARTICLE X GENERAL PROVISIONS ................................................................................. 9

Section 10.1    Amendments and Waivers ....................................................................... 9
Section 10.2    Entire Agreement ..................................................................................... 9
Section 10.3    GOVERNING LAW .................................................................................. 9
Section 10.4    No Third Party Beneficiaries ................................................................... 9
Section 10.5    Severability .............................................................................................. 9

## SECOND AMENDED AND RESTATED
## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## GRIDDY ENERGY LLC

**THIS SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT** (as it may be amended from time to time in accordance with its terms, this "***Agreement***"), effective as of [●], 2021 (the "***Effective Date***"), of Griddy Energy LLC, a Delaware limited liability company (the "***Company***"), is executed by [●] as the sole member of the Company (the "***Member***"). Capitalized terms used herein and not otherwise defined have the meanings ascribed to such terms in that certain *Modified Third Amended Plan of Liquidation for Griddy Energy LLC Under Chapter 11 of the Bankruptcy Code*, dated May 26, 2021 (as amended, supplemented or modified from time to time, the "***Plan***"), and the rules of interpretation set forth in Article 1.B. of the Plan also apply for purposes of this Agreement.

### RECITALS

WHEREAS, the Company was organized as a Delaware limited liability company on March 7, 2016 (the "***Commencement Date***") by the filing of a Certificate of Formation (the "***Certificate***") with the Secretary of State of the State of Delaware pursuant to and in accordance with the Delaware Limited Liability Company Act, as amended from time to time (the "***Delaware Act***");

WHEREAS, the Company adopted that certain First Amended and Restated Limited Liability Company Agreement of the Company, effective as of December 1, 2020 (the "***Amended LLC Agreement***");

WHEREAS, on March 15, 2021, the Company commenced a voluntary chapter 11 case, styled "In re GRIDDY ENERGY LLC," administered under Case No. 21-30923 (the "***Chapter 11 Case***") under title 11 of the United States Code (as may be amended from time to time, the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "***Bankruptcy Court***");

WHEREAS, on May 26, 2021, the Company filed the Plan and related disclosure statement (the "***Disclosure Statement***") with the Bankruptcy Court;

WHEREAS, on May 26, 2021, the Court entered an order conditionally approving the Disclosure Statement;

WHEREAS, on [●], 2021, the Bankruptcy Court entered an order approving the Disclosure Statement on a final basis and confirming the Plan (the "***Confirmation Order***");

WHEREAS, on the date hereof, the Plan has become effective and [_____] has been appointed as the Plan Administrator of the Plan;

WHEREAS, pursuant to the Plan, the Plan Administrator is the sole member and manager of the Company;

1

WHEREAS, in connection with the Plan and the liquidation of the Company as contemplated by the Plan and the Confirmation Order, all of the Company's previously-existing equity interests, options, warrants or other rights, contractual or otherwise, to acquire such interests in the Company, have been cancelled;

WHEREAS, in connection with the Plan and the liquidation of the Company pursuant to the Plan and the Confirmation Order, the Company issued 1 Common Unit representing a 100% membership interest in the Company to the Member;

WHEREAS, in connection with the Plan and the liquidation of the Company, concurrently herewith the Member entered into that certain *Plan Administrator Agreement* (the "Plan Administrator Agreement"); and

WHEREAS, the Member desires to amend and restate the Amended LLC Agreement in its entirety as set forth herein and this Agreement hereby amends, restates and supersedes the Amended LLC Agreement in its entirety.

NOW, THEREFORE, the Member hereby adopts the following:

## ARTICLE I

## ORGANIZATION

Section 1.1     Formation. The Company and the Units shall be governed by the terms and conditions of this Agreement and, except as otherwise provided herein, the Delaware Act.

Section 1.2     Name. The name of the Company is "Griddy Energy LLC."

Section 1.3     Purpose. The purpose of the Company is to act exclusively for the purposes of liquidating the Company's bankruptcy estate pursuant to the Plan, including, without limitation, as set forth in Article VI and Section 12.13 of the Plan, and the Confirmation Order.

Section 1.4     Term. The Company commenced its existence on the Commencement Date and will continue in existence until terminated pursuant to ARTICLE VI hereof.

Section 1.5     Principal Office. The principal office of the Company will be located at such place or places inside or outside the State of Delaware as the Member may designate from time to time.

Section 1.6     Registered Office; Registered Agent. The registered office and registered agent of the Company is as set forth in the Certificate. At any time (subject to the terms of the Plan Administrator Agreement), the Member may designate another registered agent and/or registered office and file an amendment of the Certificate reflecting such change, without the consent of any other Person being required.

Section 1.7    Powers of the Company. Subject to the limitations set forth in this Agreement, the Plan and the Confirmation Order, the Company shall possess and may exercise all of the powers and privileges granted to it by the Delaware Act, by any other applicable law or this Agreement, together with all powers incidental thereto, so far as such powers are necessary or convenient to the conduct, promotion or attainment of the purposes of the Company set forth in Section 1.3.

## ARTICLE II

## MEMBERS; LIMITED LIABILITY COMPANY INTERESTS

Section 2.1    Initial Member. The Member owns 100% of the membership interests in the Company.  The name and the mailing address of the Member are as follows:

| Name | Address |
|---|---|
| [●], in his capacity as Plan Administrator | [●]<br>[●] |

Section 2.2    Limited Liability Company Interests. The limited liability company membership interests in the Company are divided into and represented by "*Units*." As of the Effective Date, the Company is authorized to issue one class of Units designated as "*Common Units*." A holder of a Unit will have the rights, powers, duties, obligations, preferences and privileges attributable to such Unit as is set forth in this Agreement, provided, however, that for the avoidance of doubt, (i) the ownership of the Units shall not represent any right to participate in any profits of the Company or in any economic benefit resulting from the assets of the Company, and (ii) any and all economic benefits resulting from the assets of the Company shall be distributed in accordance with Article VIII of the Plan. The Units are being held by the Member solely in his capacity as the Plan Administrator and are not being issued to the Member as compensation for services; rather, the Member will be compensated for his services to the Company and in connection with the Plan solely pursuant to the Plan Administrator Agreement. The Company shall not issue any non-voting equity securities to the extent prohibited by Section 1123 of the Bankruptcy Code as in effect on the Effective Date; *provided, however*, that the foregoing (a) shall have no further force and effect beyond that required under Section 1123 of the Bankruptcy Code, (b) shall have such force and effect, if any, only for so long as such section of the Bankruptcy Code is in effect and applicable to the Company, and (c) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect.  Notwithstanding anything contained in this Agreement to the contrary, in accordance with the terms of the Plan, Griddy Holdings LLC, as the holder of an Allowed Class 7 Interest (as defined in the Plan), has retained its equity interest in the Company solely for the purpose of evidencing a right of distribution under the Plan.

Section 2.3    Effect of Resignation, Death or Removal of the Member. The replacement of the Member in the event of his resignation, death or removal pursuant to the Plan Administrator Agreement shall be governed by the Plan Administrator Agreement and the Plan. The resigning or removed Member (or the executor or other representative of the deceased or incapacitated Member) shall transfer, in exchange for consideration of one dollar ($1.00), all Common Units to the successor Member.

Section 2.4    Powers of Member. The Member will have only the power to exercise the rights specifically granted to the Member pursuant to the express terms of this Agreement, the Plan Administrator Agreement, the Plan, including without limitation as set forth in Article VII and Section 12.13 of the Plan, and the Confirmation Order.

Section 2.5    Officers.

(a)    *Designation and Election.*  The Member shall have the authority to elect officers of the Company to the extent reasonably necessary, including a President and Chief Executive Officer, a Chief Financial Officer, a Secretary and such other officers, including Vice Presidents and assistant officers, as it may from time to time determine (subject in all respects to the terms of the Plan Administrator Agreement).  Any two or more offices may be held by the same person.

(b)    *Authority and Duties of Officers.*

(i)    *President and Chief Executive Officer.*  The President and Chief Executive Officer, if any, shall be the chief executive officer of the Company and shall have general executive charge, management, and control of the properties and operations of the Company in the ordinary course of its business, with all such powers with respect to such properties and operations as may be reasonably incident to such responsibilities, subject in all respects to the Plan Administrator Agreement, the Plan, and the Confirmation Order.

(ii)    *Secretary.*  Except as otherwise provided in this Agreement, the Secretary shall keep the minutes of all meetings of the Company in books provided for that purpose, shall issue and execute certificates attesting to the corporate matters or records of the Company, and shall attend to the giving and service of all notices.  He or she may sign with the President and Chief Executive Officer, in the name of the Company, all contracts of the Company.  He or she shall in general perform all duties incident to the office of the Secretary, subject to the control of the Member and the President and Chief Executive Officer (and subject in all respects to the terms of the Plan Administrator Agreement).

