## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| GRIDDY ENERGY LLC,[1] | ) | Case No. 21-30923 (MI) |
| | ) | |
| Debtor. | ) | **Related to Docket Nos. 311, 312, 345, 355** |
| | ) | |

## DEBTOR'S MEMORANDUM OF LAW IN SUPPORT OF: (A) APPROVAL OF THE ADEQUACY OF DEBTOR'S DISCLOSURE STATEMENT ON A FINAL BASIS AND (B) CONFIRMATION OF THE MODIFIED THIRD AMENDED PLAN OF LIQUIDATION FOR GRIDDY ENERGY LLC UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

---

[1] The last four digits of its federal tax identification number of the Debtor are 1396.  The mailing address for the Debtor is PO Box 1288, Greens Farms, CT 06838.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................. 1

OVERVIEW OF THE PLAN ............................................................................................... 4

    A.      General Background ............................................................................... 4

    B.      The Plan and Disclosure Statement ...................................................... 5

    D.      The Plan Supplement. ......................................................................... 12

ARGUMENT ................................................................................................................... 12

I.     The Court should approve the adequacy of the information contained in the Disclosure Statement on a final basis. ........................................................................ 13

    A.      Creditors received sufficient notice of the Combined Hearing and objection deadline for approval of the Disclosure Statement. ............... 13

    B.      The Disclosure Statement contains adequate information. .................... 14

    C.      Solicitation of the Plan complied with the Bankruptcy Code and was in good faith. ......................................................................................... 17

II.    The Plan satisfies the requirements of section 1129 of the Bankruptcy Code................. 18

    A.      Section 1129(a)(1): The Plan complies with the applicable provisions of the Bankruptcy Code................................................................................ 18

    B.      Section 1129(a)(2):  The Debtor has complied with the applicable provisions of the Bankruptcy Code........................................................ 39

    C.      Section 1129(a)(3):  The Debtor proposed the Plan in good faith. ....... 40

    D.      Section 1129(a)(4):  The Plan provides that the Debtor's payment of professional fees and expenses is subject to Court approval. ............... 40

    E.      Section 1129(a)(5):  The Debtor will have disclosed all necessary information regarding directors, officers and insiders. ......................... 41

    F.      Section 1129(a)(6):  The Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission.............................. 42

    G.      Section 1129(a)(7):  The Plan is in the best interests of all the Debtor's creditors................................................................................................ 42

H.      Section 1129(a)(8):  All Classes of Claims and Interests entitled to vote
        have accepted the Plan or are unimpaired.............................................. 44

I.      Section 1129(a)(9):  The Plan provides for payment in full of all Allowed
        priority Claims. .......................................................................................... 45

J.      Section 1129(a)(10):  At least one Class of impaired Claims, excluding the
        votes of any insiders, accepted the Plan................................................... 46

K.      Section 1129(a)(11):  The Plan is feasible.......................................................... 46

L.      Section 1129(a)(12): All statutory fees have been or will be paid. .................... 47

M.      Section 1129(a)(13): There are no retiree benefits to continue post-
        confirmation. .............................................................................................. 48

N.      Section 1129(d):  The Debtor complied with section 1129(d) of the
        Bankruptcy Code. ....................................................................................... 48

O.      Section 1129(e):  The small business case section is inapplicable. ...................... 48

CONCLUSION................................................................................................................. 49

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999).................................................................................................43

*Century Glove, Inc. v. First Am. Bank of N.Y.*,
860 F.2d 94 (3d Cir. 1988)......................................................................................15

*Fin. Sec. Assurance Inc v. T–H New Orleans Ltd. P'ship (In re T–H New Orleans Ltd. P'ship)*,
116 F.3d 790 (5th Cir. 1997) ...................................................................................46

*Floyd v. Hefner*,
No. H-03-5693, 2006 WL 2844245 (S.D. Tex. Sept. 29, 2006).............................15

*In re Adelphia Commc'ns. Corp.*,
368 B.R. 140 (Bankr. S.D.N.Y. 2007).....................................................................43

*In re Alta Mesa Res., Inc.*,
No. 19-35133 (MI) (Bankr. S.D. Tex. May 27, 2020)............................................34

*In re Applegate Prop., Ltd.*,
133 B.R. 827 (Bankr. W.D. Tex. 1991)...................................................................15

*In re Armstrong World Indus., Inc.*,
348 B.R. 111 (D. Del. 2006) ...................................................................................18

*In re Bigler LP*,
442 B.R. 537 (Bankr. S.D. Tex. 2010) ...............................................................28, 37

*In re Briscoe Enters., Ltd., II*,
994 F.2d 1160 (5th Cir. 1993) .....................................................................18, 19, 46

*In re Bristow Grp. Inc.*,
No 19-32713 (DRJ) (Bankr. S.D. Tex. Oct. 8, 2019).............................................34

*In re Cajun Elec. Power Co-op., Inc.*,
230 B.R. 715 (Bankr. M.D. La. 1999) ....................................................................28

*In re Capmark Fin. Grp. Inc.*,
No. 09-13684, 2011 WL 6013718 (Bankr. D. Del. Oct. 5, 2011) ..........................46

*In re Carbo Ceramics Inc.*,
No. 20-31973 (MI) (Bankr. S.D. Tex. June 18, 2020)............................................34

iii

*In re Chapel Gate Apartments, Ltd.*,
  64 B.R. 569 (Bankr. N.D. Tex. 1986) ....................................................................41

*In re CJ Holding Co.*,
  597 B.R. 597 (S.D. Tex. 2019) ............................................................................34

*In re Cobalt Int'l Energy, Inc.*,
  No. 17-36709 (MI) (Bankr. S.D. Tex. Apr. 6, 2018) ............................................33

*In re Cypresswood Land Partners, I*,
  409 B.R. 396 (Bankr. S.D. Tex. 2009) ................................................................46

*In re Drexel Burnham Lambert Grp., Inc.*,
  138 B.R. 723 (Bankr. S.D.N.Y. 1992) .................................................................39

*In re Enron Corp.*,
  326 B.R. 497 (S.D.N.Y. 2005) .............................................................................38

*In re EP Energy Corp.*,
  No. 19-35654 (MI) (Bankr. S.D. Tex. Mar. 12, 2020) ........................................34

*In re Flintkote Co.*,
  486 B.R. 99 (Bankr. D. Del. 2012) ......................................................................46

*In re Gen. Homes Corp.*,
  134 B.R. 853 (Bankr. S.D. Tex. 1991) ............................................................28,29

*In re Genco Shipping & Trading Ltd.*,
  513 B.R. 233 (Bankr. S.D.N.Y. 2014) .................................................................34

*In re Heritage Org., L.L.C.*,
  375 B.R. 230 (Bankr. N.D. Tex. 2007) ..............................................19, 28, 29, 46

*In re Hingham Campus, LLC*,
  No. 11-33912, 2011 WL 3679057 (Bankr. N.D. Tex. Aug. 23, 2011) ..................38

*In re Holmes*,
  301 B.R. 911 (Bankr. M.D. Ga. 2003) ............................................................46, 47

*In re Hunt*,
  146 B.R. 178 (Bankr. N.D. Tex. 1992) ................................................................13

*In re iHeartMedia, Inc.*,
  No 18-31274 (MI) (Bankr. S.D. Tex. Jan. 22, 2019) ...........................................34

*In re J.D. Mfg., Inc.*,
  No. 07-36751, 2008 WL 4533690 (Bankr. S.D. Tex. Oct. 2, 2008) .....................15

*In re Lakeside Glob. II, Ltd.*,
   116 B.R. 499 (Bankr. S.D. Tex. 1989) ................................................................. 46

*In re Lapworth*,
   No. 97-34529, 1998 WL 767456 (Bankr. E.D. Pa. Nov. 2, 1998) ......................... 39

*In re Lason, Inc.*,
   300 B.R. 227 (Bankr. D. Del. 2003) ...................................................................... 43

*In re Metromedia Fiber Network, Inc.*,
   416 F.3d 136 (2d Cir. 2005) .................................................................................. 34

*In re Minges*,
   602 F.2d 38 (2d Cir. 1979) .................................................................................... 25

*In re Mirant Corp.*,
   348 B.R. 725 (Bankr. N.D. Tex. 2006) ............................................................ 28, 29

*In re Neff*,
   60 B.R. 448 (Bankr. N.D. Tex. 1985), *aff'd*, 785 F.2d 1033 (5th Cir. 1986) ......... 43

*In re Nutritional Sourcing Corp.*,
   398 B.R. 816 (Bankr. D. Del. 2008) ...................................................................... 18

*In re Ondova Ltd. Co.*,
   No. 09-34784, 2012 WL 5879147 (Bankr. N.D. Tex. Nov. 21, 2012) .................... 37

*In re Phoenix Petrol. Co.*,
   278 B.R. 385 (Bankr. E.D. Pa. 2001) .................................................................... 15

*In re Pilgrim's Pride Corp.*,
   403 B.R. 413 (Bankr. N.D. Tex. 2009) .................................................................. 25

*In re Pisces Energy, LLC*,
   2009 Nos. 09-36591, 2009 WL 7227880 (Bankr. S.D. Tex. Dec. 21, 2009) ......... 19

*In re Placid Oil Co.*,
   753 F.3d 151 (5th Cir. 2014) ................................................................................. 13

*In re PWS Holding Corp.*,
   228 F.3d 245 (3d Cir. 2000) .................................................................................. 37

*In re S&W Enter.*,
   37 B.R. 153 (Bankr. N.D. Ill. 1984) ...................................................................... 18

*In re Spiegel, Inc.*,
   No-03-11540, 2005 WL 1278094 (Bankr. S.D.N.Y. May 25, 2005) ...................... 28

*In re Sun Country Dev., Inc.*,
   764 F.2d 406 (5th Cir. 1985) ...................................................40

*In re Tex. Tamale Co., Inc.*,
   219 B.R. 732 (Bankr. S.D. Tex. 1998) ...................................................13

*In re U.S. Brass Corp.*,
   194 B.R. 420 (Bankr. E.D. Tex. 1996) ...................................................15

*In re Village at Camp Bowie I, L.P.*,
   454 B.R. 702 (Bankr. N.D. Tex. 2011)...................................................40

*In re Vitro Asset Corp.*,
   No. 11-32600, 2013 WL 6044453 (Bankr. N.D. Tex. Nov. 14, 2013)...................................................19

*In re W.R. Grace & Co.*,
   475 B.R. 34 (D. Del. 2012)...................................................46

*In re Weatherford Int'l PLC*,
   No. 19-33694 (DRJ) (Bankr. S.D. Tex. Sept. 11, 2019)...................................................34

*In re Westmoreland Coal Co.*,
   No. 18-35672 (DRJ) (Bankr. S.D. Tex. Mar. 1, 2019) ...................................................33

*In re Wool Growers Cent. Storage Co.*,
   371 B.R. 768 (Bankr. N.D. Tex. 2007)...................................................32, 34

*In re Worldcom, Inc.*,
   No. 02-13533, 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003)...................................................39

*In re Yates Dev., Inc.*,
   258 B.R. 36 (Bankr. M.D. Fla. 2000) ...................................................47

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
   987 F.2d 154 (3d Cir. 1993)...................................................19

*Kane v. Johns-Manville Corp.*,
   843 F.2d 636 (2d Cir. 1988)...................................................46

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*,
   337 F.3d 314 (3d Cir. 2003)...................................................15

*Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Co-op., Inc.)*,
   150 F.3d 503 (5th Cir. 1998) ...................................................15, 41

*Mullane v. Cent. Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950)...................................................13

*N.L.R.B. v. Bildisco & Bildisco*,
    465 U.S. 513 (1984) ............................................................................................................25

*Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*,
    78 F.3d 18 (2d Cir. 1996) ..................................................................................................25

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Co-op., Inc. (In re Cajun Elec.*
    *Power Co-op., Inc.)*,
    119 F.3d 349 (5th Cir. 1997) ............................................................................................29

*Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*,
    995 F.2d 1274 (5th Cir. 1991) ..........................................................................................19

*Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.)*,
    761 F.2d 1374 (9th Cir. 1985) ..........................................................................................46

*Richmond Leasing Co. v. Capital Bank, N.A.*,
    762 F.2d 1303 (5th Cir. 1985) ..........................................................................................25

*SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*,
    960 F.2d 285 (2d Cir. 1992) ..............................................................................................39

*Sequa Corp. v. Christopher (In re Christopher)*,
    28 F.3d 512 (5th Cir. 1994) ..............................................................................................13

*Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*,
    844 F.2d 1142 (5th Cir. 1988) .....................................................................................15, 40

**Statutes**

11 U.S.C. § 1123(a)(1) .............................................................................................................20

11 U.S.C. § 1123(b)(3)(A) ........................................................................................................28

11 U.S.C. § 1125(a)(1) .............................................................................................................15

11 U.S.C. § 1125(b) .................................................................................................................15

11 U.S.C. § 1126(c) .................................................................................................................44

11 U.S.C. § 1126(f) .........................................................................................................11, 43, 45

11 U.S.C. § 1126(g) .................................................................................................................45

