```
 1              IN THE UNITED STATES BANKRUPTCY COURT

 2             FOR THE SOUTHERN DISTRICT OF TEXAS

 3                      HOUSTON DIVISION

 4   IN RE:                  §      CASE NO. 21-30923-11
                             §      HOUSTON, TEXAS
 5   GRIDDY ENERGY, LLC,     §      WEDNESDAY,
                             §      JULY 7, 2021
 6            DEBTOR.        §      3:02 P.M. TO 4:59 P.M.

 7

                 CONFIRMATION HEARING (VIA ZOOM)
 8
              BEFORE THE HONORABLE MARVIN ISGUR
 9              UNITED STATES BANKRUPTCY JUDGE

10

11

12      APPEARANCES:               SEE NEXT PAGE

13      COURTROOM DEPUTY:          TYLER LAWS

14      (Recorded via CourtSpeak; No log notes)

15

16

17

18

19

20             TRANSCRIPTION SERVICE BY:

21          JUDICIAL TRANSCRIBERS OF TEXAS, LLC
               935 Eldridge Road, #144
22              Sugar Land, TX 77478
                   281-277-5325
23             www.judicialtranscribers.com

24
      Proceedings recorded by electronic sound recording;
25        transcript produced by transcription service.
```

1                          APPEARANCES (VIA ZOOM):

2

  FOR THE DEBTOR:                BAKER BOTTS, LLP
3                                Robin Spigel
                                 30 Rockefeller Plaza
4                                New York, NY  10112

5                                BAKER BOTTS, LLP
                                 John Lawrence
6                                2001 Ross Avenue, Ste. 900
                                 Dallas, TX  75201

7

8 FOR OFFICIAL COMMITTEE OF      MCDERMOTT WILL & EMERY, LLP
  UNSECURED CREDITORS:           Charles Gibbs
9                                2501 N. Harwood St., Ste. 1900
                                 Dallas, TX  75201

10

11 FOR PUBLIC UTILITY            ATTORNEY GENERAL OF TEXAS
   COMMISSION OF TEXAS:          Jason Binford
12                               300 W. 15th St., Mail MC-008
                                 Austin, TX  78701

13

14 FOR STATE OF TEXAS:           ATTORNEY GENERAL OF TEXAS
                                 Abigail R. Ryan
15                               P. O. Box 12548
                                 Austin, TX  78711-2548

16

17 FOR US TRUSTEE:               OFFICE OF THE US TRUSTEE
                                 Jana Smith Whitworth
18                               515 Rusk St., Suite 3516
                                 Houston, TX  77002

19

20 FOR ERCOT:                    MUNSCH HARDT KOPF & HARR, PC
                                 Kevin Lippman
                                 500 N. Akard St., Ste. 3800
21                               Dallas, TX  75201

22 FOR KAREN PRESCOTT:           FOX ROTHSCHILD LLP
                                 Trey Monsour
23                               2843 Rusk Street
                                 Houston, TX  77003

24

25           (Please also see Electronic Appearances.)

1                               INDEX

2

3

EXHIBITS:                                    Offered    Received

4

DEBTOR'S:

5   Ex. 312                                    36          36
    Ex. 338-2                                   6           7
6   Ex. 345                                    36          36
    Ex. 355                                    36          36
7   Ex. 363                                    33          33
    Ex. 367                                    33          33
8   Ex. 370                                    33          33

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       HOUSTON, TEXAS; WEDNESDAY, JULY 7, 2021; 3:02 P.M.

2         THE COURT:  All right.  Good afternoon.  We're

3 here this afternoon in the Griddy Energy case.  It's 21-

4 -30923.  We have electronic appearances that have been made

5 so what I would like to do is to go directly to Debtor's

6 counsel, ask you to press five, star on your phone, and let

7 me ask you where you intend to go today.  You can then make

8 an opening statement.  And if anyone else wishes to make an

9 opening statement, they may do so as well.

10         MS. SPIGEL:  Good afternoon.

11         THE COURT:  Ms. Spigel, good afternoon to you.

12         MS. SPIGEL:  Thank you, Your Honor, Robin Spigel,

13 Baker Botts, counsel to the Debtor.  With me in the virtual

14 courtroom is Michael Fallquist, the Debtor's Chief Executive

15 Officer; Roop Bhullar, the Debtor's Chief Financial Officer;

16 and Tony Spencer, the Debtor's retained expert.

17         There are three items on the agenda today.

18 There's a motion to approve settlement between the Debtor

19 and the State of Texas, a motion to seal certain customer

20 data in connection with the expert report filed by the

21 Debtor, and the combined hearing on the confirmation of

22 Griddy's Chapter 11 plan, as well as final approval of the

23 disclosure statement.

24         As I reported last week, Your Honor, the plan was

25 overwhelmingly accepted by voting classes, and no formal

1 objections to the plan or the disclosure statement were

2 filed.  There were a few informal comments to the plan that

3 were received and is reflected and the resolutions that are

4 reflected in the confirmation order.  And we can go over

5 that in a little bit.

6          I thought that it made sense to go -- proceed

7 first with the motion to approve the settlement between the

8 Debtor and the State of Texas.

9          THE COURT:  So let me see if anyone has any sort

10 of comment about proceeding that way.  I actually -- the

11 reason I didn't deal with that on the certificate of no

12 objection was only because I thought it was so tied to

13 whether we were going to confirm the plan that that should

14 largely be a joint decision.  If you think I should take

15 them up separately, you know, given where the world is where

16 we're here on pretty well an unopposed day, I don't know

17 that it's going to matter a lot.  But that's the reason I

18 didn't was to believing that they were pretty well

19 integrated.  Even if you read the settlement it says that

20 parts of it only come about if we confirm a plan.  So if

21 anyone else wishes to address the Court on that issue,

22 please press five, star.  Otherwise we can go there as a

23 starting point.  Let me see if I have it.

24      (No audible response)

25          All right.  No one else seems to want to run

1   interference against you so why don't you move ahead,

2   Ms. Spigel, with -- we'll go that way.

3         MS. SPIGEL:  Thank you, Your Honor.  And they are

4   integrally tied.  In fact, and I'll get to that in a second,

5   but the settlement is dependent on the plan going effective,

6   and part of the settlement is integrated in the plan.  So it

7   is subject to -- even if Your Honor approves it, it's

8   subject ultimately to confirmation and then the plan going

9   effective.  But I will go through it.

10        The Debtor's motion to approve the settlement

11  between the Debtor and its parent company, Griddy Holdings,

12  LLC, and the State of Texas was filed at Docket Number 338.

13  As the Debtor previewed at the hearing on conditional

14  approval of disclosure statement, the Debtor had reached a

15  settlement agreement with it and its parent company on the

16  one hand, with the State of Texas on the other hand.  The

17  settlement agreement is attached to the proposed order

18  approving the motion as Exhibit 1.  And next to the

19  settlement agreement is a copy of a consent judgment that

20  I'll explain shortly.

21        The certificate of service respecting the service

22  of the motion can be found at Docket 343.

23        As a preliminary matter, Your Honor, the Debtor

24  would like to at this time move to admit the Fallquist

25  declaration in support of the motion is attached as

1  Exhibit B to the motion at Docket Number 338-2.

2  Mr. Fallquist is on the line and available for cross

3  examination.

4           THE COURT:  All right.  Is there any objection to

5  the admission of 338-2, which is Mr. Fallquist's

6  declaration?

7       (No audible response)

8           All right.  Mr. Fallquist's declaration is

9  admitted.

10      (Debtor's Exhibit Number 338-2 was received in

11  evidence)

12          MS. SPIGEL:  Thank you, Your Honor.  There were no

13  objections filed to the motion.  A certificate of no

14  objection had been filed on July 1st at Docket Number 364.

15  And then we actually filed an amended certificate of no

16  objection on July 2nd to fix some signature pages to the

17  consent judgment just due to personnel changes.  That's at

18  Docket Number 369.  Unless you have any questions that

19  concerns the substance of the motion.

20          THE COURT:  No.  Let me hear if there's anyone

21  that believes that this settlement is not appropriate or

22  should not be granted.

