## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **GRIDDY ENERGY LLC,** | § | |
| | § | **Case No. 21-30923(MI)** |
| Debtor. | § | |
| | § | |
| | § | |

| | | |
|---|---|---|
| **RUSSELL F. NELMS, in his capacity as** | § | |
| **Plan Administrator of the Estate of** | § | |
| **GRIDDY ENERGY LLC,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Adversary No. _____** |
| | § | |
| **ELECTRIC RELIABILITY COUNCIL** | § | |
| **OF TEXAS, INC.,** | § | |
| | § | |
| Defendant, | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

**SBAITI & COMPANY PLLC**

Mazin A. Sbaiti, Esq.
Kevin N. Colquitt, Esq.
Griffin S. Rubin, Esq.
2200 Ross Avenue, Suite 4900W
Dallas, Texas 75201
T: (214) 432-2899
F: (214) 853-4367

***COUNSEL FOR PLAINTIFF***

# I.

## SUMMARY OF THE CASE

Russell F. Nelms, in his capacity as plan administrator of Griddy Energy LLC ("Griddy" or "Plaintiff"), via undersigned counsel, respectfully files this Original Complaint against the Electric Reliability Council of Texas, Inc. ("ERCOT") and alleges as follows:

This case arises from Winter Storm Uri ("Uri") and its aftermath. ERCOT operates Texas's electrical grid, the Ercot Interconnection, which supplies power to more than 25 million Texas customers and represents 90 percent of the state's electric load. Because Texas was left vulnerable to winter-storm-triggered supply collapses, ERCOT, despite decades of warnings, found itself needing to manage an emergency of its own creation because it lacked a plan for managing the demand spikes and supply shocks.

When Uri struck Texas, ERCOT implemented rolling blackouts and caused the price of electricity to spike to $9,000 per megawatt-hour (MWh)—an approximately 300 times increase overnight. This anemic attempt to use price as a means to shrink inelastic demand failed miserably and heaped punishment upon tragedy. While millions of Texans went without power, over a hundred of whom died, millions more—Griddy and its customers among them—bore the storm without heat or power *and* were saddled with absurdly inflated electric bills.

Griddy served as a Retail Electric Provider, purchasing electricity from ERCOT and through-putting it to retail customers for a flat $9.99 monthly subscription fee plus the wholesale cost of electricity. Griddy invested years of time and tens of millions of dollars in a successful system to accrue customers, and in technology and rights to be able to offer low-cost electricity in this deregulated market. ERCOT's Standard Form Market Participant Agreement ("SFA") allowed ERCOT to raise the price of electricity on Griddy and its customers, but only by following specific Protocols. ERCOT did not follow those Protocols, and the order it relied on failed to meet the strictures of the Texas APA.

The inflated electricity price was devoid of reason and process and was sustained longer than necessary—33 hours *after* the emergency had subsided and after any order, even had one been legitimately inacted, lost its effectiveness. After that, ERCOT sought to collect its $32+ million bill for power from Griddy. And when Griddy could not make good on the bill within three days, ERCOT terminated its SFA with Griddy, putting Griddy out of business. Griddy's customers were taken away for no compensation and given to other providers.

ERCOT's actions were in breach of the SFA's plain language and the Protocols. In addition to raising the price of electricity and destroying a business that had tens of millions invested in it, ERCOT gouged Griddy's creditors. Griddy paid ERCOT approximately $3 million in the days after the storm, but, even so, ERCOT  asserts in its proof of claim that Griddy still owes a balance of $29,913,799.84.

Thus, Griddy files this Complaint to recover these preferences and fraudulent transfers, to disallow ERCOT's claim(s) in this bankruptcy on legal and equitable grounds, and to recover for breach of contract, negligence, negligence *per se*, and/or unjust enrichment.

## II.

## PARTIES

1.      The Plaintiff is Griddy Energy, LLC, as administrated by its court-appointed administrator, Russell F. Nelms. On July 7, 2021, the Court entered its order confirming the Modified Third Amended Plan of Liquidation for Griddy Energy LLC under Chapter 11 of the Bankruptcy Code (the "Plan"). Pursuant to the Plan, Nelms became the sole member of Griddy and was appointed its plan administrator. Under the Plan, Nelms is to take all steps reasonably necessary to effectuate and fulfill the provisions of the Plan,. which includes pursuing all claims or causes of action held by Griddy or its estate.