(iii)    Subject to the provisions of this ARTICLE II, all officers of the Company shall have such powers and authority, subject to the direction and control of the Member (and subject in all respects to the terms of the Plan Administrator Agreement), and shall perform such duties in connection with the management of the business and affairs of the Company as are provided in this Agreement (subject in all respects to the terms of the Plan Administrator  Agreement), or as may be determined from time to time by the Member (subject in all respects to the terms of the Plan Administrator Agreement). In the absence of a contrary determination by the Member (subject in all respects to the terms of the Plan Administrator Agreement), each officer shall have such powers and authority as would be incident to his or her office if he or she served as a comparable officer of a Delaware corporation.

**(iv)**    The initial President, Chief Executive Officer and Secretary shall be **[the Plan Administrator]**.

4

Section 2.6    <u>Title to Company Property</u>. All property of the Company, whether real, personal or mixed, tangible or intangible, shall be deemed to be owned by the Company as an entity, and the Member, individually, shall not have any direct ownership interest in such property.

Section 2.7    <u>No State Law Partnership</u>. No provision of this Agreement shall be deemed or construed to constitute the Company as a partnership (including, without limitation, a limited partnership).

Section 2.8    <u>Maintenance of Separate Existence</u>. The Company shall do all things necessary to maintain its limited liability company existence separate and apart from the existence of the Member.

## ARTICLE III

## MANAGEMENT OF THE COMPANY

Section 3.1    <u>Authority, Power and Duties of the Member</u>. Subject to <u>Section 2.4</u>, the Member shall be the manager of the Company and have exclusive and complete authority and discretion to manage the operations and affairs of the Company and to make all decisions regarding the business of the Company, subject in all respects to the Plan Administrator Agreement, the Plan and the Confirmation Order. Any action taken by the Member shall constitute the act of and serve to bind the Company. Persons dealing with the Company are entitled to rely conclusively on the power and authority of the Member as set forth in this Agreement. The Member shall have all rights and powers of a manager under the Act, and shall have such authority, rights and powers in the management of the Company to do any and all other acts and things necessary, proper, convenient or advisable to effectuate the purposes of this Agreement (subject in all respects to the terms of the Plan Administrator Agreement).

## ARTICLE IV

## UNITS

Section 4.1    <u>Authorized Units</u>. As of the Effective Date, the Company is authorized to issue 1 Common Unit pursuant to this Agreement.  All Common Units shall be evidenced in book-entry or similar form and maintained by or on behalf of the Company in such form.

Section 4.2    <u>Initial Issuance of Common Unit; Admission of The Member</u>. On the Effective Date, the Company issued one Common Unit to the Member in accordance with the Plan and the Member was admitted as the Member of the Company.

## ARTICLE V

## CAPITAL CONTRIBUTIONS; DISTRIBUTIONS

Section 5.1    Capital Contributions. Except as required by applicable law, the Member is not obligated to make any capital contributions to the Company.

Section 5.2    Distributions.

(a)    Distributions, Generally. Except for compensation disclosed as part of the chapter 11 Plan process or as otherwise permitted by the Bankruptcy Court, under no circumstances shall the Member be entitled to receive any distributions of Company assets. Any and all distributions of assets shall be made exclusively in conformity with Article VIII of the Plan as well as the Confirmation Order.

(b)    Limitations on Distributions. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution of assets if such distribution would violate the provisions of the Plan or the Confirmation Order or any applicable law.

## ARTICLE VI

## DISSOLUTION; DEEMED
## LIQUIDATION EVENT; TERMINATION

Section 6.1    Dissolution. Subject to the terms of the Plan and the Confirmation Order, the Company will be dissolved as soon as reasonably practicable upon the first to occur of the following (a "*Liquidation Event*"): (a) after all Distributions have been made to holders of Allowed Claims in accordance with the terms of the Plan and the Confirmation Order; (b) the Chapter 11 Case is closed; (c) at such time as the Company has no Members, unless the Company is continued in accordance with the Delaware Act; or (d) the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Delaware Act. Upon a Liquidation Event, (i) the Company's affairs will be wound up as soon as is practicable, and the Company will engage in no further business except as may be necessary, in the reasonable discretion of the Member (subject in all respects to the terms of the Plan Administrator Agreement), to preserve the value of the Company's assets during the period of dissolution and liquidation, and (ii) the assets of the Company (including, without limitation, proceeds from the sale or disposition of any assets during the period of dissolution and liquidation) shall be applied in accordance with the Plan, including in accordance with Article VIII of the Plan, and the Confirmation Order.

Section 6.2    Termination. The Company and this Agreement will terminate when all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company, have been distributed in the manner provided for in this ARTICLE VI, and the Certificate has been canceled in the manner required by the Delaware Act.

## ARTICLE VII

## TRANSFERS OF UNITS

Section 7.1    General; Permitted Transfers.

6

(a)  <u>Transfer of Units, Generally</u>. No Units shall be transferred, in whole or in part, except in the event of the resignation, death or removal of the Member described in <u>Section 2.3</u>. Any successor Member shall execute a joinder to this Agreement as a condition precedent to receiving any Units. Any transfer of Units that is not in compliance with the terms of this Agreement, the Plan or Confirmation Order, as applicable, is void *ab initio*. Upon its admission as the Member, the transferee will succeed to all of the rights and obligations of the transferring Member to the extent attributable to the Units transferred to such transferee.

(b)  <u>Effect of Disposition of Units</u>. Following a permitted transfer of Units by the Member to a transferee, the transferring Member will no longer have any of the rights, powers, duties, obligations, preferences or privileges attributable to such Member, except as explicitly provided for in this Agreement.

Section 7.2  <u>Restrictions on Transfer</u>. Notwithstanding anything in this Agreement to the contrary, no transfer of any Units shall be made if such transfer would violate then applicable law.

## ARTICLE VIII

## ADMINISTRATIVE MATTERS

Section 8.1  <u>Maintenance of Records</u>. The Company shall maintain books and records necessary, convenient or incidental to recording the Company's business and affairs.

Section 8.2  <u>Accounting Methods</u>. The books and records of the Company shall be kept on an accrual basis for financial reporting and tax purposes. All financial records shall be maintained in accordance with GAAP.

Section 8.3  <u>Fiscal Year; Taxable Year</u>. The fiscal year (the "***Fiscal Year***") of the Company is the calendar year; provided that the Fiscal Year for 2021 will begin on the Effective Date. The taxable year (the "***Taxable Year***") of the Company is the Fiscal Year, except as otherwise required under the Code, the Treasury Regulations or other applicable laws.

Section 8.4  <u>Tax Classification</u>. The Company has made an election to be classified as an association taxable as a corporation for U.S. federal income tax purposes and has or will make a similar election for purposes of applicable state and local income tax purposes if any additional election is needed so that the Company is taxed as a corporation for applicable state and local income tax purposes whenever possible. The Member (subject to the terms of the Plan Administrator Agreement) shall take all reasonable actions as may reasonably be required in order for the Company to qualify for classification as a corporation for U.S. federal and applicable state, local and foreign income tax purposes.

Section 8.5  <u>Tax Returns</u>. The Company shall also cause to be prepared and filed all tax returns required of the Company.

# ARTICLE IX

## LIMITED LIABILITY; INDEMNIFICATION & EXCULPATION

Section 9.1     Limited Liability of Member. Except to the extent provided by the Delaware Act, the Member will not be liable: (i) for the debts, obligations or liabilities of the Company, or (ii) to the Company for any loss, damage or claim incurred by reason of any action taken or omitted to be taken by such Member in good-faith reliance on the provisions of the Plan Administrator Agreement or this Agreement, so long as such action or omission does not constitute bad faith, willful misconduct, fraud or gross negligence by such Member, as determined by a final order of a court of competent jurisdiction. The Member shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, net income or net losses of the Company or any facts pertinent to the existence and amount of assets from which Distributions might properly be paid) of the following Persons or groups: (i) any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company; or (ii) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person reasonably believes to be within such other Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in § 18-406 of the Delaware Act.

Section 9.2     Indemnification. The Company, its receiver or its trustee shall, to the fullest extent permitted by applicable law and the Plan, indemnify, defend and hold harmless each Mandatory Indemnified Party from and against any expense, loss, damage or liability (including reasonable attorneys' fees) (the "***Indemnified Liabilities***") incurred in connection with, or any legal proceeding arising from or related to, the Company or any act or omission of such Person on behalf of the Company; provided, that such conduct did not constitute willful misconduct, fraud or gross negligence, as determined by a final order of a court of competent jurisdiction. As used herein, "***Mandatory Indemnified Party***" means any Person (and the partners, members, directors, stockholders, employees, agents, heirs, personal representatives, and successors of such Person) who is or was a Member or officer of the Company following the Effective Date.