11 U.S.C. § 1129(a)(8) .............................................................................................................44

**Other Authorities**

Fed. R. Bankr. P. 2002(b) .........................................................................................................13

Fed. R. Bankr. P. 9019(a) ............................................................................................28

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963
................................................................................................................................18, 39

S. Rep. No. 95-989, 95th Cong., 2nd Sess. 126 (1978), *reprinted in* 1978 U.S.C. C.A.N. 5787 ...18

Griddy Energy LLC, as debtor and debtor in possession in the above-captioned chapter 11 case (the "Debtor"), submits this memorandum of law (this "Memorandum") in support of: (a) approval of the adequacy of the *Disclosure Statement for Modified Third Amended Plan of Liquidation for Griddy Energy LLC Under Chapter 11 of the Bankruptcy Code* [Docket No. 312], dated as of May 26, 2021 (as modified, amended and/or supplemented from time to time, the "Disclosure Statement") and (b) confirmation of the *Modified Third Amended Plan of Liquidation for Griddy Energy LLC Under Chapter 11 of the Bankruptcy Code* [Docket No. 311], dated as of May 26, 2021 (as modified, amended and/or supplemented from time to time, the "Plan").[2]  In support hereof, the Debtor has filed contemporaneously herewith and incorporates by reference the (a) *Declaration of Roop Bhullar in Support of (A) Approval of the Adequacy of Debtor's Disclosure Statement on a Final Basis and (B) Confirmation of the Modified Third Amended Plan of Liquidation for Griddy Energy LLC Under Chapter 11 of the Bankruptcy Code*; (b) the *Expert Report and Declaration of Tony W. Spencer*; and (c) the *Declaration of Angela Tsai on Behalf of Stretto Regarding Solicitation of Votes and Tabulation of Ballots Accepting and Rejecting Modified Third Amended Plan of Liquidation for Griddy Energy LLC Under Chapter 11 of the Bankruptcy Code* (the "Voting Declaration").  In further support of this Memorandum, the Debtor's respectfully states as follows:

## PRELIMINARY STATEMENT

1.      In mid-February 2021 an unprecedented winter storm occurred in Texas.  Load on the power grid climbed to winter records and a host of other factors led to generation outages and forced the Electric Reliability Council of Texas, Inc. ("ERCOT") to shed electric load, in the

---

[2]      Capitalized terms used but not otherwise defined herein have the meaning(s) given to them in the Disclosure Statement or Plan, as applicable.

form of rolling blackouts, in order to match the available generation on the grid.  On February 15, 2021, in response to the grid experiencing unprecedented outages, the Public Utilities Commission of Texas adopted an order instructing ERCOT to set the real time settlement point price for power at the high offer cap of $9,000 per MWh.  This order went into effect immediately and stayed in effect until February 19, 2021, representing a total duration of 87.5 consecutive hours.

2.     The Debtor had to procure power for its customers at the elevated rates and, in turn, those costs were passed on directly to its customers.  Over the 87.5 hours while the $9,000 per MWh price was imposed, the Debtor incurred significant debt to, among others, ERCOT, for the procurement of power for its customers.  However, most of the Debtor's customers stopped paying all or a portion of their bills as a result of the extreme prices.  The Debtor only earned only a fixed fee of $9.99 per month per customer regardless of whether the wholesale cost of electricity was high or low.  Without payments from its customers, it had little to no incoming funds to pay its creditors.  Because the Debtor could not pay ERCOT for outstanding charges or meet ERCOT's collateral call demands and, notwithstanding ERCOT's role in the extreme pricing, ERCOT determined to mass transition the Debtor's customers to providers of last resort.

3.     These devastating events destroyed the Debtor's business and led the Debtor to file this chapter 11 case.  The Debtor's objective in filing for chapter 11 protection was (and is) to maximize the value of its Estate for the benefit of its creditors while balancing its desire to give its former customers relief from the uncertainty of being subject to collection actions and negative credit ratings as a result of the extreme wholesale electricity prices from the winter storm event.  To that end, a key feature of the Debtor's Plan is the ability of its former customers to exchange releases with the Debtor and the other Released Parties.

2

4.      Following the solicitation of votes on the Plan, all impaired Classes of Claims and Interests entitled to vote on the Plan overwhelmingly voted to accept the Plan.  Out of the over 57,000 Ballots sent to parties entitled to vote, only 37 voted to reject the Plan.  And, out of the approximately 24,000 former customers that owe the Debtor money for their electricity consumption during the winter storm event, only 145 of those customers opted out of the Customer Releases.  Additionally, there were no objections to any of the proposed releases in the Plan, including the proposed Customer Releases.

5.      The level of support for the Plan, including the releases, is not surprising as the Plan (a) reflects the Debtor's objectives described above and (b) is the product of (i) the global settlement (the "Global Settlement") among the Debtor, the official committee of unsecured creditors (the "Committee"), the Debtor's prepetition secured creditors and certain of the Debtor's non-Debtor affiliates and (ii) the Debtor's settlement with the State of Texas.  Each of the settlements was the result of extensive arm's length negotiations that took place over several months and resulted in further improved outcomes for parties in interest in this case, including a collective desire to assist former customers in respect of the disastrous results of the actions and inactions taken by parties other than the Debtor during the winter storm event.  The Plan provides for the orderly liquidation of the Debtor, including, among other things, the post-Effective Date pursuit of Causes of Action against various parties related to the winter storm event.

6.      As more fully set forth in this Memorandum, and as the Debtor will establish at the Combined Hearing, the Disclosure Statement contains adequate information as required under section 1125 of the Bankruptcy Code and the Plan satisfies each applicable standard under section 1129 of the Bankruptcy Code and all other applicable provisions of the Bankruptcy

Code.  Accordingly, the Disclosure Statement should be approved on a final basis and the Plan should be confirmed.

## OVERVIEW OF THE PLAN

### A.  General Background

7.      On the March 15, 2021 (the "Petition Date"), the Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor is continuing in the possession of and management of its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.      On March 31, 2021, the United States Trustee for Region 7 appointed the Committee pursuant to section 1102 of the Bankruptcy Code.  As of the date hereof, no trustee or examiner has been appointed in the Debtor's chapter 11 case.

9.      Further background regarding the Debtor and the events leading to the filing of this chapter 11 case is set forth in the *Declaration of Michael Fallquist in Support of Chapter 11 Petition and First Day Pleadings* [Docket No. 21] (the "First Day Declaration").

10.      On the Petition Date, the Debtor filed the initial versions of the Plan and the Disclosure Statement.  *See* Docket Nos 22 and 23, respectively.  The Debtor subsequently filed amended and/or modified versions of the (a) Plan on April 19, 2021, April 27, 2021, May 23 2021 and May 26, 2021 [Docket Nos. 175, 212, 294 and 305, respectively] and (b) Disclosure Statement on April 19, 2021, April 27, 2021, May 18, 2021, May 23, 2021 and May 26, 2021 [Docket Nos. 176, 213, 271, 295 and 306, respectively].  On May 26, 2021, the Debtor filed the solicitation versions of the Plan and the Disclosure Statement.  *See* Docket Nos. 311 and 312, respectively.

**B.  The Plan and Disclosure Statement**

11.    The overall purpose of the Plan is to, among other things, pay all Allowed Administrative Expense Claims, Allowed Priority Claims and Allowed Non-Priority Claims in full, plus implement the (a) Global Settlement[3] and (b) the settlement with the State of Texas, and (c) provide for the orderly wind down of the Debtor.

12.    The Plan provides for, among other things:[4]

a.    (i) the Debtor's secured lenders will, for the benefit of the Debtor's Estate, forego receipt of approximately $1.448 million of the principal face amount owed to them by the Debtor plus interest at the default contract rate in favor of other creditors in accordance with the terms of the Plan and (ii) the Debtor's obligation to pay certain professional fees and expenses of the Prepetition Secured Lenders will be limited in amount and scope;

b.    holders of Allowed Other General Unsecured Claims will receive on a Pro Rata basis (i) the aggregate amount of Available Cash of the Debtor and (ii) any Net Recovery Proceeds,[5] provided that, with respect to (a) any cash that is available from the Prepetition Lender Contribution of approximately $1.448 million (net of all Wind Down Costs and payment of other claims in accordance with the payment priorities under the Plan) and (b) any Causes of Action arising from, relating to or in connection with the winter storm event that occurred in Texas in mid-February 2021, holders of Allowed Other General Unsecured Claims will share any recoveries therefrom (net of all costs and expenses) on a Pro Rata basis with the holders of Allowed Class 5 Participating Customer Claims, in each case, on account of the Participating Customers' Allowed Participating Customer Potential Return Claims.[6]

---

[3]    The Global Settlement is described more fully in the Disclosure Statement.  See Disclosure Statement, Article II.

[4]    The summary of the Plan contained herein is qualified in its entirety by the terms of the Plan.  In the event of any inconsistency, the Plan shall control in all respects.  Specific descriptions of the material terms, treatment, and distributions to each Class of Claims and Interests is set forth in Article IV of the Plan, and a summary chart is included in Article IV.B.1 of the Disclosure Statement.

[5]    "Net Recovery Proceeds" means the Cash or other amounts received by the Debtor, if any, from the pursuit of any Cause of Action (formally or informally) not released under the Plan, net of all costs and expenses deducted therefrom, to be distributed (Pro Rata) to holders of Allowed Other General Unsecured Claims, subject to all Claims of a higher priority being paid in full or adequate reserves being set aside in accordance with the Plan.  Plan Art. I § 1.67.

[6]    "Participating Customer Potential Return" means, for each applicable Participating Customer, the total amount such Participating Customer paid the Debtor for electricity consumed by such Participating Customer during the

c.      (i) former customers of the Debtor have the opportunity to exchange releases with the Debtor and the other Released Parties for all claims, including, for unpaid amounts owed by such former customers for the electricity and related fees, taxes, expenses and other costs due as a result of the winter storm event that occurred in mid-February 2021 in Texas, in exchange for such former customers releasing the Released Parties from all claims the former customers have or may have against the Released Parties.

(ii) former customers that: (x) do not opt out of the mutual releases and (y) paid the Debtor for electricity consumed by such former customer during the period February 13, 2021 through February 19, 2021 and timely and properly file a proof of claim for such amount paid as reflected on the Debtor's books and records, such former customers would have an Allowed Claim in Class 5 in such amount (less any amounts such Participating Customer successfully disputed and received a full or partial refund for) and receive its Pro Rata share of:  (1) any Texas Storm Causes of Action Net Recovery Proceeds in accordance with the terms of the Plan, and (2) any cash that is available from the Prepetition Lender Contribution of approximately $1.448 million (net of all Wind Down Costs and payment of other claims in accordance with the payment priorities under the Plan), in each case, shared Pro Rata with the holders of Allowed Other General Unsecured Claims.[7]

(iii) any former customer that does not wish to exchange releases will be considered a "Non-Participating Customer" and will not be treated as having an Allowed Class 5 Customer Claim.  Rather, such Non-Participating Customer would have a temporarily Allowed Claim in Class 4 (Other General Unsecured Claims) for purposes of voting on the Plan.  For all other purposes, if the Non-Participating Customer timely and properly files an unsecured nonpriority claim against the Debtor by the applicable Bar Date in accordance with the applicable Bar Date Order, the Non-Participating Customer will be treated as a holder of an Other General Unsecured Claim.  Any Participating Customer will have the option to elect

---

period February 13, 2021 through February 19, 2021, as reflected on the Debtor's books and records, *less* any amounts such Participating Customer successfully disputed and received a full or partial refund from such Participating Customer's credit card company (to the extent not accounted for in the Debtor's books and records).  Plan Art. I § 1.77.

[7]   The Plan provided that, if a settlement is reached between the Debtor and the PUCT related to a certain letter of credit in the amount of $500,000 the PUCT drew upon prior to the Petition Date and the settlement is less than $500,000, each holder of an Allowed Class 5 Participating Customer Potential Return Claim will share Pro Rata in Available Cash with holders of Allowed Class 4 Claims in the amount of the difference between $500,000 and amount of any PUCT Settlement proceeds.  The PUCT has informed the Debtor that it has determined to distribute the proceeds of the letter of credit to customers outside of the Debtor's bankruptcy.  Accordingly, there is no settlement between the Debtor and the PUCT.

to become a Non-Participating Customer up until 45 days following the Effective Date of the Plan.

d.      holders of Intercompany Claims are entitled to receive their Pro Rata share of any and all Cash or other property remaining with the Debtor after (i) all Allowed Claims (other than Intercompany Claims) are paid in full in Cash (including payment of postpetition interest from the Petition Date through the payment date at the Federal Judgment Rate; provided that, the contractual rate of interest shall apply, if applicable, based on the particular contractual agreement between the Debtor and the holder of an Allowed Claim) in accordance with the Plan and (ii) all other Wind Down Costs are paid.

e.      with respect to the holder of Existing HoldCo Interests, if any Causes of Action are successfully prosecuted, settled and/or otherwise resolved, the holder of the Existing HoldCo Interests is entitled to receive any and all Cash or other property remaining with the Debtor after (i) all Allowed Claims are paid in full in Cash (including payment of postpetition interest from the Petition Date through the payment date at the Federal Judgment Rate; provided that, the contractual rate of interest shall apply, if applicable, based on the particular contractual agreement between the Debtor and the holder of an Allowed Claim) in accordance with the Plan and (ii) all other Wind Down Costs are paid.

f.      the Debtor and the Committee to have jointly selected a plan administrator (the "Plan Administrator").  Upon the Effective Date, the Debtor will enter into the Plan Administrator Agreement with the Plan Administrator, and the Plan Administrator will become the sole member, manager, officer and equity holder of the Debtor.  A copy of the Plan Administrator Agreement is included in the Plan Supplement. The Plan Administrator will act as a fiduciary and will have full authority to administer the liquidation and wind down of the Debtor under the provisions of the Plan, subject to oversight by an Oversight Committee.  The Oversight Committee will be comprised initially of (i) two members selected by the Committee and (ii) one member selected by the Debtor.