23      (No audible response)

24          Mr. Gibbs, I know that you filed a statement in

25  support of the plan and I think it incorporates your

1  client's support of this settlement.  I just want to be sure

2  that I'm reading that correctly and I'm not making a mistake

3  about that.  And I also know Mr. Binford has said he wants

4  to speak.  So let me get the two of your lines active, and

5  then anyone else.  Mr. Gibbs.

6          MR. GIBBS:  Good afternoon, Your Honor, Chuck

7  Gibbs with the law firm of McDermott, Will, and Emery.

8  We're counsel for the Official Unsecured Creditors

9  Committee.  We support the entry of an order approving this

10 settlement.  As Your Honor correctly indicated, we filed a

11 general statement in support of confirmation of the plan

12 which necessarily also supports the approval of this

13 compromise with the Attorney General.  That was filed

14 yesterday at Docket 382 so I just wanted the Court and the

15 record to reflect that we are supportive of this motion.  I

16 think it's entirely appropriate and obviously critical

17 component of the plan that you're about to hear.

18          THE COURT:  All right.  Let me hear from

19 Mr. Binford.

20          MR. BINFORD:  Good afternoon, Your Honor, Jason

21 Binford with the Office of the Texas Attorney General.  Just

22 wanted to say that normally I appear in this Court on behalf

23 of the State of Texas.  Today I'm appearing on behalf of the

24 Public Utility Commission of Texas, and that's an important

25 distinction for these purposes.  Ms. Ryan and Ms. Obaldo are

1   on the line for the State of Texas relating to the

2   settlement agreement.  I just wanted to say on the record

3   that the State of Texas, as it's defined in this settlement

4   agreement, does not include the Public Utility Commission of

5   Texas.  It's a separate entity for these purposes.  Just

6   wanted to put that on the record.

7          THE COURT:  And does the PUC, who I understand is

8   not a settling party, have any objection to the settlement

9   with the State of Texas?

10         MR. BINFORD:  Absolutely not, Your Honor.

11         THE COURT:  And does the Debtor want to proceed

12  with the settlement knowing, if you didn't already, that the

13  PUC does not consider itself part of the State for the

14  purposes of this motion only?  I assume otherwise it might.

15         MS. SPIGEL:  Well, I guess I will say this, Your

16  Honor.  The settlement is with the State of Texas, and the

17  releases are specific with respect to the Consumer

18  Protection Division of Texas.  So to the extent that I don't

19  know the agencies well enough to know, you know, whether the

20  PUCT could bring the same actions as the Consumer Protection

21  Division of Texas could bring.  But we would fully expect

22  that the releases, as they're narrowly tailored, would be --

23  would apply to the PUCT to the extent that it could bring

24  the same types of claims as the Consumer Protection

25  Division.  My understanding that those claims are of course

1   limited to the deceptive Texas practices act and things like

2   that.  But, you know, --

3           THE COURT:  So Ms. Ryan --

4           MS. SPIGEL:  -- it's just not --

5           THE COURT:  -- wants to talk.  Maybe she can add

6   some clarity to this for us.  Ms. Ryan?

7           MS. RYAN:  Well I certainly hope I can add some

8   clarity, Your Honor.  For the record it's Abigail Ryan with

9   the Office of the Texas Attorney General representing the

10  Office of the Texas Attorney General's Consumer Protection

11  Division.

12          Your Honor, I echo what Ms. Spigel says in that

13  our settlement is between the Office of the Attorney

14  General's Consumer Protection Division who has brought a

15  case in State Court against Griddy alleging violations of

16  the DTPA.  And so it is narrowly tailored to exhibit the

17  DTPA allegations that were brought or could have been

18  brought in State Court or Bankruptcy Court.  And so that's

19  what our settlement covers, Your Honor.

20          We believe that it was truly an arm's length

21  conduction.  We fought hard to get the consumer protections

22  that we needed in this consent judgment that Ms. Spiegel

23  will go over in a moment.  And the Debtor fought hard for

24  the things they wanted as well.  And I think that this

25  settlement has really fulfilled the needs of the Consumer

1   Protection Division for the State of Texas and as well as

2   balancing the needs of the bankrupt, Your Honor.  So I hope

3   that added some clarity to your --

4          THE COURT:  Well maybe --

5          MS. RYAN:  -- question.  If not, we'll --

6          THE COURT:  Take a look at -- the settlement is

7   with Texas.  It isn't with the CID.  Paragraph six is called

8   a "Release By Texas."  And I need to know if we have

9   confusion over what's going on.  I need to be able to rule

10  on it today and I don't want to leave the ambiguity in

11  there.  Because I'm looking at paragraph six, Texas releases

12  everybody.

13          MS. RYAN:  Yes, Your Honor.  And I am scrolling

14  through it.  I thought I had this earmarked.  We had put in

15  here a definition defining what the State of Texas is;

16  because, Your Honor, at this point we only represent the

17  Consumer Protection Division of the State of Texas.

18  Theoretically I couldn't release any claims TCQ may have,

19  just as an example, it was none that I know of.  And so the

20  State of Texas is very broad.  Let me flip through and see

21  or if, Ms. Spigel, you remember where we put in this was

22  limited to the Consumer Protection Division.

23          THE COURT:  So --

24          MS. RYAN:  I believe it is further down in

25  paragraph six that State of Texas or Texas hereby fully

1   releases, waives, and discharge Defendants and their present

2   and former officers, agents, so forth, so on, subject to the

3   injunction in the consent judgment from any claims arising

4   out of, related to, facts alleged in the action, which is

5   defined as our State Court action, which was brought by the

6   State of Texas Consumer Protection Division that could have

7   been brought in State Court, Bankruptcy Court, or any court

8   of competent jurisdiction by the Consumer Protection

9   Division of the Texas Attorney General's Office.  And so we

10  thought, Your Honor, that that narrowed it to the Consumer

11  Protection Division.  If you would like further clarity I am

12  open to putting further clarity in there.

13          THE COURT:  So again I want to figure out what

14  people are trying to say here.  Let's assume the Consumer

15  Protection Division has the right because of the Debtor's or

16  its officers' conduct during the freeze -- and I'm not

17  saying it did have the right -- to collect some sort of

18  damages from them, money damages.  And let's also assume

19  that the PUC would have had the right to collect money

20  damages from that same conduct.  Are you telling me that

21  this release would incorporate the CID's ability to collect

22  money damages but not the PUC's ability to collect money

23  damages --

24          MS. RYAN:  Your Honor, --

25          THE COURT:  -- out of the same offense?

1          MS. RYAN:  -- I believe that it would not cut off

2    the -- if the PUCT has the right to bring similar causes of

3    action under a statute of theirs, it wouldn't cut off the

4    PUCT's right to do that.  It's the Consumer Protection

5    Division through the Texas DTPA statute where they get their

6    power to bring those actions.  And it's my understanding

7    that only the Consumer Protection Division of the Texas

8    Attorney General's Office can bring certain DTPA claims as

9    we did in State Court before this bankruptcy was filed and

10   that those rights don't belong to another State agency.

11          THE COURT:  So this --

12          MR. BINFORD:  Your Honor, if I could add to that.

13          THE COURT:  Yeah.  Who was speaking there?

14          MR. BINFORD:  This is Jason Binford on behalf of

15   the PUCT.

16          THE COURT:  Yeah.  Go ahead, Mr. Binford.

17          MR. BINFORD:  Your Honor, I'm really not trying to

18   spring anything on anyone.  I previewed this with Debtor's

19   counsel and there's no laying behind the log here.  I --

20          THE COURT:  Mr. Binford, I think --

21          MR. BINFORD:  If --

22          THE COURT:  -- you've done the opposite of laying

23   behind the log so please don't hear my comments differently.

24   You said it right out front so there isn't laying behind the

25   log.  I just -- I need to know what I'm being asked to

1  approve.

2           MR. BINFORD:  Well, I'll -- I agree with Ms. Ryan

3  that the DTPA is not really a creature of the PUCT.  My

4  charge this afternoon is to keep the PUCT's powder dry and

5  reserve all rights for future actions that are brought

6  against the PUCT and so that no one can make an argument

7  that we can't make -- defend ourselves adequately or make

8  counterclaims related to those.  And those seem to be a

9  different ballpark than what's before the Court right now.