2.      Defendant Electric Reliability Council of Texas, Inc.  ("ERCOT") is a Texas corporation. ERCOT has already appeared in this Court and submitted to the personal and subject matter jurisdiction

of this court by filing a proof of claim in this case. Accordingly, ERCOT may be served with process by serving its counsel of record, Deborah M. Perry, Munsch Hardt Kopf & Harr P.C., 500 North Akard Street, Suite 3800, Dallas, Texas 75201.

## III.

## JURISDICTION

3.      This Court has general subject matter jurisdiction over all claims and causes of action herein pursuant to 28 U.S.C. § 1334.

4.      In Count 1, Plaintiff seeks to disallow ERCOTS's proof of claim. This Court has core jurisdiction over this objection pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (O).

5.      In Count 2, Plaintiff seeks to disallow ERCOT's claim for administrative expense priority under 11 U.S.C. § 503(b)(9). This Court has core jurisdiction over this request pursuant to 28 U.S.C. § 157 (b)(2)(A), (B) and (O).

6.      In Count 3, Plaintiff sues ERCOT to avoid and recover a preference under 11 U.S.C. §§ 547 and 550. This Court has core jurisdiction over this count under 28 U.S.C. § 157 (b)(2)(C) and (F).

7.      In Counts 4 and 5, Plaintiff asserts claims against ERCOT for fraudulent transfers under 11 U.S.C. §§ 548 and 550. This Court exercises core jurisdiction over these claims pursuant to 28 U.S.C. § 157(b)(2)(C) and (H).

8.      In Count 6, Plaintiff sues ERCOT for breach of contract under the SFA. Because the facts necessary to resolve this claim are the same as those necessary to resolve Plaintiff's challenge to ERCOT's proof of claim, this Court has core jurisdiction over this claim and/or the issues raised therein pursuant to 28 U.S.C. § 157 (b)(2)(A), (B), (C) and (O).

9.      In Count 7, Plaintiff sues ERCOT for negligence/negligence per se, Because the facts necessary to resolve these claims are the same as those necessary to resolve Plaintiff's challenge to

ERCOT's proof of claim, this Court exercises core jurisdiction over this claim pursuant to 11 U.S.C. § 157(b)(2)(A), (B), (C) and (O).

10.     In Count 8, Plaintiff asks this Court to disallow ERCOT's claim under 11 U.S.C. § 502(d) until such time as ERCOT has purged itself of the fruits of the preference and the fraudulent transfers sought to be avoided. This Court exercises core jurisdiction over this claim pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (O).

11.     In Count 9, Plaintiff asks this Court to otherwise equitably subordinate the claim of ERCOT pursuant to 11 U.S.C. § 510(c). This Court has jurisdiction over this request pursuant to 28 U.S.C. §§ 157(b)(2)(A), (C), and (O).

12.     In Count 10, Plaintiff seeks restitution of payments made under a theory of disgorgement and/or unjust enrichment. Because the facts necessary to resolve this claim are the same as those necessary to resolve Plaintiff's challenge to ERCOT's proof of claim, this Court has core jurisdiction over this claim and/or the issues raised therein pursuant to 28 U.S.C. § 157 (b)(2)(A), (B), (C) and (O).

13.     To the extent the Court determines that any claim alleged as core by Plaintiff is not core, Plaintiff consents to this Court's right to hear, determine, and enter final orders with respect to such claim.

**IV.**

**<u>VENUE</u>**

14.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

**V.**

**<u>BACKGROUND FACTS</u>**

**The ERCOT Interconnection**

15.     There are three power grids in the 48 contiguous states: the Eastern Interconnection, the Western Interconnection, and the ERCOT Interconnection. Most, but not all, of Texas is in the ERCOT

Interconnection.

16.     On January 1, 2002, Texas implemented a competitive retail electric market to allow retail customers to choose their provider of electricity and encourage full and fair competition among all providers of electricity.

17.     ERCOT now oversees the operation of the majority of the state:



18.     The ERCOT Interconnection is supposed to be a deregulated market.

19.     Like all grids, the ERCOT Interconnection has three key components:

> (a) power generators that generate electricity, including coal plants, gas plants, wind farms, solar facilities, and nuclear plants;
>
> (b) transmission systems that carry electricity long distances from generators to electrical substations; and

> (c) distribution systems that deliver electricity from substations to consumers. ERCOT is the independent system operator for all generation and transmission facilities within the ERCOT Interconnection.

*Additionally*, ERCOT performs financial settlements for buyers and sellers in the Texas market.