Section 9.3     Payment of Expenses in Advance. Except as otherwise provided in the Plan, expenses incurred in defending any legal proceeding for which indemnification is required pursuant to Section 9.2 hereof shall be paid by the Company in advance of the final disposition of such Legal Proceeding, provided the Company has received a written undertaking by or on behalf of the Mandatory Indemnified Party to repay all amounts so advanced if it is ultimately determined by a final, non-appealable order of a court of competent jurisdiction that such Person is not entitled to be indemnified pursuant to this ARTICLE IX.

Section 9.4     No Impairment. No amendment or modification of this Agreement may impair the rights of any Person under this ARTICLE IX arising at any time with respect to events occurring prior to such amendment or modification.

## ARTICLE X

## GENERAL PROVISIONS

Section 10.1 <u>Amendments and Waivers</u>. This Agreement may be amended, and the observance of any provision of this Agreement may be waived (either generally or in a particular instance, and either retroactively or prospectively), only upon the written consent of the Member (but only consistent with the Plan, the Plan Administrator Agreement, and the Confirmation Order) or as may be approved by the Bankruptcy Court.

Section 10.2 <u>Entire Agreement</u>. This Agreement constitutes the entire understanding and agreement among the parties hereto with respect to the subject matter hereof. The Amended LLC Agreement is deemed amended and restated and superseded and replaced in its entirety by this Agreement and is of no further force or effect.

Section 10.3 <u>GOVERNING LAW</u>. THE PROVISIONS OF THIS AGREEMENT ARE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF DELAWARE OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF DELAWARE.

Section 10.4 <u>No Third Party Beneficiaries</u>. Except as expressly set forth in this Agreement and except for a Mandatory Indemnified Party, none of the provisions in this Agreement are for the benefit of or enforceable by any Person other than the parties to this Agreement (including the parties expressly deemed to be party hereto in accordance with the terms of this Agreement) their respective successors and assigns.

Section 10.5 <u>Severability</u>. In case any one or more of the provisions of this Agreement is for any reason held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability will not affect any other provision of this Agreement, and such invalid, illegal, or unenforceable provision will be reformed and construed so that it will be valid, legal, and enforceable to the maximum extent permitted by applicable law and still be consistent with the intentions of the parties hereto.

\* \* \* \* \* \*

IN WITNESS WHEREOF, the undersigned has executed this Agreement to be effective as of the date first above written.

By: _____

Name: **[●]**

Title:  Sole Member

**EXHIBIT C**

Amended and Restated Intellectual Property License Agreement

## AMENDED AND RESTATED IP LICENSE AGREEMENT

This AMENDED AND RESTATED IP LICENSE AGREEMENT ("**Agreement**"), is entered into and effective as of July [●], 2021 (the "**Effective Date**"), by and between Griddy Technologies LLC, a Delaware limited liability company ("**Licensor**"), and Griddy Energy LLC, a Delaware limited liability company ("**Griddy Energy**" or the "**Licensee**") (the Licensor and Licensee may be hereinafter individually or collectively referred to as the "**Party**" or "**Parties**").

**WHEREAS**, Griddy Energy was formerly in the business of delivering a retail electric service in Texas by connecting its members to ERCOT's wholesale electricity market and providing usage information and other services related to energy consumption to its members, in each case in through a proprietary platform and mobile application owned by the Licensor (such activities, the "**Business**");

**WHEREAS**, on March 15, 2021, Griddy Energy filed a voluntary petition under chapter 11 of title 11 of the United States Code (the "**Chapter 11 Case**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") as a result of the devastating effects of Winter Storm Uri and the subsequent failure of the electricity grid in Texas;

**WHEREAS**, on May 26, 2021, the Griddy Energy filed that certain *Modified Third Amended Plan of Liquidation for Griddy Energy LLC Under Chapter 11 of the Bankruptcy Code*, dated as of May 26, 2021 (as amended, supplemented or modified from time to time, the "**Plan**") and related disclosure statement (the "**Disclosure Statement**") with the Bankruptcy Court;

**WHEREAS**, on May 26, 2021, the Court entered an order conditionally approving the Disclosure Statement;

**WHEREAS**, on [●], 2021, the Bankruptcy Court entered an order approving the Disclosure Statement on a final basis and confirming the Plan;

**WHEREAS**, on the date hereof, the Plan has become effective and [●] has been appointed as the Plan Administrator of the Plan (the "**Plan Administrator**");

**WHEREAS**, the Plan Administrator is the sole member and manager of Griddy Energy;

**WHEREAS**, Licensor is the owner of all rights, title and interest in and to the domestic and foreign intellectual property and proprietary rights used in the Business, including: (1) the proprietary platform and mobile application used in the Business, (2) the patents, patent applications and patent disclosures set forth in the attached **Schedule A** (the "**Patent Rights**"); (3) the names, marks, trademarks, service marks, trade names, logo(s), and/or designs set forth in the attached **Schedule B**, as well as the trademark registrations therefor, in connection with the various goods and services set forth in such registrations and as used at common law, together with the goodwill of the business symbolized thereby (hereinafter, collectively the "**Marks**"); (4) the domain names and subdomains set forth in the attached **Schedule C** (the "**Domain Names**"); and (5) all other intellectual property rights including inventions, ideas, copyrights, computer software, trade secrets, and industrial and other protected designs used in the Business whether or not registered, applied for, or unregistered (the "**Other Business Intellectual Property**") (the Patent Rights, Marks, Domain Names, and Other Business Intellectual Property may be hereinafter referred to individually and collectively as the "**Licensed Property**"); *provided*, *that*, if any of the property described herein is not owned or held by Licensor, such property shall not be considered Licensed Property; and

**WHEREAS**, on December 4, 2020, the Parties entered into an IP License Agreement (the "**Original Agreement**");

**WHEREAS**, because the only operations of Griddy Energy from the Effective Date forward will be to wind down the company consistent with the Plan, the Parties desire to amend and restate the Original Agreement to reflect a more limited license to the Licensed Property that would be sufficient to allow Griddy Energy to wind down its operations and use the Licensed Property consistent with the Plan, including, without limitation, the access to and use of the Licensed Property for the purposes of evaluating, processing, and prosecuting claims or causes of action by or against Griddy Energy (the "**Permitted Purposes**") and nothing more, on the terms and conditions set forth below, and this Agreement hereby amends, restates and supersedes the Original Agreement in its entirety; *provided*, *that*, if Licensee retains a third party or third parties to assist with the Permitted Purposes, such third party or third parties' use of or access to the Licensed Property for the Permitted Purposes shall not be deemed a breach of this Agreement;

**NOW, THEREFORE**, in consideration of the mutual promises made, and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, confirmed and accepted, the Parties agree as follows:

1. **Ownership of the Licensed Property.** Licensee acknowledges and agrees, during the term of this Agreement and thereafter that: (i) Licensor is the sole and exclusive owner of the Licensed Property; (ii) Licensee will do nothing inconsistent with Licensor's ownership of the Licensed Property; (iii) Licensee shall not challenge, object, contest or raise any claim adverse to Licensor's rights, title or interest in and to the Licensed Property; and (iv) Licensee shall not apply for or register any of the Licensed Property or any modifications, improvements, or derivative works thereof, including but not limited to derivative works of software included in the Licensed Property.

2. **Grant of License.** Subject to the Licensee's compliance with the terms and conditions set forth and incorporated in this Agreement, Licensor grants to Licensee a non-exclusive, irrevocable, fully paid-up, non-transferable, perpetual right, license, and covenant not to sue, to use the Licensed Property and any improvements or derivative works thereof (which, according to Paragraph 4 below, remain the property of Licensor). Licensee's right to use the Licensed Property under this Agreement is limited in scope to the Permitted Purposes, and nothing more. While the license to use the Licensed Property as described in this Paragraph is fully paid-up, the costs associated with hosting the instances of any Licensed Property software hosted by Amazon Web Services or other provider shall be paid directly to Amazon Web Services or another provider by Licensee.

3. **No Right to Sub-License or Transfer.** Licensee shall not have the right to grant sub-licenses for the Licensed Property under this Agreement, nor shall Licensee have the right to transfer or assign this Agreement to any person or entity.

4. **Improvements to the Licensed Property and Access to Source Code.** For the avoidance of doubt, if Licensor is issued patent claims after the Effective Date (i) on an invention, method or process that was included in the Patent Rights, or (ii) that are entitled to priority based on a patent application that was included in the Patent Rights, such patent claims shall be included in the Licensed Property. Licensee shall not have the right under this Agreement to access or view any source code that underlies or is in any way related to the Licensed Property, and Licensee shall not make any effort to reverse engineer any source code or other Licensed Property. Licensee also shall not make any improvements to the Licensed Property. For clarity, to the extent any improvements are made to the Licensed Property by any party during the term of this Agreement, those improvements shall be solely and exclusively owned by Licensor.