13.    In addition, the Plan embodies the Global Settlement.  After extensive, arm's length negotiations, the Debtor, the Prepetition Secured Lenders, the Committee and certain Non-Debtor Affiliates reached agreement on a plan of liquidation that further benefited the Debtor's stakeholders and maximizes the value of the Estate and its assets.  The terms of the

Global Settlement were incorporated in the solicitation version of the Plan and are more fully described in Article II of the Disclosure Statement.

14.     The Global Settlement provides for, among other things, (a) the Prepetition Secured Lenders to forego the portion of their claims attributable to principal and default interest at the contract rate accruing in connection therewith owed under the Prepetition Secured Agreements; (b) one or more Non-Debtor Affiliates to pay up to $225,000 of the Prepetition Lender Fee Claims; (c) the Available Prepetition Lender Contribution to be shared pro rata between holders of Allowed Class 5 Participating Customer Potential Return Claims and holders of Class 4 Other General Unsecured Claims; (d) Participating Customers to have 45 days following the Effective Date to elect to become Non-Participating Customers for all purposes under the Plan other than in respect of voting on the Plan if such election is made after the Voting Deadline; (e) Participating Customers to be included in the Third Party Release (as defined below) provision provided for in Section 12.07(b) of the Plan; (f) Non-Debtor Affiliates to contribute their rights with respect to certain to be agreed causes of action that overlap with any Retained Causes of Action of the Debtor under the Plan; (g) the Debtor and the Committee to jointly select the Plan Administrator, with the Plan Administrator to be subject to oversight by an Oversight Committee consisting initially consisting of two members selected by the Committee and one member selected by the Debtor; (h) Griddy Technologies LLC, a non-Debtor affiliate of the Debtor, to provide a limited license of its technology to the Debtor solely for purposes of assisting the Debtor with the wind down its Estate; (i) reasonable assistance to be provided to the Plan Administrator by the Debtor's directors and officers in connection with pursuit of Causes of Action, subject to be agreed limitations on the total uncompensated time and duration of such assistance; (j) suspension of payment of certain board of directors fees from

May 14 through July 1; and (k) agreement by all parties to the Global Settlement to support the Plan.  The Global Settlement resolves the disputes among the parties thereto.

15.     The Plan also embodies that part of the settlement with the State of Texas requiring the inclusion of the Plan treatment of Participating Customers described above.

**C.  Plan Solicitation and Voting Results.**

16.     On May 26, 2021, the Court entered an order [Docket No. 308] (the "<u>Solicitation Procedures Order</u>"), which, among other things: (a) conditionally approved the adequacy of the Disclosure Statement and (b)  (i) scheduled a combined hearing (the "<u>Combined Hearing</u>") to approve the adequacy of the Disclosure Statement on a final basis and confirm the Plan,[8] (ii) established June 25, 2021 at 5:00 p.m. (prevailing Central Time) as the deadline to file objections to the adequacy of the Disclosure Statement and/or confirmation of the Plan,[9] (iii) approved the solicitation procedures as described therein with respect to the Plan, which included establishing June 25, 2021 at 5:00 p.m. (prevailing Central Time) as the Voting Deadline, approving the form and manner of service of Ballots, and contents of the Solicitation Package (defined in paragraph 17 below), [10] and (iv) approved the form and manner of service of certain notices related to acceptance and rejection of the Plan;[11] and (c) granted related relief.

17.     On May 28, 2021, the Debtor, through its solicitation agent, Stretto (the "<u>Solicitation Agent</u>"), began soliciting votes on the Plan by distributing the Disclosure Statement (including exhibits to the Disclosure Statement filed with the Court on May 26, 2021 [Docket No. 312]) and related materials to holders of Claims and Interests in impaired Classes that were

---

[8]     Solicitation Procedures Order ¶ 2.

[9]     *Id.*

[10]    *Id*. ¶¶ 6–18.

[11]    *Id.* ¶¶ 19-24.

entitled to vote under the Plan, as required by the Solicitation Procedures Order.[12]  Specifically, in accordance with the Solicitation Procedures Order, the Debtor transmitted: (i) the Solicitation Procedures Order; (ii) the Disclosure Statement, as conditionally approved by the Court; (iii) the *Notice of: (a) Deadline to Cast Votes to Accept or Reject Chapter 11 Plan of the Debtor; (b) Combined Hearing to Consider Approval of Disclosure Statement and Confirmation of the Plan; (c) Deadline to Object to Confirmation; and (d) Related Matters and Procedures* [Docket No. 315] (the "Combined Hearing Notice"); (iv) the solicitation procedures; (v) the ballots for each voting Class; (vi) for all voting Classes other than Class 5, a pre-addressed, postage pre-paid reply envelope; and (vii) a letter in support of the Plan from the Committee (collectively, (i)-(vii), the "Solicitation Package") to all known holders of Claims and Interests as of May 25, 2021 in Class 1 (Prepetition Lender Claims), Class 4 (Other General Unsecured Claims), Class 5 (Customer Claims), Class 6 (Intercompany Claims), and Class 7 (Existing HoldCo Interests).[13]

18.     As set forth below and in the Voting Declaration, the Debtor received overwhelming acceptance of the Plan from all holders of Claims and Interests entitled to vote on the Plan.[14]  A summary of the results of voting on the Plan tabulated in accordance with the Solicitation Procedures Order are reflected in the table below.

---

[12]   *See* Certificate of Service [Docket No. 330] (the "Solicitation Certificate of Service").

[13]   *See* Solicitation Procedures Order ¶¶ 9, 15; Solicitation Certificate of Service.

[14]   Voting Declaration, Ex. A.

| CLASS | TOTAL BALLOTS RECEIVED | | | | RESULT |
| | Accept | | Reject | | |
| | $ AMOUNT | NUMBER | $ AMOUNT | NUMBER | |
|---|---|---|---|---|---|
| Class 1 - Pre-Petition Lender Claims | $3,512,875.16 (100%) | 2 (100.00%) | $0 (0.00%) | 0 (0.00%) | **Accepted** |
| Class 4 - Other General Secured Claims[15] | $12,576.00 (99.83%) | 147 (86.98%) | $22.00 (0.17%) | 22 (13.02%) | **Accepted** |
| Class 5 - Customer Claims | $465.00 (96.88%) | 465 (96.88%) | $15.00 (3.13%) | 15 (3.13%) | **Accepted** |
| Class 6 - Intercompany Claims | $4,582.36 (100%) | 1 (100.00%) | $0 (0.00%) | 0 (0.00%) | **Accepted** |
| Class 7 - Existing Holdco Interests | $1.00 (100%) | 1 (100.00%) | $0 (0.00%) | 0 (0.00%) | **Accepted** |

19.     Under the Plan, Class 2 (Other Secured Claims) and Class 3 (Priority Non-Tax Claims) (together, the "Non-Voting Parties") are unimpaired and, thus, are deemed to have accepted the Plan and were not entitled to vote to accept or reject the Plan.[16]  Pursuant to the Solicitation Procedures Order, these parties were served the Court-approved *Non-Voting Status Notice With Respect to Unimpaired Classes Presumed to Accept the Third Amended Chapter 11 Plan of Liquidation for Griddy Energy LLC* and the Combined Hearing Notice.[17]

---

[15]   Pursuant to the Plan and the Solicitation Procedures, any holder of a Class 5 Customer Claim that elected on its Ballot to opt out of the Customer Releases (*i.e.*, a Non-Participating Customer) was treated for voting purposes as having a Class 4 Other General Unsecured Claim in the amount of $1.00.  The vote tabulation for Class 4 includes 168 holders of Class 5 Customer Claims that elected on their Ballots to opt out of the Customer Releases and become Non-Participating Customers.  146 of such Non-Participating Customers voted to accept the Plan and 22 of such Non-Participating Customers voted to reject the Plan.

[16]   *See* 11 U.S.C. § 1126(f).

[17]   *See* Solicitation Certificate of Service.

**D.  The Plan Supplement.**

20.     On June 18, 2021, the Debtor filed with the Court the *Plan Supplement for the*

*Modified Third Amended Chapter 11 Plan of Liquidation of Griddy Energy LLC* [Docket No.

345] (as amended, modified or supplemented from time to time, the "Plan Supplement"), which

included certain draft documents to be executed, delivered and/or performed in connection with

consummation of the Plan on the Effective Date consisting of:  (a) the Plan Administrator

Agreement; (b) the Second Amended and Restated Limited Liability Company Agreement of

Griddy Energy LLC; (c) Amended and Restated Intellectual Property License Agreement;

(d) Consulting Agreement; (e) Schedule of Retained Causes of Action; (f) Customer Opt-Out

Form; and (g) Members of the Oversight Committee.

21.     On June 27, 2021, the Debtor supplemented the Plan Supplement [Docket No.

355] by filing additional documents in connection with the Plan consisting of (a) the Wind Down

Budget; and (b) the name of the Plan Administrator and the Plan Administrator's compensation

arrangement.

22.     In accordance with the terms of the Plan, the documents contained in the Plan

Supplement may be amended, modified or supplemented from time to time prior to the Effective

Date.

## **ARGUMENT**

23.     This Memorandum is divided into two parts.  First, the Debtor requests approval

of the Disclosure Statement on a final basis.  Second, the Debtor presents its "case in chief" that

the Plan satisfies section 1129 of the Bankruptcy Code.[18]

---

[18]     No objections to approval of the Disclosure Statement on a final basis were received by the Debtor.  In addition, while the Debtor received several informal concerns regarding the Plan, all such concerns have been consensually resolved.  The proposed *Findings of Fact Conclusions of Law and Order: (i) Approving the*

I.      **The Court should approve the adequacy of the information contained in the Disclosure Statement on a final basis.**

     A.      **Creditors received sufficient notice of the Combined Hearing and objection deadline for approval of the Disclosure Statement.**

24.     Rule 3017(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provides that a hearing on consideration of the disclosure statement requires 28 days' notice.[19]  Bankruptcy Rule 2002(b) provides that parties in interest should receive 28 days' notice of the objection deadline and the hearing to consider approval of a disclosure statement.[20] Courts in the Fifth Circuit and elsewhere have adopted the general rule that due process requires "notice be reasonably calculated, under all the circumstances, to inform interested parties of the pendency of a proceeding."[21]  When evaluating the notice and the sufficiency thereof, courts consider whether (1) "the notice apprised the claimant of the pendency of the action, and (2) it was sufficiently timely to permit the claimant to present his objections."[22]  Whether a particular method of notice is reasonably calculated to inform interested parties is determined on a case-by-case basis.[23]

25.     As discussed above, on May 26, 2021, the Court entered the Solicitation Procedures Order, which, among other things, approved certain objection and reply deadlines,

---

*Disclosure Statement; (ii) Confirming Modified Third Amended Plan of Liquidation for Griddy Energy LLC Under Chapter 11 of the Bankruptcy Code; and (iii) Granting Related Relief* (the "Proposed Confirmation Order") filed concurrently herewith includes proposed compromises of such informal concerns.  *See* Proposed Confirmation Order ¶¶ 29 – 32.

[19]     *See* Fed. R. Bankr. P. 3017(a).

[20]     *See* Fed. R. Bankr. P. 2002(b).

[21]     *In re Placid Oil Co.*, 753 F.3d 151, 154 (5th Cir. 2014) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).

[22]     *Sequa Corp. v. Christopher (In re Christopher)*, 28 F.3d 512, 518 (5th Cir. 1994) (applying the two-part test); *In re Tex. Tamale Co., Inc.*, 219 B.R. 732, 739–40 (Bankr. S.D. Tex. 1998) (same).