10          THE COURT:  Ms. Spigel, what did you think you

11 were buying?  So are you buying what they're selling or --

12          MS. SPIGEL:  So the underlying action is brought

13 by the State of Texas, right?  I mean, that is who the

14 Plaintiff is.  That's why the settlement is with the State

15 of Texas.  So the releases that were negotiated heavily

16 relate to the facts alleged in the action and anything that

17 could be brought, claims that could be brought by the

18 Consumer Protection Division of Texas.

19          I don't -- as I said before, if the PUCT can't

20 bring the same actions that the Consumer Protection Division

21 of Texas can, then we have no problem with that.  We

22 understand that what the releases say.  But I don't know

23 enough about the agencies to know who can assert what.  We

24 certainly don't expect another agency of the State of Texas

25 to be able to bring same or similar claims that are being

1  released pursuant to the settlement.

2          THE COURT:  So I don't hear Mr. Binford telling

3  you that he is in agreement with that statement.  You're

4  both telling me, I think, that you don't know if there are

5  overlapping claims and that I am not sure there is a meeting

6  of the minds here and want -- I want to be sure there is.

7  If it's arising out of the same conduct on the same day,

8  there's no question in my mind but that if the PUC has a

9  regulatory interest, that you're not releasing a regulatory

10  interest.  But what if it is a money damages interest?  And

11  I think both of you all are telling me you don't know if

12  there is a money damages claim here let's say against an

13  officer or the company.  If you don't know if that's being

14  released then I don't know what I'm signing.  And I want to

15  know what you all are intending to do.

16          MS. RYAN:  Your Honor, if I may speak.  This is

17  Mrs. Ryan with the Attorney General's Office.  I think that

18  maybe I have a forest for the trees problem here.  Being in

19  the State of Texas and working as an assistant attorney

20  general, I work for many different State agencies as you can

21  imagine.  And so when I define the State of Texas it's a

22  pretty large definition because we have many, many State

23  agencies.  In this case, however, the State Court case,

24  which is being settled, was brought by the State of Texas by

25  and through the Consumer Protection Division of the Attorney

1  General's Office.  And so it was narrowed down to just the

2  Consumer Protection Division.  It wasn't all the myriad

3  State agencies.

4          And so what we were trying to get at in the

5  settlement is we're settling the DTPA claims that we raised

6  in the State Court suit through our Consumer Protection

7  Division.  The PUC, as confirmed, does not have the right to

8  bring DTPA claims and --

9          THE COURT:  So this isn't anything that were or

10  could have been brought in a Texas State Court by the

11  Consumer Protection Division.  What if what you could have

12  brought is the same as what the PUC could bring?  Texas is

13  giving a release out of that.  That's why I think there

14  isn't a meeting of the mind.  Now, maybe --

15          MS. RYAN:  So I think --

16          THE COURT:  -- the Debtor's willing to live

17  without that meeting of the minds.  I don't know.  But I'm

18  not sure that I am prepared to live with the ambiguity.

19          MS. RYAN:  I appreciate that, Your Honor.  And I

20  think a clarifying point could be made to say if we need --

21  well, if we need.  Obviously we need to amend the documents

22  we filed.  We could say the State of Texas by and through

23  the Texas Attorney General's Consumer Protection Division

24  solely, and so it narrows it to only the Consumer Protection

25  Division and only those DTPA claims that the Consumer

1  Protection Division as part of the Attorney General's office

2  had the right to bring.  There's no other State agency --

3          THE COURT:  Yeah.  I just don't know if that's

4  what the Debtor thought they were getting.  They may not be

5  willing to use that.  Maybe they are.  If they are I can do

6  that with the stroke of a typewriter.

7          MS. SPIGEL:  I would -- I need to look at the

8  complaint because I thought the complaint was not specific

9  to the Consumer Protection Division.  If it was, then it's

10 probably fine.  I mean, could we have a five -- I hate to do

11 this in the middle, you know, we have a confirmation hearing

12 we'd like to get through, but could I have a five-minute

13 recess to look at the complaint and then to just talk to my

14 client very quickly?  Because --

15         THE COURT:  Of course you can.

16         MS. SPIGEL:  -- we don't want to put this off.

17         THE COURT:  Of course you can.  I just want to be

18 sure that I know what I'm being asked to sign, and that

19 needs to be that you and Ms. Ryan and Mr. Binford all agree

20 on what the intent is of the document.  And I don't know

21 that I have a particular concern with one possibility, which

22 is when's the proof of claim deadline for the PUC?

23         MS. SPIGEL:  It's September 13th.

24         THE COURT:  Can I ask Mr. Binford if the PUC has a

25 non-regulatory claim, so a money claim, is it looking to

1   assert that solely for setoff rights or will it be looking

2   if it has a money claim to be sharing in any distributions

3   to the unsecured pool of creditors?

4          MR. BINFORD:  Your Honor, the PUCT is not -- does

5   not consider itself a creditor in this case.  I don't see us

6   filing a proof of claim, not only because we don't have a

7   monetary interest but also because it's also my charge to

8   not waive sovereign immunity if I can get away with it.  And

9   so we won't be filing a proof of claim in this case.

10         The main thing that I'm trying to maintain, and

11  this is also through the opt-out that I made sure was in the

12  version of the confirmation order that's been presented, is

13  to keep all of my defensive arrows in my quiver if people

14  come calling in the future.  So that's really what I'm

15  after, is ensuring that we can fully defend ourselves if

16  some party in relation to this case post-confirmation comes

17  calling.

18         THE COURT:  That's very helpful, and I appreciate

19  that clarification.  It certainly would -- adding something

20  to that effect is going to resolve my concern over leaving

21  this as an open issue.  It may or may not resolve

22  Ms. Spigel's concern.

23         I will tell you that I think the sovereign

24  immunity question may have been resolved in 1846 but I will

25  let you speak to the founders about that question.  We

1   aren't -- I'm not going to try and address it today.

2        How long do you want, Ms. Spigel?  I'll give you

3   as long as you want.  Ms. Spigel, 1846 --

4        MS. SPIGEL:  I think I --

5        THE COURT:  -- is when the sovereign State of

6   Texas, where I was born, gave up its sovereignty and became

7   a state and became bound by the Constitution of the United

8   States, for those of you that aren't from here.  We've tried

9   to make you welcome but that still doesn't make you a Texan,

10  Ms. Spigel.

11       MS. SPIGEL:  I think I'll become an honorary one.

12  Thank you.  I think I just need honestly maybe like five

13  minutes --

14       THE COURT:  Sure.

15       MS. SPIGEL:  -- if you don't mind.

16       THE COURT:  We'll come back --

17       MS. SPIGEL:  Maybe we could go -- come back at

18  4:30.

19       THE COURT:  We'll come back at 3:30.  And if you

20  need more time, just let me know then.

21       MS. SPIGEL:  Okay.  Thank you, Your Honor.

22       THE COURT:  Thank you.

23     (Recess taken from 3:25 p.m. to 3:31 p.m.)

24       THE COURT:  Mr. Binford, it looks like that I made

25  an error on that and Texas joined the Union on December 29th

1   of 1845.  I think I was off by three days.

2          MR. BINFORD:  I would say that I was going to

3   correct Your Honor but I did not understand the distinction

4   either.

5          MR. GIBBS:  Your Honor, I wasn't born here but I

6   had to help my kids with their homework and they had to

7   Texas history in school so I might have been able to guess

8   within five years.

9          THE COURT:  Ms. Spigel, --

10          MS. SPIGEL:  Your --

11          THE COURT:  -- how are we?

12          MS. SPIGEL:  Your Honor, can I have another five

13   minutes?  I apologize.  Jason -- I just want to give Jason a

14   call.