### Griddy's Role in the ERCOT Market

20.     Griddy was a Retail Electric Provider ("REP") in Texas.

21.     In order to be a REP, Griddy was required to procure approval of its business plan by the Public Utility Commission of Texas (the "PUCT").

22.     Griddy procured that approval in 2016 and successfully operated as a REP until the unprecedented and unlawful actions of ERCOT from February 15 to February 19, 2021.

23.     Griddy's business plan was simple and straightforward.

24.     For a monthly subscription fee of $9.99, Griddy's customers gained access to electricity at wholesale pass-through rates. In order to do so, Griddy's customers linked credit cards or debit cards to their accounts.

25.     Customers maintained certain balances in their accounts to pay for electricity and their cards were charged or debited when the balances fell below certain thresholds.

### ERCOT Ignored the Warnings—Winter Storm Uri

26.     Winter Storm Uri began rolling across North and Central Texas on February 11, 2021,[1] bringing with it freezing rain and drizzle that coated North and Central Texas, causing up to one-half inch of ice accumulation in some locations. Snow later followed on February 14-17, with five inches recorded at Dallas-Fort Worth (DFW) International Airport.

27.     Winter Storm Uri led to deaths, freezing homes, property damage, and the like, not because of the cold, but because of the loss of power and the reactions to the insufficient supply of electricity. Uri

---

[1] Unless otherwise noted, the facts alleged herein occurred in 2021.

was certainly beyond the reasonable control of Griddy and was not due to any fault or negligence on Griddy's part.

28.     But the story of Winter Storm Uri began well before 2021.

29.     Upon information and belief, ERCOT was warned repeatedly by federal regulators and others that the Texas grid needed winterization to withstand a storm such as Uri.

30.     For example, as early as 1989, freezing rain and wind caused power failures across the state which led to a federal study that spelled out exactly how to avoid such a disaster in the future by winterizing equipment so that it would not fail or freeze.

31.     In 2011, after arctic weather hit Texas and the Texas grid was stressed, the Federal Energy Regulatory Commission (FERC) produced another report that warned Texas power companies and regulators again that they had to winterize their equipment or there would continue to be shortfalls in supply as demand was foreseeably increasing. It concluded that "[t]he single largest problem during the cold weather event was the freezing of instrumentation and equipment."

32.     ERCOT knew that plans were needed to manage the eventualities brought about by the storm. Up-to-date impact studies authorized under the Protocols apparently were never performed, leaving ERCOT to manage the events of Uri, apparently flying by the seat of its pants.

33.     In the early days of Uri, on February 12, Texas Governor Greg Abbott declared a state of disaster in all 254 Texas counties. On February 13, electricity generators began experiencing excessive load leading to outages, and on February 14, ERCOT recognized that power generation could not be increased to meet demand and began random blackouts.

34.     On February 15, ERCOT issued a declaration of emergency.

35.     In an electric grid, supply and demand are not just economic forces; they must physically be balanced in order to avoid grid collapse. A grid based on alternating current (such as that of Texas)

must sustain a frequency within a range of 60 Hz in order to maintain stability. In the early morning hours of February 15, the ERCOT Interconnection fell below 59.4 Hz for more than four minutes. In order to maintain grid stability, ERCOT implemented rolling blackouts, which in industry parlance is referred to



as "shedding load." The blackout looked like this:[2]

36.     Under normal circumstances, the price of electricity in Texas ranges from $20 to $50/MWh. As of February 15, energy prices had risen, but not to anywhere near the levels that would eventually be set by ERCOT. According to ERCOT, market prices were failing to account for scarcity. ERCOT believed that the problem amounted to a market failure—i.e., the market price was not reacting to the degree of increased demand and scarce supply, and demand was not declining fast enough in

---

[2]  Graphic source: PowerOutage.us.

response to market price increases.[3]

37.     On February 16-17, at least 4.5 million people in Texas were without power.

38.     Thus, ERCOT requested that its governing body, the PUCT, address this perceived "distortion" by directing ERCOT to set the price of electricity at $9,000/MWh. Upon information and belief, this was unsupported by an impact study or any other actual scientific or robust economic analysis performed at the time.

39.     ERCOT drafted for the PUCT an order finding that energy prices that cleared at less than $9,000/MWh were "inconsistent with the fundamental design of the ERCOT market." The draft order concluded that "if customer load is being shed, scarcity is at its maximum, and the market price for the energy needed to serve that load should also be at its highest." Accordingly, the proposed order purported to direct ERCOT to ensure that firm load shed was accounted for in its scarcity pricing signals.