5. **Confidential Information.** The provisions of this Paragraph 5 shall apply to any confidential or proprietary information exchanged by the Parties in connection with this Agreement, whether or not designated as confidential or proprietary and including information that, by the nature of the information or the circumstances surrounding the disclosure, would reasonably be understood to be confidential ("**Confidential Information**"). Each Party ("**Receiving Party**") and, in the case of Licensee, any person or entity that reasonably needs to know

Confidential Information, shall keep all Confidential Information of each other Party ("**Disclosing Party**") confidential and shall not directly or indirectly disclose, reveal, divulge or communicate to any third party such Confidential Information without the prior written consent of the Disclosing Party. The Receiving Party shall use the same degree of care to prevent and restrain the unauthorized use or disclosure of the Disclosing Party's Confidential Information by any of its agents or representatives as it currently uses for its own confidential information of a like nature, but in no event less than a reasonable standard of care. The Receiving Party shall ensure that the Disclosing Party's Confidential Information shall only be disclosed to the Receiving Party's agents or representatives that reasonably need to know such Confidential Information. The Receiving Party hereunder shall not use any Confidential Information of the Disclosing Party except as permitted by the licenses granted herein. The Receiving Party will institute the necessary security policies and procedures to meet its obligations hereunder, which policies, procedures and safeguards shall be no less rigorous than those maintained by the Receiving Party as of the date of this Agreement or as would be considered reasonable.

      A. **Exclusions**. The confidentiality obligations in this Paragraph 5 shall not apply to any Confidential Information which:

      (i) is or becomes generally available to or known by the public (other than as a result of a non-permitted disclosure or other wrongful act directly or indirectly by the Receiving Party or any such other persons granted a sublicense or other rights);

      (ii) is or becomes available to the Receiving Party on a non-confidential basis from a source other than the Disclosing Party; provided that, the Receiving Party has no actual knowledge that such source was at the time of disclosure to the Receiving Party bound by a confidentiality agreement with the Disclosing Party or other obligation of secrecy which was breached by such disclosure;

      (iii) has been or is hereafter independently acquired or developed by the Receiving Party without use or reference to such Confidential Information and without otherwise violating any confidentiality agreement with or other obligation of secrecy to the Disclosing Party;

      (iv) is required by any governmental authority or pursuant to applicable law to be disclosed by oral question, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process; provided that, the Receiving Party (a) uses all reasonable efforts to provide the Disclosing Party with written notice of such request or demand as promptly as practicable under the circumstances so that the Disclosing Party shall have an opportunity to seek an appropriate protective order or other appropriate remedy; and (b) furnishes only that portion of the Confidential Information which is in the opinion of the Receiving Party's counsel legally required to be disclosed; or

      (iv) is the property of the Licensee.

      B. **Confidentiality Obligations**. The Receiving Party shall ensure that its agents and representatives comply with the provisions of this Paragraph 5. The Receiving Party shall indemnify and hold harmless the Disclosing Party in the event of any breach by the Receiving Party's Representatives or such other Persons of this Paragraph 5. The Receiving Party shall promptly notify the Disclosing Party in the event that the Receiving Party learns of any unauthorized use or disclosure of such Confidential Information by it, its agents, representatives, or other such person or entity, and shall promptly take all actions necessary to correct and prevent such use or disclosure.

      6. **Representations and Warranties.** Licensor hereby represents and warrants as of the Effective Date that Licensor owns or controls all rights necessary to grant the rights and licenses in and to the Licensed Property

granted herein and Licensor has not granted any other person or entity any rights or licenses to the Licensed Property that conflict with the rights granted to Licensee.

7. **Term.** The term of this Agreement shall commence on the Effective Date and shall terminate on the earlier of (a) Griddy Energy's chapter 11 case being closed, converted or dismissed, or (b) after the Plan Administrator has settled or otherwise resolved all Causes of Action (as that term is defined in the Plan) and all claims filed against the Debtor in the bankruptcy case have been administered, resolved or otherwise reconciled. The Parties may also terminate the Agreement prior to this time upon the written agreement of Licensee and Licensor or in accordance with Paragraph 8 below. No Bankruptcy Court approval shall be required for termination of the Agreement.

8. **Termination.**

   A. **Termination for Cause**. Licensor shall have the right, in addition to any and all other remedies available to Licensor at law or in equity, to terminate this Agreement on thirty (30) days prior written notice to Licensee if Licensee breaches any of its material obligations under this Agreement and fails to cure such breach within thirty (30) days of receipt of such notice of breach from Licensor or any agreed upon extension.

   B. **Going Concern**. In the event that Licensor is unable to continue as a going concern, this Agreement shall terminate upon the Licensor sending written notice to Licensee of Licensor's inability to continue as a going concern and Licensor having used commercially reasonable efforts to provide the Licensee with records of any data or information owned by the Licensee in the Licensor's possession in a form that is reasonably sufficient to permit the Licensee to continue the Permitted Purposes; *provided that*, notwithstanding the termination pursuant to Paragraph 8.B. of this Agreement, for the duration of the Term, Licensee may elect to retain its rights (excluding any right under applicable non-bankruptcy law to specific performance) to the Licensed Property for the Permitted Purposes as such rights existed as of the Effective Date.

   C. **Effects of Termination**. Licensee agrees that in the event of termination, all rights in the Licensed Property and the goodwill connected therewith shall remain the property of the Licensor and/or if necessary, shall immediately transfer and be assigned back to Licensor. Upon termination of the Agreement, Licensee shall: (i) immediately discontinue and forever cease all use of the Licensed Property; and (ii) cooperate with Licensor or its appointed agent to destroy or deliver to Licensor all materials or items used or developed in connection with this Agreement, which incorporate any or all of the Licensed Property.

9. **Miscellaneous.**

   A. **Governing Law and Venue**. This Agreement is made under and shall be governed and interpreted in accordance with the laws of the state Delaware, without regard to that state's choice of law principles, as if it were a contract wholly made and performed within the state of Delaware.

   B. **Severability**. If any part of this License Agreement shall be held unenforceable, the rest of the License Agreement nevertheless remains in full force and in effect.

   C. **No Third Party Beneficiaries**. This Agreement is for the sole benefit of the Parties hereto, and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit or remedy of any nature, under or by reason of this Agreement.

   D. **Complete Agreement; Modifications**. This Agreement, together with the Schedules hereto, constitutes the final expression and the complete and exclusive integrated statement of all the agreements, conditions, promises, representations and covenants among the Parties with respect to

the subject matter hereof, and supersedes all prior agreements, correspondence, negotiations, representations, understandings and discussions among the Parties, their respective representatives and any other person or entity with respect to the subject matter covered hereby, whether written or oral.  Any modification, amendment or alteration of the terms of this Agreement must be in writing and signed by all Parties.

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives where applicable as of the date set forth above.

**LICENSOR**                                    **LICENSEE**

**GRIDDY TECHNOLOGIES LLC**          **GRIDDY ENERGY LLC**


By: _____          By: _____
Name: _____          Name: _____
Title: _____          Title: _____

# **EXHIBIT D**

Consulting Agreement

## **CONSULTING AGREEMENT**

This CONSULTING AGREEMENT (this "Agreement") is effective as of [●], 2021 (the "Effective Date"), by and between New Utility Holdings LLC, a Delaware limited liability company ("Consultant") and Griddy Energy LLC, a Delaware limited liability company (the "Company"). Capitalized terms used herein and not otherwise defined have the meanings ascribed to such terms in that certain *Modified Third Amended Plan of Liquidation for Griddy Energy LLC Under Chapter 11 of the Bankruptcy Code*, dated May 26, 2021 (as amended, supplemented or modified from time to time, the "Plan").

WHEREAS, on March 15, 2021, the Company commenced a voluntary chapter 11 case, styled "In re GRIDDY ENERGY LLC," administered under Case No. 21-30923 (the "Chapter 11 Case") under title 11 of the United States Code (as may be amended from time to time, the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court");

WHEREAS, on May 26, 2021, the Company filed the Plan and related disclosure statement (the "Disclosure Statement") with the Bankruptcy Court;

WHEREAS, on May 26, 2021, the Court entered an order conditionally approving the Disclosure Statement;

WHEREAS, on [●], 2021, the Bankruptcy Court entered an order approving the Disclosure Statement on a final basis and confirming the Plan;

WHEREAS, on the date hereof, the Plan has become effective and [●] has been appointed as the Plan Administrator of the Plan;

WHEREAS, the Plan Administrator is the sole member and manager of the Company;

WHEREAS, as part of a settlement with the Company's prepetition lenders and the Official Committee of Unsecured Creditors of the Company in the Chapter 11 Case (the "Settlement"), Consultant agreed to provide reasonable assistance to the Plan Administrator in connection with the prosecution of causes of action on terms and conditions to be agreed; and

WHEREAS, the Company desires to engage the services of Consultant to assist in providing the Services (as defined below), and Consultant is willing to accept such engagement subject to the terms of this Agreement.