[23]     *In re Hunt*, 146 B.R. 178, 182 (Bankr. N.D. Tex. 1992) ("Whether a particular method of notice is reasonably calculated to reach interested parties depends upon the particular circumstances of each case.").

and approved the Combined Hearing Notice and the manner of service thereof.[24]  Starting on

May 28, 2021, the Combined Hearing Notice was served upon all of the Debtor's known

creditors and the Debtor's former customers.[25]  The Combined Hearing Notice informed

recipients of, among other things, (a) the deadline to cast votes to accept or reject the Plan;

(b) the date and time for the Combined Hearing; and (c) the deadline to object to confirmation

and the adequacy of the information contained Disclosure Statement.[26]  Accordingly, all parties

in interest had more than 35 days' notice before the Combined Hearing and 28 days before the

deadline to object to the Plan and Disclosure Statement, in compliance with Bankruptcy Rules

2002(b) and 3017(a).[27]

26.     Further, the Debtor caused the Combined Hearing Notice to be published in *The*

*New York Times* and the *Houston Chronicle* on June 1, 2021, [28] and the *Dallas Morning News* on

June 2, 2021. [29]  The Combined Hearing Notice included instructions regarding how to obtain the

Plan and the Disclosure Statement free of charge through the Solicitation Agent's website for the

Chapter 11 Case, https://cases.stretto.com/griddy/.

### B.     The Disclosure Statement contains adequate information.

27.     The primary purpose of a disclosure statement is to provide material information,

or "adequate information," that allows parties entitled to vote on a proposed plan to make an

---

[24]     *See* Solicitation Procedures Order.

[25]     *See* Solicitation Certificate of Service.

[26]     *See id.*

[27]     *See id.*

[28]     *See Affidavit of Publication of the Combined Hearing Notice in the New York Times* [Docket No. 336]; *Affidavit of Publication of the Combined Hearing Notice in the Houston Chronicle* [Docket No. 335].

[29]     *See Affidavit of Publication of the Combined Hearing Notice in The Dallas Morning News* [Docket No. 334].

informed decision about whether to vote to accept or reject the plan.[30]  "Adequate information"

is a flexible standard, based on the facts and circumstances of each case.[31]  Courts within the

Fifth Circuit and elsewhere acknowledge that determining what constitutes "adequate

information" for the purpose of satisfying section 1125 of the Bankruptcy Code resides within

the broad discretion of the court.[32]  What constitutes "adequate information" turns on the facts

and circumstances of each case, but the focus is on whether sufficient information is provided to

enable parties to vote in an informed way.[33]

---

[30]  *See, e.g.*, *In re J.D. Mfg., Inc.*, No. 07-36751, 2008 WL 4533690, at *2 (Bankr. S.D. Tex. Oct. 2, 2008) ("'Adequacy' of information is a determination that is relative both to the entity (*e.g.* assets/business being reorganized or liquidated) and to the sophistication of the creditors to whom the disclosure statement is addressed."); *In re U.S. Brass Corp.*, 194 B.R. 420, 423 (Bankr. E.D. Tex. 1996) ("The purpose of the disclosure statement is . . . to provide enough information to interested persons so they may make an informed choice . . . ."); *In re Applegate Prop., Ltd.*, 133 B.R. 827, 831 (Bankr. W.D. Tex. 1991) ("A court's legitimate concern under Section 1125 is assuring that hypothetical reasonable investors receive such information as will enable them to evaluate for *themselves* what impact the information might have on their claims and on the outcome of the case . . . .") (emphasis in original); *see also Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 321–22 (3d Cir. 2003) ("Under 11 U.S.C. § 1125(b), a party seeking chapter 11 bankruptcy protection has an affirmative duty to provide creditors with a disclosure statement containing adequate information to enable a creditor to make an informed judgment about the Plan.") (quotations omitted); *Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 100 (3d Cir. 1988) ("[Section] 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote.").

[31]  11 U.S.C. § 1125(a)(1) ("'[A]dequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . ."); *Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Co-op., Inc.)*, 150 F.3d 503, 518 (5th Cir. 1998) ("The legislative history of § 1125 indicates that, in determining what constitutes adequate information with respect to a particular disclosure statement, . . . the kind and form of information are left essentially to the judicial discretion of the court and that the information required will necessarily be governed by the circumstances of the case.") (quotations and citations omitted); *Floyd v. Hefner*, No. H-03-5693, 2006 WL 2844245, at *30–31 (S.D. Tex. Sept. 29, 2006) (what constitutes "adequate information" is a flexible standard); *In re Applegate Prop., Ltd.*, 133 B.R. at 829 ("The issue of adequate information is usually decided on a case by case basis and is left largely to the discretion of the bankruptcy court.").

[32]  *See, e.g.*, *In re Cajun Elec. Power Co-op, Inc.*, 150 F.3d at 518 (courts are vested with wide discretion to determine whether a disclosure statement contains "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code); *Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1157 (5th Cir. 1988) ("The determination of what is adequate information is subjective and made on a case by case basis.  This determination is largely within the discretion of the bankruptcy court.").

[33]  *See* 11 U.S.C. § 1125(a)(1); *see also Krystal Cadillac-Oldsmobile*, 337 F.3d at 321 (a disclosure statement must contain "adequate information to enable a creditor to make an informed judgment about the Plan") (quotations omitted); *In re Phoenix Petrol. Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) (the determination of whether a disclosure statement contains adequate information must be made on a case-by-case basis, focusing on the unique facts and circumstances of each case).

28.     Here, the Disclosure Statement is extensive and comprehensive and easily satisfies the "adequate information" standard of section 1125 of the Bankruptcy Code.  The Disclosure Statement contains descriptions and summaries of, among other things:

a.  Introduction and executive summary of the Plan and treatment of Claims and Interests (Article I);

b.  The Global Settlement and the settlement agreement with the State of Texas embodied in the Plan (Articles II – III);

c.  Description of the Plan, including the types of Claims and Interests, classification and treatment thereof (Article IV);

d.  Description of the releases and exculpation in the Plan (Article IV, § D.);

e.  Description of the Plan Administrator, including the designation thereof and the powers and duties of the Plan Administrator (Article IV, § E.);

f.  Description of voting procedures and requirements in connection with the Plan (Article V);

g.  Description of the Debtor and the events leading to the chapter 11 filing (Article VI);

h.  Overview of the Debtor and its business (Article VI, § A.);

i.  Overview of the Debtor's capital structure (Article IV, § B.);

j.  Description of prepetition litigation and prepetition term sheet with the State of Texas (Article IV, §§ C. & D.);

k.  Description of the Debtor's wind down and liquidation (Article IV, § F.);

l.  Significant events during the chapter 11 case (Article VII);

m.  Description of the confirmation procedures, including a description of the combined hearing on consideration of the Disclosure Statement and confirmation of the Plan and the confirmation standards (Article VIII);

n.  Financial information that would be relevant to a determination whether to accept or reject the Plan (Exhibit B, Liquidation Analysis);

o.  Alternatives to confirmation and consummation of the Plan (Article VIII, § C.; Exhibit B, Liquidation Analysis);

p.  Description of certain risk factors to be considered (Article IX); and

q.  Description of certain U.S. federal income tax consequences of the Plan (Article X).

Further, while the Disclosure Statement was previously approved by the Court on a conditional basis only, at the hearing on May 25, 2021, the Court stated that the Disclosure Statement contained adequate information.[34]

29.     Accordingly, the Debtor submits that the Disclosure Statement contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code and should be approved.

**C.     Solicitation of the Plan complied with the Bankruptcy Code and was in good faith.**

30.     Section 1125(e) of the Bankruptcy Code provides that "[a] person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title, . . . is not liable" on account of such solicitation for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan.[35]

31.     As discussed above, the Debtor's solicitation of the Plan was conducted in compliance with the Solicitation Procedures Order, and the Debtor, and any other parties that participated in the solicitation, including the Solicitation Agent, took appropriate actions in connection with the solicitation of the Plan in compliance with section 1125(e) of the Bankruptcy Code.  Therefore, the Court should grant the parties the protections provided under section 1125(e) of the Bankruptcy Code.

---

[34]  *See Discl. Stmt. Hr'g Tr.* at 30:4-5, *In re Griddy Energy LLC*, No. 21-30923 (MI) (Bankr. S.D. Tex. May 25, 2021) ("I do think the Disclosure Statement contains adequate information.").

[35]  11 U.S.C. § 1125(e).

## II.     The Plan satisfies the requirements of section 1129 of the Bankruptcy Code.

32.     To obtain confirmation of the Plan, the Debtor must demonstrate, by a preponderance of the evidence, that the Plan satisfies the applicable provisions of section 1129 of the Bankruptcy Code.[36]  As set forth below and based on the record and filings in this Chapter 11 Case, the Plan satisfies all applicable subsections of section 1129 of the Bankruptcy Code and should be confirmed.

### A.     Section 1129(a)(1): The Plan complies with the applicable provisions of the Bankruptcy Code.

33.     Section 1129(a)(1) of the Bankruptcy Code provides that a court may confirm a chapter 11 plan only if "[t]he plan complies with the applicable provisions of [the Bankruptcy Code]."[37]  The phrase "applicable provisions" has been interpreted to include the requirements of 1122 and 1123 of the Bankruptcy Code, which governs the classification of claims and interests and the contents of a chapter 11 plan.[38]  As set forth herein, the Plan fully complies with all relevant sections of the Bankruptcy Code, including sections 1122, 1123, 1125, 1126 and 1129, the Bankruptcy Rules and applicable non-bankruptcy law.  Each requirement is addressed below.

---

[36]  *See In re Briscoe Enters., Ltd., II*, 994 F.2d 1160, 1165 (5th Cir. 1993) ("The combination of legislative silence, Supreme Court holdings, and the structure of the Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof under § 1129(a) and in a cramdown."); *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 ("[T]he debtor's standard of proof that the requirements of § 1129 are satisfied is preponderance of the evidence.").

[37]  11 U.S.C. § 1129(a)(1).

[38]  S. Rep. No. 95-989, 95th Cong., 2nd Sess. 126 (1978), *reprinted in* 1978 U.S.C. C.A.N. 5787, 5912; H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368; *see also In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008); *In re S&W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were [s]ections 1122 and 1123.").

### 1.    The Plan complies with section 1122 of the Bankruptcy Code.

34.    The classification requirement of section 1122(a) of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[39]  For a classification structure to satisfy section 1122 of the Bankruptcy Code, not all substantially similar claims or interests need to be grouped in the same class.[40]  Instead, claims or interests designated to a particular class must be substantially similar to each other.[41]  Courts in this jurisdiction and others have recognized that plan proponents have significant flexibility in placing similar claims into different classes, provided there is a rational basis to do so.[42]  Thus, section 1122 of the Bankruptcy Code provides a debtor with a great degree of deference to create classification schemes that facilitate the bankruptcy proceeding.

35.    The Plan designates a total of 7 Classes of Claims and Interests of the Debtor.[43] Specifically, the Plan provides for the separate classification of Claims and Interests into the following Classes:

---

[39]   11 U.S.C. § 1122(a).

[40]   *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1278 (5th Cir. 1991).

[41]   *In re Vitro Asset Corp.*, No. 11-32600-hdh, 2013 WL 6044453, at *5 (Bankr. N.D. Tex. Nov. 14, 2013) ("[A] plan may provide for multiple classes of claims or interests so long as each claim or interest within a class is substantially similar to other claims or interests in that class.").

[42]   Courts have identified grounds justifying separate classification, including (a) where members of a class possess different legal rights and (b) where there are good business reasons for separate classification.  *See In re Briscoe Enters., Ltd., II*, 994 F.2d at 1166–67 (there may be good business reasons to support separate classification); *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 159  (3d Cir. 1993) (as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed," the classification is proper); *In re Pisces Energy, LLC*, 2009 Nos. 09-36591-H5-11, 2009 WL 7227880, at *8 (Bankr. S.D. Tex. Dec. 21, 2009) ("[A] plan proponent is afforded significant flexibility in classifying claims under section 1122(a) of the Bankruptcy Code provided there is a reasonable basis for the classification scheme and all claims within a particular class are substantially similar."); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007) ("the only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan").

[43]   *See* Plan Art. III.

      a.      <u>Class 1</u>: Prepetition Lender Claims;

      b.      <u>Class 2</u>: Other Secured Claims;

      c.      <u>Class 3</u>: Priority Non-Tax Claims;

      d.      <u>Class 4</u>: Other General Unsecured Claims;

      e.      <u>Class 5</u>: Customer Claims;

      f.      <u>Class 6</u>: Intercompany Claims; and

      g.      <u>Class 7</u>: Existing HoldCo Interests.

36.     This classification scheme complies with section 1122(a) of the Bankruptcy Code because each Class contains Claims or Interests that are similar to each other.  Furthermore, the classification scheme used by the Plan is based on the similar nature of Claims or Interests contained in each Class and not on any impermissible classification factor.  Finally, similar Claims and Interests have not been placed into different Classes to affect the outcome of the vote on the Plan.  Because each Class consists of only substantially similar Claims or Interests, the Court should approve the classification scheme as set forth in the Plan as consistent with section 1122(a) of the Bankruptcy Code.

         **2.**      **The Plan satisfies the mandatory plan requirements of section 1123(a) of the Bankruptcy Code.**

37.     The Plan satisfies the seven mandatory requirements of section 1123(a)(1) through (7) of the Bankruptcy Code.[44]

         a.      *Section 1123(a)(1):  Designation of classes of claims and equity interests.*

38.     Section 1123(a)(1) requires that a plan designate classes of claims and interests as permitted by section 1122.[45]  As stated above, the Plan designates 7 different Classes of Claims

---

[44]   11 U.S.C. § 1123(a)(8) is applicable only in cases in which the debtor is an individual.