15          THE COURT:  You don't need to apologize at all.

16   Just, look, I should have said this at the beginning of the

17   hearing, Ms. Spigel.  You know, Texas had a disaster and it

18   was a disaster for your company as well.  It could have

19   resulted in this case just itself being a ridiculous

20   exercise in litigation and unnecessary fights.  And what you

21   all have come together to do is a really amazing

22   accomplishment.  You take as much time as you need.  I'm not

23   trying to rush you with these five-minute breaks.  I'm

24   trying to facilitate the good work you've been doing.  So

25   you tell me how long you want.  It's just in these COVID

1   days, I've got to come back out because there's no one, you

2   know, saying, okay, we're ready.  So how much time do you

3   want?  I'll give you what you want.

4           MS. SPIGEL:  Why don't we say 3:45?  Just it

5   hopefully will be done by then.  I --

6           THE COURT:  We'll see you then.  Thank you.

7           MS. RYAN:  Robin, --

8           MR. BINFORD:  Your Honor, I'll just say,

9   Ms. Spigel, I'm on my cellphone so why don't I give you a

10  call?  And actually we might set up a conference call and

11  have Ms. Ryan on as well.

12          MS. RYAN:  Yeah.  I think I --

13          MR. BINFORD:  I'll --

14          MS. RYAN:  -- can have some clarity for you,

15  Ms. Spigel.

16          MR. BINFORD:  I'll email -- Ms. Spigel and

17  Ms. Ryan, I will email you a conference line right at this

18  very minute.

19          THE COURT:  We're going to come back at five

20  minutes until 4:00, so not at 3:45 like you asked for.

21          Okay.  Thank you.  Five until 4:00.

22          MS. SPIGEL:  Thank you.  Okay.  Thank you.

23          (Recess taken from 3:33 p.m. to 3:54 p.m.)

24                          AFTER RECESS

25          THE COURT:  All right.  Ms. Spigel, what did you

1  all figure out?

2          MS. SPIGEL:  Your Honor, can you hear me?

3          THE COURT:  I can.  Thank you.

4          MS. SPIGEL:  Okay.  Thank you.  I think Ms. Ryan

5  will put a statement on the record but I think there has

6  been a meeting of the minds, and with her statement that

7  will clarify what's intended by the releases and how they

8  work.

9          THE COURT:  Perfect.  Thank you.  Ms. Ryan, let me

10 see if I need to get your line active again.  Ms. Ryan and

11 Mr. Binford, I've got you all back on the line again.

12         MS. RYAN:  Thank you, Your Honor.  Can you hear

13 me?

14         THE COURT:  I can.  Thank you, Ms. Ryan.

15         MS. RYAN:  Okay.  So we do have a meeting of the

16 minds.  Thank you for that short break so that we could all

17 be on the same page.

18             So to start with, the Consumer Protection Division

19 has power to bring certain claims under Texas DTPA and other

20 statutes.  And these powers only belong to the State of

21 Texas' Consumer Protection Division.  No State agency can

22 bring these claims.

23             And these aren't for damages.  Generally these are

24 for injunctive relief, they are for restitution, and they're

25 for civil fines and penalties.

1          Here, Your Honor, the claims that the State of

2   Texas is settling are only the claims that were brought or

3   could have been brought by the Attorney General's Consumer

4   Protection Division.  This doesn't affect any claims or

5   causes of action that any State agency, including the PUCT,

6   may have.  It's clearly just the Consumer Protection

7   Division's claims or causes of action that were brought or

8   could have been brought by the State of Texas.

9          THE COURT:  All right.

10          MS. SPIGEL:  And, Your Honor, as we understand it,

11   that there is the PUCT does not or has its own set of claims

12   and causes of actions that it can bring against different

13   parties but they don't overlap with the Consumer Protection

14   Division.  And so there is -- there would be no concern with

15   the language that is in the release because the PUCT

16   couldn't bring those types of claims that the Consumer

17   Protection Division can bring.

18          MS. RYAN:  That's exactly right, Your Honor.  I

19   agree exactly what Ms. Spigel said.  And if you do need more

20   elaboration on these powers and why they don't extend to

21   State agencies, I have the head of the Attorney General's

22   Consumer Protection Division on the line and on the video if

23   you have questions for him.

24          THE COURT:  So I have one question.  And I'm not

25   sure who you want to answer it so I'll leave that up to you.

1    I understand that there are powers for what you're telling

2    me in the consumer division that others can't exercise.  Are

3    there any powers that the consumer division has that others

4    can also exercise?  So I --

5              MS. RYAN:  Your Honor, if you'll unmute --

6              THE COURT:  So if I think of a Venn diagram, you

7    know, I'm trying to figure out what's the overlap on the

8    Venn diagram, if you will talk to me in math terms.

9              MS. RYAN:  Absolutely.  And it's funny because

10   that's exactly how Ms. Spiegel and I were talking about

11   this.  And there is no overlap, Your Honor, --

12             THE COURT:  And that --

13             MS. RYAN:  -- in our presentation.

14             THE COURT:  -- answers the question.  If there's

15   none then there's none.  That means I understand exactly

16   what's written based on the parties' statements.  All right.

17   Sorry about -- I'm sorry.  But, look, it's really important

18   to me that I enforce my orders.  And I've learned don't sign

19   something that you don't understand what it means because

20   then when it comes time to enforce it you've got a real

21   problem.  And people rely on me to enforce the orders.

22   That's why I'm trying to ask these questions.  You all have

23   answered them.  I'm satisfied with the answers, I'm

24   satisfied that the document now -- or always made sense.  It

25   was my lack of knowledge that made me question whether there

1   was a problem.  And I don't think there is.

2           So with that said, we have the evidence in the

3   record.  I don't believe anyone is objecting.  But let me

4   hear if anyone wishes to object to the order that was filed

5   at 369.  I'm going to look through it and thumb through it a

6   little bit but please press five, star and let me know.

7           MR. GIBBS:  Your Honor, can you hear me?  This is

8   Chuck Gibbs.

9           THE COURT:  Mr. Gibbs, I can hear you fine.

10          MR. GIBBS:  Thank you.  We are supportive of the

11  entry of the order.  I just need to get one clarification as

12  you -- are the comments of counsel for the PUCT part of the

13  record that Your Honor is relying upon in approving this

14  order?  Because I understood them to say it's not their

15  intention to be filing a proof of claim in this case, that

16  their reservation of rights today, which I understood them

17  to -- and why they were making it was to retain, as counsel

18  indicated, their defensive arrows in their quiver.  But we

19  wanted it to be clear that if they're reserving -- making it

20  clear they're not a party to settlement that they're not

21  later going to be -- for a distribution that my constituency

22  is expected to give in this case.

23          THE COURT:  That is what they told me.  I will

24  rely on that when we get to the confirmation hearing in

25  determining whether I believe that the plan meets all the

1  requirements of 1129.  I've known Mr. Binford for a while

2  and he's a man of his word.

3          MR. GIBBS:  As have I and I agree.

4          THE COURT:  Thank you.  Are you going to ask me to

5  waive the 14-day stay on the plan?

6          MS. SPIGEL:  Yes, Your Honor.

7          THE COURT:  Tell me why we're -- you're seeking to

8  do that.

9          MS. SPIGEL:  We don't think that there's any

10  conditions that require the plan, you know, to -- for there

11  to be a final and non-appealable order.  We think that

12  there's been no opposition and we would like for the plan

13  and the settlement to go effective as soon as possible.

14          THE COURT:  I don't think that's a valid reason

15  under the rules to have cause to waive the stay so I'm going

16  to take out paragraph two.  I got it, that no one ever wants

17  it there if you're going to win, right?  But it's a valuable

18  appellate right and we ought to have a good reason for

19  removing it.  No one has objected.  I don't anticipate any

20  appeal.  But as has already been proven twice today, I can

21  make mistakes in what I do.  So I want to leave that here.

22          The draft has all the attachments to it.  I'm

23  signing the order right now.  And if you'll give me one

24  second, I'm going to get it sent to docketing.  All right.

25  It'll be docketed in just a few minutes.  Where did you want

1  to go now, Ms. Spigel?

2          MS. SPIGEL:  Thank you, Your Honor.  I appreciate

3  it.  Next I'd like to move to the motion to seal, which I'm

4  going to defer to my colleague John Lawrence.