40.     In an open meeting on February 15, the PUCT met to discuss ERCOT's proposed order. In a meeting that lasted only a few minutes and involved almost no actual deliberations, the PUCT voted to adopt the order sent to it by ERCOT. The order not only implemented the $9,000/MWh price for electricity going forward but made the pricing retroactive to the commencement of firm load shed.

41.     On February 16, the PUCT met again, but only to modify its prior order by eliminating retroactive pricing. The PUCT's orders are referred to hereafter as the "Rate-Setting Orders" or the "Orders".

42.     Upon information and belief, on the evening of February 17, DeAnn Walker, the chair of the PUCT, met with certain members of ERCOT. Ms. Walker reported that she had spoken with Governor Abbott, who expressed his strong desire to see the blackouts end and, once ended, not to be reinstated. In

---

[3] This misperception plainly did not take into account the circumstances that led to extreme price inelasticity—i.e., the freezing cold entailed the need for homeowners to stay home, and thus run their heating systems to keep their homes warm, and thus necessitated the demand for electricity notwithstanding escalating prices.

response to Ms. Walker's report on the Governor's position, ERCOT ceased firm load shed (rolling blackouts) shortly after midnight on February 18.

43.     Because the $9,000/MWh price was tied to firm load shed, and no load shed occurred after midnight on February 18, no PUCT directive authorized or directed the $9,000/MWh price to continue after that time.

44.     Nevertheless, ERCOT left the $9,000/MWh price in effect for 33 more hours. When ERCOT finally lifted the $9,000/MWh set price (thus allowing the market to be the free market it was designed to be), the price of electricity immediately fell to $27/MWh. Upon information and belief, a majority of the charges made to Griddy by ERCOT that Griddy was unable to pay were incurred during this period—the bill for that period of time should have been 0.3% of what it ultimately was.

**The $9,000/MWh Price Destroys Griddy's Business**

45.      ERCOT's imposition and maintenance of the $9,000/MWh price rendered Griddy insolvent. Under Griddy's business model, Griddy billed customers $9.99 per month for a subscription fee which gave customers direct access to electricity at the wholesale market rate. Griddy's subscription charge did not fluctuate with the price of electricity.

46.     When Griddy's customers were charged the $9,000/MWh rate, many—if not most—customers could not afford to pay Griddy. Others simply refused to pay Griddy.

47.      From February 16 to February 24, ERCOT demanded additional collateral from Griddy in the amount of approximatelyt $3.2 million and payment of settlement invoices in the amount of approximately $30 million. Griddy could not meet these demands.

48.     The $9,000/MWh affected the amount Griddy owed ERCOT and, in turn, Griddy's ability to collect from its customers. On February 22, ERCOT sent Griddy a notice of material breach of the SFA, alleging that Griddy had failed to pay outstanding settlement invoices and to provide additional collateral.

ERCOT collected $3,088,547.28 from Griddy, but Griddy was unable to pay the rest or provide the additional collateral demanded by ERCOT.

49.     On February 26, based upon an emergency that was wholly of ERCOT's own making, ERCOT terminated the SFA, revoked Griddy's rights as a market participant, and then initiated a mass transition of Griddy's customers to POLRs.

50.     ERCOT's actions on February 26 were the nails in Griddy's coffin. A company that had been thriving as of February 14 was now a business in name only. Its customers not only were gone but many were suing Griddy. Its bank account had been depleted. Its rights to participate in the Texas market had been revoked. ERCOT alone asserted a claim against Griddy for over $29 million.

51.     Moreover, Griddy had a $15 million borrowing capacity agreement with Macquarie Investment US Inc. ("Macquarie"). In connection with that agreement Griddy agreed to purchase energy from Macquarie Energy LLC ("Macquarie Energy") also on standard market terms. On February 17, Macquarie suspended all further lending to Griddy.

52.     The next day, Macquarie took control of all of Griddy's bank accounts in order to secure payment of the amounts that Griddy owed to Macquarie. Between February 23 and March 5, Macquarie drew $14,970,275.74 from Griddy's accounts in order to satisfy the amounts Griddy owed to Macquarie Energy for physical electricity delivered by Macquarie Energy.

53.     Griddy filed for bankruptcy on March 15. From the beginning there was little to reorganize. Liquidation was the only option. On July 23, Bankruptcy Judge Marvin Isgur confirmed Griddy's plan of liquidation.

54.     Pursuant to the order confirming the Plan, Plaintiff was appointed plan administrator. Plaintiff is charged with the responsibility of pursuing claims that will chiefly benefit the thousands of Griddy customers who suffered economic damages as a result of the actions delineated in this Complaint.