NOW, THEREFORE, in consideration of the mutual promises contained in this Agreement and other good and valuable consideration, the parties agree as follows:

1. **Term.** This Agreement shall be effective on the Effective Date and shall continue until (i) the six month anniversary of the Effective Date or (ii) as agreed to in writing by the Company and Consultant; *provided, however*, that any covenant or obligation that by its terms survives the termination of this Agreement, including Section 5, Section 6 and Section 7 shall continue in full force and effect until completed.

2. **Services.** Consultant agrees to provide consulting services reasonably requested by the Company from time to time that are reasonably necessary in connection with the pursuit of prepetition causes of action by the Company (the "Services"); *provided*, *however*, that the Services shall be limited to

an aggregate amount of up to (i) 30 hours per month during the Term; *provided*, *further*, that the Services of each individual director, officer, or employee of Consultant shall be limited to 10 hours per month during the Term. It is understood and agreed by the parties hereto that the Services to be provided will be the types of services an officer or director of a similar company would provide to such company, and entail high-level support to the Company regarding factual background related to the Debtor, the events that impacted the Debtor's business related to the winter storm event that occurred in Texas in February 2021, and other high-level consulting advice regarding the pursuit of causes of action related to the foregoing as may be reasonably requested by the Company in connection therewith. For the avoidance of doubt, the Services do not include the provision of (a) oral or written testimony or the preparation of discovery materials unless otherwise agreed in writing between the Debtor and Consultant or compelled by law, (and for which Consultant would be compensated as mutually agreed between the parties) and (b) administrative or clerical services, banking, accounting, tax related and other similar types of services.

3.     **Fees and Expenses.**  During the Term and subject to the proviso in Section 2 above, in consideration of the Services and the mutual promises and covenants contained in the Settlement, (i) Consultant shall not be compensated and (ii) the Company shall reimburse all reasonable and documented out-of-pocket expenses of the Consultant relating to the provision of the Services.

4.     **Liability and Insurance.**  Consultant is responsible for maintaining its own health, disability, liability, and other similar insurance policies on behalf of its members, employees and agents, as applicable, and Consultant agrees that the Company is not under any obligation to and shall not at any time provide such insurance for Consultant's members, employees or agents. It is the intent of the parties to create an independent contractor relationship.  Consultant cannot act for or bind Company or incur any debts or liabilities in the name of Company.

5.     **Confidentiality.**  In connection with the execution of this Agreement and the provision of the Services, Consultant acknowledges and agrees that Consultant and its Associates (as defined below) may have access to certain Confidential Information of the Company and its Associates.  Said information shall be governed as follows:

(a)     As used in this Agreement, "Confidential Information" means any proprietary, secret or confidential information of the Company or its Associates, disclosed to or otherwise obtained by Consultant or its Associates in connection with the Services.  Notwithstanding the foregoing, Confidential Information does not include any proprietary, secret or confidential information of the Company which: (i) was known by Consultant or its Associates at the time of its receipt from the Company or its Associates; (ii) prior to or after the time the disclosure becomes generally available to the public, not as a result of any inaction or action of Consultant or its Associates in violation of its obligations hereunder; (iii) is obtained by Consultant or its Associates from a source other than the Company or its Associates, which source does not have any obligation of confidentiality to the Company or its Associates; (iv) is approved, in writing, for release by the Company; or (v) was independently developed by Consultant or its Associates without use of or reference to the Confidential Information.

(b)     Except as directed or agreed to by the Company, Consultant hereby agrees not to, and will direct its Associates not to, disclose the Confidential Information or use the Confidential Information for any purpose except providing Services hereunder. Consultant will not, and will direct its Associates not to, disclose any Confidential Information to third parties except those Associates of Consultant who are similarly bound by a duty of confidentiality and are required to have the information in order to carry out the Services. Consultant shall inform its Associates of the confidential nature of the Confidential Information and shall instruct them to treat the information confidentially. Consultant shall be responsible for any breach of this Agreement by

2

its Associates and agrees, at its sole expense, to take all reasonable measures to restrain its Associates from prohibited or unauthorized disclosure or use of the Confidential Information.

(c)      In the event that Consultant or its Associates become legally compelled under applicable law, regulation, or by a competent governmental, administrative or regulatory authority or in a proceeding before a court, arbitrator or administrative agency to disclose any portion of the Confidential Information, Consultant will, and will direct its Associates to, use its reasonable efforts to cooperate with the Company at the Company's sole cost and expense in any attempt the Company may make to obtain a protective order or other appropriate remedy or with respect to Consultant's and/or its Associates' seeking a waiver of compliance with the relevant provisions of this Agreement.  In the event that a protective order or other remedy is not obtained in such a proceeding, or the Company fails to waive compliance with the relevant provisions of this Agreement, Consultant agrees that it will, and will direct its Associates to, disclose only that Confidential Information which its counsel advises is legally required to be disclosed and will exercise commercially reasonable efforts, and will direct its Associates to exercise their commercially reasonable efforts, to cooperate with the Company to obtain reliable assurance that confidential treatment will be accorded the Confidential Information which is so disclosed.

(d)      Upon written request by the Company, Consultant shall promptly return to the Company or destroy and ensure that its Associates promptly return or destroy, all documents or other tangible materials representing Confidential Information. Notwithstanding the foregoing, Consultant shall be entitled to retain archival copies of the Confidential Information for legal, regulatory, or compliance purposes, and nothing shall require the erasure or destruction of back-up media made in accordance with Consultant's document-retention procedures.

(e)      For purposes of this Agreement, "Associates" means subsidiaries and other individuals and entities controlled, directly or indirectly, by a party or under common control with a party, as well as the respective directors, officers, employees, members, managers, agents, representatives, consultants, accountants, legal counsel, insurers and/or advisors of the party or such subsidiaries, individuals or entities. For purposes of this definition, "control" means the possession of the power to direct or cause the direction of the management and policies of such person, whether through the ownership of voting securities, by contract or otherwise.

**6.      Limitation of Liability and Damages; Amount of Damages.**

(a)      Company understands that Consultant will receive no compensation or remuneration for the Services and that Consultant's agreement to offer its services without compensation is based on, among other things, the Company's agreement to limit Consultant's liability.   Notwithstanding anything to the contrary contained herein, Consultant and its Associates shall have no liability to the Company or its Associates, or any creditor or former customer of the Company or any other third party with respect to the performance of any Services hereunder (regardless of whether such liability arises from the negligence or other fault of Consultant or any of its Associates), except to the extent such liability is determined by a court of competent jurisdiction to arise from actual intentional fraud, gross negligence, or willful misconduct of Consultant or any of its Associates.

(b)      Notwithstanding anything to the contrary contained in this Agreement, no action or inaction by any party or any of their Associates shall be deemed to be a breach of this Agreement for any purpose hereunder, and no party shall have any claim or recourse against another party with respect to such action or inaction to the extent (i) the other party or any of its Associates was required to take or not to take such action pursuant to the terms of this Agreement

3

or applicable law or (ii) such party or any of its Associates has directed or requested the other party or any of its Associates to take or not take such action.

(c)     To the maximum extent permitted by applicable law, none of the parties shall be liable for any indirect, special, incidental, or consequential damages (including damages for loss of business and loss of future profits, revenue or income, damages based on a multiple of earnings, diminution in value or loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement), whether based on breach of contract, breach of warranty, tort (including negligence), product liability, misrepresentation or otherwise, even if the damages were foreseeable or if such party was advised of the possibility of such damages.

(d)     The limitations set forth in this Section 6 shall not apply to the Company's indemnification obligations contained in Section 7.

**7.     Indemnification.**

(a)     To the fullest extent permitted by law and the Plan, the Company shall indemnify and hold harmless Consultant and its Associates ("Indemnitees") from and against any and all losses, claims, damages, liabilities, judgements, fines, penalties, interest, assessments, amounts paid or payable in settlement and any and all expenses (including attorneys' fees and expenses) arising from any and all threatened, pending, or completed claims, demands, actions, suits, proceedings, or alternative dispute mechanisms, whether civil, criminal, administrative, arbitrative, investigative, or other, whether made pursuant to federal, provincial, state, or local law, whether formal or informal, and including appeals (a "Proceeding"), in which Consultant may be involved, or is threatened to be involved, as a party, a witness, or otherwise, related to any act or omission of Consultant in the provision of the Services, except to the extent such liability arises from actual intentional fraud, gross negligence, or willful misconduct of Consultant or any of its Associates.