[45]   *See* 11 U.S.C. § 1123(a)(1).

and Interests, consistent with the requirement of section 1122.[46]  Accordingly, the Plan satisfies the requirements of section 1123(a)(1) of the Bankruptcy Code.

> **b.**  *Section 1123(a)(2):  Claims or interests that are not impaired by the Plan.*

39.    Section 1123(a)(2) of the Bankruptcy Code requires that a plan specify which classes of claims or interests are not impaired under the plan.  As set forth in Article III of the Plan, Class 2 (Other Secured Claims) and Class 3 (Priority Non-Tax Claims) are not impaired under the Plan.  Accordingly, the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

> **c.**  *Section 1123(a)(3):  Treatment of claims and interests that are impaired by the Plan.*

40.    Section 1123(a)(3) of the Bankruptcy Code requires that a plan specify how it will treat classes of claims or interests that are impaired under the plan.[47]  Article IV of the Plan specifies that Claims in Class 1 (Prepetition Lender Claims), Class 4 (Other General Unsecured Claims), Class 5 (Customer Claims), Class 6 (Intercompany Claims) and Class 7 (Existing HoldCo Interests) are impaired under the Plan and provides the treatment for each Class.  Accordingly, the Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

> **d.**  *Section 1123(a)(4):  Equal treatment within classes.*

41.    Section 1123(a)(4) of the Bankruptcy Code requires that a plan provide the same treatment for each claim or interest within a particular class unless any claim or interest holder agrees to receive less favorable treatment than other class members.[48]  Under Article IV of the Plan, the treatment of each Claim against or Interest in the Debtor in each respective Class is the

---

[46]   Plan Art. III.

[47]   *See* 11 U.S.C. § 1123(a)(3).

[48]   *See* 11 U.S.C. § 1123(a)(4).

same as the treatment of every other Claim or Interest in such Class, unless the holder of a particular Claim or Interest has agreed to a less favorable treatment for such Claim or Interest. Accordingly, the Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code.

### e.   *Section 1123(a)(5): Means for implementation.*

42.     Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation and gives several examples of what may constitute "adequate means" for implementation.[49]  Article VI of the Plan sets forth the means for implementation of the Plan, which are adequate.  These implementation mechanisms include, among other things: (a) the vesting of the Debtor's assets in and the operation of the Debtor after the Effective Date of the Plan; (b) the management of the Debtor by the Plan Administrator; (c) revision of the Debtor's operating agreement; (d) the process for distributions to be made under the Plan; (d) except as provided in the Plan, the cancellation of existing securities, agreements and security interests; (e) the comprehensive settlement of Claims and controversies; and (f) preservation of Causes of Action not otherwise released under the Plan.  Accordingly, the Plan, together with the documents and agreements contemplated therein, sets forth the means for the Plan's implementation as required by section 1123(a)(5) of the Bankruptcy Code.

### f.   *Section 1123(a)(6): Issuance of non-voting securities.*

43.     Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of non-voting equity securities.[50]  In accordance with Section 6.01 of Article VI of the Plan, the Debtor's amended and restated limited liability company agreement, a draft of which is contained in the Plan Supplement, prohibits the issuance

---

[49]   *See* 11 U.S.C. § 1123(a)(5).

[50]   *See* 11 U.S.C. § 1123(a)(6).

of nonvoting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy

Code.  Accordingly, the Plan satisfies section 1123(a)(6) of the Bankruptcy Code.

### g.    *Section 1123(a)(7): Directors and officers.*

44.    Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with

respect to the manner of selection of any director, officer or trustee or any other successor thereto,

be "consistent with the interests of creditors and equity security holders and with public policy."[51]

As set forth in section 6.02 of Article VI of the Plan, from and after the Effective Date, the Debtor

shall be managed and administered by the Plan Administrator, who will be the sole officer, member

and manager of the Debtor and will have full authority to administer the provisions of the Plan.

The Plan Administrator has fiduciary duties to the Estate, of which the Debtor's creditors and

interests holders are beneficiaries.  Thus, the Debtor's actions are consistent with the interests of

Claims and Interests and with public policy, thereby satisfying section 1123(a)(7) of the

Bankruptcy Code.

### 3.    The Plan complies with the discretionary provisions of section 1123(b) of the Bankruptcy Code.

45.    Section 1123(b) of the Bankruptcy Code sets forth certain permissive plan

provisions that may be included in a chapter 11 plan.[52]  Section 1123(b) of the Bankruptcy Code

provides that a plan may:  (a) impair or leave unimpaired any class of claims or interests;

(b) provide for the assumption or rejection of executory contracts and unexpired leases;

(c) provide for the settlement or retention of claims of the debtor; and (d) include any other

---

[51]    *See* 11 U.S.C. § 1123(a)(7).

[52]    *See* 11 U.S.C. § 1123(b).

appropriate provision not inconsistent with the applicable provisions of chapter 11.[53]  The Plan

contains certain provisions contemplated by section 1123(b), which are described below.

> **a.**     ***Section 1123(b)(1): Impair or leave unimpaired any class of claims or interests.***

46.     Pursuant to section 1123(b)(1) of the Bankruptcy Code, a plan may impair or

leave unimpaired any class of claims or interests.[54]  Consistent with section 1123(b)(1), under

Article IV of the Plan, Classes 2 and 3 are unimpaired because the Plan leaves unaltered the

legal, equitable and contractual rights of the holders of Claims and Interests within such

Classes.[55]  Conversely, Classes 1 (Prepetition Lender Claims), 4 (Other General Unsecured

Claims), 5 (Customer Claims), 6 (Intercompany Claims) and 7 (Existing HoldCo Interests) are

impaired because the Plan modifies the rights of the holders of Claims and Interests, as

applicable, within such Classes as contemplated in section 1123(b)(1) of the Bankruptcy Code.[56]

> **b.**     ***Section 1123(b)(2):  Executory contracts and unexpired leases.***

47.     Section 1123(b)(2) of the Bankruptcy Code provides that a plan may provide for

the assumption, rejection or assignment of executory contracts or unexpired leases.  Pursuant to

section 365(a) of the Bankruptcy Code, a debtor may "assume or reject any executory contract or

unexpired lease of the debtor . . . ."[57]  A court should approve a decision to assume or reject an

---

[53]     11 U.S.C. § 1123(b)(1)–(3), (6).

[54]     *See* 11 U.S.C. § 1123(b)(1).

[55]     Plan Art. IV §§ 4.02–4.03.

[56]     *Id.*

[57]     *See* 11 U.S.C. § 365(a).

executory contract or unexpired lease pursuant to section 365 if based on a sound exercise of the debtor's business judgment.[58]

48.      Here, Article X of the Plan provides for the assumption or rejection of all of the Debtors' executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code and orders of the Court.  In particular, all executory contracts and unexpired leases not assumed by the Debtor will be rejected by the Debtor upon the occurrence of the Effective Date.

49.      As the Debtor is liquidating, the Debtor has determined in its business judgment to reject all of its executory contracts because those executory contracts and unexpired leases will not be necessary to facilitate the Debtor's orderly winddown in chapter 11 and are not beneficial to the Debtor or its Estate in any other way.[59]

50.      Accordingly, the Court should approve the rejection of the Debtor's executory contracts pursuant to section 365 of the Bankruptcy Code.

### c.      *Section 1123(b)(3): Settlement of claims and causes of action.*

51.      As set forth in greater detail in the paragraphs below, the Plan provides for: (a) the settlement and adjustment of claims or interests belong to the Debtor and its Estate in accordance with section 1123(b)(3)(A) (*see, e.g.*, Plan, §§ 12.7, 12.10); (b) in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the Plan contemplates the retention of Causes of Action,

---

[58]   *See N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (recognizing the "business judgment" standard used to approve rejection of executory contracts); *Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996) (recognizing the "business judgment" standard used to approve rejection of executory contracts); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1307 (5th Cir. 1985) (applying business judgment standard to the determination of whether an assumption decision was proper under § 365); *In re Minges*, 602 F.2d 38, 42–43 (2d Cir. 1979) (the "business judgment" test is appropriate for determining when an executory contract can be rejected); *In re Pilgrim's Pride Corp.*, 403 B.R. 413, 426 (Bankr. N.D. Tex. 2009) (absent public policy necessitating a more stringent standard, business judgment standard applies to a rejection decision under § 365(a)).

[59]   As of the date hereof, no executory contracts have been designated for assignment under section 365 of the Bankruptcy Code under the Plan.  Further, the Debtor does not have any unexpired leases of non-residential real property that have not already been rejected.

subject to the releases, injunctions and exculpations pursuant to 1123(b)(3)(B) contained in Article XII of the Plan (*See* Plan, § 12.13); (c) in accordance with section 1123(b)(5) of the Bankruptcy Code, Article IV of the Plan modifies or leaves unaffected, as the case may be, the rights of holders of Claims and Interests in each Class; and (d) in accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan includes additional appropriate provisions that are not inconsistent with the applicable provisions of the Bankruptcy Code.

52.     A bankruptcy court may only approve settlements when they are "fair and equitable."[60] Here, the Plan embodies the Global Settlement and part of the settlement with the State of Texas.  Both settlements were the product of extensive, arm's length negotiations. Pursuant to the Global Settlement, the Committee supports the Plan, including all of the release provisions.  While the settlement with the State of Texas is the subject of a separate settlement motion,[61] the effectiveness of the settlement is dependent upon the Participating Customers' treatment therein being approved by the Court and the Plan going effective.  The Plan resolves various alleged claims and causes of action by the applicable parties.  The Debtor and the applicable Non-Debtor Affiliates as well as the Prepetition Secured Lenders all denied any liability with respect to the various allegations and, from such parties' perspectives, such alleged claims and causes of action were highly unlikely to succeed, but pursuit thereof would have caused extensive delays and costs and likely would have caused this case to convert to chapter 7. The settlements resolve all outstanding issues and, if the Plan is confirmed, allows the Debtor to achieve its objectives in this case.

---

[60]     *See In re Zale Corp.*, 62 F.3d 746, 754, n.22 (5th Cir. 1995) (citations omitted); *see also* ¶ 56, *infra*.

[61]     *See Debtor's Motion for Order (a) Approving and Authorizing Debtor to Enter Into Settlement Agreement with the State of Texas and (b) Granting Related Relief* [Docket No. 338]

53.     As reflected by the support of creditors and interest holders for the Plan, the

settlements contained in the Plan are in the best interests of creditors and all parties in interest.

### i.     The Plan's release, injunction and exculpation provisions are appropriate and should be approved.

54.     Subject to certain specified exceptions, Article XII of the Plan provides for:

(a) releases by the Debtor and its Estate of the Released Parties;[62] (b) releases by and between

each Released Party, on the one hand, and each Participating Customer, on the other hand;[63]

(c) releases by each holder of a Claim or Interest that was entitled to vote on the Plan and that did

not opt out of the release through a timely and properly submitted on the Ballot and the Released

Parties (other than the Debtor) of the Released Parties;[64] (d) an exculpation provision for the

Released Parties and the Plan Administrator; and (e) an injunction provision prohibiting holders

of Claims against or Interests in the Debtor and its Estate from bringing any action against the

Debtor and its Estate or otherwise taking any action inconsistent with the Plan.  As set forth

below, these provisions are proper because, among other things, they are reasonable, in the best

interests of the Debtor and its Estate, the product of good faith arm's-length negotiations in

---

[62]  "Released Parties" means "collectively, and each solely in its capacity as such: (a) the Debtor, (b) the Committee and its members, (c) the Prepetition Secured Lenders and the Collateral Agent, and (d) each of such parties' respective predecessors, successors, assigns, subsidiaries, affiliates, the Non-Debtor Affiliates, owners, and each of their respective current (as of the Petition Date) officers, directors, employees, managers, members, principals, shareholders, agents, advisors and professionals (including any attorneys, consultants, financial advisors, investment bankers and other professionals retained by such Persons) or other representatives, each in their capacities as such, together with their successors and assigns; provided, however, that such attorneys and professional advisors shall only include those that provided services related to the Chapter 11 Case and the transactions contemplated by the Plan; provided, further, that no Person shall be a Released Party if it elects to opt out of the releases provided for in Article XII of the Plan in its Ballot."  Plan Art. I § 1.101.

[63]  "Participating Customer" means "any holder of a Customer Claim that does not opt-out of the Customer Releases, including those holders of Customer Claims that abstain from voting and do not opt-out of the Customer Releases."  Plan Art. § 1.76.

[64]  See Solicitation Procedures Order, Exs. 1, 3 (a)–(e).

exchange for substantial consideration from various parties, including the Released Parties, and critical to obtaining support of various constituencies for the Plan.

### ii. The releases provided by the Debtor under the Plan are appropriate and comply with the Bankruptcy Code.

55.     Subject to certain specified exceptions, including gross negligence or willful misconduct, Section 12.07(a) of the Plan (the "Debtor Release") provides that, as of the Petition Date, the Debtor will release, among other things, claims, obligations, suits, damages, demands, debts, rights and causes of action against each Released Party.  The Debtor Release is in the best interest of the Debtor's Estate and well within the Debtor's business judgment and satisfies the standards courts generally apply when reviewing this type of release.