5          THE COURT:  All right.  Thank you.  Mr. Lawrence,

6  I see you.  It's just taking me a minute to get it clicked.

7  Good afternoon, Mr. Lawrence.

8          MR. LAWRENCE:  Good afternoon, Your Honor, John

9  Lawrence from Baker Botts on behalf of the Debtor.

10          Your Honor, at Docket 368, Debtor filed a motion

11  to seal an exhibit that was attached to the expert report of

12  Mr. Spencer.  The only piece of that report that the Debtor

13  seeks to seal is that one exhibit because it contains

14  customer information.  While it doesn't include names of

15  customers or addresses or customer ID numbers, there is, as

16  Your Honor knows from being able view it, separate rows for

17  each customer and amounts paid and amounts owed by

18  customers.  And, Your Honor, because both the PUCT rules and

19  the Griddy terms of service forbid Griddy from disclosing

20  proprietary customer information, including identifying

21  information that might show historical usage, the Debtor

22  believes that caution is warranted here in sealing this

23  information.

24          While we believe it would be very difficult and

25  unlikely that somebody could use this information to

1    identify specific customers, the risk of doing so here

2    pushes the balance against the report itself which relies on

3    the information is fully public.  And the spreadsheet does

4    not, other than to someone, who's an expert like

5    Mr. Spencer, does not really inform the understanding of the

6    report warrant caution here and for that reason, out of an

7    abundance of caution, the Debtor would like to seal this

8    exhibit so that it is not publicly viewable.

9         THE COURT:  All right.  Is there -- I do have one

10   person that wants to address the sealing question.  See if I

11   have -- Ms. Whitworth, good afternoon to you.

12        MS. WHITWORTH:  Good afternoon, Judge Isgur.  Jana

13   Whitworth on behalf of the United States Trustee.  Your

14   Honor, I just wanted to let the Court know and we have

15   discussed this via email with the Debtor's counsel.  It

16   appears to the United States Trustee that the information is

17   -- that they're seeking to seal already has been redacted.

18   All of the personally identifiable information has been

19   redacted.  And as we've made clear in prior hearings, our

20   preference is to continue redaction rather than in sealing

21   information.  And I just wanted to let the Court know that

22   the Trustee's position is that an already redacted report

23   really should not be sealed.  That's it, Judge.  I just

24   wanted to let the Court know that we have reviewed that and

25   that's our position.

1          THE COURT:  So why do we need to deal with this

2   document at all?  I mean, I'm not going to use it.  No one's

3   going to use it.  It's unopposed.

4          I have the report by Mr. Spencer, presumably he's

5   going to testify today.  Is there a reason why it needs --

6          MR. LAWRENCE:  Your Honor, we --

7          THE COURT:  -- to be part of the record, why the

8   attachments need to be part of the record?

9          MR. LAWRENCE:  Your Honor, that is another

10  solution that is available.  We did attach it because it's

11  something he relied on so that it's something that the Court

12  or others who are reviewing the report for the purposes of

13  any sort of examination could view and test.  But it is --

14  as Your Honor has noted, it is not the sort of information

15  that I think that any reader of the report needs in order to

16  understand the report.  So if Your Honor would prefer that

17  we simply unfile that exhibit and still have it as something

18  listed that he relied on but not have it as part of the

19  record before the Court, that is also a resolution.

20         THE COURT:  Ms. Whitworth, does that work for your

21  client?

22         MS. WHITWORTH:  Yes, Judge.  It sure does.

23         THE COURT:  Does anyone object to the withdrawal

24  of Exhibit 1 to the Spencer report from the record

25  altogether?

1          (No audible response)

2          Going to show that Exhibit 1 is withdrawn from the

3   Court's record.  Mr. Lawrence, that's without prejudice so

4   if it turns out you get a surprise objection, you want to

5   come back with it, we'll deal with this then.  But I just

6   think it's a matter not worth spending a whole lot of brain

7   damage on given -- you're right.  I've had the opportunity

8   to look at it.  And you're wrong if you think I've read the

9   whole thing.  I don't think he's read the whole thing in

10  terms of every line.  It's just the summary data.  All

11  right.  It's withdrawn from the record.  The motion to seal

12  is now moot and we'll take no action on it.

13          All right.  We're back to you, Ms. Spigel.

14          MR. LAWRENCE:  Thank you, your -- thank you very

15  much.  The next item on the agenda is the final approval of

16  the disclosure statement and confirmation of the plan.  As I

17  said on the first day of this case, the Chapter 11 plan

18  proposed by the Debtor is unique.  The winter storm event

19  and extreme pricing destroyed Griddy's business and

20  customers didn't pay their bills and ERCOT mass transitioned

21  Griddy's customers to providers of last resort.  Until the

22  winter storm -- sometime during the winter storm, Griddy was

23  solvent.  And as I've mentioned before, Griddy's management

24  actually took the unusual steps to try to get customers off

25  its platform.  But not all were able to do so.

1          So Griddy ended up filing this case as a

2     liquidating 11 to try to do the right thing by all parties,

3     including customers, since from our perspective the

4     legislature and regulators haven't been able to provide that

5     relief.

6          And the Debtor has worked very hard with many

7     different parties, including the Committee, the Debtor's

8     prepetition lenders, its non-debtor affiliates, and the

9     State of Texas to make this plan in its current form work.

10    I think everyone wants to see relief for the customers that

11    want it, which is why people have been willing to provide

12    substantial contributions and concessions in this case.

13         The Debtor, and with the overwhelming support of

14    creditors and parties in interest, believe that maximizing

15    value can also include providing relief for customers.  And

16    that's what the plan does.  As I've noted several times I

17    think, the plan has been overwhelmingly accepted by all the

18    classes entitled to vote on the plan.

19         On May 26th, the Court entered an order

20    conditionally approving the disclosure statements.  That was

21    at Docket Number 308.  And solicitation commenced on the

22    plan on May 28th.

23         June 25th was the deadline to object to final

24    approval of the disclosure statement and confirmation of the

25    plan.  That was also the deadline to vote on the plan.

1    In accordance with the combined hearing order, the

2 Debtor provided extensive notice of today's hearing.

3 Specifically, written notice was provided to the United

4 States Trustee for Region Seven, all impaired classes of

5 claims and interest entitled to vote on the plan, counsel to

6 the Committee, counsel to the State of Texas, all parties

7 holding claims against the Debtor that's listed on the

8 creditor matrix, including parties that have -- that filed

9 prepetition actions against the Debtor.  All parties have

10 filed a notice of appearance in the case, the IRS, and all

11 parties to the Debtor's executory contracts.

12    The Debtor also published notice of the combined

13 hearing in the *The New York Times*, the national edition, the

14 *Dallas Morning News*, and the *Houston Chronicle*.  Appropriate

15 affidavits of mailing and publication have been filed with

16 the Court.

17    The following declarations have also been filed

18 with the Court:  the declaration of Angela Tsai of Stretto

19 regarding solicitation of votes and tabulation of ballots,

20 which was filed with the Court on July 1st, that's at Docket

21 Number 363; the declaration of Roop Bhullar, the Debtor's

22 Chief Financial Officer, was filed on July 2nd in support

23 of, among other things, confirmation of the plan, and sets

24 forth the basic factual predicates in support of the plan,

25 that's at Docket Number 370.  In addition, the Debtor filed

1  the export report and declaration of Tony W. Spencer, which

2  was filed in support of confirmation and, in particular, the

3  proposed customer releases.  That's at Docket Number 367.

4  Each of the declarants is on the phone and available for

5  cross examination with respect to the items set forth in

6  their respective declarations.  And unless there's any

7  objections, we would move at this time to admit each of

8  those declarations into evidence at the hearing.

9         THE COURT:  Is there any objection to the

10 admission of the declarations identified by Ms. Spigel?

11     (No audible response)

12        They are --

13        MR. SPEAKER:  No, Your Honor.

14        THE COURT:  -- each identified.  Excuse me, they

15 are each admitted.

16     (Debtor's Exhibits Numbers 363, 367, and 370 were

17 received in evidence)

18        Is there any party that wishes to cross examine

19 any of the declarants?  I do have someone.  Hold on.