### ERCOT's Proof of Claim

55.     On April 28, 2021, ERCOT filed claim number 4555 in Griddy's bankruptcy case.

56.     In its proof of claim, ERCOT alleges damages in the amount of $29,913,799.84 for the amounts it alleges remain unpaid under the SFA between Griddy and ERCOT.

57.     The SFA establishes the terms and conditions by which ERCOT and Griddy discharge their respective duties and responsibilities under the ERCOT Protocols. The Protocols are voluminous materials that contain policies, rules and procedures that govern the relationship between Griddy and ERCOT.

### ERCOT Violated the SFA and the Protocols

58.     Under the SFA, Griddy and ERCOT agreed to "comply with, and be bound by, all ERCOT Protocols." SFA at §§ 5(A) and 6(A).

59.     The Protocols governing the pricing of wholesale energy in the ERCOT Interconnection included a "scarcity pricing" mechanism that is designed to allow prices to increase up to a maximum allowable rate of up to $9,000/MWh under certain circumstances and only in extremely rare periods.

60.     The mechanism relating to scarcity conditions was Protocol 6.5.7.3.1 (2021), *Determination of Real-Time On-Line Reliability Deployment Price Adder*. This protocol set forth a set of shortage-related factors that impact scarcity pricing.

61.     Under the ERCOT Protocols in effect at the time of Winter Storm Uri, firm load shed was <u>not</u> included among the scarcity pricing triggers. *See* Protocol 6.5.7.3.1 (2021). In other words, the existence of firm load shed was not a basis for ERCOT to increase price on its own. Nevertheless, ERCOT manipulated the operation of the Real-Time Reliability Deployment Price Adder process by making firm load shed a scarcity pricing trigger.

62.     By manipulating the Real-Time Reliability Deployment Price Adder, ERCOT set the real time price of energy at $9,000/MWh. While the price calculation methodology in the ERCOT Protocols

can be changed, both the SFA and Protocols require that a specific change process be followed for the change to be effective as to Griddy. *See, e.g.,* Protocol §§ 21.4 and 21.5. ERCOT did not follow these protocol change processes.

63.     Instead, it ignored the terms of the SFA and the pricing process set forth in the Protocols when it set the price for energy at the system-wide offer cap of $9,000/MWh. As a result, Griddy and its customers were charged millions of dollars more than authorized under the SFA and the Protocols.

64.     In order to seek cover for its manual manipulation of pricing signals, ERCOT asked the PUCT to order it to take firm load shed into account as a scarcity signal, thus acknowledging that it alone had no such authority. ERCOT included that in the Rate-Setting Orders.

65.     Although the PUCT agreed to this request, to the extent that the PUCT is considered a state agency, the Rate-Setting Orders never became effective, thus depriving ERCOT of the cover it sought.

66.     A Rate-Setting Order is a "rule" under the Texas Administrative Procedures Act (the "APA"). Each such order is a "state agency statement of general applicability that: (i) implement[ed], interpret[ed], or prescrib[ed] law or policy, or (ii) describe[d] the procedure or practice requirements of a state agency," which included "the amendment or repeal of a prior rule." Tex. Gov't. Code § 2001.003(6)(A), (B). As such, the PUCT was required to index the proposed order and be open to public comment (*id.* at § 2001.005 and § 2001-028 - .029) and file the Orders with the Texas Secretary of State. *Id.* § 2001.036. The Orders could only "take effect" after such filing. *Id.*

67.     The PUCT did not expressly declare that the circumstances were necessary for utilizing the emergency rulemaking procedures available to it. Therefore, it cannot be excused from the notice and comment period required under the Texas APA. Moreover, neither the PUCT nor ERCOT followed the emergency rulemaking procedure under the APA for making the Orders emergency orders. And in any event, such procedures also require the filing of an emergency rule with the Secretary of State in order for

it to become effective. *Id.* § 2001.034(d).

68.     Because the PUCT never followed the applicable rulemaking procedures and never filed the Orders with the Texas Secretary of State, the Rate-Setting Orders never became effective.

69.     Furthermore, no contract provision, no order and no regulation authorized ERCOT to use firm load shed as a scarcity signal in its pricing mechanism.