(b)     To the fullest extent permitted by law and the Plan, Consultant shall have the right to advancement by the Company, prior to the final disposition of any Proceeding by final adjudication, of any and all expenses actually and reasonably incurred by Consultant (or reasonably expected by Consultant to be incurred by Indemnitee within three months) in connection with any Proceeding for which indemnity is provided under Section 7(a); *provided, however*, that Consultant hereby agrees to repay any amounts paid, advanced, or reimbursed by the Company pursuant to this Section 7(b) in respect of expenses that are not ultimately paid by Consultant or that relate to, arise out of, or result from any Proceeding in respect of which it shall be determined by a final and non-appealable judgment by a court of competent jurisdiction that Consultant is not entitled to be indemnified under the terms of this letter agreement.

**8.     Disclaimer of Warranties.**  The Services and deliverables of Consultant, if any, are provided "As-Is" and, to the maximum extent permitted by applicable law, Consultant and its Associates, disclaim all warranties, express or implied, regarding Consultant's Services and deliverables including any warranty of fitness for a particular purpose, title, merchantability, or non-infringement.

**9.     Continuation of Services.**  If at any time, one or more of the individuals Michael Fallquist, Christian McArthur, or Roop Bhullar are no longer employed or controlled by Consultant, such individual(s) shall enter into a separate consulting agreement, in their individual capacity, with the Company that provides for the continued provision of consulting services on terms that are substantially similar to this Agreement by such individual.

10. **Severability of Covenants.** If any provision of this Agreement is declared illegal, unenforceable, ineffective, or void, such provision shall be performed to the extent permitted by law, and the remainder of the Agreement will not be affected.

11. **Mutual Preparation.** Each party has read this Agreement, fully understands the contents thereof, has been independently advised as to its legal effect, and is under no duress or pressure of any sort to execute it. This Agreement reflects the mutual understanding of the parties with respect to all subject matter addressed herein and shall be construed accordingly.

12. **Governing Law and Venue.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware. Each of the parties hereby agrees and irrevocably consents to personal jurisdiction and venue in any state or federal court in Delaware having subject matter jurisdiction, for the purposes of any action, suit or proceeding arising out of or relating to this Agreement.

13. **Assignment; Successors; No Third-Party Beneficiaries.** This Agreement may not be assigned by either party without the other party's express written consent to such assignment. This Agreement shall be binding on and inure to the benefit of the parties to it and their respective permitted successors and/or assigns. There shall be no third-party beneficiaries to this Agreement. Consultant may not, without the prior written consent of Company: (i) subcontract any of the Consulting Services provided under this Agreement, or (ii) assign any of its rights or delegate any of its duties pursuant to this Agreement. Any attempted assignment without Company's consent will be void.

14. **Entire Agreement.** This Agreement contains the complete and exclusive agreement of Company and Consultant concerning Consultant's engagement, and all discussions, agreements, and statements are merged into this Agreement. This Agreement may not be changed orally, but only by an agreement in writing signed by Company and Consultant.

*[Signature page follows]*

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed effective as of the Effective Date.

**COMPANY**:

Griddy Energy LLC

By: _____
Name:
Title:

**CONSULTANT**:

New Utility Holdings LLC

By: _____
Name:
Title:

**MICHAEL FALLQUIST**:

By: _____
Name: Michael Fallquist

**CHRISTIAN MCARTHUR**:

By: _____
Name: Christian McArthur

**ROOP BHULLAR**:

By: _____
Name: Roop Bhullar

**Exhibit E**

**Schedule of Retained Causes of Action**

## Schedule of Retained Causes of Action[1]

Sections IV.F.2 of the Disclosure Statement provides as follows:

The Plan provides for the retention of all Causes of Action other than those that are waived, relinquished, exculpated, released, compromised or settled.

In accordance with section 1123(b) of the Bankruptcy Code, the Debtor shall retain and enforce all rights to commence and pursue any and all Causes of Action of the Debtor, and the Debtor's right to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtor pursuant to the releases and exculpations contained in the Plan and Article XII of the Plan, which shall be deemed released and waived by the Debtor as of the Effective Date.

The Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Debtor. **No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, the Disclosure Statement or any other document in this case to any Cause of Action against it as any indication that the Debtor will not pursue any and all available Causes of Action of the Debtor against it. The Debtor expressly reserves all rights to prosecute any and all Causes of Action against any Person, except as otherwise provide in the Plan, including Article XII of the Plan.** Unless any Cause of Action of the Debtor against a Person is waived, relinquished, exculpated, released, compromised or settled in the Plan or pursuant to a Final Order, the Debtor expressly reserves all such Causes of Action for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or the Effective Date.

Section 12.13 of the Plan provides as follows:

**Retention of Causes of Action/Reservation of Rights**. Except with respect to the Released Parties or any other beneficiary of the releases, injunctions, and exculpations contained in this Article XII, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims or Causes of Action, right of setoff, or other legal or equitable defense that the Debtor had immediately prior to the Effective Date, on behalf of the Estate or of itself in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law. The Debtor shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or other legal or equitable defenses which the Debtor had immediately prior to the Petition Date as fully as if the Chapter 11 Case had not been commenced, and all of the Debtor's legal and/or

---

[1] Capitalized terms not otherwise defined herein have the meanings given them in the *Modified Third Amended Plan of Liquidation for Griddy Energy LLC Under Chapter 11 of the Bankruptcy Code* [Docket No. 311] (as amended, modified or supplemented from time to time, the "Plan").

equitable rights respecting any Claim may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Case had not been commenced. Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the Debtor shall have the exclusive right to institute, prosecute, abandon, settle, or compromise all Causes of Action (excluding those Causes of Action released pursuant to this Article XII), in its sole discretion and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in the Chapter 11 Case.

Section 1.17 of the Plan defines "Causes of Action" to mean, without limitation, any and all actions, causes of action, Avoidance Actions, controversies, liabilities, obligations, rights, suits, damages, judgments, Claims, and demands whatsoever owned by the Debtor, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, whether assertable directly, indirectly, derivatively or in any representative or other capacity, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act, failure to act, error, omission, transaction, occurrence or other event arising or occurring prior to the Petition Date or during the course of the Chapter 11 Case, including through the Effective Date.

Section 1.107 of the Plan defines "Texas Storm Causes of Action" to mean any and all Causes of Action of the Debtor arising from, relating to or in connection with the winter storm (commonly referred to as "Winter Storm Uri") that occurred in Texas during the month of February 2021 (primarily February 13, 2021 through February 19, 2021). For the avoidance of doubt, such Causes of Action of the Debtor exclude any and all claims against the Released Parties.

Notwithstanding and without limiting the generality of the foregoing, including Section 12.13 of the Plan, the Debtor expressly reserves all Causes of Action, including the following types of claims:

## I.     Claims Related to Insurance Policies

Unless otherwise released by the Plan, the Debtor expressly reserves all Causes of Action based in whole or in part upon any and all insurance contracts and insurance policies to which the Debtor is a party or pursuant to which the Debtor has any rights whatsoever, regardless of whether such contract or policy is specifically identified in the Plan, this Plan Supplement, or any amendments thereto, including, without limitation, Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matters. Without limiting the generality of the foregoing, the Debtor expressly reserves all Causes of Action against the Persons identified in **Schedule E(i)** attached hereto.

## II.     Claims Related to Tax Obligations and Refunds

Unless otherwise released by the Plan, the Debtor expressly reserves all Causes of Action based in whole or in part upon any and all tax obligations to which the Debtor is a party or pursuant

to which the Debtor has any rights whatsoever, including, without limitation, against or related to all Persons that owe or that may in the future owe money related to tax refunds to the Debtor, regardless of whether such Person is specifically identified herein. Without limiting the generality of the foregoing, the Debtor expressly reserves all Causes of Action against the Persons identified in **Schedule E(ii)** attached hereto.

### III.     Claims, Defenses, Cross-Claims and Counter-Claims Related to Litigation and Possible Litigation

Unless otherwise released by the Plan, the Debtor expressly reserves all Causes of Action against or related to all Persons that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, including an adversary proceeding before the Bankruptcy Court, whether formal or informal or judicial or non-judicial, regardless of whether such Person is specifically identified in the Plan, this Plan Supplement, or any amendments thereto. Without limiting the generality of the foregoing, the Debtor expressly reserves all Causes of Action against the Persons identified in **Schedule E(iii)** attached hereto.