56.     Pursuant to section 1123(b) of the Bankruptcy Code, a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate . . . ."[65]  In reviewing releases of claims by debtors, courts frequently employ the standards for approval of settlements under Bankruptcy Rule 9019.[66]  Bankruptcy Rule 9019(a) provides, in pertinent part, "after notice and a hearing, the court may approve a compromise or settlement."[67]  This provision allows the Debtor to release Estate causes of action as consideration for concessions made by its various stakeholders pursuant to the Plan.[68]  To determine the appropriateness of releases, courts in the Fifth Circuit generally consider whether

---

[65]   11 U.S.C. § 1123(b)(3)(A).

[66]   *See In re Spiegel, Inc.*, No-03-11540 (BRL), 2005 WL 1278094, at *11 (Bankr. S.D.N.Y. May 25, 2005) (approving releases pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019); *In re Cajun Elec. Power Co-op., Inc.*, 230 B.R. 715, 751 n.101 (Bankr. M.D. La. 1999) ("The standard under 11 U.S.C. § 1123(b)(3) is the same as the standard for approval of settlements under Rule 9019 . . . .").

[67]   Fed. R. Bankr. P. 9019(a).

[68]   *See, e.g.*, *In re Bigler LP*, 442 B.R. 537, 547 (Bankr. S.D. Tex. 2010) (plan release provision "constitutes an acceptable settlement under § 1123(b)(3) because the Debtors and the Estate are releasing claims that are property of the Estate in consideration for funding of the Plan"); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 259 (Bankr. N.D. Tex. 2007); *In re Mirant Corp.*, 348 B.R. 725, 737–39 (Bankr. N.D. Tex. 2006); *In re Gen. Homes Corp.*, 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991).

the release is (a) "fair and equitable" and (b) "in the best interests of the estate."[69]  The "fair and

equitable" prong is generally interpreted, consistent with that term's usage in section 1129(b) of

the Bankruptcy Code, to require compliance with the Bankruptcy Code's absolute priority rule.[70]

Generally, courts determine whether a debtor release is "in the best interest of the estate" by

considering: (a) the probably of success of the litigation being settled; (b) the complexity and

likely duration of the litigation, any attendant expense, inconvenience, or delay, and possible

problems collecting a judgment; (c) the interest of creditors with proper deference to their

reasonable views; and (d) the extent to which the settlement is truly the product of arm's-length

negotiations.[71]  At bottom, courts provide debtors with discretion in determining for themselves

the appropriateness of granting plan releases of estate causes of action.[72]  The Debtor Release

satisfies this standard.

57.     First, the Debtor does not believe it has any viable causes of action against the

other Released Parties.  Thus, it believes that any litigation would be time consuming, expensive

and, ultimately, not successful – all of which would deplete the Estate's resources rather than

maximize amounts available to be distributed to holders of Allowed Claims and Interests.  With

respect to the Prepetition Secured Lenders, the Debtor does not believe there are any viable

causes of action against them or that their liens can be avoided pursuant to chapter 5 of the

Bankruptcy Code.  In addition, as a result of the Prepetition Secured Lenders' oversecured status,

the Debtor would have to reimburse the Prepetition Secured Lender for costs relating to any

---

[69]   *In re Mirant Corp.*, 348 B.R. at 738; *see also In re Heritage Org., L.L.C.*, 375 B.R. at 259.

[70]   *In re Mirant Corp.*, 348 B.R. at 738.

[71]   *Id.* at 739–40 (citing *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Co-op., Inc. (In re Cajun Elec. Power Co-op., Inc.)*, 119 F.3d 349, 355–56 (5th Cir. 1997)).

[72]   *See In re Gen. Homes Corp.*, 134 B.R. at 861 ("The court concludes that such a release is within the discretion of the Debtor.").

litigation against them, including reasonable legal fees and expenses.  Further, in relation to the

other Released Parties, the Debtor has not identified any viable causes of action against the

Debtor's Non-Debtor Affiliates and their officers, directors, stockholders, employees, agents and

representatives, and the stockholders, members, officers, directors, managers, employees, agents

and representatives of such persons (in their capacities as such).  Even if there were viable causes

of action, each such party has rights to seek indemnification by the Debtor under the Debtor's

limited liability company agreement and the Debtor agreed to defend and hold harmless such

Released Parties.  As such, any rights to seek indemnification or other claims could negate the

benefit to the Debtor's estate of pursuing claims against the Released Parties.

58.    Second, the Debtor Release is in the best interest of the Estate.  The Prepetition

Secured Lenders, who hold a lien on virtually all of the Debtor's remaining cash, have agreed to

forego a distribution of approximately $1.448 million plus unpaid interest at the default contract

rate, which will increase amounts available to be distributed to the Debtor's creditors.  The

Debtor believes that the Prepetition Secured Lenders would not have agreed to this concession if

they did not receive a release in exchange therefor.  In addition, other than the limited amount of

cash that will remain in the Estate at the conclusion of this case, the Debtor's only other asset is

its viable Causes of Action, primarily, related to the winter storm event.  The Debtor believes

that in order for the Plan Administrator to have the ability to pursue such Causes of Action, the

Plan Administrator will need the input, cooperation and assistance of the Non-Debtor Affiliates

and their respective officers and directors in order to implement the Plan and prosecute Causes of

Action related to the winter storm.  As part of the Global Settlement, among other things, (a) the

officers and directors agreed to provide on an uncompensated basis certain services to the Debtor

after the Effective Date in connection with the pursuit of Causes of Action (notwithstanding that

they will be employed by one or more Non-Debtor Affiliates), as more fully detailed in the Consulting Agreement included in the Plan Supplement; (b) Griddy Technologies LLC, one of the Debtor's affiliates, agreed to provide a limited license of its technology without cost in order to aid the Debtor in efficiently winding down the Estate; (c) other than the independent director, those directors that receive Board fees agreed to the suspension thereof through the month of July, notwithstanding their continued active participation on the Board; and (d) one or more Non-Debtor Affiliates agreed to pay up to $225,000 of the Prepetition Lenders' Fee Claims, which amounts would otherwise have been required to have been paid by the Debtor. Moreover, there is no question that members, managers, officers and directors have provided and continue to provide valuable consideration to the Debtor as they commit substantial time and effort to winding down and liquidating the Debtor throughout this chapter 11 process. Lastly, the Debtor is an additional insured on insurance policies issued to a parent company. Thus, it shares insurance coverage with affiliated Released Parties. If the Debtor Release is not approved, claims against affiliated Released Parties could deplete the availability of insurance proceeds under the shared insurance policy limits, which, in turn, would leave less insurance available for the benefit of the Debtor and its Estate.

59.     Third, the Plan, including the Debtor Release, was vigorously negotiated by certain significant parties in interest in the chapter 11 case, each of which was represented by able counsel, including the Prepetition Secured Lenders, certain of the Non-Debtor Affiliates, the Committee and the State of Texas. Ultimately, the Debtor Release provides the Debtor and the Released Parties with finality and, as described above, the consideration given for the releases aids in maximizing the recoveries available to the Debtor's creditors. The Debtor Release was an integral part of the negotiations between the parties and without it the Prepetition Secured

31

Lenders and the Non-Debtor Affiliates may not have supported the Plan and made the concessions provided therein.

60.     Fourth, the Debtor Release is "fair and equitable" because none of the settlements contemplated in the Plan cause the Plan to violate the absolute priority rule.[73]

61.     Accordingly, the Debtor Release is reasonable, represents a valid exercise of the Debtors' business judgment, and should be approved pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.

### iii.     The consensual Third-Party Releases set forth in the Plan are appropriate and should be approved.

62.     Section 12.07(b) of the Plan provides for consensual releases by each holder of a Claim in a Class entitled to vote on the Plan in favor of each of the Released Parties and each Participating Customer (the "Third-Party Releases").

63.     Bankruptcy Courts in the Fifth Circuit have looked to whether third-party releases are:  (a) consensual; (b) specific in language; (c) integral to the plan; (d) a condition of the settlement; and (e) given for consideration when determining whether it is permissible under the Bankruptcy Code.[74]  Paragraph 36 of the Complex Case Procedures of this Court has, in part, codified what is required for a consensual release:

> If a proposed plan seeks consensual releases with respect to claims that creditors may hold against non-debtor parties, then a ballot must be sent to creditors entitled to vote on the proposed plan and notices must be sent to non-voting creditors and parties in interest. The ballot and the notice must inform the creditors of such releases and provide a box to check to indicate assent or opposition to such

---

[73]   *See* Section G below.

[74]   *See, e.g.*, *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 776 (Bankr. N.D. Tex. 2007).  While the court in *Wool Growers* did not approve the third-party releases finding that they were not consensual, the court held that as a general matter that "[c]onsensual nondebtor releases that are specific in language, integral to the plan, a condition of the settlement, and given for consideration do not violate section 524(e)."  *Id.*

consensual releases together with a method for returning the ballot
or notice.

Complex Case Procedures ¶ 36.

64.     The Third-Party Releases comply with each of these requirements.  The Third-Party Releases are consensual because, with the exception of Classes 6 (Intercompany Claims) and 7 (Existing HoldCo Interests), which are comprised of affiliates of the Debtor who are included in the definition of Released Parties, each of the Ballots sent to the Voting Classes advises the holder in bold type of the Third-Party Release (including the language of the Third-Party Release in its entirety), the opportunity to opt out of the release, and that the Third-Party Release will apply if they fail to do so.  Each Ballot provides detailed instructions regarding how to properly complete the Ballot, including the opt out, and how to submit the Ballot so that the holder's opt out will be counted.  Additionally, the Third-Party Releases are integral to the Plan, which effectuates a global settlement of claims of and against, among others, the Debtor and the other Released Parties as well as on behalf of Participating Customers, and (a) was a condition of the Released Parties to agreeing to the settlements under the Plan and (b) with respect to the Participating Customers, was a condition of the Global Settlement.  Lastly, the Third-Party Releases are given for consideration in that the Released Parties have made concessions and contributions that benefit the Estate and the holders of Claims as beneficiaries thereof and, with respect to the Participating Customers, such releases were part of the concessions and contributions made in connection with the Global Settlement.[75]

---

[75]   *See, e.g.*, *In re Westmoreland Coal Co.*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. Mar. 1, 2019), Conf. Hr'g Tr. at 125 [Docket No. 1559] (finding mutual releases to constitute consideration); *In re Cobalt Int'l Energy, Inc.*, No. 17-36709 (MI) (Bankr. S.D. Tex. Apr. 6, 2018), Conf. Hr'g Tr. at 244 [Docket No. 790] (same).

65.     Courts in this District routinely approve third-party releases with an opt out mechanism substantially identical to that which the Debtor proposes to utilize.[76]  Significantly, such releases constitute good faith settlements and compromises and are critical components of the Plan and the Global Settlement.  As part of the Plan, such releases are appropriate, reasonable and in the best interest of the Debtor and its Estate.

66.     Accordingly, the Third-Party Releases are consensual, an integral part of the Plan, and appropriate under applicable law and should be approved.[77]

### iv.     The Customer Releases are appropriate and should be approved.

67.     Section 12.10 of the Plan provides that Participating Customers shall, in exchange for releases of the Debtor and the other Released Parties, receive releases from the Debtor and

---

[76]  *See, e.g., In re Carbo Ceramics Inc.*, No. 20-31973 (MI) (Bankr. S.D. Tex. June 18, 2020) [Docket No. 539] (approving third-party release as consensual where voting classes are entitled to opt-out of the third-party releases through ballot and non-voting classes are entitled to opt-out of third-party releases through an opt-out form); *In re Alta Mesa Res., Inc.*, No. 19-35133 (MI) (Bankr. S.D. Tex. May 27, 2020) [Docket No. 1777] (same); *In re McDermott Int'l, Inc.*, No. 20-30336 (DRJ) (Bankr. S.D. Tex. Mar. 14, 2020) [Docket No. 684] (same); *In re EP Energy Corp.*, No. 19-35654 (MI) (Bankr. S.D. Tex. Mar. 12, 2020) [Docket No. 1049] (same); *In re Bristow Grp. Inc.*, No 19-32713 (DRJ) (Bankr. S.D. Tex. Oct. 8, 2019) [Docket No. 825] (approving third-party release as consensual where voting classes are entitled to opt-out of the third party releases through ballot and impaired non-voting classes are entitled to opt-out of third-party releases through an opt-out form); *In re Weatherford Int'l PLC*, No. 19-33694 (DRJ) (Bankr. S.D. Tex. Sept. 11, 2019) [Docket No. 343] (same); *In re iHeartMedia,* Inc., No 18-31274 (MI) (Bankr. S.D. Tex. Jan. 22, 2019) [Docket No. 2525] (approving third-party release as consensual where voting classes are entitled to opt-out of the third party releases through ballot, unimpaired non-voting classes are entitled to opt-out of third party releases through formal objections to the third-party releases, and non-voting classes are entitled to opt-out of third-party releases through an opt-out form); *see also In re CJ Holding Co.*, 597 B.R. 597, 608 (S.D. Tex. 2019) ("The Fifth Circuit does not preclude bankruptcy courts from approving a 'consensual non-debtor release.' Bankruptcy courts within the Fifth Circuit commonly exercise jurisdiction to approve nonparty releases based on agreed plans.").