20 Mr. Lippman, and if this is an objection to admission of the

21 declarations you're not too late for that either.  So tell

22 me what you got.

23        MR. LIPPMAN:  Thank you, Your Honor.  I just want

24 to speak just briefly with respect to the expert report of

25 Mr. Spencer.  ERCOT doesn't oppose or otherwise take issue

1  with the opinions expressed by Mr. Spencer as expressed in

2  the report.  But Mr. Spencer's opinions are based in part on

3  the declaration of Michael Fallquist in support of the

4  Chapter 11 petition and first day pleadings, which is at

5  Docket Number 21.  As the Court may recall at the first day

6  hearing, I expressed some concerns about the accuracy of

7  some of those statements contained in the declaration.

8  ERCOT doesn't oppose the admission of Mr. Spencer's report

9  to the extent the Court's not making any findings on the

10  validity of the statement made by Mr. Fallquist in his

11  declaration.

12          THE COURT:  Ms. Spigel, are you asking me by

13  admitting and relying on Mr. Spencer's report that I would

14  also be relying on the Fallquist statements as being

15  truthful and accurate?

16          MS. SPIGEL:  No, Your Honor.  They -- no, Your

17  Honor.  Those -- the expert did rely on those in making his

18  conclusion but we're not asking Your Honor to admit the

19  Fallquist declaration into evidence --

20          THE COURT:  All right.

21          MS. SPIGEL:  -- in connection with this hearing.

22          THE COURT:  It's my understanding of an expert

23  report in the current state of the law that an expert can

24  rely on hearsay to come to conclusions but that the hearsay

25  itself does not come in as admitted or as statements of

1  fact.  It's simply something that an expert can rely on.  So

2  I will honor Mr. Lippman's request and not consider

3  independently the Fallquist statements and not admit the

4  Fallquist statements for the purpose of today's hearing.  I

5  think that's what you're asking for, Mr. Lippman.  I just

6  want to be sure.

7            MR. LIPPMAN:  I am, Your Honor.  Thank you very

8  much.

9            THE COURT:  Thank you.  All right.  Does anyone

10  now have any cross-examination for any of the declarants?

11        (No audible response)

12            All right.  Ms. Spigel.  You've got everybody

13  under control --

14            MS. SPIGEL:  Thank you.

15            THE COURT:  -- here, Ms. Spigel.  Nobody's

16  objecting to anything.

17            MS. SPIGEL:  We worked very hard for that, Your

18  Honor.

19            There's other documents we'd like to move into

20  evidence.  Would it be appropriate to do that now?

21            THE COURT:  So far you're on a roll so you can

22  give it a shot.

23            MS. SPIGEL:  Okay.  We would like to move into

24  evidence the disclosure statement, which includes the

25  liquidation analysis attached as Exhibit B.  That's at

1  Docket Number 312.

2       THE COURT:  Any objection to the admission of the

3  disclosure statement?

4       (No audible response)

5       Disclosure statement is admitted.

6       (Debtor's Exhibit Number 312 was received in evidence)

7       MS. SPIGEL:  Thank you.  We'd also like to admit

8  into evidence the plan supplements and the supplement to the

9  plan supplement.  So that's at Docket Number 345 and 355.

10  There are separate documents.  There's seven of them in

11  Docket Number 345, which is the original plan supplement.

12  Do you want me to read which documents they are?

13       THE COURT:  Is there any objection to the

14  admission of 345 or of 355?

15       (No audible response)

16       (Debtor's Exhibits 345 and 355 were received in

17  evidence)

18       So I just want to make a brief comment on the

19  record.  I've known now Mr. Nelms for a large number of

20  years.  He served on the bankruptcy bench in the Northern

21  District of Texas at the same time that I served on the

22  bankruptcy bench here.  I hold him in high regard.  That

23  said, and I don't regard myself as -- we've never gone to

24  dinner or anything like that.  I think he's a good person.

25  But we're not friends in the sense of being social friends.

1  We were business friends.  I did not recommend him, and I

2  think it would be inappropriate for me to be engaged in the

3  retention of former colleagues because I have encouraged

4  people to do that.  I also don't think they are disqualified

5  from serving merely because they are former colleagues.  And

6  I want the record clear that this was a selection that the

7  parties made and not the Court.  I have no problem with your

8  selection.  But I want to understand from you that you came

9  across the concept of retaining former Judge Nelms with no

10 input from the Court or any staff here or anything at all

11 like that.  And I just need you to confirm that.  I think

12 it's right.  I know it's true about me but I -- you never

13 know.  So I want to be sure we didn't have anything to do

14 with that.

15          MS. SPIGEL:  That is correct, Your Honor.

16          THE COURT:  All right.

17          MS. SPIGEL:  We chose a -- we had to choose a

18 mutually agreeable person between the Debtor and the

19 Committee.  And Judge Nelms was a natural choice to bridge

20 the gap between the two.

21          THE COURT:  All right.  Again, I just wanted that

22 clear on the record --

23          MR. GIBBS:  Your Honor, --

24          THE COURT:  -- because I think it's important we

25 retain the level of independence and separation that is

1    appropriate for the work we do.  Mr. Gibbs, go ahead.

2              MR. GIBBS:  For the record again, Chuck Gibbs with

3    McDermott, Will, and Emery, counsel for the Committee.  I

4    just wanted the record to be clear.  Judge Nelms was

5    actually the person that the Committee recommended and I

6    wanted Your Honor to know and the record to reflect that

7    that was through no input by you, Your Honor, or anyone from

8    the Court.  It was based on our independent evaluation of

9    Judge Nelms and concurrence with your statement regarding

10   his capabilities and integrity.  And it was our

11   recommendation and negotiation with the Debtor was agreed to

12   by the Debtor.

13             THE COURT:  Mr. Gibbs, I appreciate that.  I just

14   -- it matters to me that people understand how these things

15   happen and that it's not -- he isn't picked because of me,

16   he's picked because of you all.  And that's what matters to

17   me.  Okay.  Ms. Spigel.

18             MS. SPIGEL:  Thank you, Your Honor.  I just -- I

19   also just want to note that the Debtor filed a brief in

20   support of confirmation and the proposed order approving the

21   disclosure statement confirming the plan on July 2nd at

22   Docket Number 376 and 378.

23             THE COURT:  So I've reviewed the brief in full.  I

24   have not reviewed the order yet.  They usually change my now

25   so I try and wait on that.  But I read the brief.  Thank

1 you.

2                MS. SPIGEL:  Thank you, Your Honor.  There have

3 been no changes to the confirmation order since we filed it.

4                So the objection to the plan and disclosure

5 statement were required to be filed by the 25th of June.  As

6 I noted earlier, the Debtor received a few informal comments

7 with the plan, all of which I'm pleased to report were

8 resolved consensually and reflected in paragraphs 30 through

9 33 in the confirmation order.  No formal objections were

10 filed to the plan or the disclosure statement.

11                As Your Honor is aware, up until settlement with

12 the Committee, the Committee spent substantial time seeking

13 discovery and depositions from the Debtor.  And although the

14 depositions have been taken and extensive document requests

15 have been provided, ultimately the Debtor and the Committee,

16 the Debtor's prepetition lenders, and the Debtor's non-

17 debtor affiliates came to a settlement agreement.  And

18 obviously I'll let Mr. Gibbs speak on behalf of the

19 Committee but the Committee supports the plan.

20                If I may turn to approval of the disclosure

21 statement on a final basis.  As set forth in the Debtor's

22 motion for approval of the disclosure statement, as well as

23 the pleadings filed in support of the conditional approval

24 of the disclosure statement and the Debtor's confirmation

25 brief, the disclosure statement satisfies the requirements

1  in 1125.  Each of those documents, as well as the records of

2  the hearing on the conditional approval of the disclosure

3  statement, highlights all of the types of information that

4  was included in the disclosure statement.  And we would

5  respectfully submit that disclosure statement has the type

6  of information necessary to allow holders to have made an

7  informed judgment about the plan, and that the disclosure

8  statement contains adequate information.  There were no

9  objections and we'd ask Your Honor to approve the disclosure

10 statement on a final basis.