70.     Thus, the $9,000/MWh price was not properly authorized and was contrary to the SFA.

71.     In the alternative, even if the Orders were to be construed as "not generally applicable and instead pertain[ed] only to internal agency management, " as the PUCT has argued, then they were binding only on ERCOT, and did not direct any marked participant, such as Griddy, "to do anything," nor were they "self-executing statements applicable to market participants that 'electricity will be automatically priced at the $9,000 system-wide offer cap.'"[4]

72.     Even if the Orders were construed as directives to ERCOT from PUCT (which they should not be) instead of rules that never took effect (which they are), ERCOT was still obligated under the SFA to implement the Orders in a manner consistent with Griddy's rights under the SFA and the Protocols. ERCOT did not comply with those obligations.

73.     ERCOT did not follow the change procedures set forth in the Protocols. *See, e.g.,* Protocol §§ 21.4 and 21.5, and is not excused from following them.

74.     Moreover, even assuming that the Orders were effective as rules or directives (which they were not) and that ERCOT had the authority to implement them without following the proper protocol change procedures (which it did not), ERCOT left the $9,000/MWh price in place for an additional 33 hours from 12:00 a.m. on February 18, until 9:00 a.m. on February 19, when firm load shed was no longer

---

[4] Brief of Appellee PUCT, *Luminant Energy Company, LLC v. Public Utility Commission of Texas* (No. 03-21-00098-CV), Texas Third Court of Appeals, September 2, 2021 at pp. 23-24.

in place and, as such, no rule or directive authorized that price.

75.      Despite having been notified and disputations being lodged with respect to the pricing error relating to the last 33 hours, ERCOT refused to take any action to review the price charged to Griddy after load shed ceased. Although ERCOT was asked to and had the authority to reprice the $9,000/MWh charges within 30 days of the relevant operating days when the charges were assessed (*see* Protocol 6.3(6)), it refused to do so. Thus, any further request, demand or challenge was deemed futile.

## VI.

## CAUSES OF ACTION

### -FIRST CAUSE OF ACTION-
### Disallowance of ERCOT's Proof of Claim

76.      Plaintiff incorporates the factual allegations in this Complaint as if fully set forth herein.

77.      ERCOT's claim is based upon Griddy's alleged breach of the SFA.

78.      ERCOT materially breached the SFA (and, hence, the Protocols) by:

(a) requiring that "firm load that [was] being shed in EEA3 [was] accounted for in ERCOT's scarcity pricing signals," thus giving rise to an anti-competitive set price of $9,000/MWh on and after February 15, 2021;

(b) maintaining the $9,000/MWh set price for 33 hours after firm load shed had ceased and no PUCT order authorized or directed such price; and/or

(c) failing to mitigate its damages by refusing to permit the free market to set the price of electricity between February 15, 2021, and February 19, 2021, and failing to reprice the cost of electricity after February 19, 2021.

ERCOT's charging the amounts at $9000/MWh was a material violation of the Protocols and the SFA, and therefore, ERCOT cannot demonstrate its entitlement to said amounts.

79.      ERCOT's material breach of the SFA disentitled it to collect on the additional fees charged for electricity, rendered Griddy's performance under the SFA impossible, and as such excused any alleged

breach by Griddy since it was prevented from performing under the contract.[5]

80.     Accordingly, ERCOT's claim should be disallowed in full.

## -SECOND CAUSE OF ACTION-
### Disallowance of ERCOT's Administrative Claim

81.     Plaintiff incorporates the allegations in this Complaint as if fully set forth herein in support of this cause of action.

82.     In its proof of claim, ERCOT alleges that $33,412.15 of its claim is entitled to administrative priority under 11 U.S.C. § 503(b)(9).

83.     Plaintiff objects to this claim for the reasons set forth in the First Cause of Action.

84.     Additionally, ERCOT's claim is not entitled to administrative priority under section 503(b)(9) because: (a) the value sought by ERCOT is not reasonable; (b) electricity is not a "good;" and (c) due to the circumstances described herein, electricity was not sold to Griddy in the ordinary course of its business.

85.     Therefore, Plaintiff respectfully prays that the Court disallow ERCOT's administrative claim.

## -THIRD CAUSE OF ACTION-
### Avoidance of Preference

86.     Plaintiff incorporates the allegations in this Complaint as if fully set forth herein in support of this cause of action.

87.     Between February 17 and February 22, 2021, Griddy paid ERCOT $3,088,547.28.

88.     The payments were made due to an antecedent debt owed by Griddy before the transfers were made.

---

[5] *See Tacon Mech. Contractors, Inc. v. Grant Sheet Metal, Inc.*, 889 S.W.2d 666, 670 (Tex. App.—Houston [14th Dist.] 1994, writ denied); *see also S.K.Y. Inv. Corp. v. H.E. Butt Grocery Co.*, 440 S.W.2d 885, 889–90 (Tex. Civ. App.—Corpus Christi 1969, no writ).