### IV.     Claims Related to Contracts and Leases

Unless otherwise released by the Plan, the Debtor expressly reserves Causes of Action based in whole or in part upon any and all contracts and leases to which the Debtor is a party or pursuant to which the Debtor has any rights whatsoever (regardless of whether such contract or lease is specifically identified in the Plan, this Plan Supplement, or any amendments thereto). The Claims and Causes of Action reserved include Causes of Action against vendors, suppliers of goods and services, or any other parties: (a) for overpayments, back charges, duplicate payments, improper holdbacks, deductions owing or improper deductions taken, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (b) for wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) for failure to fully perform or to condition performance on additional requirements under contracts with the Debtor before the assumption or rejection, if applicable, of such contracts; (d) for payments, deposits, holdbacks, reserves or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor or other party; (e) for any liens, including mechanics', artisans', materialmens', possessory or statutory liens held by the Debtor; (f) arising out of environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies or suppliers of environmental services or goods; (g) for counter-claims and defenses related to any contractual obligations; (h) for any turnover actions arising under section 542 or 543 of the Bankruptcy Code; (i) for unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property or any business tort claims; (j) related to the winter storm event that occurred in Texas in mid-February 2021; and (k) related to the transfer or refusal to transfer at any time of the Debtor's former customers to one or more providers of last resort.

### V.     Claims Related to Accounts Receivable and Accounts Payable

Unless otherwise released by the Plan, the Debtor expressly reserves all Causes of Action against or related to all Persons that owe or that may in the future owe money to the Debtor,

including (i) any former customer of the Debtor that opts out of the Customer Releases in accordance with the terms of the Plan. and (ii) all former customers of the Debtor if the Bankruptcy Court does not approve the Customer Releases through the Plan, regardless of whether such Person is expressly identified in the Plan, this Plan Supplement or any amendments thereto. Furthermore, the Debtor expressly reserves all Causes of Action against or related to all Persons who assert or may assert that the Debtor owes money to him, her, it or them.

## VI. Claims Related to Deposits/ Prepayments, Adequate Assurance Postings, and Other Collateral Postings

Unless otherwise released by the Plan, the Debtor expressly reserves all Causes of Action based in whole or in part upon any and all postings of a security deposits, adequate assurance payment, or any other type of deposit, prepayment, or collateral, regardless of whether such posting of security deposit, adequate assurance payment, or any other type of deposit, prepayment or collateral is specifically identified herein.

## VII. Claims Related to Liens

Unless otherwise released by the Plan, the Debtor expressly reserves all Causes of Action based in whole or in part upon any and all liens regardless of whether such lien is specifically identified herein.

## VIII. Claims Related to Claims Objections and Reconciliation Process

Unless otherwise released by the Plan, the Debtor expressly reserves all rights to object to or otherwise dispute any Claim filed against the Debtor in the Chapter 11 Case and all rights of setoff or other legal or equitable rights and defenses with respect to any Claim.

## IX. Claims Related to the Texas Winter Storm

Unless otherwise released by the Plan, the Debtor expressly reserves all Causes of Action arising from or relating to the Texas winter storm event, colloquially referred to as Winter Storm Uri, including, without limitation, Causes of Action sounding in tort, contract, or any other theory of law relating to the decision to set the real time settlement point price for power at the high offer cap of $9,000 per MWh, the continuation of such order for a total of 87.5 consecutive hours, damages resulting from the extreme electricity prices, the failure of generators to properly winterize and prepare for the winter storm event, the actions of generators before, during, and after the winter storm event, and the decision to execute, and execution of, the mass transition of the Debtor's customers to providers of last resort. Without limiting the generality of the foregoing, the Debtor expressly reserves all Causes of Action against the Persons identified in **Schedule E(ix)** attached hereto.

For the avoidance of doubt, the Debtor reserves all rights to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

**Schedule E(i)**

**Claims Related to Insurance Proceeds**

| Insurance Carrier(s)/Party[2] | Carrier Address | Insurance Policy Description |
|---|---|---|
| Hartford Fire Insurance Company | One Hartford Plaza Hartford, Connecticut 06155 | Commercial General Liability/Package From 11/18/2020 - 11/18/2021, Policy number ending G1734 |
| Hartford Casualty Insurance Company | One Hartford Plaza Hartford, Connecticut 06155 | Umbrella From 11/18/2020 - 11/18/2021, Policy number ending G1580 |
| Federal Insurance Company Chubb Group Of Insurance Companies | Capital Center, 251 North Illinois, Suite 1100 Indianapolis, IN 46204-1927 82 Hopmeadow Street P.O. Box 2002 Simsbury, CT 06070-7683 | Directors & Officers From 11/30/2020 - 11/30/2021, Policy number ending 2855 and any tail policy |
| AXIS Insurance Company | 111 South Wacker Drive, Suite 3500 Chicago, IL 60606 | Directors and Officers/Entity Excess From 11/30/2020 - 11/30/2021, Policy number ending 99-01 |
| Nationwide Management Liability & Specialty | Attention: Claims Manager 7 World Trade Center, 37th Floor 250 Greenwich Street New York, NY 10007 | Business and Management Indemnity From 12/2/2020 - 12/2/2026 Policy number ending 6952 |
| Aon Risk Services Southwest Inc | 5555 San Felipe Suite 1500 Houston, TX 77056 | Insurance broker |
| Aon Risk Services Central, Inc. | 200 East Randolph Street Chicago, IL 60601 | Insurance broker |

---

[2] Includes each named party's predecessors, successors, assigns, subsidiaries, affiliates, owners, officers, directors, employees, managers, members, principals and shareholders.

**<u>Schedule E(ii)</u>**

**Claims Related to Tax Obligations**

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| Internal Revenue Service | Centralized Insolvency Operation<br>Post Office Box 7346<br>Philadelphia, PA 19101-7346 | United States Withholding Tax<br>United States Federal Income Tax |
| Texas Comptroller of Public Accounts | Texas Comptroller of Public Accounts<br>Lyndon B. Johnson State Office Building<br>111 East 17th Street<br>Austin, TX 78744 | Sales & Use Tax<br>Gross Receipts Tax<br>Franchise Tax |

**Schedule E(iii)**

**Claims, Defenses, Cross-Claims and Counter-Claims**
**Related to Litigation and Possible Litigation**

| Party[3] | Nature of the Suit or Cause of Action |
|---|---|
| AEP Texas Central Company | Chapter 5 avoidance claim(s) |
| AEP Texas North Company | Chapter 5 avoidance claim(s) |
| Amazon Web Services | Chapter 5 avoidance claim(s) |
| AON Risk Services | Chapter 5 avoidance claim(s) |
| CenterPoint Energy, Inc | Chapter 5 avoidance claim(s) |
| Thomas Ramer Clark | Counterclaims, defenses and other causes of action in connection with the action initiated by Clark against the Debtor |
| Energy Services Group | Chapter 5 avoidance claim(s) |
| Electric Reliability Council of Texas | Chapter 5 avoidance claim(s); Texas Storm Causes of Action |
| Facebook | Chapter 5 avoidance claim(s) |
| Frazee Valuation & Forensic Consulting | Chapter 5 avoidance claim(s) |
| Charles Huppert | Counterclaims, defenses and other causes of action in connection with the action initiated by Huppert against the Debtor |
| Lisa Khoury | Counterclaims, defenses and other causes of action in connection with the action initiated by Khoury against the Debtor |
| Oncor Electric Delivery Company LLC | Chapter 5 avoidance claim(s) |
| Public Utility Commission of Texas | Counterclaims, defenses and other causes of action in connection with investigations initiated by PUCT against the Debtor; Texas Storm Causes of Action |
| State of Texas | Counterclaims, defenses and other causes of action in connection with the action initiated by the State of Texas against the Debtor |
| Stripe, Inc. | Chapter 5 avoidance claim(s) |
| Texas New Mexico Power Company | Chapter 5 avoidance claim(s) |
| Zendesk, Inc. | Chapter 5 avoidance claim(s) |

---

[3] Includes each named party's predecessors, successors, assigns, subsidiaries, affiliates, owners, officers, directors, employees, managers, members, principals and shareholders.

Active 63790463.11

**Schedule E(ix)**

**Claims Related to the Texas Winter Storm**

| Party[4] | Nature of the Suit or Cause of Action |
|---|---|
| Electric Reliability Council of Texas | Negligence; breach of contract; aiding and abetting; fraudulent transfer |
| Public Utility Commission of Texas | Negligence; aiding and abetting; due process and other claims arising under the Federal and State Constitutions, statutes and rules |
| Any and all Providers of Last Resort, in their respective capacities as such, that received former customers of the Debtor after the February winter storm event | Fraudulent transfer |
| Texas electricity generators | Negligence; gross negligence; product liability/strict liability; misrepresentation or negligent misrepresentation; fraud; breach of continuing duty to warn; breach of express and implied warranties; tortious interference with contract; claims arising under the Texas Deceptive Trade Practices Act; breach of contract; unjust enrichment |

---

[4] Includes each named party's predecessors, successors, assigns, subsidiaries, affiliates, owners, officers, directors, employees, managers, members, principals and shareholders.