[77]  *See In re CJ Holding Co.*, 597 B.R. at608 ("Bankruptcy courts within the Fifth Circuit commonly exercise jurisdiction to approve nonparty releases based on agreed plans."); *In re Wool Growers Cent. Storage Co.*, 371 B.R. at 776 ("Consensual nondebtor releases that are specific in language, integral to the plan, a condition of the settlement, and given for consideration do not violate section 524(e)."); *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005) (noting that "[n]ondebtor releases may also be tolerated if the affected creditors consent"); *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 269 (Bankr. S.D.N.Y. 2014) (noting that non-debtor releases are appropriate where, among other things, the released party "provides substantial consideration; where the plan otherwise provides for the full payment of the enjoined claims; or where the creditors consent").

the other Released Parties for all claims, including for unpaid amounts owed by such former customers for the electricity and related fees, taxes, expenses and other costs due as a result of the winter storm event (the "Customer Releases"). As set forth below, the Customer Releases meet the standards for approval of releases outlined above.[78]

68.     First, the Debtor believes that the most efficient way to monetize consumer receivables of the ages and amounts similar to its portfolio of outstanding consumer receivables would be to sell such receivables to a collection agency or other third-party buyer. However, as a threshold matter, it would be difficult for the Debtor to sell its outstanding consumer debt portfolio to a collection agency or other third-party buyer based on the unusual circumstances in which the debt arose.[79] And, even if the portfolio could be sold, due to the unexpected nature of the debt, the fact that the customers may argue the debt was beyond their control, the litigation risks associated with the debt, the current (and potential future) negative publicity surrounding the debt, and the fact that the debt would likely need to be sold on an "as-is, where is" basis, such customer receivables would be worth far less than typical utility debt that would be sold to a collection agency in the amounts and ages of the Debtor's outstanding customer receivables.[80] If the Debtor was able to sell its consumer debt receivables to a collection agency or other third-party buyer, the value of the portfolio would likely be between 1 to 1.75 cents on the dollar. The foregoing, combined with the public interest in assisting approximately 24,000 people of the State of Texas from being subject to collection actions and negative credit ratings and the fact that there were no objections to the Customer Releases, militates in favor of approving the Customer Releases.

---

[78]   *See* ¶¶ 56, 63, *supra*.

[79]   *See* Expert Report of Tony W. Spencer.

[80]   *Id.*

69.     Second, the Customer Releases allow the Debtor to maximize value by (a) avoiding litigating thousands of lawsuits whose costs may exceed the value to be recovered and (b) avoiding claims being asserted against the Estate and litigating the merit of such claims. More than 22,000 former customers owe the Debtor an amount that is less than $5,001. Prosecuting such actions likely would be far in excess of what the Debtor would recoup.  While the underlying collections actions may not be complex, managing up to approximately 24,000 collections actions likely would require significant resources and result in significant professional fees, and could take several years to prosecute.  Further, the outstanding amounts due from former customers are the result of unanticipated events (*i.e.*, the extreme price of electricity during the winter storm).  Thus, for those former customers that owe the Debtor more than $5,000, they may not have the financial wherewithal to pay such amounts or they may try to assert claims against the Estate.  While the Debtor does not believe any such claims have any merit, it would still need to spend Estate resources to defend against those claims.

70.     Although the Debtor proposed to exchange mutual releases with its former customers as part of its Plan filed on the Petition Date, the Customer Releases in their current form (which includes allowing Participating Customers to share in, among other things, certain litigation proceeds if they file proofs of claim for amounts they paid the Debtor during period February 13 – February 19 time period) are the result of extensive arm's length negotiations between the Debtor and the State of Texas as well as the Debtor and the Committee.

71.     In addition, the Customer Releases do not violate the absolute priority rule because all holders of Claims of higher priority are being paid in full.  Accordingly, the Customer Releases are reasonable, represent a valid exercise of the Debtors' business judgment,

and should be approved pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.

72.     The Customer Releases also are consensual because the Class 5 Ballots provide detailed instructions on how to properly complete the Ballot, including the opt out of the Customer Releases, and how to submit the Ballot.[81]  The Customer Releases are an integral part of the Plan, which effectuates a global settlement of claims between the Debtor and the State of Texas, the Debtor and the Committee, and the Released Parties and each Participating Customer. Each Participating Customer provides consideration to the Released Parties in the form of a mutual release, which in addition to shielding Participating Customers from collection actions will also benefit customers by avoiding having the credit of such persons potentially damaged by reporting the overdue amounts to credit agencies.

73.     Accordingly, the Customer Releases are appropriate under applicable law and should be approved.

### v.     The Plan's exculpation provisions are permissible and should be approved.

74.     Courts have approved exculpation provisions when parties are exculpated for acts or omissions in connection with, or related to, "the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence . . . ."[82]  The exculpation of

---

[81]   In addition, the Class 5 Ballots contain detailed instructions on how former customers can opt out of the Customer Releases.

[82]   *In re PWS Holding Corp.*, 228 F.3d 245–47 (3d Cir. 2000) (approving exculpation clause release of creditors' committee and its professionals for third-party claims); *see also In re Ondova Ltd. Co.*, No. 09-34784-SGJ-11, 2012 WL 5879147, at *13 (Bankr. N.D. Tex. Nov. 21, 2012) (approving exculpation provisions that were "more in the nature of compromises and settlements that may occur in a plan pursuant to [s]ection 1123(b)(3)(A)"); *In re Bigler LP*, 442 B.R. 537, 544 (Bankr. S.D. Tex. 2010) (noting with approval an exculpation provision that was "not a simple discharge of liability, but rather a settlement of claims, for consideration, pursuant to arm['s]-length negotiations, that satisfie[d] the requirements of § 1123(b)(3)(A)").

parties participating in the plan process is appropriate where plan negotiations could not have occurred without protection from liability and the parties conferred a substantial benefit upon the estate.[83]

75.     Here, the exculpations provided for in Section 12.08 of the Plan, which exclude gross negligence or willful misconduct, are appropriate and important because they provide protection to those parties who served as fiduciaries during the chapter 11 process or made substantial and critical contributions to the settlements contained in the Plan.  The exculpation provision prevents future collateral attacks that, if permitted, may have caused the parties that are to be exculpated under the Plan[84] to be reluctant to cooperate with the negotiation, formulation and distributions under and of the Plan in the first place.  Accordingly, the exculpation provision set forth in the Plan are appropriate and consistent with applicable law and should be approved.

### vi.     The Plan's injunction provisions are permissible and should be approved.

76.     The injunction provisions contained in Sections 12.06 and 12.09 of the Plan (the "Plan Injunction") are necessary to effectuate the release and exculpation provisions of the Plan and to protect the Debtor from any potential litigation from prepetition creditors after the Effective Date.  Without the Plan Injunction, there would be no mechanism to enforce the provisions of the Plan.  The Debtor, who is liquidating and has limited wind down funds, could be faced with numerous lawsuits in various jurisdictions related to Claims that are treated under the Plan.  Any such litigation would drain the Estate's limited resources and hinder the efforts of

---

[83]     *See, e.g.*, *In re Hingham Campus, LLC*, No. 11-33912, 2011 WL 3679057, at *9 (Bankr. N.D. Tex. Aug. 23, 2011) (approving exculpation provisions as "necessary to the proposed reorganization"); *In re Enron Corp.*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (noting that removal of similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

[84]     The parties contemplated to be exculpated under the Plan are the pre-Effective Date Debtor, the Liquidating Debtor, the Plan Administrator and the Released Parties.

the Debtor to effectively fulfill its responsibilities to wind down the Debtor and administer the Estate as contemplated in the Plan.  Accordingly, the Plan Injunction is a key component of the Plan and should be approved.[85]

**B.      Section 1129(a)(2):  The Debtor has complied with the applicable provisions of the Bankruptcy Code.**

77.      Section 1129(a)(2) of the Bankruptcy Code requires that the plan proponent comply with the applicable provisions of title 11.[86]  A principal purpose of section 1129(a)(2) is to ensure that plan proponents have complied with the requirements of the Bankruptcy Code and Bankruptcy Rules regarding disclosure and the solicitation of acceptances of a plan.[87]

78.      Here, the Debtor has complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Solicitation Procedures Order governing notice, disclosure, and solicitation in connection with the Plan and Disclosure Statement.  In addition, the Debtor and its professionals acted in good faith in all respects in connection with the solicitation of votes on the Plan and the tabulation of such votes.  Accordingly, the Debtor has satisfied the requirements of section 1129(a)(2).[88]

---

[85]   *See SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 960 F.2d 285, 293 (2d Cir. 1992) ("In bankruptcy cases, a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization plan.").

[86]   *See* 11 U.S.C. § 1129(a)(2).

[87]   *See* H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368; *see also In re Worldcom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928, at *49 (Bankr. S.D.N.Y. Oct. 31, 2003) (section 1129(a)(2) requires plan proponents to comply with applicable provisions of the Bankruptcy Code, including the "disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code"); *In re Lapworth*, No. 97-34529DWS, 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2).").

[88]   *See In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 769 (Bankr. S.D.N.Y. 1992) (holding section 1129(a)(2) satisfied where debtors complied with all provisions of the Bankruptcy Code and Bankruptcy Rules governing notice, disclosure, and solicitation relating to the plan).

**C.       Section 1129(a)(3):  The Debtor proposed the Plan in good faith.**

79.       Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be

"proposed in good faith and not by any means forbidden by law."[89]  The test for good faith under

section 1129(a)(3) is that the plan is proposed in good faith "with the legitimate and honest

purpose to reorganize and has a reasonable hope of success . . . ."[90]  "Good faith" is evaluated in

light of the totality of the circumstances surrounding the development of the plan, and the Court

is in the best position to assess the good faith of the proposal of a plan.[91]

80.       The Debtor proposed the Plan for the legitimate, good faith and honest purpose of

allowing it to efficiently liquidate in chapter 11, maximize recovery to its creditors while

balancing its desire to assist its former customers in respect of their energy bills related to the

winter storm event and the extreme pricing that occurred during the storm.  The Plan embodies

arm's-length negotiations among parties in interest and incorporates agreements reached with

those parties.  The Plan received overwhelming support from the Classes entitled to vote, a

testament to its fairness and the good-faith efforts involved in its negotiation and formulation.

Accordingly, the Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code.

**D.       Section 1129(a)(4):  The Plan provides that the Debtor's payment of
           professional fees and expenses is subject to Court approval.**

81.       Section 1129(a)(4) of the Bankruptcy Code requires that payments for services or

costs and expenses incurred in connection with a chapter 11 case, or in connection with a plan

and incident to the case, either be approved by or subject to approval of the court as reasonable.[92]

---

89    *See* 11 U.S.C. § 1129(a)(3).

90    *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985); *see also In re Village at Camp Bowie I, L.P.*,
      454 B.R. 702, 709 (Bankr. N.D. Tex. 2011).

91    *Tex. Extrusion Corp. v. Lockheed Corp.* (*In re Tex. Extrusion Corp.*), 844 F.2d 1142, 1160 (5th Cir. 1988); *see
      also In re Village at Camp Bowie I, L.P.*, 454 B.R. at 709.

92    *See* 11 U.S.C. § 1129(a)(4).

This section requires that all postpetition professional fees promised or received in chapter 11 cases remain subject to the court's review.[93]

82.    Section 2.03 of the Plan contains procedures for filing applications for final allowance of Fee Claims and procedures for the payment of such Fee Claims upon approval of the Court.  Section 13.01(j) of the Plan provides for the Court's retention of jurisdiction to determine Fee Claims.  Further, as set forth in Section 2.01 of the Plan, the Debtor's ordinary course professionals will be paid in the ordinary course as holders of Administrative Expense Claims consistent with the *Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* [Docket No. 234].  Thus, the Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

### E.    Section 1129(a)(5):  The Debtor will have disclosed all necessary information regarding directors, officers and insiders.

83.    Section 1129(a)(5)(A) of the Bankruptcy Code requires that the plan proponent disclose the "identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor . . . or a successor to the debtor under the plan," and requires a finding that "the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy . . . ."[94]  Section 1129(a)(5)(B) of the Bankruptcy Code requires a plan proponent

---

[93]    *See Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Co-op., Inc.)*, 150 F.3d 503, 513 (5th Cir. 1998) ("Section 1129(a)(4) by its terms requires court approval of any payment made or to be made by the proponent … for services or for costs and expenses in or in connection with the case.") (quotations and citations omitted); *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

[94]    *See* 11 U.S.C. § 1129(a)(5)(A).

to disclose the "identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider."[95]

84.     Article VII of the Plan provides that a plan administrator will be appointed on or after the Confirmation Date and the position will become effective on the Effective Date of the Plan.[96]  The identity of the Plan Administrator has been included with the Plan Supplement. None of the Debtor's current officers, members or managers will maintain their positions with the Debtor.  However, as part of the Global Settlement, the directors of the Debtor's indirect parent and the officers of the Debtor agreed to provide on an uncompensated basis certain post-Effective Services for an agreed period of time.  The services and terms thereof are included in the Consulting Agreement included in the Plan Supplement.  Accordingly, the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

**F.      Section 1129(a)(6):  The Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission.**

85.     Section 1129(a)(6) of the Bankruptcy Code is not applicable because the Plan does not provide for rate changes by any of the Debtor.