11        THE COURT:  Thank you.  Is there any other party

12 that supports approval of the disclosure statement and

13 confirmation of the plan that wishes to introduce any

14 evidence in support?

15     (No audible response)

16        Is there any party that opposes either the

17 approval of the disclosure statement or the confirmation of

18 the plan that wishes to introduce any evidence against

19 approval and confirmation?

20     (No audible response)

21        All right.  I'm going to show that the evidentiary

22 record is closed.  This was such a difficult case.  First

23 I'll just start with the simple stuff, which is that on the

24 disclosure statement we already conditionally approved it.

25 I see no reason why we didn't get that right the first time.

1   And nobody's filed any new.  I -- for the same reasons I

2   conditionally approved it I'm going to finally approve it.

3   It absolutely contains information to allow people to decide

4   how to vote.

5          This is a very unique plan, as Ms. Spigel has

6   mentioned, because a lot of the focus of the plan is on the

7   Debtor releasing claims against customers as a swap, for

8   lack of a better word, to be sure that the customers don't

9   assert claims against the Debtors without ever admitting

10  that the customers have any valid claims against the

11  Debtors, or vice versa.  By and large, the voting reflects

12  an overwhelming basis that the customers like that idea.

13  You know, they voted, again overwhelmingly, that if Griddy

14  had done anything wrong, that they were going to swap a

15  release of whatever liability they may have on their unpaid

16  electrical bill in exchange for that.

17         With respect to electric customers who already

18  paid their bill, they're going to get an unsecured claim and

19  there will be distributions in some amount made on that

20  unsecured claim initially.  Maybe not as much as what people

21  hoped for but better than nothing.  And to date I have not

22  seen any claim against Griddy that it seems to me would

23  justify anybody not being willing to take that deal.  So I

24  don't think that I've seen rights against Griddy that appear

25  to me to be valuable.

1          Nevertheless, no one was forced to take this.  If

2    -- although the class had to accept as a class, every member

3    of the class had an opt-out right.  And a few people opted

4    out and that's fine.  They can, you know, have their perhaps

5    large claim in the unsecured creditor pool and perhaps have

6    somebody try and get them to pay their electric bill.

7    That's their choice and I think the disclosure statement

8    gave them a full opportunity to understand what they were

9    doing.

10         With respect to other creditors, you know, this is

11   a company that failed overnight.  And other creditors in

12   general were going to get extremely low returns under the

13   liquidation test.  And what this does is it provides a small

14   recovery for other general unsecured creditors.

15         The secured creditors who have some crossover with

16   formation and ownership it's my understanding are giving up

17   a substantial amount of money to be sure that this whole

18   situation works.  And, again, I've seen no valid claim

19   against them either.

20         So this situation, the freeze, the failure, from

21   what I have seen to date was in no way Griddy's fault.  The

22   amount of the bills were enormous.  But they were driven not

23   by Griddy but by others.  And I don't know how that imposes

24   liability on Griddy either.  So I think that this is the

25   best outcome in a difficult world.

1          I've read the brief.  For the reasons set forth in

2    the brief, all the requirements of Section 1129(a) with

3    respect to confirmation have been satisfied.  And we're

4    going to confirm the plan.

5          So I'd like to put your order up on the screen and

6    let you watch me as I make minor edits, if anything, to it

7    and see if anyone has any problem with that.  Unless you

8    need some additional findings I should ask.  If you need any

9    additional oral findings, I know that you'll have quite a

10   few in the draft order.

11         MS. SPIGEL:  I -- Your Honor, it's Robin Spigel.

12   I do not but there is one paragraph in particular I want to

13   make sure that I discuss with you because it's a -- is a new

14   concept.  It doesn't require re-solicitation, and I'll

15   explain why, but I do want to make sure we get to that.

16   It's paragraph 14 of the confirmation order, so when we get

17   there I just want to talk.

18         THE COURT:  Why don't we start there?

19         MS. SPIGEL:  Okay.  So paragraph 14, which is on

20   page 18 of the proposed order, essentially it relates to

21   customers being able to opt-in to the releases.  So almost

22   all of the 145 customers, former customers, that opted out

23   of the releases and the third party releases in class four

24   owe the Debtor money.  And while it's certainly their right

25   to have done so, the Debtor and the Committee were concerned

1  that many of those customers may have done so inadvertently.

2  And as a result, we thought that it made sense and in spirit

3  of the plan to have included the ability of those people to

4  opt-in to the customer releases with the caveat that they

5  wouldn't have automatically allowed claims if they file

6  those claims for the amounts that they paid for electricity

7  usage.  And the reason why we cleaved it in that way is

8  because then if they had those allowed claims that would

9  have adversely affected the treatment of class four and

10 five, and we did not want to resolicit the plan.

11           THE COURT:  Let me hear from others but I just

12 don't have a problem with including this.  Effectively, a

13 lot of this plan is to get rid of litigation fights.  And if

14 somebody decides they made a mistake and they want to do it,

15 withdraw their opt-out, which eliminates another fight, this

16 makes sense to me.  So you're not going to get any objection

17 from me to it.  I don't think it's a material change.  I

18 don't think it adversely affects other parties.  But if

19 someone does have an objection to it, some sort of, you

20 know, it's not fair that they get to come in late kind of

21 thing, please voice your objection and we'll hear it.  But

22 you're not going to get one from me.

23           MS. SPIGEL:  Thank you, Your Honor.

24           THE COURT:  No one is wishing -- is asking to

25 speak.  Can you give me the ECF number to fill in right

1  here?

2          MS. SPIGEL:  It is number 376.

3          THE COURT:  Thank you.  So the appearance of all

4  interested parties having been made electronically, since we

5  didn't take oral appearances I think.

6          MS. SPIGEL:  Thank you.

7      (Pause)

8          MR. GIBBS:  Your Honor, I don't have your proposed

9  order you're working from on my screen.  Maybe others do and

10  maybe I'm just missing it.

11          THE COURT:  You -- I apologize.  Hold on.  Try

12  that again.  Let me go back up and show you what I've

13  changed.  I haven't changed much.

14          MR. GIBBS:  You're good.

15          THE COURT:  You can see it now, right?

16          MR. GIBBS:  Yes.  Thank you.

17          THE COURT:  Okay.  I filled in the document number

18  right there.  I changed this from having taken judicial

19  notice of all written and oral evidence to just say I've

20  considered it all because some of it I don't think is

21  capable of judicial notice.  Does this affect the 14-day

22  stay or is one of the conditions that this order be final?

23      (Pause)

24          MS. SPIGEL:  I'm sorry.  I was on mute.  I

25  apologize.  It's Robin Spigel.  Can you repeat the question?

1          THE COURT:  Does 11.02 require that this order

2    become final?

3          MS. SPIGEL:  It does.

4          THE COURT:  Thank you.  So can I just tell you

5    that administratively this paragraph is very difficult to

6    administer?  If -- let me give you an example.  If somebody

7    files a fee application five days after the effective date,

8    my calendar is going to have that reviewed 26 days after the

9    effective date.  And we're giving people 65 days to object.

10   Is there a reason why we can't give them 21 days after it's

11   filed, which is normal?  It'll just be a lot easier to

12   administer.

13         MS. SPIGEL:  Absolutely that's fine, thank you,

14   Your Honor.  That -- Your Honor, it's Robin Spigel.  That

15   change also will need to -- we'll need to make it in the

16   effective -- the notice of effective date attached to the

17   order.

18         THE COURT:  Okay.  You can make conforming changes

19   to the event.

20         MS. SPIGEL:  Okay.  Thank you.  Do you want her to

21   -- this is Robin Spigel.  Do you want me to walk through

22   these paragraphs or --

23         THE COURT:  Probably helpful.

24         MS. SPIGEL:  Okay.  With respect to paragraph 30,

25   the issuer of a surety bond had asked for clarification in

1   the confirmation order that the non-debtor affiliates were

2   not released from their obligations.  And there's nothing in

3   the plan or the confirmation order that purports to provide

4   non-consensual third party releases so we included that

5   language for them.