89.     Griddy was insolvent when the transfers were made.

90.     The transfers were made within 90 days before Griddy's petition in bankruptcy.

91.     The transfers enabled ERCOT to receive more than it would have received if (a) Griddy's case was a case under Chapter 7, (b) the transfers had not been made, and (c) ERCOT had received payment of its debt to the extent provided by Title 11 U.S.C.

92.     The Court should avoid the transfers pursuant to 11 U.S.C. § 547 and direct their recovery by Plaintiff under 11 U.S.C. § 550(a).

93.     Griddy thus respectfully seeks the immediate return of such funds under these laws and any other applicable law and/or equitable principals.

**-FOURTH CAUSE OF ACTION-**
**Avoidance of Fraudulent Transfer of an Obligation**

94.     Plaintiff incorporates the allegations in this Complaint as if fully set forth herein in support of this cause of action.

95.     ERCOT's implementation of the $9,000/MWh price rendered Griddy insolvent.

96.     Alternatively, on and after February 15, 2021, Griddy was engaged in a business or transaction for which any property remaining with Griddy was an unreasonably small capital.

97.     Any and all obligations of Griddy to ERCOT after the implementation of $9,000/MWh price were incurred for less than a reasonably equivalent value.

98.     Accordingly, pursuant to 11 U.S.C. § 548(a)(1), the Court should avoid the obligation to pay all amounts allegedly owed to ERCOT after implementation of the $9,000/MWh set price.

99.     Griddy respectfully seeks to avoid such fraudulent transfers under federal fraudulent transfer statutes, and to avoid unjust enrichment.

### -FIFTH CAUSE OF ACTION-
### Avoidance of Fraudulent Transfer of Money

100.     Plaintiff incorporates the allegations in this Complaint as if fully set forth herein in support of this cause of action.

101.     Between February 17 and February 22, 2021, Griddy paid ERCOT $3,088,547.28. Griddy received less than a reasonably equivalent value for these payments. Griddy was insolvent on the date the transfers were made.

102.     Alternatively, Griddy was engaged in a business or transaction for which any property remaining with Griddy was an unreasonably small capital. The transfers should be avoided under 11 U.S.C. § 548(a)(1), and the Court should order their recovery pursuant to 11 U.S.C. § 550(a).

103.     Griddy respectfully seeks to avoid such fraudulent transfers under federal fraudulent transfer statutes, and to avoid unjust enrichment, and thus respectfully seeks the immediate return of such funds under these laws and any other applicable legal or equitable principals.

### -SIXTH CAUSE OF ACTION-
### Affirmative Recovery for Breach of Contract

104.     Plaintiff incorporates the allegations in this Complaint as if fully set forth herein in support of this cause of action.

105.     As set forth in Plaintiff's First Cause of Action, ERCOT entered into the SFA with Plaintiff.

106.     ERCOT materially breached the SFA (and, hence, the Protocols) by:

> (a) operating without proper authorization and requiring that "firm load that [was] being shed in EEA3 [was] accounted for in ERCOT's scarcity pricing signals," thus giving rise to an anti-competitive set price of $9,000/MWh on and after February 15, 2021;

> (b) maintaining the $9,000/MWh set price for 33 hours after firm load shed had ceased and no PUCT order authorized or directed such price;

> (c) failing to mitigate its damages by refusing to permit the free market to set the price of electricity between February 15, 2021, and February 19, 2021, and

failing to reprice the cost of electricity after February 19, 2021; and/or

(d) treating Griddy's failure to pay as a default under the SFA and using that as a pretext for terminating Griddy's business and transferring its customers to other providers.

107.    None of the foregoing events would have occurred but for Winter Storm Uri and ERCOT's handling of it.

108.    ERCOT materially breached the SFA by raising the price of electricity to $9,000/MWh, failing to reprice the electricity even after the emergency passed, and then terminating Griddy and ending its business. These breaches are even more egregious given that Uri was a winter storm and was outside the reasonable control of Griddy and was not due to Griddy's fault or negligence.

109.    ERCOT's breach(es) destroyed Griddy's business, caused its bankruptcy, caused it to lose all of its customers and business, and, thus, damaged Griddy in the amount of the loss of its going-concern value as a business.

110.    Plaintiff respectfully seeks the entry of judgment against ERCOT for all such amounts.

## -SEVENTH CAUSE OF ACTION-
### Negligence

111.    Plaintiff incorporates the allegations in this Complaint as if fully set forth herein in support of this cause of action.