Active 63790463.11

**<u>EXHIBIT F</u>**

Customer Opt-Out Form

**OPTIONAL CLASS 5 CUSTOMER RELEASE OPT-OUT FORM ("OPT-OUT FORM")**[1]

On May 26, 2021, the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court") entered the *Order: (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Plan; (III) Approving the Form of Various Ballots and Notices in Connection Therewith; and (IV) Approving the Scheduling of Certain Dates in Connection with Confirmation of the Plan* [Docket No. 308], authorizing Griddy Energy LLC (the "Debtor") to begin solicitation of the *Modified Third Amended Plan of Liquidation for Griddy Energy LLC Under Chapter 11 of the Bankruptcy Code* [Docket No. 311] (as amended, modified or supplemented from time to time, the "Plan").[2]

You previously received a Class 5 (Customer Claim) ballot to vote to accept or reject the Plan. As part of the ballot, you had the option to choose whether to opt out of the Customer Releases described in the ballot and in Section 12.10 of the Plan. If you did not choose to opt out of the Customer Releases in your Class 5 Customer Claim ballot, pursuant to the Plan, you have until [_____], 2021, which is 45 days after the Effective Date of the Plan, to do so. If you opt out of providing the Customer Releases, you will be treated as a Non-Participating Customer in accordance with the Plan.[3] If you elect to opt out of the Customer Releases, please consult the Plan and related disclosure statement to understand your treatment as a Non-Participating Customer. **IF YOU CHOOSE TO OPT OUT OF THE CUSTOMER RELEASES, ANY AMOUNT YOU OWE GRIDDY ENERGY FOR UNPAID BILLS WILL NOT BE FORGIVEN AND (1) YOU MAY BE SUBJECT TO COLLECTION ACTIONS AND (2) UNPAID BALANCES MAY BE REPORTED TO CREDIT BUREAUS.**

If you choose to elect to opt out of the Customer Releases, check the box below and clearly sign and return this Opt-Out Form by (a) first class mail, overnight courier, or hand delivery to Griddy Energy LLC, c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602 or (b) electronic mail to the proposed Plan Administrator by emailing [_____].

**THIS OPT-OUT FORM MUST BE ACTUALLY RECEIVED BY STRETTO OR THE PLAN ADMINISTRATOR BY 11:59 PM PREVAILING CENTRAL TIME ON THE DAY THAT IS 45 DAYS AFTER THE EFFECTIVE DATE (THE "OPT-OUT DEADLINE"). IF THE OPT-OUT FORM IS RECEIVED AFTER THE OPT-OUT DEADLINE, IT WILL NOT BE COUNTED.**

IF YOU DO NOT OPT OUT OF THE CUSTOMER RELEASES, YOU ARE DEEMED TO PROVIDE THE CUSTOMER RELEASE CONTAINED IN ARTICLE 12.10 OF THE PLAN.

| ☐ | **By checking this box, you elect to opt out of the Customer Releases.** |
|---|---|

---

[1] If you are not a holder of a Class 5 Customer Claim, this Opt-Out Form does not apply to you. For the avoidance of doubt, nothing contained in this Opt-Out Form creates or will be deemed to create or expand any right or interest that you do not otherwise have pursuant to the Plan.

[2] Capitalized terms used herein but not defined have the meanings given to such terms in the Plan.

[3] If you choose to opt out of the Customer Releases on or prior to [_____], 2021, any prior vote on the Plan will not be changed.

The Plan provides the following:

**12.10** *__Agreement by Holders of Participating Customers; Release of Certain Customer Collections__. Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, (i) each Participating Customer will be deemed to have consented to the Plan and the restructuring embodied herein for all purposes and deemed to accept the Customer Releases as they pertain to such Participating Customer and the Released Parties and (ii) each Released Party will be deemed to accept the Customer Releases as they pertain to such Released Party and the Participating Customers; __provided that, notwithstanding the foregoing, if the Bankruptcy Court does not approve the Customer Releases pursuant to Bankruptcy Rule 9019 through this Plan or otherwise, than each Participating Customer will not have an Allowed Class 5 Claim, the Customer Releases shall not become effective and, solely if such Participating Customer timely and properly filed an unsecured nonpriority proof of claim against the Debtor by the applicable Bar Date in accordance with the applicable Bar Date Order, such Customer Claim shall be classified as an Other General Unsecured Claim and treated for all purposes under this Plan as an Other General Unsecured Claim.__ For the avoidance of doubt, if the Customer Releases become effective, each Participating Customer releases and waives all Claims against each of the Released Parties, including, any claim sounding in law or equity or asserting a tort, breach of any duty or contract, violations of the common law, any federal or state statute, any federal or state securities laws, fraud or otherwise, demands, debts, rights, causes of action (including without limitation, the Causes of Action) or liabilities (other than the right to enforce the obligations of any party under the Plan and the contracts, instruments, releases, agreements and documents delivered under or in connection with the Plan), including but not limited any Claims for any such loss such Participating Customer may suffer, have suffered or be alleged to suffer as a result of the Debtor selling electricity to such Participating Customer prior to the Petition Date, the Debtor commencing the Chapter 11 Case or as a result of the Plan being consummated, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the pre-Effective Date Debtor, the Liquidating Debtor, the Plan Administrator, the Chapter 11 Case, the Plan or the Disclosure Statement; __provided__, that, notwithstanding the foregoing, each eligible Participating Customer may assert a Participating Customer Potential Return Claim in a timely and properly filed proof of claim form in accordance with the Former Customers Bar Date Order and, solely to the extent each Participating Customer has an Allowed Participating Customer Potential Return Claim, receive its Pro Rata share of (i) the Texas Storm Causes of Action Net Recovery Proceeds, if any, and (ii) any Available Prepetition Lender Contribution, which shall be shared with holders of Allowed Other General Unsecured Claims on a Pro Rata basis and be distributed (Pro Rata) to holders of (a) Allowed Other General Unsecured Claims and (b) Allowed Participating Customer Potential Return Claims.*

The Plan provides that:

**1.101** Released Parties means, collectively, and each solely in its capacity as such: (a) the Debtor, (b) the Committee and its members, (c) the Prepetition Secured Lenders and the Collateral Agent, and (d) each of such parties' respective predecessors, successors, assigns, subsidiaries, affiliates, the Non-Debtor Affiliates, owners, and each of their respective current (as of the Petition Date) officers, directors, employees, managers, members, principals, shareholders, agents, advisors and professionals (including any attorneys, consultants, financial advisors, investment bankers and

other professionals retained by such Persons) or other representatives, each in their capacities as such, together with their successors and assigns; provided, however, that such attorneys and professional advisors shall only include those that provided services related to the Chapter 11 Case and the transactions contemplated by the Plan; provided, further, that no Person shall be a Released Party if it elects to opt out of the releases provided for in Article XII of the Plan in its Ballot.

       1.76   <u>Participating Customer</u> means any holder of a Customer Claim that does not opt-out of the Customer Releases, including those holders of Customer Claims that abstain from voting and do not opt-out of the Customer Releases.

By signing this Opt-Out Form, you certify that (i) you held a Class 5 Customer Claim as of July 7, 2021 (the "<u>Distribution Record Date</u>") and are authorized to sign this Opt-Out Form as the holder of such claim or (ii) you are an authorized signatory for a Person that held a Class 5 Customer Claim against the Debtor as of the Distribution Record Date.

Name of claim holder: _____

Signature: _____

Name of signatory (if other than claim holder): _____

Title: _____

Address: _____

Email Address: _____

Telephone Number: _____

Date: _____

**IF YOU WISH TO OPT OUT OF THE CUSTOMER RELEASES, PLEASE COMPLETE, SIGN, AND DATE THIS OPT-OUT FORM AND RETURN PROMPTLY BY (A) FIRST CLASS MAIL, OVERNIGHT COURIER, OR HAND DELIVERY TO GRIDDY ENERGY LLC, C/O STRETTO, 410 EXCHANGE, SUITE 100, IRVINE, CA 92602 OR (B) ELECTRONIC MAIL TO THE PROPOSED PLAN ADMINISTRATOR BY EMAILING [_____].**

**<u>EXHIBIT G</u>**

Members of Oversight Committee

The following individuals have been designated as the initial members of the Oversight Committee:

Greg Craig – Designated by the Debtor

Lisa Khoury – Designated by the Committee

Holland O'Neil – Designated by the Committee