**G.      Section 1129(a)(7):  The Plan is in the best interests of all the Debtor's creditors.**

86.     The "best interests" test set forth in section 1129(a)(7) of the Bankruptcy Code requires that each holder of a claim or interest in an impaired class either accept the plan or receive or retain property that is not worth less, as of the effective date of the plan, than the amount that such holder of the claim or interest would receive or retain if the debtor were liquidated under chapter 7.[97]  As the language of section 1129(a)(7) makes clear, the "best

---

[95]     *See* 11 U.S.C. § 1129(a)(5)(B).

[96]     *See* Plan Art. VII § 7.01.

[97]     *See* 11 U.S.C. § 1129(a)(7).

interests" test applies only to holders of impaired Claims or Interests that do not vote to accept the Plan.[98]  The "best interests" test applies if an impaired claim or interest does not vote to accept a plan, even if the class in which such claim or interest is classified votes to accept the plan as a whole.[99]  The "best interests" test is generally satisfied by a liquidation analysis demonstrating that the impaired class in which a claim or interest of a non-accepting holder is classified will receive no less under the plan than under a chapter 7 liquidation.[100]

87.     Pursuant to section 1126(f) of the Bankruptcy Code, each holder of a Claim or Interest in a Class that is not impaired is conclusively presumed to have accepted the Plan.[101] Therefore, with respect to Class 2 (Other Secured Claims) and Class 3 (Priority Non-Tax Claims), section 1129(a)(7) of the Bankruptcy Code is not implicated because the creditors in such Classes are unimpaired and are conclusively presumed to have accepted the Plan.  All holders in Class 1 (Prepetition Lender Claims), Class 6 (Intercompany Claims) and Class 7 (Existing HolderCo Interests) have voted to accept the Plan and, accordingly, section 1129(a)(7) does not apply to such Claims and Interests.  Claims in Classes 4 and 5 are impaired under the Plan and certain holders in such Classes did not vote to accept the Plan.  Therefore, the "best interests" test must be applied to such Classes.

---

[98]    *See id.*

[99]    *Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Adelphia Commc'ns. Corp.*, 368 B.R. 140, 251 (Bankr. S.D.N.Y. 2007) (section 1129(a)(7) is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation . . . .").

[100]   *See In re Neff*, 60 B.R. 448, 452 (Bankr. N.D. Tex. 1985), *aff'd*, 785 F.2d 1033 (5th Cir. 1986) ("best interests" of creditors means "creditors must receive distributions under the Chapter 11 plan with a present value at least equal to what they would have received in a Chapter 7 liquidation of the Debtor as of the effective date of the Plan"); *see also In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) ("Section 1129(a)(7)(A) requires a determination whether 'a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization.'") (citations omitted).

[101]   *See* 11 U.S.C. § 1126(f).

88.     To demonstrate compliance with section 1129(a)(7) of the Bankruptcy Code, the

Debtor has prepared a detailed liquidation analysis (the "Liquidation Analysis") estimating and

comparing the range of proceeds generated under the Plan and a hypothetical liquidation.[102]  The

table below provides a summary of the Liquidation Analysis as it relates to the impaired Classes

of Claims that did not unanimously vote to accept the Plan.

| Class | Estimated Plan Recovery | Estimated Recovery in a Hypothetical Chapter 7 |
|---|---|---|
| Class 4 (Other General Unsecured Claims) | 3% | 0% |
| Class 5 (Customer Claims) | 3% | 0% |

89.     The Debtor believes that the Liquidation Analysis was based on a variety of

assumptions that were made in good faith and are reasonable under the circumstances.

90.     As the estimated recovery under the Plan available to holders of such Claims and

Interests is equal to or exceeds the estimated recovery that would be available to such holders in

a hypothetical liquidation, the Plan satisfies section 1129(a)(7) of the Bankruptcy Code.

**H.     Section 1129(a)(8):  All Classes of Claims and Interests entitled to vote have accepted the Plan or are unimpaired.**

91.     Subject to section 1129(b) of the Bankruptcy Code, section 1129(a)(8) requires

that each class of claims and interests either has accepted the plan or is not impaired under the

plan.[103]  A class of claims accepts a plan if the holders of at least two-thirds in dollar amount and

more than one-half in the number of claims in the class vote to accept the plan, counting only

those claims whose holders actually vote to accept or reject the plan.[104]  A class of interests

accepts a plan if the holders of at least two-thirds in amount in the class vote to accept the plan,

---

[102]   *See* Disclosure Statement, Ex. B.

[103]   *See* 11 U.S.C. § 1129(a)(8).

[104]   *See* 11 U.S.C. § 1126(c).

counting only those interests whose holders actually vote.  A class that is not impaired under a plan, and each holder of a claim or interest in such class, is conclusively presumed to have accepted the plan.[105]  Conversely, a class is conclusively deemed to have rejected a plan if the plan provides that the claims or interests of such class do not receive or retain any property under the plan on account of such claim or interests.[106]

92.     In accordance with the tabulation procedures in the Solicitation Procedures Order, all Classes entitled to vote have voted to accept the Plan within the meaning of section 1126 of the Bankruptcy Code.[107]  Accordingly, the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to all of the foregoing Classes.

**I.      Section 1129(a)(9):  The Plan provides for payment in full of all Allowed priority Claims.**

93.     Section 1129(a)(9) of the Bankruptcy Code requires a chapter 11 plan to provide that all persons holding claims entitled to priority under section 507(a) of the Bankruptcy Code will be fully compensated for their claims in cash unless the holder of a particular claim agrees to a different treatment with respect to such claim.[108]  As required by section 1129(a)(9), except to the extent that a particular holder of an Allowed Claim agrees to a less favorable treatment, Article II of the Plan provides for payment in full of all Allowed Administrative Expense Claims, Fee Claims and Priority Tax Claims.  Therefore, the Plan complies with section 1129(a)(9) of the Bankruptcy Code.

---

[105]   *See* 11 U.S.C. § 1126(f).

[106]   *See* 11 U.S.C. § 1126(g).

[107]   *See* Voting Declaration, Ex. A.

[108]   *See* 11 U.S.C. § 1129(a)(9).

J.     **Section 1129(a)(10):  At least one Class of impaired Claims, excluding the votes of any insiders, accepted the Plan.**

94.     Section 1129(a)(10) of the Bankruptcy Code requires at least one impaired class of claims accept the Plan, not counting the votes of any insiders.[109]  As evidenced in the Voting Declaration, section 1129(a)(10) of the Bankruptcy Code has been satisfied.

K.     **Section 1129(a)(11):  The Plan is feasible.**

95.     Section 1129(a)(11) of the Bankruptcy Code requires the Court to determine that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."[110]  This requirement is commonly known as the "feasibility" standard.  The threshold of proof necessary to satisfy the feasibility standard is relatively low and it is not necessary for a debtor to guarantee success.[111]  A debtor must only show by a preponderance of the evidence that the plan has a reasonable assurance of success.[112]  In the context of a liquidating chapter 11 plan, courts generally hold that plans of liquidation are feasible if the debtor is able to satisfy its obligations under the proposed plan of liquidation.[113]

---

[109]   *See* 11 U.S.C. § 1129(a)(10).

[110]   11 U.S.C. § 1129(a)(11).

[111]   *Fin. Sec. Assurance Inc v. T–H New Orleans Ltd. P'ship (In re T–H New Orleans Ltd. P'ship)*, 116 F.3d 790, 801 (5th Cir. 1997) ("[T]he [bankruptcy] court need not require a guarantee of success …, [o]nly a reasonable assurance of commercial viability is required.") (quoting *In re Briscoe Enters., Ltd., II*, 994 F.2d 1160, 1165–66 (5th Cir. 1993)); *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed."); *In re Lakeside Glob. II, Ltd.*, 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989) (the feasibility standard "has been slightly broadened and contemplates whether the debtor can realistically carry out its plan").

[112]   *Kane*, 843 F.2d at 649; *In re Flintkote Co.*, 486 B.R. 99, 139 (Bankr. D. Del. 2012); *In re W.R. Grace & Co.*, 475 B.R. 34, 115 (D. Del. 2012); *see also Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) ("The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.") (citation omitted); *In re Capmark Fin. Grp. Inc.*, No. 09-13684, 2011 WL 6013718, at *61 (Bankr. D. Del. Oct. 5, 2011) (same).

[113]   *See In re Cypresswood Land Partners, I*, 409 B.R. 396, 432 (Bankr. S.D. Tex. 2009) (holding liquidating plan feasible); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 311 (Bankr. N.D. Tex. 2007) (same); *but see In re Holmes*,

96.     The Debtor respectfully submits that the Plan is feasible.   The successful performance of the Plan is not dependent on a contingent uncertain event and all of the conditions precedent to confirmation of the Plan set forth in section 11.02 of the Plan will largely be satisfied prior to or shortly after confirmation.   Moreover, the Debtor believes it has sufficient funds to pay all of its obligations in accordance with the Plan, including paying its Allowed Administrative Expense Claims and Allowed Priority Claims in full in cash.

97.     Accordingly, the Debtor respectfully submits that section 1129(a)(11) of the Bankruptcy Code has been satisfied.

**L.     Section 1129(a)(12): All statutory fees have been or will be paid.**

98.     Section 1129(a)(12) of the Bankruptcy Code provides that a court may confirm a plan only if "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan."[114]  Section 14.04 of the Plan provides that all fees arising under 28 U.S.C. § 1930 will be paid by the Debtor on the Effective Date.  Pursuant to Section 2.04 of the Plan, the Debtor will pay any outstanding U.S. Trustee fees, if any, on an ongoing basis the later of (a) the Effective Date and (b) the date that such U.S. Trustee fees come due closed, converted or dismissed.  Accordingly, the Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

---

301 B.R. 911, 915 (Bankr. M.D. Ga. 2003) (finding a liquidation plan not feasible where the success of the liquidation depended upon the IRS's acceptance, which had not yet occurred, of a proposed compromise of the debtor's tax obligation); *In re Yates Dev., Inc.*, 258 B.R. 36, 44–45 (Bankr. M.D. Fla. 2000) (holding liquidation plan was not feasible where plan could not be effectuated absent a future, favorable appellate ruling).

[114]  *See* 11 U.S.C. § 1129(a)(12).

**M.     Section 1129(a)(13): There are no retiree benefits to continue post-confirmation.**

99.     Section 1129(a)(13) of the Bankruptcy Code requires that a plan provide for the continued payment of certain retiree benefits "for the duration of the period [that] the debtor has obligated itself to provide such benefits" at the level established by section 1114 of the Bankruptcy Code.[115]  The Debtor does not maintain any such benefit plans, and so, section 1129(a)(13) is not applicable.

**N.     Section 1129(d):  The Debtor complied with section 1129(d) of the Bankruptcy Code.**

100.     The principal purpose of the Plan is not avoidance of taxes or the avoidance of application of section 5 of the Securities Act of 1933.  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

**O.     Section 1129(e):  The small business case section is inapplicable.**

101.     Section 1129(e) is inapplicable because these Chapter 11 Cases do not qualify as small business cases.

[*The remainder of this space is intentionally left blank.*]

---

[115]   *See* 11 U.S.C. § 1129(a)(13).

## <u>CONCLUSION</u>

102.    For all of the reasons set forth herein, and as will be further shown at the Combined

Hearing, the Debtor respectfully requests that (a) the Court approve the adequacy of the Disclosure

Statement; (b) confirm the Plan as fully satisfying all of the applicable requirements of the

Bankruptcy Code; and (c) grant such other and further relief as is just and proper.

Dated: July 2, 2021

<div style="margin-left: 40%;">

Respectfully submitted,

**BAKER BOTTS L.L.P.**

By: */s/ Robin Spigel*
Robin Spigel (admitted *pro hac vice*)
*Robin.Spigel@bakerbotts.com*
Chris Newcomb (admitted *pro hac vice*)
*Chris.Newcomb@bakerbotts.com*
Jacob R. Herz (admitted *pro hac vice*)
*Jacob.Herz@BakerBotts.com*
30 Rockefeller Plaza
New York, New York 10012-4498
Telephone: (212) 408-2500
Facsimile: (212) 259-2501

– and –

David R. Eastlake
Texas Bar No. 24074165
*David.Eastlake@bakerbotts.com*
910 Louisiana Street
Houston, Texas 77002-4995
Telephone: (713) 229-1234
Facsimile: (713) 229-1522

***Counsel to the Debtor and Debtor in Possession***

</div>

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 2, 2021, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Robin Spigel*