6           In paragraph 31, as Mr. Binford had noted before,

7   they wanted it to be clear in the order that they have opted

8   out of the third party releases in Section 12.7(b) of the

9   plan.  And that obviously is a consensual release so that

10  wasn't an issue for the Debtor either.

11          In paragraph 32, ERCOT had two general comments to

12  the plan:  one, that it be permitted to amend its claims

13  without seeking authority of the court, and the second one

14  is that the Debtor be required to obtain an order of the

15  Court to estimate ERCOT's claim, both for reserve and

16  distribution purposes.  Since ERCOT's claim is the largest

17  claim of the estate, other than I think a customer filed a

18  $10 billion claim, but putting that aside ERCOT's claim is

19  the largest claim in the estate, we thought that it made

20  sense on both of those accounts, one, in connection with its

21  claims, I believe under its contract it has the ability to

22  resettle certain amounts so it will probably have an amended

23  claim, and it would be cost-effective not to have to come

24  back to the Court to allow it to file its amended claim, as

25  long as it's in compliance with applicable law, meaning that

1  they're not asserting new claims.

2         And then with respect to the certified, I

3  explained that one.

4         And then on paragraph 33, counsel for Ms. Prescott

5  and the alleged punitive class and tort claimants, in

6  settlement of their plan objections they wanted to ask for a

7  clarification regarding the lack of estoppel effect of the

8  orders on parties not released under the plan.  I know

9  Mr. Monsour is on the line as well.

10         THE COURT:  I don't have any problem with the

11  concept.  I'm trying to understand what the last sentence

12  means.

13         MS. SPIGEL:  The definition of tort claim.

14         THE COURT:  A customer tort claim means a claim

15  arising in tort for the electricity and related fees, taxes,

16  expenses and other costs.  So it's the words -- I don't have

17  a problem with what you're doing.  I don't understand where

18  it says: "including when the Public Utilities Commission of

19  Texas imposes a $9,000 per megawatt hour price for wholesale

20  power," if they did that on February 20th, are we including

21  that date?  And let's assume they only did it on February

22  16th to 19th, are we including February 13th to 15th?  Or

23  should I just take out the including language because it's

24  really just those dates?  And I'm not sure what we're saying

25  there and I don't want ambiguity.  Probably ought to get

1 Mr. Monsour on the phone to be sure that I'm understanding

2 what the goal is and we get it done.  Mr. Monsour, good

3 afternoon.

4          MR. MONSOUR:  Thank you, Your Honor, Trey Monsour

5 for Karen Prescott.  You can take out the language "after

6 February 19th" because we were just trying to define the

7 period of time by which the claims would have arisen, which

8 is between February 13th and February 19th.  So the

9 including when the public utility commission of Texas

10 imposed a 9,000 per watt, that was within that same

11 timeframe so it's probably not necessary.

12          THE COURT:  And does the Debtor have any problem

13 with me taking out that language?

14          MS. SPIGEL:  No, Your Honor.  Thank you.

15          THE COURT:  Okay.  All right.

16          MR. MONSOUR:  Thank you, Your Honor.

17          THE COURT:  Thank you.  So I am not inclined to

18 order the plan administrator to preserve and protection the

19 privileges and work product.  What if he determines it's in

20 his best interest to waive it?  I think that what I ought to

21 be saying here is the plan administrator has the exclusive

22 authority over all applicable privileges and work product

23 vested in liquidating Debtor.  He can preserve it, he can

24 protect it, he can waive it.  But I think he ought to be

25 able to do what he deems best.  Is there a reason why it

1  shouldn't say that?

2          MS. SPIGEL:  No, Your Honor.

3      (Pause)

4          THE COURT:  I think the rest of it works for me.

5          And I'm going to take this out.  I don't think I

6  have cause to waive people's appellate rights.

7          I sure don't like that parenthetical.  Why are you

8  asking me to do that?  The plan has to control.  I can't

9  authorize a conflicting document to control.  What if

10 there's a conflicting document that says, notwithstanding a

11 bankruptcy case, the Debtor has to pay?  Shouldn't I take

12 that out?

13         MS. SPIGEL:  It's not an issue in this case.  It's

14 fine, thank you, Your Honor.

15         THE COURT:  Thank you.

16     (Pause from 4:54 p.m. to 4:55 p.m.)

17         MR. SPIGEL:  Your Honor, I noticed --

18         THE COURT:  Yes.

19         MS. SPIGEL:  -- one knit (phonetic) while we were

20 scrolling by but I didn't tell you.  The liquidation

21 analysis in paragraph 11 and -- or on page 11 and 12, it's

22 actually Exhibit B, not Exhibit 2.  So apologies for that.

23         THE COURT:  Hold on one second.

24         MS. SPIGEL:  Sure.

25     (Pause)

1          THE COURT:  Sorry.  Where do you want me to go?

2          MS. SPIGEL:  On page 11 and 12.

3          THE COURT:  Okay.

4          MS. SPIGEL:  It's paragraph L.

5          THE COURT:  Okay.

6          MS. SPIGEL:  In two places in the first line it

7    says:  "Exhibit 2."  It's actually Exhibit B.  And then at

8    the end of that paragraph it also says "Exhibit 2" but it's

9    B.

10          THE COURT:  Thank you.

11          MS. SPIGEL:  Thank you.

12          THE COURT:  All right.  Let me hear any objections

13   to the form or the substance of the confirmation order as it

14   has been edited on the screen.

15       (No audible response)

16          Hearing no objections, I've signed the order.

17          MS. SPIGEL:  Thank you, Your Honor.

18          THE COURT:  And let me get it to docketing.  Hold

19   on a second.  All right.  It'll be docketed shortly.

20   Ms. Spigel, it's --

21          MS. SPIGEL:  Thank you.

22          THE COURT:  -- been a good day for you.  What do

23   you want to do now?

24          MS. SPIGEL:  Thank you, Your Honor.  What I would

25   like to do is actually thank you.  I wanted to thank the

1  Court for its time and patience and frankly guidance in

2  respect to this case.  As I said ad nauseum, it's a -- it is

3  a unique plan, and I think it took a lot of thought by all

4  parties, including Your Honor, to bring it over the finish

5  line.  And we very much appreciate, you know, your time and

6  thoughts in this case.  I think that the plan even

7  represents an excellent outcome relatively speaking under

8  the circumstances for all of the parties.  And I'm glad that

9  we were able to get all of the parties to make the

10  contributions and concessions they were able to make.

11          I also would like to thank Mr. Fallquist and

12  Mr. Bhullar, who are on the phone.  Their efforts as well as

13  the efforts of their members of management and the board,

14  they really worked tirelessly to try to make sure that this

15  company is wound down in the right way.  And obviously they

16  could've put the company in Chapter 7 but they didn't think

17  that that was appropriate.  And so I just wanted to thank

18  them as well.  So thank you.

19          THE COURT:  Thank you, Ms. Spigel.  I actually

20  don't think I did very much except let you guys figure out

21  how to solve this problem.  And hopefully I was able to

22  accommodate your needs in that regard, and you all did.

23  It's a big problem for the State, big problem for our

24  citizens.  It's important we get it resolved.  I appreciate

25  the hard work that everyone did.

1          Does anyone have anything else that we should

2   cover today or any other comments that need to be said on

3   the record?  Otherwise I'm going to adjourn and let you go

4   see your families.

5          MS. SPIGEL:  Thank you.

6          MR. GIBBS:  Thank you, Judge.

7          THE COURT:  Mr. Gibbs, did you have something you

8   wanted to say?

9          MR. GIBBS:  Oh, nothing, Your Honor.  I apologize.

10  I just said thank you.

11         THE COURT:  Oh, thank you, sir.

12         All right.  We're in adjournment.  Thank you.

13      (The parties thank the Court.)

14      (Proceeding adjourned at 4:59 p.m.)

15                          *  *  *  *  *

16         *I certify that the foregoing is a correct*

17  *transcript to the best of my ability due to the condition of*

18  *the electronic sound recording of the ZOOM/telephonic*

19  *proceedings in the above-entitled matter.*

20  */S/ MARY D. HENRY*

21  *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

22  *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

23  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

24  *JTT TRANSCRIPT #64241*

25  *DATE FILED:  JULY 9, 2021*