112.    ERCOT had a duty to manage the grid properly and to "authorize or order competitive rather than regulatory methods to achieve the goals of [a competitive market] to the greatest extent feasible and adopt rules and issue orders that are both practical and limited so as to impose the least impact on competition." Tex. Util. Code § 39.001(d).

113.    By implementing anti-competitive market pricing from February 15 to February 19, 2021—and particularly from February 18 to February 19, 2021, when no PUCT order or other protocol that purported to authorize such actions—ERCOT violated its duty of care to Griddy.

114.   ERCOT's actions, at minimum, constituted negligence or negligence per se.

115.   ERCOT's actions proximately caused the destruction of Griddy's business, which destruction was reasonably foreseeable.

116.   Griddy was damaged in the amount of the excess paid for electricity to ERCOT and to Macquarie, and for the loss of its going-concern value as a business. Griddy seeks recovery of these losses.

## -EIGHTH CAUSE OF ACTION-
### Disallowance of Claim Under 11 U.S.C. § 502(d)

117.   Plaintiff incorporates the allegations in this Complaint as if fully set forth herein in support of this cause of action.

118.   ERCOT is liable to Griddy pursuant to 11 U.S.C. §§ 547 and 548.

119.   Griddy is entitled to recover from ERCOT under 11 U.S.C. § 550.

120.   The Court should disallow ERCOT's claim pursuant to 11 U.S.C. § 502(d) until the time that ERCOT has paid to Griddy the amounts owed to Griddy under sections 547 and 548.

## -NINTH CAUSE OF ACTION-
### Equitable Subordination of Claim Under 11 U.S.C. § 510(c)

121.   Plaintiff incorporates the allegations in this Complaint as if fully set forth herein in support of this cause of action.

122.   By its unlawful and inequitable conduct, ERCOT precipitated Griddy's collapse. ERCOT's actions gave rise to the thousands of claims against Griddy, as well as its inability to satisfy those claims, causing Griddy's insolvency.

123.   Equity would not be served by permitting ERCOT to share pari-passu in any distribution to creditors who are only creditors due to ERCOT's actions.

124.   To the extent that ERCOT has any allowable claim in this case, that claim should be equitably subordinated to the claims of all other creditors pursuant to 11 U.S.C. § 510(c).

## -TENTH CAUSE OF ACTION-
### Unjust Enrichment/Assumpsit/Money Had and Received

125.     Plaintiff incorporates the foregoing allegations in this Complaint as if fully set forth herein in support of this cause of action.

126.     In the event that this Court determines that no contract governs the return of moneys paid directly or indirectly to ERCOT by Griddy, where said amounts were the result of unauthorized pricing by ERCOT or due to ERCOT's conduct, then Plaintiff respectfully seeks restitution and/or disgorgement of said moneys under a theory of unjust enrichment, assumpsit, and/or money had and received.

127.     ERCOT wrongfully obtained such funds, and it would be unjust for ERCOT to retain them, and its refusal to restore them to Plaintiff is unjust enrichment.

## -CONDITIONS PRECEDENT-

128.     All conditions precedent to suit, if any, have been satisfied or waived.

## VII.

## PRAYER FOR RELIEF

Plaintiff asks that the Court enter judgment in favor of Plaintiff on the grounds and in the amounts to be found by the trier of fact, and that Plaintiff be granted all other relief in law or in equity to which Plaintiff is justly entitled, including, but not limited to, statutory, contractual, actual or exemplary damages, injunctive relief, constructive trust, and/or reasonable attorneys' fees and costs, and pre- and post- judgment interest, and all such relief to which Plaintiff may be entitled under equity, the common law or federal or state statute.

Dated: November 3, 2022                    Respectfully submitted,

                                           **SBAITI & COMPANY, PLLC**

                                           _/s/ Mazin A. Sbaiti_
                                           Mazin A. Sbaiti
                                             Texas Bar No. 24058096
                                             MAS@SbaitiLaw.com
                                           Kevin N. Colquitt
                                             Texas Bar No. 24072047
                                             KNC@SbaitiLaw.com
                                           Griffin Rubin
                                             Texas Bar No. 24121809
                                             GSR@SbaitiLaw.com
                                           2200 Ross Avenue, Suite 4900
                                           Dallas, Texas 75201
                                           T: (214) 432-2899
                                           F: (214) 853-4367

                                           _**COUNSEL FOR PLAINTIFF**_